**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| DANIEL GRAND, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF UNIVERSITY HEIGHTS, OHIO, | ) | |
| | ) | Civil Case No. |
| *Defendant,* | ) | |
| | ) | |
| and | ) | |
| | ) | **COMPLAINT** |
| MICHAEL DYLAN BRENNAN | | |
| In his official and individual capacity | ) | |
| | ) | |
| *Defendant,* | ) | |
| | ) | |
| and | ) | |
| | ) | |
| JEFFREY PORTER | ) | |
| | ) | |
| *Defendant.* | ) | |

Plaintiff DANIEL GRAND, by and through his attorney, Jonathan Gross, respectfully alleges as follows:

**INTRODUCTION AND NATURE OF THE ACTION**

1.      Plaintiff Daniel Grand files this action to redress violations of his civil rights caused by the City of University Heights, Ohio and its mayor, Michael Dylan Brennan.

2.      In January of 2021, Grand invited a few of his friends to pray in the privacy of his residential home in University Heights, but the mayor has stated both privately to Grand and

publicly at official meetings that prayer groups like the one that Grand wished to form are forbidden by the University Heights Codified Ordinances (the "UHCO") without first obtaining a Special Use Permit.  Accordingly, for over a year and a half, Grand has been prevented from exercising his fundamental First Amendment right to free exercise of his religion.

3.      Since Grand moved into his home in 2019, he experienced discrimination based on his religion. After Grand's invitation for friends to join him in Orthodox Jewish prayer in January of 2021, the City, led by its mayor, waged a zealous campaign of capricious enforcement of its local ordinances specifically targeting Grand and several other Orthodox Jewish prayer groups. This campaign is directly responsive to a hostile segment of the mayor's constituency that seeks to prevent the growth of the City's Orthodox Jewish population by limiting the locations where Orthodox Jews can pray.

4.      Additionally, the City has targeted Grand individually for intentional, arbitrary, and discriminatory application of its ordinances that have caused him substantial injuries.

5.      This action challenges certain provisions of the UHCO that the United States Constitution, the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc, *et seq.* ("RLUIPA"), the Ohio Constitution, and Ohio common law.

6.      The action also challenges the discriminatory application of its laws against Grand, and seeks compensation of the resulting damages and attorney's fees.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1343(3), (4), 42 U.S.C. § 2000cc, et seq., 18 U.S.C. § 248, and 42 U.S.C. § 1983, which confer original jurisdiction on federal district courts in suits to redress the deprivation of

rights, privileges and immunities secured by the laws and Constitution of the United States. This Court has supplemental jurisdiction over all state law claims under 28 U.S.C. § 1367(a).

8.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because the acts and transactions complained of occurred, and continue to occur, in this District.


## PARTIES

9.    Plaintiff DANIEL GRAND (hereinafter "Grand" or "Plaintiff") is and was an adult citizen of the State of Ohio, and at all times relevant to this action resided at 2343 Miramar Blvd., University Heights, Ohio, 44118 (hereinafter the "Property").

10.    Defendant CITY OF UNIVERSITY HEIGHTS, OHIO (hereinafter the "City") is a chartered municipal corporation in Cuyahoga County, Ohio having offices at 2300 Warrensville Center Road, University Heights, Ohio 44118.

11.    Defendant MICHAEL DYLAN BRENNAN (hereinafter "Brennan") is an adult citizen of the State of Ohio and at all relevant times to this action was the mayor of the City.

12.    Defendant JEFFREY PORTER is an adult citizen of the State of Ohio.


## FACTUAL ALLEGATIONS

**The City and Brennan prevented Plaintiff from hosting a prayer group in his home.**

13.    Plaintiff lives at the Property with his wife and his four small children, ages 6, 5, 2, and under 1.

14.    Plaintiff is an Orthodox Jew and observes the laws of Orthodox Judaism, including thrice daily prayer and the observance of "Shabbos" which includes, at minimum, refraining from traveling by car every week from sunset Friday until stars emerge on Saturday night. According

to his religious beliefs, Grand, as the man of the house, is required to pray with a minimum of ten Jewish men three times every weekday, and four times on Shabbos.  Accordingly, to exercise his religion, Grand must live within walking distance of a Jewish house of worship ("shul") or else have a place to gather with at least ten Jewish men for prayer on Shabbos.

15.     The closest shul where Plaintiff can meet this requirement is three quarters of a mile away from the Property.  As part of his religious beliefs, Plaintiff is required to pray with a group of at least ten Jewish men on Friday night, on Saturday morning, and on Saturday afternoon/evening, and in between services it is a religious duty to eat festive meals at home with his family. Accordingly, to attend services on Shabbos at a shul requires four round trips; back and forth Friday evening, back and forth Saturday morning, back and forth Saturday afternoon, and back and forth Saturday evening. Based on that requirement, on any given week Plaintiff must walk six miles, which is very difficult throughout the year, and especially difficult during the cold winters and hot summers.

16.     On January 10, 2021, Plaintiff invited around 10 friends to form an Orthodox Jewish prayer group in his home on Shabboses and holidays when driving is prohibited.

17.     As the prayer group was scheduled only for Shabbos or Jewish holidays when Orthodox Jews are forbidden from driving, and the invitation was only sent to Orthodox Jews, there would be no issues of additional vehicular traffic or parking.

18.     The invitation was sent by private email to only 10 or so Orthodox Jewish neighbors; Grand did not advertise it to the general public.

19.     The prayer group planned to begin sometime in February of 2021.

20.     Before the first scheduled meeting of the prayer group ever came to pass, on January 21, 2022, at 5:08 PM, Michael Dylan Brennan, the City Mayor, called Plaintiff's personal

phone and left a voice message asking Plaintiff to call him back regarding an "urgent matter." Brennan left his official office number and his personal cell phone number.

21.     That same day, at 5:22 PM, at the behest of the Mayor, Plaintiff received an email from Luke McConville, the City Law Director containing a cease-and-desist letter from the City regarding "2343 Miramar, University Heights, OH 44118, Planned Operation of Shul/Place of Religious Assembly."

22.     Plaintiff was shocked to receive the call and the email. He did/does not know how the City ever became aware of that invitation he sent to several of his friends to come to his home to pray; further, Plaintiff had never actually hosted a prayer group in his home. Simply inviting a few friends over to pray resulted in the City, and its mayor, accusing him of starting an illicit synagogue and threatening him with legal action.

23.     Plaintiff called Brennan back that day. On the phone, Brennan said to Plaintiff, "You are under no circumstances allowed to have any type of religious gathering in your home without first obtaining a special use permit under Chapter 1274 of the University Heights Code."

24.     Plaintiff said, "I just invited people over to my house to pray, I am not trying to operate a synagogue, and I should not need a permit to do that."  Plaintiff asked him rhetorically, "If there are ten Jews in a room, does that make it a synagogue?"

25.     Brennan responded to Grand's rhetorical question and said, "Yes it does, and if you do so in your home you will be in violation of [UHCO] Chapter 1274 for operating an illegal synagogue."

26.     Brennan went further and said, "if you go ahead and do what you just described, you will be in violation of the cease-and-desist order and the City will take all legal means available to it."

27.     Plaintiff understood this as a threat of criminal prosecution if he were to invite ten friends over to his house to pray.

28.     Brennan advised Plaintiff that the only way to legally host a prayer group in his home was to obtain a Special Use Permit from the City Planning Commission (the "PC").

29.     A few days later, Plaintiff also received in the mail the same cease-and-desist letter from the City dated January 21, 2021.

30.     The cease-and-desist letter stated that Plaintiff could not use the Property as a place of religious assembly without obtaining a Special Use Permit, and that "to the extent that the Premises are currently being used for said purposes or are intended to be used for such purposes in the immediate or near future, the City hereby demands that you immediately cease and desist any and all such operations.  Violations of the City's ordinances in this manner may result in building code citations against you and in the pursuit of additional remedies."

31.     The letter also stated, "The City is particularly disturbed to learn of the proposed use of the Premises as a place of religious assembly given that you recently appeared before the City's Board of Zoning Appeals in connection with your application for variances.  The City is exploring whether variances granted for the Premises may be voidable based upon a subsequent illegal use of the Premises, or due to material omissions during the hearing process relating to your intent to utilize the Premises as a place of religious assembly."

32.     Plaintiff understood this as the City threatening to use its municipal authority to revoke variances already approved if Plaintiff would host an Orthodox Jewish prayer group in his home.

33.     Upon information and belief, this was an unprecedented action by the City; countless residents have invited ten or more people to their residential homes and the City has never before sent a cease-and-desist letter before the meeting took place, if at all.

34.     As is set forth below in greater detail, the City and Brennan's actions were motivated by animus towards Orthodox Jews in general, and animus towards Daniel Grand specifically.

35.     Plaintiff took the City's threat very seriously, and the very next day, January 22, 2021, he emailed the City clerk: "Apparently, unbeknownst to me, I will need to file for a special use permit with the City Planning Commission to have friends come over to pray at my house.  I am totally willing to comply (as usual) - I need to fill out an application today and submit it back to you today so I can be inside the 14 day window of the next upcoming meeting - God willing I will be able to make it in - I have my checks ready, one for $100 and one for $300 - I have the paperwork I need to submit, the drawings and a picture, and all I need is the application which I will fill out like greased lightning and get it right back to you."

36.     Plaintiffs' application to "have friends over to pray at [his] house" was submitted to the PC and a hearing was scheduled for March 4, 2021.

37.     The meeting on March 4, 2021 was held virtually and is available for viewing on the City's YouTube channel.[1]  Over 100 people attended the hearing on March 4. This itself was atypical, meetings of this kind usually draw a crowd of about 5-10 people, at most.

38.     Normal practice is for the City to mail out a letter giving notice of the upcoming hearing to adjoining homes, but in this case many more people were notified.

---

[1] City of University Heights, Planning Commission Meeting, March 4, 2021, www.youtube.com/watch?v=D5kP12aBUUY (last visited, September 5, 2022).

39.     Prior to the meeting, Brennan coordinated with the opposition and circulated a map which highlighted all of the houses of City residents that he knew opposed Plaintiff's prayer group, in pink, and also singled out Grand's home, in blue, on the map.

40.     Upon information and belief, Brennan arranged for residents who he knew opposed Plaintiff's prayer group to be notified of the hearing, though they would not have been notified under ordinary circumstances.

41.     Upon information and belief, Brennan arranged that certain residents who lived in close proximity to Plaintiff and who Brennan thought would be supportive of the prayer group did not receive notification for the meeting.

42.     The meeting began with Plaintiff's counsel presenting Plaintiff's proposed use of his property to host a small prayer group in his home on Shabbos and Jewish holidays when driving is prohibited.

43.     For over an hour, several angry residents vehemently expressed their opposition to the application.

44.     The PC noted on the record that it received a petition in opposition to the application with 195 signatures, but Plaintiff was prevented by Brennan from introducing for the record that he had submitted to the PC a petition in support of his application with over 200 signatures.

45.     The PC is composed of 5 members, including Brennan who chairs the PC.  Brennan and another member were in favor of denying the application, but the other three members of the PC seemed confused by the hearing.

46.     One member stated that "the whole format that we are going through tonight is different than what we have used before, and I have been on the Planning Commission for a number of years, and I don't understand why the format is so dramatically different."  He also

stated that the process that Plaintiff was subjected to lent itself to a "hostile confrontational approach."

47.    Two other members were also confused and expressed that they could not make a decision without more information, so the PC voted 3-2 to table the motion, with Brennan and one other member voting against.

48.    The meeting ended among shouting and yelling from the angry and hostile audience of residents that had hoped to see Plaintiff's application denied.

49.    The hearing was scheduled to continue on March 23, 2021,[2] but Plaintiff withdrew his application prior to the meeting.

50.    The PC held a public meeting on March 23, 2021.  Brennan stated at the meeting:

> Let there be no confusion: Congregating at 2343 Miramar Blvd., or any other address located in a residence zoned U-1, without a special-use SUP is a violation of city law. I am hopeful that the wording of the withdrawal is not intended to suggest that congregating weekly at a residence to conduct activities consistent with those in a house of assembly does not require a special-use SUP.  As recently as two months ago, the city brought suit against the organizers of another residential shul, one on Churchill Boulevard, and ultimately obtained a permanent injunction in court.
>
> To the community members who are here, let there be no question. There is no permission granted here to operate … a house of assembly or conduct activities consistent with one at 2343 Miramar Blvd. If you observe such activities – and I hope you do not – but if you do, you may report them to the city, and the city will enforce its laws which exist for the benefit of the entire community, and we will seek all appropriate remedies in court.

51.    Though the mayor said that all congregating at residential homes requires an SUP, in practice, the City has only enforced this draconian and unconstitutional application against Orthodox Jewish prayer groups.

_____

[2] City of University Heights, Special Planning Commission Meeting, March 23, 2021, www.youtube.com/watch?v=5Pl0YbrbZek (last viewed Sept.5, 2021).

52.     For example, students who attend the local college routinely hold gatherings at residential homes, as do many other affinity groups, and have never applied for, obtained, or been told by the City or the mayor that they need to obtain an SUP.

53.     Upon information and belief, the only religious or secular group that has been prohibited by the City from holding prayer groups or similar secular gatherings in residential homes is Orthodox Jews.

54.     Upon information and belief, Brennan, who is an attorney, was aware that requiring a special use permit for a private prayer group in a residential home is prohibited by the United States Constitution and other federal laws, regardless of any interpretation of the local ordinances.

55.     Plaintiff did not need a permit to host a prayer group in his home and he should not have been subjected to a hearing before the PC.

56.     By forcing Plaintiff to submit an application and appear before the PC, Brennan needlessly provoked City residents by alerting them to Plaintiff's plans to host an Orthodox Jewish Prayer group in his home, thereby inciting residents against Plaintiff and causing Plaintiff shame, humiliation, as well as apprehension and fear of exercising his religion.

57.     Because of the City's and Brennan's actions, Plaintiff has never been allowed to hold a prayer group at his home.


**The City's and Brennan's actions against Plaintiff were motivated by animus against Orthodox Jews.**

58.     The City's and Brennan's actions to prevent Plaintiff's prayer group are consistent with a systematic campaign to prevent the City's Orthodox Jewish community from growing.

59.    As set forth below, the City's zoning code, as written and as applied, has effectively limited the construction of Orthodox Jewish synagogues to one street, Green Road, on the extreme eastern border of the City.

60.    As a result, the City's established Orthodox Jewish community is clustered on the extreme eastern side of the City, along Green Road, which some residents refer to as "the Green Road Ghetto."

61.    The Property where Plaintiff lives is outside of the City's established Orthodox Jewish cluster; Plaintiff is one of only a handful of Orthodox Jews who live among mostly non-Jewish neighbors, many of whom attend GESU, a large Catholic church with a 700-student school, that is located on the very same street as Plaintiffs' Property, less than 800 feet away.

62.    GESU holds daily religious gatherings many times the size of that which Plaintiff sought to hold at his house on Shabbos and Jewish holidays.

63.    There exists a segment of the City's constituency that seeks to prevent the Jewish community from spreading from the eastern border of the City westward towards the City's interior where the GESU community is located.

64.    That which is happening in the City of University Heights is a common story that exists in several towns and cities throughout the United States with growing Orthodox Jewish communities, namely, a hostile population views a growing influx of Orthodox Jewish residents as an invasion of sorts, and new Orthodox Jewish prayer groups as beachheads for the invading army to advance and capture new territory.

65.    The City's current attempt to use municipal powers to prevent Orthodox Jewish prayer is just the latest iteration of similar episodes that occurred in surrounding cities.   Just over 20 years ago, in the neighboring city of Beachwood, Ohio, the residents fought a protracted legal

battle to prevent Orthodox Jews from building synagogues.  The saga was famously chronicled in the book, *Jew vs. Jew: The Struggle for the Soul of American Jewry,* by Pulitzer Prize finalist Samuel G. Freedman.  In the 1950s, after the neighboring city of South Euclid denied a SUP to an Orthodox Jewish synagogue, the Ohio Court of Common Pleas held that "the action of the authorities has no foundation in reason and is a mere arbitrary or irrational exercise of power having no substantial relation to the public health, the public morals, the public safety or the public welfare in its proper sense."  *Young Israel Org. v. Dworkin*, 105 Ohio App. 89, 103, 133 N.E.2d 174, 182 (1956) (internal quotations and citations omitted).

66.    The City's and Brennan's actions towards Plaintiff are directly in response to a hostile constituency that wants to prevent new Orthodox Jewish prayer groups.

67.    Upon information and belief, Brennan premeditated that his vote would be to deny Plaintiff's application for a permit before the PC hearing on March 4, 2021.

68.    Upon information and belief, the purpose of the hearing was to intimidate Plaintiff into canceling his plans to host a prayer group in his home, and, by delivering Plaintiff a formal denial, to ultimately establish a new precedent in the town, so others would be dissuaded from trying too.

69.    Nothing that Plaintiff could have presented at the hearing would have swayed Brennan's decision to vote against granting the permit.

70.    Upon information and belief, in advance of the hearing, Brennan colluded with City residents to gin up hostile opposition to Plaintiff's application by deliberately spreading disinformation about Plaintiff's intentions and encouraging people to attend the meeting to express hostile opposition and further intimidate Plaintiff.

71.     Moreover, the ordinance that restricts houses of worship in the City, as set forth below, is unconstitutional; a hearing was unnecessary and there is no process that he needs to exhaust to exercise his basic constitutional right.

72.     At least ten of the people who spoke in opposition to Plaintiff's application at the hearing were Plaintiffs' neighbors and are self-proclaimed affiliates with GESU.

73.     Several people who spoke in opposition made statements regarding Plaintiff's Orthodox Jewish religion and expressed that if Plaintiff did not want to walk far to synagogue, he should not have purchased a home in the GESU neighborhood; he should have purchased a home near Green Road where the City permits Orthodox Jewish synagogues.

74.     Prior to the hearing, Plaintiff heard one neighbor say to another "Grand is trying to create a Jewish synagogue on our block, and we don't want that type of thing around here."

75.     In advance of the hearing, one neighbor sent a letter to the PC expressing opposition to Plaintiff's application, stating "I am not Jewish and I do not want our neighborhood labeled as Jewish. This is not prejudice, it is simply common sense. GESU school draws an awful lot of people to University Hts. And that has kept the area vital."

76.     After Plaintiff received his cease-and-desist letter in January, between February and May of 2021, the City took action against at least three other Orthodox Jewish prayer groups that assembled or planned to assemble in residential homes.

77.     Upon information and belief, the City did/does not similarly target any poker games, game nights, boy scout meetings, Tupperware parties, fraternities/sororities, or any non-Orthodox Jewish prayer groups that took/take place in residential homes.

78.     There currently exists ample evidence, and discovery will reveal further evidence, that the City and Brennan were engaged in a systematic campaign against Orthodox Jewish prayer groups in the City, and their actions against Plaintiff were the tip of the spear.

**Plaintiff has been subject to harassment and intimidation based on his Orthodox Jewish practice and based on personal animus.**

79.     Plaintiff is not ashamed of his Orthodox Jewish religion and wears a yarmulke on his head when in public.

80.     When Plaintiff moved to the Property, most neighbors were immediately aware of his Orthodox Jewish religion when they saw him wearing a yarmulke indicating his religious affiliation.

81.     One neighbor openly expressed at a public meeting that from the first time she met Plaintiff, his Orthodox Jewish character made her "suspicious."

82.     Brennan has long been aware of Plaintiff's Orthodox Jewish practice because soon after Brennan was elected in early 2019, Plaintiff reserved an appointment with Brennan as the newly elected Mayor and went to the mayor's office wearing a yarmulke to congratulate Brennan on his new position.

83.     Plaintiff has experienced hostility from his neighbors and the City because of his Orthodox Jewish religion.

84.     Plaintiff's neighbors yelled "you have a temple in your house" and "we don't want your kind here."

85.     By way of example, when one neighbor first met Plaintiff, Plaintiff was wearing a baseball cap over his yarmulke, so the neighbor, who was unaware that Plaintiff was an Orthodox

Jew, acted kindly towards him, but when he subsequently discovered that Plaintiff was an Orthodox Jew, he began acting hostile.

86.    Based on their hostility and suspicion of Orthodox Jews, Plaintiff's neighbors have harassed Plaintiff and made baseless complaints to the City against him.

87.    Rather than protect Plaintiff from religious bigotry, the City has decided to placate Plaintiff's neighbors and has also harassed Plaintiff.

88.    By way of example, the City has set up regular patrols of Plaintiff's home.

89.    On March 23, 2021, the same day that Brennan had publicly called on residents to report any attempts at hosting prayer groups in residential homes, an email was sent out by Lt. Mark McArtor to "Uniform Div." of the City Police Department which instructed:

> As part of your patrols, please make frequent drive-bys at 2343 Miramar Blvd. for violations to 452.03 Prohibited Standing or parking Places of parking on landscaped surfaces.  If violations are observed, citations will be "the preferred course of action."  Also be aware, there is a great deal of contention between this address and the surrounding neighbors since the 2343 resident applied to the Planning Commission for approval to operate a Schul [sic].  If you observe or respond to the location for parking or noise complaints, be sure to log the activity in CAD.

90.    Further, Brennan has viewed surveillance footage set up by Plaintiff's neighbor to spy on Plaintiff.

91.    Plaintiff's neighbor, Defendant Jeffrey Porter, a retired police officer, set up three surveillance cameras pointed at and into Plaintiff's house to spy on Plaintiff, his wife, and his young children.

92.    Because of the cameras, Plaintiff is forced to keep his bathroom shades down at all times.

93.     Brennan admitted in public statements that Porter shared with Brennan and the City Police Department surveillance videos of Plaintiff's activities on his Property, and that the City spent many hours and resources responding to Porter.

94.     Upon information and belief, Porter acted with impunity based on direction from Brennan to surveil Plaintiff and assurances from Brennan that, as the mayor, he would shield Porter from any consequences.

95.     Plaintiff has asked the City to intervene and have the cameras removed, even citing a City ordinance that prohibits a person from disturbing the privacy of another person, and suggesting that Porter is in violation of this ordinance by setting up surveillance cameras to spy on Plaintiff.

96.     Despite Plaintiff's requests, the City has not taken any action to enjoin Porter from disturbing Plaintiff's privacy.

97.     Because the City did nothing to protect Plaintiff's privacy from the intrusive surveillance by his neighbor - and by extension the City and Brennan - Plaintiff erected a fabric barrier on his own Property to shield him from surveillance, at his own expense.

98.     Instead of demanding that Plaintiff's neighbor removes the three cameras, a City attorney informed Plaintiff that the fabric barrier did not meet the City's fence code and demanded that Plaintiff remove it, which he did, at his own expense.

99.     Another example of harassment occurred on the afternoon of May 7, 2021, when Plaintiff was visited by a friend from Israel.  Plaintiff's friend and an associate were driving through the City together.  Plaintiff's friend stopped to visit with Plaintiff in Plaintiff's home, while the associate waited in the car parked outside.  The associate, who was wearing a yarmulke, sat in

the parked car during the day on the street outside Plaintiff's house for about an hour and a half. Twice during that time, City police approached his car and asked him "are you here for the shul?"

100.    On September 7, 2021, which was Rosh Hashanah - one of the holiest days of the Jewish year - Plaintiff was making his usual trek to Synagogue, which he must do every Shabbos and holiday because the City will not permit him to host prayer groups in his house. He saw a suspicious man sitting in a dark unmarked car.

101.    Plaintiff approached the man and asked him what he was doing there. The man said he was part of a private security detail and that there were two others on the block and that the City Police were aware of their presence and activities.

102.    Plaintiff had no way to verify the suspicious man's dubious claims, which later proved to be false, and Plaintiff had no way to ascertain that the suspicious man parked outside a synagogue during a day of assembly was not armed and/or dangerous.

103.    At that moment, Plaintiff credibly feared that the man was a physical threat to him and to the other Orthodox Jews gathering to pray on the holiest day of the year.

104.    According to the Anti-Defamation league, Jews are consistently the most targeted religious community in the U.S.; Antisemitic incidents are being reported at record levels: Jewish institutions are vulnerable targets; Jews are regularly targeted because of their actual or perceived support for Israel and Zionism; Extremists and antisemites perpetrate deadly violence against Jews; Jews have been the targets of at least 21 extremist plots or credible threats since 2016.[3]

105.    Because of the looming and very real threat of violence against Jews, the Jewish Federation of Cleveland organizes private security details *in marked vehicles* to protect the Jewish

---

[3] *See* Anti-Defamation League, *Six Facts About Threats to the Jewish Community,* Jan. 16, 2022, www.adl.org/blog/six-facts-about-threats-to-the-jewish-community (last visited Sept. 5, 2022).

community on a daily basis, which is why the unmarked vehicle stalking the synagogue on Rosh Hashanah was so suspicious.

106. According to the FBI, crimes targeting the Jewish community consistently constitute over half of all religion-based crimes. There have been dozens of attacks and plots of violence and terrorism against synagogues in the last few years. For example: In December 2019, Jews were attacked while attending a Chanukah party at a rabbi's house in Monsey, New York, leaving one Jew murdered and four injured; In April 2019, Jews attending a synagogue in Poway, California were attacked, leaving one Jew murdered and three injured; In October of 2018, Jews attending the Tree of Life Synagogue in Pittsburgh, Pennsylvania were attacked, leaving 11 Jews murdered, and seven injured, including four police officers; In January 2022, in Colleyville, Texas, a gunman entered a synagogue during services and took three congregants and a rabbi as hostages; In November 2019, in Pueblo, Colorado, federal authorities arrested a Neo-Nazi on charges related to an alleged plot to blow up a synagogue.[4]

107. Plaintiff was apprehensive about going into synagogue, fearing that the suspicious man could be related to a terrorist plot.

108. Plaintiff then heard the man talking on the phone and he heard the man say, "Yes, Mr. Mayor. Yes, Mr. Mayor." Plaintiff believed that the suspicious man was speaking to Brennan.

109. When other members of the Jewish community became aware of the suspicious man's presence, a Jewish person was compelled to use their cell phone to call law enforcement, something that on a Jewish holiday is only allowed by Jewish law when there is a potential threat to human life.

---

[4] *See id.*

110.    It was subsequently revealed at a City Council meeting that Brennan authorized the hiring of a private investigator to sit outside of the home of an Orthodox Jewish family to spy on Orthodox Jewish residents and to gain information about Orthodox Jews praying in residential homes on one of the holiest days of the year.

111.    The event was deeply traumatizing to Plaintiff because at the time he had a reasonable apprehension of bodily harm to him and his family.

112.    Brennan knew or should have known that his actions would naturally and probably intimidate Plaintiff and other Orthodox Jews from exercising their religion by creating the apprehension of bodily harm.

113.    On June 28, 2021, Plaintiff submitted an information request form to the City seeking: "any and all emails having anything to do with Daniel Grand and or my property 2343 Miramar Blvd.  Emails from the Law Director, the Mayor, Council Members, the Police Dept., the Fire Department, Service Department, and from administration personnel, clerical or otherwise, Building Department, Housing Department, any and all files related to Daniel Grand, AKA Danny Grand, and Property 2343 Miramar Blvd."

114.    Plaintiff followed up several times, including the most recent emails sent to the City on June 22, 2022, and September 2, 2022, over a year later, and to date, the City has not responded to Plaintiff's request.

115.    Plaintiff learned informally from a City employee that the file he requested that the City has not provided to him is "thousands of pages long."

116.    Upon information and belief, there is no other resident who moved to University Heights only a few years ago, as Plaintiff did, that has a file with the City that is thousands of pages long.

117.    The length of the file is due to Brennan's and the City's singling out Plaintiff for harassment because of his religious practice and because of personal animus.

118.    From the end of May until early July of 2021, the City singled out Plaintiff's home by intermittently stopping the pickup of Plaintiff's garbage on the regular garbage day.

119.     Plaintiff was forced to complain several times to the City sanitation workers about skipping his home, and made several calls to the service director, but nobody would give Plaintiff a reason as to why he was being singled out among his neighbors and being skipped.

120.    Finally, after several weeks of calling the service director, the service director arrived unannounced to Plaintiff's property and was hostile to Plaintiff and to Plaintiff's wife.

121.     The service director said he ordered his staff to skip Plaintiff's Property because the conditions of Plaintiff's Property made it difficult to pick up the garbage cans. The Director said that they would only pick up Plaintiff's garbage if he put it on the curb.

122.    No other neighbor on Plaintiff's street is required to do so; however, Plaintiff's property is not different from his neighbors who were not singled out by skipping.

123.    Based on the known examples of harassment and targeted enforcement of Plaintiff because of his religious practice and because of personal animus against him, it is highly plausible and likely that the file about Plaintiff that the City has withheld - that is "thousands of pages long" - as well as additional discovery will reveal other instances of targeted arbitrary and capricious harassment and enforcement against Plaintiff because of his religious practice and because of personal animus against him.

**Immediately after Brennan's March 23, 2021, call to action against Plaintiff, Brennan and the City used the pretext of a parked car on Plaintiff's Property to persecute Plaintiff.**

124.    On March 23, 2022, at a public meeting, Brennan publicly called upon Plaintiff's neighbors and City residents to report to the City if they observed any activity by Plaintiff that was consistent with what Plaintiff requested, *i.e.,* to report any gathering of Orthodox Jews at Plaintiff's home, and if any such activities occurred, "the City will enforce its laws which exist for the benefit of the entire community, and we will seek all appropriate remedies in court."

125.    Brennan's comments ginned up further hatred and animus for Plaintiff among his neighbors and fueled the conflagration of discrimination that Brennan had encouraged.

126.    Brennan also escalated the discrimination against Plaintiff by authorizing and initiating a systematic attack against Plaintiff using municipal powers to target Plaintiff, and to harm Plaintiff economically.

127.    Brennan and the City abused the municipal power by using the City's ordinances to persecute Plaintiff, a law-abiding citizen, by unlawfully stretching extremely vague and inapplicable ordinances to reach conduct by Plaintiff that Plaintiff had every reason to believe was lawful.

128.    In accordance with the maxim "show me the man and I'll find you the crime," Brennan and the City prosecuted Plaintiff because of his religious practice and because of personal animus under the guise of enforcing laws regulating day-to-day activities.

129.    On March 23, 2021, the same day that Brennan had publicly called on residents to report any attempts at hosting prayer groups in residential homes, an email was sent out by Lt. Mark McArtor to "Uniform Div." of the City Police Department which instructed:

> As part of your patrols, please make frequent drive-bys at 2343 Miramar Blvd. for violations to 452.03 Prohibited Standing or parking Places of parking on landscaped surfaces.  If violations are observed, citations will be "the preferred course of action."  Also be aware, there is a great deal of contention between this

address and the surrounding neighbors since the 2343 resident applied to the
Planning Commission for approval to operate a Schul [sic].  If you observe or
respond to the location for parking or noise complaints, be sure to log the activity
in CAD.

130.    Two days after Brennan's March 23, 2021, public address calling on neighbors to

report Plaintiff, Vivian Porter, the wife of Jeffrey Porter who invaded Plaintiff's privacy by

installing surveillance cameras aimed into Plaintiff's home, directly responded to Brennan's call

to action and called Brennan to report on Plaintiff.

131.    On March 25, 2021, at 9:29 AM, Vivian Porter called the police to report a truck

parked on Plaintiff's Property on a small dirt/gravel area adjacent to Plaintiff's driveway, between

the end of Plaintiff's driveway and his front door.

132.    The truck, which had Virginia license plates and a handicap placard in the

windshield, belonged to Plaintiff's visiting friend, a physically disabled military veteran, who

arrived from out of town in the early hours of the morning of March 25, 2021, and parked in the

dirt/gravel area because it was close to the front door and his disability makes walking difficult.

The vehicle did not belong to Plaintiff, and Plaintiff did not park the vehicle.

133.    The police told Ms. Porter "The truck was parked on gravel so it was fine."

134.    Ms. Porter sent an email to Brennan complaining that the police told her that they

would not issue Plaintiff a citation as she had requested.

135.    Brennan immediately emailed the police chief, the police lieutenant, the director of

the building department, and the law director, seeking advice on how to issue a citation to Plaintiff.

136.    The police chief wrote back and offered some suggestions on how to catch Plaintiff,

including "patrol officers responding after hours to photograph/video possible evidence of a

complaint/infraction."

137.    Police were dispatched and issued a citation for parking on the dirt/gravel area.

138.    The police left the scene at 10:23 AM.

139.    Plaintiff returned from morning prayers at approximately 10:30 AM to find the ticket on the windshield of his friend's vehicle.  Plaintiff promptly moved the vehicle from the area.

140.    At 11:06 AM, City Police Lt. Mark McArtor sent an email to all City police units, copying the chief of police, ordering them to be on the lookout for parking violations at 2343 Miramar Blvd., Plaintiff's Property, and specifically to issue citations if any cars are parked in the dirt/gravel area.

141.    At 2:27 PM, Lt. McArtor sent another email to the same recipients instructing officers to disregard his earlier email at 11:06 AM because he consulted with the City prosecutor about Plaintiff and the prosecutor advised that citations should not be issued to Plaintiff for parking on the dirt/gravel area because "the matter is more of a Building Department enforcement issue than a police matter."

142.    Ultimately, the parking citation was rescinded.

143.    This is not the normal procedure for analogous situations.  For example, college students at the local university who live in residential homes in the area can be seen everyday parking all over properties - on the grass, in the apron, half off driveways, etc. - and they rarely if ever are given citations. In the rare event that they do receive citations, the mayor, law director, director of the building department, chief of police, police lieutenant, all police units, and City prosecutor are not involved.

144.    Nine days later, on Saturday, April 3, 2021, a letter was delivered to Plaintiff's home from the City.  As soon as Shabbos ended, Plaintiff opened the letter and found that the

Building Department had devised a pretext to issue him a citation for his handicapped veteran friend's car being parked on the dirt/gravel area, nine days earlier.

145.     The letter was dated March 30, 2021, five days after the car was moved.

146.     The citation states:

You are hereby notified that you are in violation of city ordinance no. 2063-20 of the codified ordinances of the City of University Heights in regard to the following:

1242.99 - PLEASE REMOVE STONES FROM THE AREA NEAREST TO THE GARAGE THAT IS BEING USD [sic] TO EXTEND DRIVEWAY

147.     The citation does not explain what "city ordinance no. 2063-20" is, and there is no such ordinance in UHCO.

148.     Though the citation does not explain, "1242.99" refers to UHCO 1242.99, a lengthy, vague multi-part provision that applies to the City's authority to issue citations for violating the Zoning Code.

149.     The provision says nothing about "stones," "garages" or "driveways."

150.     The citation gives no indication as to which part of 1242.99 was violated.

151.     It is impossible for Plaintiff to violate 1242.99 because it does not apply to him.

152.     The citation does not explain why "stones" are illegal or why they must be removed.

153.     The police told Ms. Porter "the truck was parked on gravel so it was fine."

154.     The City was aware of the presence of gravel stones in the dirt/gravel area for at least 10 months prior to March of 2021 and never had a problem.

155.     Other residents have similar dirt/gravel areas on their properties, but upon information and belief, the City has never issued a citation to anyone for a similar condition, citing UHCO 1242.99 or otherwise, and demanding the gravel be removed.

156.    The citation was obviously a desperate attempt by Brennan, the law director, the building department, the police, and the prosecutor to invent a pretext to issue Plaintiff a citation.

157.    The Citation stated that "the owner or operator of any structure or premises shall have the right to appeal from any order of, or written notice issued by, the Building Commissioner. The Appeal shall be written and submitted within 15 days from the date of such notice."

158.    The citation did not give any instructions as to the manner of appeal or to whom to appeal.

159.    The following Monday, April 5, 2021, the earliest possible day that Plaintiff could have appealed, Plaintiff appealed to the City by submitting a request for a permit to cure the dirt/gravel area by installing a concrete pad over the gravel, rather than remove the gravel.

160.    Pursuant to the UHCO, Plaintiff was entitled to a permit as of right because he was entitled to 25% lot coverage, and with the additional concrete he would only be at 23.09%.

161.    Additionally, the City was required to grant him a permit as of right because, pursuant to the UHCO, the area is a 290-square-foot patio, and patios less than 300 square feet are permitted as of right.

162.    Plaintiff further supported his appeal by noting that the City engineer had issued a report in August of 2020 after inspecting the dirt/gravel area and had determined that there were "no issues with the request by Mr. Grand to expand his patio and driveway area." Plaintiff attached to his appeal drawings showing the area as 290 feet and the lot coverage being under 25%, and the report from the City engineer.

163.    Even if a violation of 1242.99 was a legitimate violation, which it is not, Plaintiff was not in violation because gravel is not prohibited anywhere in the UHCO.

164.    By the next day, Plaintiff did not receive a response to his appeal, so he called the City but was unable to receive confirmation that his appeal was received.

165.    Plaintiff called and emailed several more times over the next two weeks, but received no confirmation.

166.    Finally, on April 21, 2021, Plaintiff reached the City building department and was told for the first time that he was required to appeal the citation to the City Board of Zoning Appeals ("BZA").

167.    On April 21, 2021, Plaintiff promptly appealed the citation to the BZA and submitted a reasonable request to cure the driveway situation, even though the BZA was not the appropriate forum to request the permit, because Plaintiff was entitled to his plan as of right.

168.    Plaintiff followed up several times over the next few days and received no response.

169.    Finally, on April 28, 2021, almost a month after Plaintiff submitted his initial appeal, the City law director responded by denying the violation appeal and denying the request to cure the gravel area situation.

170.    The letter stated that the request to cure the gravel situation was summarily denied; Plaintiff was not granted a hearing before the BZA and the letter did not indicate that the BZA considered the application or that the City even submitted the application to the BZA for review.

171.    The letter further stated that Plaintiff's appeal of the citation was denied because Plaintiff was required to file the appeal within 15 days from the date of the notice.  As the notice was dated March 30, the deadline was April 14.

172.    Upon information and belief, the City deliberately obstructed Plaintiff's initial appeal by not responding to him until after the deadline to appeal to the BZA had passed so that the City could deny his appeal based on untimeliness.

173.    On May 2, 2021, Plaintiff sent an email to the City Council, copying Brennan and the law director, forwarding a letter sent to Brennan by Plaintiff's attorneys arguing that preventing Plaintiff from hosting religious gatherings in his home is a violation of Plaintiff's constitutional rights.

174.    Brennan retaliated against Plaintiff by ordering an escalation of the ongoing police surveillance of Plaintiff's house.

175.    On May 7, 2021, a man wearing a yarmulke was parked in front of Plaintiff's house waiting for a friend who was visiting Plaintiff. While the man was parked there, two separate police units approached him within a span of 30 minutes, both units asked the man if he was "here for the shul."

176.    That day, Plaintiff wrote a scathing email to Brennan copying the entire City Council and Plaintiff's attorneys, chastising Brennan for the surveillance.

177.    On May 10, 2021, eight days after Plaintiff revealed that he had legal representation and three days after Plaintiff brought the ongoing surveillance to the attention of City Council, the City law director responded with a letter admitting that Plaintiff was entitled to a hearing and informed Plaintiff that he would be granted a hearing at the June 2021 meeting of the BZA.

178.    Regarding UHCO 1242.99, the law director's letter stated:

While the Notice of Violation cites [UHCO] 1242.99, the Housing Inspector also could have cited [UHCO] 1274.04, which indicates that all driveways must be a hard surface, such as asphalt or concrete.  You have previously parked vehicles on the concrete stones and used the area as an extension of your driveway, a use which violates [UHCO] 1280.03.

179.    UCHO 1274.04 applies to driveways for houses of worship, not residential homes.

180.    The law director implicitly revealed that the City was desperately trying to issue a citation to Plaintiff not because his disabled friend violated a parking ordinance and not because the gravel stones scattered in the area adjacent to Plaintiff's garage were illegal, but because the

City considered any Jewish visitors to Plaintiff's home to be a violation of City ordinances prohibiting houses of worship.

181.    Further evidence of the City's desperation to unlawfully issue arbitrary, capricious, and discriminatory citations is the law director's accusation that "you have **_previously parked vehicles on the concrete stones_** and used the area as an extension of your driveway, a use which violates [UHCO] 1280.03 (emphasis added)."  Since the ordeal that began with Plaintiff's disabled friend parking his truck on the gravel area, there had never been any allegation or evidence presented that Plaintiff had "previously parked vehicles" on the area or that Plaintiff had placed "concrete stones" on the area.

182.    The citation that began as a parking violation issued to Plaintiff's friend's vehicle, morphed into a violation for having gravel stones on the ground near the garage, which then morphed into either operating an illegal synagogue or alternatively into an illegal installation of concrete stones.

183.    The parking violation and the illegal gravel attempts failed, and the illegal synagogue and/or illegal concrete installation were provably false and were never included in any citation.

184.    On May 18, 2021, while Plaintiff's appeal of the unlawful citation was pending with the BZA and awaiting a hearing at the June 2021 meeting, the City sent Plaintiff a "notice of noncompliance" stating that Plaintiff's file had been referred by the housing inspector "for the purpose of pursuing criminal charges with regard to the failure to correct the violations that remain on the referenced property."

185.    The City had further escalated Plaintiff's friend's parking violation into a criminal matter against Plaintiff.

186.    On June 10, Plaintiff removed the gravel from the area.

187.    Plaintiff then notified the head of the building department that he had done so.

188.    Plaintiff never received confirmation that the citation, which had been referred for criminal charges, had been removed.

189.    On July 6, 2021, Plaintiff sent a follow-up email to the City with photos showing that the gravel had been removed on June 10.

190.    A few days later, instead of receiving confirmation that the fake gravel violation was removed, the City sent Plaintiff a citation for a new violation.

191.    The new citation retroactively denied approval for a fence that Plaintiff had constructed on his Property - after the City had previously approved, permitted, inspected, and signed off on it.

192.    Plaintiff's neighbors have fences in identical or substantially similar circumstances but none of his neighbors were issued citations.

193.    What is set forth above is just a portion of the arbitrary, capricious, and discriminatory treatment that the City subjects Plaintiff to because of his religion and because of personal animus towards him.  Discovery will reveal further examples.

194.    The arbitrary, capricious, and discriminatory treatment is ongoing and continues to this very day.

195.    Brennan and the law director are directly involved in all building matters related to Plaintiff and his property, which is a deviation from the normal procedures.

196.    Brennan and the law director have and continue to order building officials to issue stop work orders and citations for non-violating conditions, and to deny permits for improvements that are allowed by UHCO as of right.

197.     The City has refused to grant Plaintiff a Certificate of Occupancy for no legitimate reason.

198.     This is a routine matter and only requires an administrative sign off, which the City refuses to do.

199.     The refusal to grant a certificate of occupancy has caused real financial harm to Plaintiff; as a result, Plaintiff was and is prevented from receiving a tax abatement for his home.

200.     Further, without a Certificate of Occupancy, Plaintiff is prevented from selling his home.

201.     As a direct result of this arbitrary, capricious, and discriminatory refusal to issue a certificate of occupancy, Plaintiff's monthly payment on his home has increased substantially.

**University Heights codified ordinances, on their face and as applied, violate the United States Constitution, the Ohio Constitution, and RLUIPA and Ohio common law.**

**The City has unbridled discretion to allow or deny prayer groups in the City**

202.     As set forth above, the City and Brennan apply the City's zoning code such that they consider the small prayer group of 10 or more people that Plaintiff sought to host in his residential home to be a "house of worship," and the City does not permit such activity without a Special Use Permit ("SUP"), pursuant to UHCO Chapter 1274.

203.     Houses of worship are not permitted as of right anywhere in the City.

204.     Of the City's nine zoning districts, U-1 through U-9, houses of worship are not permitted by right or with an SUP in U-3, U-5, U-6, U-7, U-8, or U-9.  Houses of worship are only permitted in districts U-1, U-2, and U-4, by obtaining an SUP, pursuant to the standards and criteria of UHCO Chapter 1274.

205.    The process for obtaining an SUP is to first obtain a recommendation from the Planning Commission ("PC") by demonstrating "by clear and convincing evidence that the provisions of [Chapter 1274] will be met and that the special use will not impair surrounding property values or uses, vehicular parking and pedestrian or traffic conditions, lighting glare at night, noise pollution to others or other applicable criteria in the Planning and Zoning Code, and will not be otherwise contrary to the public health, safety and welfare."

206.    If an applicant is successful in obtaining a recommendation from the PC, "the recommendation of the Planning Commission shall be subject to the approval of a majority of [City] Council," and upon such approval, a certificate of occupancy should be issued.

207.    UHCO Chapter 1274 provides no standard that the City Council must adhere to when considering whether to grant approval for an application for an SUP for a house of worship, accordingly, City Council, which is the City's elective legislative body, has unbridled discretion in approving or denying an SUP for a house.

208.    The Ordinance allows the PC and City Council to take into account an applicant's personality and/or other traits unrelated to land use when considering whether to grant or deny an SUP for a house of worship, and to deny an application simply because the governing body finds that the applicant lacks likability, charisma, or spirituality.

209.    Even if the PC gives its recommendation to approve an application for an SUP, the City Council can deny the application for any reason, no reason, or a discriminatory reason.

**The standards and criteria of Chapter 1274 for an SUP are impossible to satisfy.**

210.    The provisions of Chapter 1274 that must be satisfied to obtain a PC recommendation for an SUP include requirements with respect to location, minimum lot size, yard size, height, landscaping, and more.

211.    Houses of worship are only permitted in the U-1, U-2, and U-4 zoning districts if they have frontage on one of the following six (6) streets: Cedar Road, Warrensville Center Road, South Taylor Road, Fairmount Boulevard, North Park Boulevard, Green Road (the "Permitted Streets").

212.    With the exception of Warrensville Center Road, all of the Permitted Streets are located at the extreme borders of the City.

213.    Houses of worship in the U-1, U-2, and U-4 zoning districts require a minimum lot area of three (3) acres.

214.    A building may only be used as a house of worship if it was originally designed and approved for use as a house of worship. A residence, store or other building cannot be converted into a house of worship. A house of worship cannot include a residence on any part of the site.

215.    The building cannot exceed 25% of the total lot area; a minimum of 50% of the site shall be devoted to open space and developed as planted areas; minimum lot frontage is 150 feet; and the front yard must be a minimum of 75 feet deep.

216.    The minimum parking requirement for a house of worship is the greater of: one space per 200 square feet of gross floor area of the entire building including the basement, measured from the exterior faces of the building (not less than 30 spaces); one parking space for each two seats provided within any and all rooms used for assembly; and one parking space for each two persons allowed as legal maximum occupancy.

217.    The provisions of Chapter 1274 are so restrictive that no applicant can meet them and therefore any prospective house of worship is both unreasonably limited and totally excluded from the City.

218.     Upon information and belief, there are a total of 315 parcels of land in the U-1, U-2, and U-4 zoning districts that have the required frontage on one of the Permitted Streets; the average parcel size of those 315 parcels is 0.4 acres and only three (3) parcels have a minimum lot size of three acres; of those three parcels, only two have the required 150 feet lot frontage; of those two parcels, only one has 50% open space; and that one parcel does not have a building that was originally designed for use as a house of worship.  Accordingly, upon information and belief, there are zero (0) parcels in all of University Heights that meet the necessary standards and criteria required to obtain an SUP pursuant to UHCO Chapter 1274.

219.     No variance from any of the requirements or prohibitions under Chapter 1274 may be granted without the approval of the Planning Commission and the approval of Council, each following public hearings at which the applicant demonstrates a clear benefit to the community and that denial will result in an unnecessary hardship to the applicant.

220.     The standard of "a clear benefit to the community and that denial will result in an unnecessary hardship to the applicant" lacks any narrow, objective, and definite standards to guide the Planning Commission or the City Council.

221.     A higher standard must be met to obtain a variance to the provision that restricts houses of worship to the Permitted Streets: "A special use permit may be issued by the Planning Commission for land fronting on other streets where the applicant demonstrates by clear and convincing evidence that the use will benefit and not impair surrounding property values or uses, vehicular parking and pedestrian congestion or traffic conditions, noise pollution and will not be otherwise contrary to the public health, safety or welfare, subject to the approval of a majority of Council."

222.    "For exceptional circumstances or in cases of clear hardship, the Planning Commission, may, after consideration of the proposed building or use, recommend a parking variance subject to the approval, modification or rejection of Council, and provided that such variance will not violate the spirit or intent of this chapter and provided further that a more harmonious and beneficial use of the property will result."

223.    The standard "that such variance will not violate the spirit or intent of this chapter and provided further that a more harmonious and beneficial use of the property will result" lacks any narrow, objective, and definite standards to guide the Planning Commission or the City Council.

224.    Additionally, Chapter 1274 lacks any reasonable time limits for which City Council must render a decision.

**Chapter 1274 violates the United States Constitution, RLUIPA, the Ohio Constitution, and Ohio common law.**

225.    Chapter 1274 substantially burdens Plaintiff's exercise of religion by depriving him of the ability to host a prayer group in his home.

226.    Chapter 1274 also deprives Plaintiff of the ability to have a place of worship where he lives.  *See Young Israel Org. v. Dworkin*, 133 N.E.2d 174, 183 (1956).

227.    The UHCO does not identify any compelling governmental interest to justify the draconian provisions of Chapter 1274.

228.    Even were the City able to point to a compelling governmental interest to justify the provisions of Chapter 1274, which it cannot, there are obvious and apparent means of achieving any such interests in a less restrictive manner.

229.    Pursuant to the Ohio Constitution, the state may not even indirectly encroach upon religious freedom unless the encroachment serves a compelling state interest and is the least

restrictive means of furthering that interest.  *Humphrey v. Lane*, 728 N.E.2d 1039, 1045 (Ohio 2000).

230.    The City's zoning regulations that pertain to the religious use of property within the jurisdiction create uncertainty, delay and expense for Plaintiff, as Plaintiff has been forced to hire lawyers, pay application fees, and allocated valuable time because of the regulations.

231.    The City has enforced the UHCO to prevent Orthodox Jewish religious worship.

232.    In addition to the enforcement action taken against Plaintiff, the City has taken similar action against other Orthodox Jewish prayer groups in residential homes.

233.    Upon information and belief, the City has singled Orthodox Jewish residents for special treatment when applying its zoning code.

234.    Pursuant to UHCO § 1242.99, "any use of any land or building which is conducted, operated or maintained contrary to any of the provisions of this Zoning Code shall be unlawful," and any such violations are subject to the penalties of fines and imprisonment.

235.    The UHCO, on its face, imposes land use regulations in a manner that treats religious institutions on less than equal terms with non-religious institutions.

236.    Pursuant to § 1250.02, included in the list of "permitted uses" in the U-1 zoning district are: "(b) Buildings, structures and grounds owned and operated by a board of education, municipality or by a library board."

237.    Pursuant to § 1252.02, included in the list of "permitted uses" in the U-2 zoning district are: "(a) All uses permitted in One-Family Residence Districts and as regulated in such Districts, except as modified hereinafter."

238.    Pursuant to § 1256.02, included in the list of "permitted uses" in the U-4 zoning district are: "(a) All uses permitted in Two-Family Districts (Section 1252.02) and as regulated in such Districts, except as modified hereinafter."

239.    Buildings, structures and grounds owned and operated by a board of education, municipality or by a library board are not subject to the requirements of Chapter 1274.

240.    Buildings, structures and grounds owned and operated by a board of education, municipality or by a library board are not subject to the requirement of having to obtain an SUP.

241.    The UHCO permits as of right the principal uses of "Buildings, structures and grounds owned and operated by a board of education, municipality or by a library board," within the U-1, U-2, and U-4 zoning districts without requiring a Special Use Permit.

242.    "Buildings, structures and grounds owned and operated by a board of education, municipality, or by a library board" uses are nonreligious assembly and/or institutional land uses.

243.    Accordingly, on its face, UHCO Chapters 1250, 1252, and 1256 treat houses of worship on less than equal terms as nonreligious assembly and institutional uses.

244.    The UHCO permits other non-religious assembly and institutional uses by right within the city's jurisdiction, while houses of worship are not permitted by right anywhere.

245.    The UHCO permits by right various nonreligious assembly and institutional uses within certain zoning districts, while houses of worship are not permitted by right anywhere within the City.

246.    As described above, houses of worship are not permitted by right anywhere in the City.

247.    The UHCO allows various nonreligious assembly and institutional uses within certain zoning districts without being subject to Chapter 1274, while houses of worship are subject to Chapter 1274 regardless of where they are located in the City.

248.    Pursuant to UHCO § 1258.02, "athletic fields and stadia or other spectator seating facility" are permitted as of right in the U-5 zoning district and are not subject to Chapter 1274.

249.    Upon information and belief, such facilities may have much greater land use impacts, including traffic and parking impacts, than a house of worship.

250.    Pursuant to UHCO § 1260, "Office buildings: professional, administrative, executive, governmental" are permitted as of right in the U-6 zoning district and are not subject to Chapter 1274.

251.    Upon information and belief, such facilities have much greater land use impacts, including traffic and parking impacts, than a house of worship.

252.    Pursuant to UHCO § 1264.02, "assembly halls" are permitted in the U-8 zoning district as of right and are not subject to Chapter 1274.

253.    Upon information and belief, such facilities have much greater land use impacts, including traffic and parking impacts, than a house of worship.

254.    Pursuant to UHCO § 1266.02, the following nonreligious assembly and/or institutional uses are permitted in the U-9 zoning district as of right: Libraries, Museums, Community Theaters, Assembly Halls, and Meeting Places.

255.    Houses of worship are treated on less than equal terms as "athletic fields and stadia or other spectator seating facility," "Office buildings," "Libraries," "Museums," "Community Theaters," "Assembly Halls," and "Meeting Places," because the latter uses have the opportunity to locate somewhere within the City without being subject to the burdensome requirements and

highly discretionary review procedures of Chapter 1274 and the SUP requirement, while houses of worship do not.

**The impact of the City's conduct, Brennan's conduct, Porter's conduct and the City's land use regulations on Plaintiff.**

256.     The City's zoning scheme has rendered Plaintiffs' religious exercise effectively impracticable.

257.     If the Plaintiff was permitted to host a prayer group in his home, it would affect interstate commerce by or through, among other things, providing a house of worship for families visiting from other states; the purchase of goods and services related to the prayer group; and the hosting of any religious leaders visiting the Plaintiff from out of state.

258.     The City's and Brennan's actions described above all took place under color of state law.

259.     The harm to the Plaintiff caused by the Defendants' laws and actions, which prevent him from hosting a prayer group in his home to accommodate his religious needs, is immediate and severe.

260.     The Defendants' laws and actions imminently threaten Plaintiff's free exercise of religion.

261.     Plaintiff has also suffered significant financial damages as a result of the City's laws and the City's and Brennan's application to the Plaintiff.

262.     The City and Brennan, through their actions, have turned Plaintiff's neighbors against him and ginned up hostility against Plaintiff such that Plaintiff fears for his safety and the safety of his wife and small children in their own home.

263.    The City and Brennan through their actions have deprived Plaintiff and his family of what was once a tranquil existence, and life in the neighborhood for Plaintiff and his family has become unbearable.

264.    The City's constant harassment and targeted application of the City's ordinances against Plaintiff has caused Plaintiff to spend money on otherwise unnecessary construction related costs.  They have also caused Plaintiff financial harm due to delays in construction.

265.    Plaintiff was financially harmed by not obtaining a certificate of occupancy as it prevented Plaintiff from receiving a tax abatement and it makes Plaintiff's home unmarketable.

266.    The City's, Brennan's and Porter's conduct, especially turning Plaintiff's neighbors against him and surveilling Plaintiff, causes ongoing and continuous emotional trauma and distress to Plaintiff, Plaintiff's wife, and Plaintiff's children who all are scared of their neighbors and are constantly worried that their neighbor is taking pictures of them without their consent.

267.    Being targeted and harassed by the City, Brennan, City officials, and neighbors has caused Plaintiff and his wife emotional distress, anguish, stress, shame, humiliation, anger, and fear.

268.    All of the Defendants' have caused damage to Plaintiff's social life; people are scared to come to Plaintiff's home for fear that they may be harassed by the City if they are known to associate with Plaintiff.

269.    The Defendants' actions have harmed Plaintiff's religious exercise as it is considered a religious obligation to host guests on Shabbos and holidays, and because of the Defendants' action, guests are hesitant to come to Plaintiff's home.

270.    The Defendants have also harmed Plaintiff's religious exercise because even if the City were to allow Plaintiff's prayer group, at this point the City has made it so that people will be

afraid of coming lest they'd be surveilled by the City and/or Porter and of being targeted by the City for being associated with Plaintiff.

271.    Defendants' actions have hurt Plaintiff's business because people are cautious of hiring Plaintiff for services out of fear that they will become targets of the City's and Brennan's discriminatory treatment.

272.    Defendant Porter has committed an unjustified and substantial invasion of Plaintiff's privacy causing Plaintiff and his family mental anguish, including feelings of shame, embarrassment, anger, humiliation, and fear.

273.    Brennan also invaded Plaintiff's privacy by viewing the video footage shared with him by Porter, causing Plaintiff and his family mental anguish, including feelings of shame, embarrassment, anger, humiliation, and fear.

274.    The City and Brennan enabled the invasion of Plaintiff's privacy, causing Plaintiff and his family mental anguish, including feelings of shame, embarrassment, anger, humiliation, and fear.

275.    Because of the invasion of privacy, Plaintiff incurred financial harm by erecting and then deconstructing a barrier.

276.    Porter still has cameras pointed at Plaintiff's house and the City has done nothing towards ordering him to remove them.

**COUNT I**
**City of University Heights**
**and Michael Dylan Brennan**
**United States Constitution**
**42 U.S.C. § 1983: First Amendment**
**Free Exercise of Religion**

277.    The foregoing paragraphs are incorporated by reference as if set forth fully herein.

278.     The City has deprived and continues to deprive the Plaintiff of his right to free exercise of religion, as secured by the First Amendment to the United States Constitution and made applicable to the States by the Fourteenth Amendment, by implementing land use regulations both on their face and as applied in a manner that burdens the Plaintiff's religious exercise without using the least restrictive means of achieving a compelling governmental interest.

**COUNT II**
**City of University Heights**
**and Michael Dylan Brennan**
**United States Constitution**
**42 U.S.C. § 1983: First Amendment**
**Freedom of Assembly**

279.     The foregoing paragraphs are incorporated by reference as if set forth fully herein.

280.     The City has deprived and continues to deprive the Plaintiff of his right to freedom of assembly, as secured by the First Amendment to the United States Constitution and made applicable to the States by the Fourteenth Amendment without using the least restrictive means of achieving a compelling governmental interest.

**COUNT III**
**City of University Heights**
**and Michael Dylan Brennan**
**United States Constitution**
**First Amendment, Prior Restraint**
**42 U.S.C. § 1983**

281.     The foregoing paragraphs are incorporated by reference as if set forth fully herein.

282.     The UHCO contains no articulated standards with respect to review by City Council of an application for an SUP for a house of worship in a residential zone or for variance approval by the City Council or the Planning Commission, and, as such, are an unconstitutional prior restraint on Plaintiff's protected religious expression and exercise under the First Amendment. The lack of such standards unconstitutionally provides the City Council and the Planning Commission with unbridled discretion in its review of such applications for a house of worship.

**COUNT IV**
**City of University Heights**
**and Michael Dylan Brennan**
**United States Constitution**
**42 U.S.C. § 1983: Fourth Amendment**
**Unreasonable search**

283.     The foregoing paragraphs are incorporated by reference as if set forth fully herein.

284.     The City has deprived and continues to deprive Plaintiff of his right to protection against unreasonable searches of his house by the Fourth Amendment and made applicable to the States by the Fourteenth Amendment by engaging in unwarranted, indiscriminate and intrusive video surveillance and surveillance by other means.

**COUNT V**
**City of University Heights**
**and Michael Dylan Brennan**
**United States Constitution**
**42 U.S.C. § 1983: Fifth Amendment**
**Due Process of Law**

285.     The foregoing paragraphs are incorporated by reference as if set forth fully herein.

286.     The City has deprived and continues to deprive Plaintiff of his right to due process of the law through its unlawful application of the City ordinances against Plaintiff and arbitrary and capricious application of laws, policies, and procedures.

**COUNT VI**
**City of University Heights**
**and Michael Dylan Brennan**
**United States Constitution**
**42 U.S.C. § 1983: Fourteenth Amendment**
**Equal Protection of the Law (Religious Discrimination)**

287.     The foregoing paragraphs are incorporated by reference as if set forth fully herein.

288.     The City has deprived and continues to deprive Plaintiff of his right to equal protection of the law through its discriminatory application of the City ordinances against Plaintiff based on his religious practice.

**COUNT VII**
**City of University Heights**
**and Michael Dylan Brennan**
**United States Constitution**
**42 U.S.C. § 1983: Fourteenth Amendment**
**Equal Protection of the Law (Class of One)**

289.    The foregoing paragraphs are incorporated by reference as if set forth fully herein.

290.    The City has deprived and continues to deprive Plaintiff of his right to equal protection of the law by singling out Plaintiff for arbitrary, capricious and discriminatory application of the City ordinances against Plaintiff, based on personal animus towards the Plaintiff.

**COUNT VIII**
**City of University Heights**
**and Michael Dylan Brennan**
**RLUIPA**
**42 U.S.C. § 2000cc(a)**
**"Substantial Burdens"**

291.    The foregoing paragraphs are incorporated by reference as if set forth fully herein.

292.    The City has violated RLUIPA's substantial burden provision by implementing land use regulations in a manner that imposes a substantial burden on Plaintiff's religious exercise and assembly, without furthering a compelling government interest.

**COUNT IX**
**City of University Heights**
**and Michael Dylan Brennan**
**RLUIPA**
**42 U.S.C. § 2000cc(b)(1)**
**"Equal Terms"**

293.    The foregoing paragraphs are incorporated by reference as if set forth fully herein.

294.    The City has violated RLUIPA's equal terms provision by imposing and implementing land use regulations in a manner that treats a religious assembly on less than equal terms with a nonreligious assembly.

**COUNT X**
**City of University Heights**
**and Michael Dylan Brennan**
**RLUIPA**
**42 U.S.C. § 2000cc(b)(2)**
**"non-discrimination"**

295.     The foregoing paragraphs are incorporated by reference as if set forth fully herein.

296.     The City has violated RLUIPA's non-discrimination provision by imposing and implementing land use regulations that discriminate against an assembly on the basis of religion or religious denomination.

**COUNT XI**
**City of University Heights**
**and Michael Dylan Brennan**
**RLUIPA**
**42 U.S.C. § 2000cc(b)(3)**
**"Unreasonable limitation"**

297.     The foregoing paragraphs are incorporated by reference as if set forth fully herein.

298.     The City has violated RLUIPA's unreasonable limitations provision by imposing and implementing land use regulations that totally exclude and/or unreasonably limits religious assemblies within the City.

**COUNT XII**
**City of University Heights**
**and Michael Dylan Brennan**
**Ohio Constitutions**
**Article I, Section 7**
**Right to Freedom from Direct or Indirect Government**
**Encroachment on Religious Exercise**

299.     The foregoing paragraphs are incorporated by reference as if set forth fully herein.

300.     The City has violated and continues to violate Plaintiff's "natural and indefeasible right to worship Almighty God according to the dictates of [his] own conscience" by imposing and implementing land use regulations that directly and indirectly encroach upon his free exercise of religion.

**COUNT XIII**
**City of University Heights**
**and Michael Dylan Brennan**
**Ohio Common Law Right to Worship**

301.    The foregoing paragraphs are incorporated by reference as if set forth fully herein.

302.    The City has violated and continues to violate Plaintiff right granted by Ohio common law to a place of worship "found in that part of the community where the people live" by imposing and implementing land use regulations that directly and indirectly encroach upon his free exercise of religion.

**COUNT XIV**
**City of University Heights**
**and Michael Dylan Brennan**
**Ohio Public Records Law**
**Ohio Code Section 149.43(C)(1)(b)**

303.    The foregoing paragraphs are incorporated by reference as if set forth fully herein.

304.    The City violated the Ohio Public Records Law by failing to promptly prepare and make available for inspection public records that were requested by Plaintiff in accordance with the law.

**COUNT XV**
**Michael Dylan Brennan and Jeffrey Porter**
**Ohio Common Law**
**Invasion of Privacy**

305.    The foregoing paragraphs are incorporated by reference as if set forth fully herein.

306.    Brennan and Porter invaded Plaintiff's privacy by intentionally intruding upon the solitude and seclusion and the private affairs and concerns of Plaintiff by surveilling Plaintiff in a manner that would be highly offensive to a reasonable person.

## COUNT XVI
### City of University Heights
### and Michael Dylan Brennan
### Freedom of Access to Clinic Entrances (FACE) Act
### 18 U.S.C. § 248

307.     The foregoing paragraphs are incorporated by reference as if set forth fully herein.

308.     Defendants, by engaging in acts which they knew would naturally and probably intimidate Plaintiff from exercising his religion, placed Plaintiff in apprehension of bodily harm to him and his family, in violation of the FACE act.

## COUNT XVII
### Michael Dylan Brennan and Jeffrey Porter
### Ohio Common Law
### Intentional infliction of emotional distress

309.     The foregoing paragraphs are incorporated by reference as if set forth fully herein.

310.     Brennan and Porter, by their extreme and outrageous conduct, intentionally or recklessly caused serious emotional distress to Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request that this Court grant the following relief:

A. Preliminary and permanent orders permitting Plaintiff to host prayer groups on Shabbos and Jewish holidays in his home without obtaining an SUP from the City.

B. An order declaring the City's conduct to be unlawful and unconstitutional.

C. An order enjoining the City from continuing to engage in conduct found to be unconstitutional.

D. An order enjoining the City from holding Plaintiff to a different more burdensome standard than other residents.

E. An order enjoining the City from unlawfully revoking permits already granted to Plaintiff.

F.  An order declaring that the City unlawfully and unconstitutionally discriminated against Plaintiff based on his religion and based on personal animus by, *inter alia*, imposing unlawful violations and citations on Plaintiff.

G.  An order declaring that all violations imposed unlawfully and unconstitutionally based on discrimination are null and void.

H.  An order declaring that Plaintiff is entitled to his certificate of occupancy for the Property.

I.  A writ of mandamus to compel the City to issue the Certificate of Occupancy and deliver a copy of same to Plaintiff within 3 days of the order.

J.  A writ of mandamus to compel the City to comply with Ohio Code 149.43(B) and produce the records requested by Plaintiff.

K.  An award for statutory fees, court costs, and attorney's fees set forth in Ohio Code 149.43(C)(2).

L.  An award of statutory fees pursuant to 18 U.S.C. § 248(c)(1)(B), for every instance that Brennan used fear and intimidation to prevent Plaintiff from exercising his religion.

M.  A declaration that the City's land use ordinances, to the extent that they substantially burden, exclude, unreasonably regulate, and discriminate against the Plaintiff's land use, are void, invalid and unconstitutional on their face on the ground that they violate the Free Exercise Clause of the First Amendment to the United States Constitution, the Religious Land Use and Institutionalized Persons Act, the Free Exercise Clause of the Ohio Constitution, and Ohio Common Law;

N.  A declaration that the City's land use ordinances, to the extent that they provide unbridled discretion to City decision makers when reviewing an application for an SUP or variances for a house of worship, and provide no reasonable time limits to obtain such decision, are void, invalid and unconstitutional on their face on the ground that they violate the First Amendment to the United States Constitution as a prior restraint on religious expression and exercise.

O.  Preliminary and permanent orders enjoining the City, its officers, employees, agents, successors and all others acting in concert with the City from applying their laws in a manner that violates the First, Fourth, Fifth, and/or Fourteenth Amendments to the United States Constitution, the Religious Land Use and Institutionalized Persons Act, the Free Exercise Clause of the Ohio Constitution, and Ohio Common Law, or undertaking any and all action in furtherance of these acts;

P.  An award of compensatory damages against the City in favor of Plaintiff as the Court deems just for the loss of his rights under the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, RLUIPA, the Ohio State Constitution, and Ohio Statutory and/or Common Law incurred by the Plaintiffs and caused by the City's laws and actions;

Q. An award of compensatory damages, emotional damages, and punitive damages against Defendant Brennan in favor of Plaintiff.

R. An award of compensatory damages, emotional damages, and punitive damages against Defendant Porter in favor of Plaintiff.

S. An award to the Plaintiff of full costs and attorneys' fees arising out of Defendants' actions and out of this litigation; and

T. Such other and further relief as this Court may deem just and appropriate.

## DEMAND FOR JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury in this action on all issues so triable.

Dated: September 8, 2022

Respectfully submitted,

Jonathan Stuart Gross
BarID MD-19121701
The Clevenger Firm
2833 Smith Ave.
Suite 331
Baltimore, MD 21208
(443) 813-0141
jon@clevengerfirm.com