## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| DANIEL GRAND, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF UNIVERSITY HEIGHTS, OHIO, | ) | |
| | ) | Civil Case No. 1:22-cv-1594 |
| *Defendant,* | ) | |
| | ) | |
| and | ) | **FIRST AMENDED** |
| | ) | **COMPLAINT** |
| MICHAEL DYLAN BRENNAN | ) | |
| In his official and individual capacity | ) | |
| | ) | |
| *Defendant,* | ) | |
| | ) | |
| and | ) | |
| | ) | |
| LUKE MCCONVILLE | ) | |
| In his individual capacity | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| And | ) | |
| | ) | |
| PAUL SIEMBORSKI | ) | |
| In his individual capacity | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |
| And | ) | |
| | ) | |
| APRIL URBAN | ) | |
| In her individual capacity | ) | |
| | ) | |

Defendant                                    )
                                             )
MICHAEL FINE                                 )
In his individual capacity                   )
                                             )
Defendant                                    )
                                             )
And                                          )
                                             )
STEPHANIE SCALISE                            )
In her individual capacity                   )
                                             )
Defendant                                    )
                                             )
And                                          )
                                             )
GEOFF ENGLEBRECHT                            )
In his individual capacity                   )
                                             )
Defendant                                    )
                                             )
And                                          )
                                             )
CHRISTOPHER COONEY                           )
                                             )
Defendant                                    )
                                             )
And                                          )
                                             )
JACK KLUZNIK                                 )
                                             )
Defendant                                    )

---

Plaintiff DANIEL GRAND, by and through his attorney, Jonathan Gross, respectfully

alleges as follows:

## <u>INTRODUCTION AND NATURE OF THE ACTION</u>

1.      Plaintiff Daniel Grand files this action to redress violations of his civil rights caused by the City of University Heights, Ohio; the Mayor Michael Dylan Brennan; the City Law Director Luke McConville; the City Planning Commission members Paul Siemborski, Michael Fine, and April Urban; the City Prosecutor Stephanie Scalise; the City Housing Director Geoff Englebrecht; and City residents Christopher Cooney and Jack Kluznik.

2.      The City's Orthodox Jewish community is currently clustered on the eastern most border of the City and has grown significantly in the last few years. By January of 2021, the number of Orthodox Jewish residents had become far greater than the total number of legally allowable seats in all of the City's Orthodox Jewish synagogues.

3.      Orthodox Jewish families have begun moving westward, further away from the eastern border where the Orthodox Jewish synagogues are located.  In 2019, Grand purchased a home on 2434 Miramar Blvd., in the western part of the City, approximately a mile's distance from the eastern border.

4.      Responding to this pressing need for places to pray, in January of 2021, Grand invited 15 of his friends over to pray in the privacy of his residential home in University Heights.

5.      Grand had no intention of converting his home into a synagogue.  He simply sought to satisfy the religious obligations of an Orthodox Jew by praying in his home with a "minyan," which is a group of at least 10 Jewish males aged 13 and above.  For Orthodox Jewish males, daily prayer with a minyan is a sincerely held religious obligation.  To pray in his home, Grand requires a minyan.

6.      A synagogue and a home are two completely different things.  A synagogue is not a home, and a home is not a synagogue.  A minyan in a home does not turn it into a synagogue.

7.     When the Defendants learned of Grand's plan to pray in his home, they conspired to prevent him from doing so, ginning up animosity among his neighbors, using the municipal powers of the City, and even threatening criminal prosecution.

8.     The plan to prevent Grand from praying included intentionally misinterpreting the City's zoning code and notifying Grand that he could not pray in his home without first obtaining a special use permit.  The ultimate plan was to prevent any and all Orthodox Jews from moving westward. The conspirators against Grand were aware that if the Orthodox Jews would have nowhere to pray in the west, they would not be able to move further west.

9.     Defendants Brennan and McConville and the City further threatened Grand that they would review and possibly revoke permits and variances that the City had granted in the past.

10.    Those Defendants made it clear that Grand had no choice but to apply for a special use permit to pray in his home, but the Defendants had no intention of granting him the permit.

11.    Grand's application was subjected to a hearing format that followed brand new procedures that no other permit applicant in the City had ever before been subjected to prior, including treating his application as a quasi-judicial proceeding, pursuant to Ohio Revised Code 2506.

12.    As part of the plan, Defendants conspired to gin up opposition to Grand and his application by deliberately misleading residents by telling them that Grand applied to build a synagogue in place of his house, which is false.

13.    Additionally, they tapped into the neighborhood's existing Judeophobic concern that if Grand were permitted to pray in his home, Orthodox Jews will follow his lead and continue to move west until the neighborhood gets "labeled a Jewish neighborhood."

14.     The mayor has stated both privately to Grand and publicly at official meetings that praying in a residential home, as Grand wished to do, is forbidden by the University Heights Codified Ordinances (the "UHCO") without first obtaining a Special Use Permit.  Accordingly, for over two years, Grand has been prevented from exercising his fundamental First Amendment right to free exercise of his religion.

15.     Since Grand moved into his home in 2019, he has experienced discrimination based on his religion. After Grand's invitation for friends to join him in Orthodox Jewish prayer in January of 2021, the City, led by its mayor, waged a zealous campaign of capricious enforcement of its local ordinances specifically targeting Grand and several other Orthodox Jews.  This campaign is part of a larger conspiracy that is directly responsive to a hostile segment of the mayor's constituency that seeks to prevent the growth of the City's Orthodox Jewish population by limiting the locations where Orthodox Jews can pray.

16.     Additionally, the City has targeted Grand individually through the intentional, arbitrary, and discriminatory application of its ordinances that have caused him substantial injuries.

17.     This action also challenges certain provisions of the UHCO that violate the United States Constitution, the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc, *et seq.* ("RLUIPA"), the Ohio Constitution, and Ohio common law.

18.     This action also challenges the discriminatory application of its laws against Grand and seeks compensation for the resulting damages and attorney's fees.


### JURISDICTION AND VENUE

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1343(3), (4), 42 U.S.C. § 2000cc, et seq., 18 U.S.C. § 248, and 42 U.S.C. § 1983,

which confer original jurisdiction on federal district courts in suits to redress the deprivation of rights, privileges and immunities secured by the laws and Constitution of the United States. This Court has supplemental jurisdiction over all state law claims under 28 U.S.C. § 1367(a).

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because the acts and transactions complained of occurred, and continue to occur, in this District.

## PARTIES

21.     Plaintiff DANIEL GRAND (hereinafter "Grand" or "Plaintiff") is and was an adult citizen of the State of Ohio, and at all times relevant to this action resided at 2343 Miramar Blvd., University Heights, Ohio, 44118 (hereinafter the "Property").

22.     Defendant CITY OF UNIVERSITY HEIGHTS, OHIO (hereinafter the "City") is a chartered municipal corporation in Cuyahoga County, Ohio having offices at 2300 Warrensville Center Road, University Heights, Ohio 44118.

23.     Defendant MICHAEL DYLAN BRENNAN, Esq. (hereinafter "Brennan" or the "Mayor") is an adult citizen of the State of Ohio and at all relevant times to this action was the Mayor of the City.

24.     Defendant LUKE MCCONVILLE, Esq. (hereinafter "McConville" or the "Law Director") is an adult citizen of Ohio.

25.     Defendant PAUL SIEMBORSKI, R.A. is an adult citizen of Ohio.

26.     Defendant APRIL URBAN is an adult citizen of Ohio.

27.     Defendant MICHAEL FINE, Esq. is an adult citizen of Ohio.

28.     Defendant STEPHANIE SCALISE, Esq. (hereinafter "Scalise" or the "Prosecutor") is an adult citizen of Ohio.

29.     Defendant GEOFF ENGLEBRECHT (hereinafter "Englebrecht" or the "Housing Director") is an adult citizen of Ohio.

30.     Defendant CHRISTOPHER COONEY is an adult citizen of Ohio.

31.     Defendant JACK KLUZNIK, Esq. is an adult citizen of Ohio.

## FACTUAL ALLEGATIONS

### The Defendants conspired to prevent Plaintiff from praying in his home.

32.     Plaintiff lives at the Property with his wife and his four small children, ages 6, 5, 3, and 1.

33.     Plaintiff is an Orthodox Jew and observes the laws of Orthodox Judaism, including thrice daily prayer and the observance of "Shabbos" and Jewish holidays which includes, at minimum, refraining from traveling by car every week from sunset Friday until stars emerge on Saturday night, the same driving restrictions exist on several Jewish holidays throughout the year as well.

34.     According to his religious beliefs, Grand, as the man of the house, is required to pray with a minyan three times every weekday, and four times on Shabbos and holidays when driving is prohibited.  Accordingly, to exercise his religion, Grand must live within walking distance of a Jewish Synagogue or else have a place to gather with at least ten Jewish men for prayer on Shabbos and holidays.

35.     The closest Jewish Synagogue where Plaintiff can meet this requirement is three quarters of a mile away from the Property.  As part of his religious beliefs, Plaintiff is required to pray with a minyan on Friday night, on Saturday morning, and on Saturday afternoon/evening, and in between services it is a religious duty to eat festive meals at home with his family. Accordingly,

to attend services on Shabbos at a Synagogue requires four round trips; back and forth Friday evening, back and forth Saturday morning, back and forth Saturday afternoon, and back and forth Saturday evening. Based on that requirement, on any given week Plaintiff must walk six miles, which is very difficult throughout the year, and especially difficult during the cold winters and hot summers.

36.     On Wednesday, January 20, 2021, Plaintiff invited 15 friends to pray at his home on the upcoming Shabbos.

37.     The invitation was sent by private email to 15 of Grand's Orthodox Jewish friends that live within walking distance.

38.     Grand did not advertise the invitation to the general public.

39.     Before Shabbos arrived, on Thursday, January 21, 2022, at 5:08 PM, Michael Dylan Brennan, the City Mayor, called Plaintiff's personal phone and left a voice message asking Plaintiff to call him back regarding an "urgent matter."  Brennan left his official office number and his personal cell phone number.

40.     That same day, at 5:22 PM, at the behest of the Mayor, Plaintiff received an email from Luke McConville, the City Law Director containing a cease-and-desist letter from the City regarding "2343 Miramar Blvd., University Heights, OH 44118, Planned Operation of Shul/Place of Religious Assembly."

41.     Plaintiff was shocked to receive the call and the email. He did not know how the City ever became aware of the invitation he sent to several of his friends to come to his home to pray; further, Plaintiff had never actually had a minyan in his home.

42.     Simply inviting a few friends over to pray resulted in the City, and its mayor, accusing him of starting/operating an illicit synagogue and threatening him with legal action.

43.     Mayor Brennan learned about the private email from a resident who was not an invitee, who informed Brennan about Grand's private email on January 21, 2021, at 12:14 PM, asking Brennan to "put a stop to this."

44.     Upon receiving the private email, without any investigation or communication with Grand, Brennan immediately involved the Law Director Luke McConville and set out to prevent Grand from praying in his home.  The emails between Brennan and McConville were titled "mirimar synagogue," showing that they believed that praying in a residential home constitutes a "synagogue" that violates the City zoning code.

45.     Plaintiff called Brennan back that day. On the phone, Brennan said to Plaintiff, "You are under no circumstances allowed to have any type of religious gathering in your home without first obtaining a special use permit under Chapter 1274 of the University Heights Code."

46.     Plaintiff said, "I just invited people over to my house to pray, I am not trying to operate a synagogue, and I should not need a permit to do that."  Plaintiff asked him rhetorically, "If there are ten Jews in a room, does that make it a synagogue?"

47.     Brennan responded to Grand's rhetorical question and said, "Yes it does, and if you do so in your home you will be in violation of [UHCO] Chapter 1274 for operating an illegal synagogue."

48.     Brennan went further and said, "if you go ahead and do what you just described, you will be in violation of the cease-and-desist order and the City will take all legal means available to it."

49.     Plaintiff understood this as a threat of criminal prosecution if he were to invite ten friends over to his house to pray.

50.     Brennan advised Plaintiff that the only way to legally have people pray in his home was to obtain a Special Use Permit from the City Planning Commission (the "PC").

51.     A few days later, Plaintiff also received in the mail the same cease-and-desist letter from the City dated January 21, 2021.

52.     The cease-and-desist letter stated that Plaintiff could not use the Property as a place of religious assembly without obtaining a Special Use Permit, and that:

> to the extent that the Premises are currently being used for said purposes or are intended to be used for such purposes in the immediate or near future, the City hereby demands that you immediately cease and desist any and all such operations. Violations of the City's ordinances in this manner may result in building code citations against you and in the pursuit of additional remedies.

53.     The letter also stated:

> The City is particularly disturbed to learn of the proposed use of the Premises as a place of religious assembly given that you recently appeared before the City's Board of Zoning Appeals in connection with your application for variances.  The City is exploring whether variances granted for the Premises may be voidable based upon a subsequent illegal use of the Premises, or due to material omissions during the hearing process relating to your intent to utilize the Premises as a place of religious assembly.

54.     Plaintiff understood this as the City threatening to use its municipal authority to revoke variances already approved if Plaintiff would pray with a minyan in his home.

55.     Upon information and belief, this was an unprecedented action by the City; countless residents have invited ten or more people to their residential homes and the City has never before sent a cease-and-desist letter before the meeting took place, if at all.

56.     As is set forth below in greater detail, the City and Brennan's actions were motivated by animus towards Orthodox Jews in general, and animus towards Daniel Grand specifically.

57.     Plaintiff took the City's threat very seriously, and the very next day, Friday, January 22, 2021, he emailed the City clerk:

Apparently, unbeknownst to me, I will need to file for a special use permit with the City Planning Commission to have friends come over to pray at my house.  I am totally willing to comply (as usual) - I need to fill out an application today and submit it back to you today so I can be inside the 14 day window of the next upcoming meeting - God willing I will be able to make it in - I have my checks ready, one for $100 and one for $300 - I have the paperwork I need to submit, the drawings and a picture, and all I need is the application which I will fill out like greased lightning and get it right back to you.

58.     At the time, Grand was unfamiliar with UHCO Section 1274, which regulates permits for synagogues. He believed that Brennan and McConville as high-ranking government officials and attorneys were acting in good faith and were guiding Grand towards accomplishing his goal to pray in his home.  He submitted his application and paid the $400 fee in good faith, believing his application would be summarily granted, because, after all, he was instructed to apply by the Mayor and the Law Director.  Even so, he considered the $400 fee, the application, and the hearing to be burdensome, and even wondered why it was necessary and how it could be constitutional.

59.     Because of this burden imposed by the City, the Mayor, and the Law Director, Grand was forced to cancel his invitation and was not able to pray in his home as planned on Shabbos, January 23, 2021, or thereafter.

60.     Plaintiff's application to "have friends over to pray at [his] house" was submitted to the PC and a hearing was scheduled for March 4, 2021.

61.     The hearing on March 4, 2021, was held virtually and is available for viewing on the City's YouTube channel[1] and is incorporated as if set forth fully herein.  Over 100 people attended the hearing on March 4. This itself was atypical; hearings of this kind are usually attended by only the applicants and those few residents directly impacted by the application.

---

[1] City of University Heights, Planning Commission Meeting, March 4, 2021, www.youtube.com/watch?v=D5kP12aBUUY (last visited, April 20, 2023).

62.    Normal practice is for the City to mail out a letter giving notice of the upcoming hearing to adjoining homes, but in this case many more people were notified.

63.    Prior to the hearing, Brennan coordinated with the opposition and created and circulated a map which highlighted all the houses of City residents that he knew opposed Plaintiff's application in pink, and also singled out Grand's home in blue.

64.    Grand was not provided with this map prior to the hearing.

65.    The map was circulated among the PC members prior to the hearing but was not mentioned on the record at the hearing.

66.    Defendants Christopher Cooney and Jack Kluznik were the acknowledged leaders of the residents' opposition to Grand's application.

67.    Upon information and belief, Cooney and Kluznik were in contact with members of the PC and the Law Director about the hearing prior to the hearing.

68.    Cooney's wife was sent by Cooney door-to-door to collect signatures for a petition in opposition of Grand's application, and to deliberately misinform the neighbors that Grand was applying to build a synagogue in place of his house, to gin up animosity and hostility, and to encourage wide attendance at the hearing.

69.    Upon information and belief, Brennan arranged for residents who he knew opposed Plaintiff's application to be notified of the hearing, though they would not have been notified under ordinary circumstances.

70.    Upon information and belief, Brennan arranged that certain residents who lived near Grand and who Brennan thought would be supportive of Grand's application did not receive notification for the hearing.

71.     The hearing began with Plaintiff's counsel presenting Plaintiff's proposal to pray in his home on Shabbos and Jewish holidays when driving is prohibited.

72.     For over an hour, several angry residents vehemently expressed their opposition to the application.

73.     Defendants Cooney and Kluznik, two City residents, attended the hearing and spoke in opposition.

74.     Many residents in opposition stated that Defendant Cooney spoke for them.

75.     The PC noted on the record that it received a petition in opposition to the application with 195 signatures, but Plaintiff was prevented by Brennan from mentioning a petition with over 200 signatures in support of his application that he had submitted to the PC at the hearing.

76.     Specifically, Grand tried to introduce the petition several times and was prevented by the Law Director.  At one point, Defendant Cooney, who was not a member of the Planning Commission, was permitted by Brennan and McConville to take control of the hearing while Grand was speaking and directed Brennan not to allow Grand to speak, and Brennan complied with Defendant Cooney's direction.

77.     The PC is composed of 5 members, including Brennan who chairs the PC.  Brennan and PC member Siemborski expressed that they were in favor of skipping deliberation altogether and summarily denying the application.

78.     PC member Michael Fine stated that "the whole format that we are going through tonight is different than what we have used before, and I have been on the Planning Commission for a number of years, and I don't understand why the format is so dramatically different."  He also stated that the process that Plaintiff was subjected to lent itself to a "hostile confrontational approach."

79.     Similarly, Siemborski wrote an email the next morning including the entire Planning Commission, Brennan, and the Law Director.  "I felt we handled the meeting last night poorly.  Never had we allowed such a format.  And I was appalled at the Grand standing and showmanship we allowed between the applicant and his attorney.  I am just an Architect.  That we turned this into a court proceeding was wrong in my opinion."

80.     What Siemborski and Fine were referring to was Brennan and McConville's decision to conduct the meeting in a quasi-judicial format, pursuant to Ohio Revised Code 2506.

81.     No other applicant had ever been subjected to a quasi-judicial format prior to Grand.

82.     Grand was not informed in advance that his application would be the first application ever in the history of University Heights SUP hearings to be conducted as a quasi-judicial proceeding, and accordingly had no way to prepare properly for the hearing.

83.     The strange format was part of the Defendants' plan to deny Grand his application to pray in his home, and preemptively cut off any potential avenue for Grand to appeal.

84.     PC member Siemborski insisted that he had to leave the meeting at 10:15 pm and urged the committee to deny the application without any deliberation.

85.     Immediately after the meeting, Siemborski contacted McConville and told him that the hearing was a waste of time, and that Grand should not have been granted a hearing at all.  In his opinion, when Grand submitted his application, he should have simply been told up front, "this is not allowed on Miramar."

86.     The PC voted 3-2 to table the application, with Brennan and Siemborski voting against.

87.     The hearing ended with shouting and yelling from the angry and hostile audience of residents that had hoped to see Plaintiff's application denied.

88.     The hearing was scheduled to continue on March 23, 2021.[2]

89.     Outside of and in between the public hearings, the members of the Planning Commission, the Law Director, and the Mayor, illegally communicated amongst themselves about the tabled application.

90.     For instance, On March 10, 2021, PC member Paul Siemborski, sent the following email to Law Director Luke McConville: "Luke, these are my scribbles from your call to me yesterday of the 4 variances the applicant would still need (should the planning commission be dumb enough to allow such use on Miramar).  I think it would be great if you could have someone type these up in lay person terms and distribute as information along with the map I sent…. and this should go out in advance of any meeting.  My 2 cents.  Paul"

91.     Both sender and recipient used non-government emails to communicate.

92.     The email shows that Siemborski and McConville communicated *ex parte* of the quasi-judicial proceeding.  It also shows that the law director and a PC member were working together to provide Grand's neighbors with materials in advance of the meeting to secretly assist the neighbors in articulating opposition to Grand's application.

93.     Neither McConville nor Siemborski nor any other City official or volunteer contacted Grand to inform him of any variances that he would need for his application.

94.     It has been stated by the City that it is customary for the City to work together with SUP applicants.

---

[2] City of University Heights, Special Planning Commission Meeting, March 23, 2021, www.youtube.com/watch?v=5Pl0YbrbZek (last viewed Sept.5, 2021).

95. In Grand's case, as this *ex parte* email from McConville to Siemborski shows, the City compiled a list of variances not for the purpose of assisting the applicant, but for the purpose of undermining the application.

96. The "scribbles" referred to by Siemborski included intentionally inaccurate representations of provisions of the University Heights Codified Ordinances to distribute to lay people, including "all uses must have front on the streets Green [Road]."

97. In further preparation for the PC hearing, the entire PC deliberated privately in closed session by email to discuss Grand's application without calling for executive session and without notifying Grand or the public of the deliberations, in violation of the Ohio Open Meetings Act, Ohio Revised Code, Section 121.22.

98. For instance, before the initial PC hearing, PC member Michael Fine sent an email from a non-government email to the Mayor and the Law Director, and to the rest of the PC. The email was sent to the non-government emails of PC members Urban and Siemborski. The email stated that "In correspondence distributed in connection with the upcoming Planning meeting [to consider Grand's SUP application], there are allegations of numerous and significant violations and failures to act as agreed with the BZA in regard to variances granted."

99. Whatever allegations he was referring to were false, as Mr. Grand had not received a single property violation from the City. The first property violation ever issued to Grand was issued on Passover, a week after the March 23, 2021 PC hearing, after the Mayor directed the residents to "report" potential violations to the City, as set forth below.

100. Further, on March 12, 2021, before the March 23, 2021 PC hearing, Brennan published a letter regarding Grand's application.

101.    The letter stated expressly, "To be clear, the administration does not endorse or support the application."

102.    Brennan's letter went on to state that Brennan, as chair of the Planning Commission, introduced a new procedure for Grand's application so that Grand would be prevented from appealing to another body de novo.

103.    Before Brennan published his letter to the general public, he sent it in an email to the entire City Council, all City department heads, and the City Law Director.

104.    Not a single recipient objected to the substance of the Mayor's letter.

105.    As set forth below, pursuant to the University Heights Codified Ordinances, even if Grand had received a recommendation from the Planning Commission for his application, the City council could deny his application for any reason.

106.    Accordingly, Brennan, who was both chair of the Planning Commission and the Mayor of the City, had announced publicly that any further attempts to pursue the application would ultimately result in futility because the City Council would deny the application.

107.    Further, Brennan's letter revealed that Brennan's intention was to deny Grand's application in a manner that would foreclose other avenues of appeal.

108.    Kluznik and Cooney communicated with and coordinated with McConville prior to the March 23, 2021 hearing.

109.    On March 11, 2021, Grand was notified of the March 23, 2021 hearing.  On March 17, 2021, Brennan informed Grand that Grand would not be able to provide any further testimony or evidence at the upcoming hearing.

110.    Plaintiff rightly understood that his application was doomed, so he withdrew his application prior to the March 23, 2021 hearing.

111.    The PC held a public meeting on March 23, 2021.  Brennan stated at the meeting:

Let there be no confusion: Congregating at 2343 Miramar Blvd., or any other address located in a residence zoned U-1, without a special-use SUP is a violation of city law. I am hopeful that the wording of the withdrawal is not intended to suggest that congregating weekly at a residence to conduct activities consistent with those in a house of assembly does not require a special-use SUP.  As recently as two months ago, the city brought suit against the organizers of another residential shul, one on Churchill Boulevard, and ultimately obtained a permanent injunction in court.

To the community members who are here, let there be no question. There is no permission granted here to operate … a house of assembly or conduct activities consistent with one at 2343 Miramar Blvd. If you observe such activities – and I hope you do not – but if you do, you may report them to the city, and the city will enforce its laws which exist for the benefit of the entire community, and we will seek all appropriate remedies in court.

112.    Though the mayor said that all congregating at residential homes requires a SUP, in practice, the City has only enforced this draconian and unconstitutional application against Orthodox Jews.

113.    For example, students who attend the local college routinely hold gatherings at residential homes, as do many other affinity groups, and have never applied for, obtained, or been told by the City or the mayor that they need to obtain a SUP.

114.    Upon information and belief, only Orthodox Jews have been prohibited by the City from praying in residential homes.

115.    Upon information and belief, Brennan and Law Director McConville, who are attorneys, were aware that requiring a special use permit for gathering for prayer in a residential home is prohibited by the United States Constitution, the Ohio Constitution, and other federal laws, regardless of any interpretation of the local ordinances.

116.    Plaintiff did not need a permit to pray in his home and he should not have been subjected to a hearing before the PC.

117.    By forcing Plaintiff to submit an application and appear before the PC, Brennan needlessly provoked City residents by alerting them to Plaintiff's plans to pray in his home, thereby inciting residents against Plaintiff and causing Plaintiff shame, humiliation, as well as apprehension and fear of exercising his religion.

118.    Because of the Defendants' actions, Plaintiff has never been allowed to pray in his home.

119.    The cease-and-desist letter is still in effect to this day.

## The Defendants' actions against Plaintiff were motivated by animus against Orthodox Jews.

120.    The Defendants' actions to prevent Plaintiff from praying in his home is consistent with a systematic campaign to prevent the City's Orthodox Jewish community from expanding.

121.    As set forth below, the City's zoning code, as written and as applied, has effectively limited the construction of Orthodox Jewish synagogues to one street, Green Road, on the extreme eastern border of the City.

122.    As a result, the City's established Orthodox Jewish community is clustered on the extreme eastern side of the City, along Green Road, which some residents refer to as "the Green Road Ghetto."

123.    The Property where Plaintiff lives is outside of the City's established Orthodox Jewish cluster; Plaintiff is one of only a handful of Orthodox Jews who live among mostly non-Jewish neighbors, many of whom attend GESU, a large Catholic church with a 700-student school, that is located on the very same street as Plaintiff's Property, less than 800 feet away.

124.    GESU holds daily religious gatherings many times the size of that which Plaintiff sought to hold at his house on Shabbos and Jewish holidays.

125.    There exists a segment of the City's constituency that seeks to prevent the Jewish community from spreading from the eastern border of the City westward towards the City's interior where the GESU community is located.

126.    That which is happening in the City of University Heights is a common story that exists in several towns and cities throughout the United States with growing Orthodox Jewish communities, namely, a hostile population views a growing influx of Orthodox Jewish residents as an invasion of sorts, and new Orthodox Jewish prayer groups as beachheads for the invading army to advance and capture new territory.

127.    The City's current attempt to use municipal powers to prevent Orthodox Jewish prayer is just the latest iteration of similar episodes that occurred in surrounding cities.   Just over 20 years ago, in the neighboring city of Beachwood, Ohio, the residents fought a protracted legal battle to prevent Orthodox Jews from building synagogues.  The saga was famously chronicled in the book, *Jew vs. Jew: The Struggle for the Soul of American Jewry,* by Pulitzer Prize finalist Samuel G. Freedman.  In the 1950s, after the neighboring city of South Euclid denied a SUP to an Orthodox Jewish synagogue, the Ohio Court of Common Pleas held that "the action of the authorities has no foundation in reason and is a mere arbitrary or irrational exercise of power having no substantial relation to the public health, the public morals, the public safety or the public welfare in its proper sense."  *Young Israel Org. v. Dworkin*, 105 Ohio App. 89, 103, 133 N.E.2d 174, 182 (1956) (internal quotations and citations omitted).

128. Defendants' actions towards Plaintiff are directly in response to a hostile constituency that wants to prevent new Orthodox Jewish prayer anywhere in the heart of the neighborhood.

129. Upon information and belief, Brennan premeditated that his vote would be to deny Plaintiff's application for a permit before the PC hearing on March 4, 2021.

130. Upon information and belief, the purpose of the hearing was part of a greater plan to intimidate Plaintiff into canceling his plans to pray in his home, and, by delivering Plaintiff a formal denial, to ultimately establish a new precedent in the town, so others would be dissuaded from trying as well.

131. As a matter of fact, the plan has thus far been successful.

132. Nothing that Plaintiff could have presented at the hearing would have swayed Brennan's decision to vote against granting the permit.

133. Upon information and belief, in advance of the hearing, Brennan conspired with City residents, including Cooney and Kluznik, to gin up hostile opposition to Plaintiff's application by deliberately spreading disinformation about Plaintiff's intentions and encouraging people to attend the hearing to express hostile opposition and further intimidate Plaintiff.

134. Moreover, the ordinance that restricts houses of worship in the City, as set forth below, is unconstitutional; a hearing was unnecessary and there is no process that Grand needs to exhaust to exercise his basic constitutional right to pray in his home.

135. At least ten of the people who spoke in opposition to Plaintiff's application at the hearing were Plaintiff's neighbors and are self-proclaimed affiliates with GESU.

136. Several people who spoke in opposition made statements regarding Plaintiff's Orthodox Jewish religion and expressed that if Plaintiff did not want to walk far to synagogue, he

should not have purchased a home in the GESU neighborhood; he should have purchased a home near Green Road where the City permits Orthodox Jewish synagogues.

137.    Prior to the hearing, Plaintiff heard one neighbor say to another "Grand is trying to create a Jewish synagogue on our block, and we don't want that type of thing around here."

138.    In advance of the hearing, one neighbor sent a letter to the PC expressing opposition to Plaintiff's application, stating:

> I am not Jewish and I do not want our neighborhood labeled as Jewish. This is not prejudice, it is simply common sense. GESU school draws an awful lot of people to University Hts. And that has kept the area vital.

139.    At the PC hearing, the PC referenced a petition of 195 signatures in opposition to Grand's application but ignored and refused to mention for the record the existence of petitions of support that Grand submitted in advance of the hearing which all members received copies of prior to the hearing.  The petitions included a petition with 240 Jewish residents and a petition signed by six community rabbis.

140.    The PC referred to the will of the residents in opposition as the will of the "community" whereas the will of the Jewish residents was not considered at all.

141.    After the PC hearing on March 4, 2021, the PC continued to privately deliberate by email, in violation of the Ohio Open Meetings Act.

142.    During those private deliberations, on March 9, 2021, Defendant Urban expressly stated that she intended to deny the application based purely on the opposition but decided to vote to table instead because she "firmly believe[d] that course of action would have toed the line of violating fair housing law, and would have put the city in a bad position."

143.    Specifically, she cited a Joint Statement of HUD and the DOJ about the FHA's prohibition of discrimination in housing on the basis of religion and other protected classes.

144.    Defendant Urban also admitted in the private deliberations that "We don't require other social gatherings occurring in a private home to have a special use permit."

145.    Defendant Urban acknowledged the "anti-semetic rhetoric and sentiment that goes against fair housing laws," including:

> "Repeated stated concerns about property tax exemption, especially after it has been explained these concerns are irrelevant, repeated concerns about the Shul being a profit-making commercial business, concerns about community 'change,' claims of long-standing community ownership, statements that the applicant should 'move somewhere else' if inconvenienced."

146.    After Plaintiff received his cease-and-desist letter in January, between February and May of 2021, the City took action against at least three other Orthodox Jews that assembled or planned to assemble in residential homes.

147.    Upon information and belief, the City did/does not similarly target any poker games, game nights, boy scout meetings, Tupperware parties, fraternities/sororities, or any non-Orthodox Jewish prayer that takes place in residential homes.

148.    There currently exists ample evidence, and discovery will reveal further evidence, that the City and Brennan were engaged in a systematic campaign against Orthodox Jews in the City, and their actions against Plaintiff were the tip of the spear.


**Plaintiff has been subjected to harassment and intimidation based on his Orthodox Jewish practice and based on personal animus.**

149.    Plaintiff is not ashamed of his Orthodox Jewish religion and wears a yarmulke on his head when in public.

150.    When Plaintiff moved to the Property, most neighbors were immediately aware of his Orthodox Jewish religion when they saw him wearing a yarmulke indicating his religious affiliation.

151.    One neighbor openly expressed at a public meeting that from the first time she met Plaintiff, his Orthodox Jewish character made her "suspicious."

152.    Brennan has long been aware of Plaintiff's Orthodox Jewish practice because soon after Brennan was elected in early 2019, Plaintiff reserved an appointment with Brennan as the newly elected Mayor and went to the mayor's office wearing a yarmulke to congratulate Brennan on his new position.

153.    Plaintiff has experienced hostility from his neighbors and the City because of his Orthodox Jewish religion.

154.    Plaintiff's neighbors yelled "you have a temple in your house" and "we don't want your kind here."

155.    By way of example, when one neighbor first met Plaintiff, Plaintiff was wearing a baseball cap over his yarmulke, so the neighbor, who was unaware that Plaintiff was an Orthodox Jew, acted kindly towards him, but when he subsequently discovered that Plaintiff was an Orthodox Jew, he began acting hostile.

156.    Based on their hostility and suspicion of Orthodox Jews, Plaintiff's neighbors have harassed Plaintiff and made baseless complaints to the City against him.

157.    Rather than protect Plaintiff from religious bigotry, the City has decided to placate Plaintiff's neighbors and has also harassed Plaintiff.

158.    By way of example, the City has set up regular patrols of Plaintiff's home.

159.    On March 23, 2021, the same day that Brennan had publicly called on residents to report any attempts at hosting prayer groups in residential homes, an email was sent out by Lt. Mark McArtor to "Uniform Div." of the City Police Department which instructed:

> As part of your patrols, please make frequent drive-bys at 2343 Miramar Blvd. for violations to 452.03 Prohibited Standing or parking Places of parking on

landscaped surfaces.  If violations are observed, citations will be "the preferred course of action."  Also be aware, there is a great deal of contention between this address and the surrounding neighbors since the 2343 resident applied to the Planning Commission for approval to operate a Schul [sic].  If you observe or respond to the location for parking or noise complaints, be sure to log the activity in CAD.

160.    Further, Brennan has viewed surveillance footage set up by Plaintiff's neighbor to spy on Plaintiff.

161.    Plaintiff's neighbor, a retired police officer, set up three surveillance cameras pointed at and into Plaintiff's house to spy on Plaintiff, his wife, and his young children.

162.    Because of the cameras, Plaintiff was forced to keep his bathroom shades down at all times.

163.    Brennan admitted in public statements that the retired police officer shared with Brennan and the City Police Department surveillance videos of Plaintiff's activities on his property, and that the City spent many hours and resources responding to him.

164.    Upon information and belief, the retired police officer acted with impunity based on direction from Brennan to surveil Plaintiff and assurances from Brennan that, as the mayor, he would shield him from any consequences.

165.    Plaintiff asked the City to intervene and have the cameras removed, even citing a City ordinance that prohibits a person from disturbing the privacy of another person and suggesting that setting up surveillance cameras to spy on a neighbor violated the ordinance.

166.    Despite Plaintiff's requests, the City did not take any action to enjoin the retired police officer from disturbing Plaintiff's privacy.

167.    Specifically, Defendant Stephanie Scalise, the City Prosecutor, through inaction, allowed the surveillance to continue.

168.    Because the City did nothing to protect Plaintiff's privacy from the intrusive surveillance by his neighbor - and by extension the City and Brennan - Plaintiff erected a fabric barrier on his own Property to shield him from surveillance, at his own expense.

169.    Instead of demanding that Plaintiff's neighbor removes the three cameras, a City attorney informed Plaintiff that the fabric barrier did not meet the City's fence code and demanded that Plaintiff remove it, which he did, at his own expense.

170.    Another example of harassment occurred on the afternoon of May 7, 2021, when Plaintiff was visited by a friend from Israel.  Plaintiff's friend and an associate were driving through the City together.  Plaintiff's friend stopped to visit with Plaintiff in Plaintiff's home, while the associate waited in the car parked outside.  The associate, who was wearing a yarmulke, sat in the parked car during the day on the street outside Plaintiff's house for about an hour and a half. Twice during that time, City police approached his car and asked him "are you here for the shul?"

171.    On September 7, 2021, which was Rosh Hashanah - one of the holiest days of the Jewish year - Plaintiff was making his usual trek to Synagogue, which he must do every Shabbos and holiday because the City will not permit him to pray in his home.  He saw a suspicious man sitting in a dark unmarked car.

172.    Plaintiff approached the man and asked him what he was doing there.  The man said he was part of a private security detail and that there were two others on the block and that the City Police were aware of their presence and activities.

173.    Plaintiff had no way to verify the suspicious man's dubious claims, which later proved to be false, and Plaintiff had no way to ascertain that the suspicious man parked outside a synagogue during a day of assembly was not armed and/or dangerous.

174.   At that moment, Plaintiff credibly feared that the man was a physical threat to him and to the other Orthodox Jews gathering to pray on the holiest day of the year.

175.   According to the Anti-Defamation league, Jews are consistently the most targeted religious community in the U.S.; Antisemitic incidents are being reported at record levels: Jewish institutions are vulnerable targets; Jews are regularly targeted because of their actual or perceived support for Israel and Zionism; Extremists and antisemites perpetrate deadly violence against Jews; Jews have been the targets of at least 21 extremist plots or credible threats since 2016.[3]

176.   Because of the looming and very real threat of violence against Jews, the Jewish Federation of Cleveland organizes private security details *in marked vehicles* to protect the Jewish community on a daily basis, which is why the unmarked vehicle stalking the synagogue on Rosh Hashanah was so suspicious.

177.   According to the FBI, crimes targeting the Jewish community consistently constitute over half of all religion-based crimes.  There have been dozens of attacks and plots of violence and terrorism against synagogues in the last few years.  For example: In December 2019, Jews were attacked while attending a Chanukah party at a rabbi's house in Monsey, New York, leaving one Jew murdered and four injured; In April 2019, Jews attending a synagogue in Poway, California were attacked, leaving one Jew murdered and three injured; In October of 2018, Jews attending the Tree of Life Synagogue in Pittsburgh, Pennsylvania were attacked, leaving 11 Jews murdered, and seven injured, including four police officers; In January 2022, in Colleyville, Texas, a gunman entered a synagogue during services and took three congregants and a rabbi as hostages;

---

[3] *See* Anti-Defamation League, *Six Facts About Threats to the Jewish Community,* Jan. 16, 2022, www.adl.org/blog/six-facts-about-threats-to-the-jewish-community (last visited Sept. 5, 2022).

In November 2019, in Pueblo, Colorado, federal authorities arrested a Neo-Nazi on charges related to an alleged plot to blow up a synagogue.[4]

178.    Plaintiff was apprehensive about going into synagogue, fearing that the suspicious man could be related to a terrorist plot.

179.    Plaintiff then heard the man talking on the phone and he heard the man say, "Yes, Mr. Mayor.  Yes, Mr. Mayor."  Plaintiff believed that the suspicious man was speaking to Brennan.

180.    When other members of the Jewish community became aware of the suspicious man's presence, a Jewish person was compelled to use their cell phone to call law enforcement, something that on a Jewish holiday is only allowed by Jewish law when there is a potential threat to human life.

181.    It was subsequently revealed at a City Council meeting that Brennan authorized the hiring of a private investigator to sit outside of the home of an Orthodox Jewish family to spy on Orthodox Jewish residents and to gain information about Orthodox Jews praying in residential homes on one of the holiest days of the year.

182.    The event was deeply traumatizing to Plaintiff because at the time he had a reasonable apprehension of bodily harm to him and his family.

183.    Brennan knew or should have known that his actions would naturally and probably intimidate Plaintiff and other Orthodox Jews from exercising their religion by creating the apprehension of bodily harm.

184.    On July 28, 2021, Plaintiff submitted an information request form to the City seeking: "any and all emails having anything to do with Daniel Grand and or my property 2343 Miramar Blvd.  Emails from the Law Director, the Mayor, Council Members, the Police Dept., the

---

[4] *See id.*

Fire Department, Service Department, and from administration personnel, clerical or otherwise, Building Department, Housing Department, any and all files related to Daniel Grand, AKA Danny Grand, and Property 2343 Miramar Blvd."

185. Plaintiff followed up several times, including the most recent emails sent to the City on June 22, 2022, and September 2, 2022, over a year later, and to date, the City has not responded to Plaintiff's request.

186. During this time period, the City received multiple requests about Grand's property from other individuals and made sure to expeditiously satisfy the requests so as to avoid exposure to "monetary sanctions."

187. After this lawsuit was filed, the City produced some documents in response to Plaintiff's request, but the City has yet to satisfy Grand's request in full.

188. The City clerk informed Plaintiff that the file he requested that the City has not provided to him is "thousands of pages long."

189. Upon information and belief, there is no other resident who moved to University Heights only a few years ago, as Plaintiff did, that has a file with the City that is thousands of pages long.

190. The length of the file is due to Brennan's and the City's singling out Plaintiff for harassment because of his religious practice and because of personal animus.

191. From the end of May until early July of 2021, the City singled out Plaintiff's home by intermittently stopping the pickup of Plaintiff's garbage on the regular garbage day.

192. Plaintiff was forced to complain several times to the City sanitation workers about skipping his home, and made several calls to the service director, but nobody would give Plaintiff a reason as to why he was being singled out among his neighbors and being skipped.

193.    Finally, after several weeks of calling the service director, the service director arrived unannounced at Plaintiff's property and was hostile to Plaintiff and to Plaintiff's wife.

194.    The service director said he ordered his staff to skip Plaintiff's Property because the conditions of Plaintiff's Property made it difficult to pick up the garbage cans. The Director said that they would only pick up Plaintiff's garbage if he put it on the curb.

195.    No other neighbor on Plaintiff's street is required to do so; however, Plaintiff's property is not different from his neighbors who were not singled out by skipping.

196.    Based on the known examples of harassment and targeted enforcement of Plaintiff because of his religious practice and because of personal animus against him, it is highly plausible and likely that the file about Plaintiff that the City has withheld - that is "thousands of pages long" - as well as additional discovery will reveal other instances of targeted arbitrary and capricious harassment and enforcement against Plaintiff because of his religious practice and because of personal animus against him.


**Immediately after Brennan's March 23, 2021, call to action against Plaintiff, Brennan and the City used the pretext of a parked car on Plaintiff's Property to persecute Plaintiff.**

197.    Prior to March 23, 2021, the City had never issued a violation to Grand concerning his property.

198.    On March 23, 2021, at a public meeting, Brennan publicly called upon Plaintiff's neighbors and City residents to report to the City if they observed any activity by Plaintiff that was consistent with what Plaintiff requested, *i.e.,* to report any gathering of Orthodox Jews at Plaintiff's home, and if any such activities occurred, "the City will enforce its laws which exist for the benefit of the entire community, and we will seek all appropriate remedies in court."

199.    Brennan's comments ginned up further hatred and animus for Plaintiff among his neighbors and fueled the conflagration of discrimination that Brennan had encouraged.

200.    Brennan also escalated the discrimination against Plaintiff by authorizing and initiating a systematic attack against Plaintiff using municipal powers to target Plaintiff, and to harm Plaintiff economically.

201.    Brennan and the City abused the municipal power by using the City's ordinances to persecute Plaintiff, a law-abiding citizen, by unlawfully stretching extremely vague and inapplicable ordinances to reach conduct by Plaintiff that Plaintiff had every reason to believe was lawful.

202.    In accordance with the maxim "show me the man and I'll find you the crime," Brennan and the City and McConville and Scalise and Englebrecht prosecuted Plaintiff because of his religious practice and because of personal animus under the guise of enforcing laws regulating day-to-day activities.

203.    On March 23, 2021, the same day that Brennan had publicly called on residents to report any attempts at hosting prayer groups in residential homes, an email was sent out by Lt. Mark McArtor to "Uniform Div." of the City Police Department which instructed:

> As part of your patrols, please make frequent drive-bys at 2343 Miramar Blvd. for violations to 452.03 Prohibited Standing or parking Places of parking on landscaped surfaces.  If violations are observed, citations will be "the preferred course of action."  Also be aware, there is a great deal of contention between this address and the surrounding neighbors since the 2343 resident applied to the Planning Commission for approval to operate a Schul [sic].  If you observe or respond to the location for parking or noise complaints, be sure to log the activity in CAD.

204.    Two days after Brennan's March 23, 2021, public address calling on neighbors to report Plaintiff, the wife of the retired police officer who invaded Plaintiff's privacy by installing

surveillance cameras aimed into Plaintiff's home, directly responded to Brennan's call to action and called Brennan to report on Plaintiff.

205.    On March 25, 2021, at 9:29 AM, the retired police officer's wife called the police to report a truck parked on Plaintiff's Property on a small dirt/gravel area adjacent to Plaintiff's driveway, between the end of Plaintiff's driveway and his front door.

206.    The truck, which had Virginia license plates and a handicap placard in the windshield, belonged to Plaintiff's visiting friend, a physically disabled military veteran, who arrived from out of town in the early hours of the morning of March 25, 2021, and parked in the dirt/gravel area because it was close to the front door and his disability makes walking difficult. The vehicle did not belong to Plaintiff, and Plaintiff did not park the vehicle.

207.    The police told her "The truck was parked on gravel so it was fine."

208.    She sent an email to Brennan complaining that the police told her that they would not issue Plaintiff a citation as she had requested.

209.    Brennan immediately emailed the Police Chief Dustin Rogers, the Police Lieutenant Mark McArtor, the Director of Housing Geoff Englebrecht, and the Law Director Luke McConville, seeking advice on how to issue a citation to Plaintiff.

210.    Police Chief Rogers wrote back and offered some suggestions on how to catch Plaintiff.

211.    Police were dispatched and issued a citation for parking on the dirt/gravel area.

212.    The police left the scene at 10:23 AM.

213.    Plaintiff returned from morning prayers at approximately 10:30 AM to find the ticket on the windshield of his friend's vehicle.  Plaintiff promptly moved the vehicle from the area.

214.    At 11:06 AM, Police Lt. Mark McArtor sent an email to all City police units, copying the Police Chief, ordering them to be on the lookout for parking violations at 2343 Miramar Blvd., Plaintiff's Property, and specifically to issue citations if any cars are parked in the dirt/gravel area.

215.    At 2:27 PM, Lt. McArtor sent another email to the same recipients instructing officers to disregard his earlier email at 11:06 AM because he consulted with the City Prosecutor Stephanie Scalise about Plaintiff and Scalise advised that citations should not be issued to Plaintiff for parking on the dirt/gravel area because "the matter is more of a Building Department enforcement issue than a police matter."

216.    Ultimately, the parking citation was rescinded.

217.    This is not the normal procedure for analogous situations.  For example, college students at the local university who live in residential homes in the area can be seen everyday parking all over properties - on the grass, in the apron, half off driveways, etc. - and they rarely if ever are given citations. In the rare event that they do receive citations, the Mayor, Law Director, Director of Housing, Chief of Police, Police Lieutenant, all police units, and the City Prosecutor are not involved.

218.    On March 28, 2021, City Prosecutor Stephanie Scalise sent an email to the retired police officer's wife assuring her that the City had a plan to criminally prosecute Grand.

219.    The email stated:

"I have had a productive conversation with our Mayor.  I learned that a housing inspector has been directed to conduct an inspection and issue a written 10-day notice for all violations he sees.  At this point, I am awaiting an update from the inspector and have even made a note on my calendar to proactively contact him when that 10-day deadline might be up to determine next steps.  The 10-day notice is the first step in laying a foundation for a successful prosecution if it becomes necessary.  I will note that the city cannot just walk into anyone's home anytime it wants.  Even if neighbors request inspections on a nearby property, we have either

have the property owner's permission or get a search warrant from the court. A search warrant for housing code violations is very hard to obtain. I have to convince a court that there's enough evidence to be sure that major violations are occurring in a way that it's enough to override a homeowner's right to privacy. It's a big wall to jump over, but not impossible. I say all of that to say, it would not be a surprise to me if our inspector comes back with a list of external violations based only on what he can see from the sidewalk. That type of list, however, may be enough to get me started on a process of getting a court to order more. Realistically, this will probably be a long process and it will likely still feel like nothing is happening for awhile. I'm not doing you any favors if I don't tell you that up front. But, I can promise you that no one is ignoring this now. Between the mayor's office, the housing department, and my office, we are all pressing forward as urgently as we can."

220.    This email clearly shows City residents and City officials working in tandem to manufacture a violation so Grand could be criminally prosecuted.

221.    To make matters worse, the Defendants did this during the holiday of Passover, when they knew that Grand would not be able to respond, and to harass Grand during his holiday and interfere with his religious celebration.

222.    Planning Commission members also indicated that any manufactured violations should bar Grand from applying for any SUP.

223.    The manufactured violations have also been used to withhold Grand's certificate of occupancy and tax abatement application, and have caused other injuries to Grand, as set forth below.

224.    City building inspector Brown was the one assigned to manufacture violations that Prosecutor Scalise could use to "lay[ ] a foundation for a successful prosecution" as she stated in her email above.

225.    On March 25, 2021, Chief of Police Rogers sent an email to Brennan, McArtor, the head of the Building Department, and McConville recommending that instead of the police, the Building department should "take the lead on this matter going forward." Chief Rogers added, "However, the PD will assist in any way we can to resolve this matter, to include patrol officers

responding after hours to photograph/video possible evidence of a complaint/infraction.  In this matters, Lt. Mark McArtor will follow up directly with Fred [White, head of Building Department]."

226.    Twenty minutes later, Law Director McConville gave instructions in an email to Brennan, Chief Rogers, Lt. McArtor, White, and Prosecutor Scalise.

227.    At the same time, Brennan sent an email to Inspector Preston, Inspector Brown, and Prosecutor Scalise.  Inspector Preston is the City Building Department Inspector who is normally assigned to Grand's property as part of his assigned area.  On March 25, 2021, Brennan emailed Preston, Inspector Brown, and Scalise and told Preston, "Until further notice, I will be having [Inspector Brown] working on violations relating to 2343 Miramar.  As Miramar is one of your streets, if you observe any condition there, please refer it to [Inspector Brown] so he may then observe and tag.  If [Inspector Brown] is unavailable, then go ahead and tag what you observe, and then refer it to [Inspector Brown]."

228.    Brennan forwarded Law Director McConville's instructions to Brown.

229.    Brennan emailed McConville, Rogers, McArtor, Fred White, and Scalise to let them know, "Housing Inspector Brown is coming over to my office already at 2pm to discuss another assignment I have for him regarding this property."

230.    On March 26, 2021, Brennan sent an email to Brown: "Also, prepare it now, but wait till this afternoon to send/serve it.  I am meeting with Stephanie Scalise later this morning to discuss the situation.  Possible we might change course after our chat at 11:45 this morning."

231.    On March 29, 2021, Brennan asked Brown for an update.  Brown responded on March 30, 2021, "Here is the inspection report on this.  It [is] in the mail now it should be there by tomorrow or the 1st. [of April 2021]"

232.    Saturday, April 3, 2021, a letter was delivered to Plaintiff's home from the City. As soon as Passover ended on Sunday night April 4, Plaintiff opened the letter and found that the Building Department, Inspector Brown, Prosecutor Scalise, Brennan, Chief Rogers, Lt. McArtor, and Law Director McConville had devised a pretext to issue him a citation for his handicapped veteran friend's car being parked on the dirt/gravel area, nine days earlier.

233.    The citation was issued just after the Mayor's March 23, 2021 speech where he promised to "enforce the City's laws" against Grand.  The proximity clearly shows retaliation for Grand attempting to pray in his home.

234.    The letter was dated March 30, 2021, five days after the car was moved, and seven days after the Mayor's promise to "enforce the laws" against Grand.

235.    The citation states:

You are hereby notified that you are in violation of city ordinance no. 2063-20 of the codified ordinances of the City of University Heights in regard to the following:

1242.99 - PLEASE REMOVE STONES FROM THE AREA NEAREST TO THE GARAGE THAT IS BEING USD [sic] TO EXTEND DRIVEWAY

236.    The citation does not explain what "city ordinance no. 2063-20" is, and there is no such ordinance in UHCO.

237.    Though the citation does not explain it, "1242.99" refers to UHCO 1242.99, a lengthy, vague, multi-part provision that applies to the City's authority to issue citations for violating the Zoning Code.

238.    The provision says nothing about "stones," "garages" or "driveways."

239.    The citation gives no indication as to which part of 1242.99 was violated.

240.    It is impossible for Plaintiff to violate 1242.99 because it does not apply to him.

241.    The citation does not explain why "stones" are illegal or why they must be removed.

242.    The police told the retired police officer's wife "the truck was parked on gravel so it was fine."

243.    The City was aware of the presence of gravel stones in the dirt/gravel area for at least 10 months prior to March of 2021 and never had a problem.

244.    It was not possible for Grand to remove the "stones" that were "being used to extend the driveway" because the dirt/gravel area that the City was referring to was mostly dirt with only a few scattered rocks, and Grand had never placed "stones" there to build an extension to his driveway.  The entire accusation by the City in the citation is false.

245.    Other residents have similar dirt/gravel areas on their properties, but upon information and belief, the City has never issued a citation to anyone for a similar condition, citing UHCO 1242.99 or otherwise, and demanding the stones be removed.

246.    The citation was obviously a malicious attempt by Brennan, the Law Director, the Building Department, the Police, and the Prosecutor to invent a pretext to issue Plaintiff a citation that could not possibly be remedied and would inevitably lead to criminal prosecution.

247.    The Citation stated that "the owner or operator of any structure or premises shall have the right to appeal from any order of, or written notice issued by, the Building Commissioner. The Appeal shall be written and submitted within 15 days from the date of such notice."

248.    The citation did not give any instructions as to the manner of appeal or to whom to appeal.

249.    The following Monday, April 5, 2021, the earliest possible day that Plaintiff could have appealed, Plaintiff appealed to the City by submitting a request for a permit to cure the dirt/gravel area by installing a concrete pad over the dirt/gravel area, rather than remove the "stones", because, as mentioned above, there were no "stones" to remove.

250.    Pursuant to the UHCO, Plaintiff was entitled to a permit as of right because he was entitled to 25% lot coverage, and with the additional concrete he would only be at 23.09%.

251.    Additionally, the City was required to grant him a permit as of right because, pursuant to the UHCO, the area is a 290-square-foot patio, and patios less than 300 square feet are permitted as of right.

252.    Plaintiff further supported his appeal by noting that the City Engineer had issued a report in August of 2020 after inspecting the dirt/gravel area and had determined that there were "no issues with the request by Mr. Grand to expand his patio and driveway area."  Plaintiff attached to his appeal drawings showing the area as 290 feet and the lot coverage being under 25%, and the report from the City engineer.

253.    Even if a violation of 1242.99 was a legitimate violation, which it is not, Plaintiff was not in violation because gravel is not prohibited anywhere in the UHCO.

254.    By the next day, Plaintiff did not receive a response to his appeal, so he called the City but was unable to receive confirmation that his appeal was received.

255.    Plaintiff called and emailed several more times over the next two weeks but received no confirmation.

256.    Finally, on April 21, 2021, Plaintiff reached the City building department and was told for the first time that he was required to appeal the citation to the City Board of Zoning Appeals ("BZA").

257.    On April 21, 2021, Plaintiff promptly appealed the citation to the BZA and submitted a reasonable request to cure the driveway situation, so to avoid criminal prosecution.

258.    Plaintiff followed up several times over the next few days and received no response.

259.    On April 23, 2021, Brennan emailed Inspector Brown "I have become aware of Mr. Grand's repeated requests. We will be telling him formally that it is being denied."

260.    In other words, there was no way for Grand to avoid criminal prosecution because it required him to remove stones that were not there.

261.    Finally, on April 28, 2021, almost a month after Plaintiff submitted his initial appeal, the City law director responded by denying the violation appeal and denying the request to cure the gravel area situation before the BZA.

262.    The letter stated that the request to cure the gravel situation was summarily denied; Plaintiff was not granted a hearing before the BZA, and the letter did not indicate that the BZA considered the application or that the City even submitted the application to the BZA for review.

263.    The letter further stated that Plaintiff's appeal of the citation was denied because Plaintiff was required to file the appeal within 15 days from the date of the notice. As the notice was dated March 30, the deadline was April 14.

264.    As Brennan's email to inspector Brown on April 23, 2021, shows, the City deliberately obstructed Plaintiff's initial appeal by not responding to him until after the deadline to appeal to the BZA had passed so that the City could deny his appeal based on untimeliness.

265.    On May 2, 2021, Plaintiff sent an email to the City Council, copying Brennan and the law director, forwarding a letter sent to Brennan by Plaintiff's attorneys arguing that preventing Plaintiff from hosting religious gatherings in his home is a violation of Plaintiff's constitutional rights.

266.    Upon information and belief, Brennan retaliated against Plaintiff by ordering an escalation of the ongoing police surveillance of Plaintiff's house.

267.    On May 7, 2021, a man wearing a yarmulke was parked in front of Plaintiff's house waiting for a friend who was visiting Plaintiff. While the man was parked there, two separate police units approached him within a span of 30 minutes, both units asked the man if he was "here for the shul."

268.    That day, Plaintiff wrote a scathing email to Brennan copying the entire City Council and Plaintiff's attorneys, chastising Brennan for the surveillance.

269.    On May 10, 2021, eight days after Plaintiff revealed that he had legal representation and three days after Plaintiff brought the ongoing surveillance to the attention of City Council, the City law director responded with a letter admitting that Plaintiff was entitled to a hearing about the dirt/gravel area and informed Plaintiff that he would be granted a hearing at the June 2021 meeting of the BZA.

270.    Regarding UHCO 1242.99, the Law Director's letter stated:

While the Notice of Violation cites [UHCO] 1242.99, the Housing Inspector also could have cited [UHCO] 1274.04, which indicates that all driveways must be a hard surface, such as asphalt or concrete.  You have previously parked vehicles on the concrete stones and used the area as an extension of your driveway, a use which violates [UHCO] 1280.03.

271.    UCHO 1274.04 applies to driveways for houses of worship, not residential homes.

272.    By the Law Director stating that 1274.04 would apply to Grand, the Law Director implicitly revealed that the City was retaliating against Grand for his desire to pray in his home.

273.    Further evidence of the City's desperation to unlawfully issue arbitrary, capricious, and discriminatory citations is the Law Director's accusation that "you have **_previously parked vehicles on the concrete stones_** and used the area as an extension of your driveway, a use which violates [UHCO] 1280.03 (emphasis added)."  Since the ordeal that began with Plaintiff's disabled friend parking his truck on the gravel area, there had never been any allegation or evidence

presented that Plaintiff had "previously parked vehicles" on the area or that Plaintiff had placed "concrete stones" on the area.

274.    On May 18, 2021, while Plaintiff's appeal of the unlawful citation was pending with the BZA and awaiting a hearing at the June 2021 meeting, the City sent Plaintiff a "notice of noncompliance" stating that Plaintiff's file had been referred by the housing inspector "for the purpose of pursuing criminal charges with regard to the failure to correct the violations that remain on the referenced property."

275.    The City had further escalated Plaintiff's friend's parking violation into a criminal matter against Plaintiff.

276.    Genuinely concerned about ongoing criminal prosecution, Grand was unable to remedy the situation because, as mentioned above, there were no "stones" to remove, and his violation appeal was denied, and his attempt to obtain a hearing before the BZA was denied as well, on June 10, 2021, Plaintiff had no choice but to go so far as to purchase stones and dirt from Walmart to fill up in bags, that he then placed beside his house to show that the "stones" had been removed from the area, and to pretend to "remediate" the area by pushing some dirt back and forth, but really doing nothing.

277.    On July 6, 2021, Plaintiff sent a follow-up email to the City with photos showing that the gravel had been "remedied" on June 10.

278.    Director of Housing Englebrecht called Grand and left a voicemail to confirm that the "stones" had been removed.

279.    The irony is, the before and after photos of the area were practically identical, aside from the bags of dirt and stones from Walmart.  This shows that the citation was fake.

280.    A few days later, the City sent Plaintiff a citation for a new "violation."

281.    The new citation retroactively denied approval for a fence that Plaintiff had constructed on his Property - after the City had previously approved, permitted, inspected, and signed off on it.

282.    Plaintiff's neighbors have fences in identical or substantially similar circumstances but none of his neighbors were issued citations.

283.    What is set forth above is just a portion of the arbitrary, capricious, and discriminatory treatment that the City subjected Plaintiff to in a relentless and coordinated attempt to subject him to criminal prosecution because of his religion and because of personal animus towards him.  Discovery will likely reveal further examples.

284.    The arbitrary, capricious, and discriminatory treatment is ongoing and continues to this very day.

285.    Brennan and the McConville are directly involved in all building matters related to Plaintiff and his property, which is a deviation from the normal procedures.

286.    Brennan and the McConville have ordered and continue to order building officials to issue stop work orders and citations for non-violating conditions, and to deny permits for improvements to Grand's home that are allowed by UHCO as of right.

287.    The City has refused to grant Plaintiff a Certificate of Occupancy for no legitimate reason.

288.    This is a routine matter and only requires an administrative sign off, which the City refuses to do.

289.    In fact, on January 17, 2022, in a letter from the head of the Building Department Fred White to Brennan, McConville, City Engineer Joseph Cuini, and City Fire Department Director Robert Perko, Fred White wrote, "Final inspections were approved on [Grand's] house

addition and remodeling.  He is requesting a certificate of occupancy.  The certificate of occupancy shall be issued unless there are pending violations on the property.  Not sure if the fence is a violation because the building department issued a fence permit with a drawing showing the fence at the front line of the house.  I sent Luke [McConville] a copy of the fence permit."

290.    Even after the letter from Fred White, the City continued to withhold the certificate of occupancy for no lawful reason.

291.    The refusal to grant a certificate of occupancy has caused real financial harm to Plaintiff; as a result, Plaintiff was and is prevented from receiving a tax abatement for his home.

292.    Plaintiff submitted his application for a tax abatement in person to the clerk for the building department, on January 31, 2022.

293.    When Plaintiff submitted his application, he was told by the clerk that he needed to submit a deed to his home.

294.    As instructed, Plaintiff emailed a copy of the deed to the clerk that same day on January 31, 2022.

295.    On September 20, 2022, after this lawsuit was filed, the clerk forwarded Plaintiff's email from January 31, 2022, with the deed attached to Geoff Englebrecht head of the housing department, and wrote in the email, "2343 miramar deed – for tax abatement."

296.    Grand has confirmed with the clerk and the clerk recalls the day Grand dropped off the tax abatement application, and that the application has been forwarded multiple times to the housing department.

297.    Without a Certificate of Occupancy, Plaintiff is prevented from selling his home.

298.    Also, without a Certificate of Occupancy, Plaintiff cannot be approved for an application for home occupancy, which requires a certificate of occupancy on file.

299.     Because of the inability to be approved for home occupancy, Plaintiff cannot use his home for any business.

300.     As a direct result of this arbitrary, capricious, and discriminatory refusal to issue a certificate of occupancy and relatedly the refusal to report his tax abatement, Plaintiff's monthly payment on his home has increased substantially.

301.     The City and its officials have obsessively and continually sought to create a pretext to build a criminal case against Grand and/or his wife.

302.     Housing Director Geoff Englebrecht told a resident regarding Grand's property, "I did speak with the Law Director regarding the property.  I would not be able to go into too much detail about what was said during the meeting, however, know that the City will begin to move in one way or another soon in regards to the property."

303.     For instance, on August 5, 2021, Building Director Geoff Englebrecht made inquiries with the County Fiscal Office about Grand, but came up empty handed.

304.     Over a year later, on August 15, 2022, Building Director Geoff Englebrecht, sent an email to the police department's administration with the subject, "[Grand's wife], Request for SSI and DOB…"  The email stated, "I hope all is well.  I'm looking to file a case against the following property owner: [Grand's wife], 2343 Miramar Blvd. University Heights, OH 44118. Please let me know if you need any other information."   This shows ongoing harassment.

305.     On August 23, 2022, Geoff Englebrecht requested that Mike Cicero, assistant law director, make out a Complaint against Grand.

306.     This lawsuit was filed shortly thereafter, and a case was never brought against Grand or his wife.

**University Heights codified ordinances, on their face and as applied, violate the United States Constitution, the Ohio Constitution, and RLUIPA and Ohio common law.**

**The City has unbridled discretion to allow or deny prayer in the City.**

307.    As set forth above, the City and Brennan apply the City's zoning code such that they consider people praying in their homes to be a "house of worship," and the City does not permit such activity without a Special Use Permit ("SUP"), pursuant to UHCO Chapter 1274.

308.    Houses of worship are not permitted as of right anywhere in the City.

309.    Of the City's nine zoning districts, U-1 through U-9, houses of worship are not permitted by right or with an SUP in U-3, U-5, U-6, U-7, U-8, or U-9.  Houses of worship are only permitted in districts U-1, U-2, and U-4, by obtaining a SUP, pursuant to the standards and criteria of UHCO Chapter 1274.

310.    The standard process for obtaining a SUP is to first obtain a recommendation from the Planning Commission ("PC") by demonstrating "by clear and convincing evidence that the provisions of [Chapter 1274] will be met and that the special use will not impair surrounding property values or uses, vehicular parking and pedestrian or traffic conditions, lighting glare at night, noise pollution to others or other applicable criteria in the Planning and Zoning Code, and will not be otherwise contrary to the public health, safety and welfare."

311.    If an applicant is successful in obtaining a recommendation from the PC, "the recommendation of the Planning Commission shall be subject to the approval of a majority of [City] Council," and upon such approval, a certificate of occupancy should be issued.

312.    UHCO Chapter 1274 provides no standard that the City Council must adhere to when considering whether to grant approval for an application for a SUP for a house of worship, accordingly, City Council, which is the City's elective legislative body, has unbridled discretion in approving or denying a SUP for a house.

313.    The Ordinance allows the PC and City Council to take into account an applicant's personality, race, religion, and/or other traits unrelated to land use when considering whether to grant or deny a SUP for a house of worship, and to deny an application simply because the governing body finds that the applicant lacks likability, charisma, or spirituality.

314.    Even if the PC gives its recommendation to approve an application for a SUP, the City Council can deny the application for any reason, no reason, or a discriminatory reason.

**The standards and criteria of Chapter 1274 for a SUP are impossible to satisfy.**

315.    The provisions of Chapter 1274 that must be satisfied to obtain a PC recommendation for a SUP include requirements with respect to location, minimum lot size, yard size, height, landscaping, and more.

316.    Houses of worship are only permitted in the U-1, U-2, and U-4 zoning districts, and only with a SUP.

317.     The provisions and restrictions set forth in Section 1274 apply only if the property in question has frontage on one of the following six (6) streets: Cedar Road, Warrensville Center Road, South Taylor Road, Fairmount Boulevard, North Park Boulevard, Green Road (the "Permitted Streets").

318.    Properties on "other" streets are subject to the same burdensome restrictions, as well as an even more restrictive and burdensome standard, as set forth below.

319.    With the exception of Warrensville Center Road, all of the Permitted Streets are located at the extreme borders of the City.

320.    Houses of worship in the U-1, U-2, and U-4 zoning districts require a minimum lot area of three (3) acres.

321.    A building may only be used as a house of worship if it was originally designed and approved for use as a house of worship.

322.    A residence, store or other building cannot be converted into a house of worship.

323.    A house of worship cannot include a residence on any part of the site.

324.    The building cannot exceed 25% of the total lot area; a minimum of 50% of the site shall be devoted to open space and developed as planted areas; minimum lot frontage is 150 feet; and the front yard must be a minimum of 75 feet deep.

325.    The minimum parking requirement for a house of worship is the greater of: one space per 200 square feet of gross floor area of the entire building including the basement, measured from the exterior faces of the building (not less than 30 spaces); one parking space for each two seats provided within any and all rooms used for assembly; and one parking space for each two persons allowed as legal maximum occupancy.

326.    The provisions of Chapter 1274 are so restrictive that no applicant can meet them and therefore any prospective house of worship is both unreasonably limited and totally excluded from the City.

327.    Upon information and belief, there are a total of 315 parcels of land in the U-1, U-2, and U-4 zoning districts that have the required frontage on one of the Permitted Streets; the average parcel size of those 315 parcels is 0.4 acres and only three (3) parcels have a minimum lot size of three acres; of those three parcels, only two have the required 150 feet lot frontage; of those two parcels, only one has 50% open space; and that one parcel does not have a building that was originally designed for use as a house of worship.  Accordingly, upon information and belief, there are zero (0) parcels in all of University Heights that meet the necessary standards and criteria required to obtain a SUP pursuant to UHCO Chapter 1274.

328.     When interrogated about this, the City responded by saying "... it is believed that no parcels in a U-1 zoning district without a SUP meet the requirement for a 3-acre parcel. Answering further, parcels have been aggregated in the past in order to obtain a SUP on aggregated parcels less than 3 acres, and land can be aggregated and consolidated to create a 3-acre parcel."

329.     No variance from any of the requirements or prohibitions under Chapter 1274 may be granted without the approval of the Planning Commission and the approval of Council, each following public hearings at which the applicant demonstrates a clear benefit to the community and that denial will result in an unnecessary hardship to the applicant.

330.     The standard of "a clear benefit to the community and that denial will result in an unnecessary hardship to the applicant" lacks any narrow, objective, and definite standards to guide the Planning Commission or the City Council.

331.     A higher standard must be met to obtain a SUP on "other" streets: "A special use permit may be issued by the Planning Commission for land fronting on other streets where the applicant demonstrates by clear and convincing evidence that the use will benefit and not impair surrounding property values or uses, vehicular parking and pedestrian congestion or traffic conditions, noise pollution and will not be otherwise contrary to the public health, safety or welfare, subject to the approval of a majority of Council."

332.     The standards lack any narrow, objective, and definite standards to guide the Planning Commission or the City Council.

**333.**     Additionally, Chapter 1274 lacks any reasonable time limits for which City Council must render a decision.

**Chapter 1274 violates the United States Constitution, RLUIPA, the Ohio
Constitution, and Ohio common law.**

334.    Chapter 1274 substantially burdens Plaintiff's exercise of religion by depriving him of the ability to pray in his home.

335.    Chapter 1274 also deprives Plaintiff of the ability to have a place of worship where he lives.  *See Young Israel Org. v. Dworkin*, 133 N.E.2d 174, 183 (1956).

336.    The UHCO does not identify any compelling governmental interest to justify the draconian provisions of Chapter 1274.

337.    Even were the City able to point to a compelling governmental interest to justify the provisions of Chapter 1274, which it cannot, there are obvious and apparent means of achieving any such interests in a less restrictive manner.

338.    Pursuant to the Ohio Constitution, the state may not even indirectly encroach upon religious freedom unless the encroachment serves a compelling state interest and is the least restrictive means of furthering that interest.  *Humphrey v. Lane*, 728 N.E.2d 1039, 1045 (Ohio 2000).

339.    The City's zoning regulations that pertain to the religious use of property within the jurisdiction create uncertainty, delay and expense for Plaintiff, as Plaintiff has been forced to hire lawyers, pay application fees, and allocated valuable time because of the regulations.

340.    The City has enforced the UHCO to prevent Orthodox Jewish religious worship.

341.    In addition to the enforcement action taken against Plaintiff, the City has taken similar action against other Orthodox Jews praying in residential homes.

342.    Upon information and belief, the City has singled Orthodox Jewish residents for special treatment when applying its zoning code.

343.    Pursuant to UHCO § 1242.99, "any use of any land or building which is conducted, operated or maintained contrary to any of the provisions of this Zoning Code shall be unlawful," and any such violations are subject to the penalties of fines and imprisonment.

344.    The UHCO, on its face, imposes land use regulations in a manner that treats religious institutions on less than equal terms with non-religious institutions.

345.    Pursuant to § 1250.02, included in the list of "permitted uses" in the U-1 zoning district are: "(b) Buildings, structures and grounds owned and operated by a board of education, municipality or by a library board."

346.    Pursuant to § 1252.02, included in the list of "permitted uses" in the U-2 zoning district are: "(a) All uses permitted in One-Family Residence Districts and as regulated in such Districts, except as modified hereinafter."

347.    Pursuant to § 1256.02, included in the list of "permitted uses" in the U-4 zoning district are: "(a) All uses permitted in Two-Family Districts (Section 1252.02) and as regulated in such Districts, except as modified hereinafter."

348.    Buildings, structures and grounds owned and operated by a board of education, municipality or by a library board are not subject to the requirements of Chapter 1274.

349.    Buildings, structures and grounds owned and operated by a board of education, municipality or by a library board are not subject to the requirement of having to obtain a SUP.

350.    The UHCO permits as of right the principal uses of "Buildings, structures and grounds owned and operated by a board of education, municipality or by a library board," within the U-1, U-2, and U-4 zoning districts without requiring a Special Use Permit.

351.    "Buildings, structures and grounds owned and operated by a board of education, municipality, or by a library board" uses are nonreligious assembly and/or institutional land uses.

352.     Accordingly, on its face, UHCO Chapters 1250, 1252, and 1256 treat houses of worship on less than equal terms as nonreligious assembly and institutional uses.

353.     The UHCO permits other non-religious assembly and institutional uses by right within the city's jurisdiction, while houses of worship are not permitted by right anywhere.

354.     The UHCO permits by right various nonreligious assembly and institutional uses within certain zoning districts, while houses of worship are not permitted by right anywhere within the City.

355.     As described above, houses of worship are not permitted by right anywhere in the City.

356.     As the Defendants have interpreted Section 1274 to include Orthodox Jewish Prayer in a residential home, it follows that Orthodox Jewish prayer is not permitted by right anywhere in University Heights, save a few synagogues.

357.     The UHCO allows various nonreligious assembly and institutional uses within certain zoning districts without being subject to Chapter 1274, while houses of worship are subject to Chapter 1274 regardless of where they are located in the City.

358.     Pursuant to UHCO § 1258.02, "athletic fields and stadia or other spectator seating facility" are permitted as of right in the U-5 zoning district and are not subject to Chapter 1274.

359.     Upon information and belief, such facilities may have much greater land use impacts, including traffic and parking impacts, than a house of worship.

360.     Pursuant to UHCO § 1260, "Office buildings: professional, administrative, executive, governmental" are permitted as of right in the U-6 zoning district and are not subject to Chapter 1274.

361.     Upon information and belief, such facilities have much greater land use impacts, including traffic and parking impacts, than a house of worship.

362.     Pursuant to UHCO § 1264.02, "assembly halls" are permitted in the U-8 zoning district as of right and are not subject to Chapter 1274.

363.     Upon information and belief, such facilities have much greater land use impacts, including traffic and parking impacts, than a house of worship.

364.     Pursuant to UHCO § 1266.02, the following nonreligious assembly and/or institutional uses are permitted in the U-9 zoning district as of right: Libraries, Museums, Community Theaters, Assembly Halls, and Meeting Places.

365.     Houses of worship are treated on less than equal terms as "athletic fields and stadia or other spectator seating facility," "Office buildings," "Libraries," "Museums," "Community Theaters," "Assembly Halls," and "Meeting Places," because the latter uses have the opportunity to locate somewhere within the City without being subject to the burdensome requirements and highly discretionary review procedures of Chapter 1274 and the SUP requirement, while houses of worship do not.

### Defendants conspired to deprive Plaintiff of his constitutional rights through unlawful means.

366.     The City, Brennan, McConville, Scalise, Englebrecht, Fine, Urban, Siemborski, Cooney, Kluznik, and other unnamed residents conspired to unlawfully deprive Grand of his constitutional rights.

367.     Specifically, because of the actions of the named Defendants and others working in concert, Grand was denied his right to assemble and exercise his religion in his home.

368. Also, because of the actions of the named Defendants and others working in concert, Grand was deprived of his rights and property without due process, as guaranteed by the constitutions of the United States and Ohio.

369. Also, because of the actions of the named Defendants and others working in concert, Grand was denied his right to equal protection under the City's ordinances.

370. The conspirators were in agreement with the general conspiratorial objective that under no conditions shall the Jewish community be allowed to expand west from the Jewish Green Road cluster to the GESU area of the City where the conspirators live.

371. As one conspirator said outright in a letter, the conspirators did not want the GESU area to be "labeled as Jewish."

372. As Defendant Urban stated in an email, the conspirators were careful not to state the conspiratorial objective out in the open, and instead concealed their true intentions, because they knew that the conspiratorial objective was illegal.

373. The conspirators agreed that the Orthodox Jewish community could not expand if the Orthodox Jews are not permitted to pray in their homes in the City.

374. Accordingly, when it was discovered that Grand invited people to pray in his home with him on Shabbos and holidays, the conspirators devised a plan to prevent Grand from praying in his home, and to make Grand an example so that Jews throughout University Heights would not attempt to pray in their homes.

375. To achieve the illegal objective of preventing the Orthodox Jewish community from expanding west, the conspirators agreed to injure Grand by unlawfully preventing his attempt to pray in his home, and by weaponizing the municipal authorities against him.

376.     The conspirators put Grand in an impossible situation: he was served with a cease-and-desist order which criminalized Orthodox Jewish prayer in his home, and then they required that if he wanted to pray, he had to apply for a special use permit, which was inappropriate for the situation, which he did not qualify for or desire, and which the Defendants knew in advance that they would not grant under any circumstances.  If Grand declined to apply for the SUP or applied and was subsequently denied, prayer would remain prohibited in his home because of the case-and-desist order, which is still in effect today, over two years later.

377.     Even if the SUP was granted, which it would not have been under any circumstances, according to the UHCO section 1274, Grand would have to vacate his home, because UHCO 1274.02(f)(4) states that "no use permitted herein shall include sleeping or residential use accommodations on any part of the site."

378.     There was a single plan to injure Grand that the alleged coconspirators shared in the general conspiratorial objective of preventing the Jewish community from expanding into the GESU neighborhood and to deprive Grand of his civil rights, and many overt acts were committed in furtherance of the conspiracy that deprived Grand of his civil rights.

379.     The City, Brennan, and McConville committed many overt acts in furtherance of the conspiracy, issuing a cease-and-desist letter accusing Grand of converting his home into a synagogue when it was obviously known that Grand did no such thing. The City, Brennan, McConville, and Englebrecht weaponized the building department by issuing baseless violations against Grand.  The violations were issued, among other reasons, to attempt to criminally prosecute Grand.

380.    Brennan, McConville, and Scalise refused to enforce the City's ordinances against Grand's neighbor, thereby allowing the neighbor to maintain surveillance cameras pointed at Grand's property, which Brennan reviewed.

381.    They also demanded that Grand remove a fabric barrier that Grand erected to block the cameras so that the illegal surveillance could continue.

382.    Brennan also ordered police to surveil Grand's property.

383.    Brennan also hired a private investigator in an unmarked vehicle to scare and surveil and intimidate Grand and other Orthodox Jews while they were walking to synagogue on the holiday of Rosh Hashanah.

384.    The video surveillance and police surveillance and the private investigator were meant to intimidate and harass Grand in retaliation for attempting to pray in his home, and to intimidate Orthodox Jews from visiting Grand's home, or to pray in their own homes.

385.    Scalise acted in concert with Grand's neighbors to manufacture a pretext to threaten Grand with criminal prosecution to the point of potential incarceration to intimidate Grand and prevent him from praying in his home.

386.    Scalise also advised her coconspirators on how to weaponize the municipal power to harass and intimidate Grand into abandoning his plans to pray in his home.

387.    Fine, Siemborski, and Urban abused their positions on the Planning Commission to prevent Grand from praying in his home, and deprived Grand of due process by denying him a fair hearing.

388.    Fine, Siemborski, Urban, McConville, and Brennan violated the Ohio Open Meetings Act when they held private secret meetings to deliberate about how to evade liability for illegal discrimination based on religion, among other things.

389.     Cooney and Kluznik acted as liaisons between the Planning Commission and the neighbors and facilitated illegal *ex parte* communications between the Planning Commission and the neighbors during a quasi-judicial proceeding.   This assisted the Planning Commission, Brennan, and McConville to create a pretext to illegally deny Grand's application.

390.     Pursuant to 18 U.S.C. 1512(c)(2), it is illegal to corruptly influence or attempt to influence an official proceeding.

391.     Brennan, McConville, Fine, Siemborski, Urban, Cooney, and Kluznik, all violated 18 U.S.C. 1512(c)(2) for the purpose of furthering the conspiracy against Grand and to deprive him of religious freedom, freedom of assembly, due process, and equal protection under the laws.

392.     Brennan, McConville, Fine, Siemborski, and Urban violated Section 1512(c)(2) by taking steps to influence the outcome of the Planning Commission hearing so that they could reach the desired outcome of denying Grand a recommendation for a SUP, which would then influence the City Council's ultimate approval, and/or any appeal to the City Counsel, the BZA, and/or a court.

393.     Cooney and Kluznik violated Section 1512(c)(2) by acting as a liaison and communicating *ex parte* with McConville, Brennan, and members of the Planning Commission to gin up community opposition which influenced the official proceeding as set forth above.

394.     Additionally, Cooney commandeered the Planning Commission meeting without objection from Brennan or McConville, and prevented Grand from presenting his petitions which would have provided evidence of a larger body of support for Grand's application than presented by the residents in opposition, that the Planning Commission repeatedly referenced.

395.    Cooney and others obstructed the PC hearing on March 4 by preventing Grand from presenting his evidence on the record in order to preemptively obstruct any future official proceedings, including any appeals before the City Council, BZA, or a court.

396.    Brennan expressly stated in one of his closed session deliberations with the Planning Commission that the reason he chose to run the Planning Commission hearing in a "quasi-judicial" format, pursuant to Ohio Revised Code 2506, was so that another body or court could not review the application de novo.

397.    Accordingly, the conspirators made sure to prevent Grand from introducing certain evidence into the record so that the Grand would be barred from introducing the evidence on appeal.

398.    Specifically, Cooney took over the planning commission meeting and interrupted Grand just before Grand was able to introduce his petitions into the record.

**The impact of the Defendants' conduct and the City's land use regulations on Plaintiff.**

399.    The City's zoning scheme and the Defendants' conduct has rendered Plaintiffs' religious exercise effectively impracticable.

400.    If the Plaintiff was permitted to pray in his home, it would affect interstate commerce by or through, among other things, providing a place to pray for visitors from other states; the purchase of goods and services related to the minyan; and the hosting of any religious leaders visiting the Plaintiff from out of state.

401.    The actions of Defendants City, Brennan, McConville, Scalise, Engelbrecht, Fine, Urban, and Siemborski described above all took place under color of state law.

402. The harm to the Plaintiff caused by the City's laws and the Defendants' actions, which prevent him from praying in his home to accommodate his religious needs, is immediate and severe.

403. The City's laws and the Defendants' actions imminently threaten Plaintiff's free exercise of religion.

404. Plaintiff has also suffered significant financial damages as a result of the City's laws and the Defendants' conduct.

405. The Defendants, through their actions, have turned Plaintiff's neighbors against him and ginned up hostility towards Plaintiff such that Plaintiff fears for his safety and the safety of his wife and small children in their own home.

406. The Defendants through their actions have deprived Plaintiff and his family of what was once a tranquil existence, and life in the neighborhood for Plaintiff and his family has become unbearable.

407. The Defendants' constant harassment and targeted application of the City's ordinances against Plaintiff has caused Plaintiff to spend money on otherwise unnecessary construction related costs.

408. For example, because of the Defendants' conduct, Grand is now required to demolish and rebuild his driveway, his fence, his walkway, his sidewalk, and his front yard.

409. Plaintiff was financially harmed by the City's refusal to issue a certificate of occupancy as it prevented Plaintiff from receiving a tax abatement and it makes Plaintiff's home unmarketable.

410. Since the filing of this lawsuit, Grand has decided to sell his property in University Heights and to move his family out of University Heights.

411.    He listed his house for sale, but the marketability of the home has suffered, and the value of the home has substantially decreased due to Defendants' conduct.

412.    The home was built in a manner that caters to Orthodox Jewish homebuyers, including amenities like a dual kitchen to accommodate a kosher lifestyle, two large dining rooms to accommodate dietary laws and a separate dining room for Shabbos and festivals, a handwashing station for ritual washing before meals, guest rooms to accommodate Shabbos guests, a private library and study for Torah study, and bedrooms to accommodate large families which is a Biblical obligation observed by Orthodox Jewish families.

413.    Because of the Defendants' conduct and the publicity brought to Grand and the Property because of the same, it is unreasonable to expect that any Orthodox Jewish person would express interest in purchasing the home.

414.    In fact, no Orthodox Jewish person has expressed interest in the home to date due to all the negative attention.

415.    Grand has spoken to members of the Orthodox Jewish community about the lack of interest and has discovered that the families that might have had interest in purchasing, and therefore moving to Grand's house, are concerned that moving there would result in them receiving the same negative treatment that Grand has received.

416.    This shows the effectiveness of the conspiracy, as it has effectively intimidated Orthodox Jews from purchasing houses on the west side of University Heights near GESU and prevented the Orthodox Jewish community from expanding beyond the cluster around Green Road.

417.    The issuance of baseless violations and the refusal to issue a certificate of occupancy has deprived Grand of the ability to apply for a home occupancy permit which would

allow him to conduct business out of his home, which he intends to do as soon as the City issues a certificate of occupancy.

418.    As a result, Grand had to rent space for his business and incur other expenses like insurance and internet and other expenses to maintain an office that he would not have incurred otherwise.

419.    Also, the issuance of these baseless violations and the refusal to issue a certificate of occupancy has deprived Grand of the ability to apply for a special use permit and/or variances in conjunction with his application with ODJFS for a type A home childcare permit for 7-12 children, which Grand's wife has intended to do since before the initial cease-and-desist letter was sent in January of 2021.

420.    The Defendants' conduct has deprived Grand of use of portions of his house that he would have used to pray, to have guests participate in religious meals and to stay for Shabbos.

421.    The Defendants' conduct causes ongoing and continuous emotional trauma and distress to Plaintiff, Plaintiff's wife, and Plaintiff's children who all are scared of their neighbors.

422.    Being targeted and harassed by the City, Brennan, City officials, and neighbors has caused Plaintiff and his wife emotional distress, anguish, stress, shame, humiliation, anger, and fear.

423.    All of the Defendants' have caused damage to Plaintiff's social life; people are scared to come to Plaintiff's home for fear that they may be harassed by the City if they are known to associate with Plaintiff.

424.    The Defendants' actions have harmed Plaintiff's religious exercise as it is considered a religious obligation to host guests on Shabbos and holidays, and because of the Defendants' action, guests are reluctant to come to Plaintiff's home.

425. The Defendants have also harmed Plaintiff's religious exercise because even if the City were to allow Plaintiff to pray in his home, at this point the City has made it so that people will be afraid of coming lest they'd be surveilled by the City and of being targeted by the City for being associated with Plaintiff.

426. Brennan also invaded Plaintiff's privacy by viewing the video footage from the invasive cameras set up by Grand's neighbor, causing Plaintiff and his family mental anguish, including feelings of shame, embarrassment, anger, humiliation, and fear.

427. The City and Brennan, McConville, and Scalise enabled the invasion of Plaintiff's privacy, causing Plaintiff and his family mental anguish, including feelings of shame, embarrassment, anger, humiliation, and fear.

428. Because of the invasion of privacy that the City allowed, Plaintiff incurred financial harm by erecting a barrier, and then incurred further harm because the City demanded that the invasion of privacy be allowed to continue and that Grand then deconstruct the barrier.

429. Grand also incurred damages in needless administrative and service fees to the City and other professionals because of the City's targeting.

430. Grand also incurred other damages because of his inability to pray in his home.

431. Grand is religiously obligated to tithe and is religiously obligated to nourish guests who visit his home. He was deprived of the opportunity to fulfil these religious obligations in the way that he would have preferred, namely, by sponsoring the communal Shabbos meals to his guests following the Shabbos prayers. Because of the City's conduct, Grand was and is forced to tithe by donating to others.

**COUNT I**
**City of University Heights, Michael Dylan Brennan, Luke McConville, Stephanie Scalise,**
**Geoff Englebrecht, Michael Fine, April Urban, and Paul Siemborski**
**42 U.S.C. § 1983: United States Constitution, First Amendment, Free Exercise of Religion**

432.    The foregoing paragraphs are incorporated by reference as if set forth fully herein.

433.    The Defendants have deprived and continue to deprive the Plaintiff of his right to free exercise of religion, as secured by the First Amendment to the United States Constitution and made applicable to the States by the Fourteenth Amendment, without using the least restrictive means of achieving a compelling governmental interest.

**COUNT II**
**City of University Heights, Michael Dylan Brennan, Luke McConville, Stephanie Scalise,**
**Geoff Englebrecht, Michael Fine, April Urban, and Paul Siemborski**
**42 U.S.C. § 1983: United States Constitution, First Amendment, Freedom of Assembly**

434.    The foregoing paragraphs are incorporated by reference as if set forth fully herein.

435.    The Defendants have deprived and continues to deprive the Plaintiff of his right to freedom of assembly, as secured by the First Amendment to the United States Constitution and made applicable to the States by the Fourteenth Amendment without using the least restrictive means of achieving a compelling governmental interest.

**COUNT III**
**City of University Heights, Michael Dylan Brennan, Luke McConville, Stephanie Scalise,**
**Geoff Englebrecht, Michael Fine, April Urban, and Paul Siemborski**
**42 U.S.C. § 1983: United States Constitution, First Amendment, Prior Restraint**

436.    The foregoing paragraphs are incorporated by reference as if set forth fully herein.

437.    The UHCO contains no articulated standards with respect to review by City Council of an application for a SUP for a house of worship in a residential zone or for variance approval by the City Council or the Planning Commission, and, as such, are an unconstitutional prior restraint on Plaintiff's protected religious expression and exercise under the First Amendment.

The lack of such standards unconstitutionally provides the City Council and the Planning Commission with unbridled discretion in its review of such applications for a house of worship.

438.    Additionally, the Defendants engaged in numerous acts under the color of state law that prevented Grand from engaging in First Amendment protected activity.

## COUNT IV
### City of University Heights, Michael Dylan Brennan, Luke McConville, Stephanie Scalise
### 42 U.S.C. § 1983: United States Constitution, Fourth Amendment, Unreasonable search

439.    The foregoing paragraphs are incorporated by reference as if set forth fully herein.

440.    The Defendants have deprived and continue to deprive Plaintiff of his right to protection against unreasonable searches of his house by the Fourth Amendment and made applicable to the States by the Fourteenth Amendment by engaging in unwarranted, indiscriminate, and intrusive video surveillance and surveillance by other means.

## COUNT V
### City of University Heights, Michael Dylan Brennan, Luke McConville, Stephanie Scalise, Geoff Englebrecht, Michael Fine, April Urban, and Paul Siemborski
### 42 U.S.C. § 1983: United States Constitution, Fifth Amendment, Due Process of Law

441.    The foregoing paragraphs are incorporated by reference as if set forth fully herein.

442.    The Defendants have deprived and continue to deprive Plaintiff of his right to due process of the law through its unlawful application of the City ordinances against Plaintiff and its arbitrary and capricious application of laws, policies, and procedures.

## COUNT VI
### City of University Heights, Michael Dylan Brennan, Luke McConville, Stephanie Scalise, Geoff Englebrecht, Michael Fine, April Urban, and Paul Siemborski
### 42 U.S.C. § 1983: United States Constitution, Fourteenth Amendment
### Equal Protection of the Law (Religious Discrimination)

443.    The foregoing paragraphs are incorporated by reference as if set forth fully herein.

444.     The Defendants have deprived and continue to deprive Plaintiff of his right to equal protection of the law through its discriminatory application of the City ordinances against Plaintiff, and its arbitrary and capricious application of laws, policies, and procedures based on his religious practice.

## COUNT VII
**City of University Heights, Michael Dylan Brennan, Luke McConville, Stephanie Scalise,**
**Geoff Englebrecht, Michael Fine, April Urban, and Paul Siemborski**
**42 U.S.C. § 1983: United States Constitution, Fourteenth Amendment**
**Equal Protection of the Law (Class of One)**

445.     The foregoing paragraphs are incorporated by reference as if set forth fully herein.

446.     The Defendants have deprived and continue to deprive Plaintiff of his right to equal protection of the law by singling out Plaintiff for arbitrary, capricious and discriminatory application of the City ordinances against Plaintiff, and its arbitrary and capricious application of laws, policies, and procedures based on personal animus towards the Plaintiff.

## COUNT VIII
**City of University Heights, Michael Dylan Brennan, Luke McConville, Stephanie Scalise,**
**Geoff Englebrecht, Michael Fine, April Urban, and Paul Siemborski**
**RLUIPA 42 U.S.C. § 2000cc(a) "Substantial Burdens"**

447.     The foregoing paragraphs are incorporated by reference as if set forth fully herein.

448.     The Defendants have violated RLUIPA's substantial burden provision by implementing land use regulations in a manner that imposes a substantial burden on Plaintiff's religious exercise and assembly, without furthering a compelling government interest.

## COUNT IX
**City of University Heights, Michael Dylan Brennan, Luke McConville, Stephanie Scalise,**
**Geoff Englebrecht, Michael Fine, April Urban, and Paul Siemborski**
**RLUIPA 42 U.S.C. § 2000cc(b)(1) "Equal Terms"**

449.     The foregoing paragraphs are incorporated by reference as if set forth fully herein.

450.     The Defendants have violated RLUIPA's equal terms provision by imposing and implementing land use regulations in a manner that treats a religious assembly on less than equal terms with a nonreligious assembly.

**COUNT X**
**City of University Heights, Michael Dylan Brennan, Luke McConville, Stephanie Scalise, Geoff Englebrecht, Michael Fine, April Urban, and Paul Siemborski**
**RLUIPA 42 U.S.C. § 2000cc(b)(2) "non-discrimination"**

451.     The foregoing paragraphs are incorporated by reference as if set forth fully herein.

452.     The Defendants have violated RLUIPA's non-discrimination provision by imposing and implementing land use regulations that discriminate against an assembly on the basis of religion or religious denomination.

**COUNT XI**
**City of University Heights, Michael Dylan Brennan, Luke McConville, Stephanie Scalise, Geoff Englebrecht, Michael Fine, April Urban, and Paul Siemborski**
**RLUIPA 42 U.S.C. § 2000cc(b)(3) "Unreasonable limitation"**

453.     The foregoing paragraphs are incorporated by reference as if set forth fully herein.

454.     The Defendants have violated RLUIPA's unreasonable limitations provision by imposing and implementing land use regulations that totally exclude and/or unreasonably limit religious assemblies within the City.

**COUNT XII**
**City of University Heights, Michael Dylan Brennan, Luke McConville, Stephanie Scalise, Geoff Englebrecht, Michael Fine, April Urban, and Paul Siemborski**
**Ohio Constitution, Article I, Section 7**
**Right to Freedom from Direct or Indirect**
**Government Encroachment on Religious Exercise**

455.     The foregoing paragraphs are incorporated by reference as if set forth fully herein.

456.     The Defendants have violated and continue to violate Plaintiff's "natural and indefeasible right to worship Almighty God according to the dictates of [his] own conscience" by

imposing and implementing land use regulations that directly and indirectly encroach upon his free exercise of religion.

## COUNT XIII
### City of University Heights, Michael Dylan Brennan, Luke McConville, Stephanie Scalise, Geoff Englebrecht, Michael Fine, April Urban, and Paul Siemborski
### Ohio Common Law Right to Worship

457.    The foregoing paragraphs are incorporated by reference as if set forth fully herein.

458.    The City has violated and continue to violate Plaintiff's right granted by Ohio common law to a place of worship "found in that part of the community where the people live" by imposing and implementing land use regulations that directly and indirectly encroach upon his free exercise of religion.

## COUNT XIV
### City of University Heights
### Ohio Public Records Law, Ohio Code Section 149.43(C)(1)(b)

459.    The foregoing paragraphs are incorporated by reference as if set forth fully herein.

460.    The City violated the Ohio Public Records Law by failing to promptly prepare and make available for inspection public records that were requested by Plaintiff in accordance with the law.

## COUNT XV
### Michael Dylan Brennan
### Ohio Common Law, Invasion of Privacy

461.    The foregoing paragraphs are incorporated by reference as if set forth fully herein.

462.    Brennan invaded Plaintiff's privacy by intentionally intruding upon the solitude and seclusion and the private affairs and concerns of Plaintiff by surveilling Plaintiff in a manner that would be highly offensive to a reasonable person.

**COUNT XVI**
**City of University Heights, Michael Dylan Brennan**
**Freedom of Access to Clinic Entrances (FACE) Act, 18 U.S.C. § 248**

463.     The foregoing paragraphs are incorporated by reference as if set forth fully herein.

464.     Defendants, by engaging in acts which they knew would naturally and probably intimidate Plaintiff from exercising his religion, placed Plaintiff in apprehension of bodily harm to him and his family, in violation of the FACE act.

**COUNT XVII**
**Michael Dylan Brennan**
**Ohio Common Law, Intentional infliction of emotional distress**

465.     The foregoing paragraphs are incorporated by reference as if set forth fully herein.

466.     Brennan by his extreme and outrageous conduct, intentionally and/or recklessly caused serious emotional distress to Plaintiff.

**COUNT XVIII**
**Michael Dylan Brennan, Luke McConville, Stephanie Scalise, Geoff Englebrecht, Michael Fine, April Urban, Paul Siemborski, Christopher Cooney, and Jack Kluznik**
**Civil Conspiracy Under 42 U.S.C. § 1983**

467.     The foregoing paragraphs are incorporated by reference as if set forth fully herein.

468.     The Defendants shared in a general conspiratorial objective to deprive the Plaintiff of his constitutional rights and committed overt acts in furtherance of a single plan agreed upon by the Defendants with the intention to cause injury to the Plaintiff, and in fact did cause injury to the Plaintiff.

**COUNT XIX**
**Michael Dylan Brennan, Luke McConville, Stephanie Scalise, Geoff Englebrecht, Michael Fine, April Urban, and Paul Siemborski**
**Ohio Common Law, Abuse of Process**

469.     The foregoing paragraphs are incorporated by reference as if set forth fully herein.

470.    The Defendants perverted a legal proceeding to accomplish an ulterior purpose for which the legal proceeding was not designed that resulted in direct damage to the Plaintiff.

### COUNT XX
### Michael Dylan Brennan, Luke McConville, Stephanie Scalise
### Ohio Common Law, Malicious Prosecution

471.    The foregoing paragraphs are incorporated by reference as if set forth fully herein.

472.    The Defendants maliciously initiated and continued prosecution without probable cause against the Plaintiff and the prosecution was terminated in favor of the Plaintiff.

### PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request that this Court grant the following relief:

A.  Preliminary and permanent orders permitting Plaintiff to pray with a minyan on Shabbos and Jewish holidays in his home without obtaining a SUP from the City.

B.  An order declaring the City's conduct to be unlawful and unconstitutional.

C.  An order enjoining the City from continuing to engage in conduct found to be unconstitutional.

D.  An order enjoining the City from holding Plaintiff to a different more burdensome standard than other residents.

E.  An order enjoining the City from unlawfully revoking permits already granted to Plaintiff.

F.  An order declaring that the City unlawfully and unconstitutionally discriminated against Plaintiff based on his religion and based on personal animus by, *inter alia*, imposing unlawful violations, citations, and restrictions on Plaintiff.

G.  An order declaring that all violations imposed unlawfully and unconstitutionally based on discrimination are null and void.

H.  An order declaring that Plaintiff is entitled to his certificate of occupancy for the Property.

I.  A writ of mandamus compelling the City to issue the Certificate of Occupancy and deliver a copy of same to Plaintiff within 3 days of the order.

J.  A writ of mandamus to compel the City to comply with Ohio Code 149.43(B) and produce the records requested by Plaintiff.

K. An award for statutory fees, court costs, and attorney's fees set forth in Ohio Code 149.43(C)(2).

L. An award of statutory fees pursuant to 18 U.S.C. § 248(c)(1)(B), for every instance that Brennan used fear and intimidation to prevent Plaintiff from exercising his religion.

M. A declaration that the City's land use ordinances, to the extent that they substantially burden, exclude, unreasonably regulate, and discriminate against the Plaintiff's land use, are void, invalid and unconstitutional on their face on the ground that they violate the Free Exercise Clause of the First Amendment to the United States Constitution, the Religious Land Use and Institutionalized Persons Act, the Free Exercise Clause of the Ohio Constitution, and Ohio Common Law;

N. A declaration that the City's land use ordinances, to the extent that they provide unbridled discretion to City decision makers when reviewing an application for a SUP or variances for a house of worship, and provide no reasonable time limits to obtain such decision, are void, invalid and unconstitutional on their face on the ground that they violate the First Amendment to the United States Constitution as a prior restraint on religious expression and exercise.

O. Preliminary and permanent orders enjoining the City, its officers, employees, agents, successors and all others acting in concert with the City from applying their laws in a manner that violates the First, Fourth, Fifth, and/or Fourteenth Amendments to the United States Constitution, the Religious Land Use and Institutionalized Persons Act, the Free Exercise Clause of the Ohio Constitution, and Ohio Common Law, or undertaking any and all action in furtherance of these acts;

P. An award of compensatory damages against the City in favor of Plaintiff as the Court deems just for the loss of his rights under the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, RLUIPA, the Ohio State Constitution, and Ohio Statutory and/or Common Law incurred by the Plaintiffs and caused by the City's laws and actions;

Q. Awards of compensatory damages, emotional damages, and punitive damages against Defendants Brennan, McConville, Scalise, Englebrecht, Fine, Urban, Siemborski, Cooney, and Kluznik in favor of Plaintiff.

R. Awards against Defendants City, Brennan, McConville, Scalise, Englebrecht, Fine, Urban, Siemborski, Cooney, and Kluznik to the Plaintiff of full costs and attorneys' fees arising out of Defendants' actions and out of this litigation; and

S. Such other and further relief as this Court may deem just and appropriate.

## **DEMAND FOR JURY**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands

a trial by jury in this action on all issues so triable.

Dated: May 9, 2023

Respectfully submitted,


/s/ Jonathan Gross
Jonathan Stuart Gross
Bar ID MD-19121701
2833 Smith Ave.
Suite 331
Baltimore, MD 21208
(443) 813-0141
jonathansgross@gmail.com

### **CERTIFICATE OF ELECTRONIC SERVICE**

I hereby certify that on May 9, 2023, I electronically filed the foregoing with the Clerk of the
Court using the CM/ECF System, with consequent service on all parties that have responded.

/s/ *Jonathan Gross*