Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

DANIEL GRAND,                    )
          Plaintiff,             )
    vs.                          )  Case No. 1:22-cv-01594
CITY OF UNIVERSITY               )
HEIGHTS, OHIO, ET AL.,           )
          Defendants.            )

- - - - -

Transcript of the deposition of DANIEL GRAND, the Plaintiff herein, called by the Defendants as if upon examination pursuant to the Federal Rules of Civil Procedure, taken before Rebecca L. Fumich, Registered Professional Reporter, Notary Public in and for the State of Ohio, held at Mazanec, Raskin & Ryder, 100 Franklin's Row, 34305 Solon Road, Solon, Ohio 44139, Thursday, November 2, 2023, commencing at 10:10 a.m.

- - - - -

Page 2

APPEARANCES:

    On behalf of the Plaintiff:
    JONATHAN S. GROSS, ESQ.
    EDEN P. QUAINTON, ESQ. (via Zoom)
    Quainton Law
    2 Park Avenue, 20th Floor
    New York, NY 10016
    443-813-0141
    jonathansgross@gmail.com
    eden.quainton@quaintonlaw.net

    On behalf of the Defendants:
    JAMES A. CLIMER, ESQ.
    STEPHEN K. Kelly, ESQ.
    Mazanec, Raskin & Ryder Co., L.P.A.
    100 Franklin's Row
    34305 Solon Road
    Cleveland, OH 44139
    440-248-7906
    jclimer@mrrlaw.com
    skelley@mrrlaw.com

- - - - -

Page 3

EXAMINATION INDEX

DANIEL GRAND
    BY MR. CLIMER . . . . . . . . . . . . . 6
    CONTINUED BY MR. CLIMER . . . . . . . . .155
    BY MR. GROSS . . . . . . . . . . . . . 267

EXHIBIT INDEX

Defendant's Exhibit              Marked
A    First Amended Complaint          109
B    Defendant's First Set of Requests for 84
     Admission Propounded to Plaintiff
D    1/21/21 Letter to Daniel Grand from  102
     Luke McConville
E    1/22/21 Email; Subject: 2343 Miramar 113
     request for special use permit
G    3/2/21 Letter to the University     96
     Heights Community and my neighbors on
     Miramar from Daniel and Rachel Grand
H    Email chain' Subject: 2343 Miramar  116
     Blvd
J    3/23/21 Email; Subject: I am       134
     withdrawing my application
K    4/1/21 Letter to Michael D. Brennan 143
     from Abigail A. Southerland

Page 4

L    1/18/22 Letter to Abigail A.       151
     Southerland from James A. Climer
L    3/7/22 Letter to James A. Climer from155
     Abigail A. Southerland (REMARKED)
M    3/7/22 Letter to James A. Climer from152
     Abigail A. Southerland
N    Business card                      17
O    3/18/19 Email; Subject: Thank you for 37
     the gift

Plaintiff's Exhibit
1    Email chain; Subject: Special       269
     Planning Commission Meeting

Deposition of Daniel Grand                                    Daniel Grand, vs. City of University Heights, Ohio, et al.

OBJECTION INDEX

BY MR. GROSS . . . . . . . . . . . . 8
BY MR. GROSS . . . . . . . . . . . . 8
BY MR. GROSS . . . . . . . . . . . . 13
BY MR. GROSS . . . . . . . . . . . . 14
BY MR. GROSS . . . . . . . . . . . . 15
BY MR. GROSS . . . . . . . . . . . . 57
BY MR. GROSS . . . . . . . . . . . . 122
BY MR. GROSS . . . . . . . . . . . . 122
BY MR. GROSS . . . . . . . . . . . . 131
BY MR. QUAINTON . . . . . . . . . . . 136
BY MR. QUAINTON . . . . . . . . . . . 139
BY MR. QUAINTON . . . . . . . . . . . 139
BY MR. GROSS . . . . . . . . . . . . 144
BY MR. GROSS . . . . . . . . . . . . 145
BY MR. GROSS . . . . . . . . . . . . 202
BY MR. GROSS . . . . . . . . . . . . 203
BY MR. GROSS . . . . . . . . . . . . 218
BY MR. GROSS . . . . . . . . . . . . 254
BY MR. CLIMER . . . . . . . . . . . 275
BY MR. KELLEY . . . . . . . . . . . 278

- - - - -

DANIEL GRAND
after having been first duly affirmed, as
hereinafter certified, was examined and testified
as follows:

EXAMINATION

BY MR. CLIMER:

Q  Can you state your name please, sir.

A  Yes.  Daniel Grand.

Q  Mr. Grand, my name is Jim Climer, and with me
is Steve Kelley.  We represent the Defendants in
the case that you filed against University
Heights and a number of its officials.

    Have you ever given a deposition before?

A  As in conducted one and asked questions of
someone like you're doing to me?

Q  Correct.

A  No.

Q  Have you ever testified in a deposition
before?

A  No.

Q  Okay.  I'm going to ask you to do a couple
things then, if you would.

    First of all, if you don't hear or understand
a question I ask you, please let me know, and
I'll be happy to rephrase it.  Okay?  If I do not

hear from you, I'll assume we are on the same
wavelength.

A  Please don't.

Q  Okay.  Secondly, we need to try to talk one
at a time because it's very difficult for our
court reporter to take down a nod or a shake of
the head or some other non-verbal gesture.  Okay?
And it's difficult for the court reporter to take
down two people talking at once.

    Last of all, if you need a break, let us
know, and we'll be happy to accommodate that.
The only time we can't do that is if there's a
question pending on the table, but once that is
answered, we'll do so.  Okay?

A  All that you just said since you've heard me
speak last is understood.  Fine.

Q  Gotcha.  Have you ever been known by any
other names?

A  Yes.

Q  What were those?

A  Daniel Joshua -- is a middle name -- Gerlich,
G-E-R-L-I-C-H.

Q  Okay.  Any other names that you've been known
by?

A  My name -- my name that I changed it to.

Q  Okay.  And when did you change your name?

A  I believe around 2015 or so.

Q  What was the reason for that?

        MR. GROSS:   Objection.

        You can answer.

A  My father had just died.

Q  And why did that -- and your father's name
was Gerlich?

A  You're right.

Q  Why did that motivate a name change?

        MR. GROSS:   Objection.

        You can answer.

A  I felt like I wanted a change.

Q  Okay.  Where do you presently live?

A  In University Heights, Ohio.

Q  Okay.  Is that the Miramar address that we're
here about today?

A  Could you be more specific?

Q  What's your address?

A  2343 Miramar Boulevard.

Q  Okay.  How long have you lived there?

A  Since January of 2019.

Q  Where did you live prior to that?

A  In University Heights.

Q  And I think you own some property on Silsby.

Deposition of Daniel Grand                                    Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 9

1 A  I own property on Silsby.
2 Q  **Is that where you lived?**
3 A  Yes.
4 Q  **Okay.  How long did you live on Silsby?**
5 A  From 2017 until I moved to Miramar.
6 Q  **Okay.  Where did you live prior to Silsby?**
7 A  In Queens, New York.
8 Q  **And you're a native of Queens?**
9 A  Yes.
10 Q  **And what motivated your move to University**
11 **Heights?**
12 A  Interested in a change.
13 Q  **You wanted a change of scenery?**
14 A  Yes.
15 Q  **Okay.  Any particular reason you picked**
16 **University Heights?**
17 A  Recommendation of a friend.
18 Q  **Okay.  Who was that?**
19 A  Someone that my wife met on Facebook.
20 Q  **Okay.  And what was it that you found**
21 **appealing about University Heights?**
22 A  I didn't know it.  I didn't find anything
23 appealing about it.
24 Q  **Okay.  Did your wife find it appealing?**
25 A  I don't know.

Page 10

1 Q  **So you had no thoughts one way or the other**
2 **about whether University Heights would be a good**
3 **place to live?**
4 A  Agreed.
5 Q  **Okay.  How far have you gone in school?**
6   **As I understand it, you're a graduate of**
7 **Excelsior University.**
8 A  I'm a graduate of Excelsior University, yes.
9 Q  **Okay.  And you have a Bachelor's degree from**
10 **there?**
11 A  I do.
12 Q  **You attended Touro Law School for a period of**
13 **time?**
14 A  That is correct.
15 Q  **All right.  When was that?**
16 A  I believe it was in 2014.
17 Q  **That's when you were enrolled there?**
18 A  Yes.
19 Q  **How long did you spend at Touro?**
20 A  I was a 1L.
21 Q  **Okay.  Did you complete your first year?**
22 A  No.
23 Q  **Okay.  Why not?**
24 A  My father died abruptly and I got married all
25 within about a week of finals and it was hard to

Page 11

1 continue.
2 Q  **Okay.  My condolences about your dad.**
3 A  Thank you.
4 Q  **Are you presently employed?**
5 A  Yes.
6 Q  **Okay.  What do you do?**
7 A  Be more specific.
8 Q  **What's your occupation?**
9 A  Entrepreneur.
10 Q  **What types of endeavors do you pursue as an**
11 **entrepreneur?**
12 A  A multitude.
13 Q  **Can you describe some of them for us?**
14 A  Music.
15 Q  **Anything else?**
16 A  Real estate.
17 Q  **Anything else?**
18 A  Mainly in those two realms.
19 Q  **In terms of the music industry, what do you**
20 **do there?  Are you a performer?**
21 A  Yeah.
22 Q  **Do you also produce or are you a producer?**
23 A  My own music, yeah.
24 Q  **And what kind of music do you perform?**
25 A  What do you mean?  Genre?

Page 12

1 Q  **Yes.**
2 A  Rock and roll.
3 Q  **Okay.  Are you a member of a group?**
4 A  Not at the moment.
5 Q  **Okay.  You mentioned real estate.  What do**
6 **you do in the real estate industry?**
7 A  I buy and sell.
8 Q  **Okay.  Where's that?  I mean, in any**
9 **particular area?**
10 A  No.  Wherever the deals are.
11 Q  **Okay.  Is it predominantly in the Cleveland**
12 **area?**
13 A  At this time, yes.
14 Q  **Okay.  How many transactions, say, in the**
15 **past year have you engaged in in the real estate**
16 **industry approximately?**
17 A  A couple.
18 Q  **Okay.  How about the year before that?**
19 A  The same.
20 Q  **Okay.  Are these residential, commercial?**
21 **What types of transactions are you involved in?**
22 A  Could you clarify what you mean by
23 "transactions"?  I'm not following.
24 Q  **You indicated that you buy and sell real**
25 **estate.  That implies to me that there are**

Deposition of Daniel Grand

Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 13

1 transactions for the purchase and sale of that
2 real estate, and that's what I mean by
3 "transactions."
4 A  I haven't really bought very much or sold
5 very much recently.
6 Q  I understand that.  But you indicated in the
7 past year or so you've had a couple of real
8 estate transactions, correct?
9 A  Yeah.  But they were not what you say buy or
10 sell.  They were like refinances, which is a
11 transaction of a different kind with a bank, so I
12 wasn't sure what you meant.
13 Q  Okay.  And are you engaging in these
14 transactions with the bank on properties that you
15 own --
16 A  Yeah.
17 Q  -- or for other people?
18 A  Properties I own.
19 Q  All right.  And are these residential or
20 commercial properties?
21        MR. GROSS:   I'm just going
22     to object to relevance.
23        But you can answer.
24        MR. CLIMER:   I think it
25     has a great deal of relevance to

Page 14

1     this case.
2 BY MR. CLIMER:
3 Q  Are these residential or commercial
4 properties?
5 A  Could you tell me what you mean by
6 "commercial"?  Because it might have more than
7 one definition in this line of business.
8 Q  Well, let's talk about residential, anything
9 that people live in whether it be houses or
10 apartments.  Everything else would be defined as
11 commercial.
12 A  That wouldn't be an accurate definition.
13 Commercial is defined as any multi-family over
14 four units.  That's a commercial transaction.
15 Even though it's purely residential, that's still
16 commercial.  Not just stores and strip malls.
17     But what I think you're saying is, yes,
18 residential.
19 Q  Fair enough.  And are those single family,
20 multi-family?
21 A  Mostly single family.  One multi-family.
22 Q  All right.  Have you ever been employed by
23 other people?
24        MR. GROSS:   I'm just going
25     to do one standing objection and

Page 15

1     we'll discuss it later -- but you
2     can answer -- to the relevance of
3     this line of questioning.
4 A  I'm sorry.  I didn't hear the question.  Can
5 you repeat it?
6 Q  Have you ever been employed by another person
7 or entity?
8 A  In Ohio?
9 Q  Well, let's start with Ohio.
10 A  No.
11 Q  And you've engaged in the same type of
12 entrepreneurial activities more or less since you
13 came to Ohio?
14 A  Yes.
15 Q  How about your previous residence in New
16 York, have you ever been employed by another
17 person or entity?
18        MR. GROSS:   I'm going to
19     object.
20        But you can answer.
21 A  Yes.
22 Q  When were you last employed by another person
23 or entity?
24 A  2008.
25 Q  Okay.  And what did you do?

Page 16

1 A  I was the information technology director for
2 the Touro College of Pharmacy.
3 Q  How long did you work there?
4 A  The Touro College of Pharmacy or Touro
5 College?  I didn't understand.
6 Q  As the info tech for the Touro College of
7 Pharmacy.
8 A  Maybe a year and a half.
9 Q  Why did you leave?
10 A  The death of the founder.
11 Q  Okay.  The founder of the school?
12 A  Correct.
13 Q  Were you employed by any persons or entities
14 prior to your time at the Touro College of
15 Pharmacy?
16 A  Yes.
17 Q  Okay.  Can you tell us about that?
18 A  I had worked for Touro main campus.
19 Q  Was that also in the information tech sector?
20 A  It was, but a different position.
21 Q  Okay.  What did you do in that position?
22 A  The latter position?
23 Q  The position prior to your time with the
24 College of Pharmacy.
25 A  I was in the help desk.

Deposition of Daniel Grand                                    Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 17

1 Q  How long did you do that?
2 A  I think another about year and a half or so.
3 Q  Okay.  That would get us back to 2006 or so?
4 A  Correct.
5 Q  What did you do prior to that?
6 A  I did a variety of different jobs,
7 restaurants and things.
8 Q  Okay.
9 A  I was a young 20-something-year-old.
10 Q  Good enough.
11        MR. CLIMER:  Can you mark
12 this as Defendant's Exhibit --
13        MR. GROSS:  Which one is
14 this?  The ones that were sent to
15 me?
16        MR. CLIMER:  Yeah.  Let's
17 go Defendant's N.
18        - - - - -
19        (Defendant's Exhibit N was
20        marked for identification.)
21        - - - - -
22 BY MR. CLIMER:
23 Q  Mr. Grand, I'm going to hand you what's been
24 marked Defendant's Exhibit N, and the pages are
25 actually kind of backwards on that.  I think page

Page 18

1 2 should probably be page 1, if I'm not mistaken.
2    Do you recognize that document?
3 A  It's a picture of something that I recognize,
4 yeah.
5 Q  And is that a business card you handed out at
6 one time?
7 A  It's not really a business card, no.
8 Q  A card of introduction, so to speak?
9 A  Yes.
10 Q  I'm going to represent that you gave this to
11 Mayor Brennan at a meeting you had with him back,
12 I believe, in 2018.  Does that sound like the
13 right time frame that you used this type of card?
14 A  I'm not sure.  If you're asking if I gave --
15 you said something in my name, I don't think you
16 should do that.
17    Did you want to ask me if I gave this to
18 Mayor Brennan, please?
19 Q  Well, did you?
20 A  Did I?
21 Q  Yes.
22 A  Yes.
23 Q  Okay.
24 A  I don't know what you're saying.  I'm sorry.
25 Q  Well, I asked you, first of all, if you used

Page 19

1 this card around 2018 or 2019.
2 A  I think, yes.
3 Q  Okay.  And do you recall having given it to
4 Mayor Brennan?
5 A  I did give it to him.
6 Q  Okay.  And does this card accurately describe
7 the scope of your entrepreneurial activities that
8 you've engaged in?
9 A  No.
10 Q  All right.  What's inaccurate about it?
11 A  Nothing is inaccurate about it.  It's just
12 not a correct assessment.
13 Q  How is it --
14 A  It's a description of my entrepreneurial
15 pursuits.  It's not limited to.  No, there's
16 nothing inaccurate about this card.
17 Q  I'm sorry.  I don't understand your answer.
18 A  There's nothing inaccurate about this card,
19 but it's not limited to my entrepreneurial
20 pursuits.
21 Q  Okay.  So explain what you mean.
22 A  What's your question?
23 Q  All right.  You indicated that it does not
24 accurately list your entrepreneurial pursuits,
25 correct?

Page 20

1 A  No.
2 Q  All right.  And what -- why does it not
3 accurately list them?
4 A  I never said accurate.  It does -- this is
5 accurate, but it's not correct to say to me that
6 this is an embodiment of my entrepreneurial
7 pursuits.  I disagree with your question.  I
8 don't agree with that.
9 Q  Okay.  Why not?
10 A  Why not what?
11 Q  Why do you not agree with my question?
12 A  Because it doesn't seem to really capture
13 what is on the card here.
14 Q  All right.  Tell me what you're trying to
15 convey with the card.
16 A  Aspects of my character and personality and a
17 little bit about me.
18 Q  Okay.
19 A  Not my entrepreneurial pursuits.
20 Q  Fair enough.
21 A  These are certain things I do.
22 Q  Okay.  You've listed one of your
23 characteristics as being a business expense
24 reductionist.  What do you mean by that?
25 A  Businesses have expenses and sometimes they

Deposition of Daniel Grand                                     Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 21

1 can overspend on certain things -- and
2 reductionist is a chokhmah term -- that you can
3 help people to reduce their business expenses.
4 **Q  Are you engaged in doing that presently?**
5 A  No, I'm not.
6 **Q  When was the last time you acted as a**
7 **business expense reductionist?**
8 A  For over a decade as an owner of Violation
9 Removal, Inc.
10 **Q  What is Violation Removal, Inc.?**
11 A  Pardon?
12 **Q  What is Violation Removal, Inc.?**
13 A  It was my property violation removal company.
14 **Q  Okay.  Are you still actively engaged with**
15 **that company?**
16 A  As of today, no.
17 **Q  When were you last active with it?**
18 A  I don't know the exact date, but I phased
19 myself out around -- it's been almost -- it's
20 been around a year or so, give or take.
21 **Q  Okay.  And that company was active in the**
22 **Cleveland area?**
23 A  No.
24 **Q  Okay.  Where did you pursue that business,**
25 **the Violation Removal, Inc. business?**

Page 22

1 A  New York City.
2 **Q  Okay.**
3 A  But I want to be technical.
4 **Q  Okay.**
5 A  That business, Violation Removal, Inc., is a
6 New York entity that operated in New York.
7 **Q  We're actually going to get to that.  It's**
8 **incorporated in New York.**
9 A  That particular entity.
10 **Q  Okay.  Is there some entity through which you**
11 **pursue a similar business in Ohio?**
12 A  The words might be similar, but the actual
13 work is different.
14 **Q  Okay.  What is that business?**
15 A  I'm not sure we're seeing eye to eye right
16 now.
17 **Q  I'm not sure we are.**
18 A  That's fine.  Do you want to clarify what you
19 mean?
20 **Q  Do you want to clarify what you mean by the**
21 **wording may be similar but a different line of**
22 **business in Ohio from what Violation Removal,**
23 **Inc. does?**
24 A  All right.  Property violation removal in New
25 York is a very complex matter.  It involves

Page 23

1 multiple administrative departments.  It involves
2 dealing with the Landmark Preservation
3 Commission, which is a massive entity.  I mean,
4 they have hundreds and hundreds and hundreds of
5 entities -- or excuse me -- employees for this
6 particular piece.
7 It involves dealing with the building
8 department, which isn't some small house like it
9 is in University Heights, for example.  It's a
10 real department, like 280 Broadway in Manhattan.
11 It's a multi-billion dollar enterprise, and it's
12 a very, very -- 14.1 billion in revenue from New
13 York City in 2015, if I remember correctly.  It's
14 a very big entity.
15 It involves a lot of different aspects.
16 There are ECB hearings that are conducted.
17 Violations that you have to go and appear for
18 before a tribunal.  So you're dealing with
19 ALJs -- administrative law judges -- and you're
20 representing your customers, your clients, et
21 cetera, and you're having disputes over
22 administrative code.  It's like a quasi-judicial
23 proceeding, so to speak, among other things.
24 As opposed to Cleveland where they say, you
25 know, you have a jiggling toilet handle, you

Page 24

1 know, we want you to replace that with a new
2 toilet handle, and it's much sillier and watered
3 down.  It's not really much other than, you know,
4 the building inspectors issue violations as they
5 feel fit.  And then you simply talk to them and
6 say, hey, I got to get rid of these violations,
7 and you do the work they want you to do and the
8 violations go away.  It's really not the same
9 thing, but the term "violation removal" would
10 carry over, but it's two different things.
11 Like if somebody called Michael Jackson a
12 singer, and then called the guy sitting in
13 McDonald's a singer, yeah, you can use the same
14 word, they're both singers.  Michael Jackson can
15 sing, and that guy, you can call him whatever you
16 want.  So that's how I look at it.
17 **Q  All right.  So, if I understand you**
18 **correctly -- and I don't want to put words in**
19 **your mouth --**
20 A  Okay.
21 **Q  -- but I want to see if we understand one**
22 **another.  You've engaged -- first of all,**
23 **Violation Removal, Inc. in New York City deals**
24 **with the remediation of property code violations.**
25 A  From the legal side.

Deposition of Daniel Grand                                      Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 25

1  Q   From the legal side.  You're not the actual
2  contractor.
3  A   That's right.
4  Q   All right.  And so Violation Removal, Inc.
5  would handle the administrative and bureaucratic
6  side of remediating property violations, correct?
7  A   I concur.
8  Q   Okay.  You indicated it's a $14.1 billion
9  business, and I assume you mean the industry in
10 the New York City area.
11 A   I said the industry.  We're talking about the
12 department of buildings.  No.  We're talking
13 about revenues generated by the department of
14 buildings for the City of New York.
15 Q   Got it.
16 A   That's not the other departments.  There's
17 the fire department, which issues tickets and
18 gets a lot of revenue.  There's the sanitation
19 department.  There's the housing preservation
20 development department, HPD.  There's another --
21 I think there's 13 agencies in all that all issue
22 violations that can carry a court case, that can
23 bring you to a hearing, that can have 20, 30,
24 $50,000 fines associated with it.  So the
25 industry that the people work in, people who work

Page 26

1  for companies like that like me, they're engaged
2  in defending the public against the city.
3  Q   All right.  And in the course of running that
4  business you became familiar with the concept of
5  quasi-judicial hearings, did you not?
6  A   I don't think I can say that.  I don't know.
7  Every -- every jurisdiction has its own set of
8  rules.  So, no, I can't say that.  I know the
9  word "quasi-judicial."  I went to law school.
10 No, I don't know.
11 Q   Okay.  At least in New York City you went to
12 hearings on behalf your customers, did you not?
13 A   ECB tribunal hearings, yeah.  But it's not a
14 full-blown judicial procedure, so it's sort of in
15 that regard a layman way of saying it's
16 quasi-judicial.  That's all.
17 Q   All right.  And if I understand correctly,
18 you found that type of business in Ohio to be
19 different in complexity and scope.  Would that be
20 fair?
21 A   Almost.  I think that they're not really
22 synonymous other than, you know, local cities in
23 Ohio issue property violations that people do
24 need to remove, but it's -- they're just so far a
25 part.  They're not really relatable.

Page 27

1  Q   Have you engaged in that business in Ohio?
2  A   I wouldn't call it a business.  There's
3  really not much work there.
4  Q   Okay.  So the answer is no?
5  A   I'm not saying yes or no to your question
6  because it's not really what I'm being asked.
7  I'm saying that I don't think it's much of a
8  business.  Doesn't mean it's yes or no.
9  Q   Well, have you engaged in that business in
10 Ohio?
11 A   It's not much of a business.  Have I dealt
12 with anything in another business that had to do
13 with violation removal?  I mean, that's the
14 question you're asking?
15 Q   So you weren't pursuing that as a profession,
16 but you may have interacted with public entities
17 on behalf of yourself or somebody else.
18 A   See, this is where I think we're getting a
19 little cloudy again.  First of all, we need to
20 make this very clear for the record.  I'm saying
21 on the record there's a clear distinction between
22 violation removal as a business in New York than
23 there is with removing a property violation in
24 Ohio.  There is no business of that in Ohio.
25 Q   Okay.

Page 28

1  A   That's what I'm saying.  But what you're
2  asking is leading me to another point which
3  you're sort of alluding to.  I don't understand
4  what you're -- come out with it.  What are you
5  trying to tell me?  I don't understand what
6  you're trying to ask me about Ohio and violation
7  removal.  Do you have something you're asking?
8  Q   I'm asking if you have pursued that as -- the
9  violation removal practice that you engaged in
10 New York in Ohio?
11 A   In the same fashion possible, no.
12 Q   All right.  But I take it you have pursued it
13 to a degree.
14 A   Characterization.  I would say when you're
15 working in real estate, you're dealing with a lot
16 of different moving parts, and one of them is
17 interacting with the department of buildings even
18 in Ohio, even though it's a much smaller level.
19 They may come to your property before issuing a
20 certificate of occupancy or some sort of
21 certificate to allow a tenant to occupy a place
22 or what have you.
23    And when you deal with them and you work with
24 them, they might say, oh, there's a violation
25 here that we want you to take care of.  So you

Case: 1:22-cv-01594-BMB  Doc #: 80  Filed: 01/26/24  8 of 101.  PageID #: 1234

Deposition of Daniel Grand                                    Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 29

1  call up a handyman and you tell him to come knock
2  that little thing out or whatever.  You get rid
3  of the violation if that's what it takes.
4      It depends what -- there's nothing specific.
5  You know what I'm saying?  It depends what you're
6  asking so ...
7  Q  You took up residence in University Heights
8  in 2017, correct?
9  A  That is correct.
10 Q  And if I'm understanding correctly, you had a
11 meeting with the mayor sometime in 2018 or so in
12 which you expressed an interest in perhaps being
13 an intern at the city.
14 A  Not exactly like that, no.
15 Q  Okay.  Tell me about that.
16 A  Tell you about what?
17 Q  Your meeting with the mayor.
18 A  My meeting with the mayor?  To me, it was
19 congratulatory.  I was extremely new to the town
20 and so was he as a mayor.
21 Q  And this would be Mayor Brennan?
22 A  You're asking me about a meeting that I had
23 with which mayor?
24 Q  Mayor Brennan.
25 A  Oh, yeah.  Mayor Brennan.  That's who we're

Page 30

1  talking about.
2  Q  Okay.  How did that meeting come about?
3  A  Councilwoman Weiss suggested I meet with him.
4  Q  Did you know Councilwoman Weiss before she
5  suggested this meeting?
6  A  Did I know her?
7  Q  Let's back up.
8      How did it come to be that Councilwoman Weiss
9  suggested this meeting?
10 A  Someone made an introduction with me and her.
11 Q  Do you know who that was?
12 A  I'm thinking hard.  I don't remember right
13 now.
14 Q  Okay.  Fair enough.
15      Do you know under what circumstances this
16 introduction took place?
17 A  Not really.  I remember the meeting that I
18 had with Ms. Weiss at a Starbucks.  We sat and
19 met for a few minutes.
20 Q  Did you know her before that?
21 A  That was my first time interacting with her.
22 Q  All right.
23 A  We might have had just an email to confer
24 what the place we were going to meet was going to
25 be, maybe like that.  But nothing other than

Page 31

1  that, no.
2  Q  What was the subject of the meeting?
3  A  Just an introduction.  I was a new resident,
4  and I saw it quite differently than it is in New
5  York, that there's a way to meet people and get
6  involved with, you know, civics and the city and,
7  you know, just be a good citizen --
8  Q  Okay.
9  A  -- caring about your local city, and I played
10 into that.  I got to admit I like that because I
11 grew up in Queens and it's a nice thing for me to
12 be able to do.
13 Q  Ms. Weiss suggested then that perhaps you
14 should meet with the mayor?
15 A  Yes.  Among other things.
16 Q  All right.  Anything else she suggested to
17 you?
18 A  Um-hmm.
19 Q  Okay.  What's that?
20 A  She mentioned to me that there was at that
21 time going to be an opening in a subcommittee,
22 and she was very impressed meeting me, and
23 thought that I should apply for the position of
24 being on that subcommittee, and that's what I
25 did.

Page 32

1  Q  What was the subcommittee?
2  A  I think it was an economics or finance.  I
3  can't really recall 100 percent right now.
4  Q  And this was a subcommittee of the city
5  council?
6  A  I'm making myself sound ignorant, but I'm not
7  really sure if it was or wasn't.  I kind of just
8  went ahead and followed her suggestion to reach
9  out about the subcommittee.  Figured I'd learn
10 more as I go.
11 Q  Gotcha.  And did you also reach out to the
12 mayor to meet with him?
13 A  It wasn't me who reached out to the mayor.
14 It was Michele Weiss who bridged the two of us
15 and he accepted the meeting before I even, I
16 think, replied to him by email.
17 Q  Okay.  So tell me about your meeting with the
18 mayor.  What happened during the course of the
19 meeting?
20 A  I congratulated him.  I was trying to be a
21 fan and root him on, tell him I think he's going
22 to do a good job and make him feel good and
23 welcomed.  I'm sure it's hard uprooting a prior
24 mayor that, I think, was there 28 years,
25 something like that, so he probably would have a

Deposition of Daniel Grand                                    Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 33

1  lot of people who would be not used to him. And
2  sometimes when people are not used to you, they
3  might take a negative approach toward you, at
4  least it seems that way to me.
5      And I felt that it would be good to
6  commiserate and to just let him know while I was
7  there -- again, I didn't make the meeting, it was
8  Michele's meeting, she suggested I meet him. But
9  while I was there, just to be polite and nice to
10 him and just be friendly and tell him that, you
11 know, there are people in the community that are
12 rooting for you and hoping you do good.
13     I shared one thing about what I thought as
14 far as there's a property in University Heights
15 that's sort of blighted, or whatever, and was a
16 big eyesore, University Square. And -- I don't
17 remember exactly what I told him right now, but I
18 remember having -- that was part of our
19 discussion, how I think that there's a lot of
20 stuff the city could do to kind of, you know,
21 bring in some tax dollars for the city, and if
22 there's anything I can do to help and -- you
23 know, with my real estate knowledge and things
24 like that, working with administrations and
25 stuff, if I can help, I would be happy to help in

Page 34

1  some way, you know, be involved in either the
2  administration -- not necessarily his
3  administration -- but with the city. If I could
4  just get involved and help the city out, I would
5  be willing to do that. A lot of time on my
6  hands, and I was just willing to give and to be,
7  like, just a noble citizen.
8  Q  Did anybody else participate in that meeting?
9  A  No.
10 Q  Okay. Did you ever express an interest in an
11 internship?
12 A  I sent an email to a Ms. Mullen -- I think
13 it's M-U-L-L-E-N -- in regards to the openings
14 that might be in the city for different things
15 like any internship. I think it was in the
16 Cleveland paper, a local paper, University paper.
17 I don't remember the name of it. They still
18 publish it, I think. And I said, oh, that's
19 cool, so I sent an email for that, or my words
20 were like I'm interested to find out if there's
21 anything like a mayoral internship or the like or
22 any committees or subcommittees, I gave a whole
23 list of things, but I did not make up or intently
24 go and pursue actively an internship for the
25 mayor, per se, and note. No, I didn't do that.

Page 35

1  Q  Okay. And was that before or after your
2  meeting with the mayor, if you recall?
3  A  That email would tell the correct date, but
4  if it were -- to the best of my memory, I think
5  it was after --
6  Q  Okay.
7  A  -- but I could be wrong. The email will
8  really tell better. It will just be a fact. I'm
9  not really sure right now.
10 Q  During your meeting with the mayor did you
11 gain any feedback from him?
12 A  About?
13 Q  Well, was his demeanor pleasant, unpleasant?
14 A  He was very charming at that meeting.
15 Q  Anything else about the meeting that you
16 recall?
17 A  Not really. It wasn't quite long.
18 Q  I'm sorry?
19 A  It wasn't quite long.
20 Q  Okay. You're saying it was not very long?
21 A  That's right.
22 Q  Okay. Almost a little double negative there.
23 I just wanted to make sure.
24 A  Poetic license.
25 Q  Did there come a time when you arranged for a

Page 36

1  gift to be sent to the mayor in the way of a
2  bottle of wine and a cigar and a cigar cutter?
3  A  I did send him a bottle of wine, and I don't
4  know about the cigar and the cigar cutter. In
5  fact, I actually know that it was not me that
6  sent that. That was the liquor store guy's own
7  tack-on.
8  Q  Okay.
9  A  Because I only -- I only bought him -- to be
10 perfectly honest with you, I had simply walked
11 into the liquor store -- which had just opened up
12 itself at that time so you have another new group
13 to town -- and I said, "Oh, I'm excited. I'm
14 meeting the mayor of our town. I want to send
15 him a welcoming present to congratulate him for
16 becoming our mayor. Can you please pick out a
17 bottle of wine and charge my card?" And I said,
18 "Please drop it off to him."
19     And he was all pepped up, the worker at the
20 new liquor store -- I think he was the liquor
21 store owner who was still working behind the
22 register at that time -- and he was like, "Wow.
23 That is really cool. We're going to get a chance
24 to meet the mayor. Thank you for setting us up a
25 chance to go meet him."

Deposition of Daniel Grand                                    Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 37

1    And I think he added -- must have been -- and
2 I think it was him who added a cigar and a cutter
3 on his own.  I didn't -- I didn't authorize or --
4 I found out about it later because I was told by
5 the liquor store guy, you know, whatever, a week
6 or so after when I went to buy something to drink
7 or whatever, a bottle of wine or something, that
8 it was returned.  And I said, "Oh."
9    And then he told me, "And then I gave him
10 this cigar and this cutter and it was returned."
11    And I was like, "Oh, I'm so sorry."
12    But he still thanked me for having him, you
13 know, go do that errand for me, so to speak, and
14 getting to meet the mayor.  So he thought that
15 was a very cool thing because, you know, it's
16 kind of a cool thing.
17         MR. CLIMER:    Let's go with
18 Exhibit O.
19 A  But as far as what type of wine or whatever,
20 I don't know.  I don't know what he sent.
21         - - - - -
22         (Defendant's Exhibit O was
23         marked for identification.)
24         - - - - -
25         MR. GROSS:   I just want

Page 38

1         to -- since we didn't receive the
2         thing until this morning, can I
3         just show him the list of the
4         documents that we're going to see
5         today?  Is that appropriate?
6         MR. CLIMER:    Yeah.
7         MR. GROSS:    Because there's
8         not that many.
9         So just look very quickly
10         just so you know.
11         THE WITNESS:    I
12         understood.  Let's see what this
13         is.
14         MR. GROSS:    Just read it
15         silently.
16         (Recess had.)
17 BY MR. CLIMER:
18 Q  All right.  You've been handed what's been
19 marked as Defendant's Exhibit O.  That appears to
20 be an email to you from Mayor Brennan returning
21 the gift that you had sent him, correct?
22 A  It is a letter -- email that was sent to an
23 email address of mine that didn't always work
24 very well.
25 Q  Okay.

Page 39

1 A  It regards him returning bottle -- a lovely
2 bottle -- to the Green Road liquor store.  So
3 that's what it seems to say to me.
4 Q  Do you know if you received it or not?
5 A  Sorry.  Do I know if he received it?
6 Q  If you received --
7 A  If he received --
8 Q  No.  That you received this email.
9 A  I'm sorry.  I just want to take another
10 second to look over the second page here I didn't
11 notice before I speak.  I'm sorry.
12 Q  I am not --
13 A  You're not up to that?
14 Q  I'm talking about the email right now.
15 A  Oh.  Because you opened the page.  Just this
16 email?
17 Q  Yes.
18 A  I know I've seen this document before.  If I
19 received it or read it back then or not, I can't
20 really recall right now, but I know that having
21 gone through all of the document requests and
22 requests for production and some aspects of some
23 parts of FOIA requests that were given to other
24 people that were sent to us, I saw this before.
25 Q  Okay.  And you don't -- just don't know if

Page 40

1 you received it when it was sent.
2 A  That email address, it has quotes on it, so
3 it seems like it might not have really gotten
4 sent properly.  And I also see that, particularly
5 on my end, that dannygrand.com email --
6 talk@dannygrand, it was always a little buggy.  I
7 guess the service provider that I used.  So you
8 know how stuff always go to spam?  So it's hard
9 to say truthfully that I recall receiving this or
10 not.  I don't think so, but I'm not sure so I
11 can't really fully answer you.
12 Q  In any event, you did learn that the bottle
13 had been returned from the owner of the liquor
14 store, correct?
15 A  I did.
16 Q  All right.
17 A  I thought it was interesting that it was
18 returned.  I didn't understand why.
19 Q  All right.  And did you receive the letter
20 that's page 2 of Exhibit O?
21 A  I don't -- I don't think I ever received this
22 letter.  It wasn't addressed to me.
23 Q  Okay.
24 A  It was actually a letter that was addressed
25 to Mr. Ray from the liquor store, and if he would

Deposition of Daniel Grand                          Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 41

1  have then forwarded this -- and, again, that
2  email I don't believe arrived ever because of my
3  buggy email, and because the email address in
4  this email has quotes on it so it wouldn't go.
5  It would have bounced back.  Yeah.  I don't think
6  I received this email at that time period, to be
7  honest.
8  **Q  Were you offended at all by the fact that the**
9  **gift had been returned?**
10 A  I'm just going to say I don't like that
11 terminology "offended."  I think if you could
12 rephrase that.  I'm not going to answer offended.
13 I'm not offended.  That's an insult, really.
14 That's insulting, really.
15 **Q  That's an insult to you?**
16 A  Yeah.
17 **Q  How am I insulting you?**
18 A  By asking me -- because I'm not so frail and
19 squiggly that I should be offended.  I don't like
20 the word --
21 **Q  What were your --**
22 A  "offended."
23 **Q  -- feelings about the fact that the bottle**
24 **had been returned?**
25 A  When I first recall learning of it, it was at

Page 42

1  the liquor store.  I just didn't really know why
2  it was returned.  I didn't really care in a
3  certain way or mind.  I shouldn't say "care."  I
4  take that back.  I didn't care.  I figured he had
5  some reason that he wanted to send it back.
6  Perhaps he didn't like wine.
7  **Q  Okay.**
8  A  I didn't know.
9  **Q  Does the letter explain to you the reasons**
10 **why it was returned?**
11 A  I don't know if I read this letter.  Should I
12 read the letter?
13 **Q  If you want to.**
14 A  Okay.  March 18th, 2019.  Neal Shehadeh,
15 Green Road Liquor, Regarding:  Your gifts.
16 **Q  You don't need to read it out loud in the**
17 **record.  Just familiarize yourself with the**
18 **letter.  Let us know when you're ready.**
19 A  Well, I want to comment and say that the
20 mayor seems to say in the first sentence that he
21 wants to thank Ray and Danny Grand for the gifts,
22 with an S.  So he must have known that the other
23 parts of this, cigar and thing, were from Ray
24 because I only bought the bottle for him.
25 **Q  Okay.**

Page 43

1  A  And he appreciates the spirit of giving.  The
2  mayor said that.  Okay.  Right.  So this wine
3  box, cigar, and cigar cutter I had nothing to do
4  with.  I never knew anything about that.
5  **Q  Okay.**
6  A  I only asked Ray to send him a bottle of
7  wine.  Ray picked whatever he picked, I wasn't
8  even there, and he charged my card.
9  Thanks for the kindness and appreciation that
10 he feels are behind the gifts.  Okay.  And I
11 remain happy to have provided the time to
12 Mr. Grand and you to converse.  After he
13 consulted with the law director, he realized he
14 couldn't accept these gifts and he had to return
15 them.
16 Oh, okay.  The law director told him he had
17 to return them.  Okay.  Oh, his reasons -- it's
18 perfectly foreseeable that someone like me or Ray
19 might have official business and he wouldn't want
20 to be in a position where he felt that he might
21 have been influenced due to the gifts.
22 Okay.  Wow.  Okay.  I respect him.  Okay.
23 But he thinks that it wasn't anyone's intention
24 to do that, but as a result, he felt more
25 comfortable just returning it anyway.  Good.

Page 44

1  Yeah.
2  So I agree with that part of it.  I agree
3  with that part of it that the mayor believed that
4  nobody's intentions were bad here, but he felt
5  more comfortable just returning it.  I agree with
6  that.  The sentiment of that letter makes me
7  happy because it makes me feel like the mayor
8  understood I was a good-hearted person trying to
9  be a congratulatory and giving him a present, and
10 he felt for his own safety and sake of mind and
11 comfort of his ownself and he would feel -- and
12 these are his words, I'm paraphrasing, but that's
13 what he said in the letter.
14 **Q  Do you have any reason to doubt the reason**
15 **for that return -- the reason given in that**
16 **letter for the return of the gift?**
17 A  Do I have a reason to doubt what the mayor
18 wrote?  I can't answer that.  The mayor would
19 have to answer that.
20 Did he write the truth or not you're asking?
21 I think he did.  I think what he said makes
22 perfect sense here.  "To be clear, I don't think
23 that was anyone's intention here, nor would it
24 have been the result."  And he's implying that
25 anybody was trying to improperly influence him.

Deposition of Daniel Grand                    Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 45

1 So, yeah, I agree with the mayor that nobody was
2 trying to improperly influence him, and I thank
3 him for putting that here saying that he
4 recognized that nobody was trying to improperly
5 influence him. So, yes, that's what I think this
6 letter means.
7 Q So --
8 A "Sincerely yours, Michael Dylan Brennan."
9   It says "CC: Danny Grand" too, but I've got
10 to be honest with you, I don't know what that CC
11 applies to. I didn't get anything in the mail.
12 It's not mailed to my address.
13   I want to make sure we're clear because
14 obviously we have an agenda here, and I don't
15 think that this is appropriate, but I'm going to
16 answer you strongly and honestly.
17 Q I'm not sure what you mean.
18 A You don't have to. I know what it means.
19 Q Okay. So let's talk about once you moved to
20 University Heights. Did you maintain a religious
21 affiliation with any organization? Do you attend
22 a temple?
23 A Temple is an incorrect word.
24 Q Okay. I'm happy to be corrected. A
25 synagogue?

Page 46

1 A Okay. What are you asking me again?
2 Q I'm asking about your religious affiliation.
3 A I'm an Orthodox Jew.
4 Q I understand.
5 A Okay.
6 Q And do you attend worship services?
7 A Every day of my life three times and
8 sometimes four times, and once a year five times
9 a day. Every day.
10 Q And do you attend at a synagogue?
11 A I attend prayer at the local synagogues all
12 the time. Not "a synagogue."
13 Q You're not affiliated with any particular
14 synagogue?
15 A That's incorrect.
16 Q Well --
17 A You are -- you are saying something in my
18 name, and I'm saying it's incorrect, no.
19 Q And I'm asking you --
20 A What are you asking?
21 Q -- are you affiliated with a particular
22 synagogue?
23 A Particular -- okay. I don't think you
24 understand. When you want to go pray, it's like
25 a library. If there are 10 libraries and you

Page 47

1 want to go get a book, you don't necessarily have
2 to go to that library that you always go to. If
3 the other one's closer, you go to the closer
4 library.
5 Q Okay.
6   MR. GROSS: Before the next
7     question, can we go off the
8     record?
9   (Discussion had off the record.)
10   THE WITNESS: I'd like to
11     simply start by saying that I want
12     to make sure that my strong way of
13     expressing myself is not to be
14     construed as being adversarial, so
15     forgive me, and let's see -- see
16     my performance be a little bit
17     mellowed out going forward.
18   MR. CLIMER: No worries.
19 BY MR. CLIMER:
20 Q I am trying to understand your religious
21 affiliations and where you worship. Okay. Can
22 you just simply describe that for us?
23 A Yes. My religious affiliation is that of an
24 Orthodox Jewish man. I have a daily requirement
25 to pray in a group of a minimum of 10 men.

Page 48

1 Q Which I believe is called a minyan.
2 A When you make a minyan, you make quorum. You
3 need that 10 to start to have one of the daily
4 prayer services. There are three daily
5 services: There's a morning prayer service
6 before people go to work, 6:00 in the morning,
7 7:00 in the morning, it's called Shacharit;
8 there's the midday prayer, which is shorter in
9 duration, it's usually 15, 20 minutes at most,
10 it's called Mincha, and that's done in the middle
11 of the day; and then at night, lai'lah, there is
12 something called Arvit or Ma'ariv, which means
13 the evening prayer, so we go back out again at
14 night.
15   I usually go well after sundown when the
16 three stars have come out -- a minimum of three
17 stars have come out to verify it's really the
18 night, the twilight, ten o'clock at night, 9:30,
19 9:45 typically, that's when I'll pray the evening
20 prayer, and we do that every single day. So it's
21 like going to church three times a day no matter
22 what you're doing for an hour before work, for 20
23 minutes in the middle of your workday, and for 30
24 minutes after seeing your family or whatever in
25 the evening. God is a part of your life every

Deposition of Daniel Grand
Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 49

1 single step of the way. Everything you do.
2 Q  Okay. Appreciate that.
3     And do you regularly worship at a synagogue
4 in the University Heights area?
5 A  I don't want to speak inappropriately with
6 you. I'm going to put my rabbi hat on for a
7 minute --
8 Q  Okay.
9 A  -- and speak with you as I would speak with a
10 congregant of some type.
11 Q  I don't mean to be ignorant of the Jewish
12 faith.
13 A  You're not ignorant. I just don't want to
14 patronize you either, but I don't want you to
15 characterize things that make no sense, and then
16 you want me to answer it because I can't.
17 Q  Okay.
18 A  I'm trying to be cordial and respectful of
19 you --
20 Q  I understand.
21 A  -- so that's why I'm framing it and phrasing
22 it that way.
23     So in all earnest -- pardon me. Would you
24 repeat your last question? I'm sorry.
25 Q  Do you regularly worship at a particular

Page 50

1 synagogue in the University Heights area?
2 A  An Orthodox Jew lives with God by his side at
3 all hours of the day. I wake up and I have to
4 thank God that my soul's been restored to my
5 body. I have to wash my hands with a ritual
6 washing cup.
7     There are many actions that are part of the
8 life -- the course of the life of an Orthodox Jew
9 that do not have anything to do with the prayer
10 session aspect of Jewish life. That is just a
11 small function. A big, important function, but
12 a -- if you're looking at the whole picture of
13 what a Jew has to do in a day, prayer -- those
14 three prayer sessions, as burdensome as they
15 might be for some people to have to break their
16 schedules up like that, it's a balancing act, but
17 those are the just the prayer sessions. What
18 about the other 98 percent of being a Jew? So
19 there's a lot more. So you cannot separate the
20 Jew from religion anywhere he goes.
21     So the answer to your question is yes, of
22 course I pray at the local synagogues, but I do
23 more than that.
24 Q  Where do you attend? And I'm not asking you
25 everything that you do to carry out your faith.

Page 51

1 I'm just simply asking do you attend at a local
2 synagogue.
3 A  All of them.
4 Q  Okay. Which ones?
5 A  Zichron Chaim, the JLC, Chabad, Katz Kollel,
6 Young Israel, Green Road, Heights sometimes -- I
7 haven't gone there in a while though for some
8 other reasons, but -- Heights Jewish Center.
9 I've been to them all.
10 Q  Okay.
11 A  I use them all. Like I said, depending on --
12 because, like, I wouldn't expect you to know what
13 it means to go to mincha minyan. I just wouldn't
14 expect you to know that. Not that you're
15 ignorant. I don't think you're ignorant. I just
16 think that -- you know, I don't know much about
17 eucharist and all that. I just don't. No
18 offense.
19 Q  None taken.
20     You have throughout your time in University
21 Heights been able to attend daily prayers with
22 minyans.
23 A  In the local synagogues during the week and
24 stuff like that.
25 Q  Well --

Page 52

1 A  We have to be clear because it's totally
2 different worlds.
3 Q  I understand.
4 A  I do too. Shabbos and weekday services are
5 different.
6 Q  Yes. I understand.
7 A  Which are you talking about?
8 Q  Have you been able to attend weekday services
9 throughout your time in University Heights?
10 A  Yes.
11 Q  All right. And you've been able to fulfill
12 your obligations to pray three times a day?
13 A  During the week?
14 Q  Yes.
15 A  Yes, I have.
16 Q  And you've been able to attend Shabbos
17 services?
18 A  Sometimes, yes.
19 Q  All right. Is there anything that has
20 prevented you from attending Shabbos services?
21 A  Yes.
22 Q  Tell me about that.
23 A  Cleveland has severe weather patterns that
24 make long distances very difficult to do. And it
25 must be known that an Orthodox Sabbath-observing

Case: 1:22-cv-01594-BMB  Doc #: 80  Filed: 01/26/24  14 of 101.  PageID #: 1240
Deposition of Daniel Grand
Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 53

Jew has a multitude of restrictions for the
Sabbath that prevent them from behaving in a
colloquial seemingly normal type of
run-of-the-mill way for the average person.

You know, for example, I can't carry an
umbrella.  Orthodox Jews are not allowed to
create what we call a tent of any kind, and by
opening an umbrella, I would be violating a
biblical prohibition of making a tent.

Another issue would be carrying from domain
to domain.  There are biblical prohibitions that
you're not allowed to carry.

So I couldn't even travel with a book if I
wanted to, a prayer book or whatever.  And I hold
by the distinction of the Sephardic Jewry that do
not hold by an eruv.  Sephardic Jewry is
predominantly -- the roots are from Spain in 1492
and that line, as opposed to Ashkenazic, which is
more the European descent Jewry, et cetera, and
the ways that they follow the Jewish law are, you
know, similar, but maybe have little differences
amongst how they go about certain practices.

As a Sephardic Jew, I wouldn't carry, but
Ashkenazic Jews might carry.  Doesn't matter.
For me, in my observation, observing my faith, I

Page 54

can't.  So weather.

Another is proximity.  Proximity is distance.
I think the closest place that I have for
purposes of Sabbath goes -- meaning I have to
walk.  In a car it's nothing.  It's two minutes.
In the weekday it's like a cinch.  I don't need
any assistance praying anywhere on the weekdays
in University Heights because there's a robust
offering of synagogues that you can reach by car
in two or three minutes.  No big deal.

But on the Sabbath, on the other hand, it's
quite different because I think the closest
synagogue to my house is .7 miles.  Now, that
might not sound like much, but here's the thing,
you pray three times a day, on the Sabbath you
pray four times, but you have to go back and
forth in the evening on a Friday, you've got to
go back and forth on the morning of the Saturday,
the Shabbos daytime, and you have to go back and
forth in the afternoon, stay until the evening,
then walk back, you know, at nighttime.  So
you have three round trips.

And sometimes you can even have more because
there are certain meals that you eat that you
have to have like a Seudah Shelishit.  Seudah

Page 55

Shelishit is the third meal, and then -- the
third of the four festive meals that are had on
the Sabbath, and sometimes I've got to go back
home to have Seudah Shelishit with my family.  So
I can actually be making 4.7 round trips, which
is a mile, four, so a mile, four times four in a
24-hour period.  That's a marathon runner, with
all due respect, on a weekly basis ad infinitum.

And that's not always easy when it's snowing,
and Cleveland's known for massive snow, lake
effect, lots of rain.  Little kids.  I have a
very diluted opportunity there not to be able to
practice by bringing my family.  So it's very
hard for me.

**Q  And was this part of your motivation, as I
understand it, in wanting to form a prayer group
or it's been referred to as a shul or a prayer
group in your home?**

A  I'm not so -- what is motivating me what?  I
don't know what you mean.  I'm sorry.  Can you
rephrase that?

**Q  There came a point in time when you wished to
form a shul or a prayer group, depending on how
you want to phrase it, in your home, correct?**

A  I don't know.  I think that I bought this

Page 56

house by accident.  The story of how I got to my
house on Miramar is not like it's portrayed, and
it's not like your history will speak to you.
Realities are never asked and I'll divulge they
are simply to hear.

I lived on Silsby.  I was very close to the
synagogues for Shabbos.  I can walked easily.
That's why I bought my house.

**Q  I'll be happy to get to that issue.**

A  I think it's important to go there.

**Q  I want to know how it is you came to go to
Miramar.**

A  It's important to go there first.

**Q  If I understand it correctly, part of your
motivation in wanting to form a shul, as you had
put in your initial application, or --**

A  I didn't put that in my initial application.

**Q  Well, in some of the materials that you
provided.**

THE WITNESS:    Can you have
an objection to that?

**Q  We will get to that.  All right.**

As I understand it, you wanted to form a
prayer group or a minyan or a shul in your home
on Miramar, correct?

Case: 1:22-cv-01594-BMB  Doc #: 80  Filed: 01/26/24  15 of 101.  PageID #: 1241

Deposition of Daniel Grand                                    Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 57

1        MR. GROSS:   Objection as to
2    form of the question.
3        You may answer.
4 A  Not always.
5 **Q  But there came a time that you wanted to do**
6 **that.**
7 A  The idea was brought to me by someone, and I
8 thought maybe it was a nice thing to try, so yes.
9 **Q  All right.  And that was in order to lighten**
10 **the burden of traveling back and forth to the**
11 **synagogue on the Sabbath.**
12 A  Solely?
13 **Q  Well, was that one of the motivating factors.**
14 A  I think it was more important that my kids
15 could be with me when I prayed, and that's
16 something that I can't do if I have to walk so
17 many miles.
18 **Q  Okay.  Because it was difficult for them to**
19 **walk that distance.**
20 A  They're little, yeah.
21 **Q  Okay.**
22 A  But I would like to say when I spoke in my
23 email to my small group of friends that lived
24 within a block or two of my house -- the only
25 people that would really want to participate,

Page 58

1 right?  Because it doesn't make sense to send an
2 invitation to people in Nebraska.  They're not
3 going to fly to my house for Shabbos.  You want
4 people who can walk a block or two.  I don't want
5 to walk three blocks you're seeing.  So, of
6 course, people don't want to walk three blocks to
7 me either.  So it's a one- or two-block radius
8 we're talking of people that I thought might be
9 interested, and I was wrong.  It wasn't --
10 **Q  So I want to back up.**
11     **Are there other prayer groups or minyans that**
12 **are closer to your house than the synagogue that**
13 **you would walk to on the Sabbath?**
14 A  Not to my knowledge.  The synagogues are the
15 only prayer groups that there are in this town as
16 far as I know.  That may not be the case, but I'm
17 not aware of them.  So I don't know.  To speak
18 about something I don't know about, I can't do.
19 **Q  You've never researched that or looked for**
20 **another minyan?**
21 A  Not really.
22 **Q  Okay.**
23 A  No.
24 **Q  You want --**
25 A  I'm happy with the place that I tend to walk

Page 59

1 to.  My way to go there has just been a little
2 longer than I'd like, but that's not anybody's
3 fault.
4 **Q  Okay.**
5 A  I also want to add, if you want to know, to
6 this topic -- how I got to Miramar you will get
7 to later, I'll hold you to it, but I do want to
8 say that, for me, I got older, I gained a little
9 weight, walking got harder, my children aged me,
10 and I say that politely, but they aged me.  I
11 came --
12 **Q  They all do.**
13 A  I came gung ho.  I had vigor and vim.  And it
14 wasn't like something that I thought it was going
15 to be.  But after years and years -- or many
16 years of getting hit with the -- you know, it
17 became a little bit hard.  But at the same time
18 that isn't really the motivating factor behind it
19 all.  It's just the fact of the matter that it is
20 true that it became a little harder.
21 **Q  All right.  You wanted to relate the story of**
22 **how it came that you moved from Silsby to**
23 **Miramar.**
24 A  I do.
25 **Q  Let's hear it.**

Page 60

1 A  It was an accident.  I told my wife that if
2 she wasn't happy with the current house we were
3 living in on Silsby, that I would look for other
4 properties that might suit her better.  Her
5 discontent revolved around our amount of
6 children.  We had grown out of the Silsby house,
7 so to speak, and so we looked and we looked and
8 we looked and we looked, and we couldn't find
9 anything in any part of University Heights that
10 was going to work for us at all.
11     Aha.  Then we found an alternative idea,
12 which was let's not buy a different house and
13 move, let's buy a second house and use the second
14 house for the things that we might want to do,
15 like a home office, like a music room, like a
16 guest room, if I have people come from out of
17 town they can stay in the guest house.  And
18 that's really what the MO was.  In fact, the
19 Connors, who live across the street from me, I
20 actually was in contract to buy that house.  That
21 is what we were going to do, buy that house and
22 have that as our second home living on Silsby,
23 but having our weekly necessities taken care of
24 on that across-the-street Miramar property.
25     As a matter of happenstance, I had a friend

Deposition of Daniel Grand                                    Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 61

of mine, Yonatan Khodhunda, from New York, he
came to visit me and I said, "Hey, I know you're
sleeping on the cot here in our Silsby basement
and I want to show you what we're working on.
We're working on getting a new house so next time
you come, I'll have a guest room for you."
   My wife was happy with the idea.  I was happy
with the idea.  And we were buying the house
across the street, the Connor's current -- they
didn't live there then.  They bought it after.
The contract didn't go.  The lady was negotiating
too hard.  We were in contract, but we got out of
it.
   The point being I took him on a trip from
Silsby to Miramar to show him the house that we
were going to buy.  Now get this:  We pull up to
the block, we pull up to the Connor's current
house, and I said, "Here it is."  And I turn my
head, I look out my window.  And I had been
hawking the MLS system, the system to find houses
on the market, and I could not find anything, but
there was a sign in the grass at 2343 Miramar.
   The people who lived there, the Nestor
family, Catherine Nestor -- and it's really not
my way of doing things as a person, I was a

Page 62

little like I don't really want to knock on the
person's door, but I looked at the size of the
property.  It was a triple lot.  It was big.  And
I was just curious how much it might cost.  And I
thought while we're on the market for a house,
this is pretty big.  Maybe my wife will actually
like the size.
   So I did something I never do.  And I walked
up to the lady's house, and I knocked on her
door, and I was very polite and said to her,
"Ma'am, I'm sorry to disturb you, but I see that
you have a for sale sign on your lawn here.  Can
I ask you if we can make an inspection" -- not an
inspection -- "an appointment to see your house?"
   And she said, "Well, no, not with me, but you
can call the realtor, here's her number."  And
she was nice and gave me her number and we kind
of parted ways.  And I left off a little
gleefully.  I'm like, okay, cool.
   So I call her up.  I gave her a call and we
did make an appointment to see the house.  One or
two other people did.  Unfortunately, without
getting into too many details, I don't want to
make anybody feel bad, but I believe the Nestor
family was in probate, and they were forced to

Page 63

sell, and she didn't really want -- they were
divorced for a while.  He didn't live there
anymore, but she didn't really want to let the
house go, but they had to do it, they had to sell
it.  So they didn't have a lot of time.  So only
two or three people ever saw the house, and they
accepted my offer.
   So I wind up buying this house on Miramar and
I'm like oh, my God.  I don't know that we could
afford both of the houses so I feel like we're
going to move here.  My wife is like "Wow."  She
saw it.  She was like "What a pretty house."
   I'm like, "You like this house?"  Because my
wife is like -- I need to make her happy and it's
not easy to do sometimes.
   And she was like "I like the house."
   So it was purely kind coincidental,
accidental, happenstance that we ever saw or
picked that house, and it happened so fast,
kheref ayin, as we say in Hebrew, which means in
the blink of an eye.  It happened in blink of the
eye.
   And it's funny because I randomly went to
show my friend that house on Miramar which was
just going to be a supplement to house my weekday

Page 64

activities.  So I had no idea that I was going to
be moving to Miramar.  Even when I bought the
house, I didn't even exactly know if we were
going to move there or she wanted -- I didn't
know what she wanted to do anymore.  But I
listened to my wife and I bought her the house
thinking that would make her happy, and, boy, did
that not work out.
**Q  And you retained the Silsby house at the same
time?**
A  I retained the Silsby house at the same time.
I did.
**Q  And are you renting that out now?**
A  Right now I have people that I let stay
there, but it's my house.
**Q  They're living free of rent?**
A  I don't -- I pay the mortgage.
**Q  Okay.  You moved in somewhere around January
of 2019 on Miramar.**
A  Yeah.
**Q  How did you get along with the neighbors?**
A  Well, it was really kind funny you say that
because there really weren't any neighbors for
the first couple of months because, I think,
they're snowbirds.  So I think Karen Newman, she

Page 65

was suffering from dementia, and her family wound
up taking her out shortly after we had moved in
there and she sold to a new couple.

And I believe the people on the right, the
Porter people, the Porter family, they weren't
even there for the first couple of months.  We
didn't really have any interactions at all during
that time to anybody right away.

But then, you know, as you walk around,
springtime or whatnot, the Porters introduced
themselves.  I was known for wearing my Trump hat
everywhere I go.  I wear a Trump hat all the
time.  People didn't even know what my hair
looked like for the first two years I lived here.
That's actually true.  I know a lot of people
that would say they never saw my hair before,
even I'm saying in the synagogues, people who see
me all the time, like, man, you're not bald.  I'm
like not yet.  So they never even saw my hair.

So I can easily appear as a non-affiliated to
any religion person from the outlook of judging a
book by its cover type to many people.  And I
think during that time, particularly
Mr. Porter -- I didn't have any other neighbors
really.  Mr. Porter was cordial.  He said that

Page 66

he'd one day invite me over.  They have a liquor
night with cigar smoking and things like that.
He told me he was an ex-cop and he was a Trump
supporter too.
**Q  Did you have any problems with people in the**
**neighborhood prior to, say, the time period of**
**March 2021 when you began the idea -- or prior to**
**early 2021 when the idea of the shul or prayer**
**group first came up?**
A  So we're talking about 2019 here.
**Q  Right.**
A  So what about 2020?
**Q  That's what I'm talking about.**
A  You said 2021.
**Q  I'm talking about the period between your**
**move in, January of '19, and the time the prayer**
**group came up in early 2021, did you have any**
**difficulties with any of the neighbors during**
**that period of time?**
A  I'd say yes and no.  I think that I'm not the
kind of person to toss words around, yet when I
see something that doesn't pass the smell test, I
think it's important to state it because if you
don't, then it can go off the record unnoticed
like a head nod, and that's not cool.  Meaning

Page 67

that there were people who, I think, took a
viewpoint of me when I wasn't wearing a hat and
only my yarmulke was showing that surprised and
caused the faces of nice people to change to not
as nice.
**Q  And --**
A  Now, I can't say that happened to me every
day, but I definitely had some interaction of
that nature.  One particularly with an
ex-councilman, Phillip Ertel.  I was doing some
renovation work in my front yard at that moment
in time, and the contractor, who was a real
schlub, if you want to know the truth, he left
this big mound of my sandstones strewed across
the front yard, and I was furious.  I don't have
a dirty home.  I keep one of the nicest cleanest
most beautiful homes in University Heights,
period, and it was bothering me that the
sandstones were there.

Low and behold, of his own volition, this man
took it upon himself, Mr. Ertel, to go on to my
property, take some of my sandstones to his back
yard, and install them in his back yard.  And
when my wife told me someone was there, I figured
out who it was, et cetera, and I went over to

Page 68

approach him.  He was sitting in his back yard
listening to Cocaine from the guitar player and
Singer Eric Clapton, and he had a beer, and he
was just hanging out in his back yard.  And I saw
all my sandstones over there, and I said to him,
"Hey, what's going on over here?"

He says, "Who the heck are you?"  Wasn't
really nice, but he was curious, like who are
you, I'll say it that way.  "Who are you?"

I said, "I'm Daniel Grand.  I live up the
block."

He's like, "No, you're not.  He's an
Orthodox."

I said, "What do you mean?  I'm Daniel Grand
up the block."

He goes, "He's an Orthodox."

And I lift up my shirt, and I revealed my
undergarment, which is called tzitzit, which is a
biblically mandated garment that Jews wear, and I
took my hat off and I said, "You see this?"

And, again, he went from what's going on here
to, oh, you're that guy, you're the Orthodox.

So there's something going on that isn't
exactly tangible and it's never going to be
verbalized and presented outwardly demonstrated

Deposition of Daniel Grand                                    Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 69

1  that, oh, you're Jewish, I can't talk to you.
2  That's ridiculous.  That's too smart.  This day
3  and age being mean to people based off of their
4  religion or the color of their skin, or whatever
5  the reason, isn't going to be other than veiled,
6  and that's obvious to me.  So, yeah, there were
7  interactions --
8  Q  Anybody else?
9  A  -- here and there.  Between Porter going and
10 changing his whole tune and story line on me as
11 well, Ertel, Cooney, and a couple of other people
12 that I don't know their names -- because it's a
13 long time frame you're talking about here.  So,
14 yeah, there were plenty of interactions where
15 they said, "Oh, you're Jewish.  Oh, God."
16 Q  When did you notice things changing with
17 Porter?
18 A  You know what?  It's all kind of vague.  I
19 don't remember right now exactly, but I can tell
20 you it was between May, let's say, of 2019,
21 probably we were still on good in terms in June
22 of 2019, and then once my construction project
23 really started and he found out I was Jewish
24 around the same time, I feel like he just jumped
25 on the business of my construction to kind of go

Page 70

1  really where he wanted to go and sort of isolate
2  the Orthodox.  I don't know.  It's hard to tell
3  you because you really can't know what's going on
4  in his head.
5  Q  When did the --
6  A  But he got a little cold-shouldered -- he got
7  a little cold-shouldered and started there.  But
8  then it started to be that he started showing up
9  at variance meetings and like speaking out
10 against me and cursing at me in my yard.
11    He walks into my front yard and says, "Danny,
12 you're shaking my expletive house."
13    I'm like, "What are you talking about?"
14    They were putting in a garage that we were
15 building.
16 Q  That's the construction work thing?
17 A  It's an aspect of my construction.
18 Q  I'm trying to get a bead on when the
19 construction started and --
20 A  It's in the plans.
21 Q  You've got to let me finish.
22 A  Sure.
23 Q  -- and you noticed Porter's attitude
24 changing.
25 A  I don't.  I don't.  I don't know whether it

Page 71

1  really related to that or not.  I just think that
2  he found out around that time, anyway, that I was
3  Jewish, and when he did, he started to like not
4  really vibe with me the same way.  We got along
5  as Republican type/GOP Trump type guys, and then
6  once he kind of maybe caught me one day without
7  my hat on, then he started to look at me like oh.
8  And I don't know when that happened exactly, and
9  I don't know when the behavior changed exactly
10 because you really can't.  That's a him question.
11 Q  I think you keyed it --
12 A  To a region of time.
13 Q  Hang on.
14 A  No.  Because I didn't key it to nothing.  To
15 a region of time.  That's all I'm going to give
16 you.  I'm sorry.
17 Q  You need to let me -- you need to let me
18 finish my --
19 A  I don't need to do anything.
20 Q  You need to let me finish my question.  All
21 right?
22        MR. GROSS:   Can we go off
23    the record for one second?
24        MR. CLIMER:   Yeah.
25        (Recess had.)

Page 72

1        MR. GROSS:   Back on the
2    record.
3  BY MR. CLIMER:
4  Q  I believe you indicated earlier that you
5  noticed Porter's attitude changing around the
6  beginning of some construction at your house, and
7  I'm asking you which project are you talking
8  about -- which construction project are you
9  talking about?
10 A  I don't know when his attitude changed.  I'm
11 making that clear for the record.  You would have
12 to ask him.
13 Q  Mr. Cooney, when did you begin to notice that
14 there were issues with him?
15 A  I didn't really meet him as much at that
16 time.  I saw him a few times in passing.  But his
17 wife, Alicia, was very pleasant originally.
18 She's walked her dog many times, as she does
19 every day, and I've seen her walk her dog, and
20 she chose to wave and either say hello, or you
21 know, have a little two-minute conversation about
22 how is it going, nice to see you kind of deal
23 with me, and that -- that also changed.  That
24 also changed.  That particularly changed by the
25 time that you had mentioned earlier, in the March

Case: 1:22-cv-01594-BMB  Doc #: 80  Filed: 01/26/24  19 of 101.  PageID #: 1245

Deposition of Daniel Grand                                    Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 73

1  area, February area of 2021.

2  **Q   Okay.**

3  A   And that actually was a shocker.  I was at

4  the Connor's house, and I was asked to go over to

5  his house by him because he was having a leak in

6  his roof.

7  **Q   He being Mr. Cooney?**

8  A   Mr. Connor.  My across-the-street neighbor.

9  Cooney lives up the block from me.

10      Mr. Connor is the across-the-street neighbor.

11  And he had asked me to go over there to see if I

12  can help and try to figure out maybe where his

13  leak is coming from in his roof.  So I said,

14  "Yeah, I will do that for you."

15      So I was over there.  And it's so weird

16  because I had, like, never been to his house

17  before, and I've only been there one time since

18  then, and that was outside.  We were just

19  drinking something, a beer together, a bonfire

20  thing he was doing one night, and he asked me to

21  come over.  I said "Sure."  I didn't want to

22  insult him.  And I was outside.

23      The only time I was in his house was to look

24  at that.  So I'm standing in his house, he gets a

25  knock on the door.  Low and behold, it's Alicia

Page 74

1  Cooney with a petition.  She went on to say some

2  of the most vile, disgusting, anti-Jewish,

3  Judeophobic lies that I ever heard, and I was

4  there.  And I'm standing behind, like, the little

5  foyer entry door, so I wasn't visible to her.

6      So she was speaking freely and openly to

7  Mr. Connor.  And I asked him, I said, "Hey, man,

8  can I please go out there and say something to

9  her because she's just totally lying?"

10      She's like, "Our neighbor is trying to open

11  up a synagogue.  That's not really a house over

12  there.  He's trying to actually convert the

13  entire structure into like a commercial

14  establishment, and now he wants to go for a

15  permit.  He's got this whole plan that he wants

16  to do this thing."

17      And I was like "Wow."

18      "And we don't want that kind of thing around

19  here.  We don't want Jewish people or the prayer

20  houses or anything like that over here."

21      I was like "Wow."

22      Meanwhile, literally, you could throw a

23  football -- I couldn't, but Tom Brady could throw

24  a football and hit the Gesu church on the corner

25  of Miramar up the block from my house, but we're

Page 75

1  saying we don't want a religious establishment in

2  our house and our streets, really?  But the

3  700-family church up the block you don't have a

4  problem with?  But me wanting to have a prayer

5  group is a problem because it's Jewish?  These

6  are her words.

7      I stood there as a witness in disgust, and I

8  asked him if I could approach her.  He said sure.

9  And he got out of the way of his foyer, and I

10  went over to her, I said, "Alicia, what are you

11  saying?"  She didn't recognize me at first

12  because we were a little bit bundled up.  It was

13  cold.  She had her like fur hat and little garb

14  on to stay warm and stuff.

15      I was like, "Alicia, what are saying?  None

16  of what you're saying is even true."

17      So when I pressed her a little on it, she

18  said, "I don't want to talk to you anymore," and

19  she sort of just scuttled off.

20          MR. GROSS:   I think this

21      is -- Eden is ready to join us.

22          (Recess had.)

23      (Eden Quainton, Esq. joins via Zoom.)

24          MR. GROSS:   Before we

25      resume, first of all, my colleague

Page 76

1      Eden Quainton, also counsel for

2      Mr. Grand, is joining us.  And as

3      we had mentioned earlier, we

4      discussed before this deposition

5      that we would stipulate to just

6      preserve our objections to any

7      questions for form just so we

8      don't have to interrupt the flow

9      of the questioning.

10         MR. CLIMER:   That's

11      correct.

12  BY MR. CLIMER:

13  **Q   Mr. Grand, I think the subject on the table**

14  **when we left off were people with whom you**

15  **developed issues or developed issues with you**

16  **between January of '19 when you moved in and**

17  **early 2021 when the idea of the prayer group came**

18  **up, and you mentioned Mr. Porter's attitude**

19  **changed and that Ms. Cooney's changed.  Anybody**

20  **else that you can think of?**

21  A   I also mentioned Mr. Ertel.

22  **Q   Mr. Ertel.  I'm sorry.  You're right.**

23  A   Okay.  I also believe there are two people

24  who live across the street from me, Lonnie and

25  Adrienne, I believe, Belski, but I'm not clearly

Deposition of Daniel Grand           Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 77

1 remembering right now, but I think that is
2 correct.
3 **Q  Delski?**
4 A   Belski with a B, I believe.
5 **Q  Thank you.**
6    **What happened with them?**
7 A   They had come over to me one time, and they
8 told me that I should come over to visit them one
9 day or something like that, and I had said,
10 "Yeah.  Hey, we'd love to have you over for a
11 Shabbos."
12    And what that implies is to eat at the
13 Shabbos meals.  It's like Thanksgiving every
14 week.  You do these big, big meals.  You
15 have like -- Shabbos is a time to rest and to
16 spend time with friends and family and be close
17 and talk about God, and you do that over the
18 table and people say grace, we say grace after
19 meals, you know, every time we eat.  And before
20 we eat, make berakhah, which are called
21 blessings.  So you bring people who are
22 interested in being a part of that to your table.
23    So when I met the Belskis that day in the
24 street, I had only ever said to Ms. Belski and
25 Mr. Belski that I had invited them for Shabbos,

Page 78

1 meaning to go for lunch.
2    (Discussion had off the record.)
3 A   At any rate, shall we continue?
4 **Q  Yes.  So what happened when you invited them**
5 **for Shabbos.**
6 A   I just mentioned it in passing.  They went
7 about their business.  I do recall that at the
8 hearing for the special use permit that she spoke
9 up and said something like I invited her to pray
10 in my minyan with me.  That's on the record, at
11 that time meaning.
12    And I was just so upset because it couldn't
13 be farther from the truth.  You can't pray.
14 Women are not allowed to pray in the same space
15 that men pray.  There are religious reasons for
16 that.  And it's actually a lot of beautiful
17 reasons why that is, respect reasons why that is.
18 But at the end of the day, no Orthodox man like
19 me is going to invite a woman to pray in a
20 minyan.  That's just not Orthodox Judaism.
21    So I think there was a misunderstanding on
22 her part, and I always wanted to get the world to
23 become aware of what really, you know, I thought.
24 99 percent of the things that I experienced in
25 this town come from nobody asking me anything.

Page 79

1 It's all based on assumptions, guilty by
2 accusation, tar the guy, feather the guy.  The
3 stuff I heard, I don't know what they're talking
4 about half the time.  They just make it up.
5 **Q  So the issue with the Belskis was her**
6 **statement at the SUP hearing that she had been**
7 **invited to pray at the minyan?**
8 A   She said that.
9 **Q  Okay.  Anybody else you developed issues with**
10 **during the time frame we previously described?**
11 A   So I live on Miramar between Washington and
12 Silsby.  I'm not very active with the community
13 between the street of Washington and Silsby or
14 Miramar where I live.  So what I described to you
15 is primarily like, you know, a third of the
16 people that live on my block, and, actually,
17 about 75 percent of the people that live within
18 10 houses of me if you look at like two or three
19 to the left, two or three to the right, and
20 across the street like four or five.
21    Actually, that's incorrect.  Now you have me
22 thinking.  There are three more neighbors that
23 also became jerks, if you want to call them that,
24 toward me that are right after Porter in a
25 straight line, which is Hodson, Wagner, and then

Page 80

1 the one after that.
2    Now, Ruth Wagner, she was very nice to my
3 wife and me.  They gave us, when we first moved
4 there, a little croquet kit.  Croquet is a game
5 with a mallet and a hard ball, I believe.  Am I
6 right?  So it was something that probably was
7 their grandkids or something and they're much
8 older now.  And Mrs. Hodson, not Mr. Hodson, but
9 Ruth, she had given us that set for my kids to
10 play with, and they did, and they had a great
11 time.  It has like the little spokes you put in
12 the grass, and you hit with the mallets, and they
13 were little, they were 3 or 4, whatever, and they
14 just had a lot of fun hitting the croquet balls
15 all over the place, which is kind of nice, and I
16 thought it was a nice gesture.
17    But then later down the road -- again, I'm
18 not exactly clear what date, per se, but
19 Mr. Hodson started doing all sorts of terrible
20 stuff.  He started trespassing on my property on
21 multiple occasions, measuring my fence, filing
22 multiple complaints with the building department
23 when I never had any building department
24 violations.  Up until after the hearing I never
25 had a single violation.  So we went the whole

Deposition of Daniel Grand                                    Daniel Grand, vs. City of University Heights, Ohio, et al.

1  time living on Miramar all the way until the
2  hearing, the big reveal, and then --
3  **Q  The SUP hearing?**
4  A  The SUP hearing.  Correct.  Thank you for
5  that.
6     And low and behold, I start getting bombarded
7  with all these people in this town.  Many I don't
8  even know.  I don't even know who's shooting
9  arrows at me.  There's all these different
10  complaints being filed, inspections, and
11  violations that aren't really substantive and
12  don't make any legal sense legally, and that
13  would be so easy for me to just like blow up and
14  explain with any sort of rational commonsense
15  perspective and knowledge of building code like I
16  have.
17  **Q  So --**
18  A  So he changed.
19     And then after Hodson, there's Wagner.  The
20  guy selling the building on Green Bridge right
21  over here.  So if you look when you walk in your
22  driveway here, there's a sign Green Bridge, and
23  John Wagner's name's on it.  That's the guy.  So
24  he lives two doors down from Porter, which is two
25  doors down from me.  He is something else too.

1  He's calling making complaints.  He's speaking to
2  Ertel.
3     And there's a lot of non-public transmissions
4  going on as well.  They're communicating, and
5  they're all in this little kind of network of
6  people, and it's growing in its intensity, and
7  they're forming all around me, and they're trying
8  to be like the Apaches that just want to go and
9  knock out the cowboys, et cetera.
10     And I really can't -- I can't get down with
11  that.  I can't accept that as a person.  Because
12  I look at people, and I say, you know what, I
13  want to look at the goodness in you.  I want to
14  see you're a good-hearted person.  I want to see
15  you care about humanity.
16     And these people are showing me that you
17  can't do that.  You can't show humanity to him.
18  Why?  Because he's Jewish.  There's no humanity
19  for Jews.  That's what I get because I live there
20  and I went through that.
21     That was my impression, to answer your
22  question.
23  **Q  And my understanding is that those attitudes**
24  **seemed to have changed sometime around the time**
25  **of the SUP hearing.**

1  A  I just don't want to lie to you.  Don't you
2  understand?  I'm not sure when their attitude
3  changed.
4  **Q  Okay.**
5  A  I can't say what they thought and felt the
6  day it happened.  We're talking years ago.  I
7  don't even remember what I ate for lunch
8  yesterday.  I'm just being respectful, but I
9  don't remember right now.  That question is too
10  hard for me to give you a definitive answer.
11  **Q  Good enough.**
12  A  Okay.
13  **Q  Anybody else?**
14  A  But they've been bad to me all along as far
15  as I'm concerned.  I don't know when they
16  actually exposed it.  Because what it is is if I
17  hate a Jew in the back of my head and I didn't
18  show you yet, that doesn't mean I don't hate a
19  Jew in the back of my head always.  I just didn't
20  know you were one.  So when they each found
21  out -- the day they all found out, get him.  I
22  don't know.
23     Do you know the history -- should I even tell
24  you about Gesu?  Do you know the history of the
25  Gesu people?  Do you?

1  **Q  I'm trying to I understand --**
2  A  Me too.  I want to explain to you.  Do you?
3  **Q  Well, you don't need to.**
4     **Anybody else's attitude seem to change?**
5  A  Most of my block, and then most of the larger
6  community, depending on when you want to start
7  unraveling the behavior.  So people way off my
8  block who had nothing to do with my construction
9  project, obviously, they all came after me too.
10  Hundreds of people in the whole town.
11           - - - - -
12        (Defendant's Exhibit B was
13         marked for identification.)
14           - - - - -
15  BY MR. CLIMER:
16  **Q  I'm going to hand you what's been marked**
17  **Defendant's Exhibit B, as in boy.  I'm going to**
18  **represent to you that that is the first set of**
19  **requests for admissions that you answered in this**
20  **case.  I'm going to ask you to turn to Exhibit A**
21  **to that document, which is about six or seven**
22  **pages back.**
23     **Can you identify that for us?**
24  A  This looks like the body of an email that I
25  sent to a close group of friends --

Deposition of Daniel Grand                                Daniel Grand, vs. City of University Heights, Ohio, et al.

1 Q   Okay.
2 A   -- on -- sometime in, I think, January.
3 Q   And in that email you're inviting this group
4 to -- I'm sorry if I'm mispronouncing -- shomaya
5 tefilah beis hakeneset at your house.
6 A   Shomaya tefilah beis hakeneset.
7 Q   Can you tell us what that means?
8 A   Shomaya Tefilah is a portion of the Jewish
9 liturgy inside of a prayer, which is called the
10 Shemoneh Esrei, which means the 18 benedictions,
11 the 18 blessings prayer.  One of the 18 blessings
12 is that God should be someone who hears our
13 prayers.  And in this tense, Shomaya Tefilah
14 means the one who hears.  Shomaya, like shema is
15 to listen, like Shomaya is the one who is
16 listening, referring to God Almighty.  Tefilah
17 prayer.  Shomaya Tefilah means the one who hears
18 prayer; meaning God hears our prayers.  That's
19 how I think it would be.  God hears our prayers.
20 That's what it means.
21 Q   Okay.
22 A   Beis hakeneset, beis means house.
23 Q   And how about hakeneset?
24 A   Hakeneset.  Well, hakeneset is the gathering.
25 Meaning like, you know, the Israeli politics, we

1 have congress; they have hakeneset.  So it has a
2 colloquial term to it.  What you would call a
3 beis hakeneset, I mean, it's just a place, not
4 necessarily formal or informal, but a place where
5 you can pray.
6     So Shomaya Tefilah, a place where God hears
7 your prayer.  That's what it means.
8 Q   And that is intended as a name for the
9 gathering, correct?
10 A   It's a cutesy name, but it's not a serious
11 name, no.
12 Q   You referred to Rabbi Rosskam.  And who's he?
13 A   There are lots of rabbis.  I'm a rabbi.
14 Jonathan's a rabbi.
15 Q   I understand that.
16 A   Rabbi Rosskam is just his name, but he's not
17 like the only rabbi in town.  Rabbi Rosskam, he's
18 a gentleman from the community.  He had just
19 moved there at this time period, like he had been
20 there two weeks maybe.  And like I have
21 maintained all along, but nobody ever asked me, I
22 had somebody approach me from the community and
23 said that Rabbi Rosskam is new to town and if I
24 would be interested maybe in having a prayer
25 group in my house.

1     And I said I hadn't really ever thought about
2 it, but let me give it some thought.  I did and I
3 met with him.  He was a gentleman, very nice.
4 And I said, let's see, maybe we can do it.  It
5 would make life easier a little bit.
6 Q   Who raised the idea of opening a prayer group
7 at your house?
8 A   You know, it's a guy from the neighborhood,
9 but I don't really know his name so well, to be
10 honest.  I recognize him by face because you see
11 a lot of people like 100 times in a week when you
12 see them at the prayer place.
13     He was like, "Did you see Rosskam?  Hey,
14 what's going on?"
15     So he's somebody I can see and recognize, but
16 I don't know what his name exactly is, to be
17 honest right now.
18 Q   He lives in your neighborhood?
19 A   He lives in University Heights probably,
20 yeah.  Somewhere.
21 Q   You said a guy from the neighborhood.
22 A   Yeah.
23 Q   That implies somewhere --
24 A   No.  Neighborhood involves South Euclid.  It
25 involves Beachwood.  It involves -- the Jewish

1 neighborhood is like a little enclave that
2 encapsulates itself in a nebulous which is in the
3 outskirts of three or four towns within three
4 blocks of each other.  So that's what I thought
5 the definition implied.
6 Q   All right.  You don't know who the guy is
7 that raised the idea, but it was a couple weeks
8 before you sent this out; is that correct?
9 A   I don't recall who the guy is right now.  I
10 didn't say I don't know who he is.  I can
11 recognize his face if you put him in a lineup
12 with 10 people.  I don't remember his name is
13 really the truth right now.  I cannot tell you
14 that right now.  I don't know.
15 Q   Did you ever see this person in your travels
16 around town?
17 A   Not every day.  Not every week.  Maybe once
18 every couple of months I might bump into him at a
19 local synagogue or something like that.
20 Q   Do you have any means of recalling that
21 person's name or finding that --
22 A   I feel like I could find out who he was if I
23 were to make an effort to search him out, yeah.
24 Q   I'm going to ask you to take a look in your
25 records, and if you find that name, provide it to

Page 89

your attorneys.

At the same time you met -- at some point you met Rabbi Rosskam who was new to town.

A  Yes, he was.

Q  Are you still in contact with him?

A  Not after really like -- you know, I might see him once every couple of months also at a passing minyan, but as far as like maintaining any kind of relationship with him -- first of all, I never really had much of a relationship with him.  Maintaining one, really no, not really; colloquial, nonchalant, you know.

Q  Do you know where he lives?

A  I do think I know where he moved to when he first moved here.  I think he lives on Claver.  I'm not going to tell you that I know that for a fact, but I believe that.  But I'm sure a simple research of, you know, the GIS system, Cuyahoga MyPlace, or something you can find Rosskam.  I think he's there somewhere.

Q  I'm going to ask you if you've got any information concerning his whereabouts to please produce that to your attorney.

Do you know Rabbi Rosskam's first name?

A  No.  I think it's maybe -- I don't know.  I

Page 90

don't want to say.  I don't know.  Maybe Haskel.  I don't know if I'm right.

Q  We can agree, can we not, that in the second paragraph you introduce him as "our Rabbi, Rabbi Rosskam"; is that accurate?

A  Yeah.

Q  All right.

A  Meaning me and my family.  The sentence before that says the Daniel J. Grand residence.  That's my house.  Yeah.

Q  And was he, in fact, your family's rabbi at the time?

A  No.  Never.  Rabbis from my age group of people -- I couldn't have a young man be a rabbi of mine.  A rabbi needs to have superior knowledge.  I would go to somebody knowledgeable, like an older person in their '60s, '70s, or '80s.

Q  Was he anticipated as the rabbi for the prayer group that you were organizing?

A  You see, I'd like to give you a little context, if I may.

Q  Yeah.  I would like that context.

A  The answer is this is not a formal thing.  It's sort of like having your kids go to the back

Page 91

yard and play baseball and call it Grand Stadium.  This was meant for 10 of my friends who know me, know my personality, know my talking style.  They weren't taking this out of context or mischaracterizing this that, unfortunately, everybody in this whole episode, besides these people I mailed this to, are doing inadvertently, unwillingly, unknowingly, but, regardless, they are.

And, in reality, this is sort of like a cutesy invitation to a get-together at my house.  And now it's like, "Oh, so when you want to try and build a Roman Coliseum in your back yard, we're on to you."

I'm like, "What are you talking about?"

So that's just my point of view.  I don't mean to -- you're just here to help me discuss this with you, but I'm just sharing with you how I feel.  And there's a certain level of, you know, detachment from what the heart of this letter to my friends and what is being described to me to answer to it as.  There's a major detachment there.  So I just want that to be clear to you.  I don't want to be argumentative or adversarial.

Page 92

Q  I understand you're taking a different position than perhaps you think I am.  But, nevertheless, the letter attaches a name to the group, does it not?  It introduces a rabbi for the group.  It sets out a regular schedule for davening times.

A  No, it does not.  It's an inauguration, which means never before, first time, and it shows prayers for that day.  If it ever went, if it would go again after that, is not clear from this document.

Q  All right.  And it's described as being a shul, correct?

A  What does a shul mean to you?

Q  Well, I think in another filing or in another document you indicated that shul and synagogue are the same word or essentially the same word in Yiddish.

A  No.  You can't put a synagogue in a house.  A house is a house and a synagogue is a synagogue.  So that's some characterization stuff that I'm trying to tell you.  I'm not going to go for that.  It's a false light.  It's not true.  What is being -- trying to be pressed to me, no, I did not build a Roman Coliseum in my back yard

Deposition of Daniel Grand                                    Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 93

1  because I had a couple of little toy swords that
2  my kids were fighting with and jousting.  It's
3  just not right.
4  Q  Did you hear me imply that you were building
5  a coliseum?
6  A  When you say I have a synagogue in my house,
7  essentially yes.
8  Q  I did not.
9  A  You did.  You said it's a synagogue.
10          MR. GROSS:   Can we go off
11       the record for one moment?
12          MR. CLIMER:   Yes.
13             (Recess had.)
14             (Record read.)
15  BY MR. CLIMER:
16  Q  In Exhibit A that we were just talking about,
17  in the next to last paragraph you indicate to the
18  recipients "Finally, if you're interested in
19  joining us for some or all of the minyanim,
20  please let us know," correct?
21  A  Yeah.
22  Q  "It will be super helpful, we're pushing hard
23  to make sure we have a minyan right from the
24  start so please come and also please consider
25  bringing someone with you," correct?

Page 94

1  A  Sure.
2  Q  You indicated that this was distributed
3  beyond the original recipients that you intended,
4  correct?
5  A  I indicated that somewhere?
6  Q  I think you had indicated that you sent it to
7  a small group of friends and then it expanded
8  out.
9  A  I sent this to approximately 10 people, then
10  there was the mayor who asked me not to have it,
11  don't have your prayer group.  And I wrote an
12  email in response to the mayor, to the same
13  people saying that apparently, not knowingly, I
14  didn't know how at that time, but perhaps this
15  message got sent to other people, and it got to
16  the mayor and he ordered it to be stopped.  So my
17  only action was to send this message to the 10
18  people and maybe it went to other people.  I
19  don't really know, but it seems like it did.
20  Q  Okay.  You also in the one, two, three,
21  fourth paragraph say -- and maybe sixth
22  paragraph -- "And please spread the word to
23  whomever you might feel might be interested in
24  coming."
25      Did I read that correctly?

Page 95

1  A  Yeah.
2  Q  All right.  We had a discussion a minute ago
3  about my understanding of the meaning of the word
4  "shul."  I'm going to ask you to explain to us
5  your understanding of that word, what it means.
6  A  To me?
7  Q  Yeah.
8  A  Because it means different things to
9  different people.
10  Q  Okay.
11  A  To me, a shul is any little space where you
12  can gather and minyan and daven.
13  Q  I'm sorry.  Any little space where?
14  A  Where you can gather and minyan and daven,
15  which just means pray.
16  Q  Okay.  And can it refer to different size
17  groups of people who may meet?
18  A  No.
19  Q  Okay.
20  A  It doesn't refer to groups of people.  It
21  refers to the space.  This could be a shul.  This
22  room we are sitting in now is a shul.  Perfect
23  for a shul.
24  Q  So it refers to the place, rather than the
25  number.

Page 96

1  A  It's the building, the shul, synagogue, beis
2  hakeneset, house.  It's the -- refers not to the
3  people who go inside the house.  It refers --
4  minyan refers to a group of people, but the shul
5  refers to the space.
6  Q  Thank you.
7  A  So any room can be a shul.  Airplanes are
8  shuls when you go to Israel.  You pray in the
9  back of the El Al flights to Israel.  You pray a
10  minyan there.  Baseball stadiums can be a shul.
11  Q  And being a space, it can be a small group of
12  people that gather in that space that's called
13  the shul or a larger group, correct?
14  A  It depends on the room size.  Space doesn't
15  matter.  The size of the space doesn't change my
16  definition of a shul.  The size doesn't matter.
17  Q  Understood.  But the people who gather, it
18  may be a smaller number, it may be a bigger
19  number in the shul.  I understand the shul refers
20  to the space.  All right.  But it may be
21  different numbers of people who gather there.
22  A  In some shul?  Yeah.
23             - - - - -
24         (Defendant's Exhibit G was
25          marked for identification.)

Case: 1:22-cv-01594-BMB  Doc #: 80  Filed: 01/26/24  25 of 101.  PageID #: 1251

Deposition of Daniel Grand                                    Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 97

- - - - -

BY MR. CLIMER:

**Q  All right.  I'm going to hand you what's been marked Defendant's Exhibit G.  Are you familiar with that?**

A  Yes.  This is a letter that I wrote.

**Q  Okay.  And I'm going to refer you to the first paragraph, second sentence, where you indicate "The city informed me that the zoning ordinances allowed for a synagogue or shul."**

A  I apologize.  The second paragraph or the first?

**Q  I'm sorry.  First paragraph.**

A  No.

**Q  I may have said second.**

A  You said second sentence.  I don't see anything -- oh, the very end of the second sentence.  I'm sorry.  I see where you're looking at.

**Q  Yeah.  "The zoning ordinances allowed for a synagogue or shul," and in brackets you put "same word in Yiddish."  Okay.**

**Can I ask you what you're intending to say with that?**

A  Sure.  This is a letter that I wrote to the

Page 98

36 people who live on Miramar between Washington and Silsby because they have no idea what any of these words mean.  So the audience of this letter, with that in mind, was to a bunch of people who don't know the difference between any of these words, a shul and synagogue.  They have no concept.  They wouldn't have known that your conference room could be a shul either.  So I have to kind of politely do my part to explain to them, no, no, no, no, you're getting this wrong.  I'm not trying to build some massive commercial facility here.

And I was making a joke, a Roman Coliseum, when it's really nothing more that a ball game in the back yard with the kids.  I was making a joke by that.  This is simply a letter to people that didn't understand what that meant.

**Q  Understood.  I get that.  And you're saying in that sentence "allowed for a synagogue or shul (same word in Yiddish)."**

A  The city told me that they would allow for a synagogue or temple, which is the same word in English, and I said shul because they were using the word "shul."  So I had just responded to their misunderstanding by saying it's a similar

Page 99

word, yeah, it's same the same word in Yiddish.  It just means it's another place you can pray.  A synagogue is a place you can pray, but it doesn't mean that it's the same thing as far as it's a synagogue and it's a place where you can pray.

**Q  Are you saying that the word for synagogue and shul is the same in Yiddish, the same word in Yiddish?**

A  What I wrote here was that shul is a word that's a Yiddish word.  Really, I think it means school, but it's, so to speak, used colloquially interchangeably.  But it doesn't mean that it's limited to strictly the use of the word full-blown commercial synagogue establishment that has to have a permit to be where it was and shul, and that's exactly the same thing because you said so in this letter.  No, it's not the same thing in that way.

What I said is the same word, sort of like parenthetical -- that's why it's in parenthesis -- to give people a little bit of an idea of the similarity between utilization and colloquial Hebrew and Jewish expressions in the community that they're not familiar with, that if we say shul, it just means a place you go to

Page 100

pray.  You might look at that as a synagogue or something, but it's not like a synagogue necessarily because you hear that word.

That's what I was trying to do, but whether I failed or not is fine.  I didn't know I was going to be speaking to you years later, but that was my intention at the time of this letter.

**Q  And that's what I'm trying to understand.  Is, in fact, the word for synagogue and shul the same in Yiddish?**

A  I don't know.  Can I ask somebody who speaks Yiddish better than I do?  I'm being honest with you.  I think shul means school.

**Q  Okay.**

A  I think so, but it has a reference to a place you pray.  A synagogue is like a reference to a place you pray.  Temple.  There's multiple Jewish places to pray.  A minyan room, conference rooms, those are all shuls.  I just wanted to try to make a connection there, but I don't know if I can be held to the degree you're trying to hold me to this word.

**Q  I'm trying to understand --**

A  Me too.

**Q  -- what you're trying to express there.**

Deposition of Daniel Grand | Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 101

1 A  I was saying that the city informed me that
2 zoning ordinances allow for synagogues, which is
3 an English word, or what somebody might refer to
4 as a shul, which is what these people were doing.
5 That's why I wrote "or shul." There's such a
6 thing with a special use permit.
7    "Upon being notified, I immediately
8 abided" -- because I was told to go file one by
9 the mayor. I abided. I've never had anyone come
10 over to my house to pray. That's what I wrote
11 there. It speaks for itself. I don't know the
12 answer.
13 Q  All right. So --
14 A  I think it means school.
15 Q  -- let's move on.
16    The city eventually became aware of the plans
17 for a shul or prayer group in your house,
18 correct?
19 A  I don't know what you mean by "plans." Do
20 you mean architectural plans? There are none.
21 What do you mean by "plans"?
22 Q  Your intention --
23 A  To host a group?
24 Q  However you want to put it.
25 A  I want to put it the right way. I had no

Page 102

1 plans. The city became aware of me sending an
2 email message to my friends through someone else
3 who got it and sent it to the mayor. They became
4 aware that I wanted to have people come to my
5 house to have a prayer group.
6 Q  Do you know Mr. Feldman?
7 A  Not personally.
8 Q  All right. Have you ever interacted with him
9 at all?
10 A  Yeah. One time in a shul, a synagogue, or
11 whatever you call it.
12 Q  Was it before or after the events at issue in
13 this case?
14 A  Right about COVID-19 time, so I think it
15 might have been somewhere around here. I don't
16 know.
17 Q  Did you have any discussions with him about
18 the issues at Miramar, at your house?
19 A  Never.
20      - - - - -
21    (Defendant's Exhibit D was
22     marked for identification.)
23      - - - - -
24 BY MR. CLIMER:
25 Q  I'm going to hand you what's been marked

Page 103

1 Defendant's Exhibit D and ask you to take a look
2 at that.
3 A  Okay.
4 Q  Can you tell us what that is?
5 A  Yes.
6 Q  What is it?
7 A  It is a letter that was mailed to me and
8 emailed to me by the law director, which I took
9 as a cease-and-desist order.
10 Q  Okay. And that would be cease and desist
11 from operating a place where there's religious
12 assembly.
13 A  It's written however it's written. I don't
14 know. It's not my language.
15 Q  You wouldn't disagree that that's what it
16 says?
17 A  That's what it says. I would not disagree
18 with that being what it says.
19 Q  When you received that, what, if anything,
20 did you do?
21 A  This was post facto.
22 Q  I'm not sure what you mean by that.
23 A  When I received this in the mail, I had
24 already spoken with the mayor, and I think that
25 supercedes this.

Page 104

1 Q  Okay. How did you come to contact the mayor?
2 A  He left me a voicemail.
3 Q  All right. What did he say in the voicemail?
4 A  It's a matter of major importance, some
5 urgency, please call me back. Something to that
6 effect.
7 Q  All right. And did you do so?
8 A  When I got home later that day, yeah. I
9 didn't receive it right away.
10 Q  And did you reach the mayor?
11 A  I called and he picked up.
12 Q  Okay. What happened?
13 A  We spoke.
14 Q  I want to know what took place in that
15 conversation.
16 A  We had a conversation about this matter.
17 Q  What did he say?
18 A  I don't remember everything he said right
19 now. It was about a 10-minute conversation.
20 Q  As best you can recall, I'd like to know what
21 the mayor said to you.
22 A  I can only paraphrase. I really can't speak
23 for him. I didn't record it. I don't have a
24 transcript. It would be off my memory.
25 Q  Nobody is asking you for a verbatim rendition

Deposition of Daniel Grand                                    Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 105

1 of what the mayor said, but I do want to know
2 your recollection of what he said.
3 A  I can highlight some things that stand out.
4 Q  Okay.
5 A  One thing he said was that you need a special
6 use permit if you want to pray in your house.
7 Q  Okay.
8 A  Another thing he said, or perhaps alluded to
9 in the sense that he might have said it and not
10 completely said that outright, but in a way he
11 said that, which was if you are to have 10 men in
12 your home for the purpose of praying without a
13 special use permit, you will be in violation of
14 this cease-and-desist order and the city will use
15 all of its means and powers necessary even as far
16 as criminally indicting you for violating a
17 cease-and-desist order.  That's something else he
18 said.
19 Q  Okay.  Anything else he said?
20 A  I had asked him if 10 Jews in a room makes a
21 synagogue in his mind, and he says, "Well, yes,
22 it does."
23 Q  Okay.
24 A  And he said that you should go and apply for
25 this permit and have a hearing on it.  And I

Page 106

1 thought about it.  I just listened to what he had
2 to say and ...
3 Q  Did you say anything else to the mayor aside
4 from the statement or the question asking if 10
5 Jews in the room makes a synagogue?
6 A  I apologize.  People are talking in the other
7 room and your chair was moving and I didn't
8 really hear you.  Could you say the question
9 again?  I didn't hear you very well.
10 Q  I'm sorry.
11    Did you say anything else to the mayor that
12 you can recall other than asking if 10 Jews in
13 the room constitutes a synagogue?
14 A  I think I spoke with him and said things like
15 I'm not doing what you think I'm trying to do.
16 This is like me having people come and sit at my
17 dining room table and eat dinner.  Does that make
18 me a restaurant?  If I have 10 people come to my
19 movie room, does that make me an illicit theater?
20    It just -- it sounded off, and it still does.
21 It seems very unfair.  Always did.  Still does.
22 And felt like I was being singled out and being
23 told, you know, you can't be Jewish here.
24 Q  Did you explain that to him?
25 A  Yeah.  That's what I talked about with him.

Page 107

1 Q  Did he respond to that, as to whether you
2 were being singled out?
3 A  He assured me about the process for the
4 special use permit and to have a meeting -- a
5 hearing, rather, a public hearing.  I didn't know
6 what he was talking about.  I never applied for
7 that type of special use permit before.
8 Q  Do you know the city's history in acting on
9 special use permits for religious assemblies?
10 A  I don't know.  Other than what was shown in
11 something that you guys stated.  Besides that, I
12 have no concept.
13 Q  Anything else in this phone call with the
14 mayor that you can recall?
15 A  No.  It's all just the gist of it.  It was
16 sort of like polite and standoffish and didn't
17 really feel like he wanted to help me.  It seemed
18 like he wanted to see me fail.
19 Q  What makes you say that?
20 A  When someone basically says to you, you know,
21 yeah, 10 Jews in your room makes a synagogue and
22 you need a permit, and if you don't have one,
23 then I'm going to put you in jail, that kind of
24 makes you feel like that.
25 Q  Okay.

Page 108

1 A  And we've asked for this cease-and-desist
2 order to be removed forever, and it's never been
3 removed.  So he's intentionally holding that on
4 top of my head as we speak willfully, which I
5 don't think is fair either.  Very unfair
6 treatment.
7 Q  What leads you to conclude that the mayor is
8 holding a cease-and-desist order over your head?
9 A  He ordered it and it still stands today.
10 Meeting and discussions with counsel asking for
11 it to be lifted and other opposition counsel
12 said, no, it's still active.  So it makes me feel
13 like it's still active.
14 Q  I'm sorry.  I missed the first part.  You
15 said there was discussions with counsel about
16 lifting it?
17 A  If it was still active or not.
18 Q  Okay.  When did that occur?
19 A  I don't remember exactly when, but not very
20 long ago.
21 Q  Okay.  And when you say "counsel," you're
22 saying legal counsel -- correct? -- as opposed to
23 city council?
24 A  I think your law firm said that it's still
25 active --

Case: 1:22-cv-01594-BMB  Doc #: 80  Filed: 01/26/24  28 of 101.  PageID #: 1254

Deposition of Daniel Grand                                    Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 109

1 Q  Okay.
2 A  -- today as far as I'm concerned.
3 Q  And was that --
4 A  That's all I know.
5 Q  -- written or --
6          MR. GROSS:   Before you ask
7     the question, can we go off the
8     record for one minute?
9          (Recess had.)
10          - - - - -
11          (Defendant's Exhibit A was
12          marked for identification.)
13          - - - - -
14 BY MR. CLIMER:
15 Q  Mr. Grand, a moment ago we spoke about the
16 conversation with the mayor, and I'm going to
17 hand you what's been marked Defendant's Exhibit
18 A, which is the amended complaint -- the first
19 amended complaint that you filed in this matter.
20 And if you could turn to page 9 of 70, paragraph
21 45 -- actually, paragraph 45 through 48, and I --
22          MR. QUAINTON:   Sorry, Jim.
23     This is Eden.  Just a quick
24     question of order.  Do you have
25     any way to put the exhibits up

Page 110

1     electronically or is that not
2     possible?  If it's possible, that
3     would be great.  If not --
4          MR. GROSS:   I'll send them
5     to you as we go.
6          (Discussion had off the record.)
7 BY MR. CLIMER:
8 Q  If you take a look at paragraphs 45 through
9 48, I think that's the conversation that we just
10 spoke about that you had with the mayor, and I
11 know a lot of the statements in there are in
12 quotes as if they're being quoted verbatim.
13      And so my question to you is this:  Do you
14 have any recordings or notes or anything like
15 that that permits you to quote any conversations
16 that you had with any city officials about this
17 matter verbatim?
18 A  If I have a recording of this conversation
19 that we had?  I do not.
20 Q  Okay.  Do you have a recording of any other
21 conversations that you had with city officials
22 concerning this matter setting aside the planning
23 commission meeting?  We know there's a recording
24 of that.
25 A  Any public hearing is presumed to be all

Page 111

1 recorded.
2 Q  True.
3 A  I had a few various meetings, so it would
4 just be the one you mentioned.  As far as phone
5 calls go, I don't have any recorded phone calls.
6 Q  Okay.  Do you have any verbatim notes of any
7 conversations that you had with any city
8 officials?
9 A  When this document was drafted, my memory was
10 fresher as it was closer to the episode, and I
11 really spent a lot of time thinking hard about
12 what we spoke about.  Here with you on the fly
13 it's a little different, but this is good.  This
14 document here states what was stated to me.
15 Q  I understand that.  I understand that.  But
16 my question is did you have any notes that
17 refreshed you in terms of being able to quote
18 those conversations as if verbatim?
19 A  Possibly, but I can't recall at this moment.
20 Q  Okay.
21 A  This was -- okay.
22 Q  Do you have any notes or recordings of any
23 in-person meetings you had with city officials
24 concerning this matter?
25 A  I don't have any recordings as far as notes.

Page 112

1 Do mental notes count?
2 Q  I'm talking about written notes of some kind.
3 A  Written notes?  It's really hard to say.
4 Sometimes you jot down something to yourself in
5 an email somewhere.  Maybe you do; maybe you
6 don't.  I'm more on the verge of just making sure
7 I tell you the truth.  That's what's important
8 for me to do today.  I want to make sure
9 everything I say is true and accurate.  So I
10 would say probably possible, but not positive
11 right now.
12 Q  Okay.  Fair enough.
13      Referring back to Exhibit D, as in dog, that
14 does, in fact, give you the means or instructions
15 on how to apply for the special use permit, does
16 it not?
17 A  It doesn't really.
18 Q  It gives you the citation to the code,
19 correct?
20 A  It lists the codified ordinance chapter,
21 yeah.
22 Q  All right.  That permits for an application
23 for special use permit, does it not?
24 A  I read that ordinance.  It doesn't describe
25 to you how to apply, no.

Deposition of Daniel Grand                                      Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 113

1  Q  Okay.  Nevertheless, you did apply for a
2  special use permit, correct?
3  A  I did.
4              - - - - -
5          (Defendant's Exhibit E was
6           marked for identification.)
7              - - - - -
8  BY MR. CLIMER:
9  Q  You've been handed what's been marked as
10 Defendant's Exhibit E.  I'm going to ask you to
11 familiarize yourself with that.
12 A  The subject is "2343 Miramar request for
13 special use permit."  It seems like it was simply
14 from me to Ms. Thomas and Mayor Brennan.  That's
15 what this document is.
16 Q  Yeah.  I understand.  Go ahead and let me
17 know when you've had a chance to look at and then
18 we'll discuss it.
19 A  "I have been advised to apply for a special
20 use permit."  My recreation room.  Okay.  Okay.
21 We can talk about this document.
22 Q  All right.  At the outset you indicate you've
23 been advised to apply for a special use permit
24 for a place of religious assembly, correct?
25 A  I was advised, yeah --

Page 114

1  Q  All right.
2  A  -- by the mayor.
3  Q  And you do indicate that you wish to utilize
4  my current recreation room for periodic religious
5  gatherings; is that correct?  That would be the
6  second paragraph, I believe.
7  A  Yeah.  My recreation room for periodic
8  religious gatherings.  That's correct.
9  Q  And that's your wording?
10 A  That was my wording, yeah.
11 Q  And you have 11 tables set up and 21 chairs.
12 A  Yeah.  This room's like four times or five
13 times the size of this room.  You got about 15
14 chairs in here.  So it's not that much space
15 taken up, actually.
16 Q  Gotcha.  In that you give other details
17 concerning the use, and I believe that document
18 also contains a picture of the room as you
19 anticipated setting it up.
20 A  Yes.
21 Q  And a drawing of the room as you intended to
22 set it up, correct?
23 A  No.  This is an excerpt of the floor plan
24 from my architectural plans when I filed, and
25 then I drew in much later a hand sketch just to

Page 115

1  give them a description because the application
2  wants you to give a little drawing.  So I didn't
3  know how to draw that well a sketch of my house
4  so I just hand wrote in the tables.
5  Q  This is part of your --
6  A  That's not my work there, just to clarify.
7  Q  Fair enough.
8  A  The architectural part of it was done as part
9  of my on-the-record plans when I built my home.
10 Q  And you're talking about --
11 A  My recreation room, which it says here it's
12 remodeling the garage room in the middle of that
13 paper.  This drawing -- we're talking about the
14 architectural rendering that you're pointing out
15 was done by my architect way before any of this
16 was ever even a figment of my imagination.
17 Q  I understand.
18 A  Well, I need to understand.  The drawing of
19 table, table, table, table, table, table, table,
20 table, table, that's me.  That's what I did, yes.
21 Q  So am I correct in my understanding your
22 architect essentially drew the layout of the room
23 and you drew the details of how you intended to
24 set it up?
25 A  Two and a half years apart, yeah.  That's

Page 116

1  what it says.  Yeah.  My remodeled garage.  This
2  was my garage before.  It became a rec room.
3  That's what we did.
4  Q  Leading up to the special use permit hearing
5  on March 4th of 2021, did you have any
6  interactions with city officials at all
7  concerning the anticipated hearing?
8  A  When you say "interactions," can you be more
9  clear what you mean?
10 Q  Communications.
11 A  From the time I filed this application, this
12 email says Friday, January 22nd, 2021, until
13 March 4th, the actual moments of the hearing, did
14 I have any sort of communications with any city
15 officials?  Did I understand that right?
16 Q  Yeah.  And I phrased that badly, and for that
17 I apologize because I know you had at least one
18 exchange.
19 A  Email maybe.  Does that sound right?
20 Q  Yes.
21 A  Maybe.  Yeah.
22              - - - - -
23          (Defendant's Exhibit H was
24           marked for identification.)
25              - - - - -

Deposition of Daniel Grand                                    Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 117

BY MR. CLIMER:

Q   My apologies.  I did not mean to give you a trick question.  I knew that you had at least one email exchange, which I forgot about, and that would be, I believe, at the bottom of page 1 in Exhibit H.  And if you want, I'll get you a magnifying glass.

A   No.  I have stellar vision here.

So, yeah, I see what you're talking about.

Q   That would be an email to Kelly Thomas who's the lady that you filed the special use permit application with, correct?

A   That's the city clerk, Kelly Thomas, yeah.

Q   And if I'm not mistaken, you are giving her so some supplemental information that you wanted to be considered at the hearing; is that correct?

A   This information was part of our process of the application, and it was necessary based of of what they wanted for the application, so yes.

Q   Yeah.  And you sent to her a video called "my house."

A   I did.

Q   All right.  A community member support document with 240 names.

A   I did.

Page 118

Q   And I take it that is in the nature of a petition with people signing and saying that the city should allow this to happen.

A   Yeah.  You could say something like that. Yeah.

Q   All right.  Do I have that wrong?

A   That document speaks for itself.  It states what it was intended to do.  Whether it's legally called a petition or not, I don't really know the answer to that.

Q   Okay.

A   I think more or less it's a community member support document of 240 people from the community at minimum --

Q   That's fine.

A   -- who want to --

Q   I'm using the term "petition" colloquially.

A   Colloquially, it's sort of a petition.  Yeah.

Q   A support document from some of the neighborhood rabbis.  I take it that also is colloquially sort of a petition from them.

A   Like a haskome.  Haskome, like approbation. Like an approbational letter.  You need to have the rabbis sort of like give a blessing that they think what you're doing is okay for their

Page 119

community's perspective.  So these rabbis thought that was okay that I did that and other people shouldn't be upset in our community.

Q   Gotcha.  A letter of clarity that you sent out to a bunch of your neighbors.

A   Everyone on Miramar.  That's an exhibit, by the way, that you gave me earlier.

Q   Right.  And that would be Exhibit G, correct?

MR. KELLEY:   G.

A   Agreed.  That's right.

Q   And if I'm correct from the documentation, that would be the first time that you have characterized your intentions as being to carry out -- well, let's strike that.  I got a little tangle-tongued.

Among the documents we've seen, that would appear to me to be the first time that you have described your intentions as forming an informal prayer group, at least among your submissions to the city, correct?

A   For sake of thinking about your question, would this document seem to be -- this document was not presented to the city when it was submitted, but by the time it went to this email it was.  Okay.

Page 120

Q   Yeah.  It was submitted to the city the next day.

A   Yeah.  But that's a day before the hearing too.

Q   Correct.

A   So between filing the application on the 22nd until sending this document on the 3rd, you were asking me if there was some -- if this was the first time that any statement regarding my intentions was made to the city?  No.

Q   In terms of your characterizing this as an informal prayer group.

A   No.  It would be at least the second time.

Q   Well, it was --

A   Talking to Mayor Brennan was the first time. He had already known that it was informal all along and told me to go file a special use permit.  That's the only reason I ever did, which I thought was unfair.

Now, as far as people, I don't know.  I don't know.

Q   All right.  At least this is the first time you put it in writing to the planning commission or -- I understand it wasn't directed to the planning commission, but it was ultimately

Deposition of Daniel Grand      Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 121

1 submitted to the planning commission, correct?
2 A  If it was submitted to the planning
3 commission or not, I don't know.  I sent it to
4 Ms. Kelly.  I hope that she sent it to the
5 planning commission.  I can't confirm that she
6 did, though.  I don't know that.
7    And I think that my intentions were expressed
8 when I filed the application, actually.  So
9 everybody already knew at the city months before,
10 or a month and change before this.  So,
11 therefore, it's not the first time.  I think that
12 the application says essentially what the letter
13 that I wrote to the neighbors says.
14 Q  Okay.  We'll let the app speak for itself.
15 A  So it's two prior times before the hearing,
16 and I just want to say that the hearing didn't
17 happen yet.  Normally you present these things to
18 people, the planning commission, when you go
19 before the planning commission.
20 Q  I understand.
21 A  Okay.
22 Q  So the two times we're talking about would be
23 your conversation with the mayor -- correct?
24 A  That's one.
25 Q  -- and the second would be the letter of

Page 122

1 March 7th which was submitted to the planning
2 commission on March 3rd.
3 A  That's two.
4      MR. GROSS:  Objection.
5      You can answer.  Okay.
6 Q  All right.
7 A  A third would be the application letter
8 itself was a communication to the city and that
9 describes my intention prior to the other letter.
10 Q  Correct.  So the record's clear --
11 A  So it's not the first time, no.  It's the
12 third time.
13 Q  Just so the record's clear, you're
14 maintaining that your application, which is
15 Exhibit E, expresses your intentions to use the
16 property for informal religious gatherings.
17 A  Not the property.  The recreation room.
18 Q  The recreation room.
19 A  Well, it's a big difference.
20 Q  Okay.  The second time would be Exhibit G,
21 which is the letter of March 2nd of 2021.
22 A  I don't have a G.
23      MR. GROSS:  Objection.
24      You can answer.
25 Q  That was submitted to the city with Exhibit

Page 123

1 H.
2 A  Just one moment.  Let me get to G.
3    Forgive me.  I was shuffling papers.  Can you
4 repeat the last question?
5 Q  The second -- well, let's back up.
6    The first time you told the city it was going
7 to be an informal prayer group was your
8 conversation with Mayor Brennan.
9 A  Correct.
10 Q  The second time was in Exhibit G, which was
11 the March 2nd letter to the neighbors that was
12 submitted to the city with Exhibit H.
13 A  No.
14 Q  Okay.
15 A  The second time was Exhibit E, which came
16 after the phone call.
17 Q  With your application.
18 A  But it clearly is more than just -- the
19 application is a statement as to my intention.
20 Q  Okay.
21 A  That was the second time.
22 Q  And the third time would be the letter that
23 was submitted with Exhibit H.
24 A  It would be at least the third time.
25 Q  Have you ever -- you were represented at the

Page 124

1 planning commission hearing; is that correct?
2 A  Yes, I was.
3 Q  That was attorney -- it was Rosen --
4 A  Feld.
5 Q  Feld.  Thank you.
6 A  Rosenfeld.
7 Q  You attended that hearing, correct?
8 A  Virtually, yes.
9 Q  Right.  As did everybody else, if I'm not
10 mistaken --
11 A  True.
12 Q  -- in that period of time.
13    I want you to describe your experience at
14 that meeting for us.
15 A  Unfair.
16 Q  Why do you say that?
17 A  The meeting was unfair.  There was no chance
18 for me to succeed either way.  I felt like I was
19 being made into a scapegoat.  I felt like I was
20 being put on public display.  I felt mocked and
21 ridiculed.  I felt like it was very unfair.
22 Q  When you say you felt there was no chance for
23 you to succeed, why is that?
24 A  Either way.
25 Q  I'm not sure what you mean by "either way."

Deposition of Daniel Grand                                    Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 125

A   Damned if you do; damned if you don't.  If I wanted to have people pray in my house, should I really need the city to have any say whatsoever?

They propped me up.  They want me to go get a special use permit, make a spectacle of me, set a precedent in the city.  No Jews allowed.  No minyans allowed essentially.  That's how I felt. So if I wanted to go back to the other way, which is just to have a -- what I always really wanted, if I ever wanted anything out of this, was an informal gathering at that point in time, I couldn't do that either now.

Q   Was there anything said by any city official that made you feel that you're damned if you did and damned if you didn't?

A   Do you mean at the hearing?

Q   Yes.

A   Mr. Siemborski.  He was acting very out of sorts.  He was being very pushy and trying to shut the meeting down as soon as possible because he had other more important things to do.

Q   Did you know Mr. Siemborski before that?

A   I wasn't finished.

Q   I'm sorry.

A   That's okay.

Page 126

Q   I didn't mean to interrupt.

A   That's okay.

Q   Did you know him before this hearing at all?

A   Mr. Siemborski?

Q   Yeah.

A   Know him?

Q   Yeah.

A   Like that he's a person on the planning commission know him or knew him talked to him ever?

I never interacted with him.  I don't even know who he is.

Q   So you wouldn't be in a position to know what his normal demeanor is?

A   No.  His demeanor is not what I'm referring to.  Demeanor and decorum of a standard tribunal hearing meeting, which I'm very familiar with. It's just ridiculous.  People don't do that. It's unprofessional.  Doesn't take much to know what an unprofessional actor looks like.  You don't have to know him to know he is acting ridiculous -- ridiculously.

He said something else too about the petition from the people who are not in favor of me having a prayer group or whatever, and he kept

Page 127

referencing it and drilling it down and nailing it down, saying there's only this.  Why are we even having this stupid hearing?  Why are we having such a hearing when most people are in opposition?  We shouldn't be entertaining such a hearing.

When did they ever bring up my 240 number that wanted it?  So much for that.  How's that for fair?

What about when I begged?  I asked multiple times, "Can you please make sure that my submissions will be told to the public at this hearing right now so they can have a sense of what's going on?"

"Oh, yes, Mr. Grand," Mr. Brennan said. "You'll have a chance to do that later," Mr. Brennan said.  He didn't let me.

And when I tried it again and said I really want to bring up the fact that I have all of these other documents that people should know about, my support letter from the rabbis, and the community support letter, and the 240 people that signed a so-called petition in favor of this, they said, "No, Mr. Grand."

And then Mr. Cooney chimes in, hijacks the

Page 128

meeting, pushes the mayor and McConville -- Mr. Luke McConville, the law director, out of the way and he says "You already had your chance to speak," or something to that effect.

And they said "Oh, yes.  That's true.  He's already rested his case."  Oh, well too bad.  So that was very unfair.

And Michael Fine, another member of the board there, said basically in a great cliche-esque -- in a cliche sort of way, "Why is this night different from any other night?  Why are we acting this way with this guy than we've ever done before?  I've been on the planning commission for a number of years and I've never seen anybody treated like this, in this very quasi-judicial format that's very adversarial. We've never treated anybody like that in the all the years I've ever been on the planning commission, but this man we're treating that way. And why?  And I want to table it over that or this or whatever."

So, I mean, you literally have every person who was on that meeting, besides maybe Mr. Rach, who was a nice guy, besides him, you know, who was not looking like they had any interest of

Deposition of Daniel Grand                    Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 129

1 hearing about any of this and really wanted to
2 help either way, you know. So that's why it felt
3 unfair.
4 **Q  You mentioned you felt you were being**
5 **scapegoated. What led you to that?**
6 A  Common sense.
7 **Q  Anything other than -- anything said by city**
8 **officials that led you to feel that way other**
9 **than what you've already discussed?**
10 A  You know, my father didn't say anything, but
11 if he smacked me, I got the point. It's not
12 always about words, you understand. So there
13 were actions that, I think, led me to conclude
14 that more than just speech, per se.
15 **Q  And I think we spoke of some of those,**
16 **correct?**
17 A  Some perhaps.
18 **Q  Any others that you can think of?**
19 A  As to why I might have felt scapegoated you
20 mean?
21 **Q  Yeah.**
22 A  I felt the entire episode, the special use
23 permit, was a spectacle that the city put on.
24 They wanted to tar me. Why? I don't know. You
25 tell me. I have my suspicions. And the process

Page 130

1 was totally unfair and corrupt. There's no way
2 to achieve the goal.
3 I mean, it was a classic example of the
4 prisoners that they said, oh, we'll let you go
5 free, we're going to open the gate and let you
6 go, here's the rule, the gate's five -- the exit
7 gate's five miles away, you got 30 seconds before
8 we start shooting. So we'll let you go. We'll
9 let you go.
10 We'll let you have your permit. Did I ever
11 need one? I don't think I should have ever been
12 subjected to this entire ordeal is why I feel
13 scapegoated. I feel like the city wanted to make
14 an example of me. I feel like they worked in
15 tandem behind the scenes with other council
16 members and neighbors on my block to be so
17 active.
18 I've been to special board meetings and
19 council meetings before. You couldn't even --
20 you couldn't even -- you know, you hear pin drops
21 and crickets in those rooms. You couldn't say
22 there was three people in those rooms. And with
23 my hearing, hundreds of people are showing up,
24 and they're all like vehemently opposed all of a
25 sudden, 15 steps from a 700-family church and 20

Page 131

1 steps from my house, my house, with an idea to
2 have people pray.
3 I should have never been put in such a light
4 where I have to stand up in front of these people
5 and tell why I want to have a private gathering
6 in my house, and they have private gatherings
7 every single day of the week. They didn't have
8 to file any special documents or file any plans
9 or spend any money or go before hearing boards or
10 any of that stuff to be able to be normal people
11 living their normal lives. But I have to go
12 through it all and be subjected to all the stuff.
13 Yeah, I do feel like it was a setup and a
14 spectacle and I feel scapegoated. They would
15 have been happy -- they would have been happy if
16 that never happened.
17 **Q  The matter was reset to be considered, I**
18 **believe, on March 23rd of '21, correct?**
19 A  Passover. That was a horrible time. What
20 was exactly the question?
21 **Q  I said the matter was reset to come off the**
22 **table and be considered further at the hearing of**
23 **March -- scheduled for March 23rd of '21. Is**
24 **that consistent with your recollection?**
25 MR. GROSS:  Objection.

Page 132

1 You can answer.
2 A  I knew that there was a speed-lined,
3 fast-tracked meeting because the normal meetings
4 are once a month. And, for me, other things that
5 I've done with the city, they have dragged me out
6 month after month after month, but somehow this
7 particular meeting was speed-lined to Passover,
8 which was a very difficult time for me to be
9 involved in any of this stuff, and never gave me
10 a chance to really follow up with what they asked
11 me to follow up with, which I was happy to do.
12 There was no fair process here.
13 How could I possibly be expected to have gone
14 to the second meeting that occurred that you're
15 talking about on the date that it occurred that
16 you're talking about that I agree with? How
17 could I even expect to partake in that thing?
18 **Q  So --**
19 A  So unfair.
20 **Q  -- you're saying there were some other items**
21 **that you needed to follow up on.**
22 A  Not that I needed to follow up on. That they
23 asked me to produce for them.
24 **Q  That's what I'm asking.**
25 A  It's not that I needed to follow up.

Deposition of Daniel Grand

Daniel Grand, vs. City of University Heights, Ohio, et al.

1  Q  Understood.

2  A  I was not deficient.  That's what I'm trying

3  to make clear.  When we had the first meeting

4  there were some things that they had asked me for

5  that I followed up on around the 12th, and I said

6  to Ms. Thomas if you can send an email -- a

7  paraphrasing, can be an email for the exact

8  verbiage.

9      I said basically, "Mrs. Thomas, they're

10 asking me for certain things.  I'm happy to

11 provide them.  I haven't heard a peep from the

12 city administration whatsoever.  Are they here to

13 help me and do business?  What's going on here?

14 It seems unfair to me."

15 Q  That's what I'm trying to get --

16 A  Me too.

17 Q  -- my arms around.

18 A  Yeah.

19 Q  Were those requests for follow-up information

20 made in the meeting on the transcript?  Because I

21 don't recall that.

22 A  Yeah, they were.  Mrs. Thomas wrote me an

23 email of the minutes of the meeting showing me

24 where Mr. Rach wanted this type of thing,

25 Mr. Siemborski perhaps might have wanted to see

1  that type of thing, Mrs. Urban wanted to see that

2  type of thing, the police chief might have wanted

3  to see this type of thing.  That's in an email

4  that you have and I have.

5      And I was very upset because I'm the one who

6  had to reach out to the city and beg them to tell

7  me who do I speak to.  I don't even know any of

8  these people.  I don't know how to reach the fire

9  chief on the fire department.  Help me out here.

10 Otherwise, it's not fair.

11 Q  You sent that in an email?

12 A  We did.  I reached out because the city

13 wasn't even doing anything to demonstrate that

14 they had any desire or interest.  While they're

15 fast-tracking a meeting at the same time they're

16 inadvertently or directly not helpful and not

17 helping me and not even telling me what to do.

18 And I was the one who was reaching out to them,

19 hey, I'm trying to comply with whatever you're

20 asking me for here.  Where did you go?  Why are

21 you not here?  Why is this so unfair and hard to

22 do?  And that's the facts.

23              - - - - -

24        (Defendant's Exhibit J was

25        marked for identification.)

1              - - - - -

2  BY MR. CLIMER:

3  Q  You've been handed what's been marked

4  Defendant's Exhibit J, and if you have your

5  magnifying glass, that appears to me to be an

6  email from you to the mayor and the planning

7  commission withdrawing your application for a

8  special use permit, correct?

9  A  This is an email from Mr. Michael Brennan

10 acknowledged -- meaning he's acknowledging that

11 he's still going to host a planning commission

12 meeting as intended, and he'll state on that

13 record that I told him that I wanted to withdraw

14 the application for a special use permit.  And

15 below that is an email from me around eight

16 minutes earlier at 5:50 p.m. telling him that I

17 was withdrawing my application for a special use

18 permit.

19     "I do not wish to operate a house of worship

20 as it's defined in the zoning ordinance in the

21 privacy of my home."  I wrote that.

22 Q  Did you attend the meeting that evening?

23 A  No, sir.

24 Q  Did you take any further steps to pursue a

25 special use permit?

1  A  I'd like to ask, actually, for one-minute

2  break, if I could, two minutes.  I kind of have

3  to use the hole -- use the bathroom.

4  Q  That's fine.  But --

5  A  May I --

6  Q  If you can just answer the question.

7          MR. GROSS:   You have to

8          answer the question.  There's a

9          question pending.

10 A  What is the question again?

11 Q  Did you take any further steps to pursue a

12 special use permit?

13 A  At that moment -- that moment of that email,

14 no, I hadn't.

15 Q  No.  I mean after that.

16 A  It's a little murky, the question.  It's not

17 your fault.  The answer I should say.  It's a

18 little murky.  Not exactly sure.

19 Q  I don't want to hold up your bathroom break,

20 but can you give us the capsulated version?

21          MR. QUAINTON:   I'm going to

22          object to ask the witness to

23          answer that when he's clearly made

24          a statement he needs a bathroom

25          break.  Why don't you just let him

Page 137

1   take the bathroom break before
2   he --
3        MR. KELLEY:   It's a pretty
4   standard procedure to answer a
5   question before we take the break.
6  A  Jewish laws says if you have to use the
7  bathroom it's forbidden to wait a millisecond.
8  It's a detestable nature.
9  Q  Go ahead and go.
10  A  That's what it says in the Bible.  Thank you.
11        (Recess had.)
12  A  I think the answer to your question is like
13  this:  At that moment I didn't feel like the
14  permit process I was going through and enduring
15  was fair at all.  I wanted to reserve myself the
16  right to maybe, maybe not, potentially attempt at
17  a later time to file for a special use permit if
18  that's what was necessary.  Because I clearly
19  couldn't get it through to this group of people
20  running the planning commission and the city
21  administrative personnel at that time that you
22  want me to provide you with documentation to
23  supplement this meeting that we had, you're
24  giving me less than the normal amount of time,
25  which is one month, you're giving me two weeks

Page 138

1  right in the middle of a Jewish holiday -- that's
2  not suspect, right? -- and you want me to produce
3  these things by myself, but you don't even tell
4  me what you really want?  I had to ask you for
5  the minutes.  Then you gave it to me.  Then you
6  told me you won't be able to submit anything
7  else -- Mayor Brennan says in an email you won't
8  be able to submit anything.
9     So what the hell's going on here?  On one
10  hand you're telling me you want all these other
11  documents, then you've got Mayor Brennan saying
12  you're not going to be able to submit anything
13  else that you want.
14     So, to be honest with you, I couldn't say
15  that I was ruling it out forever, but at that
16  time I ruled out having the special use permit
17  and withdrew at that time.  So anything after
18  that, I'm -- you never know.  I don't know.  I
19  don't have a good answer for you.
20  Q  So the answer is you haven't to date?
21  A  Not sure.  I don't really have a good answer
22  for you.
23  Q  Okay.
24  A  If the process was more fair, maybe I would
25  have never withdrawn.  Maybe that's what I'm

Page 139

1  trying to say.
2  Q  Have you continued to hold private prayer
3  gathering at your house?
4        MR. QUAINTON:   I'm going to
5        object to the foundation of that
6        question.
7  A  Me too.
8  Q  I'm just asking you, have you continued to
9  hold private prayer gatherings at your house?
10  A  "Continued" is just an incorrect word of it.
11        MR. QUAINTON:   Objection.
12  BY MR. CLIMER:
13  Q  Have you since the end of the special use
14  permit hearing continued -- held private prayer
15  group meetings at your house?
16  A  One time I had a large Shabbos gathering,
17  matter of factly, and at it there was enough men
18  there and their families and wives, et cetera,
19  for dinner purposes to have a minyan.  We had
20  enough people to make a minyan.  So, yeah, one
21  time from the time when I withdrew the
22  application until today, one time I had a prayer
23  group.
24     No.  One time I had a large Shabbos gathering
25  that resulted in me having a minyan in my other

Page 140

1  room, actually.  It wasn't even in the orange
2  room that you guys -- that you think of when you
3  think of the room that I -- it was actually in my
4  other dining room.  So one time I had a prayer
5  gathering.  I'm just going to say minyan.  Just
6  to make it easy for us, minyan means 10 people in
7  the room that prayed anywhere in world -- any
8  room in the world except for a bathroom.  So
9  10 -- 10 men in a dining room that happened one
10  time.  So I had a minyan in my house one time --
11  one time -- since the application until today.
12  One time.
13  Q  And nobody indicated to you that that was a
14  problem, correct?
15  A  Nobody indicated that to me?  Who's nobody?
16  Q  Did anybody indicate to you that that was
17  illegal, that you could not have that spontaneous
18  prayer gathering in your house?
19  A  Yeah.  It was under the color of night
20  essentially.  I didn't even know it was going to
21  happen.  It wasn't planned to have a minyan.  If
22  I knew I was trying to have a minyan with the
23  city on my back, with the surveillance state that
24  I live in, and all the other stuff that I had
25  going on at that time, with cameras being pointed

Page 141

1 at my house, police officers being hired by the
2 mayor to follow along where I'm going and to
3 surveil me, yes, I absolutely would have thought
4 that.
5     But it happened to be that since they came to
6 my house for a dinner, I didn't think anything of
7 it. They're like, oh, wait a minute, there's 10
8 of us, let's go in the room and pray. We did
9 that.
10    So the answer to your question is absolutely,
11 under the color of night. I would have been
12 petrified to actually have a bona fide prayer
13 gathering in my house after what had gone on.
14 Absolutely.
15 **Q  If you take a look --**
16 A  I was very threatened by that meeting.
17 **Q  If you take a look at --**
18 A  I felt very scared after that meeting,
19 actually, for the welfare of my being and my
20 family.
21 **Q  Are you finished?**
22 A  I was very intimidated at that meeting. I'm
23 just answering your question.
24 **Q  Can you take a look at Exhibit B?**
25 A  Did you give B to me before?

Page 142

1 **Q  Yeah. That's the responses to the requests**
2 **for admission.**
3 A  I have it here. I have the first page of B.
4 **Q  If you go to request 8 --**
5 A  Number 8.
6 **Q  -- and that is -- the question is admit that**
7 **you have conducted private prayer gatherings with**
8 **friends in your home after the March 4th, 2021,**
9 **University Heights planning commission hearing,**
10 **and your answer is admit.**
11 A  Yeah. But the only thing I say to that is
12 the "S" to me is superfluous and de minimus. The
13 prior prayer gathering. You could have put the S
14 in parentheses, which would have been probably
15 more accurate and descriptive, and I would have
16 still answered in the admit form because I
17 answered admit to this question. But I'm just
18 letting you know that as a parenthetical that S
19 should really be prayer gathering. I didn't want
20 to lie. It was pluralized by you, but it should
21 have more appropriately wrapped in a --
22 **Q  So your testimony is it was one gathering.**
23 A  That is right. I did have one. It was
24 inadvertent, but I did have one, yes, which leads
25 back to unfair. I never heard of anybody else in

Page 143

1 University Heights feeling like they're on the
2 witness stand, so to speak, about did you have
3 people pray in your house. Who else has to go
4 through this? Even today, it's still abuse and
5 torture that I'm going through.
6 **Q  You were at one point in time represented by**
7 **the American Center For Law and Justice, correct?**
8 A  Yes.
9 **Q  That would be Abigail Southerland and perhaps**
10 **other attorneys there.**
11 A  The ACLJ did represent me. Who they
12 appointed to me, I mean, it -- I don't exactly
13 remember. Maybe.
14 **Q  Okay.**
15 A  Today -- I don't remember right now.
16                    - - - - -
17              (Defendant's Exhibit K was
18               marked for identification.)
19                    - - - - -
20 BY MR. CLIMER:
21 **Q  I'm going to ask you to just generally**
22 **familiarize yourself with that letter, and I'll**
23 **have some questions about it.**
24 A  I'm going to self-object and say that if
25 there's attorney/client privilege -- I'm not sure

Page 144

1 the balance of this -- the metes and bounds of
2 anything that could be stated about any of this
3 stuff, so I don't know what to say.
4 **Q  I will suggest to you that it's been shared**
5 **with an outside party, i.e. University Heights,**
6 **so there would not be a privilege involved, and**
7 **I'm not going to ask you about your conversations**
8 **with them.**
9 A  I don't mean to misrepresent my curiosity, I
10 also respect you and I respect what you want to
11 do is have a conversation, and I want to give you
12 whatever I can, but I don't want to be out of
13 bounds.
14 **Q  Yeah.**
15        MR. GROSS:    And to
16     clarify, obviously we object to
17     the admissibility of this letter
18     from their attorneys that looks
19     like it's for settlement purposes
20     of some kind.
21        But you can answer.
22        MR. CLIMER:    We can sort
23     that out when we get to the court.
24        MR. GROSS:    Yeah. I was
25     going to say but you can answer

Deposition of Daniel Grand                                    Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 145

1   with respect to the content.  I'll
2   stop it if it gets into any
3   attorney/client privilege.
4       MR. CLIMER:    I would
5   submit that it's germane.  We'll
6   figure that out later.
7  A  It's a little long.  I can't tell you that I
8  can really read this and fully understand it, but
9  I get the gist of what it is, yeah.
10 Q  Okay.  And was that sent with your
11 authorization or approval?
12     MR. GROSS:    I'm going to
13     object to whether or not that
14     was --
15         THE WITNESS:    It was
16     conversational.
17     MR. GROSS:    -- privileged
18     conversations.
19         MR. CLIMER:    I don't think
20     that that would be for purposes of
21     obtaining legal advice.  It would
22     just be simply whether this person
23     was authorized to send this letter
24     on his behalf, and I'm not asking
25     about the conversations leading up

Page 146

1   to it or anything like that.
2       THE WITNESS:    You're
3   asking if I pulled the trigger.
4       MR. GROSS:    Hold on.  Hold
5   on.
6       THE WITNESS:    I can't
7   make --
8       MR. GROSS:    Hold on.
9   Eden, do you want to comment
10  on it?  Can he hear?
11      MR. QUAINTON:    I think the
12  question is fine.
13      MR. GROSS:    Okay.
14 A  Can you say the question to me one more time?
15 Q  Was this letter sent with your authorization?
16 Were they authorized to act on your behalf in
17 doing so?
18 A  I think when it says Daniel Grand has
19 retained the ACLJ to represent him, I think it
20 means that on April 1st I had been under their
21 legal auspices.
22 Q  Okay.
23 A  So they were -- they were large and in
24 charge, yeah.
25 Q  If you turn to page 2 of that letter, that

Page 147

1   second paragraph relates your intention and plans
2   with respect to the prayer group that you
3   envisioned for your home, does it not?
4  A  I don't like the word "plans" because in a
5  real estate background I think of drawings from
6  an architect.  You mean my intentions?
7  Q  I was just going to say intentions, if you
8  would prefer that word.
9  A  I don't know yet.  I need to look at what
10 this says.
11 Q  Take a look at it.
12 A  What I've seen from this is just a matter of
13 tense in language.  And we speak in different
14 ways if you're writing an editorial or if you're
15 writing an article, if you're writing a synopsis
16 or a brief or whatever.  In certain times you
17 speak of things in the present moment as having
18 occurred or will occur in a different way.
19     So this particular second paragraph seems to
20 read as though there is or was at the time of the
21 letter an ongoing prayer group.  So this was
22 really more about an intended prayer group.
23 That's what the letter says.  I didn't write the
24 letter, but that's what that paragraph makes me
25 think.

Page 148

1  Q  Okay.  My question is is this consistent with
2  your intentions?
3  A  For example --
4  Q  I'm not implying that there was an ongoing
5  prayer group, but Ms. Southerland says that you
6  have explained on more than one occasion that you
7  host -- we'll say "want to host" a weekly prayer
8  group in your home to invited guests, correct?
9  A  The letter states -- yes.  Instead, and as
10 Mr. Grand has explained on more than one occasion
11 to city officials, his desire is to a host a
12 weekly prayer group in his home to his invited
13 guests.  I would say that statement was accurate
14 at that time.
15 Q  Okay.
16 A  Hasn't been accurate for some time now for
17 other reasons, but it was probably accurate at
18 that time.  That one sentence that I read, I
19 would say, yeah.
20 Q  And it was your intention, number two, that
21 the gathering would not or at any time in the
22 future be open to the public.
23 A  It can't be open to the public in the way
24 that you might say it from just like legalese to
25 the public because it's only reserved for, you

Case: 1:22-cv-01594-BMB  Doc #: 80  Filed: 01/26/24  38 of 101.  PageID #: 1264

Deposition of Daniel Grand                                    Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 149

know, people who live two blocks away from my
house.  That's the reality of it.  If it's to the
public two blocks around my house, maybe you
could say that, and happen to be Orthodox Jews
and men.  So when you whittle that down to like
11 or 9 people that there could possibly be,
that's about as public as it could be.  So that's
as open to the public as it could actually be.
Another Roman Coliseum gesture.
    Do you remember that?
Q  Fair enough.  There's no intention --
A  There's not --
Q  -- to expand this generally to the eligible
population.
A  You're a good guy, but that's -- I can't
answer that kind of question.
Q  We've got to go one at a time.  All right.
    And was it your intention to not put up any
signs advertising the gatherings?
A  To be really frank, this letter was drafted
by an attorney.  You're hitting bullet points.
If they told me don't put up a sign -- not that I
would ever, but if they told me don't put up a
sign, okay, I won't put up a sign.
    Did I want to put up a sign you're asking me?

Page 150

No.  It's my house.  I don't want to have any
signs up.
Q  And the gatherings were to be by invitation
only, correct?
A  My intention was to tell the two-block
radius, three-block radius around me that they
can come to my house and they have to be invited
by me is what I meant.  That's what I mean.  I
didn't write this so it's not like -- you know,
you stand by these words as much as you stand by
what your lawyer writes for you.  But if you're
asking me if I would say it this way exactly?
No, not exactly.  Similar.
Q  That's not what I'm asking.  I'm asking if
that is consistent with your intentions.
A  My intentions, if I were to have people come
to my house to pray, just like if you wanted to
have someone come to your house, they got to get
through your boss.  They can't just walk in my
front door.  My wife has to approve them.  They
have to be nice people.  I have to know them.
Whatever it is.
Q  You never had any intention of soliciting
donations, correct?
A  Absolutely not.  For what?

Page 151

Q  And your intention was to hold these prayer
groups only on the Sabbath and hence there would
be no driving with some limited exceptions by
attendees, correct?
A  All the Jewish days when you can't drive.
Only exclusively non-drivable days.
Q  I stand corrected.  Thank you.
        - - - - -
        (Defendant's Exhibit L was
        marked for identification.)
        - - - - -
BY MR. CLIMER:
Q  All right.  You've been handed what's been
marked Defendant's Exhibit L right there.  That
is correspondence from my office to
Ms. Southerland.  And if you turn to page 2 -- by
the way, did you receive a copy of this?
A  I mean, it has the Bates stamps at the
bottom.
Q  No, no.  Had you -- had you received a copy
of this before?  Have you ever seen this letter
before?
A  It's a good question.  I don't know.
Q  Okay.
A  I've seen the letterhead, but I really

Page 152

haven't read this letter to know if it's
something I've seen before.
Q  Okay.  Fair enough.
    And if you'll take a look at page 2, there
are a number of bullet pointed things.
        MR. CLIMER:    Let's make
    this Exhibit M.
        - - - - -
        (Defendant's Exhibit M was
        marked for identification.)
        - - - - -
BY MR. CLIMER:
Q  So if you put those down side by side, I
think you'll notice that in the middle of page 2
Exhibit M -- or L -- I'm sorry -- it appears the
city is proposing a number of conditions that
would guarantee you that your gathering would not
be considered a place of assembly and proposes a
memorandum of understanding to that effect, and
Exhibit M appears to be Ms. Southerland's
response to that.  Just take a look and then
we've got a couple of questions about it.
A  Well, I would just tell you that this
document says Abigail Southerland, April 7th,
2023.

Page 153

Q  I apologize.  I have it mixed up.

A  That's a year later.

Q  Yeah.

A  What happened there?

Q  And just so we're clear, somehow April 7th of '23 made its way onto the --

A  I'm not going to be able to.  These dates are all wrong.

Q  The accurate date, I'm going to represent, is February 18th of '22.

MR. GROSS:    I'm sorry.  I missed that.  Can you clarify that again?

MR. CLIMER:    The actual date, I believe, on Exhibit L --

THE WITNESS:    This is Exhibit L, page 2, and it says April 7th, 2023.  That's a year after this.  He's trying to tell me it's before that.  I don't know what that means.

MR. KELLEY:    Word updates.

THE WITNESS:    I don't know what's new, what's not.  I can't work with that.

Page 154

MR. GROSS:    Can we go off the record for a minute?

- - - - -

(Lunch recess had at 2:05 p.m.)

- - - - -

Page 155

Thursday, November 2, 2023
4:10 p.m.
- - - - -
(Defendant's Exhibit L was
remarked for identification.)
- - - - -

MR. CLIMER:    So back on the record.

I have requested the court reporter, at everybody's request, to remark the previous Exhibit L, which now has the correct date stamp on pages 2 and 3 of February 18th, 2022.

Is that satisfactory to everybody?

MR. GROSS:    Yes.  That is satisfactory to us.

MR. CLIMER:    Okay.

- - - - -

CONTINUED EXAMINATION
BY MR. CLIMER:

Q  So, Mr. Grand, I'd kind of like to go back to the progression that we were talking about before.  There was a letter from Abbey Southerland that was previously marked as

Page 156

Defendant's Exhibit K, 4-1-21, and we discussed that that generally outlined your objectives, correct?

A  We discussed that on page 2 there was a paragraph that Ms. Southerland wrote, and then we went a little bit into a couple of the sentences in that paragraph on the second page, the largest paragraph on the page, with some roundabout similarities to what she might have thought was going on at that time.  So more than that, not necessarily, no.

Q  I understood that that generally outlined what you were looking to do.

A  I spoke before and I would like to rely on whatever words I used before, but I don't mind going forward.

Q  That's fine.  The record will say what it does.

I'd like to turn your attention to Exhibit -- the new Exhibit L and ask you to take a look at page 2.  There are six bullet points.  Bullet point 1 is Mr. Grand intends to hold weekly prayer groups on the Sabbath only, correct?

A  This is a letter from Abigail Southerland or

Deposition of Daniel Grand                                    Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 157

1  from you?
2  Q   No.  This is a letter from me to
3  Ms. Southerland.
4  A   You wrote this?
5  Q   And it generally proposes a memorandum of
6  understanding of what would not be considered a
7  place of assembly.
8  A   You wrote this to her?
9  Q   I wrote this letter to her.
10  A   In February of 2022?
11  Q   Correct.
12  A   Oh.  I don't even know what this is, to be
13  honest.  I'm not sure.
14  Q   You've never seen this?
15  A   I don't remember this letter.
16  Q   Okay.
17  A   Today -- I can't say I remember this today,
18  no.
19  Q   In Exhibit K, her letter of April 1st, '21,
20  she indicated that you wanted to hold a weekly
21  prayer group, correct?
22  A   She indicated that, yes.
23  Q   All right.  And that's what, in fact, you
24  wanted to do, wasn't it?
25  A   I was -- I was entertaining the idea.  I was

Page 158

1  willing to do that at that time, yeah.
2  Q   All right.  And she also wrote that it would
3  be invited guests.
4  A   To my house, yeah.
5  Q   Item 2 is attendance is limited to invited
6  guests on Exhibit --
7  A   Where?
8  Q   -- L.
9  A   Invited guests to where?  My house?
10  Q   Attendance of the prayer groups.
11  A   At my house?
12  Q   Yeah.
13  A   My house, yeah.
14  Q   Correct.
15  A   I invited people to my house.  Yeah, that
16  makes sense.
17  Q   Ms. Southerland indicated in her letter,
18  Exhibit K, that there would be no signs
19  advertising public religious gatherings, and item
20  3 on Exhibit L outlines that there will be no
21  signs or advertising of public religious
22  gatherings, correct?
23  A   Is she responding to anyone in this letter?
24  I'm just not sure that --
25  Q   You're looking at Exhibit K.

Page 159

1  A   Yeah.  You're on page 335 of Exhibit K, which
2  is page 2 --
3  Q   Correct.
4  A   -- and I'm just trying to make sure that this
5  is not a letter from her in response to something
6  you had sent to her or not.  That's what I'm
7  asking.
8  Q   Not to my knowledge.
9  A   Oh, she's making the statement to you to try
10  to clarify the misunderstandings between the
11  conversations from prior to April 1st, 2021.
12  Q   Correct.
13  A   From the time of the application on the 21st
14  until April 1st.  She's probably responding to
15  the misunderstandings of the meeting and the
16  second meeting.  That's what she's responding to.
17  Not to you.
18  Q   I would be speculating about that because
19  this is directed to Mayor Brennan, Exhibit K is.
20  A   Makes sense that she would write the letter
21  to him to clarify because it was him who wanted
22  the special use permit.  Yeah.
23  Q   And what I'm trying to do is figure out if
24  our two letters essentially match each other with
25  your objectives.  She had indicated that you had

Page 160

1  no intention of advertising it or putting up
2  signs.
3      Item 3 on my letter back to Ms. Southerland
4  repeats that essentially that there have not and
5  will be no signs of advertising of public
6  religious gatherings.
7  A   If that's to try and draw a conclusion of
8  sorts that that particular line item would have
9  been something initiated by her, I don't think
10  so.  I think it's actually a defense posture that
11  she's stating in writing.
12      You are alleging that he's going to want to
13  be this and that, this and that, and this that,
14  and typically when this and that, this and that,
15  and this and that happens, signs will go up.  And
16  we're telling you, no, he's not putting signs up
17  which is why he's not a synagogue.  So she's
18  really writing that to defend against a
19  non-written, non-formatted, non-stated document
20  that you can put in front of me.
21      So there's really a precursor, which is the
22  time period between my letter to my friends on
23  the 20th, the email that I sent on the 21st to
24  the city, the actual hearing on the 4th, and then
25  the subsequent second hearing on the 23rd.  So

Deposition of Daniel Grand                                    Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 161

1  from January 21st to March of '22, but really
2  this letter on April 1st, that's the time period
3  she's responding back to.  So we can pretend
4  that's all in the letter, and we'll call that
5  exhibit fictitious in front of me.
6     So if I look at exhibit fictitious in the
7  timeline and then reference K, she's saying not
8  saying this is what we want to do.  She's saying
9  he's not trying to be a synagogue and people in
10 synagogues are going to do that.  He doesn't want
11 to do that.  So it was really a negatory, a
12 statement of negation.  It's a fashion of
13 negation.  She's not saying that's what he wants
14 to do.
15 Q  We can speculate on that all we want.  All
16 I'm asking --
17 A  I'm not speculating.
18 Q  -- is her letter indicates that there would
19 be no advertising of public religious gatherings
20 at your house, and item 3 on Exhibit L,
21 responding to her, agrees that there have not
22 been or will be no signs of advertising of public
23 religious gatherings.
24 A  Number 3, there have not been -- they're the
25 conditions that you described.  You wrote that.

Page 162

1  Q  I understand.
2  A  Those are the conditions you described,
3  meaning that's what she's describing, and she's
4  not describing that.
5  Q  It's repeating back, is it not --
6  A  No, it's curtailing.
7  Q  No.  Hang on.  Let me finish the question --
8  A  Okay.  Go ahead and finish the question.
9  Q  -- please.
10    It's repeating back to her something outlined
11 in her letter that's Exhibit K that she raised in
12 that letter --
13 A  Can I see --
14 Q  -- indicating that you had no indication that
15 there would be signs or advertising of public
16 religious gatherings.
17 A  What line are you referring to so I can see
18 it with my eyes?
19 Q  That would be about in the middle of that
20 paragraph, "Absolutely no signs advertising
21 public religious gatherings have ever been or
22 will be erected."
23 A  The conditions you describe are that there
24 were no signs.  That's not a condition.  That's a
25 lack of a condition.  There were no signs.

Page 163

1  There's no condition of signs and, oh, there
2  won't be any signs.  There were never any signs.
3  No, I can't agree with that.
4  Q  That's not the question.
5     The only question is do those two lines
6  match?  Do they align with one another?
7     She indicates "Absolutely no signs
8  advertising public religious gatherings have ever
9  been or will be erected.  These gatherings will
10 be by invitation only."
11    Item 3 in the letter of February 18th says
12 "There have not been and will be no signs or
13 advertising of public religious gatherings."
14    Essentially those two conditions match, do
15 they not?  That's the simple question.
16 A  It's not a simple question.
17 Q  Yes, it is.
18 A  Not for me it isn't.  I don't think they
19 match in the context of the letter.
20 Q  You're going to elect not to answer that
21 question?
22 A  No.  I'm answering the way I want.  I think
23 that there's a context issue here.  If you see a
24 man leaving a building and he gets shot by
25 another man, you can say, oh, that man who shot

Page 164

1  him is so bad, until you see he was a bank robber
2  and the guy was a cop, then he's a good guy.  So
3  this is out of context.
4     If you look at the context of
5  Ms. Southerland's letter, the letter she wrote on
6  April 1st, she's responding back to a previous
7  time, which I called a fictitious exhibit, which
8  is the time period where they said you're trying
9  to be a place that puts signs up because you want
10 to be a synagogue.  She's like we're not putting
11 up any synagogue signs.  There's no synagogue
12 here.  And you're writing a letter after that
13 saying so we agree that there's not going to be
14 any signs put up here by your synagogue.
15    What are we talking about?  That's what lines
16 up.  The word "synagogue" and "sign" or the word
17 "no signs" and "no signs," that lines up, but
18 that's not the context of these two things that
19 you're doing is not really very fair.
20 Q  Okay.  The next --
21 A  Another unfair process.
22 Q  The next question, Ms. Southerland's letter,
23 Exhibit K, indicates "No donations are solicited
24 as they would be for a house of worship and no
25 regular services or other church operations take

Deposition of Daniel Grand                    Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 165

1  place in this private residence as they would in
2  a house of worship."
3      Item 4 on Exhibit L indicates "No donations
4  will be solicited or accepted," does it not?
5  A  You wrote what you saw in her letter.
6  Q  Does it or doesn't it?
7  A  To the extent that the words are the same
8  words, yeah.  The extent that the contexts are
9  the same, no.
10  Q  All right.  Next item on Ms. Southerland's
11  letter is "No regular services or other church
12  operations take place in his private residence
13  (such as regular services, child care,
14  counseling, and church offices)."
15      Item 5 in the letter of February 18th to her
16  says "No ancillary services such as child care,
17  counseling or offices will be housed in
18  Mr. Grand's residence," correct?
19  A  Again, I'm just going to go back to context.
20  She's responding to what they said to her at the
21  hearing.  You're now presenting that here in a
22  document form, and I think it's disingenuous.
23  You should have shown me the paper from that
24  actual meeting where she's saying -- the people
25  at that meeting on the 23rd, the city's people,

Page 166

1  said "You're going to be a synagogue.  You're
2  going to put signs up.  You can't have a house of
3  worship."  There is a statute in the record --
4  they're talking about an ordinance, rather, into
5  the record.
6      She's responding that, no, we're not doing
7  any of that stuff.  Now you're taking the letter
8  off out of context that she was saying in
9  response to other people at that hearing and
10  you're now putting that in front of me.  So it's
11  disingenuous, this process.  I can't say there
12  are syllogisms here because you're seriously
13  being a bit deceptive.  No offense.
14      You have an ulterior motive, which is trying
15  to get me to agree the two things are the same,
16  but they're really not.  Because the words are
17  the same, but you don't want to do it with
18  context.  I can't stand for that.  That's
19  dishonest to me as a person and my moral
20  character --
21  Q  I'll tell you what --
22  A  -- moral principal, moral, ethical, and
23  legal.
24  Q  -- we'll let the documents speak for
25  themselves.

Page 167

1  A  I don't like that document.  I'm sorry.
2  Q  The final item -- all right? --
3  A  Right.
4  Q  -- Ms. Southerland indicates "Invited guests
5  choosing to gather at Mr. Grand's home walk from
6  neighboring properties or communities or, in very
7  limited circumstances, receive a ride to his
8  home."
9      Item 6 in the letter of February 18th,
10  "Invited guests will walk or be driven to the
11  gatherings," correct?  Is that what it says?
12  A  In the sense that we have said all along;
13  yes/no.
14  Q  All right.  Let's move to Exhibit M, which I
15  believe you've got in front of you, it's a letter
16  to me from Ms. Southerland of March 7th of 2022.
17  Can you familiarize yourself with that letter,
18  please?
19  A  I'm pretty familiar with this now.
20  Q  Have you seen that letter before?
21  A  I've seen it right now for sure.
22  Q  Have you seen it earlier?
23  A  I'm not sure if I've seen her writings to you
24  or not.
25  Q  Was Ms. Southerland authorized to write this

Page 168

1  letter by you?
2  A  This letter -- was she authorized to write
3  it?  I think that as my attorney she's going
4  to -- well, really there was also Mr. Goldfeder
5  and a couple other people, I think, at the ACLJ.
6  They would be the ones to put something like this
7  together.  I don't even know if I even --
8  Mr. Goldfeder's name is on this too.  They're the
9  we, I think.  I don't -- I don't know.  I can't
10  recall right now.  I don't think so, but I'm not
11  sure.
12  Q  So certainly by this period of time you had
13  realized -- strike that.
14      Have you attempted to convene any further
15  informal prayer gatherings other than the one we
16  talked about this morning?
17  A  At my house?
18  Q  Yes.
19  A  To the best of my recollection, no, I've had
20  only one.
21  Q  Why not?  Why would you not do that?
22  A  Well, you can see from the episode that we've
23  all been a part of here that I was really treated
24  unfairly by the community.  I had hundreds and
25  hundreds of people come out to tell me how much

Deposition of Daniel Grand                                    Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 169

1  they disliked me and my people, signing petitions
2  to get the Jews out of here, we don't want that
3  kind of thing here.  So I told you after the
4  hearing I was a little shell shocked and very
5  uncomfortable and nervous for my family and
6  welfare.  I still am.  I have to keep a look out
7  all the time, look over my shoulder when I walk
8  down the block.  I wear a baseball cap because I
9  don't want to be singled out as a Jew.
10  **Q  Has anybody from -- anybody associated with**
11  **the city threatened you in any way?**
12  A  You know, it's something that I would think
13  shouldn't happen to anyone.  It's not like I saw
14  some guy standing in front of my house cracking
15  his knuckles saying we're going to beat you up or
16  nothing, but I can't tell you the answer.  Just
17  because they didn't tell me doesn't mean they're
18  not trying to do stuff.
19     I've had plenty of instances with them
20  harassing me through other vehicles of government
21  institutions, such as the building department,
22  the zoning department, and the hearings, and all
23  the way that they've used those processes to
24  their advantage to harm me and malign me, bad
25  light, publicity, the mayor's rhetoric, all these

Page 170

1  false statements he's put out in the public eye
2  in my name that aren't even true.  So he's done a
3  lot of damage to me and the defamation aspect of
4  it that I haven't really spoken about, but it's
5  true.
6  **Q  Let's talk about that a little bit.  Let's**
7  **look at Defendant's Exhibit A, which is your**
8  **complaint, and I want to talk about some of the**
9  **individual allegations that have been made.**
10     **Do you have that in front of you?**
11  A  I'm working on it.  They're out of order.  I
12  tried to keep them in order.
13  **Q  That's okay.**
14  A  Okay.  I tried.
15  **Q  On page 4, paragraph 12, you allege that**
16  **defendants have conspired to gin up opposition to**
17  **Grand.  What I want to know is what evidence do**
18  **you have of that?**
19  A  It says Grand's application by deliberately
20  misleading residents by telling them that Grand
21  applied to build a synagogue in place of his
22  house, which is untrue.  It's false.
23     How do I know?  I told you before.  I was
24  inside Mr. Connor's house and I saw the lady
25  going door to door saying fictitious things about

Page 171

1  me.
2  **Q  Do you know if anybody associated with the**
3  **city had anything to do with that?**
4  A  Let me give that some thought.
5     I know Mr. Ertel was involved with making
6  sure that this wouldn't happen.  He hand
7  delivered a letter to my house.
8  **Q  And was Mr. Ertel on council at that time?**
9  A  I want to say that he was still.  I don't
10  know if I'm correct.
11  **Q  Do you know what, if any, conversations or**
12  **agreements he had with the defendants who are**
13  **named in this case to do whatever it is he did?**
14  A  Well, the letter he sent to us was signed The
15  Residents of Miramar.  So he outspokenly
16  suggested to me in that letter that it was the
17  residents of Miramar, which essentially can
18  embody up to all of them.  So that means that he,
19  as a person of the government, Mr. Ertel, spoke
20  with potentially all of the residents of Miramar
21  so that they could all get together and expose
22  discontent with this notion and politely ask me
23  not to file my application, which is what the
24  letter did say.
25  **Q  So did Mr. Ertel sign that letter?**

Page 172

1  A  Yeah.  On behalf and presented -- signature?
2  He delivered the letter and he's a Miramar
3  resident himself because he lives on Miramar.  I
4  don't know if he signed it with his hand or not.
5  I don't know.  It's been awhile.
6  **Q  Do you know if he spoke to Mayor Brennan**
7  **about that?**
8  A  You're asking if I have firsthand knowledge
9  whether or not he spoke with Mayor Brennan?
10  **Q  Yeah.**
11  A  I don't have firsthand knowledge to the
12  extent or not to that extent.
13  **Q  How about with McConville?**
14  A  How about Luke McConville?
15  **Q  Did he have any conversations with him that**
16  **you know of?**
17  A  Ertel?
18  **Q  Yeah.**
19  A  That I know of?  I cannot say that I do or do
20  not know.
21  **Q  How about Paul Siemborski?**
22  A  I'll simply address the blanketing of the
23  statement in that I do not know if Mr. Ertel
24  spoke with other people in the administration or
25  not.

Deposition of Daniel Grand      Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 173

1 Q  Okay.  Fair enough.

2    Anything else that leads you to believe that

3 the defendants conspired to gin up opposition to

4 your application?

5 A  Humbly, yes.

6 Q  Pardon?

7 A  Humbly, yes.

8 Q  Okay.

9 A  Again, as a bit of a legal novice, at best, I

10 would simply tell you, speaking on my own,

11 that -- not completely familiar with, but having

12 glanced at Chapter 1274, that ordinance seems to

13 say to this layman that you can handle the

14 special use permit process completely

15 administratively, meaning you do not have to have

16 a hearing whatsoever, save or let alone a

17 quasi-judicial hearing under a totally different

18 ordinance.  It's not.  It's a statute at that

19 point because it's the ORC.

20    So when I look at that 1274 and say why was I

21 even made into a hearing, whether it's quasi or

22 not, is sort of irrelevant to me.  Why did we

23 have to have a hearing?  That question stands out

24 in my head.  That's what makes me feel like I was

25 brought to the public light.

Page 174

1    How is it that so many people were sent

2 messages?  In the documents that we received we

3 can see the mailings that were issued.  Because

4 I'm sure there's some rule somewhere, some

5 ordinance, that says you have to mail this around

6 to people.  Why are people getting mailings two,

7 three, four blocks away from my house that have

8 nothing to do with my house at all?  Why are

9 hundreds and hundreds of people showing up to

10 typical barren wasteland meetings that have like

11 three people and a bunch of chipmunks?  What's

12 going on here?  So the stage was set.

13    Where is this hostility?  What was it

14 centered in?  What is this animus?  What was this

15 display of vile hatred slur words that the mayor

16 himself had to say this is getting out of hand,

17 everybody needs to be quiet or we're going to

18 have a problem and kick people out of the

19 meeting?  He was disgusted in a sense with all

20 the disgusting things he was hearing, which is

21 terrible if you think about it.  So --

22 Q  So -- go ahead.

23 A  Those are some more reasons as to

24 legitimately why, Mr. Climer, I felt and thought

25 and accurately can describe the events as being

Page 175

1 haphazard, unfair, and ridiculous in a certain

2 sense.

3 Q  Who conspired with whom to impanel a hearing

4 as opposed to handling this administratively?

5 A  It would have to be Mr. McConville and

6 Mr. Brennan.  And the reason I know that is

7 because they gave a cease-and-desist order three

8 hours after they received a message from somebody

9 who they don't know if it's good or bad or

10 credible or honest or has photo shop and is

11 making up stories or anything since there was no

12 investigation.  That simply proves to you that

13 they went ahead and already had this decided.

14    What does it mean this was decided?  It means

15 that they had a decision to refer me to 1274,

16 which is verbatim at the bottom of that CADO,

17 cease-and-desist order, and it means that they

18 thought about that, go through that process.

19    Then, therefore, walk -- this is my synopsis.

20 Why then thereafter did they not simply say "But

21 we don't need a hearing, Mr. Grand.  We're going

22 to tell you to go to 1274, but we can do it

23 administratively.  It will be hush-hush and on

24 the low."

25    That's not what they wanted.  That's not what

Page 176

1 they did.  That's not what they offered.  They

2 didn't do that.  Forget even telling me about

3 quasi.  They never even told me about quasi.

4 They told me hearing and then they never told me

5 quasi.  Why did you tell me hearing?  You could

6 have told me administratively we could have done

7 it behind closed doors.

8    There was no love here.  This was tar,

9 feather, and execute.

10 Q  Do you have any firsthand knowledge as to

11 whether or not they know Mr. Feldman?

12 A  What do you mean by "know Mr. Feldman"?  Go

13 to dinner with him?

14 Q  No.  You indicated that Mayor Brennan and

15 Mr. McConville got a communication from

16 Mr. Feldman who they didn't even know.

17 A  If he was credible is what I said.  It could

18 have been a made up email or --

19 Q  What firsthand knowledge do you have that

20 they should know Mr. Feldman is not credible?

21 A  The fact that they didn't investigate the

22 matter is the way you cannot know for sure that

23 the person's credible or not.

24 Q  How do you know they --

25 A  How do you know that he's credible if he just

Case: 1:22-cv-01594-BMB  Doc #: 80  Filed: 01/26/24  45 of 101.  PageID #: 1271

Deposition of Daniel Grand                                          Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 177

1 simply says so?
2 Q  What firsthand knowledge do you have that
3 Mayor Brennan and Mr. McConville conspired with
4 one another to make this a hearing?
5 A  Because the only two people who were involved
6 on this day, which went from cease-and-desist
7 order, phone call with the mayor, application for
8 hearing in less than a 24-hour period, the only
9 people who even communicated or knew about it at
10 such a time would have been McConville, which is
11 a fact, and the mayor, which is a fact.
12 Q  So you're surmising that as opposed to having
13 firsthand knowledge.
14 A  You can't be in a room with somebody you're
15 not in a room with.  It doesn't take much of a
16 genius to realize those two communicate.  We have
17 emails, which are facts.  I'm relying on fact.
18 Not supposition, not hearsay, but fact.
19     Was I in the room, firsthand knowledge?  No.
20 I have their emails, which gives me sort of a
21 type of firsthand knowledge of what they were
22 doing, but I wasn't in the room with them.
23 Certainly not.  But he told me that I have to
24 have a hearing on the phone call.  I had to have
25 a hearing.  Why?  That's not true, Mr. Mayor.

Page 178

1     I could have done this administratively.  And
2 that's why I know he wanted me to be -- and he
3 drew a map?  Come on.  You want to go after that
4 one day.  Who draws a map?
5 Q  Okay.
6 A  He said he was familiar with Godaven.
7 Really?
8 Q  I don't think there's a question on the
9 table.
10 A  Comfy chair, by the way, just to say the
11 truth.
12 Q  I'm glad it is.
13     So paragraph 63, we know that the mayor did
14 create a map of people who had signed the
15 petition that were presented to him.  My question
16 to you is you've also alleged that he coordinated
17 with the opposition to your proposal, to your
18 permit, and aside from creating that map is there
19 anything else that leads you to believe that he
20 coordinated with the opposition to your proposal?
21 A  Yeah.
22 Q  Okay.  Tell me what that is.
23 A  Well, for starters, where did he get this map
24 information from?  Somebody had to give it to
25 him.

Page 179

1 Q  Do you have any knowledge as to where he got
2 it from?
3 A  Yeah.
4 Q  Where?
5 A  From the opposition, which is represented by
6 a number of people, namely Mr. Cooney; Jack
7 Kluznik; Vivienne Porter; Hodson, my neighbor;
8 McConville.
9 Q  Did you see those communications?
10 A  They exist, don't they?
11 Q  I don't know.  My question is to you.
12 A  Yeah.
13 Q  All right.
14 A  They're in the record.  You saw them.
15 Q  Did you see the mayor responding to those
16 communications?
17 A  I'm not sure what he sent me because I never
18 had my FOIA request fully answered ever.  There's
19 probably a lot of stuff that slipped through the
20 cracks that was never sent to me yet.
21 Q  You say in paragraph 69, "Upon information
22 and belief, Brennan arranged for residents who he
23 knew opposed Plaintiff's application to be
24 notified of the hearing."
25     Do you have any firsthand knowledge of that?

Page 180

1 A  Pardon my ignorance, but there were Facebook
2 posts that he put out there that told people
3 about me and my address and the special use
4 hearing -- the special use meeting that was going
5 to be going on.  Who does that?  He doesn't do
6 that for anybody else's public hearings on his
7 Facebook feed.  That's him blowing it up in the
8 neighborhood.
9     What happens if I send a message to you and
10 you're the mayor of the city, and then you send
11 it as the mayor back out to the entire community,
12 they all see it because it's the mayor.  That's
13 important.  If little Danny Grand writes a
14 message, it doesn't go very far, as we can see.
15 But if mayor does it, it goes all over the world.
16 Q  You indicate in paragraph 70 that Mayor
17 Brennan arranged that certain residents that
18 lived near you that Brennan thought would be
19 supportive did not receive notification of the
20 hearing.  What evidence do you have of that?
21 A  The hearings that you have in your subject
22 matter, your FOIA requests, show that two of the
23 residents that are on the block did not receive
24 them, and they're on my block, and people on
25 other blocks did receive them, which is curious.

Deposition of Daniel Grand        Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 181

1 Q Who is that?
2 A Fred Bolotin. Fred Bolotin is an Orthodox
3 Jew who lives about 10 doors down from me on my
4 block, maybe eight doors.
5 Q He appeared at the hearing, didn't he?
6 A I can't say. No. He might because Fred
7 Bolotin served -- he's a lawyer, he served as a
8 person on one of these boards or committees for
9 many years. He was surprised. And I have an
10 email from him even saying that he never got any
11 mailing.
12 Q Anybody else that you know of that --
13 A I don't have a lot of people on my block --
14 Q All right.
15 A -- that are Jewish. I know there might be
16 one or two more who I figured would have gotten
17 it, but didn't get it.
18 Oh, yeah. I don't remember her name. I
19 think -- okay. I can say this to you. There's a
20 woman that's one house off the corner, a Jewish
21 lady, an old Jewish lady. I think her name might
22 be Ruth. I don't really know her name. It's
23 easily ascertainable which house it is. She
24 didn't get it either.
25 So the two Jews on the block five steps away

Page 182

1 from my house, they didn't get it, and that's
2 factual because the mailings that the city
3 produced in their FOIA requests -- that was a
4 partial response to my FOIA requests contained
5 mailings, certificates of mailings, so to speak,
6 and didn't contain any for those two people.
7 And I even had an email from an attorney,
8 Mr. Bolotin, who served for the City of
9 University Heights on these committees, saying,
10 no, I never got it, which is true. So it
11 corroborates. So that's firsthand, isn't it?
12 How do you make that mistake? How do you
13 ironically miss the two Jews on the block? I
14 mean, it's kind of hard to imagine that one. But
15 17 blocks away you got people coming with a map
16 and the whole city. How did that map come to be?
17 Q I think you've answered the question.
18 A Well, it's important to me. My life's been
19 turned upside down. No offense.
20 Q All right. Paragraph 89 you indicate that
21 "Outside of and in between public hearings, the
22 members of the Planning Commission, the Law
23 Director, and the Mayor illegally communicated
24 amongst themselves about the tabled application."
25 A Correct.

Page 183

1 Q And I assume you're referring to emails that
2 went back and forth.
3 A At minimum.
4 Q Are you aware of any other verbal
5 communications?
6 A The --
7 MR. QUAINTON: Sorry, Jim.
8 This is Eden. What paragraph are
9 you referring to? I apologize.
10 MR. CLIMER: I'm sorry.
11 Paragraph 89.
12 THE WITNESS: 89.
13 MR. QUAINTON: Got it.
14 BY MR. CLIMER:
15 Q Were you a party to any verbal communications
16 among those people?
17 A Was I a party to any verbal communications?
18 Q Not a party. That was badly phrased.
19 Did you overhear personally any verbal
20 communications between those parties?
21 A No, sir. Yet there are emails that reference
22 calls that they have had between each other,
23 specifically Mr. Siemborski and Mr. McConville.
24 Q All right. And you were aware that that
25 dialog was shut down, correct?

Page 184

1 A Incorrect.
2 Q All right.
3 A There's a separate matter. You're asking a
4 different question. I'm sorry.
5 The dialog of the emails and the attempt that
6 the mayor had mentioned in his deposition that
7 they were saying we can't talk like this, there
8 was an email that went out to that effect.
9 However, that is not the same communication I'm
10 referring to.
11 I'm referring to an additional communication
12 effort by telephone that exists. To what degree,
13 I do not know. Yet, it does reference in a
14 separate email between Mr. McConville and
15 Mr. Siemborski about a phone call the two of them
16 had just had; it was great speaking with you
17 about this matter, Mr. Siemborski or
18 Mr. McConville. That's an email that we all
19 have.
20 So that's additional and outside of the email
21 chain with Ms. Urban and Mr. Fine, Mr. Rach, and
22 Mr. Mayor. So that's another one. So it's
23 another one. Yeah.
24 Q Any other evidence that you're aware of that
25 there were verbal communications about this

Page 185

1 application outside of the hearing?
2 A  Yes.
3 Q  All right.  What's that?
4 A  Rodney, Mr. Cooney -- currently councilman,
5 wasn't at the time -- Jack Kluznik, lives next to
6 and across the street from Luke McConville, both
7 attorneys, on Loyola, and Luke McConville had
8 tremendous amount of communication -- and
9 Vivienne Porter as well, tremendous amount of
10 communication going back and forth, back and
11 forth.  There's a half dozen emails about that.
12 And there's plenty of phone calls.  Even
13 McConville is prepping Kluznik at one point on
14 what to do, what to say, how it's going to be,
15 how to prepare Cooney.
16    I mean, it's all out there.  So there's a lot
17 more than that.  There's about a half dozen to
18 maybe a dozen and a half communications that were
19 on paper, email, and also verbal, and they also
20 had private meetings amongst themselves.
21 Q  How do you know that?
22 A  How do I know that?  Because there's another
23 one about -- right after one of the hearings
24 they're making complaints to me about garbage on
25 my lawn or something like that, which wasn't

Page 186

1 garbage -- it was just me being courteous and
2 putting tree shrubs inside a bag for the garbage
3 men to take away -- and in there it's like a
4 backdoor or backhanded sort of reference to I
5 know that you and Jack in the meetings that we've
6 been having are the notated ringleaders of the
7 Grand opposition.
8    So how does this other person -- I guess a
9 Gesu person, I don't really know, but another
10 person have awareness of these leaders of the
11 opposition?  There's private meetings going on.
12 It's an easily inferable and obvious conclusion
13 to make from the tone and tenor and the point of
14 what she is saying in that email transmission.
15 So it leads me to believe there were physical
16 meetings, at least one, that I can tell from that
17 email.  Probably others.
18    In fact, I think that Luke McConville and
19 Jack Kluznik did meet at some point maybe for a
20 lunch or something, even though they lived
21 catty-corner across the street, and they know
22 each other on a first-name basis.  So they're
23 friends.  It's clear the way they communicate.
24 He speaks about his wife in one of the emails.  I
25 think Janine or something, whatever his wife's

Page 187

1 name is, that would be Kluznik's wife, and he
2 speaks about her as though Mr. McConville already
3 knows that's his wife.  So they have a very close
4 relationship.
5    They all went to Gesu together.  Jack
6 Kluznik's daughter goes to Gesu.  Luke McConville
7 is the secretary of treasury for Gesu actively
8 and has been the whole time.
9 Q  So I want to unpack that a little bit.
10 A  Sure.
11 Q  I think you talked about a garbage complaint.
12 Was that a complaint by Mrs. Porter?
13 A  No.
14 Q  Who made the complaint?
15 A  It's in an email.  It's a lady from the
16 neighborhood who was walking by, jogging, or
17 something like that.  I don't really know her
18 name right now, but it's in an email.
19 Q  All right.
20 A  And it was a fictitious complaint.  It wasn't
21 garbage.  They even came back, and Silas Brown,
22 the inspector, commented and said, "Nope.
23 There's nothing wrong here."
24    The mayor wanted to, give him a ticket, give
25 him a ticket.

Page 188

1    But Silas was like I really can't.
2    Just give him a ticket anyway.
3 Q  And the second item is an email referencing a
4 meeting between Luke McConville and Jack Kluznik?
5 A  Multiple.  Yeah.  Either verbal over the
6 phone, through email, and/or in person.  Yes.
7 All the above.  The emails speak about it.  Bates
8 stamped emails from the city, as a matter of
9 fact.  There's probably more, but I'm just
10 leaving it there for now.
11 Q  And then paragraph 108 you referred to
12 Mr. Kluznik and Mr. Cooney communicating and
13 coordinating with Mr. McConville prior to the
14 March 23rd hearing.
15    And those are the communications we just
16 discussed, correct?
17 A  I would accept that, yes.
18 Q  Okay.
19    MR. QUAINTON:  Jim, sorry.
20 I've got to jump in here for a
21 sec.  I have to leave for a court
22 conference in another matter.
23 I'll try to come back when that's
24 done.  So I'm going to be signing
25 off now.

Deposition of Daniel Grand                    Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 189

1   MR. CLIMER:   No worries.
2   You have a good one if we don't
3   see you.
4   MR. QUAINTON:   Thanks. And
5   I'll check back if I have time.
6   MR. CLIMER:   All right.
7   Thanks.
8   THE WITNESS:   Thank you,
9   Eden.
10  MR. QUAINTON:   Thanks.
11  BY MR. CLIMER:
12  **Q  Do you know of any non-Jewish religious**
13  **organizations that have applied for an SUP to**
14  **conduct a house of worship within the residential**
15  **zoning district?**
16  A  I think Gesu would be subjected to that.
17  However, I think they are establishing a time
18  period that would have preceded the zoning rules
19  of University Heights in the '50s, I think, and
20  before that.
21  **Q  Okay.**
22  A  So they would be needing to do that.  I
23  believe the Gesu nuns, they have a commissary --
24  not a commissary.  That's not correct.  Not a
25  monastery.

Page 190

1   **Q  A convent?**
2   A  That's what I meant.  I'm sorry.  A convent.
3   And for a priest it would be vestry?
4   **Q  I'm not sure.**
5   A  The convent, they do have a house --
6   **Q  I grew up Presbyterian so ...**
7   A  Okay.  All right.
8   They do have a house on Miramar up the block
9   past the church that they have gone over many
10  times for special use permits and special
11  accommodations for garages and various permits
12  for the expansion of their driveway.  I've seen
13  those visually.  I read them in my history being
14  involved in this matter.  And they're on the
15  record as far as the city's matters, city's
16  business, but it didn't revolve around my
17  property, per se, so it never came out like in
18  the document dumps or whatever.  So they have an
19  ongoing renewed permit that they have to do.
20  So, at minimum, I can say the Gesu church
21  people, they carte blanche just get oh, sure,
22  here you go, you need another extension for 700
23  more families, okay, we'll give you 10.  That's
24  the way you get that vibe.
25  I don't mind.  I'm kind of open to

Page 191

1   everybody's races, religions, and creed.  I love
2   everybody equally.  They all hate me equally.  So
3   it's just terrible, but it's not my fault.
4   **Q  So are you aware of the specific nature of**
5   **the SUP requests submitted by Gesu, I think you**
6   **said, for garages and stuff like that?**
7   A  Not Gesu.  The church is standing because --
8   it is in U-1 zoning, as a matter of fact, but I
9   think it's supposedly -- you might want to call
10  it grandfathered in.  I don't know that to be
11  accurate or true, but I think that's what the
12  overall theme of the city's mentality is.
13  **Q  You mean the previous --**
14  A  But we're talking about the convent.
15  **Q  Yeah.  The convent or the --**
16  A  That's a separate -- it's home.
17  **Q  Right.  Yeah.**
18  A  That home --
19  **Q  I understand.**
20  A  -- had a regular home --
21  **Q  Yeah.**
22  A  -- that has a regular garage in the back, and
23  I think it was the nuns who wanted to have an
24  extension or expansion to their driveway, which
25  was approved.  And they wanted to have their

Page 192

1   garages -- maybe it went from a two to three
2   garage -- expanded, and that was it, requiring
3   them to get a permit or whatever, and it was
4   approved, and they had no problems getting it.
5   They could get whatever they want.  That's the
6   problem.
7   It's not like they had to go -- they had to
8   go too.  They had to get a permit too.  It's the
9   fact that they weren't tarred and feathered and
10  executed in broad daylight.  That's the point I'm
11  making.
12  **Q  Are you aware of any non-Jewish organizations**
13  **conducting a house of worship in the U-1 zoning**
14  **district who have not had to get a special use**
15  **permit?**
16  A  I don't want to argue with you, but I want to
17  tell you as a zoning guy from New York days,
18  there are distinctions in this town that are
19  pretty -- not fleshed out, and it's not going to
20  look good in the future probably, but think about
21  this --
22  **Q  My question is --**
23  A  -- there's something called community
24  facility --
25  **Q  No.  My question is --**

Case: 1:22-cv-01594-BMB  Doc #: 80  Filed: 01/26/24  49 of 101.  PageID #: 1275

Deposition of Daniel Grand                    Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 193

1  A  You're not letting me let me tell you what I want to
2  tell you.
3  Q  -- are you aware of any non-Jewish religious
4  organizations who have been permitted to conduct
5  a house of worship in the U-1 zoning district
6  without a special use permit?
7  A  I don't know if they're required to or not.
8  Q  Okay.  You don't know if they are --
9  A  If they were required to or not.
10  Q  Okay.
11  A  They might have made me go for one when I
12  didn't necessarily need one, but they might let
13  the Catholic group who wants to have a prayer
14  group in their house not even have to apply, so
15  the question doesn't even add up.  I don't know
16  that they made them go get one.  The mayor made
17  me go get one.  That's what I'm telling you.  I
18  didn't want to make --
19  Q  So the answer is you don't know, correct?
20  A  The answer is I don't know if the city
21  imposed that restriction on them like they did on
22  me.
23  Q  All right.
24  A  I can say this:  I do know --
25  Q  You've answered the question.

Page 194

1       THE WITNESS:    Are we like
2       4.15 right now?
3           MR. GROSS:    It's 5:00.
4       THE WITNESS:    No.  Hours
5       on the record.  I think we're like
6       4.15.
7  BY MR. CLIMER:
8  Q  We've got time.
9  A  I just asked how long, like, we have been on
10  the record.  Fine.  You don't have to answer me.
11  Q  We're not going to use the whole -- I mean,
12  if you got to know, go ahead.
13       (Recess had.)
14  BY MR. CLIMER:
15  Q  The pages -- or paragraphs 157 to 159 you
16  indicate that the city set up regular patrols of
17  your home looking for parking violations.  You
18  reference an email from Lieutenant McArtor.  Can
19  you tell me what was going on with the parking
20  situation there?
21  A  158, you said, or 7?
22  Q  157 through 159.
23  A  So between 156 and 159 which carries on to
24  the next page.  Okay.  So what is the question?
25  Q  There is apparently some kind of dispute or

Page 195

1  controversy over how you're parking.
2  A  Okay.
3  Q  My question to you is do you understand what
4  the controversy was about?
5  A  I probably know better than anybody.
6  Q  So tell me about it.
7  A  March 23rd, which is part of leading up to
8  Passover, I suppose -- I have to verify that.
9  I'm pretty sure it's true.  The night of the --
10  no.
11     The night of the 23rd, meaning the early,
12  early morning hours, like two o'clock in the
13  morning of March 23rd, I had an out-of-state
14  friend, disabled military vet, who drives a
15  pickup truck come to my house.  He arrived --
16  because he was driving from New York, by the time
17  he got there with his stops he calculated one
18  thing and winds up showing up around 2:00 in the
19  morning, and my two cars were parked in my
20  driveway.
21     My driveway is a winding road driveway, which
22  is very long.  It's not a straight line.
23  My house is 120 feet wide.  My lot is 155 feet
24  wide.  So you can hold like 30 cars in my
25  driveway, but the angle of the S-curve of my

Page 196

1  driveway made it such that he wouldn't be able to
2  get around my two vehicles who kind of like
3  blocked it, so to speak, without turning on my
4  other two cars -- not my other two cars.  My two
5  cars.
6     My two cars would have made a lot of noise.
7  My pickup truck is a V8 super-charged Hemi, it's
8  blue with very clear identification stripes all
9  over it, Ohio plates naturally, and turning that
10  on at two o'clock in the morning would have been
11  very inconsiderate to my neighbors because it's
12  going to "Vroom" and like really blast through
13  the neighborhood at that time.  So to not be a
14  jerk like somebody who doesn't care about other
15  people, even the week after they treated me the
16  way they treated me, I still, as a matter of my
17  personal ethics, told my friend to pull around me
18  and go up further.
19     So he went around my grass line and came back
20  onto my driveway, and then he dumped his car in a
21  part of disputed territory that the city couldn't
22  get their game together.  They don't know what
23  they're doing over there.  The zoning code people
24  don't know what they're doing at all over there
25  about an area that previously was approved to

Page 197

1 pour concrete, that they then go on to say you
2 can't pour there, so I took all the gravel that
3 was there out of there and put it in the back
4 yard to recycle it, and it had little speckle
5 dusts of gravel from two years earlier that my
6 friend put his car in there, which is part of my
7 driveway area in front of my house, not
8 disturbing a sole in the world.
9    Eight o'clock in the morning, Mrs. Porter,
10 who was in Florida on March 23rd, using her
11 cameras that she set up to spy on me and my
12 personal doings, my personal space, my personal
13 happenings, notified the department of buildings
14 via the mayor.  She called the mayor on his cell
15 phone.  She emailed the mayor and said "Danny
16 Grand, Danny Grand is parking illegally in his
17 driveway."
18    So here we are with a driveway that can hold
19 like 20 cars, 30 cars, 15 cars, whatever it is,
20 and I have three cars that are -- two of mine, my
21 wife's car, my car, and my friend who just
22 visited from town a few hours earlier, and low
23 and behold a phone call from a lady in Florida
24 watching camera videos of my house gets the
25 police to come.  And the police, who don't really

Page 198

1 know the law very well either, apparently, issued
2 me a violation for parking regulation when their
3 authority ends at the sidewalk.  Everybody knows
4 that the police have restrictions for parking to
5 the street.  The department of buildings would
6 have jurisdiction over any sort of parked
7 vehicles on the lot itself, not on the public
8 rights-of-way.
9    So they issue a ticket to my friend, the
10 disabled veteran.  They lied in their CAD report
11 and said that I was the one that they noticed and
12 my car was there, but I wasn't there.  I was at
13 synagogue.
14    And you know who knew that?  Mrs. Porter, who
15 said I was at synagogue in her email, and she was
16 right.  I did.  So I wasn't there.  The CAD
17 report said I was there.  They never changed it.
18 They issued my friend a ticket for putting his
19 car in my driveway.  Get it.  Think about that.
20    He put a car in my driveway and he got a
21 ticket.  That's not a nuisance?  That's not
22 annoying me?  That's not harassing me?  That's
23 not unfair to me?  This comes right after the
24 mayor said call up on him, make complaints on him
25 if you see anything, and this is what they see?

Page 199

1 So I don't understand what's going on over here.
2    That's the whole parking thing:  One car, one
3 day, and we moved it right away.  They didn't
4 even give me a chance to move the car out of the
5 thing.  It was in a little indentation in the
6 front of my house, which is, again, 125 feet
7 wide, and a little tiny car, which is 14 feet
8 wide, that wasn't disturbing anyone in the world,
9 but I've got nine police cars over there giving
10 me tickets that isn't to me.  I never got issued
11 a ticket.  It wasn't issued to me.  So that's not
12 even accurate.
13 **Q  So I -- you mentioned Mrs. Porter, and I**
14 **understand the Porters set up video surveillance**
15 **of your property, correct?**
16 A  That's right.
17 **Q  And I think there were pictures that you**
18 **provided that are like three cameras set up.**
19 A  Four.  On that round at the front of the
20 house there's one more.  Three on the side that
21 you're referring to three.  And then they
22 relocated them a few times.  So they danced them
23 around to get better angles and shots.  But
24 ultimately they had three to four cameras at any
25 given time for a very long time, which was very

Page 200

1 damning for my son and my daughter, and it really
2 bothered them.
3 **Q  You indicated that Mayor Brennan had used**
4 **video footage set up by the Porters.**
5 A  He said that.
6 **Q  Mayor Brennan did?**
7 A  Right.
8 **Q  What did he view?**
9 A  He said that he seen all the documents and
10 the transcripts and the videos and all the things
11 that the Porters sent him as evidence, and they
12 kept -- they kept bombarding him with tons and
13 tons of stuff.  He got censured over it, that
14 whole ordeal.  He said it himself.
15 **Q  Was he censured perhaps for calling**
16 **Mr. Porter an asshole?**
17 A  To be honest with you, I don't think it was
18 limited to just that, but that's probably the
19 reason he called him that because he was just
20 harassing him too, which started out as a
21 buddy-buddy relationship, got to the point where
22 you're pissing me off so I'm going to curse you
23 out.  That's what the mayor did.  He got
24 reprimanded for that.  He wasn't standing up for
25 me, though.  Don't get mistaken.

Deposition of Daniel Grand                                    Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 201

1  Q  I'm not.
2  A  I'm just telling you.  Okay.  I'm not saying
3  a word.
4  Q  You take issue with the decision by
5  Prosecutor Scalise not to take legal action
6  against the Porters?
7  A  Where are we on that?
8  Q  166 and 167.
9  A  166 and 167 don't say that I took issue with
10  anything.
11  Q  No.  Well --
12  A  I'm sorry.
13  Q  -- you allege that Ms. Scalise did not take
14  any action.
15  A  No.  I know that she didn't.
16  Q  Okay.  My question to you is have you done
17  any legal research into whether or not the
18  Porters' actions were legal?
19  A  Yeah, I did.
20  Q  Do you have the results of that anywhere?
21  A  Are you asking for memorandum of law?
22  Q  No.  I'm asking what research you did that
23  would indicate to you that the Porters' cameras
24  were a criminal offense --
25  A  There's an order --

Page 202

1  Q  -- that Ms. Scalise would have jurisdiction
2  to pursue.
3  A  Fine.  There's an ordinance called annoying
4  persons and any objective reading -- fair,
5  objective reading of annoying persons in the
6  UHCO, which is potentially a misdemeanor --
7  Q  All right.  That would be --
8  A  -- would be enforceable.
9  Q  I'm sorry.  I thought you were done.
10  A  It would be something that she could go and
11  do something about, number one.
12  Q  This is a University Heights ordinance?
13  A  UHCO.  That's right.
14  I also know that there's a tort law, you
15  know, common law tort for -- in Ohio, I think
16  it's intrusion upon solitude or something of that
17  nature, which has to do with the privacy of a
18  person --
19  MR. GROSS:  I'm going to
20  object at this point just because
21  you may be crossing the line into
22  things that he may have discussed
23  with his attorney versus stuff
24  that he may have researched on his
25  own.

Page 203

1  BY MR. CLIMER:
2  Q  I don't really want to know about your advice
3  or conversations with your attorney that are
4  seeking legal advice.
5  What I do want to know is what research
6  you've done on your own that would indicate that
7  what the Porters did was a criminal offense.
8  MR. GROSS:  Can I object to
9  the form of the question?  I mean,
10  I will object to the form of the
11  question just in that -- asking
12  about legal research that he did,
13  that he may or may not have
14  consulted an attorney about.
15  So can you rephrase the
16  question to not ask for what legal
17  research he did or maybe narrow
18  it?
19  MR. CLIMER:  I'm asking
20  for anything he did, not what he
21  got from you or any of his other
22  attorneys.
23  THE WITNESS:  Personal
24  conclusions?  Can we call it that
25  instead of legal research?  I'm

Page 204

1  not a legal research person in a
2  way.  I'm not an attorney in a
3  way.  That's well known.
4  MR. GROSS:  I'll just
5  instruct the witness not to
6  discuss anything that you may have
7  consulted with an attorney.
8  BY MR. CLIMER:
9  Q  Okay.  So is there anything besides the
10  University Heights codified ordinance on annoying
11  persons -- anything other than that that you
12  consulted on your own without your attorneys'
13  input that would lead you to believe that what
14  the Porters did was a criminal offense?
15  A  I think that there are -- there are three
16  things that stand out to me that I thought of on
17  my own, respectfully.
18  One was the intrusion of solitude, one was
19  the annoying persons of the University Heights
20  codified ordinances, and the third thing that
21  stands out at this time was voyeurism.
22  Q  Okay.
23  A  That's about as much as I can say.
24  Q  Okay.  Good enough.
25  In paragraph 169, which is on page 26, you

Deposition of Daniel Grand                                              Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 205

1  indicate that a city attorney informed you that
2  the fabric barrier that you put up because of the
3  Porters' cameras -- and I'm adding that -- did
4  not meet the city's fence code and demanded that
5  you remove it.  Okay.  Who did that?
6  A  It may have been Mr. Cicero.
7  Q  Okay.  Was it in writing or verbal?
8  A  I believe it was in an email.
9  Q  Okay.  Do you recall ever having received any
10 offers of assistance from the city in placing
11 arborvitae or some other type of screening?
12 A  I can say that I recall them telling me to
13 take the fabric barrier down, that it did not
14 meet the city's fence code, even though it wasn't
15 a fence really.  And I think that I vaguely
16 recall -- I don't remember who, perhaps, but
17 maybe there was a notion that there could be some
18 other alternative, but I don't know what it was.
19 It wasn't expressed to me at any point more
20 clearly than that.  And since it wasn't offered
21 to me, I didn't know what to take from it.  No.
22 I went on to remove that fence like I was told
23 to, but there was no other follow-up from the
24 city after that either.
25 Q  I want to talk to you about the incident that

Page 206

1  you relate in paragraph 170.  Who was the friend
2  that you were with?
3  A  His name was Baruch Hoffman.  He lives in
4  Israel.
5  Q  Bara, B-A-R-A?
6  A  B-A-R-U-C-H.  Baruch.
7  Q  I'm sorry.  I didn't hear that last part of
8  it.
9  A  I probably did pronounce it wrong.  I'm
10 sorry.
11 Q  Hoffman?
12 A  Double F.
13 Q  Okay.  He lives in Israel?
14 A  Yeah, he does.
15 Q  Are you still in contact with him?
16 A  He is a person who collects money on behalf
17 of charitable organizations.  He's an
18 administrator of charitable organizations in
19 Israel, and he comes from Israel to different
20 cities around the world to meet with people who
21 want to be philanthropic.  So that's my
22 relationship with him.
23 Q  I was just asking --
24 A  So when he comes, he comes.
25 Q  Are you still in contact with him?

Page 207

1  A  I understood you.  I'm just letting you know
2  what he is.  He's a guy that shows up at your
3  door one day, he says, "Hi, Danny.  I'm here
4  again.  Can you give me a check?"
5  I'm like, "Okay.  Talk.  Let's hang out for a
6  little while.  We'll talk."
7  I don't see him again until he shows up
8  again.  That's the level of contact.  And when
9  he'll show up again, only God knows and Baruch.
10 Q  Got you.  He shows up when he wants money.
11 A  Yes.  That's what I meant.
12 Q  And do you have any contact information for
13 him?
14 A  I do, actually.  I think I can get his number
15 or email if I had to, yeah.
16 Q  Can you produce that to your attorney,
17 please?
18 A  Yeah, I can do that.
19 Q  And Mr. Hoffman indicated to you that as he
20 sat outside your house --
21 A  No, sir.  Not him.  He had a driver.
22 Q  Okay.  He had somebody with him, a driver?
23 A  That's right.
24 Q  Do you know who that driver was?
25 A  He would, but I don't.

Page 208

1  Q  Okay.  Do you know if that person was
2  American or Israeli or some other -- some other
3  origin?
4  A  I could tell you he was Jewish, but that has
5  nothing to do with the place you're born.
6  Q  Yeah.
7  A  I don't know if he was from Israel or from
8  America or not.  I don't know.  I know he's a
9  Jewish guy, but I don't know if he was from
10 Israel or America, no.
11 Q  So was it Mr. Hoffman or his driver that were
12 sitting outside or both?
13 A  No.  The driver.  And Mr. Hoffman came to my
14 house.  Mr. Hoffman went inside my house.  The
15 driver remained in the vehicle the whole time.
16 And while Mr. Hoffman and I were
17 communicating -- oh, it's nice to see you since
18 the last time I saw you.  He gave me some
19 progress of how -- you know, he deals with an
20 orphanage, and he deals with -- Ezrat Hachim is
21 the name, I think, of his organization.  They
22 help feed the poor.  They give food out.  You
23 know, like a Red Cross kind of deal in Israel, so
24 to speak.  So he's a big administrator for them.
25 He's a founder of it too, I think, one of them.

Case: 1:22-cv-01594-BMB  Doc #: 80  Filed: 01/26/24  53 of 101.  PageID #: 1279

Deposition of Daniel Grand                    Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 209

So he and I were just talking. He's giving me updates, and he has a presentation booklet, and he's showing me all the people's lives that are being saved. They're buying medical equipment. So we talked for a good hour. And he gives you the big: "So can you help us this year, Daniel?"

I'm like "Here you ago." I write him a check, but I want to help him. I like what he's doing.

So during that time, little did we have any idea what was going on, I was still apparently being surveilled, because he was stopped twice by police officers, two separate times over a 40-minute period because we were there together for an hour --

**Q  "He" being the driver?**

A  Yeah.

The driver stopped -- the police -- two different patrols did a check on this man sitting in the car in front of my house within a 45-minute period. Our conversation with Mr. Hoffman and I was about an hour.

So he came inside, sort of nothing doing, 10 minutes in or so, that 45 minutes begins in this

Page 210

timeline of our total hour, two times in that 45 minutes the driver's getting knocked on his door, "Get out. Get out of the car. Let me see your driver's license. Who are you? Where you from? Are you here for the shul." That's what the cops did to the driver. I'll call him the driver because I don't know his name.

And then the last 10 minutes Mr. Hoffman left, and then that's my hour or so with Mr. Hoffman. Later that day, he called back my house, Mr. Hoffman, and told this situation about what the driver just told him. He was shocked out of his mind. He goes I got to tell Danny.

So I wasn't home. My wife was home, and she told me a message that she got from Mr. Hoffman when I was out and I came back home. She goes, "You'll never believe what I heard today."

I said, "What happened?"

She said, "Mr. Hoffman called and he said that the driver told him when they were leaving that the police came and banged on his window and told him to get out of his car not once, but twice. They asked him who he is. What he's doing here. Is he here for the shul?"

And the Rabbi Hoffman, Baruch Hoffman, he

Page 211

asked me "What shul? What are you talking about?"

Nobody had any idea, actually, at all about what they're talking about.

**Q  So if I understand correctly, you didn't witness this yourself, correct?**

A  Witness the police --

**Q  The police encountering Mr. Hoffman's driver.**

A  I didn't witness it personally, but I know it happened for another reason.

**Q  You know about that only because the driver told Mr. Hoffman who told your wife who told you.**

A  No. That's when I first learned of it, but that's not how I only learned of it.

**Q  How else?**

A  There are police reports for both incidents recorded in CAD, and I've seen those both. It's two separate patrol numbers; two separate police officer units.

And what are they doing? Why are they coming after this man, bothering him, asking about a shul?

Yeah. I don't know why they're doing that.

**Q  Okay. In 171 through 173 you indicate that you are on your way to the synagogue on Rosh**

Page 212

Hashanah, correct?

A  171 I indicate that, yeah.

**Q  And you saw a suspicious man in a dark, unmarked car.**

A  Yeah. I saw a suspicious man sitting in a dark, unmarked car. Yep.

**Q  Yeah.**

A  Yeah. I approached him, too.

**Q  All right. Can you describe this person?**

A  An older man. I would say somewhere between super late 50's and early 70's.

**Q  Okay.**

A  He was mildly bearded, mainly gray-haired, like a thin like kind of scrubble that I have going on here. He was on the phone, and he kept saying "Mr. Mayor, Mr. Mayor" when he was on the phone. I overheard him because his window was open.

And I was curious because there were so many households in the area that I was when I encountered him that are Jewish, and on Rosh Hashanah or Shabbos, there are no cars that are just idly sitting there. That doesn't make sense because everybody's cars are parked. They can't be idling in the car. The cars are off. So it

Deposition of Daniel Grand                                    Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 213

1 was strange and it didn't make sense that he
2 would be there. So I was a little bit on guard
3 and confused and --
4 **Q  By the way, which synagogue were you going**
5 **to?**
6 A  Where was I going to pray? Is that what you
7 want to know?
8 **Q  When you say you were on your usual track to**
9 **synagogue, and I'm wondering what synagogue you**
10 **were going to.**
11 A  Yeah. I was going to pray at the corner
12 house of University Parkway and Milton, which was
13 the Aleksander Shtiebel outfit.
14 **Q  Okay.**
15 A  So I approached him sort of as though like,
16 you know, what's the story over here. And he was
17 basically misleading me, lying to me, saying that
18 he's part of a larger outfit of multiple people,
19 there's three or five cars, and we're doing a
20 security mission right now for somebody further
21 up the block farther away, the opposite direction
22 of the Churchill -- not Churchill -- excuse me,
23 that's not the right word -- the corner of
24 University Parkway and Milton, which we're going
25 to say is the Aleksander Shtiebel. So that's the

Page 214

1 place that I had confronted him. And he told me
2 that there's more and more of us on the block, et
3 cetera, for security detail. I said you're not
4 in security. You're an old man.
5 **Q  Did he say who had dispatched him?**
6 A  He wouldn't divulge that information to me,
7 but he was speaking on the phone saying
8 "Mr. Mayor, Mr. Mayor," sort of talking to me and
9 taking orders from whoever he was calling
10 Mr. Mayor.
11    I'm like this doesn't make any sense. He
12 tells me he's in security. And I said to myself,
13 you know, I'm not an ignorant person, you're not
14 in security, you're an old guy.
15 **Q  So did he say who it was he was speaking to**
16 **when he was saying "Mr. Mayor, Mr. Mayor"?**
17 A  He was like, "I'll see what I can do. No
18 problem, Mr. Mayor," blah, blah, blah, Mr. Mayor.
19 Sort of like that. So I think he was saying who
20 he was talking to, Mr. Mayor.
21 **Q  But he didn't say which mayor?**
22 A  He didn't say it was a mayor from a different
23 place or not, but it seemed like he was talking
24 about some mayor. And since he was in University
25 Heights seemingly not supposed to be there,

Page 215

1 obviously surveilling, yeah, I thought it was
2 Mr. Mayor Brennan, and that turned out to be the
3 case.
4 **Q  How did you learn that it was Mayor Brennan?**
5 A  Public record. There was a big tumult over
6 it. It was all over the news. It turned out
7 that he was surveilling the Jewish population,
8 and he got in big trouble with city council.
9 **Q  Okay. So this is the incident in which you**
10 **talk about surveillance being conducted on the**
11 **Aleksander Shul?**
12 A  I don't agree with that, no. That's a part
13 of it. I said when I first confronted him.
14 There were, like he said, multiple cars. I don't
15 know. It hasn't fully come out. I don't know
16 exactly how many cars were there.
17    Do I feel like I was surveilled the whole
18 time? Yeah. Do I think I was? Yeah. There
19 were people driving by and it was very strange.
20    Once you get more into the like Jewish-Jewish
21 area where there's literally not going to be any
22 cars for a 25-hour period, and then there's still
23 cars driving around -- so there was a lot of
24 that. And he even divulged that there's more of
25 them.

Page 216

1 **Q  In paragraph 181 --**
2 A  That's firsthand. He told me that.
3 **Q  Who?**
4 A  The driver of that -- the surveillance
5 company.
6 **Q  That it was --**
7 A  The private eye. He said there's multiple
8 guys like him.
9 **Q  All right. So --**
10 A  And we have the Jewish Federation Security.
11 I knew he was lying to me because we have our own
12 security in the streets, and they would say JFS
13 on them. So all these unmarked cars, it's not
14 believable. He's lying.
15    Who is this guy? What does he want? And he
16 was saying "Mr. Mayor," and then it turned out it
17 was. So the mayor was surveilling and he was
18 surveilling me too.
19 **Q  So in 181 you talk about council -- being**
20 **revealed at council that Mayor Brennan authorized**
21 **the hiring of a private investigator to sit**
22 **outside the home of an Orthodox Jewish family.**
23 **Is that home also the home of the Aleksander**
24 **Shtiebel?**
25 A  It can be. That's what we were referring to.

Deposition of Daniel Grand                                    Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 217

1  But, again, that person said there were multiple
2  surveillers doing their rounds, so it wasn't
3  limited to just that.  This is all that came out
4  in council or not, I don't really know.  I know
5  that's a fact that that's at least that guy.  I
6  saw him myself.
7  **Q  I understand.**
8  A  But there were others.
9  **Q  I'm just trying to understand paragraph 181**
10 **if it's referring to all the same incident.**
11 A  Okay.  I respect that.  It's just hard to
12 understand walking outside of your house and
13 feeling you're always being surveilled because
14 you're Jewish, and that's what I feel like
15 because that's what happened to me.  So it's very
16 hard to live that life.  I'm sorry if I'm a
17 little angry about it, but it's not your fault.
18 **Q  At pages 187 and 188 --**
19 A  Paragraph.
20 **Q  Yeah.  I'm sorry.  Paragraph 187 and 188 you**
21 **talk about public records requests.**
22 A  Yep.
23 **Q  We're aware of two public records requests**
24 **that were responded to, one was responded to**
25 **initially and then there was a follow-up.  You**

Page 218

1  **received no follow-up response to a public**
2  **records request?**
3  A  Not --
4         MR. GROSS:    Objection to
5         the form and basis of the
6         question.
7              You may answer.
8  A  Just not a complete one.  We did get the
9  first one we talked about when I sent that
10 request directly to the police department, and
11 the police department within a few weeks or so, I
12 would say, let's say quickly enough, responded
13 back to me.  Then city hall, to the mayor's
14 office, so to speak, that one to this day as we
15 stand here on 11-2-2023 has never been fully
16 satisfied.  I've never actually had my FOIA
17 request satisfied or answered or really reviewed,
18 if you want to know the truth, and I can tell you
19 that too.  I know why.
20 **Q  So number one was fully responded to by the**
21 **police department, correct?**
22 A  They submitted something to me right away,
23 yeah.  That's what they had.  Yeah.
24 **Q  Number two was responded to, albeit after a**
25 **while, and you contend that that is not fully**

Page 219

1  **fulfilled.**
2  A  That's exactly right.  I know it's deficient,
3  and I can tell you how I know.
4  **Q  Well, can you point out the parts that are**
5  **deficient?**
6  A  I can tell you how I know it's deficient.
7  That document set that was sent to me has
8  somebody else's name on it.  It was prepared for
9  somebody named Peggy.  That Peggy person must
10 have asked for something along the lines of stuff
11 for me.  A lot of other people did, too.  There
12 were four or five other people who did FOIA
13 requests for my house and myself, and they asked
14 for, oh, we want everything that says Mr. Grand,
15 and somebody else might have said, oh, we want
16 everything for 2343.
17      But my FOIA request was A, B, C, D, E, F, G,
18 H, I, J, K, L, M, N, O, P, and I never had
19 anybody go to this place -- and you talk about
20 the City of University Heights, go through their
21 records and give me A, B, C, D, E, F, G, all that
22 I asked for.  So they gave me some tidbits and
23 trinkets a year and a half or two years later
24 that they wound up giving some other people, but
25 I know that they never did the work on mine

Page 220

1  because there's stuff that I asked for that they
2  didn't even bother to look into.  I know that for
3  a fact.  I'm still waiting for them to actually
4  give me the real deal.
5  **Q  So you're comparing the documents that you**
6  **received to the requests you made.**
7  A  Of course.
8  **Q  Okay.**
9  A  And why did it take almost two years to even
10 get a little bit of something?  It wasn't for me.
11 It was just some other lady that did me a favor
12 and threw me a chewed up dog bone.  I want my own
13 piece of steak.  They never, ever took the time
14 to focus on my FOIA request to this day and look
15 into what I asked for exactly and satisfied that
16 at all.
17 **Q  At pages 191 through --**
18 A  Paragraph.
19 **Q  Paragraph.  I keep wanting to say pages.**
20 A  It feels like it's that long.
21 **Q  Yeah.  It kind of does, doesn't it?**
22 A  Yeah.
23 **Q  Paragraphs 191 through 194 are talking about**
24 **missed garbage pickups.  Tell me about that.**
25 A  It was another way that I feel the city

Page 221

1  utilized the administrative process through the
2  service department, building department, housing
3  department, all these other administrative
4  departments to kind of pick on me and make my
5  life a living hell and miserable and annoying or
6  whatever.
7      Your screen went out. Does that matter
8  because Eden is not on it?
9      (Discussion had off the record.)
10  A  So you just asked me, if I understand you --
11  **Q  What happened that you -- what were the**
12  **things that were missed?**
13  A  There's a standard pickup day. I believe for
14  us it's Tuesday. Mr. Pokorny, who was the
15  service director at that time, had been reached
16  out to by my wife multiple times because no one's
17  picking up our garbage, but only miraculously
18  through this little period of time did they do
19  that. So it was like, I think -- I'm going to
20  paraphrase my memory here -- an 8-week or a
21  10-week or a 12-week period where they were
22  routinely not picking up our trash, and you have
23  to wait another week. And we will call about it,
24  where are they, why aren't they coming, and they
25  never really had much of a reason other than, oh,

Page 222

1  I guess the guys must have missed it. Like how
2  do you miss it? And how do you miss it week in
3  and week out?
4      So that was clearly just not taking care of
5  us like they take care of everybody else.
6  **Q  So the only reason you got was I guess we**
7  **just missed it?**
8  A  We got nonsense reasons. Mr. Pokorny was
9  then at one point called to my house because it
10  was a little bit frustrating. I probably pay the
11  most or close to the most taxes of any resident
12  in University Heights. You figure I could get a
13  little bit of garbage cleanup, you know. And,
14  honestly, I just get mistreated by all these
15  people. And if they didn't mistreat me, then I
16  couldn't kind of, you know, be upset. I don't
17  want to be upset. I want to be positive and
18  happy.
19  **Q  Did Mr. Pokorny give you any reasons why this**
20  **had occurred?**
21  A  So what he wanted to try and do is have a
22  conversation with my wife without me knowing
23  about it, and I just didn't like that. As the
24  Orthodox Jewish man of the house, it's like in my
25  mind, you know, very inappropriate. So --

Page 223

1  **Q  She's the one that made the call, wasn't she?**
2  A  That's okay. But she doesn't have to meet
3  with him. He can meet with the head of the
4  household.
5  **Q  Okay.**
6  A  I'm not from that mind state. I think that
7  he should meet with me. He's a man and he should
8  speak to the man.
9  **Q  Well, did he -- did your wife advise him to**
10  **speak with you --**
11  A  I had pulled up --
12  **Q  -- or did he --**
13  A  -- just as he arrived and rang the bell. I'm
14  not claiming he did something wrong. Don't
15  misunderstand me. I felt that he should be
16  speaking to me. And I redirected the
17  conversation as I got there, I said, "No,
18  Mr. Pokorny. Please, let's have a conversation,
19  you and I."
20      I sent my wife basically to not worry about
21  it because it's a pressure. She's a mom with
22  four kids, she's working very hard, and I don't
23  want her to be frazzled and have a bad day.
24  **Q  So what did Mr. Pokorny tell you?**
25  A  He tried to tell me, "Oh, well, one of the

Page 224

1  reasons we don't pick it up because your
2  driveway's kind of winding and curving, and it's
3  -- the guys don't want to drive up it, so you
4  just have to bring your garbage to the front."
5  **Q  Okay.**
6  A  But nobody has to bring their garbage to the
7  front. In fact, that's one of the main perks, if
8  you want to call it that, of University Heights
9  is that they come to pick up your garbage.
10  Everybody loves that. But they don't want to do
11  that for Mr. Grand, the Jewish guy, but only
12  after he came out as Jewish, only after he had
13  this hearing.
14      What's going on over here?
15  **Q  Did you have any further conversations with**
16  **anyone about this situation?**
17  A  You mean on that day?
18  **Q  No. At all.**
19  A  I will tell you that I would not be the one
20  to make a phone call to the city and ask them to
21  pick the garbage up again or whatever. So my
22  wife probably did call them again and say, "Hey,
23  you missed it again, you missed it again."
24  Eventually they got back on track, I imagine. I
25  don't know when.

Deposition of Daniel Grand                    Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 225

Q   Eventually they did start picking it up
again.
A   Thanks very much.  Yeah.  But, like I said,
it was probably 12 weeks or maybe even more by
the time we actually got them to knock it off.
Q   Paragraphs 234 to 235 talk about an incident
in which you were cited telling you to remove
stones from an area nearest to the garage that's
being used to extend the driveway.
      Is this the area that your friend parked in
before?
A   Partially, yes.
Q   Okay.  And that's the area where you had
attempted to expand your driveway, the city said
no, and then you hauled the stones to your
back yard?
A   No.
Q   Okay.  Tell me about this situation.
A   When I first moved in 2019 to that house,
shortly thereafter I hired an architect to do
renovation work which included extensions on the
left side and the right side of the original
footprint of the house when I bought it.  The
contractor did not do a good job regarding
walkways, pathways, concreting, and they left out

Page 226

basically anything.
      Now, what the contractor told me then was,
"Oh, I'm one of the good ole boys.  I've been
working here for years.  I'm a good guy.  I do
this and I do that with them.  They don't ask for
that stuff.  They just give me whatever I want,"
blah, blah, blah.  Meanwhile, I paid a lot of
money and I hired an Amish company to come in and
pour concrete where we were supposed to pour
concrete in the place where there was a brick
paver stone path that cars could be parked on in
the area you're talking.
      And I'm talking about when I bought the
house.  So nobody had a problem with the previous
person parking in that same exact place ever when
the stones were there.  We're talking about paver
stones that were there.  Satellite photos will
show you they were there before I bought the
property.
      Further, I had the area excavated and trimmed
out.  Because when you do concrete, you have to
put down your wood framing, then you pour gravel,
you proceed to tamp the gravel, that is part of
what you do, and you conduct a pre-pour
inspection with the city.  I called the city for

Page 227

a pre-pour inspection for that area in 2020
before any of these things ever happened.  Our
hearing was in 2021.  So the gravel was added
after I took out the stones that were already
there before I ever moved there.
      And I was left in a very difficult situation
because of the architect and contractor botching
their job, if you will, and not making any notes
when I originally filed my plan.  Just the caveat
is when I filed my plan, I didn't need a variance
for anything because I was able to have that
level of expansion and not traverse the floor
area ratio requirements which confine you to, I
believe, in University Heights 25 percent lot
coverage.  Therefore, I never had a variance.  I
never needed a variance.  I didn't need anything
from anybody other than file, accept, and go.
And that's what I did.
      I already did the extensions.  I already had
the footers inspected.  We already poured that
concrete.  We didn't hear a word.
      This happened, and it was Mr. Jason Monaco
who came as an inspector -- it's on the record,
that inspection from 2020 is evidenced by the
record -- go look and see that he failed the

Page 228

pre-pour inspection, but as a noble citizen I
called for the inspection, come look at my house
and give me permission to put concrete.  And they
said, "Oh, you don't have a permit on file,
Mr. Grand."
      I looked at the contractor like he had three
heads.  I said, "What the hell is that supposed
to mean?  I'm spending a lot of money over here
to do a big, beautiful project for my wife to
make a nice house for her who is expecting so she
has a nice home birth, and you're holding me up
and you're wasting my time, and now I have to go
for a permit that you were supposed to pull,
Mr. Contractor."
      I said, "Okay.  Fine."  I said, "Mr. Monaco,
thank you very much for letting me know that we
don't have a permit on file.  We are going to
hold off.  We're not pouring anything right now."
      I sent the Amish away, and it cost me many
more thousands of dollars.  So I said fine.  I
then went to back to the drawing board, and I
went and filed the permit application immediately
thereafter following that run-in, if you want, of
the inspection by Mr. Monaco.  Not Nino Monaco.
Jason Monaco, the inspector.  Not Nino Monaco,

Deposition of Daniel Grand                          Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 229

the head of the department of buildings at a
later time, but they did work at the same time at
one point for a few weeks, and Jason's gone.
He's been gone for a long time.

So I called for a permit. I did the right
thing. I didn't try to deceive anybody. We put
gravel down, we called for a pre-pour, the city
said you don't have a permit. I said, okay,
we're not doing anything. I never got a stop
work order. I was told to go pull a permit. I
did what I was told, as usual.

I go -- I go for a permit and they said,
"Nope. It doesn't fit the needs of your house."
I said, "What are you talking about?"

"You are trying to put concrete and that will
eclipse your overall max area of floor plate."
I said, "No, it won't, even with concrete."
And they said, "Well, you have to dispute
that with the BZA."
I said, "No, I don't."

This is a simple thing: If you read this
ordinance very simply, in UHCO it talks about
concrete walkways and pads not needing to be
calculated against the floor area ratio of 25
percent. So I could essentially have all the

Page 230

walkways that I need to get around my house
because the people who envisioned the building
codes were a lot brighter than the people
interpreting and understood that you're going
to need to have a walkway around your house.

How do you guys walk over here? You have a
walkway naturally. Naturally. This is what it
is.

So I went and I said, "Okay. So what do you
want me to do?"

"Well, we're only going to give you this
little smidgeon so you can walk from part of your
driveway to your front door."

Not your side door, not your rear two doors,
but just your front door, which was ridiculous.
Come on now. Why are you giving me a hard time
already? What's going on over here? So that's
what happened there.

Now fast forward a little bit. They give me
one permit for a little bit of stuff, and I went
ahead and I poured that little bit of stuff, and
I got that little bit of stuff approved.

Now I have this big, massive gaping hole in
front of my house, and I said how am I supposed
to go from my house -- you see all this beautiful

Page 231

walkway and that is all ripped out and it's dirt?
So you have to walk every morning, you attorneys,
with your beautiful shoes and get them all muddy.
That's not fair. It's not fair at all. And why
should I? There was a path there before. You're
not letting me replace it now because that's
going to eclipse the amount of the square
footage.

I said, "Guys, this is a triple lot. What
are you talking about? I'm not even at 23
percent with all the concrete that I want to do.
I don't need a variance because nothing's over
300 feet that's countable."

They don't care. They interpret what they
want to interpret. They utilize the building
code and the interpretation of it willy-nilly
against who they want, when they want, and they
did that to me a lot.

So then I go and I say, "Okay. Fine. You
guys want me to go before the BZA. I don't want
to. I don't need to. I told you this already."

"Oh, we can't, Mr. Grand. Take it up with
them."

So I go for a BZA meeting, and I said, "Okay.
Here's what they told me to do. Here's the

Page 232

markup of the walkways. Here's the pad I want in
the back yard. Here's my front yard so I don't
have to walk in dirt. Here's a walkway to my
fourth door. I have four exit doors to the
house. It's a big house. What do you want me to
do?"

"No, Mr. Grant. You have to walk out in the
dirt. Nobody else has that many doors in their
house."

I said, "But nobody has a triple lot. What
do you want from me? To not be what I am?"

Q  Was there a resolution with the BZA?
A  They buried me so badly. They just took the
advice of all the people in another one of these
public hearings, another tar the Jew session. It
really is. Because at the end of the day, all
they want to do is just stick you in these public
hearings and harass you and say all intelligent
legalese, "Well, in the rules of this particular
case and the way we organize things, you don't
need this and it doesn't match the integrity and
the spirit of the law."

Come on.

Q  Was the matter ever resolved?
A  What?

Deposition of Daniel Grand                                    Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 233

1  Q  Was it ever resolved?
2  A  It's much deeper than you think.  It doesn't
3  stop there.  It goes for a lot longer and they
4  have been harassing me ever since.  It's still
5  not resolved.  No.  No.
6     I'd like to tell you what else happened.
7  Q  What else happened?
8  A  Well, if you think about it, I went to the
9  BZA meeting.  They didn't want to give me
10 anything, and I asked for a rear pad, I asked for
11 walkways, and then I asked for a front yard pad.
12 They said, "Well, we're going to have to get the
13 city engineer, Mr. Ciuni."
14    Mr. Ciuni is a very nice guy.  He came and he
15 said, "Well, I don't know what the Porters are
16 talking about."
17    They're worried about water runoff with this
18 patch of area that you bring up where my
19 friend's -- part of his car was in that had
20 stones that I took out that had gravel, that I
21 took out with little flakes of gravel.  I never
22 built up that area.  That's the biggest lie that
23 everybody ever said, and I have every kind of
24 proof to tell otherwise and show otherwise, and
25 the record speaks for that if you look at it.

Page 234

1     So, anyway, I said to him, "So you don't have
2  a problem with the front yard if I want to
3  concrete the whole area?"
4     Because it's much easier for me
5  to inadvertently -- inadvertently expand the
6  driveway.  If you look at the house profile, it
7  sort of looks like -- you see this little area
8  right here with my hand diagram I'm drawing on
9  the table right here?  Like you drive in,
10 wouldn't just you fill the whole thing in?  I
11 don't care that I'm trying to expand my driveway.
12 What's illegal about expanding a driveway?
13 There's nothing wrong with expanding a driveway.
14 And it wasn't even my intention.  I just didn't
15 want to walk in the mud.
16 Q  So what happened?
17 A  What happened was they said you cannot have
18 it, but I said, "Mr. Ciuni sent you a letter that
19 the city has that the mayor requested he comes
20 down."
21    We waited a month.  We waited another month.
22 We met again.  I met Mr. Ciuni.  He says, "Danny,
23 hunky-dory.  I love it.  It's fine.  I give you
24 full approval.  You got the city engineer's
25 blessing.  They should approve it for you."

Page 235

1     "Oh, no.  We're not going to approve it for
2  you, Mr. Grand."
3     So despite having Mr. Ciuni's letter stamped
4  and approved by the mayor's office, which is
5  another document in the data dump over here, they
6  still refused to give me the front area because
7  you're trying to expand your driveway too much,
8  you're going to have too much concrete.
9     I said, "Even if I have that concrete,
10 there's no runoff issues and I'm still under the
11 25 percent.  Why are you giving me a hard time?"
12 Q  Does that remain the case?
13 A  It does remain the case.
14 Q  All right.
15 A  Now, later on, there were like two more
16 variance meetings, and the mayor wanted to speak
17 about that, but he doesn't understand really the
18 matter of how it happened, to be honest.
19    So I go back and say, "Okay.  Fine."
20    Mr. McReynolds was now the building
21 department inspector.  Mr. Monaco gave me the
22 walkarounds and I have a permit for that.
23    Mr. McReynolds became the department building
24 inspector again after having been there for many
25 years before that between Monaco and him again.

Page 236

1  He said, "Danny, I don't see what they're doing
2  this to you for.  I'm giving you approval to make
3  a walkway from part of your driveway to the
4  second front door" -- because I have two front
5  doors -- "to the second front door."
6     So he went ahead and gave me a beautiful
7  walkway.  It was big and long, and it just gave
8  me enough space to walk.  And I have a carriage
9  and I didn't feel like I was walking in mud
10 anymore.  So I did that because he gave me a
11 permit to do that.  It's a walkway.  Walkways
12 don't count towards calculable square feet.  He
13 decided it was a walkway.  The permit says it's a
14 walkway.  That's what we did.  In the back yard
15 he gave me a walkway.
16    BZA gave me a hard time, but eventually gave
17 me a rear pad, which I also needed to go out of
18 my fourth door.  So they gave me -- Monaco gave
19 me the walkways around that got me to my front
20 door, front door one.  McReynolds gave me
21 permission to pour for front door two and rear
22 door one.  BZA gave me a concrete pad for rear
23 door two.  So now I have a normal walk around
24 your property with a little walkway type of deal
25 area permitted.

Deposition of Daniel Grand                                    Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 237

1 Dum, dum, dum. We come back to this thing
2 you talk about. When they gave me this bogus
3 violation that doesn't even exist -- 2063-20 is
4 not a codified ordinance at all. 1242.99, if you
5 want to read that one, the UHCO as well, what
6 that talks about is as a department of buildings
7 we reserve the right to issue violations. They
8 call that the non-violation violation. It's
9 nothing. There's no such thing for gravel. It's
10 not illegal to have stone or gravel anywhere on
11 your property, and I'm the only one getting
12 violations for gravel.
13 The lie, when you talk about this little
14 region over here, was, oh, you put extra gravel
15 after we gave you this violation. Excuse me.
16 That hearing was six months earlier. Six months
17 earlier you told me not to park there, and I
18 didn't park there. One friend of mine from New
19 York who doesn't know apples from Adams and Adams
20 from apples, and he comes over at 2:00 in the
21 morning, out of respect and courtesy I don't move
22 my other two vehicles, and he parks his car there
23 overnight for three hours, and now I have the
24 police investigating and issuing tickets
25 haphazardly because they were incorrect. It

Page 238

1 should have been the building department, which
2 they came later and they did.
3 How do you like them apples?
4 Q All right.
5 A So, as I said, it's all nonsense.
6 Q My question is has it finally been resolved?
7 A I'm trying to get to that. So here's what
8 happened next. Okay.
9 So then they came. They gave the tickets.
10 It's a joke. The tickets are fake. The
11 violations are fake. The area you're talking
12 about was all dirt. It stayed dirt. This
13 idea -- okay. I'm going to tell you something
14 very important for you. This idea that I added
15 gravel is easily disprovable. Why? Because I
16 have a picture from 2020 when the Amish came
17 where they didn't pour yet all of the Monaco
18 walkways, that included the graveled up area of,
19 we'll call it, the subject Bermuda Triangle --
20 it's shaped like a triangle -- the Bermuda
21 Triangle. Okay. That was covered in gravel from
22 head to toe as well at that time. There was no
23 accusations of parking there. It was just gravel
24 because you have to pre-pour, you have to tamp
25 it. Okay.

Page 239

1 After the Monaco walkways, after the
2 McReynolds walkways, I'm left with the Bermuda
3 Triangle. But don't forget, when the BZA gave me
4 that big expansion in the back, I scooped out all
5 the gravel to save a little money. I took out
6 all the gravel in 2020, and I brought it to the
7 back to use the gravel in the back, which is what
8 I did. And then what you have left in the
9 Bermuda Triangle is a bunch of little scattered
10 fragments of gravel from 2020.
11 That had nothing to do with the BZA meeting.
12 That had to do with complying with the other BZA
13 meeting that gave me the rear pad. So it had
14 nothing to do with the Bermuda Triangle aspect of
15 it. I took it away from there. I didn't put it
16 there after they denied me and my friend parked
17 there. It wasn't even me.
18 Mr. McConville is on record saying that I'm
19 the person who went ahead and parked there. It
20 wasn't my car. The ticket was issued to a
21 Virginia license plate guy. They knew who it
22 was. It was my friend, not me. I never got a
23 ticket. I never got anything.
24 What did I get? I got hit with another fake
25 violation because they had nothing on me, but

Page 240

1 they wanted to stick it to me and they wanted to
2 harass me.
3 What did they do? They made me out to be
4 somebody who's manipulative and misleading when
5 it's a fallacy. I didn't do anything with that
6 area. And my friend parked there unknowingly one
7 time for three hours and never again. And people
8 parked there before because there used to be
9 stones there, not the fragments of gravel, but
10 actual paver stones, and the satellite photos
11 will show you that from 2018.
12 Now fast forward. I said enough of this
13 because it's really getting on my nerves, and
14 here's where the defect lies. This is when I had
15 a 12-foot driveway.
16 I had then said you know what? You should
17 have been honest with me. You all at the
18 department of buildings and the zoning department
19 should have been fair with your constituent here
20 and your resident here. Like Beachwood,
21 Beachwood has a liaison department that you can
22 plan with them and they help you to get your jobs
23 accomplished. These are adversarial people who
24 want to malign me and lie and give me violations.
25 That's what I'm dealing with.

Page 241

So I said what can I do? And I came up with a great idea. I said you know what? They're really iffy and spiffy biffy, whatever, about the Bermuda Triangle zone. I said wait a minute. Why not try the other side? Let me go the other way.

So I said "Fine. How big of a driveway am I allowed to have? Can anybody tell me?"

Because this 12-foot little driveway getting out of my wife's minivan and my kids are walking on mud or my wife is walking on mud is getting on my nerves. And I've been doing this for a year and a half simply trying to get a little thing done, and they wouldn't do, even though the engineer said it's no problem.

So who stopped them? The mayor. Because they told me the mayor did. Fred White told me the mayor said no and Luke McConville said no. Okay. Thanks a lot boys. Go on.

So what did I do? I said fine. I don't need variance. I don't need BZA. I don't need any of you people. I'll outsmart you. And I outsmarted you bad guys. Okay.

How did I do it? Because I said I want to have the rule on how big of a driveway I'm

Page 242

allowed to have.

"Mr. Grand, you're allowed to have a driveway 19 feet wide."

I said, "What's my driveway now?"

"12 feet, Mr. Grand."

I said, "So I can have 19 wide." Because your garage dictates the width. If you have a 19-foot garage, which I guess we accidentally approved before we knew we were Jewish, but now that you have it --

**Q  They didn't actually say that.**

A  Obviously.

**Q  All right.**

A  But you see that. It is very clear in the fact that it's been two and a half years that they know what I'm trying to do, but nobody was forthcoming and spent five seconds to say, "Danny, why don't you take the 19 feet the other way? You don't need to expand your driveway in a way that you're not allowed to. You have it as a code. You don't need the variance."

I had to think about that on my own. Not the architect. Not the engineer. Not the first architect. Not the three department buildings. Not all these city seven department heads and

Page 243

chiefs that are all in the room. Not the mayor. Not McConville. Interesting. This guy.

**Q  So the matter is now resolved?**

A  No, it's not. I'll tell you why.

**Q  Why is it not?**

A  I'm going to tell you why. Because now they keep going. They don't stop. Because now I go ahead, we fast forward to the driveway, a big beautiful rounded driveway was poured. They let me do it two days before October ended. How do you like them apples? And they cut off permits in November. They don't let you pour from November until pretty much April because they don't want it to be a problem. It's too cold for concrete to set.

**Q  Yeah.**

A  So I said, wait a minute, I could file -- and I filed another permit and I got 19 approved. They couldn't say it, but they were so pissed off. They were mad. They were really upset because they couldn't get over the fact that I outsmarted them.

**Q  Who was that?**

A  The administration.

**Q  Who did you talk to --**

Page 244

A  They kept saying you can't get it --

**Q  Who did you talk to that indicated they were mad or that gave you an indication they were mad?**

A  The indication that mad came from the result of them tarring Mr. Fred White publicly at a hearing, and Mr. Fred White was forced and compelled to say at a hearing, "Well, Mr. Mayor, I would have allowed something like that in other jurisdictions."

Because the mayor was trying to get him to say "You would never allow that, right?" But he couldn't do that. So he had to tell the truth and he wound up getting fired a few weeks later. I don't know if there's any connection to that, but, hey, come on now. That's how I feel. I don't know if it's true or not. But that's what happened. He got fired right away.

So I get the 19 feet, and look at the irony of this, they gave it to me two days when it's cold and you're not -- and I had to go through all this stuff. So I go and do what they want. I followed their rules. I put the vapor barrier I put six inches instead of four. I did everything they asked me to do to comply with the law as usual, which they could have told me two

Deposition of Daniel Grand
Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 245

years earlier when they failed to do that for
whatever reason you want to make up.

And then low and behold, they refuse to sign
off the concrete job. They refuse to sign it off
to this day, and they issued me a violation for
the concrete on there to this day.

And I asked the guy, I said, "Okay. Sir,
Officer Inspector, do me a favor. Can you tell
me the basis for why you're denying me sign-off
for this concrete driveway?"

And he said, "I don't like the way it looks."

I said, "That's fine. It doesn't matter how
it looks. I'm asking you" --

**Q   Who was the inspector?**

A   I think it was Cook. I could be wrong. I
could be wrong, but it's written on the documents
from that time.

**Q   All right.**

A   So he says to me, "Well, I don't like the way
it looks. I'm not signing this off."

I said, "Okay. I'm sorry. I had a pre-pour.
It was already poured the way we were told to
pour it. We did everything you guys asked and
now you want to say it doesn't look good? How is
it supposed to look the same? This is brand new

Page 246

concrete next to a driveway that's 30 or 40 years
old. How are they supposed to look contiguous?
They can't."

So he doesn't want to -- I'm almost done.
We'll get back to the Bermuda Triangle.

So the concrete of the 19 feet driveway, they
still today won't pass. They left a violation on
my head again.

**Q   Did you have a pre-pour inspection?**

A   And I passed it.

**Q   All right. And did you have an inspection
after it was poured?**

A   Yeah, I did, and they failed it.

**Q   And did they say why?**

A   Yeah. They didn't like the way it looks.

**Q   How was the concrete mixed?**

A   Ask Osborne.

**Q   You had Osborne deliver it?**

A   Osborne delivered, but also they had the
fiber additive and I had mesh. I went above and
beyond to do it because I knew they were going to
give me a hard time.

But what did they say? "Oh, we don't like
the finish."

Dude, I did a broom finish. That's a

Page 247

standard finish. It's totally allowed. It's
totally what I want to do, and I did.

And then he comes back on expansion joints.
"I don't see the expansion joints."

I'm like, "Well, look a little closer.
They're all there."

I put all the expansions in. I know how it
works. Look, when you have grass or you have old
concrete, those two areas, whenever you're
meeting with them with new concrete, you've got
to put an expansion joint in there. So every
single place in these -- and I cut the lines
beautifully, the way I wanted them, and they
matched the old lines. They're just giving me a
hard time. And that's okay.

So now I'm back at the next thing and the
last thing over there for this concrete
controversy, which is all fictitious, garbage
nonsense, with all due respect to everybody here,
but I'm saying in general because this is what
they did to me.

The Bermuda Triangle. So I said you know
what? I got the 19. That's all I ever wanted.
I didn't want some industrial parking space for
10,000 cars that they all accused me of in public

Page 248

hearings. All I really wanted was my wife and
kids not to have to fall in the mud.

You see, the reason is very simple.
Everybody else on that block --

**Q   Just tell us what happened with the Bermuda
Triangle, if you would.**

A   Fine.

So after I got the 19, I said now I have to
go from this other side of my house to get to my
second front door, and I still had this big muddy
triangle. So now I've got to walk 25 feet this
way just to get to the other side, so go 25 feet
back that way. It's ridiculous. I said I just
want to put paver stones -- actual walking path
paver stones as a walkway because they're not
going to give me concrete, even though I should
be able to have concrete. Ciuni said I could
have it all concreted, but they won't give it to
me, and I don't want to waste any more time.

So what did I do? I looked at the codes, and
I called up the building department, I said, "Do
I need a permit for pavers?"

She says, "You don't need a permit for
pavers."

I said, "I can put down paver stones?"

Page 249

She goes, "As long as it's not more than 10 feet away from your house, we're not going to ask you for pavers."

I said, "Okay. Fine. So if I put 10 feet of pavers, and then I put a little bit of shrubs or some decorative elements or something like that to indicate that I'm not expanding the driveway, they're not going to come give me a hard time, are they?"

"Absolutely not. No problem, Mr. Grand. Thank you."

Okay. Fine.

I started to put paver stones in. Weeks after I was complete, Vivienne Porter shows back up from Florida or wherever, and she calls up again on me, and she says, "He built the whole thing and a thing" -- and I got a whole 'nother response.

Luke McConville and the mayor specifically chose to issue a stop work order to me for the paver pathway that I legally put in with permission and blessing from the building department. This is the fourth or fifth time building department representatives, particularly in this case, the man who came with the red tag

Page 250

stop work order said, "I don't know why I'm here. The mayor told me to come here. He told me to give you this. I've never inspected the place." Literally what he told me.

Q  Who was the inspector?
A  I don't know his name. He was definitely somebody who's still there now and it wasn't Silas Brown. It was another person who works for the city as an inspector who handed it to me. He said to me clear as day, "I wasn't ever here. I never inspected. I've been informed to go by what the mayor told me and what Mr. McConville told me to issue this and tag you with a stop work order."

For what?

So this is now today I have a stop work order on my paver path. I filled it in with nice, big rock boulders and a nice decorative table so it shows that in this triangular area you can drive up the driveway to the garage, and you can now just walk on this little narrow 10-foot path, instead of walking 25 and 25, you just walk straight across 10 feet, and I have these big rocks that show you can't pull up your car in the area where my friend one time that got a ticket

Page 251

put his car.

And that's what really happened.
(Recess had.)
BY MR. CLIMER:
Q  One of the issues you have is you do not have a certificate of occupancy, correct?
A  One of the issues I have is I was not issued a formal certificate of occupancy. However, I'm aware the city did issue one, but they refused to give it to me.
Q  Okay. Who refused to do that?
A  I believe it was Geoff Englebrecht who's holding it back.
Q  Okay. Do you know when that was issued?
A  It's stated in the docs. It's got a sticky note on it. I don't recall exactly the date, but it's there.
Q  Okay.
A  It should have been issued way long ago.
Q  You've alleged a number of different causes of action in this case. Among them is a claim that your rights under the 4th Amendment not to be subject to unreasonable searches was violated. And my question to you is does that relate to the Porters' cameras?

Page 252

A  I'm going to ask my attorney to tell you the answer to that. I respectfully, as you know, didn't complete law school yet, so I -- that's above my pay grade today, Mr. Climer.
Q  Fair enough. If you don't know, you don't know.
A  Wish I did, but ...
Q  We've talked about the public records issues, correct?
A  More or less, yes.
Q  All right. You've alleged a claim under the Free Access to Clinics Act. Do you conduct any medical procedures in your house?
A  I don't know if that's all the FACA Act speaks of, sir. It's also barring places besides that.
Q  I'm sorry?
A  I defer any legalesque question. I'm going to have to say speak to my attorney. I don't know.
Q  I want to talk to you about your familial relations. You've been able to continue through all of this to fulfill your duties as a father, correct?
A  What does that mean? What are the duties of

Page 253

1 a father?
2 Q  You still have a familial relationship with
3 your family, you've been able to keep up
4 relationships with your wife, your family, your
5 kids, correct?
6 A  To what degree?  I don't know what that
7 means.  Do I see my kids every day?  They live
8 with me.
9 Q  Okay.  You continue to handle your financial
10 affairs, correct?
11 A  If you look at my books, you can see that the
12 past couple years since this whole thing happened
13 have not been as pretty as they were when I first
14 came here for sure, no.  So I would say not on
15 the same level at the moment, no.
16 Q  But, nevertheless, you were able to provide
17 for your family.
18 A  I'm going to tell you the truth.  A Torah Jew
19 like myself, what we do as far as our work, or
20 whatever, is called, achrayut, but your parnasa,
21 the sustenance that you receive, is from God.  So
22 does God continue to provide for me while I've
23 been on the earth?  Yes.  I don't think I have
24 really much else to do with that in my religious
25 belief system.

Page 254

1 Q  How would you characterize your relationships
2 with your family; good, bad, indifferent?
3 A  When you say my family, are you referring to
4 my wife and my children?
5 Q  Yes.
6 A  How would I characterize my relationship with
7 them?
8        MR. GROSS:   I'll object.
9        You can answer.
10 A  My relationship to them?
11 Q  Yes.
12 A  Kids are pip squeaks.  They're little and
13 cute.  I think my oldest child is 7, and then 6,
14 and then 3, and then 1 and a half.  So how much
15 can you relate to them?  It depends how you ask.
16    If you ask like how you and I can relate to
17 each other, you're a senior to me, and I can
18 still look up to you and have a conversation and
19 learn something from you.  You know, my kids are
20 still tiny.
21    And my wife, I love my wife and she's
22 dedicated to working hard to take care of our
23 family, and I'm proud of her.
24 Q  Very good.  I want to talk to you about
25 damages in this matter.

Page 255

1    You claim that your house is suffering a
2 stigma, if I understand it correctly.  Tell me
3 about that.
4 A  I mean, it seems pretty clear that nobody
5 wants to touch the place.
6 Q  Okay.  Have you had it listed with a realtor?
7 A  Yes.
8 Q  Who's that?
9 A  She's from Berkshire Hathaway.  Friedman
10 maybe.  Sharon Friedman might be the name.
11 Q  Have you had any offers?
12 A  We have not.
13 Q  Have you had anybody tour the house?
14 A  I had thus far three families:  Two were
15 doctors, one was an Indian descent; one was an
16 Irish Catholic descent; and one dean of the
17 school, an African-American family.  So three
18 people who are well to do came and that was it.
19 Q  How long has the house been on the market?
20 A  Around -- it was ultimately less than a year.
21 I don't know the status if it's technically still
22 listed or not right now.  I don't know what
23 Sharon's up to.  I really don't know.  I don't
24 know.
25 Q  What was the initial asking price?

Page 256

1 A  It was I believe 975.
2 Q  What was it last listed at?
3 A  I believe we tried to go -- so I was willing
4 to take a much lower number than what the real
5 valuation should be, and I think I said 799,999,
6 799,999, and let's just get out of here, please.
7 Q  And you're not sure if it's still listed or
8 not?
9 A  You know what?  It is.  I think that you
10 get -- every agent you deal with has their own
11 set of contracts, and it's sometimes six months,
12 sometimes it's a year exclusive, sometimes it's
13 six with a three bump, and a three bump, and a
14 three bump.  So I don't know if she's bumping or
15 not bumping.
16 Q  Okay.  I'd like you to give the contact
17 information for your agent to your attorney, if
18 you would, please, and produce that.
19 A  I don't see why not.
20 Q  You've also alleged that you've been unable
21 to earn income from a home business that you
22 planned to engage in.  Tell me about that.
23 A  Can I see what you're referencing?  Because
24 I'm not really clear.
25 Q  It's a demand letter.

Page 257

1 A  Can I see it, please, so I can see what's
2 written there?  I would feel a lot more
3 comfortable with that.
4 Q  **I don't want to have it entered as an**
5 **exhibit.  I'm just using it for a reference.**
6 A  I'd like to reference it as a non-exhibit,
7 too.
8 Q  **I mean, did you plan a home business?**
9 A  I would like to see what he wrote.  I didn't
10 write that document, per se.  That was written by
11 another human being.  I would like to see what he
12 wrote.
13 Q  **I understand.  I'm just trying to understand**
14 **if you did or didn't plan to engage in a home**
15 **business.**
16 A  I want to call this up on my own device if
17 you won't give it to me.
18 Q  **If you want to look, that's fine.**
19 A  Yeah.  I want to look at it.  Thank you.
20 Q  **I'm looking at item 3.**
21 A  Thank you.
22 Q  **So what is the home business that you planned**
23 **to engage in?**
24 A  Okay.  This talks about me and my wife.  You
25 were asking about me only.

Page 258

1 Q  **Yes.**
2 A  When I wanted to have a certificate of
3 occupancy in my house, I was told they wouldn't
4 issue me one because of exterior violations that
5 existed on the property.  I said it makes no
6 difference if there's exterior violations.  You
7 still receive a C of O.  That's the rule.  And
8 part of that was I wasn't able to apply for a
9 home occupancy permit for the purposes of working
10 from home.
11     I wanted to conduct online sales from home,
12 and I'm not sure if my lawyer has written that in
13 this letter as far as what I would also say I
14 would want to do from my home, but I wanted to do
15 something called -- actually, it's kind of a
16 funny name, but it's called BUTT Camp.  So BUTT
17 Camp is where people come from all around the
18 world who want to understand more about business
19 and more about how to be a businessman and how to
20 file your own documents for incorporating and
21 things like that.
22     So they come sit with you in a chair in your
23 house, and they spend $1,000 bucks or 2,000
24 bucks, and they come and visit, and they stay
25 with you for two or three days, and it's

Page 259

1 basically like an emersion session in how to be a
2 businessman.
3     I was never able to do that because I was
4 treated like terribly and unfairly by the city so
5 much.  And if I would have had -- I had one
6 friend come over and I'm getting complaints --
7 you know that -- from the Bermuda Triangle.  My
8 friend from -- his pickup truck --
9 Q  **So you're --**
10     MR. GROSS:  Slow down.
11 A  So I was never able to do it.
12 Q  **Your contention is because you didn't have a**
13 **occupancy permit, you were unable to get a permit**
14 **to do the home business?**
15 A  I was told that I would not be given a home
16 occupancy permit because I didn't have a
17 certificate of occupancy.
18 Q  **Okay.**
19 A  Only when I got lawyers involved many years
20 later did they say, "Oh, we can issue you a
21 permit to work from home without issuing a
22 certificate of occupancy."  But it's funny
23 because that application --
24     THE WITNESS:  I'm sorry.
25     I'm going fast.

Page 260

1 A  But it's funny because that application that
2 you file for home occupancy permit, which is what
3 you can call a work-from-home permit, that even
4 says on it that you need a certificate of
5 occupancy to be able to apply for it.  So it's
6 clear from the department applications that you
7 can't really, legally, if you want to follow the
8 law, apply for a home occupancy work-from-home
9 permit without having in your custody a
10 certificate of occupancy.
11 Q  **So I want to back up.  You were told at first**
12 **that you couldn't get a work-from-home permit**
13 **without a certificate of occupancy.  Who told you**
14 **that?**
15 A  The department of building's representative
16 and the application itself says that.
17 Q  **Who was the rep that said that?**
18 A  I don't know.  One of the girls who works in
19 the office over there.
20 Q  **You were later told that you could get a**
21 **work-from-home permit event without a certificate**
22 **of occupancy.  Who told you that?**
23 A  I wasn't told that.  I think we were aware of
24 that from maybe an email.
25 Q  **Did you ever then apply for that permit, the**

Page 261

1  work-from-home permit?
2  A  I did.
3  Q  And was it granted?
4  A  Eventually it was granted.
5  Q  Okay.
6  A  But, again, they bent the rule that they
7  shouldn't have bent, per se, if they followed
8  their own rules.  And why are they bending the
9  rules for me now?  Because they're probably
10  scared of me at this point and they know they did
11  wrong.
12  Q  How long was it from the time you first
13  wanted to get the work-from-home permit until the
14  time it was ultimately issued?
15  A  Well, I would say that I would have wanted to
16  work from home from the day I moved in
17  realistically until the day that I got the
18  permit.
19  Q  When did you first try to get the
20  work-from-home permit?
21  A  I was told I couldn't get one from the
22  beginning.  So then I went to apply only after
23  they said, okay, we'll give you one, which was
24  just a couple of months ago.
25  Q  All right.  When were you told you couldn't

Page 262

1  get one?
2  A  When I asked about it probably early 2020 if
3  I had -- if I had to guess, I think it would be
4  around that time.
5  Q  You did finally get it a couple months ago?
6  A  I didn't apply for it until a couple of
7  months ago, and maybe after three weeks or a
8  month after having applied for it it was
9  approved.
10  Q  Okay.
11  A  So I would say it was a reasonable amount of
12  time that if they would have just said we didn't
13  give you a C of O, we should have given you a C
14  of O -- a certificate of occupancy, C of O -- but
15  we'll let you apply for the work-from-home permit
16  anyway -- they didn't say that.  They said that
17  you wouldn't be able to get one.
18  Q  Your wife is a speech therapist?
19  A  An SLP, licensed speech language pathologist,
20  yes.
21  Q  Okay.  Where's her license held?
22  A  I don't know if she's still current and
23  active in New York, and she did have her license
24  transferred to Ohio.  I know that she was active
25  for all this time.  I think she still pays her

Page 263

1  dues and keeps current with her continuing
2  education requirements as well.  I can't speak
3  for her, but I can safely say that she's mostly
4  still licensed.  And if it lapsed in the past
5  week or two, like she just gets behind schedule
6  with the kids, but she's kept it current, if
7  that's the point.
8  Q  And you also indicated that you intended to
9  conduct a day care at your house.
10  A  So my kids are homeschooled, and they would
11  benefit from having more social interaction, and
12  my wife liked the idea from day one of doing a
13  day care because University Heights is very
14  flexible.  You can have seven kids as a schedule
15  A or class A type establishment for day care
16  without any kind of permitting at all, and you
17  can go up to 12, but she was hesitant because
18  you've got to go before the -- maybe BZA, one of
19  the boards, to get permission.  So you've got to
20  come in front of your peers again, and she never
21  really wanted to deal with that after what had
22  transpired for sure.
23      And the city never even gave us a C of O.
24  So, again, you need a work-from-home permit if
25  you're going to be a class B.  So it would have

Page 264

1  never happened because the city would never give
2  the C of O.  So they pinned us down.  And to this
3  day have never given us the C of O.
4  Q  Your wife never applied, though, correct?
5  A  She never applied because the application
6  says you can't without a C of O.  We did ask for
7  the C of O over and over and over again, and we
8  were told no.
9  Q  You've alleged that you've incurred emotional
10  distress as a result of this.
11  A  Oh, come on.
12  Q  First of all, have you gained a -- have you
13  sought out any psychological counseling or
14  treatment of any kind?
15  A  Are you talking about me alone?
16  Q  Yeah.
17  A  I don't want to be rude, but I've been
18  through a lot of stuff in my life, a lot of stuff
19  that would make the average man crumble and fall.
20  I'm not that type to go asking for people to talk
21  to and give me medication and stuff so ...
22  Q  So the answer is no.
23  A  Yeah.  But it doesn't mean that I didn't need
24  it, and it doesn't mean I wasn't shaken up and I
25  wasn't put in a bad position, but I just don't

Deposition of Daniel Grand                           Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 265

1 handle things that way.
2 **Q  Tell me how this has affected you.**
3 A  What do you mean?  Emotionally?
4 **Q  Yeah.**
5 A  For starters, for a long period of time
6 having three cameras pointed on you knowing the
7 city's behind it -- I mean, acceptant that it's
8 going on -- it's nerve wracking.  You feel like
9 the paparazzi is following you around, but you're
10 not getting paid the movie star money over here.
11 It's a very uncomfortable feeling.
12     People are up your nose.  They're talking
13 behind your back.  They're slandering you.
14 They're libeling you.  They're insulting you.
15 They don't want to work with you.  They don't
16 want to talk to you.  They make you feel like you
17 have to kind of watch out where you're going and
18 look over your shoulder.
19     You're better off putting a hat on because if
20 they see your yarmulke, then you never know what
21 you're going to get, calling out names.  It's a
22 terrible thing if you think about it, but I
23 understand it.  I understand it better than most.
24     If you look at Ignatius Loyola, founder of
25 the Gesu people, he put out a decree in the 1600s

Page 266

1 that says that Jews cannot enter into the Gesu
2 establishment or the Gesu order for five
3 generations, and it wasn't until 1979 that John
4 Paul, II, abolished and decree.  So all the baby
5 boomers are like no Jews allowed.  It's the
6 truth.
7     So knowing that, it's very damning.  It makes
8 me feel very discomforted.  There are deed
9 restrictions in the books at University Heights
10 today that we won't sell to blacks or Jews.  Deed
11 covenant.  It's publicly known.  So there's a
12 big problem over here with a certain aspect of
13 University Heights.
14 **Q  Do you know when those deed restrictions were**
15 **written?**
16 A  I know that they were throughout the '20s to
17 the '50s, maybe even '60s.  Might have gotten
18 quashed in the civil rights era perhaps.
19 **Q  Do you know if they're enforceable in this**
20 **day and age?**
21 A  Do I know that those deed restrictions are
22 enforceable?
23 **Q  Yeah.**
24 A  No.  I said historically that's what's gone
25 on in that neighborhood.

Page 267

1 **Q  Okay.**
2     MR. CLIMER:  Let me have
3 just a second.
4     I believe it or not, I think
5 that's all we got.
6     MR. GROSS:  Okay.  I'm
7 going to do, hopefully, a quick
8 cross exam.
9     - - - - -
10     EXAMINATION
11 BY MR. GROSS:
12 **Q  Mr. Grand, I'm going to ask you a few**
13 **questions now.**
14     **First set is about the planning commission**
15 **hearings on March 4th, 2021, and the follow-up**
16 **meeting on March 23rd, 2021.**
17     **Question one, why did you get an attorney for**
18 **those meetings?**
19 A  I think I was told to.
20 **Q  Do you remember by who?**
21 A  Could have been Ms. Thomas maybe or maybe
22 Michele Weiss or somebody from the city.  I don't
23 know exactly who, but I wouldn't have done that
24 on my own.
25 **Q  In writing or oral?**

Page 268

1 A  Might be through a phone call.  I was
2 advised -- not advised.  Wrong word.  I was told
3 I would need an attorney present.
4 **Q  Did you know in advance of the March 4th**
5 **hearing that it would be a quasi-judicial**
6 **proceeding?**
7 A  I had no idea.  Nobody told me.
8 **Q  Okay.  So you did not know that you would be**
9 **in a situation that would be like a court of law?**
10 A  No, I did not know that I would be in that
11 type of situation.
12 **Q  And you did not know that there would be kind**
13 **of the interrogation of witnesses with**
14 **cross-examination?**
15 A  No, I did not.
16 **Q  And under oath?**
17 A  I did not know I would be under oath.
18 **Q  Did you know that you would have a certain**
19 **amount of time and then you would have to rest**
20 **your case and that your case would be closed?**
21 A  I was not made aware of that by anyone, not
22 until the day of the meeting.  At the time the
23 hearing started, Mr. McConville rambled off some
24 things.  That's the first I heard of it.
25 **Q  So it was not your understanding that after**

Page 269

1  that meeting the record would be closed and you
2  would not be able to supplement the record
3  afterwards?
4  A  I started to find that out midstream in the
5  hearing, and I protested and begged for them to
6  let me bring some stuff out, and they kept
7  telling me no.
8  Q  Okay.  So this one document, this is the only
9  document -- I'm going to put that over there.
10      MR. GROSS:    Can we put
11      this as, I guess, Plaintiff's
12      Exhibit 1?
13      - - - - -
14      (Plaintiff's Exhibit 1 was
15      marked for identification.)
16      - - - - -
17 BY MR. GROSS:
18 Q  I'll give you a minute to review it.
19      Have you seen this document before?
20 A  This is a very long email chain, multiple
21 people writing messages.  Yeah, I have seen these
22 emails before.
23 Q  Okay.  So in the interest of time, I'm going
24 to take us through it pretty quickly.  So if you
25 can go to the last page, so this is on -- if you

Page 270

1  can look with me --
2  A  Second to last page?
3  Q  Sorry.  The second to last page.
4  A  Okay.  Second to last page.
5  Q  You can see where after the first paragraph
6  it says on March -- on 3-11-2021?
7  A  From Kelly Thomas.
8  Q  Kelly Thomas.  Okay.
9      And she wrote, Mr. Grand, the University
10 Heights Planning Commission will hold a special
11 meeting on March 23rd at 7:00 p.m.
12 A  Yeah.
13 Q  Okay.  So this is the first that you heard
14 that there was going to be this meeting on March
15 23rd?
16 A  I knew that there was the original meeting
17 being tabled.  Normally once a hearing concludes,
18 they'll do it again on their next monthly
19 scheduled time, which would be a month later.  I
20 thought when I left the meeting, that's what I
21 was set up for.
22 Q  Was this the first --
23 A  When I saw this, it was a surprise, and it
24 was the first time that I knew I'd be having to
25 be coming again on the 23rd.

Page 271

1  Q  Okay.  So that's the first time.
2      So then moving to what would be the --
3  counting from the front, the second page.
4  A  Okay.
5  Q  Okay.  So there's an email from John Rach on
6  this on March 16th, 2021.
7  A  Rach?  Mr. Rach.  Yeah.  I see that here in
8  the middle.
9  Q  Okay.  So when you read the second sentence
10 in the second paragraph -- well, let me go back.
11     In his first sentence he says "if I can weigh
12 in on what I'm looking for."
13 A  Okay.
14 Q  So did you understand that sentence to mean
15 that Mr. Rach was looking for something?  How did
16 you understand the sentence?
17 A  Just like you describe it, yeah.  My previous
18 email says that.  Yeah.  Mr. Rach asked me for
19 some things at the hearing, but they never were
20 very clear, and they were never given to me, so I
21 was still looking for them.
22 Q  So the second sentence he says "That being
23 said" -- do you see that second sentence?
24 A  Yeah, I do.  The first sentence of the
25 second -- it's the end --

Page 272

1  Q  Sorry.
2  A  Second paragraph, beginning of the second
3  sentence, the first line of it, yeah.  "That
4  being said."
5  Q  He writes, "That being said, we would need
6  floor plans from an architect indicating the
7  allowable size," and he asked for a couple more
8  things.
9      Did you understand from that that he was
10 asking you to provide documents?
11 A  Absolutely.
12 Q  Okay.
13 A  Architectural renderings take a long time.
14 Q  Okay.  Great.
15     And then going up to the first page, to the
16 next day, on March 17th, 2021 --
17 A  Yes, I see that.
18 Q  -- so that says "Mr. Grand and
19 Mr. Rosenfeld."
20 A  Who's this from?
21 Q  This is from -- well, you tell me.  On March
22 17th, 2021, do you see where it says --
23 A  "Michael Brennan wrote."
24 Q  Is this from Mayor Brennan?
25 A  Yes.

Deposition of Daniel Grand                                    Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 273

Q  Okay.  And in that first paragraph he says "At the meeting of March 4th, 2021, the Planning Commission tabled the matter without discussion or deliberation, even though you had closed your case as applicant."

Do you see that?

A  We were told to close our case.  Yeah, I see that.

Q  Okay.  So then he says in the second paragraph, "Any additional testimony or additional evidence/materials for or against the application is closed for purposes of this meeting."

A  Second paragraph.

Q  Second paragraph.  It's the second line in the middle of the line.

A  Yeah.  It says there on the 17th now that I wouldn't be able to supply any additional evidence or anything like that for this application.

Q  Were you surprised by that?

A  It makes no sense.  It's very unfair.

Q  Okay.

A  Surprised, yeah.

Q  Okay.  And then -- so your lawyer asks, "Was

Page 274

Danny advised that you had decided to turn that first meeting into a quasi-judicial format?"

A  Where am I looking?

Q  Sorry.  It's --

A  The very top of the page?

Q  No.  It's right in the middle of the page where it says "Was Danny advised."

A  So on March 17th, 10:39 a.m., "Was Danny advised that you had decided to turn the first meeting into a quasi-judicial format?"

It looks like the lawyer sent that to Mr. Brennan, Mr. Rach, myself, and Mr. Thomas.

Q  Who do you understand that question being directed to?

A  It seems like it was really being sent back in response to the mayor.

Q  Okay.  And --

A  It also seems like --

Q  -- the mayor responds --

A  -- nobody knew about it.

Q  So look in the blue at the top of the page, the first email all the way at the top of the page.

A  Got it.

Q  Okay.  So what does the -- in your own words,

Page 275

if you could qualify how you understand the mayor's response in response to the question "Was Danny advised that you had decided to turn the first meeting into a quasi-judicial format?"  How did the mayor respond?  What is your understanding of that?

A  He tries to throw course to the wind and make it as though Mr. Rosenfeld should have known.  He goes on to suggest in the affirmative that it's well known that special use permits in their application process hearings are always quasi-judicial.

Q  Was it known to you?

A  Not at all.

Q  And so is the mayor, in your understanding of his answer, saying that he did or did not advise you in advance -- or rather I should say in response to the question is he saying that you were or were not advised by him?

MR. CLIMER:   I'm going to object, but go ahead.

MR. GROSS:   Okay.  I will reframe the question.

You know what?  I'll leave it as is.

Page 276

A  Can I say something?

Q  No.  We'll keep it short.

So let's go -- we're done with that document.  So I'm going to ask you a few questions about the cease and desist letter.

A  Okay.

Q  Has anybody from the city officially told you that the cease and desist letter has been lifted?

A  Nobody has told me that.

Q  Okay.  Is it your understanding that it is still in effect?

A  Yes.

Q  Okay.  And it is your understanding that it has been continuously in effect since 2021?

A  Since it was issued.

Q  Okay.  And at the March 23rd hearing -- you were not there, but have you seen the video.

A  It's just very short, but I saw it much later on, yeah.

Q  Okay.  So you saw that video.

Moving on.  Next is gin up opposition.  So on January 21st, 2021, when you first spoke to the mayor on the phone, did you tell the mayor that you did not intend to convert your home into a synagogue?

Case: 1:22-cv-01594-BMB  Doc #: 80  Filed: 01/26/24  70 of 101.  PageID #: 1296

Deposition of Daniel Grand                                    Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 277

1 A  Yeah.  They misunderstood me.
2 Q  Okay.  Did he, nevertheless, continue to
3 accuse you of making it into a synagogue?
4 A  Very much so.  He blew right past me and
5 didn't believe a word I said for some reason.
6 Q  Okay.
7 A  It was my house.
8 Q  So when they sent out the meeting agenda --
9 A  Which?  For the first meeting on the 4th?
10 Q  For the first meeting.  Did you give the city
11 language for the meeting agenda item?
12 A  Really, no.  That language was adopted from
13 the cease and desist order that they put out
14 before they really ever had a chance to talk to
15 me.
16 Q  Okay.  And --
17 A  I always objected to all the meetings to the
18 characterization of it.
19 Q  So prior to that meeting, did you provide
20 your neighbors with that document that we've
21 seen?  We've established that you provided them
22 with that.
23 A  Through my wife.
24 Q  Okay.  That's fine.
25 A  She is more likeable.

Page 278

1 Q  So that letter was then provided to the
2 planning commission as far as you know?
3 A  That letter was sent to Ms. Thomas, and I saw
4 an email that she sent it to the council members,
5 the planning commission members.
6 Q  And would you say that that email, in your
7 mind, set forth enough information that a reader
8 who was fair minded would be able to understand
9 that you weren't trying to convert your house
10 into a synagogue?
11       MR. KELLEY:  Objection.
12       MR. CLIMER:  Objection.
13     Go ahead.
14 A  If anyone were to read the documents that I
15 submitted with a fair mind, they would conclude,
16 you know, prima facie, like, you know, that this
17 person is trying to have a group of people at
18 some point come to his house and pray
19 periodically, and they want him to obtain a
20 permit to do so, he's willing to do whatever he
21 needs to do to comply with whatever the city is
22 demanding of him as usual, but they just didn't
23 have that in mind.
24 Q  Okay.  On March 4th were you at the hearing?
25 A  I was there virtually, yeah.

Page 279

1 Q  Virtually.  Okay.
2   At that hearing did you hear many of the
3 residents who were in opposition say that they
4 thought that -- or accused you, let's say, of
5 converting your house into a synagogue?
6 A  Yeah.
7 Q  Okay.  Did --
8 A  Even before that.  "It's a big house, Danny."
9 Q  But at the meeting did you hear them?
10 A  Yeah.
11 Q  And did you hear anybody from the planning
12 commission or the mayor or Mr. McConville correct
13 the residents to that effect?
14 A  You know, I watched that video,
15 unfortunately, a few times, and there were a
16 couple of parts where residents openly spoke
17 about the synagogue, and nobody batted an eyelash
18 from the administration at all.  And I can even
19 point to certain parts of the video.  They just
20 roll on.  They all knew that's what they were
21 doing and talking about.
22       MR. GROSS:  Okay.  I have
23 no further questions.
24       MR. CLIMER:  I don't have
25 any more questions.

Page 280

1     You've got the right to read.
2 We need to let the court reporter
3 know if you want to read this or
4 waive that right.
5     THE WITNESS:  Read it?
6     MR. GROSS:  Yes.  We would
7 like to read, of course.
8     THE WITNESS:  I'm sorry.
9 What does that mean?
10     MR. GROSS:  You get a
11 chance to read the --
12     THE WITNESS:  Now?
13     MR. CLIMER:  No, no.
14     MR. GROSS:  Eventually.
15     MR. CLIMER:  When it's
16 printed up in English, you can
17 read it.  You can, if something's
18 taken down wrong, correct it.
19     MR. GROSS:  Yes.  We're not
20 waiving that right.  Absolutely.
21 As far as I'm concerned, we
22 are off the record.
23 (Deposition concluded at 6:46 p.m.)
24   (Signature not waived.)
25

Deposition of Daniel Grand                                    Daniel Grand, vs. City of University Heights, Ohio, et al.

Page 281

1                    CERTIFICATE

2          I, Rebecca L. Fumich, Notary Public

3    within and for the State of Ohio, do hereby

4    certify that the within named witness, DANIEL

5    GRAND, was first duly sworn to testify to the

6    truth and nothing but the truth in the cause

7    aforesaid; that the testimony was by me reduced

8    to stenotype in the presence of said witness;

9    afterwards transcribed, and that the foregoing is

10   a true and correct transcription of the testimony

11   so given by the above referenced witness.  I

12   further certify that this deposition was taken at

13   the time and place in the foregoing caption

14   specified.  I do further certify that I am not a

15   relative, counsel or attorney for either party,

16   or otherwised interested in the event of this

17   action.

18          IN WITNESS WHEREOF, I have hereunto set my

19   hand and affixed by seal of office at Cleveland,

20   Ohio this 22nd day of November, 2023.

21

22   _____

23          Rebecca L. Fumich, Notary Public,

24          within and for the State of Ohio.

25          My Commission expires:  6-5-2025.

Deposition of Daniel Grand                                    Daniel Grand, vs. City of University Heights, Ohio, et al.

### WORD INDEX

**< $ >**
**$1,000** 258:23
**$14.1** 25:8
**$50,000** 25:24

**< 1 >**
**1** 4:13 18:1 117:5
 156:23 254:14 269:12, 14
**1/18/22** 4:1
**1/21/21** 3:5
**1/22/21** 3:5
**1:22-cv-01594** 1:7
**10** 46:25 47:25 48:3
 79:18 88:12 91:2 94:9,
 17 105:11, 20 106:4, 12,
 18 107:21 140:6, 9 141:7
 181:3 190:23 209:24
 210:8 249:1, 4 250:23
**10,000** 247:25
**10:10** 1:10
**10:39** 274:8
**100** 1:10 2:16 32:3
 87:11
**10016** 2:7
**102** 3:5
**108** 188:11
**109** 3:5
**10-foot** 250:21
**10-minute** 104:19
**10-week** 221:21
**11** 114:11 149:6
**11-2-2023** 218:15
**113** 3:5
**116** 3:5
**12** 170:15 225:4 242:5
 263:17
**120** 195:23
**122** 5:8, 9
**1242.99** 237:4
**125** 199:6
**1274** 173:12, 20 175:15,
 22
**12-foot** 240:15 241:9
**12th** 133:5
**12-week** 221:21
**13** 5:4 25:21
**131** 5:10
**134** 3:5
**136** 5:11
**139** 5:12, 13
**14** 5:5 199:7
**14.1** 23:12
**143** 3:5
**144** 5:14
**145** 5:15
**1492** 53:17
**15** 5:6 48:9 114:13

**130:25** 197:19
**151** 4:1
**155** 3:4 195:23
**156** 194:23
**157** 194:15, 22
**158** 194:21
**159** 194:15, 22, 23
**1600s** 265:25
**166** 201:8, 9
**167** 201:8, 9
**169** 204:25
**16th** 271:6
**17** 4:7 182:15
**170** 206:1
**171** 211:24 212:2
**173** 211:24
**17th** 272:16, 22 273:17
 274:8
**18** 85:10, 11
**181** 216:1, 19 217:9
**187** 217:18, 20
**188** 217:18, 20
**18th** 42:14 153:10
 155:14 163:11 165:15
 167:9
**19** 66:16 76:16 242:3, 6,
 18 243:18 244:18 246:6
 247:23 248:8
**191** 220:17, 23
**194** 220:23
**1979** 266:3
**19-foot** 242:8
**1L** 10:20
**1st** 146:20 157:19
 159:11, 14 161:2 164:6

**< 2 >**
**2** 1:10 2:6 18:1 40:20
 146:25 151:16 152:4, 14
 153:17 155:1, 13 156:5,
 22 158:5 159:2
**2,000** 258:23
**2:00** 195:18 237:20
**2:05** 154:4
**20** 25:23 48:9, 22 130:25
 197:19
**2006** 17:3
**2008** 15:24
**2014** 10:16
**2015** 8:2 23:13
**2017** 9:5 29:8
**2018** 18:12 19:1 29:11
 240:11
**2019** 8:22 19:1 42:14
 64:19 66:10 69:20, 22
 225:19
**202** 5:16
**2020** 66:12 227:1, 24
 238:16 239:6, 10 262:2

**2021** 66:7, 8, 14, 17 73:1
 76:17 116:5, 12 122:21
 142:8 159:11 227:3
 267:15, 16 271:16 272:16,
 22 273:2 276:14, 22
**2022** 155:14 157:10
 167:16
**2023** 1:10 152:25 153:18
 155:1 281:20
**203** 5:17
**2063-20** 237:3
**20s** 266:16
**20-something-year-old**
 17:9
**20th** 2:6 160:23
**21** 114:11 131:18, 23
 157:19
**218** 5:18
**21st** 159:13 160:23
 161:1 276:22
**22** 153:10 161:1
**22nd** 116:12 120:6
 281:20
**23** 153:6 231:10
**234** 225:6
**2343** 3:5 8:20 61:22
 113:12 219:16
**235** 225:6
**23rd** 131:18, 23 160:25
 165:25 188:14 195:7, 11,
 13 197:10 267:16 270:11,
 15, 25 276:16
**240** 117:24 118:13 127:7,
 22
**24-hour** 55:7 177:8
**25** 227:14 229:24 235:11
 248:11, 12 250:22
**254** 5:19
**25-hour** 215:22
**26** 204:25
**267** 3:5
**269** 4:13
**275** 5:20
**278** 5:21
**28** 32:24
**280** 23:10
**2nd** 122:21 123:11

**< 3 >**
**3** 80:13 155:13 158:20
 160:3 161:20, 24 163:11
 254:14 257:20
**3/18/19** 4:8
**3/2/21** 3:5
**3/23/21** 3:5
**3/7/22** 4:3, 5
**30** 25:23 48:23 130:7
 195:24 197:19 246:1
**300** 231:13

**3-11-2021** 270:6
**335** 159:1
**34305** 1:10 2:17
**36** 98:1
**37** 4:8
**3rd** 120:7 122:2

**< 4 >**
**4** 80:13 165:3 170:15
**4.15** 194:2, 6
**4.7** 55:5
**4/1/21** 3:5
**4:10** 155:2
**40** 246:1
**40-minute** 209:15
**4-1-21** 156:2
**440-248-7906** 2:19
**44139** 1:10 2:18
**443-813-0141** 2:8
**45** 109:21 110:8 209:25
 210:1
**45-minute** 209:22
**48** 109:21 110:8
**4th** 116:5, 13 142:8
 160:24 251:22 267:15
 268:4 273:2 277:9
 278:24

**< 5 >**
**5** 165:15
**5:00** 194:3
**5:50** 135:16
**50s** 189:19 266:17
**50's** 212:11
**57** 5:7

**< 6 >**
**6** 3:3 167:9 254:13
**6:00** 48:6
**6:46** 280:23
**60s** 90:17 266:17
**63** 178:13
**6-5-2025** 281:25
**69** 179:21

**< 7 >**
**7** 54:13 194:21 254:13
**7:00** 48:7 270:11
**70** 109:20 180:16
**700** 190:22
**700-family** 75:3 130:25
**70s** 90:17
**70's** 212:11
**75** 79:17
**799,999** 256:5, 6
**7th** 122:1 152:24 153:5,
 18 167:16

**< 8 >**

**8**  5:2, *3*  142:*4, 5*
**80s**  90:*18*
**84**  3:5
**89**  182:20  183:*11, 12*
**8-week**  221:20

**< 9 >**
**9**  109:20  149:6
**9:30**  48:*18*
**9:45**  48:*19*
**96**  3:5
**975**  256:*1*
**98**  50:*18*
**99**  78:24

**< A >**
**a.m**  1:*10*  274:8
**Abbey**  155:25
**abided**  101:8, *9*
**Abigail**  3:5  4:*1, 4, 6*
  143:9  152:24  156:25
**able**  31:*12*  51:21  52:8,
  *11, 16*  55:*12*  111:*17*
  131:*10*  138:6, 8, *12*  153:7
  196:*1*  227:11  248:*17*
  252:22  253:*3, 16*  258:8
  259:*3, 11*  260:5  262:*17*
  269:2  273:*18*  278:8
**abolished**  266:*4*
**abruptly**  10:2*4*
**absolutely**  141:*3, 10, 14*
  150:25  162:20  163:7
  249:*10*  272:11  280:20
**abuse**  143:*4*
**accept**  43:*14*  82:11
  188:*17*  227:*17*
**acceptant**  265:7
**accepted**  32:*15*  63:7
  165:*4*
**Access**  252:*12*
**accident**  56:*1*  60:*1*
**accidental**  63:*18*
**accidentally**  242:8
**accommodate**  7:*11*
**accommodations**  190:*11*
**accomplished**  240:*23*
**accurate**  14:*12*  20:*4, 5*
  90:5  112:9  142:*15*
  148:*13, 16, 17*  153:9
  191:*11*  199:*12*
**accurately**  19:6, *24*  20:*3*
  174:25
**accusation**  79:2
**accusations**  238:*23*
**accuse**  277:*3*
**accused**  247:25  279:*4*
**achieve**  130:2
**achrayut**  253:2*0*
**acknowledged**  135:*10*
**acknowledging**  135:*10*

**ACLJ**  143:*11*  146:*19*
  168:5
**across-the-street**  60:2*4*
  73:8, *10*
**act**  50:*16*  146:*16*  252:*12*,
  *14*
**acted**  21:6
**acting**  107:8  125:*18*
  126:*21*  128:*12*
**action**  94:*17*  201:5, *14*
  251:*21*  281:*17*
**actions**  50:7  129:*13*
  201:*18*
**active**  21:*17, 21*  79:*12*
  108:*12, 13, 17, 25*  130:*17*
  262:*23, 24*
**actively**  21:*14*  34:2*4*
  187:7
**activities**  15:*12*  19:7  64:*1*
**actor**  126:2*0*
**actual**  22:*12*  25:*1*
  116:*13*  153:*14*  160:2*4*
  165:2*4*  240:*10*  248:*14*
**ad**  55:8
**Adams**  237:*19*
**add**  59:5  193:*15*
**added**  37:*1, 2*  227:*3*
  238:*14*
**adding**  205:*3*
**additional**  184:*11, 20*
  273:*10, 11, 18*
**additive**  246:2*0*
**address**  8:*16, 19*  38:*23*
  40:2  41:*3*  45:*12*  172:*22*
  180:*3*
**addressed**  40:22, *24*
**administration**  34:2, *3*
  133:*12*  172:2*4*  243:2*4*
  279:*18*
**administrations**  33:2*4*
**administrative**  23:*1, 19,*
  *22*  25:5  137:*21*  221:*1, 3*
**administratively**  173:*15*
  175:*4, 23*  176:6  178:*1*
**administrator**  206:*18*
  208:2*4*
**admissibility**  144:*17*
**Admission**  3:5  142:2
**admissions**  84:*19*
**admit**  31:*10*  142:6, *10, 16,*
  *17*
**adopted**  277:*12*
**Adrienne**  76:25
**advance**  268:*4*  275:*17*
**advantage**  169:2*4*
**adversarial**  47:*14*  91:25
  128:*16*  240:*23*
**advertising**  149:*19*
  158:*19, 21*  160:*1, 5*

**advice**  145:*21*  203:2, *4*
  232:*14*
**advise**  223:9  275:*16*
**advised**  113:*19, 23, 25*
  268:2  274:*1, 7, 9*  275:*3,*
  *19*
**affairs**  253:*10*
**affiliated**  46:*13, 21*
**affiliation**  45:*21*  46:2
  47:*23*
**affiliations**  47:*21*
**affirmative**  275:*9*
**affirmed**  6:2
**affixed**  281:*19*
**afford**  63:*10*
**aforesaid**  281:*7*
**African-American**  255:*17*
**afternoon**  54:2*0*
**age**  69:*3*  90:*13*  266:2*0*
**aged**  59:9, *10*
**agencies**  25:*21*
**agenda**  45:*14*  277:8, *11*
**agent**  256:*10, 17*
**ago**  83:6  95:2  108:2*0*
  109:*15*  209:8  251:*19*
  261:2*4*  262:5, *7*
**agree**  20:8, *11*  44:2, *5*
  45:*1*  90:*3*  132:*16*  163:*3*
  164:*13*  166:*15*  215:*12*
**Agreed**  10:*4*  119:*10*
**agreements**  171:*12*
**agrees**  161:*21*
**Aha**  60:*11*
**ahead**  32:8  113:*16*  137:9
  162:8  174:22  175:*13*
  194:*12*  230:*21*  236:6
  239:*19*  243:8  275:*21*
  278:*13*
**Airplanes**  96:7
**AL**  1:9  96:9
**albeit**  218:2*4*
**Aleksander**  213:*13, 25*
  215:*11*  216:*23*
**Alicia**  72:*17*  73:25  75:*10,*
  *15*
**align**  163:6
**ALJs**  23:*19*
**allegations**  170:9
**allege**  170:*15*  201:*13*
**alleged**  178:*16*  251:2*0*
  252:*11*  256:2*0*  264:9
**alleging**  160:*12*
**allow**  28:*21*  98:2*1*  101:2
  118:*3*  244:*11*
**allowable**  272:7
**allowed**  53:6, *12*  78:*14*
  97:*10, 20*  98:*19*  125:6, *7*

**161**:*19, 22*  162:*15, 20*
  163:8, *13*
**advice**  145:*21*  203:2, *4*
**241**:8  242:*1, 2, 20*  244:8
  247:*1*  266:5
**alluded**  105:8
**alluding**  28:*3*
**Almighty**  85:*15*
**alternative**  60:*11*  205:*18*
**Amended**  3:5  109:*18, 19*
**Amendment**  251:*22*
**America**  208:8, *10*
**American**  143:7  208:2
**Amish**  226:8  228:*19*
  238:*16*
**amount**  60:5  137:2*4*
  185:8, *9*  231:7  262:*11*
  268:*19*
**ancillary**  165:*16*
**and/or**  188:6
**angle**  195:25
**angles**  199:2*3*
**angry**  217:*17*
**animus**  174:*14*
**annoying**  198:22  202:*3, 5*
  204:*10, 19*  221:5
**answer**  8:5, *12*  13:*23*
  15:2, *20*  19:*17*  27:*4*
  40:*11*  41:*12*  44:*18, 19*
  45:*16*  49:*16*  50:*21*  57:*3*
  82:*21*  83:*10*  90:2*4*  91:*22*
  101:*12*  118:*10*  122:5, *24*
  132:*1*  136:6, *8, 17, 23*
  137:*4, 12*  138:*19, 20, 21*
  141:*10*  142:*10*  144:*21, 25*
  149:*16*  163:2*0*  169:*16*
  193:*19, 20*  194:*10*  218:7
  252:2  254:9  264:*22*
  275:*16*
**answered**  7:*14*  84:*19*
  142:*16, 17*  179:*18*  182:*17*
  193:*25*  218:*17*
**answering**  141:2*3*  163:22
**anticipated**  90:*19*  114:*19*
  116:7
**anti-Jewish**  74:2
**anybody**  34:8  44:25
  62:2*4*  65:8  69:8  76:*19*
  79:9  83:*13*  84:4  128:*15,*
  *17*  140:*16*  142:25  169:*10*
  171:2  180:6  181:*12*
  195:5  219:*19*  227:*17*
  229:6  241:8  255:*13*
  276:7  279:*11*
**anybody's**  59:2
**anymore**  63:*3*  64:5
  75:*18*  236:*10*
**anyone's**  43:*23*  44:2*3*
**anyway**  43:25  71:2
  188:2  234:*1*  262:*16*
**Apaches**  82:8
**apart**  115:25

Case: 1:22-cv-01594-BMB  Doc #: 80  Filed: 01/26/24  74 of 101.  PageID #: 1300

Deposition of Daniel Grand

Daniel Grand, vs. City of University Heights, Ohio, et al.

**apartments** 14:10
**apologies** 117:2
**apologize** 97:11 106:6
116:17 153:1 183:9
**app** 121:14
**apparently** 94:13 194:25
198:1 209:12
**appealing** 9:21, 23, 24
**appear** 23:17 65:20
119:17
**APPEARANCES** 2:1
**appeared** 181:5
**appears** 38:19 135:5
152:15, 20
**apples** 237:19, 20 238:3
243:11
**applicant** 273:5
**application** 3:5 56:16, 17
112:22 115:1 116:11
117:12, 18, 19 120:6
121:8, 12 122:7, 14
123:17, 19 135:7, 14, 17
139:22 140:11 159:13
170:19 171:23 173:4
177:7 179:23 182:24
185:1 228:22 259:23
260:1, 16 264:5 273:12,
20 275:11
**applications** 260:6
**applied** 107:6 170:21
189:13 262:8 264:4, 5
**applies** 45:11
**apply** 31:23 105:24
112:15, 25 113:1, 19, 23
193:14 258:8 260:5, 8, 25
261:22 262:6, 15
**appointed** 143:12
**appointment** 62:14, 21
**Appreciate** 49:2
**appreciates** 43:1
**appreciation** 43:9
**approach** 33:3 68:1 75:8
86:22
**approached** 212:8 213:15
**approbation** 118:22
**approbational** 118:23
**appropriate** 38:5 45:15
**appropriately** 142:21
**approval** 145:11 234:24
236:2
**approve** 150:20 234:25
235:1
**approved** 191:25 192:4
196:25 230:22 235:4
242:9 243:18 262:9
**approximately** 12:16 94:9
**April** 146:20 152:24
153:5, 18 157:19 159:11,
14 161:2 164:6 243:13
**arborvitae** 205:11

**architect** 115:15, 22
147:6 225:20 227:7
242:23, 24 272:6
**architectural** 101:20
114:24 115:8, 14 272:13
**area** 12:9, 12 21:22
25:10 49:4 50:1 73:1
196:25 197:7 212:20
215:21 225:8, 10, 13
226:12, 20 227:1, 13
229:16, 24 233:18, 22
234:3, 7 235:6 236:25
238:11, 18 240:6 250:19,
25
**areas** 247:9
**argue** 192:16
**argumentative** 91:24
**arms** 133:17
**arranged** 35:25 179:22
180:17
**arrived** 41:2 195:15
223:13
**arrows** 81:9
**article** 147:15
**Arvit** 48:12
**ascertainable** 181:23
**Ashkenazic** 53:18, 24
**aside** 106:3 110:22
178:18
**asked** 6:14 18:25 27:6
43:6 56:4 73:4, 11, 20
74:7 75:8 86:21 94:10
105:20 108:1 127:10
132:10, 23 133:4 194:9
210:23 211:1 219:10, 13,
22 220:1, 15 221:10
233:10, 11 244:24 245:7,
23 262:2 271:18 272:7
**asking** 18:14 27:14 28:2,
7, 8 29:6, 22 41:18 44:20
46:1, 2, 19, 20 50:24 51:1
72:7 78:25 104:25 106:4,
12 108:10 120:8 132:24
133:10 134:20 139:8
145:24 146:3 149:25
150:12, 14 159:7 161:16
172:8 184:3 201:21, 22
203:11, 19 206:23 211:21
245:13 255:25 257:25
264:20 272:10
**asks** 273:25
**aspect** 50:10 70:17
170:3 239:14 266:12
**Aspects** 20:16 23:15
39:22
**assemblies** 107:9
**assembly** 103:12 113:24
152:18 157:7
**assessment** 19:12

**asshole** 200:16
**assistance** 54:7 205:10
**associated** 25:24 169:10
171:2
**assume** 7:1 25:9 183:1
**assumptions** 79:1
**assured** 107:3
**ate** 83:7
**attaches** 92:3
**attempt** 137:16 184:5
**attempted** 168:14 225:14
**attend** 45:21 46:6, 10, 11
50:24 51:1, 21 52:8, 16
135:22
**attendance** 158:5, 10
**attended** 10:12 124:7
**attendees** 151:4
**attending** 52:20
**attention** 156:20
**attitude** 70:23 72:5, 10
76:18 83:2 84:4
**attitudes** 82:23
**attorney** 89:23 124:3
149:21 168:3 182:7
202:23 203:3, 14 204:2, 7
205:1 207:16 252:1, 19
256:17 267:17 268:3
281:15
**attorney/client** 143:25
145:3
**attorneys** 89:1 143:10
144:18 185:7 203:22
204:12 231:2
**audience** 98:3
**auspices** 146:21
**authority** 198:3
**authorization** 145:11
146:15
**authorize** 37:3
**authorized** 145:23
146:16 167:25 168:2
216:20
**Avenue** 2:6
**average** 53:4 264:19
**aware** 58:17 78:23
101:16 102:1, 4 183:4, 24
184:24 191:4 192:12
193:3 217:23 251:9
260:23 268:21
**awareness** 186:10
**awhile** 172:5
**ayin** 63:20

**< B >**
**baby** 266:4
**Bachelor's** 10:9
**back** 17:3 18:11 30:7
39:19 41:5 42:4, 5 48:13
54:16, 18, 19, 21 55:3
57:10 58:10 67:22, 23

68:1, 4 72:1 83:17, 19
84:22 90:25 91:13 92:25
96:9 98:15 104:5 112:13
123:5 125:8 140:23
142:25 155:7, 23 160:3
161:3 162:5, 10 164:6
165:19 180:11 183:2
185:10 187:21 188:23
189:5 191:22 196:19
197:3 210:10, 16 218:13
224:24 225:16 228:21
232:2 235:19 236:14
237:1 239:4, 7 246:5
247:3, 16 248:13 249:14
251:13 260:11 265:13
271:10 274:15
**backdoor** 186:4
**background** 147:5
**backhanded** 186:4
**backwards** 17:25
**bad** 44:4 62:24 83:14
128:6 164:1 169:24
175:9 223:23 241:23
254:2 264:25
**badly** 116:16 183:18
232:13
**bag** 186:2
**balance** 144:1
**balancing** 50:16
**bald** 65:18
**ball** 80:5 98:14
**balls** 80:14
**banged** 210:21
**bank** 13:11, 14 164:1
**Bara** 206:5
**B-A-R-A** 206:5
**barren** 174:10
**barrier** 205:2, 13 244:22
**barring** 252:15
**Baruch** 206:3, 6 207:9
210:25
**B-A-R-U-C-H** 206:6
**baseball** 91:1 96:10
169:8
**based** 69:3 79:1 117:18
**basement** 61:3
**basically** 107:20 128:9
133:9 213:17 223:20
226:1 259:1
**basis** 55:8 186:22 218:5
245:9
**Bates** 151:18 188:7
**bathroom** 136:3, 19, 24
137:1, 7 140:8
**batted** 279:17
**Beachwood** 87:25 240:20,
21
**bead** 70:18
**bearded** 212:13
**beat** 169:15

**beautiful** 67:17 78:16
228:9 230:25 231:3
236:6 243:9
**beautifully** 247:13
**becoming** 36:16
**beer** 68:3 73:19
**beg** 134:6
**began** 66:7
**begged** 127:10 269:5
**beginning** 72:6 261:22
272:2
**begins** 209:25
**behalf** 2:2, 12 26:12
27:17 145:24 146:16
172:1 206:16
**behaving** 53:2
**behavior** 71:9 84:7
**behold** 67:20 73:25 81:6
197:23 245:3
**beis** 85:5, 6, 22 86:3 96:1
**belief** 179:22 253:25
**believable** 216:14
**believe** 8:2 10:16 18:12
41:2 48:1 62:24 65:4
72:4 76:23, 25 77:4 80:5
89:17 114:6, 17 117:5
131:18 153:15 167:15
173:2 178:19 186:15
189:23 204:13 205:8
210:17 221:13 227:14
251:12 256:1, 3 267:4
277:5
**believed** 44:3
**bell** 223:13
**Belski** 76:25 77:4, 24, 25
**Belskis** 77:23 79:5
**bending** 261:8
**benedictions** 85:10
**benefit** 263:11
**bent** 261:6, 7
**berakhah** 77:20
**Berkshire** 255:9
**Bermuda** 238:19, 20
239:2, 9, 14 241:4 246:5
247:22 248:5 259:7
**best** 35:4 104:20 168:19
173:9
**better** 35:8 60:4 100:12
195:5 199:23 265:19, 23
**beyond** 94:3 246:21
**Bible** 137:10
**biblical** 53:9, 11
**biblically** 68:19
**biffy** 241:3
**big** 23:14 33:16 50:11
54:10 62:3, 6 67:14
77:14 81:2 122:19
208:24 209:6 215:5, 8
228:9 230:23 232:5
236:7 239:4 241:7, 25

243:8 248:10 250:17, 23
266:12 279:8
**bigger** 96:18
**biggest** 233:22
**billion** 23:12 25:8
**birth** 228:11
**bit** 20:17 47:16 59:17
75:12 87:5 99:21 156:7
166:13 170:6 173:9
187:9 213:2 220:10
222:10, 13 230:19, 20, 21,
22 249:5
**blacks** 266:10
**blah** 214:18 226:7
**blanche** 190:21
**blanketing** 172:22
**blast** 196:12
**blessing** 118:24 234:25
249:22
**blessings** 77:21 85:11
**blew** 277:4
**blighted** 33:15
**blink** 63:21
**block** 57:24 58:4 61:17
68:11, 15 73:9 74:25
75:3 79:16 84:5, 8
130:16 169:8 180:23, 24
181:4, 13, 25 182:13
190:8 213:21 214:2
248:4
**blocked** 196:3
**blocks** 58:5, 6 88:4
149:1, 3 174:7 180:25
182:15
**blow** 81:13
**blowing** 180:7
**blue** 196:8 274:21
**Blvd** 3:5
**board** 128:8 130:18
228:21
**boards** 131:9 181:8
263:19
**body** 50:5 84:24
**bogus** 237:2
**Bolotin** 181:2, 7 182:8
**bombarded** 81:6
**bombarding** 200:12
**bona** 141:12
**bone** 220:12
**bonfire** 73:19
**book** 47:1 53:13, 14
65:22
**booklet** 209:2
**books** 253:11 266:9
**boomers** 266:5
**born** 208:5
**boss** 150:19
**botching** 227:7
**bother** 220:2

**bothered** 200:2
**bothering** 67:18 211:21
**bottle** 36:2, 3, 17 37:7
39:1, 2 40:12 41:23
42:24 43:6
**bottom** 117:5 151:19
175:16
**bought** 13:4 36:9 42:24
55:25 56:8 61:10 64:2, 6
225:23 226:13, 18
**boulders** 250:18
**Boulevard** 8:20
**bounced** 41:5
**bounds** 144:1, 13
**box** 43:3
**boy** 64:7 84:17
**boys** 226:3 241:19
**brackets** 97:21
**Brady** 74:23
**brand** 245:25
**break** 7:10 50:15 136:2,
19, 25 137:1, 5
**Brennan** 3:5 18:11, 18
19:4 29:21, 24, 25 38:20
45:8 113:14 120:15
123:8 127:15, 17 135:9
138:7, 11 159:19 172:6, 9
175:6 176:14 177:3
179:22 180:17, 18 200:3,
6 215:2, 4 216:20 272:23,
24 274:12
**brick** 226:10
**Bridge** 81:20, 22
**bridged** 32:14
**brief** 147:16
**brighter** 230:3
**bring** 25:23 33:21 77:21
127:7, 19 224:4, 6 233:18
269:6
**bringing** 55:13 93:25
**broad** 192:10
**Broadway** 23:10
**broom** 246:25
**brought** 57:7 173:25
239:6
**Brown** 187:21 250:8
**bucks** 258:23, 24
**buddy-buddy** 200:21
**buggy** 40:6 41:3
**build** 91:13 92:25 98:11
170:21
**building** 23:7 24:4 70:15
80:22, 23 81:15, 20 93:4
96:1 163:24 169:21
221:2 230:2 231:15
235:20, 23 238:1 248:21
249:22, 24
**buildings** 25:12, 14 28:17
197:13 198:5 229:1

237:6 240:18 242:24
**building's** 260:15
**built** 115:9 233:22
249:16
**bullet** 149:21 152:5
156:22
**bump** 88:18 256:13, 14
**bumping** 256:14, 15
**bunch** 98:4 119:5
174:11 239:9
**bundled** 75:12
**burden** 57:10
**burdensome** 50:14
**bureaucratic** 25:5
**buried** 232:13
**Business** 4:7 14:7 18:5,
7 20:23 21:3, 7, 24, 25
22:5, 11, 14, 22 25:9 26:4,
18 27:1, 2, 8, 9, 11, 12, 22,
24 43:19 69:25 78:7
133:13 190:16 256:21
257:8, 15, 22 258:18
259:14
**Businesses** 20:25
**businessman** 258:19
259:2
**BUTT** 258:16
**buy** 12:7, 24 13:9 37:6
60:12, 13, 20, 21 61:16
**buying** 61:8 63:8 209:4
**BZA** 229:19 231:20, 24
232:12 233:9 236:16, 22
239:3, 11, 12 241:21
263:18

< C >
**CAD** 198:10, 16 211:17
**CADO** 175:16
**calculable** 236:12
**calculated** 195:17 229:24
**call** 24:15 27:2 29:1
53:7 62:16, 20 79:23
86:2 91:1 102:11 104:5
107:13 123:16 161:4
177:7, 24 184:15 191:9
197:23 198:24 203:24
210:6 221:23 223:1
224:8, 20, 22 237:8
238:19 257:16 260:3
268:1
**called** 1:10 24:11, 12
48:1, 7, 10, 12 68:18
77:20 85:9 96:12 104:11
117:20 118:9 164:7
192:23 197:14 200:19
202:3 210:10, 19 222:9
226:25 228:2 229:5, 7
248:21 253:20 258:15, 16
**calling** 82:1 200:15
214:9 265:21

**calls** 111:*5* 183:*22*
185:*12* 249:*15*
**camera** 197:*24*
**cameras** 140:*25* 197:*11*
199:*18, 24* 201:*23* 205:*3*
251:*25* 265:*6*
**Camp** 258:*16, 17*
**campus** 16:*18*
**cap** 169:*8*
**capsulated** 136:*20*
**caption** 281:*13*
**capture** 20:*12*
**car** 54:*5, 9* 196:*20* 197:*6,
21* 198:*12, 19, 20* 199:*2, 4,
7* 209:*21* 210:*3, 22* 212:*4,
6, 25* 233:*19* 237:*22*
239:*20* 250:*24* 251:*1*
**card** 4:*7* 18:*5, 7, 8, 13*
19:*1, 6, 16, 18* 20:*13, 15*
36:*17* 43:*8*
**care** 28:*25* 42:*2, 3* 60:*23*
82:*15* 165:*13, 16* 196:*14*
222:*4, 5* 231:*14* 234:*17*
254:*22* 263:*9, 13, 15*
**caring** 31:*9*
**carriage** 236:*8*
**carries** 194:*23*
**carry** 24:*10* 25:*22* 50:*25*
53:*5, 12, 23, 24* 119:*13*
**carrying** 53:*10*
**cars** 195:*19, 24* 196:*4, 5,
6* 197:*19, 20* 199:*9*
212:*22, 24, 25* 213:*19*
215:*14, 16, 22, 23* 216:*13*
226:*11* 247:*25*
**carte** 190:*21*
**Case** 1:*7* 6:*11* 14:*1*
25:*22* 58:*16* 84:*20*
102:*13* 128:*6* 171:*13*
215:*3* 232:*20* 235:*12, 13*
249:*25* 251:*21* 268:*20*
273:*5, 7*
**Catherine** 61:*24*
**Catholic** 193:*13* 255:*16*
**catty-corner** 186:*21*
**caught** 71:*6*
**cause** 281:*6*
**caused** 67:*4*
**causes** 251:*20*
**caveat** 227:*9*
**CC** 45:*9, 10*
**cease** 103:*10* 276:*5, 8*
277:*13*
**cease-and-desist** 103:*9*
105:*14, 17* 108:*1, 8* 175:*7,
17* 177:*16*
**cell** 197:*14*
**censured** 200:*13, 15*
**Center** 51:*8* 143:*7*
**centered** 174:*14*

**certain** 20:*21* 21:*1* 42:*3*
53:*22* 54:*24* 91:*19*
133:*10* 147:*16* 175:*1*
180:*17* 266:*12* 268:*18*
279:*19*
**certainly** 168:*12* 177:*23*
**certificate** 28:*20, 21*
251:*6, 8* 258:*2* 259:*17, 22*
260:*4, 10, 13, 21* 262:*14*
281:*1*
**certificates** 182:*5*
**certified** 6:*3*
**certify** 281:*4, 12, 14*
**cetera** 23:*21* 53:*19*
67:*25* 82:*9* 139:*18* 214:*3*
**Chabad** 51:*5*
**Chaim** 51:*5*
**chain** 3:*5* 4:*13* 184:*21*
269:*20* 271:*6*
**chair** 106:*7* 178:*10*
258:*22*
**chairs** 114:*11, 14*
**chance** 36:*23, 25* 113:*17*
124:*17, 22* 127:*16* 128:*3*
132:*10* 199:*4* 277:*14*
280:*11*
**change** 8:*1, 10, 13* 9:*12,
13* 67:*4* 84:*4* 96:*15*
121:*10*
**changed** 7:*25* 71:*9* 72:*10,
23, 24* 76:*19* 81:*18* 82:*24*
83:*3* 198:*17*
**changing** 69:*10, 16* 70:*24*
72:*5*
**chapter** 112:*20* 173:*12*
**character** 20:*16* 166:*20*
**characteristics** 20:*23*
**Characterization** 28:*14*
92:*21* 277:*18*
**characterize** 49:*15* 254:*1,
6*
**characterized** 119:*13*
**characterizing** 120:*11*
**charge** 36:*17* 146:*24*
**charged** 43:*8*
**charitable** 206:*17, 18*
**charming** 35:*14*
**check** 189:*5* 207:*4* 209:*9,
20*
**chewed** 220:*12*
**chief** 134:*2, 9*
**chiefs** 243:*1*
**child** 165:*13, 16* 254:*13*
**children** 59:*9* 60:*6* 254:*4*
**chimes** 127:*25*
**chipmunks** 174:*11*
**chokhmah** 21:*2*
**choosing** 167:*5*
**chose** 72:*20* 249:*20*

**church** 48:*21* 74:*24* 75:*3*
130:*25* 164:*25* 165:*11, 14*
190:*9, 20* 191:*7*
**Churchill** 213:*22*
**Cicero** 205:*6*
**cigar** 36:*2, 4* 37:*2, 10*
42:*23* 43:*3* 66:*2*
**cinch** 54:*6*
**circumstances** 30:*15*
167:*7*
**citation** 112:*18*
**cited** 225:*7*
**cities** 26:*22* 206:*20*
**citizen** 31:*7* 34:*7* 228:*1*
**CITY** 1:*8* 22:*1* 23:*13*
24:*23* 25:*10, 14* 26:*2, 11*
29:*13* 31:*6, 9* 32:*4* 33:*20,
21* 34:*3, 4, 14* 97:*9* 98:*21*
101:*1, 16* 102:*1* 105:*14*
108:*23* 110:*16, 21* 111:*7,
23* 116:*6, 14* 117:*13*
118:*3* 119:*20, 23* 120:*1,
10* 121:*9* 122:*8, 25* 123:*6,
12* 125:*3, 6, 13* 129:*7, 23*
130:*13* 132:*5* 133:*12*
134:*6, 12* 137:*20* 140:*23*
148:*11* 152:*16* 160:*24*
169:*11* 171:*3* 180:*10*
182:*2, 8, 16* 188:*8* 193:*20*
194:*16* 196:*21* 205:*1, 10,
24* 215:*8* 218:*13* 219:*20*
220:*25* 224:*20* 225:*14*
226:*25* 229:*7* 233:*13*
234:*19, 24* 242:*25* 250:*9*
251:*9* 259:*4* 263:*23*
264:*1* 267:*22* 276:*7*
277:*10* 278:*21*
**city's** 107:*8* 165:*25*
190:*15* 191:*12* 205:*4, 14*
265:*7*
**Ciuni** 233:*13, 14* 234:*18,
22* 248:*17*
**Ciuni's** 235:*3*
**civics** 31:*6*
**Civil** 1:*10* 266:*18*
**claim** 251:*21* 252:*11*
255:*1*
**claiming** 223:*14*
**Clapton** 68:*3*
**clarify** 12:*22* 22:*18, 20*
115:*6* 144:*16* 153:*12*
159:*10, 21*
**clarity** 119:*4*
**class** 263:*15, 25*
**classic** 130:*3*
**Claver** 89:*15*
**cleanest** 67:*16*
**cleanup** 222:*13*
**clear** 27:*20, 21* 44:*22*
45:*13* 52:*1* 72:*11* 80:*18*

91:*24* 92:*10* 116:*9*
122:*10, 13* 133:*3* 153:*5*
186:*23* 196:*8* 242:*14*
250:*10* 255:*4* 256:*24*
260:*6* 271:*20*
**clearly** 76:*25* 123:*18*
136:*23* 137:*18* 205:*20*
222:*4*
**clerk** 117:*13*
**Cleveland** 2:*18* 12:*11*
21:*22* 23:*24* 34:*16* 52:*23*
281:*19*
**Cleveland's** 55:*10*
**cliche** 128:*10*
**cliche-esque** 128:*9*
**clients** 23:*20*
**CLIMER** 2:*13* 3:*3, 4*
4:*2, 3, 5* 5:*20* 6:*6, 9*
13:*24* 14:*2* 17:*11, 16, 22*
37:*17* 38:*6, 17* 47:*18, 19*
71:*24* 72:*3* 76:*10, 12*
84:*15* 93:*12, 15* 97:*2*
102:*24* 109:*14* 110:*7*
113:*8* 117:*1* 135:*2*
139:*12* 143:*20* 144:*22*
145:*4, 19* 151:*12* 152:*6,
12* 153:*14* 155:*7, 19, 22*
174:*24* 183:*10, 14* 189:*1,
6, 11* 194:*7, 14* 203:*1, 19*
204:*8* 251:*4* 252:*4* 267:*2*
275:*20* 278:*12* 279:*24*
280:*13, 15*
**Clinics** 252:*12*
**close** 56:*6* 77:*16* 84:*25*
187:*3* 222:*11* 273:*7*
**closed** 176:*7* 268:*20*
269:*1* 273:*4, 12*
**closer** 47:*3* 58:*12* 111:*10*
247:*5*
**closest** 54:*3, 12*
**cloudy** 27:*19*
**Cocaine** 68:*2*
**code** 23:*22* 24:*24* 81:*15*
112:*18* 196:*23* 205:*4, 14*
231:*16* 242:*21*
**codes** 230:*3* 248:*20*
**codified** 112:*20* 204:*10,
20* 237:*4*
**coincidental** 63:*17*
**cold** 75:*13* 243:*14* 244:*20*
**cold-shouldered** 70:*6, 7*
**Coliseum** 91:*13* 92:*25*
93:*5* 98:*13* 149:*9*
**colleague** 75:*25*
**collects** 206:*16*
**College** 16:*2, 4, 5, 6, 14, 24*
256:*2*
**colloquial** 53:*3* 86:*2*
89:*12* 99:*23*
**colloquially** 99:*11* 118:*17,*

Case: 1:22-cv-01594-BMB  Doc #: 80  Filed: 01/26/24  77 of 101.  PageID #: 1303
Deposition of Daniel Grand
Daniel Grand, vs. City of University Heights, Ohio, et al.

18, 21
**color** 69:4 140:19 141:11
**come** 28:4, 19 29:1 30:2,
8 35:25 48:16, 17 60:16
61:6 73:21 77:7, 8 78:25
93:24 101:9 102:4 104:1
106:16, 18 131:21 150:7,
16, 18 168:25 178:3
182:16 188:23 195:15
197:25 215:15 224:9
226:8 228:2 230:16
232:23 237:1 244:15
249:8 250:2 258:17, 22,
24 259:6 263:20 264:11
278:18
**comes** 198:23 206:19, 24
234:19 237:20 247:3
**comfort** 44:11
**comfortable** 43:25 44:5
257:3
**Comfy** 178:10
**coming** 73:13 94:24
182:15 211:20 221:24
270:25
**commencing** 1:10
**comment** 42:19 146:9
**commented** 187:22
**commercial** 12:20 13:20
14:3, 6, 11, 13, 14, 16
74:13 98:11 99:14
**commiserate** 33:6
**commissary** 189:23, 24
**Commission** 4:14 23:3
110:23 120:23, 25 121:1,
3, 5, 18, 19 122:2 124:1
126:9 128:14, 19 135:7,
11 137:20 142:9 182:22
267:14 270:10 273:3
278:2, 5 279:12 281:25
**committees** 34:22 181:8
182:9
**Common** 129:6 202:15
**commonsense** 81:14
**communicate** 177:16
186:23
**communicated** 177:9
182:23
**communicating** 82:4
188:12 208:17
**communication** 122:8
176:15 184:9, 11 185:8,
10
**Communications** 116:10,
14 179:9, 16 183:5, 15, 17,
20 184:25 185:18 188:15
**communities** 167:6
**Community** 3:5 33:11
79:12 84:6 86:18, 22
99:24 117:23 118:12, 13

119:3 127:22 168:24
180:11 192:23
**community's** 119:1
**companies** 26:1
**company** 21:13, 15, 21
216:5 226:8
**comparing** 220:5
**compelled** 244:7
**Complaint** 3:5 109:18, 19
170:8 187:11, 12, 14, 20
**complaints** 80:22 81:10
82:1 185:24 198:24
259:6
**complete** 10:21 218:8
249:14 252:3
**completely** 105:10
173:11, 14
**complex** 22:25
**complexity** 26:19
**comply** 134:19 244:24
278:21
**complying** 239:12
**concept** 26:4 98:7 107:12
**concerned** 83:15 109:2
280:21
**concerning** 89:22 110:22
111:24 114:17 116:7
**conclude** 108:7 129:13
278:15
**concluded** 280:23
**concludes** 270:17
**conclusion** 160:7 186:12
**conclusions** 203:24
**concrete** 197:1 226:9, 10,
21 227:21 228:3 229:15,
17, 23 231:11 234:3
235:8, 9 236:22 243:15
245:4, 6, 10 246:1, 6, 16
247:9, 10, 17 248:16, 17
**concreted** 248:18
**concreting** 225:25
**concur** 25:7
**condition** 162:24, 25
163:1
**conditions** 152:16 161:25
162:2, 23 163:14
**condolences** 11:2
**conduct** 189:14 193:4
226:24 252:12 258:11
263:9
**conducted** 6:14 23:16
142:7 215:10
**conducting** 192:13
**confer** 30:23
**conference** 98:8 100:18
188:22
**confine** 227:13
**confirm** 121:5
**confronted** 214:1 215:13

**confused** 213:3
**congratulate** 36:15
**congratulated** 32:20
**congratulatory** 29:19
44:9
**congregant** 49:10
**congress** 86:1
**connection** 100:20 244:14
**Connor** 73:8, 10 74:7
**Connors** 60:19
**Connor's** 61:9, 17 73:4
170:24
**consider** 93:24
**considered** 117:16
131:17, 22 152:18 157:6
**consistent** 131:24 148:1
150:15
**conspired** 170:16 173:3
175:3 177:3
**constituent** 240:19
**constitutes** 106:13
**construction** 69:22, 25
70:16, 17, 19 72:6, 8 84:8
**construed** 47:14
**consulted** 43:13 203:14
204:7, 12
**contact** 89:5 104:1
206:15, 25 207:8, 12
256:16
**contain** 182:6
**contained** 182:4
**contains** 114:18
**contend** 218:25
**content** 145:1
**contention** 259:12
**context** 90:22, 23 91:4
163:19, 23 164:3, 4, 18
165:19 166:8, 18
**contexts** 165:8
**contiguous** 246:2
**continue** 11:1 78:3
252:22 253:9, 22 277:2
**CONTINUED** 3:4 139:2,
8, 10, 14 155:21
**continuing** 263:1
**continuously** 276:14
**contract** 60:20 61:11, 12
**contractor** 25:2 67:12
225:24 226:2 227:7
228:6, 14
**contracts** 256:11
**controversy** 195:1, 4
247:18
**convene** 168:14
**convent** 190:1, 2, 5
191:14, 15
**conversation** 72:21
104:15, 16, 19 109:16
110:9, 18 121:23 123:8

144:11 209:22 222:22
223:17, 18 254:18
**conversational** 145:16
**conversations** 110:15, 21
111:7, 18 144:7 145:18,
25 159:11 171:11 172:15
203:3 224:15
**converse** 43:12
**convert** 74:12 276:24
278:9
**converting** 279:5
**convey** 20:15
**Cook** 245:15
**cool** 34:19 36:23 37:15,
16 62:19 66:25
**Cooney** 69:11 72:13
73:7, 9 74:1 127:25
179:6 185:4, 15 188:12
**Cooney's** 76:19
**coordinated** 178:16, 20
**coordinating** 188:13
**cop** 164:2
**cops** 210:5
**copy** 151:17, 20
**cordial** 49:18 65:25
**corner** 74:24 181:20
213:11, 23
**Correct** 6:16 10:14 13:8
16:12 17:4 19:12, 25
20:5 25:6 29:8, 9 35:3
38:21 40:14 55:24 56:25
76:11 77:2 81:4 86:9
88:8 92:13 93:20, 25
94:4 96:13 101:18
108:22 112:19 113:2, 24
114:5, 8, 22 115:21
117:12, 16 119:8, 11, 20
120:5 121:1, 23 122:10
123:9 124:1, 7 129:16
131:18 135:8 140:14
143:7 148:8 150:4, 24
151:4 155:12 156:4, 24
157:11, 21 158:14, 22
159:3, 12 165:18 167:11
171:10 182:25 183:25
188:16 189:24 193:19
199:15 211:6 212:1
218:21 251:6 252:9, 24
253:5, 10 264:4 279:12
280:18 281:10
**corrected** 45:24 151:7
**correctly** 23:13 24:18
26:17 29:10 56:14 94:25
211:5 255:2
**correspondence** 151:15
**corroborates** 182:11
**corrupt** 130:1
**cost** 62:4 228:19
**cot** 61:3

**council** 32:5 108:23
130:15, 19 171:8 215:8
216:19, 20 217:4 278:4
**councilman** 185:4
**Councilwoman** 30:3, 4, 8
**counsel** 76:1 108:10, 11,
15, 21, 22 281:15
**counseling** 165:14, 17
264:13
**count** 112:1 236:12
**countable** 231:13
**counting** 271:3
**couple** 6:21 12:17 13:7
64:24 65:3, 6 69:11 88:7,
18 89:7 93:1 152:22
156:7 168:5 253:12
261:24 262:5, 6 272:7
279:16
**course** 26:3 32:18 50:8,
22 58:6 220:7 275:7
280:7
**COURT** 1:2 7:6, 8
25:22 144:23 155:9
188:21 268:9 280:2
**courteous** 186:1
**courtesy** 237:21
**covenance** 266:11
**cover** 65:22
**coverage** 227:15
**covered** 238:21
**COVID-19** 102:14
**cowboys** 82:9
**cracking** 169:14
**cracks** 179:20
**create** 53:7 178:14
**creating** 178:18
**credible** 175:10 176:17,
20, 23, 25
**creed** 191:1
**crickets** 130:21
**criminal** 201:24 203:7
204:14
**criminally** 105:16
**croquet** 80:4, 14
**Cross** 208:23 267:8
**cross-examination** 268:14
**crossing** 202:21
**crumble** 264:19
**cup** 50:6
**curiosity** 144:9
**curious** 62:4 68:8
180:25 212:19
**current** 60:2 61:9, 17
114:4 262:22 263:1, 6
**currently** 185:4
**curse** 200:22
**cursing** 70:10
**curtailing** 162:6
**curving** 224:2

**custody** 260:9
**customers** 23:20 26:12
**cut** 243:11 247:12
**cute** 254:13
**cutesy** 86:10 91:11
**cutter** 36:2, 4 37:2, 10
43:3
**Cuyahoga** 89:18

**< D >**
**dad** 11:2
**daily** 47:24 48:3, 4 51:21
**damage** 170:3
**damages** 254:25
**Damned** 125:1, 14, 15
**damning** 200:1 266:7
**danced** 199:22
**DANIEL** 1:5, 10 3:2, 5
6:1, 8 7:21 68:10, 14
90:9 146:18 209:7 281:4
**Danny** 42:21 45:9 70:11
180:13 197:15, 16 207:3
210:13 234:22 236:1
242:18 274:1, 7, 8 275:3
279:8
**dannygrand.com** 40:5
**dark** 212:3, 6
**data** 235:5
**date** 21:18 35:3 80:18
132:15 138:20 153:9, 15
155:12 251:16
**dates** 153:7
**daughter** 187:6 200:1
**daven** 95:12, 14
**davening** 92:6
**day** 46:7, 9 48:11, 20, 21
50:3, 13 52:12 54:15
66:1 67:8 69:2 71:6
72:19 77:9, 23 78:18
83:6, 21 88:17 92:9
104:8 120:2, 3 131:7
177:6 178:4 199:3 207:3
210:10 218:14 220:14
221:13 223:23 224:17
232:16 245:5, 6 250:10
253:7 261:16, 17 263:9,
12, 13, 15 264:3 266:20
268:22 272:16 281:20
**daylight** 192:10
**days** 151:5, 6 192:17
243:10 244:19 258:25
**daytime** 54:19
**de** 142:12
**deal** 13:25 28:23 54:10
72:22 208:23 220:4
236:24 256:10 263:21
**dealing** 23:2, 7, 18 28:15
240:25
**deals** 12:10 24:23

208:19, 20
**dealt** 27:11
**dean** 255:16
**death** 16:10
**decade** 21:8
**deceive** 229:6
**deceptive** 166:13
**decided** 175:13, 14
236:13 274:1, 9 275:3
**decision** 175:15 201:4
**decorative** 249:6 250:18
**decorum** 126:16
**decree** 265:25 266:4
**dedicated** 254:22
**deed** 266:8, 10, 14, 21
**deeper** 233:2
**defamation** 170:3
**defect** 240:14
**defend** 160:18
**Defendants** 1:10 2:12
6:10 170:16 171:12
173:3
**Defendant's** 3:5 17:12,
17, 19, 24 37:22 38:19
84:12, 17 96:24 97:4
102:21 103:1 109:11, 17
113:5, 10 116:23 134:24
135:4 143:17 151:9, 14
152:9 155:4 156:2 170:7
**defending** 26:2
**defense** 160:10
**defer** 252:15
**deficient** 133:2 219:2, 5, 6
**defined** 14:10, 13 135:20
**definitely** 67:8 250:6
**definition** 14:7, 12 88:5
96:16
**definitive** 83:10
**degree** 10:9 28:13
100:21 184:12 253:6
**deliberately** 170:19
**deliberation** 273:4
**deliver** 246:18
**delivered** 171:7 172:2
246:19
**Delski** 77:3
**demand** 256:25
**demanded** 205:4
**demanding** 278:22
**demeanor** 35:13 126:14,
15, 16
**dementia** 65:1
**demonstrate** 134:13
**demonstrated** 68:25
**denied** 239:16
**denying** 245:9
**department** 23:8, 10
25:12, 13, 17, 19, 20 28:17
80:22, 23 134:9 169:21,
22 197:13 198:5 218:10,

11, 21 221:2, 3 229:1
235:21, 23 237:6 238:1
240:18, 21 242:24, 25
248:21 249:23, 24 260:6,
15
**departments** 23:1 25:16
221:4
**depending** 51:11 55:23
84:6
**depends** 29:4, 5 96:14
254:15
**deposition** 1:10 6:13, 18
76:4 184:6 280:23
281:12
**descent** 53:19 255:15, 16
**describe** 11:13 19:6
47:22 112:24 124:13
162:23 174:25 212:9
271:17
**described** 79:10, 14
91:21 92:12 119:18
161:25 162:2
**describes** 122:9
**describing** 162:3, 4
**description** 19:14 115:1
**descriptive** 142:15
**desire** 134:14 148:11
**desist** 103:10 276:5, 8
277:13
**desk** 16:25
**despite** 235:3
**detachment** 91:20, 23
**detail** 214:3
**details** 62:23 114:16
115:23
**detestable** 137:8
**developed** 76:15 79:9
**development** 25:20
**device** 257:16
**diagram** 234:8
**dialog** 183:25 184:5
**dictates** 242:7
**died** 8:6 10:24
**difference** 98:5 122:19
258:6
**differences** 53:21
**different** 13:11 16:20
17:6 22:13, 21 23:15
24:10 26:19 28:16 34:14
52:2, 5 54:12 60:12 81:9
92:1 95:8, 9, 16 96:21
111:13 128:11 147:13, 18
173:17 184:4 206:19
209:20 214:22 251:20
**differently** 31:4
**difficult** 7:5, 8 52:24
57:18 132:8 227:6
**difficulties** 66:18
**diluted** 55:12
**dining** 106:17 140:4, 9

**dinner** 106:*17* 139:*19*
141:*6* 176:*13*
**directed** 120:*24* 159:*19*
274:*14*
**direction** 213:*21*
**directly** 134:*16* 218:*10*
**director** 16:*1* 43:*13, 16*
103:*8* 128:*2* 182:*23*
221:*15*
**dirt** 231:*1* 232:*3, 8*
238:*12*
**dirty** 67:*16*
**disabled** 195:*14* 198:*10*
**disagree** 20:*7* 103:*15, 17*
**discomforted** 266:*8*
**discontent** 60:*5* 171:*22*
**discuss** 15:*1* 91:*17*
113:*18* 204:*6*
**discussed** 76:*4* 129:*9*
156:*2, 5* 188:*16* 202:*22*
**discussion** 33:*19* 47:*9*
78:*2* 95:*2* 110:*6* 221:*9*
273:*3*
**discussions** 102:*17*
108:*10, 15*
**disgust** 75:*7*
**disgusted** 174:*19*
**disgusting** 74:*2* 174:*20*
**dishonest** 166:*19*
**disingenuous** 165:*22*
166:*11*
**disliked** 169:*1*
**dispatched** 214:*5*
**display** 124:*20* 174:*15*
**disprovable** 238:*15*
**dispute** 194:*25* 229:*18*
**disputed** 196:*21*
**disputes** 23:*21*
**distance** 54:*2* 57:*19*
**distances** 52:*24*
**distinction** 27:*21* 53:*15*
**distinctions** 192:*18*
**distress** 264:*10*
**distributed** 94:*2*
**DISTRICT** 1:*2, 3* 189:*15*
192:*14* 193:*5*
**disturb** 62:*11*
**disturbing** 197:*8* 199:*8*
**DIVISION** 1:*4*
**divorced** 63:*2*
**divulge** 56:*4* 214:*6*
**divulged** 215:*24*
**docs** 251:*15*
**doctors** 255:*15*
**document** 18:*2* 39:*18, 21*
84:*21* 92:*11, 16* 111:*9, 14*
113:*15, 21* 114:*17* 117:*24*
118:*7, 13, 19* 119:*22*
120:*7* 152:*24* 160:*19*
165:*22* 167:*1* 190:*18*

219:*7* 235:*5* 257:*10*
269:*8, 9, 19* 276:*3* 277:*20*
**documentation** 119:*11*
137:*22*
**documents** 38:*4* 119:*16*
127:*20* 131:*8* 138:*11*
166:*24* 174:*2* 200:*9*
220:*5* 245:*16* 258:*20*
272:*10* 278:*14*
**dog** 72:*18, 19* 112:*13*
220:*12*
**doing** 6:*15* 21:*4* 48:*22*
61:*25* 67:*10* 73:*20* 80:*19*
91:*7* 101:*4* 106:*15*
118:*25* 134:*13* 146:*17*
164:*19* 166:*6* 177:*22*
196:*23, 24* 209:*10, 24*
210:*24* 211:*20, 23* 213:*19*
217:*2* 229:*9* 236:*1*
241:*12* 263:*12* 279:*21*
**doings** 197:*12*
**dollar** 23:*11*
**dollars** 33:*21* 228:*20*
**domain** 53:*10, 11*
**donations** 150:*24* 164:*23*
165:*3*
**door** 62:*2, 10* 73:*25* 74:*5*
150:*20* 170:*25* 207:*3*
210:*2* 230:*13, 14, 15*
232:*4* 236:*4, 5, 18, 20, 21,
22, 23* 248:*10*
**doors** 81:*24, 25* 176:*7*
181:*3, 4* 230:*14* 232:*4, 8*
236:*5*
**double** 35:*22* 206:*12*
**doubt** 44:*14, 17*
**dozen** 185:*11, 17, 18*
**drafted** 111:*9* 149:*20*
**dragged** 132:*5*
**draw** 115:*3* 160:*7*
**drawing** 114:*21* 115:*2, 13,
18* 228:*21* 234:*8*
**drawings** 147:*5*
**draws** 178:*4*
**drew** 114:*25* 115:*22, 23*
178:*3*
**drilling** 127:*1*
**drink** 37:*6*
**drinking** 73:*19*
**drive** 151:*5* 224:*3* 234:*9*
250:*19*
**driven** 167:*10*
**driver** 207:*21, 22, 24*
208:*11, 13, 15* 209:*17, 19*
210:*6, 12, 20* 211:*8, 11*
216:*4*
**driver's** 210:*2, 4*
**drives** 195:*14*
**driveway** 81:*22* 190:*12*
191:*24* 195:*20, 21, 25*

196:*1, 20* 197:*7, 17, 18*
198:*19, 20* 225:*9, 14*
230:*13* 234:*6, 11, 12, 13*
235:*7* 236:*3* 240:*15*
241:*7, 9, 25* 242:*2, 4, 19*
243:*8, 9* 245:*10* 246:*1, 6*
249:*7* 250:*20*
**driveway's** 224:*2*
**driving** 151:*3* 195:*16*
215:*19, 23*
**drop** 36:*18*
**drops** 130:*20*
**Dude** 246:*25*
**due** 43:*21* 55:*8* 247:*19*
**dues** 263:*1*
**duly** 6:*2* 281:*5*
**Dum** 237:*1*
**dump** 235:*5*
**dumped** 196:*20*
**dumps** 190:*18*
**duration** 48:*9*
**dusts** 197:*5*
**duties** 252:*23, 25*
**Dylan** 45:*8*

**< E >**
**earlier** 72:*4, 25* 76:*3*
119:*7* 135:*16* 167:*22*
197:*5, 22* 237:*16, 17*
245:*1*
**early** 66:*8, 17* 76:*17*
195:*11, 12* 212:*11* 262:*2*
**earn** 256:*21*
**earnest** 49:*23*
**earth** 253:*23*
**easier** 87:*5* 234:*4*
**easily** 56:*7* 65:*20* 181:*23*
186:*12* 238:*15*
**EASTERN** 1:*4*
**easy** 55:*9* 63:*15* 81:*13*
140:*6*
**eat** 54:*24* 77:*12, 19, 20*
106:*17*
**ECB** 23:*16* 26:*13*
**eclipse** 229:*16* 231:*7*
**economics** 32:*2*
**EDEN** 2:*4* 75:*21, 23*
76:*1* 109:*23* 146:*9* 183:*8*
189:*9* 221:*8*
**eden.quainton@quaintonla
w.net** 2:*10*
**editorial** 147:*14*
**education** 263:*2*
**effect** 55:*11* 104:*6* 128:*4*
152:*19* 184:*8* 276:*11, 14*
279:*13*
**effort** 88:*23* 184:*12*
**eight** 135:*15* 181:*4* 197:*9*
**either** 34:*1* 49:*14* 58:*7*
72:*20* 98:*8* 108:*5* 124:*18,*

24, 25* 125:*12* 129:*2*
181:*24* 188:*5* 198:*1*
205:*24* 281:*15*
**El** 96:*9*
**elect** 163:*20*
**electronically** 110:*1*
**elements** 249:*6*
**eligible** 149:*13*
**else's** 84:*4* 180:*6* 219:*8*
**Email** 3:*5* 4:*8, 13* 30:*23*
32:*16* 34:*12, 19* 35:*3, 7*
38:*20, 22, 23* 39:*8, 14, 16*
40:*2, 5* 41:*2, 3, 4, 6* 57:*23*
84:*24* 85:*3* 94:*12* 102:*2*
112:*5* 116:*12, 19* 117:*4,
10* 119:*24* 133:*6, 7, 23*
134:*3, 11* 135:*6, 9, 15*
136:*13* 138:*7* 160:*23*
176:*18* 181:*10* 182:*7*
184:*8, 14, 18, 20* 185:*19*
186:*14, 17* 187:*15, 18*
188:*3, 6* 194:*18* 198:*15*
205:*8* 207:*15* 260:*24*
269:*20* 271:*5, 18* 274:*22*
278:*4, 6*
**emailed** 103:*8* 197:*15*
**emails** 177:*17, 20* 183:*1,
21* 184:*5* 185:*11* 186:*24*
188:*7, 8* 269:*22*
**embodiment** 20:*6*
**embody** 171:*18*
**emersion** 259:*1*
**emotional** 264:*9*
**Emotionally** 265:*3*
**employed** 11:*4* 14:*22*
15:*6, 16, 22* 16:*13*
**employees** 23:*5*
**encapsulates** 88:*2*
**enclave** 88:*1*
**encountered** 212:*21*
**encountering** 211:*8*
**endeavors** 11:*10*
**ended** 243:*10*
**ends** 198:*3*
**enduring** 137:*14*
**enforceable** 202:*8* 266:*19,
22*
**engage** 256:*22* 257:*14, 23*
**engaged** 12:*15* 15:*11*
19:*8* 21:*4, 14* 24:*22* 26:*1*
27:*1, 9* 28:*9*
**engaging** 13:*13*
**engineer** 233:*13* 241:*15*
242:*23*
**engineer's** 234:*24*
**Englebrecht** 251:*12*
**English** 98:*23* 101:*3*
280:*16*
**enrolled** 10:*17*

enter 266:1
entered 257:4
enterprise 23:11
entertaining 127:5 157:25
entire 74:13 129:22
130:12 180:11
entities 16:13 23:5 27:16
entity 15:7, 17, 23 22:6, 9,
10 23:3, 14
Entrepreneur 11:9, 11
entrepreneurial 15:12
19:7, 14, 19, 24 20:6, 19
entry 74:5
envisioned 147:3 230:2
episode 91:6 111:10
129:22 168:22
equally 191:2
equipment 209:5
era 266:18
erected 162:22 163:9
Eric 68:3
errand 37:13
Ertel 67:10, 21 69:11
76:21, 22 82:2 171:5, 8,
19, 25 172:17, 23
eruv 53:16
ESQ 2:3, 4, 13, 14 75:23
Esrei 85:10
essentially 92:17 93:7
115:22 121:12 125:7
140:20 159:24 160:4
163:14 171:17 229:25
established 277:21
establishing 189:17
establishment 74:14 75:1
99:14 263:15 266:2
estate 11:16 12:5, 6, 15,
25 13:2, 8 28:15 33:23
147:5
ET 1:9 23:20 53:19
67:25 82:9 139:18 214:2
ethical 166:22
ethics 196:17
eucharist 51:17
Euclid 87:24
European 53:19
evening 48:13, 19, 25
54:17, 20 135:22
event 40:12 260:21
281:16
events 102:12 174:25
eventually 101:16 224:24
225:1 236:16 261:4
280:14
everybody 91:6 121:9
124:9 155:16 174:17
191:2 198:3 222:5
224:10 233:23 247:19
248:4

everybody's 155:10
191:1 212:24
evidence 170:17 180:20
184:24 200:11 273:19
evidence/materials 273:11
evidenced 227:24
exact 21:18 133:7 226:15
exactly 29:14 33:17 64:3
68:24 69:19 71:8, 9
80:18 87:16 99:16
108:19 131:20 136:18
143:12 150:12, 13 215:16
219:2 220:15 251:16
267:23
exam 267:8
examination 1:10 3:1
6:5 155:21 267:10
examined 6:3
example 23:9 53:5 130:3,
14 148:3
excavated 226:20
Excelsior 10:7, 8
exceptions 151:3
excerpt 114:23
exchange 116:18 117:4
excited 36:13
exclusive 256:12
exclusively 151:6
ex-cop 66:3
ex-councilman 67:10
excuse 23:5 213:22
237:15
execute 176:9
executed 192:10
EXHIBIT 3:5 4:12
17:12, 19, 24 37:18, 22
38:19 40:20 84:12, 17, 20
93:16 96:24 97:4 102:21
103:1 109:11, 17 112:13
113:5, 10 116:23 117:6
119:6, 8 122:15, 20, 25
123:10, 12, 15, 23 134:24
135:4 141:24 143:17
151:9, 14 152:7, 9, 15, 20
153:15, 17 155:4, 11
156:2, 20, 21 157:19
158:6, 18, 20, 25 159:1, 19
161:5, 6, 20 162:11 164:7,
23 165:3 167:14 170:7
257:5 269:12, 14
exhibits 109:25
exist 179:10 237:3
existed 258:5
exists 184:12
exit 130:6 232:4
expand 149:13 225:14
234:5, 11 235:7 242:19
expanded 94:7 192:2
expanding 234:12, 13
249:7

expansion 190:12 191:24
227:12 239:4 247:3, 4, 11
expansions 247:7
expect 51:12, 14 132:17
expected 132:13
expecting 228:10
expense 20:23 21:7
expenses 20:25 21:3
experience 124:13
experienced 78:24
expires 281:25
explain 19:21 42:9
81:14 84:2 95:4 98:9
106:24
explained 148:6, 10
expletive 70:12
expose 171:21
exposed 83:16
express 34:10 100:25
expressed 29:12 121:7
205:19
expresses 122:15
expressing 47:13
expressions 99:23
extend 225:9
extension 190:22 191:24
extensions 225:21 227:19
extent 165:7, 8 172:12
exterior 258:4, 6
extra 237:14
extremely 29:19
eye 22:15 63:21, 22
170:1 216:7
eyelash 279:17
eyes 162:18
eyesore 33:16
Ezrat 208:20

< F >
fabric 205:2, 13
FACA 252:14
face 87:10 88:11
Facebook 9:19 180:1, 7
faces 67:4
facie 278:16
facility 98:12 192:24
fact 35:8 36:5 41:8, 23
59:19 60:18 89:17 90:11
100:9 112:14 127:19
157:23 176:21 177:11, 17,
18 186:18 188:9 191:8
192:9 217:5 220:3 224:7
242:15 243:21
factly 139:17
facto 103:21
factor 59:18
factors 57:13
facts 134:22 177:17
factual 182:2
fail 107:18

failed 100:5 227:25
245:1 246:13
Fair 14:19 20:20 26:20
30:14 108:5 112:12
115:7 127:9 132:12
134:10 137:15 138:24
149:11 152:3 164:19
173:1 202:4 231:4
240:19 252:5 278:8, 15
faith 49:12 50:25 53:25
fake 238:10, 11 239:24
fall 248:2 264:19
fallacy 240:5
false 92:23 170:1, 22
familial 252:21 253:2
familiar 26:4 97:4 99:24
126:17 167:19 173:11
178:6
familiarize 42:17 113:11
143:22 167:17
families 139:18 190:23
255:14
family 14:19, 21 48:24
55:4, 13 61:24 62:25
65:1, 5 77:16 90:8
141:20 169:5 216:22
253:3, 4, 17 254:2, 3, 23
255:17
family's 90:11
fan 32:21
far 10:5 26:24 33:14
37:19 58:16 83:14 89:8
99:4 105:15 109:2 111:4,
25 120:20 180:14 190:15
253:19 255:14 258:13
278:2 280:21
farther 78:13 213:21
fashion 28:11 161:12
fast 63:19 230:19 240:12
243:8 259:25
fast-tracked 132:3
fast-tracking 134:15
father 8:6 10:24 129:10
252:23 253:1
father's 8:7
fault 59:3 136:17 191:3
217:17
favor 126:24 127:23
220:11 245:8
feather 79:2 176:9
feathered 192:9
February 73:1 153:10
155:13 157:10 163:11
165:15 167:9
Federal 1:10
Federation 216:10
feed 180:7 208:22
feedback 35:11
feel 24:5 32:22 44:7, 11
62:24 63:10 69:24 88:22

Deposition of Daniel Grand | Daniel Grand, vs. City of University Heights, Ohio, et al.

91:*19*  94:*23*  107:*17, 24*
108:*12*  125:*14*  129:*8*
130:*12, 13, 14*  131:*13, 14*
137:*13*  173:*24*  215:*17*
217:*14*  220:*25*  236:*9*
244:*15*  257:*2*  265:*8, 16*
266:*8*
**feeling**  143:*1*  217:*13*
265:*11*
**feelings**  41:*23*
**feels**  43:*10*  220:*20*
**feet**  195:*23*  199:*6, 7*
231:*13*  236:*12*  242:*3, 5,
18*  244:*18*  246:*6*  248:*11,
12*  249:*2, 4*  250:*23*
**Feld**  124:*4, 5*
**Feldman**  102:*6*  176:*11,
12, 16, 20*
**felt**  8:*13*  33:*5*  43:*20, 24*
44:*4, 10*  83:*5*  106:*22*
124:*18, 19, 20, 21, 22*
125:*7*  129:*2, 4, 19, 22*
141:*18*  174:*24*  223:*15*
**fence**  80:*21*  205:*4, 14, 15,
22*
**festive**  55:*2*
**fiber**  246:*20*
**fictitious**  161:*5, 6*  164:*7*
170:*25*  187:*20*  247:*18*
**fide**  141:*12*
**fifth**  249:*23*
**fighting**  93:*2*
**figment**  115:*16*
**figure**  73:*12*  145:*6*
159:*23*  222:*12*
**Figured**  32:*9*  42:*4*  67:*24*
181:*16*
**file**  101:*8*  120:*17*  131:*8*
137:*17*  171:*23*  227:*17*
228:*4, 17*  243:*17*  258:*20*
260:*2*
**filed**  6:*11*  81:*10*  109:*19*
114:*24*  116:*11*  117:*11*
121:*8*  227:*9, 10*  228:*22*
243:*18*
**filing**  80:*21*  92:*15*  120:*6*
**fill**  234:*10*
**filled**  250:*17*
**final**  167:*2*
**Finally**  93:*18*  238:*6*
262:*5*
**finals**  10:*25*
**finance**  32:*2*
**financial**  253:*9*
**find**  9:*22, 24*  34:*20*  60:*8*
61:*20, 21*  88:*22, 25*  89:*19*
269:*4*
**finding**  88:*21*
**Fine**  7:*16*  22:*18*  100:*5*
118:*15*  128:*8*  136:*4*

146:*12*  156:*18*  184:*21*
194:*10*  202:*3*  228:*15, 20*
231:*19*  234:*23*  235:*19*
241:*7, 20*  245:*12*  248:*7*
249:*4, 12*  257:*18*  277:*24*
**fines**  25:*24*
**finish**  70:*21*  71:*18, 20*
162:*7, 8*  246:*24, 25*  247:*1*
**finished**  125:*23*  141:*21*
**fire**  25:*17*  134:*8, 9*
**fired**  244:*13, 17*
**firm**  108:*24*
**First**  3:*5*  6:*2, 23*  10:*21*
18:*25*  24:*22*  27:*19*  30:*21*
41:*25*  42:*20*  56:*13*  64:*24*
65:*6, 14*  66:*9*  75:*11, 25*
80:*3*  84:*18*  89:*9, 15, 24*
92:*8*  97:*8, 12, 13*  108:*14*
109:*18*  119:*12, 17*  120:*9,
15, 22*  121:*11*  122:*11*
123:*6*  133:*3*  142:*3*
211:*13*  215:*13*  218:*9*
225:*19*  242:*23*  253:*13*
260:*11*  261:*12, 19*  264:*12*
267:*14*  268:*24*  270:*5, 13,
22, 24*  271:*1, 11, 24*  272:*3,
15*  273:*1*  274:*2, 9, 22*
275:*4*  276:*22*  277:*9, 10*
281:*5*
**firsthand**  172:*8, 11*
176:*10, 19*  177:*2, 13, 19,
21*  179:*25*  182:*11*  216:*2*
**first-name**  186:*22*
**fit**  24:*5*  229:*13*
**five**  46:*8*  79:*20*  114:*12*
130:*6, 7*  181:*25*  213:*19*
219:*12*  242:*17*  266:*2*
**flakes**  233:*21*
**fleshed**  192:*19*
**flexible**  263:*14*
**flights**  96:*9*
**Floor**  2:*6*  114:*23*  227:*12*
229:*16, 24*  272:*6*
**Florida**  197:*10, 23*  249:*15*
**flow**  76:*8*
**fly**  58:*3*  111:*12*
**focus**  220:*14*
**FOIA**  39:*23*  179:*18*
180:*22*  182:*3, 4*  218:*16*
219:*12, 17*  220:*14*
**follow**  53:*20*  132:*10, 11,
21, 22, 25*  141:*2*  260:*7*
**followed**  32:*8*  133:*5*
244:*22*  261:*7*
**following**  12:*23*  228:*23*
265:*9*
**follows**  6:*4*
**follow-up**  133:*19*  205:*23*
217:*25*  218:*1*  267:*15*

**food**  208:*22*
**footage**  200:*4*  231:*8*
**football**  74:*23, 24*
**footers**  227:*20*
**footprint**  225:*23*
**forbidden**  137:*7*
**forced**  62:*25*  244:*7*
**foregoing**  281:*9, 13*
**foreseeable**  43:*18*
**forever**  108:*2*  138:*15*
**Forget**  176:*2*  239:*3*
**forgive**  47:*15*  123:*3*
**forgot**  117:*4*
**form**  55:*16, 23*  56:*15, 23*
57:*2*  76:*7*  142:*16*  165:*22*
203:*9, 10*  218:*5*
**formal**  86:*4*  90:*24*  251:*8*
**format**  128:*16*  274:*2, 10*
275:*4*
**forming**  82:*7*  119:*18*
**forth**  54:*17, 18, 20*  57:*10*
183:*2*  185:*10, 11*  278:*7*
**forthcoming**  242:*17*
**forward**  47:*17*  156:*17*
230:*19*  240:*12*  243:*8*
**forwarded**  41:*1*
**found**  9:*20*  26:*18*  37:*4*
60:*11*  69:*23*  71:*2*  83:*20,
21*
**foundation**  139:*5*
**founder**  16:*10, 11*  208:*25*
265:*24*
**four**  14:*14*  46:*8*  54:*16*
55:*2, 6*  79:*20*  88:*3*
114:*12*  174:*7*  199:*19, 24*
219:*12*  223:*22*  232:*4*
244:*23*
**fourth**  94:*21*  232:*4*
236:*18*  249:*23*
**foyer**  74:*5*  75:*9*
**fragments**  239:*10*  240:*9*
**frail**  41:*8*
**frame**  18:*13*  69:*13*  79:*10*
**framing**  49:*21*  226:*22*
**frank**  149:*20*
**Franklin's**  1:*10*  2:*16*
**frazzled**  223:*23*
**Fred**  181:*2, 6*  241:*17*
244:*5, 6*
**free**  64:*16*  130:*5*  252:*12*
**freely**  74:*6*
**fresher**  111:*10*
**Friday**  54:*17*  116:*12*
**Friedman**  255:*9, 10*
**friend**  9:*17*  60:*25*  63:*24*
195:*14*  196:*17*  197:*6, 21*
198:*9, 18*  206:*1*  225:*10*
237:*18*  239:*16, 22*  240:*6*
250:*25*  259:*6, 8*
**friendly**  33:*10*

**friends**  57:*23*  77:*16*
84:*25*  91:*2, 21*  94:*7*
102:*12*  142:*8*  160:*22*
186:*23*
**friend's**  233:*19*
**from152**  4:*5*
**from155**  4:*3*
**front**  67:*11, 15*  70:*11*
131:*4*  150:*20*  160:*20*
161:*5*  166:*10*  167:*15*
169:*14*  170:*10*  197:*7*
199:*6, 19*  209:*21*  224:*4, 7*
230:*13, 15, 24*  232:*2*
233:*11*  234:*2*  235:*6*
236:*4, 5, 19, 20, 21*  248:*10*
263:*20*  271:*3*
**frustrating**  222:*10*
**fulfill**  52:*11*  252:*23*
**fulfilled**  219:*1*
**full**  234:*24*
**full-blown**  26:*14*  99:*14*
**fully**  40:*11*  145:*8*  179:*18*
215:*15*  218:*15, 20, 25*
**Fumich**  1:*10*  281:*2, 23*
**fun**  80:*14*
**function**  50:*11*
**funny**  63:*23*  64:*22*
258:*16*  259:*22*  260:*1*
**fur**  75:*13*
**furious**  67:*15*
**further**  131:*22*  135:*24*
136:*11*  168:*14*  196:*18*
213:*20*  224:*15*  226:*20*
279:*23*  281:*12, 14*
**future**  148:*22*  192:*20*

**< G >**
**gain**  35:*11*
**gained**  59:*8*  264:*12*
**game**  80:*4*  98:*14*  196:*22*
**gaping**  230:*23*
**garage**  70:*14*  115:*12*
116:*1, 2*  191:*22*  192:*2*
225:*8*  242:*7, 8*  250:*20*
**garages**  190:*11*  191:*6*
192:*1*
**garb**  75:*13*
**garbage**  185:*24*  186:*1, 2*
187:*11, 21*  220:*24*  221:*17*
222:*13*  224:*4, 6, 9, 21*
247:*18*
**garment**  68:*19*
**gate**  130:*5*
**gate's**  130:*6, 7*
**gather**  95:*12, 14*  96:*12,
17, 21*  167:*5*
**gathering**  85:*24*  86:*9*
125:*11*  131:*5*  139:*3, 16,
24*  140:*5, 18*  141:*13*

Deposition of Daniel Grand                                    Daniel Grand, vs. City of University Heights, Ohio, et al.

142:*13, 19, 22*  148:*21*
152:*17*
**gatherings**  114:*5, 8*
122:*16*  131:6  139:*9*
142:7  149:*19*  150:*3*
158:*19, 22*  160:6  161:*19,*
*23*  162:*16, 21*  163:*8, 9, 13*
167:*11*  168:*15*
**general**  247:*20*
**generally**  143:*21*  149:*13*
156:*3, 13*  157:*5*
**generated**  25:*13*
**generations**  266:*3*
**genius**  177:*16*
**Genre**  11:*25*
**gentleman**  86:*18*  87:*3*
**Geoff**  251:*12*
**Gerlich**  7:*21*  8:*8*
**G-E-R-L-I-C-H**  7:*22*
**germane**  145:*5*
**gesture**  7:7  80:*16*  149:*9*
**Gesu**  74:*24*  83:*24, 25*
186:*9*  187:*5, 6, 7*  189:*16,*
*23*  190:*20*  191:*5, 7*
265:*25*  266:*1, 2*
**getting**  27:*18*  37:*14*
59:*16*  61:*5*  62:*23*  81:6
98:*10*  174:6, *16*  192:*4*
210:*2*  237:*11*  240:*13*
241:*9, 11*  244:*13*  259:6
265:*10*
**get-together**  91:*11*
**gift**  4:*9*  36:*1*  38:*21*  41:*9*
44:*16*
**gifts**  42:*15, 21*  43:*10, 14,*
*21*
**gin**  170:*16*  173:*3*  276:*21*
**girls**  260:*18*
**GIS**  89:*18*
**gist**  107:*15*  145:*9*
**give**  19:*5*  21:*20*  34:6
71:*15*  83:*10*  87:*2*  90:*21*
99:*21*  112:*14*  114:*16*
115:*1, 2*  117:*2*  118:*24*
136:*20*  141:*25*  144:*11*
171:*4*  178:*24*  187:*24*
188:*2*  190:*23*  199:*4*
207:*4*  208:*22*  219:*21*
220:*4*  222:*19*  226:6
228:*3*  230:*11, 19*  233:*9*
234:*23*  235:6  240:*24*
246:*22*  248:*16, 18*  249:*8*
250:*3*  251:*10*  256:*16*
257:*17*  261:*23*  262:*13*
264:*1, 21*  269:*18*  277:*10*
**given**  6:*13*  19:*3*  39:*23*
44:*15*  80:*9*  199:*25*
259:*15*  262:*13*  264:*3*
271:*20*  281:*11*

**gives**  112:*18*  177:*20*
209:6
**giving**  43:*1*  44:*9*  117:*14*
137:*24, 25*  199:*9*  209:*1*
219:*24*  230:*16*  235:*11*
236:*2*  247:*14*
**glad**  178:*12*
**glanced**  173:*12*
**glass**  117:7  135:*5*
**gleefully**  62:*19*
**go**  17:*17*  23:*17*  24:8
32:*10*  34:*24*  36:*25*  37:*13,*
*17*  40:*8*  41:*4*  46:*24*  47:*1,*
*2, 3, 7*  48:*6, 13, 15*  51:*13*
53:*22*  54:*16, 18, 19*  55:*3*
56:*10, 11, 13*  59:*1*  61:*11*
63:*4*  65:*12*  66:*24*  67:*21*
69:*25*  70:*1*  71:*22*  73:*4,*
*11*  74:*8, 14*  78:*1*  82:8
90:*16, 25*  92:*10, 22*  93:*10*
96:*3, 8*  99:*25*  101:8
105:*24*  109:7  110:*5*
111:*5*  113:*16*  120:*17*
121:*18*  125:*4, 8*  130:*4, 6,*
*8, 9*  131:*9, 11*  134:*20*
137:*9*  141:*8*  142:*4*  143:*3*
149:*17*  154:*1*  155:*23*
160:*15*  162:*8*  165:*19*
174:*22*  175:*18, 22*  176:*12*
178:*3*  180:*14*  190:*22*
192:*7, 8*  193:*11, 16, 17*
194:*12*  196:*18*  197:*1*
202:*10*  219:*19, 20*  227:*17,*
*25*  228:*12*  229:*10, 12*
230:*25*  231:*19, 20, 24*
235:*19*  236:*17*  241:*5, 19*
243:*7*  244:*20, 21*  248:*9,*
*12*  250:*11*  256:*3*  263:*17,*
*18*  264:*20*  269:*25*  271:*10*
275:*21*  276:*3*  278:*13*
**goal**  130:*2*
**God**  48:*25*  50:*2, 4*  63:*9*
69:*15*  77:*17*  85:*12, 16, 18,*
*19*  86:6  207:*9*  253:*21, 22*
**Godaven**  178:6
**goes**  50:*20*  54:*4*  68:*16*
180:*15*  187:6  210:*13, 16*
233:*3*  249:*1*  275:*9*
**going**  6:*21*  13:*21*  14:*24*
15:*18*  17:*23*  18:*10*  22:7
30:*24*  31:*21*  32:*21*  36:*23*
38:*4*  41:*10, 12*  45:*15*
47:*17*  48:*21*  49:6  58:*3*
59:*14*  60:*10, 21*  61:*16*
63:*11, 25*  64:*1, 4*  68:*6, 21,*
*23, 24*  69:*5, 9*  70:*3*  71:*15*
72:*22*  78:*19*  82:*4*  84:*16,*
*17, 20*  87:*14*  88:*24*  89:*16,*
*21*  92:*22*  95:*4*  97:*3, 7*
100:*5*  102:*25*  107:*23*

109:*16*  113:*10*  123:6
127:*14*  130:*5*  133:*13*
135:*11*  136:*21*  137:*14*
138:*9, 12*  139:*4*  140:*5, 20,*
*25*  141:*2*  143:*5, 21, 24*
144:*7, 25*  145:*12*  147:7
153:*7, 9*  156:*11, 17*
160:*12*  161:*10*  163:*20*
164:*13*  165:*19*  166:*1, 2*
168:*3*  169:*15*  170:*25*
174:*12, 17*  175:*21*  180:*4,*
*5*  185:*10, 14*  186:*11*
188:*24*  192:*19*  194:*11, 19*
196:*12*  199:*1*  200:*22*
202:*19*  209:*12*  212:*15*
213:*4, 6, 10, 11, 24*  215:*21*
221:*19*  224:*14*  228:*17*
230:*4, 11, 17*  231:7
233:*12*  235:*1, 8*  238:*13*
243:*6, 7*  246:*21*  248:*16*
249:*2, 8*  252:*1, 18*  253:*18*
259:*25*  263:*25*  265:*8, 17,*
*21*  267:*7, 12*  269:*9, 23*
270:*14*  272:*15*  275:*20*
276:*4*
**Goldfeder**  168:*4*
**Goldfeder's**  168:*8*
**good**  10:*2*  17:*10*  31:7
32:*22*  33:*5, 12*  43:*25*
69:*21*  83:*11*  111:*13*
138:*19, 21*  149:*15*  151:*23*
164:*2*  175:*9*  189:*2*
192:*20*  204:*24*  209:*5*
225:*24*  226:*3, 4*  245:*24*
254:*2, 24*
**good-hearted**  44:*8*  82:*14*
**goodness**  82:*13*
**Gotcha**  7:*17*  32:*11*
114:*16*  119:*4*
**gotten**  40:*3*  181:*16*
266:*17*
**government**  169:*20*
171:*19*
**grace**  77:*18*
**grade**  252:*4*
**graduate**  10:*6, 8*
**GRAND**  1:*5, 10*  3:*2, 5*
6:*1, 8, 9*  17:*23*  42:*21*
43:*12*  45:*9*  68:*10, 14*
76:*2, 13*  90:*9*  91:*1*
109:*15*  127:*15, 24*  146:*18*
148:*10*  155:*23*  156:*23*
170:*17, 20*  175:*21*  180:*13*
186:*7*  197:*16*  219:*14*
224:*11*  228:*5*  231:*22*
235:*2*  242:*2, 5*  249:*10*
267:*12*  270:*9*  272:*18*
281:*5*
**grandfathered**  191:*10*
**grandkids**  80:*7*

**Grand's**  165:*18*  167:*5*
170:*19*
**Grant**  232:*7*
**granted**  261:*3, 4*
**grass**  61:*22*  80:*12*
196:*19*  247:*8*
**gravel**  197:*2, 5*  226:*22,*
*23*  227:*3*  229:*7*  233:*20,*
*21*  237:*9, 10, 12, 14*
238:*15, 21, 23*  239:*5, 6, 7,*
*10*  240:*9*
**graveled**  238:*18*
**gray-haired**  212:*13*
**great**  13:*25*  80:*10*  110:*3*
128:*9*  184:*16*  241:*2*
272:*14*
**Green**  39:*2*  42:*15*  51:6
81:*20, 22*
**grew**  31:*11*  190:6
**GROSS**  2:*3*  3:*5*  5:*2, 3, 4,*
*5, 6, 7, 8, 9, 10, 14, 15, 16,*
*17, 18, 19*  8:*4, 11*  13:*21*
14:*24*  15:*18*  17:*13*  37:*25*
38:*7, 14*  47:6  57:*1*  71:*22*
72:*1*  75:*20, 24*  93:*10*
109:6  110:*4*  122:*4, 23*
131:*25*  136:7  144:*15, 24*
145:*12, 17*  146:*4, 8, 13*
153:*11*  154:*1*  155:*17*
194:*3*  202:*19*  203:*8*
204:*4*  218:*4*  254:*8*
259:*10*  267:6, *11*  269:*10,*
*17*  275:*22*  279:*22*  280:*6,*
*10, 14, 19*
**group**  12:*3*  36:*12*  47:*25*
55:*16, 18, 23*  56:*24*  57:*23*
66:*9, 17*  75:*5*  76:*17*
84:*25*  85:*3*  86:*25*  87:6
90:*13, 20*  92:*4, 5*  94:*7, 11*
96:*4, 11, 13*  101:*17, 23*
102:*5*  119:*19*  120:*12*
123:*7*  126:*25*  137:*19*
139:*15, 23*  147:*2, 21, 22*
148:*5, 8, 12*  157:*21*
193:*13, 14*  278:*17*
**groups**  58:*11, 15*  95:*17,*
*20*  151:*2*  156:*24*  158:*10*
**growing**  82:6
**grown**  60:6
**guarantee**  152:*17*
**guard**  213:*2*
**guess**  40:*7*  186:*8*  222:*1,*
*6*  242:*8*  262:*3*  269:*11*
**guest**  60:*16, 17*  61:6
**guests**  148:*8, 13*  158:*3, 6,*
*9*  167:*4, 10*
**guilty**  79:*1*
**guitar**  68:*2*
**gung**  59:*13*

Case: 1:22-cv-01594-BMB  Doc #: 80  Filed: 01/26/24  83 of 101.  PageID #: 1309
Deposition of Daniel Grand

Daniel Grand, vs. City of University Heights, Ohio, et al.

guy 24:12, 15 37:5 68:22 79:2 81:20, 23 87:8, 21 88:6, 9 128:12, 24 149:15 164:2 169:14 192:17 207:2 208:9 214:14 216:15 217:5 224:11 226:4 233:14 239:21 243:2 245:7

guys 71:5 107:11 140:2 216:8 222:1 224:3 230:6 231:9, 20 241:23 245:23

guy's 36:6

< H >
Hachim 208:20
hair 65:13, 16, 19
hakeneset 85:5, 6, 22, 23, 24 86:1, 3 96:2
half 16:8 17:2 79:4 115:25 185:11, 17, 18 219:23 241:13 242:15 254:14
hall 218:13
hand 17:23 54:11 84:16 97:3 102:25 109:17 114:25 115:4 138:10 171:6 172:4 174:16 234:8 281:19
handed 18:5 38:18 113:9 135:3 151:13 250:9
handle 23:25 24:2 25:5 173:13 253:9 265:1
handling 175:4
hands 34:6 50:5
handyman 29:1
Hang 71:13 162:7 207:5
hanging 68:4
haphazard 175:1
haphazardly 237:25
happen 118:3 121:17 140:21 149:4 169:13 171:6
happened 32:18 63:19, 21 67:7 71:8 77:6 78:4 83:6 104:12 131:16 140:9 141:5 153:4 210:18 211:10 217:15 221:11 227:2, 22 230:18 233:6, 7 234:16, 17 235:18 238:8 244:17 248:5 251:2 253:12 264:1
happenings 197:13
happens 160:15 180:9
happenstance 60:25 63:18
happy 6:25 7:11 33:25 43:11 44:7 45:24 56:9 58:25 60:2 61:7 63:14

64:7 131:15 132:11 133:10 222:18
harass 232:18 240:2
harassing 169:20 198:22 200:20 233:4
hard 10:25 30:12 32:23 40:8 55:14 59:17 61:12 70:2 80:5 83:10 93:22 111:11 112:3 134:21 182:14 217:11, 16 223:22 230:16 235:11 236:16 246:22 247:15 249:8 254:22
harder 59:9, 20
harm 169:24
Hashanah 212:1, 22
Haskel 90:1
haskome 118:22
hat 49:6 65:11, 12 67:2 68:20 71:7 75:13 265:19
hate 83:17, 18 191:2
Hathaway 255:9
hatred 174:15
hauled 225:15
hawking 61:20
head 7:7 61:19 66:25 70:4 83:17, 19 108:4, 8 173:24 223:3 229:1 238:22 246:8
heads 228:7 242:25
hear 6:23 7:1 15:4 56:5 59:25 93:4 100:3 106:8, 9 130:20 146:10 206:7 227:21 279:2, 9, 11
heard 7:15 74:3 79:3 133:11 142:25 210:17 268:24 270:13
hearing 25:23 78:8 79:6 80:24 81:2, 3, 4 82:25 105:25 107:5 110:25 116:4, 7, 13 117:16 120:3 121:15, 16 124:1, 7 125:16 126:3, 17 127:3, 4, 6, 13 129:1 130:23 131:9, 22 139:14 142:9 160:24, 25 165:21 166:9 169:4 173:16, 17, 21, 23 174:20 175:3, 21 176:4, 5 177:4, 8, 24, 25 179:24 180:4, 20 181:5 185:1 188:14 224:13 227:3 237:16 244:6, 7 268:5, 23 269:5 270:17 271:19 276:16 278:24 279:2
hearings 23:16 26:5, 12, 13 169:22 180:6, 21 182:21 185:23 232:15, 18 248:1 267:15 275:11
hears 85:12, 14, 17, 18, 19

86:6
hearsay 177:18
heart 91:20
Hebrew 63:20 99:23
heck 68:7
he'd 66:1
HEIGHTS 1:9 3:5 6:12 8:15, 24 9:11, 16, 21 10:2 23:9 29:7 33:14 45:20 49:4 50:1 51:6, 8, 21 52:9 54:8 60:9 67:17 87:19 142:9 143:1 144:5 182:9 189:19 202:12 204:10, 19 214:25 219:20 222:12 224:8 227:14 263:13 266:9, 13 270:10
held 1:10 100:21 139:14 262:21
hell 221:5 228:7
he'll 135:12 207:9
hello 72:20
hell's 138:9
help 16:25 21:3 33:22, 25 34:4 73:12 91:17 107:17 129:2 133:13 134:9 208:22 209:6, 9 240:22
helpful 93:22 134:16
helping 134:17
Hemi 196:7
hereinafter 6:3
hereunto 281:18
hesitant 263:17
hey 24:6 61:2 68:6 74:7 77:10 87:13 134:19 224:22 244:15
Hi 207:3
highlight 105:3
hijacks 127:25
hired 141:1 225:20 226:8
hiring 216:21
historically 266:24
history 56:3 83:23, 24 107:8 190:13
hit 59:16 74:24 80:12 239:24
hitting 80:14 149:21
ho 59:13
Hodson 79:25 80:8, 19 81:19 179:7
Hoffman 206:3, 11 207:19 208:11, 13, 14, 16 209:23 210:8, 10, 11, 15, 19, 25 211:12
Hoffman's 211:8
hold 53:14, 16 59:7 100:21 136:19 139:2, 9 146:4, 8 151:1 156:23 157:20 195:24 197:18 228:18 270:10

holding 108:3, 8 228:11 251:13
hole 136:3 230:23
holiday 138:1
home 55:4, 18, 24 56:24 60:15, 22 67:16 104:8 105:12 115:9 135:21 142:8 147:3 148:8, 12 167:5, 8 191:16, 18, 20 194:17 210:14, 16 216:22, 23 228:11 256:21 257:8, 14, 22 258:9, 10, 11, 14 259:14, 15, 21 260:2, 8 261:16 276:24
homes 67:17
homeschooled 263:10
honest 36:10 41:7 45:10 87:10, 17 100:12 138:14 157:13 175:10 200:17 235:18 240:17
honestly 45:16 222:14
hope 121:4
hopefully 267:7
hoping 33:12
horrible 131:19
host 101:23 135:11 148:7, 11
hostility 174:13
hour 48:22 209:5, 16, 23 210:1, 9
hours 50:3 175:8 194:4 195:12 197:22 237:23 240:7
house 23:8 54:13 56:1, 2, 8 57:24 58:3, 12 60:2, 6, 12, 13, 14, 17, 20, 21 61:5, 8, 15, 18 62:5, 9, 14, 21 63:4, 6, 8, 12, 13, 16, 19, 24, 25 64:3, 6, 9, 11, 15 70:12 72:6 73:4, 5, 16, 23, 24 74:11, 25 75:2 85:5, 22 86:25 87:7 90:10 91:11 92:19, 20 93:6 96:2, 3 101:10, 17 102:5, 18 105:6 115:3 117:21 125:2 131:1, 6 135:19 139:3, 9, 15 140:10, 18 141:1, 6, 13 143:3 149:2, 3 150:1, 7, 17, 18 158:4, 9, 11, 13, 15 161:20 164:24 165:2 166:2 168:17 169:14 170:22, 24 171:7 174:7, 8 181:20, 23 182:1 189:14 190:5, 8 192:13 193:5, 14 195:15, 23 197:7, 24 199:6, 20 207:20 208:14 209:21 210:11 213:12 217:12 219:13 222:9, 24 225:19, 23 226:14 228:2, 10

Deposition of Daniel Grand

Daniel Grand, vs. City of University Heights, Ohio, et al.

229:*13*  230:*1*, *5*, *24*, *25*
232:*5*, *9*  234:*6*  248:*9*
249:*2*  252:*13*  255:*1*, *13*,
*19*  258:*3*, *23*  263:*9*  277:*7*
278:*9*, *18*  279:*5*, *8*
**housed** 165:*17*
**household** 223:*4*
**households** 212:*20*
**houses** 14:*9*  61:*20*  63:*10*
74:*20*  79:*18*
**housing** 25:*19*  221:*2*
**How's** 127:*8*
**HPD** 25:*20*
**human** 257:*11*
**humanity** 82:*15*, *17*, *18*
**Humbly** 173:*5*, *7*
**hundreds** 23:*4*  84:*10*
130:*23*  168:*24*, *25*  174:*9*
**hunky-dory** 234:*23*
**hush-hush** 175:*23*

**< I >**
**i.e** 144:*5*
**idea** 57:*7*  60:*11*  61:*7*, *8*
64:*1*  66:*7*, *8*  76:*17*  87:*6*
88:*7*  98:*2*  99:*22*  131:*1*
157:*25*  209:*12*  211:*3*
238:*13*, *14*  241:*2*  263:*12*
268:*7*
**identification** 17:*20*
37:*23*  84:*13*  96:*25*
102:*22*  109:*12*  113:*6*
116:*24*  134:*25*  143:*18*
151:*10*  152:*10*  155:*5*
196:*8*  269:*15*
**identify** 84:*23*
**idling** 212:*25*
**idly** 212:*23*
**iffy** 241:*3*
**Ignatius** 265:*24*
**ignorance** 180:*1*
**ignorant** 32:*6*  49:*11*, *13*
51:*15*  214:*13*
**II** 266:*4*
**illegal** 140:*17*  234:*12*
237:*10*
**illegally** 182:*23*  197:*16*
**illicit** 106:*19*
**imagination** 115:*16*
**imagine** 182:*14*  224:*24*
**immediately** 101:*7*  228:*22*
**impanel** 175:*3*
**implied** 88:*5*
**implies** 12:*25*  77:*12*
87:*23*
**imply** 93:*4*
**implying** 44:*24*  148:*4*
**importance** 104:*4*
**important** 50:*11*  56:*10*,
*13*  57:*14*  66:*23*  112:*7*

125:*21*  180:*13*  182:*18*
238:*14*
**imposed** 193:*21*
**impressed** 31:*22*
**impression** 82:*21*
**improperly** 44:*25*  45:*2*, *4*
**inaccurate** 19:*10*, *11*, *16*,
*18*
**inadvertent** 142:*24*
**inadvertently** 91:*7*
134:*16*  234:*5*
**inappropriate** 222:*25*
**inappropriately** 49:*5*
**inauguration** 92:*7*
**inches** 244:*23*
**incident** 205:*25*  215:*9*
217:*10*  225:*6*
**incidents** 211:*16*
**included** 225:*21*  238:*18*
**income** 256:*21*
**inconsiderate** 196:*11*
**incorporated** 22:*8*
**incorporating** 258:*20*
**incorrect** 45:*23*  46:*15*, *18*
79:*21*  139:*10*  184:*1*
237:*25*
**incurred** 264:*9*
**indentation** 199:*5*
**INDEX** 3:*1*, *5*  5:*1*
**Indian** 255:*15*
**indicate** 93:*17*  97:*9*
113:*22*  114:*3*  140:*16*
180:*16*  182:*20*  194:*16*
201:*23*  203:*6*  205:*1*
211:*24*  212:*2*  249:*7*
**indicated** 12:*24*  13:*6*
19:*23*  25:*8*  72:*4*  92:*16*
94:*2*, *5*, *6*  140:*13*, *15*
157:*20*, *22*  158:*17*  159:*25*
176:*14*  200:*3*  207:*19*
244:*2*  263:*8*
**indicates** 161:*18*  163:*7*
164:*23*  165:*3*  167:*4*
**indicating** 162:*14*  272:*6*
**indication** 162:*14*  244:*3*, *4*
**indicting** 105:*16*
**indifferent** 254:*2*
**individual** 170:*9*
**industrial** 247:*24*
**industry** 11:*19*  12:*6*, *16*
25:*9*, *11*, *25*
**inferable** 186:*12*
**infinitum** 55:*8*
**influence** 44:*25*  45:*2*, *5*
**influenced** 43:*21*
**info** 16:*6*
**informal** 86:*4*  119:*18*
120:*12*, *16*  122:*16*  123:*7*
125:*11*  168:*15*

**information** 16:*1*, *19*
89:*22*  117:*15*, *17*  133:*19*
178:*24*  179:*21*  207:*12*
214:*6*  256:*17*  278:*7*
**informed** 97:*9*  101:*1*
205:*1*  250:*11*
**initial** 56:*16*, *17*  255:*25*
**initially** 217:*25*
**initiated** 160:*9*
**in-person** 111:*23*
**input** 204:*13*
**inside** 93:*6*  96:*3*  170:*24*
186:*2*  208:*14*  209:*24*
**inspected** 227:*20*  250:*3*,
*11*
**inspection** 62:*13*, *14*
226:*25*  227:*1*, *24*  228:*1*, *2*,
*24*  246:*9*, *11*
**inspections** 81:*10*
**inspector** 187:*22*  227:*23*
228:*25*  235:*21*, *24*  245:*8*,
*14*  250:*5*, *9*
**inspectors** 24:*4*
**install** 67:*23*
**instances** 169:*19*
**institutions** 169:*21*
**instruct** 204:*5*
**instructions** 112:*14*
**insult** 41:*13*, *15*  73:*22*
**insulting** 41:*14*, *17*  265:*14*
**integrity** 232:*21*
**intelligent** 232:*18*
**intend** 276:*24*
**intended** 86:*8*  94:*3*
114:*21*  115:*23*  118:*8*
135:*12*  147:*22*  263:*8*
**intending** 97:*23*
**intends** 156:*23*
**intensity** 82:*6*
**intention** 43:*23*  44:*23*
100:*7*  101:*22*  122:*9*
123:*19*  147:*1*  148:*20*
149:*11*, *18*  150:*5*, *23*
151:*1*  160:*1*  234:*14*
**intentionally** 108:*3*
**intentions** 44:*4*  119:*13*,
*18*  120:*10*  121:*7*  122:*15*
147:*6*, *7*  148:*2*  150:*15*, *16*
**intently** 34:*23*
**interacted** 27:*16*  102:*8*
126:*11*
**interacting** 28:*17*  30:*21*
**interaction** 67:*8*  263:*11*
**interactions** 65:*7*  69:*7*, *14*
116:*6*, *8*
**interchangeably** 99:*12*
**interest** 29:*12*  34:*10*
128:*25*  134:*14*  269:*23*

**Interested** 9:*12*  34:*20*
58:*9*  77:*22*  86:*24*  93:*18*
94:*23*  281:*16*
**interesting** 40:*17*  243:*2*
**intern** 29:*13*
**internship** 34:*11*, *15*, *21*,
*24*
**interpret** 231:*14*, *15*
**interpretation** 231:*16*
**interpreting** 230:*4*
**interrogation** 268:*13*
**interrupt** 76:*8*  126:*1*
**intimidated** 141:*22*
**introduce** 90:*4*
**introduced** 65:*10*
**introduces** 92:*4*
**introduction** 18:*8*  30:*10*,
*16*  31:*3*
**intrusion** 202:*16*  204:*18*
**investigate** 176:*21*
**investigating** 237:*24*
**investigation** 175:*12*
**investigator** 216:*21*
**invitation** 58:*2*  91:*11*
150:*3*  163:*10*
**invite** 66:*1*  78:*19*
**invited** 77:*25*  78:*4*, *9*
79:*7*  148:*8*, *12*  150:*7*
158:*3*, *5*, *9*, *15*  167:*4*, *10*
**inviting** 85:*3*
**involved** 12:*21*  31:*6*
34:*1*, *4*  132:*9*  144:*6*
171:*5*  177:*5*  190:*14*
259:*19*
**involves** 22:*25*  23:*1*, *7*, *15*
87:*24*, *25*
**Irish** 255:*16*
**ironically** 182:*13*
**irony** 244:*18*
**irrelevant** 173:*22*
**isolate** 70:*1*
**Israel** 51:*6*  96:*8*, *9*  206:*4*,
*13*, *19*  208:*7*, *10*, *23*
**Israeli** 85:*25*  208:*2*
**issue** 24:*4*  25:*21*  26:*23*
53:*10*  56:*9*  79:*5*  102:*12*
163:*23*  198:*9*  201:*4*, *9*
237:*7*  249:*20*  250:*13*
251:*9*  258:*4*  259:*20*
**issued** 174:*3*  198:*1*, *18*
199:*10*, *11*  239:*20*  245:*5*
251:*7*, *14*, *19*  261:*14*
276:*15*
**issues** 25:*17*  72:*14*  76:*15*
79:*9*  102:*18*  235:*10*
251:*5*, *7*  252:*8*
**issuing** 28:*19*  237:*24*
259:*21*
**Item** 158:*5*, *19*  160:*3*, *8*
161:*20*  163:*11*  165:*3*, *10*,

*15* 167:2, *9*  188:*3*  257:*20*
277:*11*
**items**  132:*20*
**its**  6:*12*  26:7  65:22  82:6
105:*15*  153:6

**< J >**
**Jack**  179:6  185:5  186:*5*,
*19*  187:5  188:*4*
**Jackson**  24:*11*, *14*
**jail**  107:*23*
**JAMES**  2:*13*  4:2, *3*, *5*
**Janine**  186:*25*
**January**  8:22  64:*18*
66:*16*  76:*16*  85:2  116:*12*
161:*1*  276:22
**Jason**  227:22  228:25
**Jason's**  229:*3*
**jclimer@mrrlaw.com**  2:*20*
**jerk**  196:*14*
**jerks**  79:*23*
**Jew**  46:*3*  50:2, *8*, *13*, *18*,
*20*  53:*1*, *23*  83:*17*, *19*
169:*9*  181:*3*  232:*15*
253:*18*
**Jewish**  47:24  49:*11*
50:*10*  51:8  53:20  69:*1*,
*15*, *23*  71:*3*  74:*19*  75:5
82:*18*  85:8  87:25  99:*23*
100:*17*  106:*23*  137:6
138:*1*  151:5  181:*15*, *20*,
*21*  208:*4*, *9*  212:*21*  215:7
216:*10*, 22  217:*14*  222:24
224:*11*, *12*  242:9
**Jewish-Jewish**  215:*20*
**Jewry**  53:*15*, *16*, *19*
**Jews**  53:6, *24*  68:*19*
82:*19*  105:20  106:*5*, *12*
107:*21*  125:6  149:*4*
169:*2*  181:*25*  182:*13*
266:*1*, *5*, *10*
**JFS**  216:*12*
**jiggling**  23:*25*
**Jim**  6:*9*  109:22  183:7
188:*19*
**JLC**  51:5
**job**  32:22  225:*24*  227:8
245:*4*
**jobs**  17:6  240:22
**jogging**  187:*16*
**John**  81:*23*  266:*3*  271:5
**join**  75:*21*
**joining**  76:2  93:*19*
**joins**  75:*23*
**joint**  247:*11*
**joints**  247:*3*, *4*
**joke**  98:*13*, *15*  238:*10*
**JONATHAN**  2:*3*
**Jonathan's**  86:*14*

**jonathansgross@gmail.com**
2:*9*
**Joshua**  7:*21*
**jot**  112:*4*
**jousting**  93:2
**Judaism**  78:*20*
**Judeophobic**  74:*3*
**judges**  23:*19*
**judging**  65:*21*
**judicial**  26:*14*
**jump**  188:*20*
**jumped**  69:*24*
**June**  69:*21*
**jurisdiction**  26:7  198:6
202:*1*
**jurisdictions**  244:9
**Justice**  143:7

**< K >**
**Karen**  64:*25*
**Katz**  51:5
**keep**  67:*16*  169:6  170:*12*
220:*19*  243:7  253:*3*
276:2
**keeps**  263:*1*
**KELLEY**  5:*21*  6:*10*
119:9  137:*3*  153:22
278:*11*
**Kelly**  2:*14*  117:*10*, *13*
121:*4*  270:7, *8*
**kept**  126:*25*  200:*12*
212:*15*  244:*1*  263:6
269:6
**key**  71:*14*
**keyed**  71:*11*
**kheref**  63:*20*
**Khodhunda**  61:*1*
**kick**  174:*18*
**kids**  55:*11*  57:*14*  80:9
90:*25*  93:2  98:*15*  223:22
241:*10*  248:2  253:5, *7*
254:*12*, *19*  263:6, *10*, *14*
**kind**  11:*24*  13:*11*  17:*25*
32:7  33:*20*  37:*16*  53:7
62:*17*  63:*17*  64:22  66:*21*
69:*18*, *25*  71:6  72:22
74:*18*  80:*15*  82:5  89:9
98:9  107:*23*  112:2  136:2
144:*20*  149:*16*  155:*23*
169:*3*  182:*14*  190:*25*
194:*25*  196:2  208:*23*
212:*14*  220:*21*  221:*4*
222:*16*  224:2  233:*23*
258:*15*  263:*16*  264:*14*
265:*17*  268:*12*
**kindness**  43:9
**kit**  80:*4*
**Kluznik**  179:7  185:5, *13*

186:*19*  188:*4*, *12*
**Kluznik's**  187:*1*, 6
**knew**  43:*4*  117:*3*  121:9
126:9  132:2  140:22
177:9  179:*23*  198:*14*
216:*11*  239:*21*  242:9
246:*21*  270:*16*, *24*  274:*20*
279:*20*
**knock**  29:*1*  62:*1*  73:25
82:9  225:5
**knocked**  62:9  210:2
**know**  6:24  7:*11*  9:22, *25*
18:*24*  21:*18*  23:25  24:*1*,
*3*  26:6, *8*, *10*, 22  29:5
30:4, 6, *11*, *15*, 20  31:6, *7*
33:6, *11*, 20, *23*  34:*1*  36:*4*,
*5*  37:5, *13*, *15*, 20  38:*10*
39:*4*, 5, *18*, 20, *25*  40:8
42:*1*, 8, *11*, *18*  45:*10*, *18*
51:*12*, *14*, *16*  53:5, *21*
54:*21*  55:20, *25*  56:*11*
58:*16*, *17*, *18*  59:5, *16*
61:2  63:*9*  64:*3*, 5  65:9,
*13*, *15*  67:*13*  69:*12*, *18*
70:2, *3*, *25*  71:8, 9  72:*10*,
*21*  77:*19*  78:*23*  79:*3*, *15*
81:8  82:*12*  83:*15*, *20*, 22,
*23*, *24*  85:*25*  87:8, 9, *16*
88:6, *10*, *14*  89:6, *12*, *13*,
*14*, *16*, *18*, *24*, *25*  90:*1*, 2
91:*2*, *3*, 20  93:*20*  94:*14*,
*19*  98:5  100:5, *11*, *20*
101:*11*, *19*  102:6, *16*
103:*14*  104:*14*, 20  105:*1*
106:*23*  107:5, 8, *10*, 20
109:*4*  110:*11*, *23*  113:*17*
115:*3*  116:*17*  118:9
120:20, *21*  121:*3*, 6
125:22  126:*3*, 6, 9, *12*, *13*,
*19*, *21*  127:20  128:24
129:2, *10*, 24  130:20
134:7, 8  138:*18*  140:20
142:*18*  144:*3*  147:9
149:*1*  150:9, *21*  151:*23*
152:*1*  153:20, *23*  157:*12*
168:7, 9  169:*12*  170:*17*,
*23*  171:2, *5*, *10*, *11*  172:*4*,
*5*, 6, *16*, *19*, 20, *23*  175:6, 9
176:*11*, *12*, *16*, *20*, 22, *24*,
*25*  178:2, *13*  179:*11*
181:*12*, *15*, *22*  184:*13*
185:*21*, 22  186:*5*, 9, *21*
187:*17*  189:*12*  191:*10*
193:7, 8, *15*, *19*, 20, *24*
194:*12*  195:5  196:22, *24*
198:*1*, *14*  201:*15*  202:*14*,
*15*  203:2, 5  205:*18*, *21*
207:*1*, *24*  208:*1*, 7, 8, 9, *19*,
*23*  210:7  211:9, *11*, *23*
213:7, *16*  214:*13*  215:*15*

217:*4*  218:*18*, *19*  219:2, *3*,
*6*, *25*  220:2  222:*13*, *16*, *25*
224:*25*  228:*16*  233:*15*
237:*19*  240:*16*  241:2
242:*16*  244:*14*, *16*  247:7,
*22*  250:*1*, 6  251:*14*  252:2,
*5*, 6, *14*, 20  253:6  254:*19*
255:*21*, 22, *23*, *24*  256:*9*,
*14*  259:7  260:*18*  261:*10*
262:22, *24*  265:20  266:*14*,
*16*, *19*, *21*  267:*23*  268:*4*, 8,
*10*, *12*, *17*, *18*  275:*24*
278:2, *16*  279:*14*  280:*3*
**knowing**  222:22  265:6
266:7
**knowingly**  94:*13*
**knowledge**  33:*23*  58:*14*
81:*15*  90:*16*  159:8  172:8,
*11*  176:*10*, *19*  177:2, *13*,
*19*, *21*  179:*1*, *25*
**knowledgeable**  90:*16*
**known**  7:*17*, *23*  42:22
52:*25*  55:*10*  65:*11*  98:7
120:*16*  204:*3*  266:*11*
275:8, *10*, *13*
**knows**  187:*3*  198:*3*  207:9
**knuckles**  169:*15*
**Kollel**  51:5

**< L >**
**L.P.A**  2:*15*
**lack**  162:*25*
**lady**  61:*11*  117:*11*
170:*24*  181:*21*  187:*15*
197:*23*  220:*11*
**lady's**  62:9
**lai'lah**  48:*11*
**lake**  55:*10*
**Landmark**  23:2
**language**  103:*14*  147:*13*
262:*19*  277:*11*, *12*
**lapsed**  263:*4*
**large**  139:*16*, *24*  146:*23*
**larger**  84:5  96:*13*  213:*18*
**largest**  156:8
**late**  212:*11*
**Law**  2:5  10:*12*  23:*19*
26:9  43:*13*, *16*  53:20
103:8  108:*24*  128:2
143:7  182:22  198:*1*
201:*21*  202:*14*, *15*  232:22
244:*25*  252:*3*  260:8
268:9
**lawn**  62:*12*  185:*25*
**laws**  137:6
**lawyer**  150:*11*  181:7
258:*12*  273:*25*  274:*11*
**lawyers**  259:*19*
**layman**  26:*15*  173:*13*

**layout** 115:22
**lead** 204:13
**leaders** 186:10
**leading** 28:2 116:4
  145:25 195:7
**leads** 108:7 142:24
  173:2 178:19 186:15
**leak** 73:5, 13
**learn** 32:9 40:12 215:4
  254:19
**learned** 211:13, 14
**learning** 41:25
**leave** 16:9 188:21 275:24
**leaving** 163:24 188:10
  210:20
**led** 129:5, 8, 13
**left** 62:18 67:13 76:14
  79:19 104:2 210:9
  225:22, 25 227:6 239:2, 8
  246:7 270:20
**legal** 24:25 25:1 81:12
  108:22 145:21 146:21
  166:23 173:9 201:5, 17,
  18 203:4, 12, 16, 25 204:1
**legalese** 148:24 232:19
**legalesque** 252:18
**legally** 81:12 118:8
  249:21 260:7
**legitimately** 174:24
**Letter** 3:5 4:1, 3, 5
  38:22 40:19, 22, 24 42:9,
  11, 12, 18 44:6, 13, 16
  45:6 91:21 92:3 97:6, 25
  98:4, 16 99:17 100:7
  103:7 118:23 119:4
  121:12, 25 122:7, 9, 21
  123:11, 22 127:21, 22
  143:22 144:17 145:23
  146:15, 25 147:21, 23, 24
  148:9 149:20 151:21
  152:1 155:25 156:25
  157:2, 9, 15, 19 158:17, 23
  159:5, 20 160:3, 22 161:2,
  4, 18 162:11, 12 163:11,
  19 164:5, 12, 22 165:5, 11,
  15 166:7 167:9, 15, 17, 20
  168:1, 2 171:7, 14, 16, 24,
  25 172:2 234:18 235:3
  256:25 258:13 276:5, 8
  278:1, 3
**letterhead** 151:25
**letters** 159:24
**letting** 142:18 193:1
  207:1 228:16 231:6
**level** 28:18 91:19 207:8
  227:12 253:15
**liaison** 240:21
**libeling** 265:14
**libraries** 46:25
**library** 46:25 47:2, 4

**license** 35:24 210:4
  239:21 262:21, 23
**licensed** 262:19 263:4
**lie** 83:1 142:20 233:22
  237:13 240:24
**lied** 198:10
**lies** 74:3 240:14
**Lieutenant** 194:18
**life** 46:7 48:25 50:8, 10
  87:5 217:16 221:5
  264:18
**life's** 182:18
**lift** 68:17
**lifted** 108:11 276:8
**lifting** 108:16
**light** 92:23 131:3 169:25
  173:25
**lighten** 57:9
**likeable** 277:25
**liked** 263:12
**limited** 19:15, 19 99:13
  151:3 158:5 167:7
  200:18 217:3
**line** 14:7 15:3 22:21
  53:18 69:10 79:25 160:8
  162:17 195:22 196:19
  202:21 272:3 273:15, 16
  219:10 247:12, 14
**lineup** 88:11
**liquor** 36:6, 11, 20 37:5
  39:2 40:13, 25 42:1, 15
  66:1
**list** 19:24 20:3 34:23
  38:3
**listed** 20:22 255:6, 22
  256:2, 7
**listen** 85:15
**listened** 64:6 106:1
**listening** 68:2 85:16
**lists** 112:20
**literally** 74:22 128:22
  215:21 250:4
**little** 20:17 27:19 29:2
  35:22 40:6 47:16 53:21
  55:11 57:20 59:1, 8, 17,
  20 62:1, 18 70:6, 7 72:21
  74:4 75:12, 13, 17 80:4,
  11, 13 82:5 87:5 88:1
  90:21 93:1 95:11, 13
  99:21 111:13 115:2
  119:14 136:16, 18 145:7
  156:7 169:4 170:6
  180:13 187:9 195:22
  197:4 199:5, 7 207:6
  209:11 213:2 217:17
  220:10 221:18 222:10, 13
  230:12, 19, 20, 21, 22
  233:21 234:7 236:24
  237:13 239:5, 9 241:9, 13

**247:5** 249:5 250:21
  254:12
**liturgy** 85:9
**live** 8:14, 23 9:4, 6 10:3
  14:9 60:19 61:10 63:2
  68:10 76:24 79:11, 14, 16,
  17 82:19 98:1 140:24
  149:1 217:16 253:7
**lived** 8:21 9:2 56:6
  57:23 61:23 65:14
  180:18 186:20
**lives** 50:2 73:9 81:24
  87:18, 19 89:13, 15
  131:11 172:3 181:3
  185:5 206:3, 13 209:3
**living** 60:3, 22 64:16
  81:1 131:11 221:5
**local** 26:22 31:9 34:16
  46:11 50:22 51:1, 23
  88:19
**long** 8:21 9:4 10:19
  16:3 17:1 35:17, 19, 20
  52:24 69:13 108:20
  145:7 194:9 195:22
  199:25 220:20 229:4
  236:7 249:1 251:19
  255:19 261:12 265:5
  269:20 272:13
**longer** 59:2 233:3
**Lonnie** 76:24
**look** 24:16 38:9 39:10
  60:3 61:19 71:7 73:23
  79:18 81:21 82:12, 13
  88:24 100:1 103:1 110:8
  113:17 141:15, 17, 24
  147:9, 11 152:4, 21
  156:21 161:6 164:4
  169:6, 7 170:7 173:20
  192:20 220:2, 14 227:25
  228:2 233:25 234:6
  244:18 245:24, 25 246:2
  247:5, 8 253:11 254:18
  257:18, 19 265:18, 24
  270:1 274:21
**looked** 58:19 60:7, 8
  62:2 65:14 228:6 248:20
**looking** 50:12 97:18
  128:25 156:14 158:25
  194:17 257:20 271:12, 15,
  21 274:3
**looks** 84:24 126:20
  144:18 234:7 245:11, 13,
  20 246:15 274:11
**lot** 23:15 25:18 28:15
  33:1, 19 34:5 50:19 62:3
  63:5 65:15 78:16 80:14
  82:3 87:11 110:11
  111:11 170:3 179:19
  181:13 185:16 195:23
  196:6 198:7 215:23

**219:11** 226:7 227:14
  228:8 230:3 231:9, 18
  232:10 233:3 241:19
  257:2 264:18
**lots** 55:11 86:13
**loud** 42:16
**love** 77:10 176:8 191:1
  234:23 254:21
**lovely** 39:1
**loves** 224:10
**Low** 67:20 73:25 81:6
  175:24 197:22 245:3
**lower** 256:4
**Loyola** 185:7 265:24
**Luke** 3:5 128:2 172:14
  185:6, 7 186:18 187:6
  188:4 241:18 249:19
**lunch** 78:1 83:7 154:4
  186:20
**lying** 74:9 213:17
  216:11, 14

**< M >**
**Ma'am** 62:11
**Ma'ariv** 48:12
**mad** 243:20 244:3, 4
**magnifying** 117:7 135:5
**mail** 45:11 103:23 174:5
**mailed** 45:12 91:7 103:7
**mailing** 181:11
**mailings** 174:3, 6 182:2, 5
**main** 16:18 224:7
**maintain** 45:20
**maintained** 86:21
**maintaining** 89:8, 11
  122:14
**major** 91:22 104:4
**making** 32:6 53:9 55:5
  72:11 82:1 98:13, 15
  112:6 159:9 171:5
  175:11 185:24 192:11
  227:8 277:3
**malign** 169:24 240:24
**mallet** 80:5
**mallets** 80:12
**malls** 14:6
**man** 47:24 65:18 67:20
  74:7 78:18 90:14 128:19
  163:24, 25 209:20 211:21
  212:3, 5, 10 214:4 222:24
  223:7, 8 249:25 264:19
**mandated** 68:19
**Manhattan** 23:10
**manipulative** 240:4
**map** 178:3, 4, 14, 18, 23
  182:15, 16
**marathon** 55:7
**March** 42:14 66:7 72:25
  116:5, 13 122:1, 2, 21
  123:11 131:18, 23 142:8

Case: 1:22-cv-01594-BMB  Doc #: 80  Filed: 01/26/24  87 of 101.  PageID #: 1313
Deposition of Daniel Grand
Daniel Grand, vs. City of University Heights, Ohio, et al.

161:*1* 167:*16* 188:*14*
195:*7, 13* 197:*10* 267:*15,*
*16* 268:*4* 270:*6, 11, 14*
271:*6* 272:*16, 21* 273:*2*
274:*8* 276:*16* 278:*24*
**mark** 17:*11*
**Marked** 3:*5* 17:*20, 24*
37:*23* 38:*19* 84:*13, 16*
96:*25* 97:*4* 102:*22, 25*
109:*12, 17* 113:*6, 9*
116:*24* 134:*25* 135:*3*
143:*18* 151:*10, 14* 152:*10*
156:*1* 269:*15*
**market** 61:*21* 62:*5*
255:*19*
**markup** 232:*1*
**married** 10:*24*
**massive** 23:*3* 55:*10*
98:*11* 230:*23*
**match** 159:*24* 163:*6, 14,*
*19* 232:*21*
**matched** 247:*14*
**materials** 56:*18*
**matter** 22:*25* 48:*21*
53:*24* 59:*19* 60:*25* 96:*15,*
*16* 104:*4, 16* 109:*19*
110:*17, 22* 111:*24* 131:*17,*
*21* 139:*17* 147:*12* 176:*22*
180:*22* 184:*3, 17* 188:*8,*
*22* 190:*14* 191:*8* 196:*16*
221:*7* 232:*24* 235:*18*
243:*3* 245:*12* 254:*25*
273:*3*
**matters** 190:*15*
**max** 229:*16*
**Mayor** 18:*11, 18* 19:*4*
29:*11, 17, 18, 20, 21, 23, 24,*
*25* 31:*14* 32:*12, 13, 18, 24*
34:*25* 35:*2, 10* 36:*1, 14,*
*16, 24* 37:*14* 38:*20* 42:*20*
43:*2* 44:*3, 7, 17, 18* 45:*1*
94:*10, 12, 16* 101:*9* 102:*3*
103:*24* 104:*1, 10, 21*
105:*1* 106:*3, 11* 107:*14*
108:*7* 109:*16* 110:*10*
113:*14* 114:*2* 120:*15*
121:*23* 123:*8* 128:*1*
135:*6* 138:*7, 11* 141:*2*
159:*19* 172:*6, 9* 174:*15*
176:*14* 177:*3, 7, 11, 25*
178:*13* 179:*15* 180:*10, 11,*
*12, 15, 16* 182:*23* 184:*6,*
*22* 187:*24* 193:*16* 197:*14,*
*15* 198:*24* 200:*3, 6, 23*
212:*16* 214:*8, 10, 16, 18,*
*20, 21, 22, 24* 215:*2, 4*
216:*16, 17, 20* 234:*19*
235:*16* 241:*16, 17, 18*
243:*1* 244:*8, 10* 249:*19*
250:*2, 12* 272:*24* 274:*16,*
*19* 275:*5, 15* 276:*23*
279:*12*
**mayoral** 34:*21*
**mayor's** 169:*25* 218:*13*
235:*4* 275:*2*
**Mazanec** 1:*10* 2:*15*
**McArtor** 194:*18*
**McConville** 3:*5* 128:*1, 2*
172:*13, 14* 175:*5* 176:*15*
177:*3, 10* 179:*8* 183:*23*
184:*14, 18* 185:*6, 7, 13*
186:*18* 187:*2, 6* 188:*4, 13*
239:*18* 241:*18* 243:*2*
249:*19* 250:*12* 268:*23*
279:*12*
**McDonald's** 24:*13*
**McReynolds** 235:*20, 23*
236:*20* 239:*2*
**meal** 55:*1*
**meals** 54:*24* 55:*2* 77:*13,*
*14, 19*
**mean** 11:*25* 12:*8, 22*
13:*2* 14:*5* 19:*21* 20:*24*
22:*19, 20* 23:*3* 25:*9* 27:*8,*
*13* 45:*17* 49:*11* 55:*20*
68:*8, 14* 69:*3* 83:*18* 86:*3*
91:*17* 92:*14* 98:*3* 99:*4,*
*12* 101:*19, 20, 21* 103:*22*
116:*9* 117:*2* 124:*25*
125:*16* 126:*1* 128:*22*
129:*20* 130:*3* 136:*15*
143:*12* 144:*9* 147:*6*
150:*8* 151:*18* 169:*17*
175:*14* 176:*12* 182:*14*
185:*16* 191:*13* 194:*11*
203:*9* 224:*17* 228:*8*
252:*25* 255:*4* 257:*8*
264:*23, 24* 265:*3, 7*
271:*14* 280:*9*
**meaning** 54:*4* 66:*25*
78:*1, 11* 85:*18, 25* 90:*8*
95:*3* 135:*10* 162:*3*
173:*15* 195:*11*
**means** 45:*6, 18* 48:*12*
51:*13* 63:*20* 85:*7, 10, 14,*
*17, 20, 22* 86:*7* 88:*20*
92:*8* 95:*5, 8, 15* 99:*2, 10,*
*25* 100:*13* 101:*14* 105:*15*
112:*14* 140:*6* 146:*20*
153:*21* 171:*18* 175:*14, 17*
253:*7*
**meant** 13:*12* 91:*2* 98:*17*
150:*8* 190:*2* 207:*11*
**measuring** 80:*21*
**medical** 209:*4* 252:*13*
**medication** 264:*21*
**meet** 30:*3, 24* 31:*5, 14*
32:*12* 33:*8* 36:*24, 25*
37:*14* 72:*15* 95:*17*

186:*19* 205:*4, 14* 206:*20*
223:*2, 3, 7*
**Meeting** 4:*14* 18:*11*
29:*11, 17, 18, 22* 30:*2, 5, 9,*
*17* 31:*2, 22* 32:*15, 17, 19*
33:*7, 8* 34:*8* 35:*2, 10, 14,*
*15* 36:*14* 107:*4* 108:*10*
110:*23* 124:*14, 17* 125:*20*
126:*17* 128:*1, 23* 132:*3, 7,*
*14* 133:*3, 20, 23* 134:*15*
135:*12, 22* 137:*23* 141:*16,*
*18, 22* 159:*15, 16* 165:*24,*
*25* 174:*19* 180:*4* 188:*4*
231:*24* 233:*9* 239:*11, 13*
247:*10* 267:*16* 268:*22*
269:*1* 270:*11, 14, 16, 20*
273:*2, 13* 274:*2, 10* 275:*4*
277:*8, 9, 10, 11, 19* 279:*9*
**meetings** 70:*9* 111:*3, 23*
130:*18, 19* 132:*3* 139:*15*
174:*10* 185:*20* 186:*5, 11,*
*16* 235:*16* 267:*18* 277:*17*
**mellowed** 47:*17*
**member** 12:*3* 117:*23*
118:*12* 128:*8*
**members** 130:*16* 182:*22*
278:*4, 5*
**memorandum** 152:*19*
157:*5* 201:*21*
**memory** 35:*4* 104:*24*
111:*9* 221:*20*
**men** 47:*25* 78:*15* 105:*11*
139:*17* 140:*9* 149:*5*
186:*3*
**mental** 112:*1*
**mentality** 191:*12*
**mentioned** 12:*5* 31:*20*
72:*25* 76:*3, 18, 21* 78:*6*
111:*4* 129:*4* 184:*6*
199:*13*
**mesh** 246:*20*
**message** 94:*15, 17* 102:*2*
175:*8* 180:*9, 14* 210:*15*
**messages** 174:*2* 269:*21*
**met** 9:*19* 30:*19* 77:*23*
87:*3* 89:*2, 3* 234:*22*
**metes** 144:*1*
**Michael** 3:*5* 24:*11, 14*
45:*8* 128:*8* 135:*9* 272:*23*
**Michele** 32:*14* 267:*22*
**Michele's** 33:*8*
**midday** 48:*8*
**middle** 7:*21* 48:*10, 23*
115:*12* 138:*1* 152:*14*
162:*19* 271:*8* 273:*16*
274:*6*
**midstream** 269:*4*
**mildly** 212:*13*
**mile** 55:*6*

**miles** 54:*13* 57:*17* 130:*7*
**military** 195:*14*
**millisecond** 137:*7*
**Milton** 213:*12, 24*
**Mincha** 48:*10* 51:*13*
**mind** 42:*3, 4* 44:*10* 98:*4*
105:*21* 156:*16* 190:*25*
210:*13* 222:*25* 223:*6*
278:*7, 15, 23*
**minded** 278:*8*
**mine** 38:*23* 61:*1* 90:*15*
197:*20* 219:*25* 237:*18*
**minimum** 47:*25* 48:*16*
118:*14* 183:*3* 190:*20*
**minimus** 142:*12*
**minivan** 241:*10*
**minute** 49:*7* 95:*2* 109:*8*
141:*7* 154:*2* 241:*4*
243:*17* 269:*18*
**minutes** 30:*19* 48:*9, 23,*
*24* 54:*5, 10* 133:*23*
135:*16* 136:*2* 138:*5*
209:*25* 210:*2, 8*
**minyan** 48:*1, 2* 51:*13*
56:*24* 58:*20* 78:*10, 20*
79:*7* 89:*8* 93:*23* 95:*12,*
*14* 96:*4, 10* 100:*18*
139:*19, 20, 25* 140:*5, 6, 10,*
*21, 22*
**minyanim** 93:*19*
**minyans** 51:*22* 58:*11*
125:*7*
**miraculously** 221:*17*
**Miramar** 3:*5* 8:*16, 20*
9:*5* 56:*2, 12, 25* 59:*6, 23*
60:*24* 61:*15, 22* 63:*8, 24*
64:*2, 19* 74:*25* 79:*11, 14*
81:*1* 98:*1* 102:*18* 113:*12*
119:*6* 171:*15, 17, 20*
172:*2, 3* 190:*8*
**mischaracterizing** 91:*5*
**misdemeanor** 202:*6*
**miserable** 221:*5*
**misleading** 170:*20*
213:*17* 240:*4*
**mispronouncing** 85:*4*
**misrepresent** 144:*9*
**missed** 108:*14* 153:*12*
220:*24* 221:*12* 222:*1, 7*
224:*23*
**mission** 213:*20*
**mistake** 182:*12*
**mistaken** 18:*1* 117:*14*
124:*10* 200:*25*
**mistreat** 222:*15*
**mistreated** 222:*14*
**misunderstand** 223:*15*
**misunderstanding** 78:*21*
98:*25*

Case: 1:22-cv-01594-BMB  Doc #: 80  Filed: 01/26/24  88 of 101.  PageID #: 1314
Deposition of Daniel Grand
Daniel Grand, vs. City of University Heights, Ohio, et al.

**misunderstandings** 159:*10,*
*15*
**misunderstood** 277:*1*
**mixed** 153:*1* 246:*16*
**MLS** 61:*20*
**MO** 60:*18*
**mocked** 124:*20*
**mom** 223:*21*
**moment** 12:*4* 67:*11*
93:*11* 109:*15* 111:*19*
123:*2* 136:*13* 137:*13*
147:*17* 253:*15*
**moments** 116:*13*
**Monaco** 227:22 228:*15,*
*24, 25* 235:*21, 25* 236:*18*
238:*17* 239:*1*
**monastery** 189:*25*
**money** 131:*9* 206:*16*
207:*10* 226:*8* 228:*8*
239:*5* 265:*10*
**month** 121:*10* 132:*4, 6*
137:*25* 234:*21* 262:*8*
270:*19*
**monthly** 270:*18*
**months** 64:*24* 65:6
88:*18* 89:*7* 121:*9* 237:*16*
256:*11* 261:*24* 262:*5, 7*
**moral** 166:*19, 22*
**morning** 38:2 48:*5, 6, 7*
54:*18* 168:*16* 195:*12, 13,*
*19* 196:*10* 197:9 231:2
237:*21*
**mortgage** 64:*17*
**motivate** 8:*10*
**motivated** 9:*10*
**motivating** 55:*19* 57:*13*
59:*18*
**motivation** 55:*15* 56:*15*
**motive** 166:*14*
**mound** 67:*14*
**mouth** 24:*19*
**move** 9:*10* 60:*13* 63:*11*
64:*4* 66:*16* 101:*15*
167:*14* 199:*4* 237:*21*
**moved** 9:*5* 45:*19* 59:22
64:*18* 65:*2* 76:*16* 80:*3*
86:*19* 89:*14, 15* 199:*3*
225:*19* 227:*5* 261:*16*
**movie** 106:*19* 265:*10*
**moving** 28:*16* 64:2
106:*7* 271:*2* 276:*21*
**mud** 234:*15* 236:9
241:*11* 248:2
**muddy** 231:*3* 248:*10*
**Mullen** 34:*12*
**M-U-L-L-E-N** 34:*13*
**multi-billion** 23:*11*
**multi-family** 14:*13, 20, 21*
**multiple** 23:*1* 80:*21, 22*
100:*17* 127:*10* 188:*5*

213:*18* 215:*14* 216:7
217:*1* 221:*16* 269:*20*
**multitude** 11:*12* 53:*1*
**murky** 136:*16, 18*
**Music** 11:*14, 19, 23, 24*
60:*15*
**MyPlace** 89:*19*

**< N >**
**nailing** 127:*1*
**name** 6:*7, 9* 7:*21, 25* 8:*1,*
*7, 10* 18:*15* 34:*17* 46:*18*
86:*8, 10, 11, 16* 87:*9, 16*
88:*12, 21, 25* 89:*24* 92:*3*
168:*8* 170:2 181:*18, 21,*
*22* 187:*1, 18* 206:*3*
208:*21* 210:7 219:*8*
250:6 255:*10* 258:*16*
**named** 171:*13* 219:9
281:*4*
**names** 7:*18, 23* 69:*12*
117:*24* 265:*21*
**name's** 81:*23*
**narrow** 203:*17* 250:*21*
**native** 9:*8*
**naturally** 196:*9* 230:7
**nature** 67:*9* 118:*1* 137:*8*
191:*4* 202:*17*
**Neal** 42:*14*
**near** 180:*18*
**nearest** 225:*8*
**Nebraska** 58:2
**nebulous** 88:2
**necessarily** 34:2 47:*1*
86:*4* 100:*3* 156:*12*
193:*12*
**necessary** 105:*15* 117:*18*
137:*18*
**necessities** 60:*23*
**need** 7:*4, 10* 26:*24* 27:*19*
42:*16* 48:*3* 54:*6* 63:*14*
71:*17, 19, 20* 84:*3* 105:*5*
107:*22* 115:*18* 118:*23*
125:*3* 130:*11* 147:*9*
175:*21* 190:*22* 193:*12*
227:*10, 16* 230:*1, 5*
231:*12, 21* 232:*21* 241:*20,*
*21* 242:*19, 21* 248:*22, 23*
260:*4* 263:*24* 264:*23*
268:*3* 272:*5* 280:2
**needed** 132:*21, 22, 25*
227:*16* 236:*17*
**needing** 189:22 229:*23*
**needs** 90:*15* 136:*24*
174:*17* 229:*13* 278:*21*
**negation** 161:*12, 13*
**negative** 33:*3* 35:22
**negatory** 161:*11*
**negotiating** 61:*11*

**neighbor** 73:*8, 10* 74:*10*
179:*7*
**neighborhood** 66:*6* 87:*8,*
*18, 21, 24* 88:*1* 118:*20*
180:*8* 187:*16* 196:*13*
266:*25*
**neighboring** 167:*6*
**neighbors** 3:*5* 64:*21, 23*
65:*24* 66:*18* 79:22 119:*5*
121:*13* 123:*11* 130:*16*
196:*11* 277:*20*
**nerve** 265:*8*
**nerves** 240:*13* 241:*12*
**nervous** 169:*5*
**Nestor** 61:*23, 24* 62:*24*
**network** 82:*5*
**never** 20:*4* 43:*4* 56:*4*
58:*19* 62:*8* 65:*16, 19*
68:*24* 73:*16* 80:*23, 24*
89:*10* 90:*13* 92:*8* 101:*9*
102:*19* 107:6 108:2
126:*11* 128:*14, 17* 131:*3,*
*16* 132:*9* 138:*18, 25*
142:*25* 150:*23* 157:*14*
163:*2* 176:*3, 4* 179:*17, 20*
181:*10* 182:*10* 190:*17*
198:*17* 199:*10* 210:*17*
218:*15, 16* 219:*18, 25*
220:*13* 221:*25* 227:*15, 16*
229:9 233:*21* 239:22, *23*
240:*7* 244:*11* 250:*3, 11*
259:*3, 11* 263:*20, 23*
264:*1, 3, 4, 5* 265:*20*
271:*19, 20*
**nevertheless** 92:*3* 113:*1*
253:*16* 277:2
**New** 2:*7* 9:*7* 15:*15* 22:*1,*
*6, 8, 24* 23:*12* 24:*1, 23*
25:*10, 14* 26:*11* 27:22
28:*10* 29:*19* 31:*3, 4*
36:*12, 20* 61:*1, 5* 65:*3*
86:*23* 89:*3* 153:*24*
156:*21* 192:*17* 195:*16*
237:*18* 245:*25* 247:*10*
262:*23*
**Newman** 64:*25*
**news** 215:6
**nice** 31:*11* 33:*9* 57:*8*
62:*17* 67:*4, 5* 72:*22* 80:*2,*
*15, 16* 87:*3* 128:*24*
150:*21* 208:*17* 228:*10, 11*
233:*14* 250:*17, 18*
**nicest** 67:*16*
**night** 48:*11, 14, 18* 66:2
73:*20* 128:*10, 11* 140:*19*
141:*11* 195:*9, 11*
**nighttime** 54:*21*
**nine** 199:*9*
**Nino** 228:*24, 25*

**noble** 34:7 228:*1*
**nobody's** 44:*4*
**nod** 7:6 66:*25*
**noise** 196:6
**non-affiliated** 65:*20*
**nonchalant** 89:*12*
**non-drivable** 151:*6*
**non-exhibit** 257:*6*
**non-formatted** 160:*19*
**non-Jewish** 189:*12*
192:*12* 193:*3*
**non-public** 82:*3*
**nonsense** 222:*8* 238:*5*
247:*19*
**non-stated** 160:*19*
**non-verbal** 7:*7*
**non-violation** 237:*8*
**non-written** 160:*19*
**Nope** 187:22 229:*13*
**normal** 53:*3* 126:*14*
131:*10, 11* 132:*3* 137:*24*
236:*23*
**Normally** 121:*17* 270:*17*
**NORTHERN** 1:*3*
**nose** 265:*12*
**Notary** 1:*10* 281:*2, 23*
**notated** 186:*6*
**note** 34:*25* 251:*16*
**notes** 110:*14* 111:*6, 16,*
*22, 25* 112:*1, 2, 3* 227:*8*
**nother** 249:*17*
**nothing's** 231:*12*
**notice** 39:*11* 69:*16* 72:*13*
152:*14*
**noticed** 70:*23* 72:*5*
198:*11*
**notification** 180:*19*
**notified** 101:7 179:*24*
197:*13*
**notion** 171:22 205:*17*
**November** 1:*10* 155:*1*
243:*12, 13* 281:*20*
**novice** 173:9
**nuisance** 198:*21*
**number** 6:*12* 62:*16, 17*
95:*25* 96:*18, 19* 127:7
128:*14* 142:*5* 148:*20*
152:*5, 16* 161:*24* 179:*6*
202:*11* 207:*14* 218:*20, 24*
251:*20* 256:*4*
**numbers** 96:*21* 211:*18*
**nuns** 189:*23* 191:*23*
**NY** 2:*7*

**< O >**
**oath** 268:*16, 17*
**object** 13:22 15:*19*
136:*22* 139:*5* 144:*16*
145:*13* 202:*20* 203:*8, 10*

Case: 1:22-cv-01594-BMB  Doc #: 80  Filed: 01/26/24  89 of 101.  PageID #: 1315
Deposition of Daniel Grand
Daniel Grand, vs. City of University Heights, Ohio, et al.

254:8  275:21
objected  277:17
OBJECTION  5:1  8:4, 11
14:25  56:21  57:1  122:4,
23  131:25  139:11  218:4
278:11, 12
objections  76:6
objective  202:4, 5
objectives  156:3  159:25
obligations  52:12
observation  53:25
observing  53:25
obtain  278:19
obtaining  145:21
obvious  69:6  186:12
obviously  45:14  84:9
144:16  215:1  242:12
occasion  148:6, 10
occasions  80:21
occupancy  28:20  251:6, 8
258:3, 9  259:13, 16, 17, 22
260:2, 5, 8, 10, 13, 22
262:14
occupation  11:8
occupy  28:21
occur  108:18  147:18
occurred  132:14, 15
147:18  222:20
o'clock  48:18  195:12
196:10  197:9
October  243:10
offended  41:8, 11, 12, 13,
19, 22
offense  51:18  166:13
182:19  201:24  203:7
204:14
offer  63:7
offered  176:1  205:20
offering  54:9
offers  205:10  255:11
office  60:15  151:15
218:14  235:4  260:19
281:19
officer  211:19  245:8
officers  141:1  209:14
offices  165:14, 17
official  43:19  125:13
officially  276:7
officials  6:12  110:16, 21
111:8, 23  116:6, 15  129:8
148:11
OH  2:18  28:24  29:25
34:18  36:13  37:8, 11
39:15  43:16, 17  63:9
68:22  69:1, 15  71:7
91:12  97:17  127:15
128:5, 6  130:4  141:7
157:12  159:9  163:1, 25
181:18  190:21  208:17
219:14, 15  221:25  223:25

226:3  228:4  231:22
235:1  237:14  246:23
259:20  264:11
OHIO  1:3, 9, 10  8:15
15:8, 9, 13  22:11, 22
26:18, 23  27:1, 10, 24
28:6, 10, 18  196:9  202:15
262:24  281:3, 20, 24
Okay  6:21, 25  7:4, 7, 14,
23  8:1, 14, 16, 21  9:4, 6,
15, 18, 20, 24  10:5, 9, 21,
23  11:2, 6  12:3, 5, 8, 11,
14, 18, 20  13:13  15:25
16:11, 17, 21  17:3, 8
18:23  19:3, 6, 21  20:9, 18,
22  21:14, 21, 24  22:2, 4,
10, 14  24:20  25:8  26:11
27:4, 25  29:15  30:2, 14
31:8, 19  32:17  34:10
35:1, 6, 20, 22  36:8  38:25
39:25  40:23  42:7, 14, 25
43:2, 5, 10, 16, 17, 22
45:19, 24  46:1, 5, 23  47:5,
21  49:2, 8, 17  51:4, 10
57:18, 21  58:22  59:4
62:19  64:18  73:2  76:23
79:9  83:4, 12  85:1, 21
94:20  95:10, 16, 19  97:7,
22  100:14  103:3, 10
104:1, 12  105:4, 7, 19, 23
107:25  108:18, 21  109:1
110:20  111:6, 20, 21
112:12  113:1, 20  118:11,
25  119:2, 25  121:14, 21
122:5, 20  123:14, 20
125:25  126:2  138:23
143:14  145:10  146:13, 22
148:1, 15  149:24  151:24
152:3  155:19  157:16
162:8  164:20  170:13, 14
173:1, 8  178:5, 22  181:19
188:18  189:21  190:7, 23
193:8, 10  194:24  195:2
201:2, 16  204:9, 22, 24
205:5, 7, 9  206:13  207:5,
22  208:1  211:24  212:12
213:14  215:9  217:11
220:8  223:2, 5  224:5
225:13, 18  228:15  229:8
230:9  231:19, 24  235:19
238:8, 13, 21, 25  241:19,
23  245:7, 21  247:15
249:4, 12  251:11, 14, 18
253:9  255:6  256:16
257:24  259:18  261:5, 23
262:10, 21  267:1, 6  268:8
269:8, 23  270:4, 8, 13
271:1, 4, 5, 9, 13  272:12,
14  273:1, 9, 23, 25  274:17,
25  275:22  276:6, 10, 13,

16, 20  277:2, 6, 16, 24
278:24  279:1, 7, 22
old  181:21  214:4, 14
246:2  247:8, 14
older  59:8  80:8  90:17
212:10
oldest  254:13
ole  226:3
once  7:9, 13  45:19  46:8
69:22  71:6  88:17  89:7
132:4  210:22  215:20
270:17
one-minute  136:1
ones  17:14  51:4  168:6
on's  47:3  221:16
ongoing  147:21  148:4
190:19
online  258:11
on-the-record  115:9
open  74:10  130:5  148:22,
23  149:18  190:25  212:18
opened  36:11  39:15
opening  31:21  53:8  87:6
openings  34:13
openly  74:6  279:16
operate  135:19
operated  22:6
operating  103:11
operations  164:25  165:12
opportunity  55:12
opposed  23:24  53:18
108:22  130:24  175:4
177:12  179:23
opposite  213:21
opposition  108:11  127:5
170:16  173:3  178:17, 20
179:5  186:7, 11  276:21
279:3
oral  267:25
orange  140:1
ORC  173:19
ordeal  130:12  200:14
order  57:9  103:9  105:14,
17  108:2, 8  109:24
170:11, 12  175:7, 17
177:7  201:25  229:10
249:20  250:1, 14, 16
266:2  277:13
ordered  94:16  108:9
orders  214:9
ordinance  112:20, 24
135:20  166:4  173:12, 18
174:5  202:3, 12  204:10
229:22  237:4
ordinances  97:10, 20
101:2  204:20
organization  45:21
208:21
organizations  189:13

192:12  193:4  206:17, 18
organize  232:20
organizing  90:20
origin  208:3
original  94:3  225:22
270:16
originally  72:17  227:9
orphanage  208:20
Orthodox  46:3  47:24
50:2, 8  52:25  53:6  68:13,
16, 22  70:2  78:18, 20
149:4  181:2  216:22
222:24
Osborne  246:17, 18, 19
otherwised  281:16
outfit  213:13, 18
outlined  156:3, 13  162:10
outlines  158:20
outlook  65:21
out-of-state  195:13
outright  105:10
outset  113:22
outside  73:18, 22  144:5
182:21  184:20  185:1
207:20  208:12  216:22
217:12
outskirts  88:3
outsmart  241:22
outsmarted  241:22
243:22
outspokenly  171:15
outwardly  68:25
overall  191:12  229:16
overhear  183:19
overheard  212:17
overnight  237:23
overspend  21:1
owner  21:8  36:21  40:13
ownself  44:11

< P >
p.m  135:16  154:4  155:2
270:11  280:23
pad  232:1  233:10, 11
236:17, 22  239:13
pads  229:23
page  17:25  18:1  39:10,
15  40:20  109:20  117:5
142:3  146:25  151:16
152:4, 14  153:17  156:5, 8,
9, 22  159:1, 2  170:15
194:24  204:25  269:25
270:2, 3, 4  271:3  272:15
274:5, 6, 21, 23
pages  17:24  84:22
155:13  194:15  217:18
220:17, 19
paid  226:7  265:10
paparazzi  265:9

Deposition of Daniel Grand                              Daniel Grand, vs. City of University Heights, Ohio, et al.

**paper** 34:*16* 115:*13*
165:*23* 185:*19*
**papers** 123:*3*
**paragraph** 90:*4* 93:*17*
94:*21,22* 97:*8, 11, 13*
109:*20, 21* 114:*6* 147:*1,*
*19, 24* 156:*6, 8, 9* 162:*20*
170:*15* 178:*13* 179:*21*
180:*16* 182:*20* 183:*8, 11*
188:*11* 204:*25* 206:*1*
216:*1* 217:*9, 19, 20*
220:*18, 19* 270:*5* 271:*10*
272:*2* 273:*1, 10, 14, 15*
**paragraphs** 110:*8* 194:*15*
220:*23* 225:*6*
**paraphrase** 104:*22*
221:*20*
**paraphrasing** 44:*12* 133:*7*
**Pardon** 21:*11* 49:*23*
173:*6* 180:*1*
**parentheses** 142:*14*
**parenthesis** 99:*21*
**parenthetical** 99:*20*
142:*18*
**Park** 2:*6* 237:*17, 18*
**parked** 195:*19* 198:*6*
212:*24* 225:*10* 226:*11*
239:*16, 19* 240:*6, 8*
**parking** 194:*17, 19* 195:*1*
197:*16* 198:*2, 4* 199:*2*
226:*15* 238:*23* 247:*24*
**parks** 237:*22*
**Parkway** 213:*12, 24*
**parnasa** 253:*20*
**part** 26:*25* 33:*18* 44:*2, 3*
48:*25* 50:*7* 55:*15* 56:*14*
60:*9* 77:*22* 78:*22* 98:*9*
108:*14* 115:*5, 8* 117:*17*
168:*23* 195:*7* 196:*21*
197:*6* 206:*7* 213:*18*
215:*12* 226:*23* 230:*12*
233:*19* 236:*3* 258:*8*
**partake** 132:*17*
**parted** 62:*18*
**partial** 182:*4*
**Partially** 225:*12*
**participate** 34:*8* 57:*25*
**particular** 9:*15* 12:*9*
22:*9* 23:*6* 46:*13, 21, 23*
49:*25* 132:*7* 147:*19*
160:*8* 232:*19*
**particularly** 40:*4* 65:*23*
67:*9* 72:*24* 249:*24*
**parties** 183:*20*
**parts** 28:*16* 39:*23* 42:*23*
219:*4* 279:*16, 19*
**party** 144:*5* 183:*15, 17,*
*18* 281:*15*
**pass** 66:*22* 246:*7*

**passed** 246:*10*
**passing** 72:*16* 78:*6* 89:*8*
**Passover** 131:*19* 132:*7*
195:*8*
**patch** 233:*18*
**path** 226:*11* 231:*5*
248:*14* 250:*17, 21*
**pathologist** 262:*19*
**pathway** 249:*21*
**pathways** 225:*25*
**patrol** 211:*18*
**patrols** 194:*16* 209:*20*
**patronize** 49:*14*
**patterns** 52:*23*
**Paul** 172:*21* 266:*4*
**paver** 226:*11, 16* 240:*10*
248:*14, 15, 25* 249:*13, 21*
250:*17*
**pavers** 248:*22, 24* 249:*3, 5*
**pay** 64:*17* 222:*10* 252:*4*
**pays** 262:*25*
**peep** 133:*11*
**peers** 263:*20*
**Peggy** 219:*9*
**pending** 7:*13* 136:*9*
**people** 7:*9* 13:*17* 14:*9,*
*23* 21:*3* 25:*25* 26:*23*
31:*5* 33:*1, 2, 11* 39:*24*
48:*6* 50:*15* 57:*25* 58:*2, 4,*
*6, 8* 60:*16* 61:*23* 62:*22*
63:*6* 64:*14* 65:*4, 5, 13, 15,*
*17, 22* 66:*5* 67:*1, 4* 69:*3,*
*11* 74:*19* 76:*14, 23* 77:*18,*
*21* 79:*16, 17* 81:*7* 82:*6,*
*12, 16* 83:*25* 84:*7, 10*
87:*11* 88:*12* 90:*14* 91:*7*
94:*9, 13, 15, 18* 95:*9, 17,*
*20* 96:*3, 4, 12, 17, 21* 98:*1,*
*5, 16* 99:*21* 101:*4* 102:*4*
106:*6, 16, 18* 118:*2, 13*
119:*2* 120:*20* 121:*18*
125:*2* 126:*18, 24* 127:*4,*
*20, 22* 130:*22, 23* 131:*2, 4,*
*10* 134:*8* 137:*19* 139:*20*
140:*6* 143:*3* 149:*1, 6*
150:*16, 21* 158:*15* 161:*9*
165:*24, 25* 166:*9* 168:*5,*
*25* 169:*1* 172:*24* 174:*1, 6,*
*9, 11, 18* 177:*5, 9* 178:*14*
179:*6* 180:*2, 24* 181:*13*
182:*6, 15* 183:*16* 190:*21*
196:*15, 23* 206:*20* 213:*18*
215:*19* 219:*11, 12, 24*
222:*15* 230:*2, 3* 232:*14*
240:*7, 23* 241:*22* 255:*18*
258:*17* 264:*20* 265:*12, 25*
269:*21* 278:*17*
**people's** 209:*3*
**pepped** 36:*19*

**percent** 32:*3* 50:*18*
78:*24* 79:*17* 227:*14*
229:*25* 231:*11* 235:*11*
**perfect** 44:*22* 95:*22*
**perfectly** 36:*10* 43:*18*
**perform** 11:*24*
**performance** 47:*16*
**performer** 11:*20*
**period** 12:*12* 41:*6* 55:*7*
66:*6, 15, 19* 67:*18* 86:*19*
124:*12* 160:*22* 161:*2*
164:*8* 168:*12* 177:*8*
189:*18* 209:*15, 22* 215:*22*
221:*18, 21* 265:*5*
**periodic** 114:*4, 7*
**periodically** 278:*19*
**perks** 224:*7*
**permission** 228:*3* 236:*21*
249:*22* 263:*19*
**permit** 3:*5* 74:*15* 78:*8*
99:*15* 101:*6* 105:*6, 13, 25*
107:*4, 7, 22* 112:*15, 23*
113:*2, 13, 20, 23* 116:*4*
117:*11* 120:*18* 125:*5*
129:*23* 130:*10* 135:*8, 14,*
*18, 25* 136:*12* 137:*14, 17*
138:*16* 139:*14* 159:*22*
173:*14* 178:*18* 190:*19*
192:*3, 8, 15* 193:*6* 228:*4,*
*13, 17, 22* 229:*5, 8, 10, 12*
230:*20* 235:*22* 236:*11, 13*
243:*18* 248:*22, 23* 258:*9*
259:*13, 16, 21* 260:*2, 3, 9,*
*12, 21, 25* 261:*1, 13, 18, 20*
262:*15* 263:*24* 278:*20*
**permits** 107:*9* 110:*15*
112:*22* 190:*10, 11* 243:*11*
275:*10*
**permitted** 193:*4* 236:*25*
**permitting** 263:*16*
**person** 15:*6, 17, 22* 44:*8*
53:*4* 61:*25* 65:*21* 66:*21*
82:*11, 14* 88:*15* 90:*17*
126:*8* 128:*22* 145:*22*
166:*19* 171:*19* 181:*8*
186:*8, 9, 10* 188:*6* 202:*18*
204:*1* 206:*16* 208:*1*
212:*9* 214:*13* 217:*1*
219:*9* 226:*15* 239:*19*
250:*8* 278:*17*
**personal** 196:*17* 197:*12*
203:*23*
**personality** 20:*16* 91:*3*
**personally** 102:*7* 183:*19*
211:*9*
**personnel** 137:*21*
**persons** 16:*13* 202:*4, 5*
204:*11, 19*
**person's** 62:*2* 88:*21*

176:*23*
**perspective** 81:*15* 119:*1*
**petition** 74:*1* 118:*2, 9, 17,*
*18, 21* 126:*23* 127:*23*
178:*15*
**petitions** 169:*1*
**petrified** 141:*12*
**Pharmacy** 16:*2, 4, 7, 15,*
*24*
**phased** 21:*18*
**philanthropic** 206:*21*
**Phillip** 67:*10*
**phone** 107:*13* 111:*4, 5*
123:*16* 177:*7, 24* 184:*15*
185:*12* 188:*6* 197:*15, 23*
212:*15, 17* 214:*7* 224:*20*
268:*1* 276:*23*
**photo** 175:*10*
**photos** 226:*17* 240:*10*
**phrase** 55:*24*
**phrased** 116:*16* 183:*18*
**phrasing** 49:*21*
**physical** 186:*15*
**pick** 36:*16* 221:*4* 224:*1,*
*9, 21*
**picked** 9:*15* 43:*7* 63:*19*
104:*11*
**picking** 221:*17, 22* 225:*1*
**pickup** 195:*12* 196:*7*
221:*13* 259:*8*
**pickups** 220:*24*
**picture** 18:*3* 50:*12*
114:*18* 238:*16*
**pictures** 199:*24*
**piece** 23:*6* 220:*13*
**pin** 130:*20*
**pinned** 264:*2*
**pip** 254:*12*
**pissed** 243:*19*
**pissing** 200:*22*
**place** 10:*3* 28:*21* 30:*16,*
*24* 54:*3* 58:*25* 80:*15*
86:*3, 4, 6* 87:*12* 95:*24*
99:*2, 3, 5, 25* 100:*15, 17*
103:*11* 104:*14* 113:*24*
152:*18* 157:*7* 164:*9*
165:*1, 12* 170:*21* 208:*5*
214:*1, 23* 219:*19* 226:*10,*
*15* 247:*12* 250:*3* 255:*5*
281:*13*
**places** 100:*18* 252:*15*
**placing** 205:*10*
**Plaintiff** 1:*6, 10* 2:*2* 3:*5*
**Plaintiff's** 4:*12* 179:*23*
269:*11, 14*
**plan** 74:*15* 114:*23* 227:*9,*
*10* 240:*22* 257:*8, 14*
**planned** 140:*21* 256:*22*
257:*22*

**Planning** 4:*14* 110:22
120:23, *25* 121:*1, 2, 5, 18,
19* 122:*1* 124:*1* 126:8
128:*13, 18* 135:6, *11*
137:20 142:9 182:22
267:*14* 270:*10* 273:2
278:2, *5* 279:*11*
**plans** 70:*20* 101:*16, 19,
20, 21* 102:*1* 114:*24*
115:9 131:8 147:*1, 4*
272:6
**plate** 229:*16* 239:*21*
**plates** 196:9
**play** 80:*10* 91:*1*
**played** 31:9
**player** 68:2
**pleasant** 35:*13* 72:*17*
**please** 6:7, *24* 7:*3* 18:*18*
36:*16, 18* 74:8 89:22
93:*20,* 24 94:22 104:5
127:*11* 162:9 167:*18*
207:*17* 223:*18* 256:6, *18*
257:*1*
**plenty** 69:*14* 169:*19*
185:*12*
**pluralized** 142:*20*
**Poetic** 35:*24*
**point** 28:2 55:22 61:*14*
89:2 91:*16* 125:*11*
129:*11* 143:6 156:*23*
173:*19* 185:*13* 186:*13, 19*
192:*10* 200:*21* 202:*20*
205:*19* 219:*4* 222:9
229:*3* 261:*10* 263:7
278:*18* 279:*19*
**pointed** 140:*25* 152:*5*
265:6
**pointing** 115:*14*
**points** 149:*21* 156:22
**Pokorny** 221:*14* 222:*8,
19* 223:*18, 24*
**police** 134:2 141:*1*
197:25 198:*4* 199:9
209:*14, 19* 210:*21* 211:7,
8, 16, 18* 218:*10, 11, 21*
237:*24*
**polite** 33:9 62:*10* 107:*16*
**politely** 59:*10* 98:9
171:*22*
**politics** 85:*25*
**poor** 208:*22*
**population** 149:*14* 215:7
**Porter** 65:5, *24, 25* 69:9,
*17* 79:*24* 81:*24* 179:7
185:9 187:*12* 197:9
198:*14* 199:*13* 200:*16*
249:*14*
**Porters** 65:*10* 199:*14*
200:*4, 11* 201:6, *18, 23*

203:7 204:*14* 205:*3*
233:*15* 251:25
**Porter's** 70:*23* 72:5
76:*18*
**portion** 85:8
**portrayed** 56:2
**position** 16:*20, 21, 22, 23*
31:*23* 43:*20* 92:2 126:*13*
264:25
**positive** 112:*10* 222:*17*
**possible** 28:*11* 110:2
112:*10* 125:*20*
**Possibly** 111:*19* 132:*13*
149:6
**post** 103:*21*
**posts** 180:2
**posture** 160:*10*
**potentially** 137:*16* 171:*20*
202:6
**pour** 197:*1, 2* 226:9, *22*
236:*21* 238:*17* 243:*12*
245:*23*
**poured** 227:*20* 230:*21*
243:9 245:22 246:*12*
**pouring** 228:*18*
**powers** 105:*15*
**practice** 28:9 55:*13*
**practices** 53:22
**pray** 46:*24* 47:*25* 48:*19*
50:*22* 52:*12* 54:*15, 16*
78:9, *13, 14, 15, 19* 79:7
86:5 95:*15* 96:8, *9* 99:2,
*3, 5* 100:*1, 16, 17, 18*
101:*10* 105:6 125:2
131:2 141:8 143:*3*
150:*17* 213:6, *11* 278:*18*
**prayed** 57:*15* 140:7
**prayer** 46:*11* 48:*4, 5, 8,
13, 20* 50:9, *13, 14, 17*
53:*14* 55:*16, 17, 23* 56:*24*
58:1*11, 15* 66:8, *16* 74:*19*
75:*4* 76:*17* 85:9, *11, 17,
18* 86:7, *24* 87:6, *12*
90:*20* 94:*11* 101:*17*
102:5 119:*19* 120:*12*
123:7 126:25 139:2, *9, 14,
22* 140:*4, 18* 141:*12*
142:7, *13, 19* 147:2, *21, 22*
148:5, *7, 12* 151:*1* 156:*24*
157:*21* 158:*10* 168:*15*
193:*13*
**prayers** 51:*21* 85:*13, 18,
19* 92:9
**praying** 54:7 105:*12*
**preceded** 189:*18*
**precedent** 125:6
**precursor** 160:*21*
**predominantly** 12:*11*
53:*17*

**prefer** 147:8
**prepare** 185:*15*
**prepared** 219:*10*
**pre-pour** 226:*24* 227:*1*
228:*1* 229:7 238:*24*
245:*21* 246:9
**prepping** 185:*13*
**Presbyterian** 190:6
**presence** 281:8
**present** 36:*15* 44:9
121:*17* 147:*17* 268:*3*
**presentation** 209:2
**presented** 68:25 119:*23*
172:*1* 178:*15*
**presenting** 165:*21*
**presently** 8:*14* 11:4 21:4
**Preservation** 23:2 25:*19*
**preserve** 76:6
**pressed** 75:*17* 92:24
**pressure** 223:*21*
**presumed** 110:25
**pretend** 161:*3*
**pretty** 62:6 63:*12* 137:*3*
167:*19* 192:*19* 195:9
243:*13* 253:*13* 255:4
269:24
**prevent** 53:2
**prevented** 52:*20*
**previous** 15:*15* 155:*11*
164:6 191:*13* 226:*14*
271:*17*
**previously** 79:*10* 156:*1*
196:25
**price** 255:*25*
**priest** 190:*3*
**prima** 278:*16*
**primarily** 79:*15*
**principal** 166:22
**printed** 280:*16*
**prior** 8:*23* 9:6 16:*14, 23*
17:5 32:*23* 66:6, *7*
121:*15* 122:9 142:*13*
159:*11* 188:*13* 277:*19*
**prisoners** 130:*4*
**privacy** 135:*21* 202:*17*
**private** 131:5, *6* 139:2, *9,
14* 142:7 165:*1, 12*
185:*20* 186:*11* 216:7, *21*
**privilege** 143:*25* 144:6
145:*3*
**privileged** 145:*17*
**probably** 18:*1* 32:25
69:*21* 80:6 87:*19* 112:*10*
142:*14* 148:*17* 159:*14*
179:*19* 186:*17* 188:9
192:*20* 195:5 200:*18*
206:9 222:*10* 224:22
225:*4* 261:9 262:2
**probate** 62:25

**problem** 75:4, *5* 140:*14*
174:*18* 192:6 214:*18*
226:*14* 234:2 241:*15*
243:*14* 249:*10* 266:*12*
**problems** 66:5 192:*4*
**Procedure** 1:*10* 26:*14*
137:*4*
**procedures** 252:*13*
**proceed** 226:23
**proceeding** 23:*23* 268:6
**process** 107:*3* 117:*17*
129:25 132:*12* 137:*14*
138:*24* 164:*21* 166:*11*
173:*14* 175:*18* 221:*1*
275:*11*
**processes** 169:*23*
**produce** 11:22 89:*23*
132:*23* 138:2 207:*16*
256:*18*
**produced** 182:*3*
**producer** 11:22
**production** 39:22
**profession** 27:*15*
**Professional** 1:*10*
**profile** 234:6
**progress** 208:*19*
**progression** 155:*24*
**prohibition** 53:9
**prohibitions** 53:*11*
**project** 69:22 72:7, *8*
84:9 228:9
**pronounce** 206:9
**proof** 233:*24*
**properly** 40:*4*
**properties** 13:*14, 18, 20*
14:4 60:4 167:6
**property** 8:25 9:*1* 21:*13*
22:*24* 24:*24* 25:6 26:*23*
27:*23* 28:*19* 33:*14* 60:*24*
62:*3* 67:22 80:*20* 122:*16,
17* 190:*17* 199:*15* 226:*19*
236:*24* 237:*11* 258:*5*
**proposal** 178:*17, 20*
**proposes** 152:*18* 157:*5*
**proposing** 152:*16*
**Propounded** 3:*5*
**propped** 125:*4*
**Prosecutor** 201:*5*
**protested** 269:*5*
**proud** 254:*23*
**proves** 175:*12*
**provide** 88:25 133:*11*
137:22 253:*16, 22* 272:*10*
277:*19*
**provided** 43:*11* 56:*19*
199:*18* 277:*21* 278:*1*
**provider** 40:7
**proximity** 54:2
**psychological** 264:*13*

**Public** 1:*10* 26:2 27:*16*
107:5 110:25 124:*20*
127:*12* 148:22, *23, 25*
149:*3, 7, 8* 158:*19, 21*
160:5 161:*19, 22* 162:*15,*
*21* 163:*8, 13* 170:*1*
173:*25* 180:6 182:*21*
198:7 215:5 217:*21, 23*
218:*1* 232:*15, 17* 247:25
252:8 281:2, *23*
**publicity** 169:*25*
**publicly** 244:6 266:*11*
**publish** 34:*18*
**pull** 61:*16, 17* 196:*17*
228:*13* 229:*10* 250:*24*
**pulled** 146:3 223:*11*
**purchase** 13:*1*
**purely** 14:*15* 63:*17*
**purpose** 105:*12*
**purposes** 54:*4* 139:*19*
144:*19* 145:*20* 258:*9*
273:*12*
**pursuant** 1:*10*
**pursue** 11:*10* 21:*24*
22:*11* 34:*24* 135:*24*
136:*11* 202:*2*
**pursued** 28:8, *12*
**pursuing** 27:*15*
**pursuits** 19:*15, 20, 24*
20:7, *19*
**pushes** 128:*1*
**pushing** 93:22
**pushy** 125:*19*
**put** 24:*18* 49:6 56:*16, 17*
80:*11* 88:*11* 92:*19* 97:21
101:*24, 25* 107:*23* 109:25
120:*23* 124:*20* 129:*23*
131:*3* 142:*13* 149:*18, 22,*
*23, 24, 25* 152:*13* 160:*20*
164:*14* 166:2 168:6
170:*1* 180:2 197:*3, 6*
198:*20* 205:2 226:*22*
228:*3* 229:*6, 15* 237:*14*
239:*15* 244:22, *23* 247:7,
*11* 248:*14, 25* 249:*4, 5, 13,*
*21* 251:*1* 264:25 265:25
269:*9, 10* 277:*13*
**puts** 164:*9*
**putting** 45:*3* 70:*14*
160:*1, 16* 164:*10* 166:*10*
186:2 198:*18* 265:*19*

**< Q >**
**QUAINTON** 2:*4, 5* 5:*11,*
*12, 13* 75:*23* 76:*1* 109:22
136:*21* 139:*4, 11* 146:*11*
183:*7, 13* 188:*19* 189:*4,*
*10*
**qualify** 275:*1*

**quashed** 266:*18*
**quasi** 173:*21* 176:*3, 5*
**quasi-judicial** 23:22 26:*5,*
*9, 16* 128:*16* 173:*17*
268:*5* 274:*2, 10* 275:*4, 12*
**Queens** 9:*7, 8* 31:*11*
**question** 6:*24* 7:*13* 15:*4*
19:22 20:*7, 11* 27:5, *14*
47:*7* 49:*24* 50:*21* 57:2
71:*10, 20* 82:22 83:*9*
106:*4, 8* 109:*7, 24* 110:*13*
111:*16* 117:*3* 119:*21*
123:*4* 131:*20* 136:*6, 8, 9,*
*10, 16* 137:5, *12* 139:*6*
141:*10, 23* 142:*6, 17*
146:*12, 14* 148:*1* 149:*16*
151:*23* 162:*7, 8* 163:*4, 5,*
*15, 16, 21* 164:22 173:*23*
178:*8, 15* 179:*11* 182:*17*
184:*4* 192:*22, 25* 193:*15,*
*25* 194:*24* 195:*3* 201:*16*
203:*9, 11, 16* 218:6 238:6
251:*24* 252:*18* 267:*17*
274:*13* 275:*2, 18, 23*
**questioning** 15:*3* 76:*9*
**questions** 6:*14* 76:*7*
143:*23* 152:22 267:*13*
276:*4* 279:*23, 25*
**quick** 109:*23* 267:*7*
**quickly** 38:*9* 218:*12*
269:*24*
**quiet** 174:*17*
**quite** 31:*4* 35:*17, 19*
54:*12*
**quorum** 48:2
**quote** 110:*15* 111:*17*
**quoted** 110:*12*
**quotes** 40:2 41:*4* 110:*12*

**< R >**
**rabbi** 49:6 86:*12, 13, 14,*
*16, 17, 23* 89:*3, 24* 90:*4,*
*11, 14, 15, 19* 92:*4* 210:25
**rabbis** 86:*13* 90:*13*
118:*20, 24* 119:*1* 127:*21*
**races** 191:*1*
**Rach** 128:*23* 133:*24*
184:*21* 271:5, *7, 15, 18*
274:*12*
**Rachel** 3:*5*
**radius** 58:7 150:6
**rain** 55:*11*
**raised** 87:6 88:7 162:*11*
**rambled** 268:*23*
**randomly** 63:*23*
**rang** 223:*13*
**Raskin** 1:*10* 2:*15*
**rate** 78:*3*
**ratio** 227:*13* 229:*24*
**rational** 81:*14*

**Ray** 40:25 42:*21, 23*
43:6, *7, 18*
**reach** 32:8, *11* 54:9
104:*10* 134:6, *8*
**reached** 32:*13* 134:*12*
221:*15*
**reaching** 134:*18*
**read** 38:*14* 39:*19* 42:*11,*
*12, 16* 93:*14* 94:25
112:24 145:8 147:*20*
148:*18* 152:*1* 190:*13*
229:*21* 237:5 271:*9*
278:*14* 280:*1, 3, 5, 7, 11,*
*17*
**reader** 278:*7*
**reading** 202:*4, 5*
**ready** 42:*18* 75:*21*
**Real** 11:*16* 12:5, *6, 15, 24*
13:*2, 7* 23:*10* 28:*15*
33:*23* 67:*12* 147:5 220:*4*
256:*4*
**realistically** 261:*17*
**Realities** 56:*4*
**reality** 91:*10* 149:2
**realize** 177:*16*
**realized** 43:*13* 168:*13*
**really** 13:*4* 18:7 20:*12*
24:*3, 8* 26:*21, 25* 27:*3, 6*
30:*17* 32:*3, 7* 35:*8, 9, 17*
36:*23* 39:*20* 40:*3, 11*
41:*13, 14* 42:*1, 2* 48:*17*
57:*25* 58:*21* 59:*18* 60:*18*
61:*24* 62:*1* 63:*1, 3* 64:22,
*23* 65:*7, 25* 68:*8* 69:*23*
70:*1, 3* 71:*1, 4, 10* 72:*15*
74:*11* 75:*2* 78:*23* 81:*11*
82:*10* 87:*1, 9* 88:*13* 89:*6,*
*10, 11, 12* 94:*19* 98:*14*
99:*10* 104:22 106:*8*
107:*17* 111:*11* 112:*3, 17*
118:*9* 125:*3, 9* 127:*18*
129:*1* 132:*10* 138:*4, 21*
142:*19* 145:*8* 147:22
149:*20* 151:*25* 160:*18, 21*
161:*1, 11* 164:*19* 166:*16*
168:*4, 23* 170:*4* 178:*7*
181:22 186:*9* 187:*17*
188:*1* 196:*12* 197:25
200:*1* 203:*2* 205:*15*
217:*4* 218:*17* 221:*25*
232:*16* 235:*17* 240:*13*
241:*3* 243:*20* 248:*1*
251:*2* 253:*24* 255:*23*
256:*24* 260:*7* 263:*21*
274:*15* 277:*12, 14*
**realms** 11:*18*
**realtor** 62:*16* 255:*6*
**rear** 230:*14* 233:*10*
236:*17, 21, 22* 239:*13*

**reason** 8:*3* 9:*15* 42:*5*
44:*14, 15, 17* 69:5 120:*18*
175:6 200:*19* 211:*10*
221:25 222:6 245:2
248:*3* 277:*5*
**reasonable** 262:*11*
**reasons** 42:9 43:*17* 51:8
78:*15, 17* 148:*17* 174:*23*
222:*8, 19* 224:*1*
**Rebecca** 1:*10* 281:2, *23*
**rec** 116:2
**recall** 19:*3* 32:*3* 35:2, *16*
39:*20* 40:9 41:*25* 78:7
88:9 104:*20* 106:*12*
107:*14* 111:*19* 133:*21*
168:*10* 205:9, *12, 16*
251:*16*
**recalling** 88:*20*
**receive** 38:*1* 40:*19* 104:*9*
151:*17* 167:*7* 180:*19, 23,*
*25* 253:*21* 258:*7*
**received** 39:*4, 5, 6, 7, 8, 19*
40:*1, 21* 41:6 103:*19, 23*
151:20 174:*2* 175:*8*
205:9 218:*1* 220:6
**receiving** 40:*9*
**Recess** 38:*16* 71:25
75:22 93:*13* 109:9
137:*11* 154:*4* 194:*13*
251:*3*
**recipients** 93:*18* 94:*3*
**recognize** 18:2, *3* 75:*11*
87:*10, 15* 88:*11*
**recognized** 45:*4*
**recollection** 105:2 131:*24*
168:*19*
**Recommendation** 9:*17*
**record** 27:*20, 21* 42:*17*
47:8, 9 66:*24* 71:*23* 72:2,
*11* 78:2, *10* 93:*11, 14*
104:*23* 109:*8* 110:6
135:*13* 154:2 155:*8*
156:*18* 166:*3, 5* 179:*14*
190:*15* 194:*5, 10* 215:5
221:*9* 227:*23, 25* 233:25
239:*18* 269:*1, 2* 280:22
**recorded** 111:*1, 5* 211:*17*
**recording** 110:*18, 20, 23*
**recordings** 110:*14* 111:22,
*25*
**records** 88:*25* 217:*21, 23*
218:2 219:*21* 252:8
**record's** 122:*10, 13*
**recreation** 113:*20* 114:*4,*
*7* 115:*11* 122:*17, 18*
**recycle** 197:*4*
**Red** 208:*23* 249:25
**redirected** 223:*16*
**reduce** 21:*3*

Case: 1:22-cv-01594-BMB  Doc #: 80  Filed: 01/26/24  93 of 101.  PageID #: 1319

Deposition of Daniel Grand

Daniel Grand, vs. City of University Heights, Ohio, et al.

**reduced** 281:7
**reductionist** 20:24 21:2, 7
**refer** 95:16, 20 97:7
101:3 175:15
**reference** 100:15, 16
161:7 183:21 184:13
186:4 194:18 257:5, 6
**referenced** 281:11
**referencing** 127:1 188:3
256:23
**referred** 55:17 86:12
188:11
**referring** 85:16 112:13
126:15 162:17 183:1, 9
184:10, 11 199:21 216:25
217:10 254:3
**refers** 95:21, 24 96:2, 3, 4,
5, 19
**refinances** 13:10
**reframe** 275:23
**refreshed** 111:17
**refuse** 245:3, 4
**refused** 235:6 251:9, 11
**regard** 26:15
**Regarding** 42:15 120:9
225:24
**regardless** 91:8
**regards** 34:13 39:1
**region** 71:12, 15 237:14
**register** 36:22
**Registered** 1:10
**regular** 92:5 164:25
165:11, 13 191:20, 22
194:16
**regularly** 49:3, 25
**regulation** 198:2
**relatable** 26:25
**relate** 59:21 206:1
251:24 254:15, 16
**related** 71:1
**relates** 147:1
**relations** 252:22
**relationship** 89:9, 10
187:4 200:21 206:22
253:2 254:6, 10
**relationships** 253:4 254:1
**relative** 281:15
**relevance** 13:22, 25 15:2
**religion** 50:20 65:21 69:4
**religions** 191:1
**religious** 45:20 46:2
47:20, 23 75:1 78:15
103:11 107:9 113:24
114:4, 8 122:16 158:19,
21 160:6 161:19, 23
162:16, 21 163:8, 13
189:12 193:3 253:24
**relocated** 199:22
**rely** 156:15

**relying** 177:17
**remain** 43:11 235:12, 13
**remained** 208:15
**remark** 155:11
**REMARKED** 4:4 155:5
**remediating** 25:6
**remediation** 24:24
**remember** 23:13 30:12,
17 33:17, 18 34:17 69:19
83:7, 9 88:12 104:18
108:19 143:13, 15 149:10
157:15, 17 181:18 205:16
267:20
**remembering** 77:1
**remodeled** 116:1
**remodeling** 115:12
**Removal** 21:9, 10, 12, 13,
25 22:5, 22, 24 24:9, 23
25:4 27:13, 22 28:7, 9
**remove** 26:24 205:5, 22
225:7
**removed** 108:2, 3
**removing** 27:23
**rendering** 115:14
**renderings** 272:13
**rendition** 104:25
**renewed** 190:19
**renovation** 67:11 225:21
**rent** 64:16
**renting** 64:13
**rep** 260:17
**repeat** 15:5 49:24 123:4
**repeating** 162:5, 10
**repeats** 160:4
**rephrase** 6:25 41:12
55:21 203:15
**replace** 24:1 231:6
**replied** 32:16
**report** 198:10, 17
**Reporter** 1:10 7:6, 8
155:10 280:2
**reports** 211:16
**represent** 6:10 18:10
84:18 143:11 146:19
153:9
**representative** 260:15
**representatives** 249:24
**represented** 123:25 143:6
179:5
**representing** 23:20
**reprimanded** 200:24
**Republican** 71:5
**request** 3:5 113:12
142:4 155:10 179:18
218:2, 10, 17 219:17
220:14
**requested** 155:9 234:19
**Requests** 3:5 39:21, 22,
23 84:19 133:19 142:1

**180:22 182:3, 4 191:5
217:21, 23 219:13 220:6
**required** 193:7, 9
**requirement** 47:24
**requirements** 227:13
263:2
**requiring** 192:2
**research** 89:18 201:17,
22 203:5, 12, 17, 25 204:1
**researched** 58:19 202:24
**reserve** 137:15 237:7
**reserved** 148:25
**reset** 131:17, 21
**residence** 15:15 29:7
90:9 165:1, 12, 18
**resident** 31:3 172:3
222:11 240:20
**residential** 12:20 13:19
14:3, 8, 15, 18 189:14
**residents** 170:20 171:15,
17, 20 179:22 180:17, 23
279:3, 13, 16
**resolution** 232:12
**resolved** 232:24 233:1, 5
238:6 243:3
**respect** 43:22 55:8 78:17
144:10 145:1 147:2
217:11 237:21 247:19
**respectful** 49:18 83:8
**respectfully** 204:17 252:2
**respond** 107:1 275:5
**responded** 98:24 217:24
218:12, 20, 24
**responding** 158:23
159:14, 16 161:3, 21
164:6 165:20 166:6
179:15
**responds** 274:19
**response** 94:12 152:21
159:5 166:9 182:4 218:1
249:18 274:16 275:2, 18
**responses** 142:1
**rest** 77:15 268:19
**restaurant** 106:18
**restaurants** 17:7
**rested** 128:6
**restored** 50:4
**restriction** 193:21
**restrictions** 53:1 198:4
266:9, 14, 21
**result** 43:24 44:24 244:5
264:10
**resulted** 139:25
**results** 201:20
**resume** 75:25
**retained** 64:9, 11 146:19
**return** 43:14, 17 44:15, 16
**returned** 37:8, 10 40:13,
18 41:9, 24 42:2, 10

**returning** 38:20 39:1
43:25 44:5
**reveal** 81:2
**revealed** 68:17 216:20
**revenue** 23:12 25:18
**revenues** 25:13
**review** 269:18
**reviewed** 218:17
**revolve** 190:16
**revolved** 60:5
**rhetoric** 169:25
**rid** 24:6 29:2
**ride** 167:7
**ridiculed** 124:21
**ridiculous** 69:2 126:18,
22 175:1 230:15 248:13
**ridiculously** 126:22
**right** 8:9 10:15 13:19
14:22 18:13 19:10, 23
20:2, 14 22:15, 24 24:17
25:3, 4 26:3, 17 28:12
30:12, 22 31:16 32:3
33:17 35:9, 21 38:18
39:14, 20 40:16, 19 43:2
52:11, 19 56:22 57:9
58:1 59:21 64:14 65:4, 8
66:11 69:19 71:21 76:22
77:1 79:19, 24 80:6
81:20 83:9 87:17 88:6, 9,
13, 14 90:2, 7 92:12 93:3,
23 95:2 96:20 97:3
101:13, 25 102:8, 14
104:3, 7, 9, 18 112:11, 22
113:22 114:1 116:15, 19
117:23 118:6 119:8, 10
120:22 122:6 124:9
127:13 137:16 138:1, 2
142:23 143:15 149:17
151:13, 14 157:23 158:2
165:10 167:2, 3, 14, 21
168:10 179:13 181:14
182:20 183:24 184:2
185:3, 23 187:18, 19
189:6 190:7 191:17
193:23 194:2 198:16, 23
199:3, 16 200:7 202:7, 13
207:23 212:9 213:20, 23
216:9 218:22 219:2
225:22 228:18 229:5
234:8, 9 235:14 237:7
238:4 242:13 244:11, 17
245:18 246:11 252:11
255:22 261:25 274:6
277:4 280:1, 4, 20
**rights** 251:22 266:18
**rights-of-way** 198:8
**ringleaders** 186:6
**ripped** 231:1
**ritual** 50:5

Deposition of Daniel Grand

Daniel Grand, vs. City of University Heights, Ohio, et al.

**Road** 1:*10* 2:*17* 39:*2*
42:*15* 51:*6* 80:*17* 195:*21*
**robber** 164:*1*
**robust** 54:*8*
**Rock** 12:2 250:*18*
**rocks** 250:*24*
**Rodney** 185:*4*
**roll** 12:2 279:*20*
**Roman** 91:*13* 92:*25*
98:*13* 149:*9*
**roof** 73:6, *13*
**room** 60:*15*, *16* 61:*6*
95:22 96:*7*, *14* 98:*8*
100:*18* 105:*20* 106:*5*, *7*,
*13*, *17*, *19* 107:*21* 113:*20*
114:*4*, *7*, *13*, *18*, *21* 115:*11*,
*12*, *22* 116:*2* 122:*17*, *18*
140:*1*, *2*, *3*, *4*, *7*, *8*, *9* 141:*8*
177:*14*, *15*, *19*, *22* 243:*1*
**rooms** 100:*18* 130:*21*, *22*
**room's** 114:*12*
**root** 32:*21*
**rooting** 33:*12*
**roots** 53:*17*
**Rosen** 124:*3*
**Rosenfeld** 124:*6* 272:*19*
275:*8*
**Rosh** 125:*25* 212:*21*
**Rosskam** 86:*12*, *16*, *17*, *23*
87:*13* 89:*3*, *19* 90:*5*
**Rosskam's** 89:*24*
**round** 54:*22* 55:*5* 199:*19*
**roundabout** 156:*9*
**rounded** 243:*9*
**rounds** 217:2
**routinely** 221:*22*
**Row** 1:*10* 2:*16*
**rude** 264:*17*
**rule** 130:6 174:*4* 241:*25*
258:*7* 261:*6*
**ruled** 138:*16*
**Rules** 1:*10* 26:*8* 189:*18*
232:*19* 244:*22* 261:*8*, *9*
**ruling** 138:*15*
**run-in** 228:*23*
**runner** 55:*7*
**running** 26:*3* 137:*20*
**runoff** 233:*17* 235:*10*
**run-of-the-mill** 53:*4*
**Ruth** 80:2, *9* 181:*22*
**Ryder** 1:*10* 2:*15*

**< S >**
**Sabbath** 53:2 54:*4*, *11*, *15*
55:*3* 57:*11* 58:*13* 151:2
156:*24*
**Sabbath-observing** 52:*25*
**safely** 263:*3*
**safety** 44:*10*

**sake** 44:*10* 119:*21*
**sale** 13:*1* 62:*12*
**sales** 258:*11*
**sandstones** 67:*14*, *19*, *22*
68:*5*
**sanitation** 25:*18*
**sat** 30:*18* 207:*20*
**Satellite** 226:*17* 240:*10*
**satisfactory** 155:*15*, *18*
**satisfied** 218:*16*, *17*
220:*15*
**Saturday** 54:*18*
**save** 173:*16* 239:*5*
**saved** 209:*4*
**saw** 31:*4* 39:*24* 63:6, *12*,
*18* 65:*16*, *19* 68:*4* 72:*16*
165:*5* 169:*13* 170:*24*
179:*14* 208:*18* 212:*3*, *5*
217:6 270:*23* 276:*18*, *20*
278:*3*
**saying** 14:*17* 18:*24*
26:*15* 27:*5*, *7*, *20* 28:*1*
29:*5* 35:*20* 45:*3* 46:*17*,
*18* 47:*11* 65:*17* 75:*1*, *11*,
*15*, *16* 94:*13* 98:*18*, *25*
99:6 101:*1* 108:*22* 118:2
127:2 132:*20* 138:*11*
161:*7*, *8*, *13* 164:*13*
165:*24* 166:*8* 169:*15*
170:*25* 181:*10* 182:*9*
184:*7* 186:*14* 201:2
212:*16* 213:*17* 214:*7*, *16*,
*19* 216:*16* 239:*18* 244:*1*
247:*20* 275:*16*, *18*
**says** 45:*9* 68:*7* 70:*11*
90:*9* 103:*16*, *17*, *18*
105:*21* 107:*20* 115:*11*
116:*1*, *12* 121:*12*, *13*
128:*3* 137:6, *10* 138:*7*
146:*18* 147:*10*, *23* 148:*5*
152:*24* 153:*17* 163:*11*
165:*16* 167:*11* 170:*19*
174:*5* 177:*1* 207:*3*
219:*14* 234:*22* 236:*13*
245:*19* 248:*23* 249:*16*
260:*4*, *16* 264:6 266:*1*
270:6 271:*11*, *18*, *22*
272:*18*, *22* 273:*1*, *9*, *17*
274:*7*
**Scalise** 201:*5*, *13* 202:*1*
**scapegoat** 124:*19*
**scapegoated** 129:*5*, *19*
130:*13* 131:*14*
**scared** 141:*18* 261:*10*
**scattered** 239:*9*
**scenery** 9:*13*
**scenes** 130:*15*
**schedule** 92:*5* 263:*5*, *14*
**scheduled** 131:*23* 270:*19*

**schedules** 50:*16*
**schlub** 67:*13*
**school** 10:*5*, *12* 16:*11*
26:*9* 99:*11* 100:*13*
101:*14* 252:*3* 255:*17*
**scooped** 239:*4*
**scope** 19:*7* 26:*19*
**screen** 221:*7*
**screening** 205:*11*
**scrubble** 212:*14*
**S-curve** 195:*25*
**scuttled** 75:*19*
**se** 34:*25* 80:*18* 129:*14*
190:*17* 257:*10* 261:*7*
**seal** 281:*19*
**search** 88:*23*
**searches** 251:*23*
**sec** 188:*21*
**second** 39:*10* 60:*13*, *22*
71:*23* 90:*3* 97:*8*, *11*, *15*,
*16*, *17* 114:6 120:*13*
121:*25* 122:*20* 123:*5*, *10*,
*12*, *32* 124:*14* 147:*1*, *19*
156:*8* 159:*16* 160:*25*
188:*3* 236:*4*, *5* 248:*10*
267:*3* 270:*2*, *3*, *4* 271:*3*, *9*,
*10*, *22*, *23*, *25* 272:*2* 273:*9*,
*14*, *15*
**Secondly** 7:*4*
**seconds** 130:*7* 242:*17*
**secretary** 187:*7*
**sector** 16:*19*
**security** 213:*20* 214:*3*, *4*,
*12*, *14* 216:*10*, *12*
**see** 24:*21* 27:*18* 38:*4*, *12*
40:*4* 47:*15* 62:*11*, *14*, *21*
65:*17* 66:*22* 68:*20* 72:*22*
73:*11* 82:*14* 87:*4*, *10*, *12*,
*13*, *15* 88:*15* 89:*7* 90:*21*
97:*16*, *18* 107:*18* 117:*9*
133:*25* 134:*1*, *3* 162:*13*,
*17* 163:*23* 164:*1* 168:*22*
174:*3* 179:*9*, *15* 180:*12*,
*14* 189:*3* 198:*25* 207:*7*
208:*17* 210:*3* 214:*17*
227:*25* 230:*25* 234:*7*
236:*1* 242:*14* 247:*4*
248:*3* 253:*7*, *11* 256:*19*,
*23* 257:*1*, *9*, *11* 265:*20*
270:*5* 271:*7*, *23* 272:*17*,
*22* 273:*6*, *7*
**seeing** 22:*15* 48:*24* 58:5
**seeking** 203:*4*
**seemingly** 53:*3* 214:*25*
**seen** 39:*18* 72:*19* 119:*16*
128:*15* 147:*12* 151:*21*, *25*
152:2 157:*14* 167:*20*, *21*,
*22*, *23* 190:*12* 200:*9*
211:*17* 269:*19*, *21* 276:*17*

277:*21*
**self-object** 143:*24*
**sell** 12:*7*, *24* 13:*10* 63:*1*,
*4* 266:*10*
**selling** 81:*20*
**send** 36:*3*, *14* 42:*5* 43:*6*
58:*1* 94:*17* 110:*4* 133:*6*
145:*23* 180:*9*, *10*
**sending** 102:*1* 120:*7*
**senior** 254:*17*
**sense** 44:*22* 49:*15* 58:*1*
81:*12* 105:*9* 127:*13*
129:*6* 158:*16* 159:*20*
167:*12* 174:*19* 175:*2*
212:*23* 213:*1* 214:*11*
273:*22*
**sent** 17:*14* 34:*12*, *19*
36:*1*, *6* 37:*20* 38:*21*, *22*
39:*24* 40:*1*, *4* 84:*25* 88:*8*
94:*6*, *9*, *15* 102:*3* 117:*20*
119:*4* 121:*3*, *4* 134:*11*
145:*10* 146:*15* 159:*6*
160:*23* 171:*14* 174:*1*
179:*17*, *20* 200:*11* 218:*9*
219:*7* 223:*20* 228:*19*
234:*18* 274:*11*, *15* 277:*8*
278:*3*, *4*
**sentence** 42:*20* 90:*8*
97:*8*, *16*, *18* 98:*19* 148:*18*
271:*9*, *11*, *14*, *16*, *22*, *23*, *24*
272:*3*
**sentences** 156:*7*
**sentiment** 44:*6*
**separate** 50:*19* 184:*3*, *14*
191:*16* 209:*14* 211:*18*
**Sephardic** 53:*15*, *16*
**Sephardis** 53:*23*
**serious** 86:*10*
**seriously** 166:*12*
**served** 181:*7* 182:*8*
**service** 40:*7* 48:*5* 221:*2*,
*15*
**services** 46:*6* 48:*4*, *5*
52:*4*, *8*, *17*, *20* 164:*25*
165:*11*, *13*, *16*
**session** 50:*10* 232:*15*
259:*1*
**sessions** 50:*14*, *17*
**Set** 3:*5* 26:*7* 80:*9* 84:*18*
114:*11*, *22* 115:*24* 125:*5*
174:*12* 194:*16* 197:*11*
199:*14*, *18* 200:*4* 219:*7*
243:*15* 256:*11* 267:*14*
270:*21* 278:*7* 281:*18*
**sets** 92:*5*
**setting** 36:*24* 110:*22*
114:*19*
**settlement** 144:*19*
**setup** 131:*13*
**Seudah** 54:*25* 55:*4*

**seven** 84:*21* 242:*25* 263:*14*
**severe** 52:*23*
**Shabbos** 52:*4*, *16*, *20* 54:*19* 56:*7* 58:*3* 77:*11*, *13*, *15*, *25* 78:*5* 139:*16*, *24* 212:*22*
**Shacharit** 48:*7*
**shake** 7:*6*
**shaken** 264:*24*
**shaking** 70:*12*
**shaped** 238:*20*
**shared** 33:*13* 144:*4*
**sharing** 91:*18*
**Sharon** 255:*10*
**Sharon's** 255:*23*
**Shehadeh** 42:*14*
**Shelishit** 54:*25* 55:*1*, *4*
**shell** 169:*4*
**shema** 85:*14*
**Shemoneh** 85:*10*
**shirt** 68:*17*
**shocked** 169:*4* 210:*12*
**shocker** 73:*3*
**shoes** 231:*3*
**shomaya** 85:*4*, *6*, *8*, *13*, *14*, *15*, *17* 86:*6*
**shooting** 81:*8* 130:*8*
**shop** 175:*10*
**short** 276:*2*, *18*
**shorter** 48:*8*
**shortly** 65:*2* 225:*20*
**shot** 163:*24*, *25*
**shots** 199:*23*
**shoulder** 169:*7* 265:*18*
**show** 38:*3* 61:*4*, *15* 63:*24* 82:*17* 83:*18* 180:*22* 207:*9* 226:*18* 233:*24* 240:*11* 250:*24*
**showing** 67:*3* 70:*8* 82:*16* 130:*23* 133:*23* 174:*9* 195:*18* 209:*3*
**shown** 107:*10* 165:*23*
**shows** 92:*8* 207:*2*, *7*, *10* 249:*14* 250:*19*
**shrubs** 186:*2* 249:*5*
**Shtiebel** 213:*13*, *25* 216:*24*
**shuffling** 123:*3*
**shul** 55:*17*, *23* 56:*15*, *24* 66:*8* 92:*13*, *14*, *16* 95:*4*, *11*, *21*, *22*, *23* 96:*1*, *4*, *7*, *10*, *13*, *16*, *19*, *22* 97:*10*, *21* 98:*6*, *8*, *19*, *23*, *24* 99:*7*, *9*, *16*, *25* 100:*9*, *13* 101:*4*, *5*, *17* 102:*10* 210:*5*, *24* 211:*1*, *22* 215:*11*
**shuls** 96:*8* 100:*19*
**shut** 125:*20* 183:*25*

**side** 24:*25* 25:*1*, *6* 50:*2* 152:*13* 199:*20* 225:*22* 230:*14* 241:*5* 248:*9*, *12*
**sidewalk** 198:*3*
**Siemborski** 125:*18*, *22* 126:*4* 133:*25* 172:*21* 183:*23* 184:*15*, *17*
**sign** 61:*22* 62:*12* 81:*22* 149:*22*, *24*, *25* 164:*16* 171:*25* 245:*3*, *4*
**signature** 172:*1* 280:*24*
**signed** 127:*23* 171:*14* 172:*4* 178:*14*
**signing** 118:*2* 169:*1* 188:*24* 245:*20*
**sign-off** 245:*9*
**signs** 149:*19* 150:*2* 158:*18*, *21* 160:*2*, *5*, *15*, *16* 161:*22* 162:*15*, *20*, *24*, *25* 163:*1*, *2*, *7*, *12* 164:*9*, *11*, *14*, *17* 166:*2*
**Silas** 187:*21* 188:*1* 250:*8*
**silently** 38:*15*
**sillier** 24:*2*
**Silsby** 8:*25* 9:*1*, *4*, *6* 56:*6* 59:*22* 60:*3*, *6*, *22* 61:*3*, *15* 64:*9*, *11* 79:*12*, *13* 98:*2*
**similar** 22:*11*, *12*, *21* 53:*21* 98:*25* 150:*13*
**similarities** 156:*10*
**similarity** 99:*22*
**simple** 89:*17* 163:*15*, *16* 229:*21* 248:*3*
**simply** 24:*5* 36:*10* 47:*11*, *22* 51:*1* 56:*5* 98:*16* 113:*13* 145:*22* 172:*22* 173:*10* 175:*12*, *20* 177:*1* 229:*22* 241:*13*
**Sincerely** 45:*8*
**sing** 24:*15*
**singer** 24:*12*, *13* 68:*3*
**singers** 24:*14*
**single** 14:*19*, *21* 48:*20* 49:*1* 80:*25* 131:*7* 247:*12*
**singled** 106:*22* 107:*2* 169:*9*
**sir** 6:*7* 135:*23* 183:*21* 207:*21* 245:*7* 252:*15*
**sit** 106:*16* 216:*21* 258:*22*
**sitting** 24:*12* 68:*1* 95:*22* 208:*12* 209:*20* 212:*5*, *23*
**situation** 194:*20* 210:*11* 224:*16* 225:*18* 227:*6* 268:*9*, *11*
**six** 84:*21* 156:*22* 237:*16* 244:*23* 256:*11*, *13*
**sixth** 94:*21*
**size** 62:*2*, *7* 95:*16* 96:*14*, *15*, *16* 114:*13* 272:*7*

**skelley@mrrlaw.com** 2:*21*
**sketch** 114:*25* 115:*3*
**skin** 69:*4*
**slandering** 265:*13*
**sleeping** 61:*3*
**slipped** 179:*19*
**Slow** 259:*10*
**SLP** 262:*19*
**slur** 174:*15*
**smacked** 129:*11*
**small** 23:*8* 50:*11* 57:*23* 94:*7* 96:*11*
**smaller** 28:*18* 96:*18*
**smart** 69:*2*
**smell** 66:*2*
**smidgeon** 230:*12*
**smoking** 66:*2*
**snow** 55:*10*
**snowbirds** 64:*25*
**snowing** 55:*9*
**so-called** 127:*23*
**social** 263:*11*
**sold** 13:*4* 65:*3*
**sole** 197:*8*
**Solely** 57:*12*
**solicited** 164:*23* 165:*4*
**soliciting** 150:*23*
**solitude** 202:*16* 204:*18*
**Solon** 1:*10* 2:*17*
**somebody** 24:*11* 27:*17* 86:*22* 87:*15* 90:*16* 100:*11* 101:*3* 175:*8* 177:*14* 178:*24* 196:*14* 207:*22* 213:*20* 219:*8*, *9*, *15* 240:*4* 250:*7* 267:*22*
**something's** 280:*17*
**son** 200:*1*
**soon** 125:*20*
**sorry** 15:*4* 18:*24* 19:*17* 35:*18* 37:*11* 39:*5*, *9*, *11* 49:*24* 55:*20* 62:*11* 71:*16* 76:*22* 85:*4* 95:*13* 97:*13*, *18* 106:*10* 108:*14* 109:*22* 125:*24* 152:*15* 153:*11* 167:*1* 183:*7*, *10* 184:*4* 188:*19* 190:*2* 201:*12* 202:*9* 206:*7*, *10* 217:*16*, *20* 245:*21* 252:*17* 259:*24* 270:*3* 272:*1* 274:*4* 280:*8*
**sort** 26:*14* 28:*3*, *20* 33:*15* 70:*1* 75:*19* 81:*14* 90:*25* 91:*10* 99:*19* 107:*16* 116:*14* 118:*18*, *21*, *24* 128:*10* 144:*22* 173:*22* 177:*20* 186:*4* 198:*6* 209:*24* 213:*15* 214:*8*, *19* 234:*7*
**sorts** 80:*19* 125:*19* 160:*8*
**sought** 264:*13*
**soul's** 50:*4*

**sound** 18:*12* 32:*6* 54:*14* 116:*19*
**sounded** 106:*20*
**South** 87:*24*
**Southerland** 3:*5* 4:*2*, *4*, *6* 143:*9* 148:*5* 151:*16* 152:*24* 156:*1*, *6*, *25* 157:*3* 158:*17* 160:*3* 167:*4*, *16*, *25*
**Southerland's** 152:*20* 164:*5*, *22* 165:*10*
**space** 78:*14* 95:*11*, *13*, *21* 96:*5*, *11*, *12*, *14*, *15*, *20* 114:*14* 197:*12* 236:*8* 247:*24*
**Spain** 53:*17*
**spam** 40:*8*
**speak** 7:*16* 18:*8* 23:*23* 37:*13* 39:*11* 49:*5*, *9* 56:*3* 58:*17* 60:*7* 99:*11* 104:*22* 108:*4* 121:*14* 128:*4* 134:*7* 143:*2* 147:*13*, *21* 166:*24* 182:*5* 188:*7* 196:*3* 208:*24* 218:*14* 223:*8*, *10* 235:*16* 252:*19* 263:*2*
**speaking** 70:*9* 74:*6* 82:*1* 100:*6* 173:*10* 184:*16* 214:*7*, *15* 223:*16*
**speaks** 100:*11* 101:*11* 118:*7* 186:*24* 187:*2* 233:*25* 252:*15*
**special** 3:*5* 4:*13* 78:*8* 101:*6* 105:*5*, *13* 107:*4*, *7*, *9* 112:*15*, *23* 113:*2*, *13*, *19*, *23* 116:*4* 117:*11* 120:*17* 125:*5* 129:*22* 130:*18* 131:*8* 135:*8*, *14*, *17*, *25* 136:*12* 137:*17* 138:*16* 139:*13* 159:*22* 173:*14* 180:*3*, *4* 190:*10* 192:*14* 193:*6* 270:*10* 275:*10*
**specific** 8:*18* 11:*7* 29:*4* 191:*4*
**specifically** 183:*23* 249:*19*
**specified** 281:*14*
**speckle** 197:*4*
**spectacle** 125:*5* 129:*23* 131:*14*
**speculate** 161:*15*
**speculating** 159:*18* 161:*17*
**speech** 129:*14* 262:*18*, *19*
**speed-lined** 132:*2*, *7*
**spend** 10:*19* 77:*16* 131:*9* 258:*23*
**spending** 228:*8*
**spent** 111:*11* 242:*17*
**spiffy** 241:*3*
**spirit** 43:*1* 232:*22*

Deposition of Daniel Grand                                    Daniel Grand, vs. City of University Heights, Ohio, et al.

---

**spoke** 57:22 78:8 104:13 106:14 109:15 110:10 111:12 129:15 156:15 171:19 172:6, 9, 24 276:22 279:16

**spoken** 103:24 170:4

**spokes** 80:11

**spontaneous** 140:17

**spread** 94:22

**springtime** 65:10

**spy** 197:11

**Square** 33:16 231:7 236:12

**squeaks** 254:12

**squiggly** 41:19

**Stadium** 91:1

**stadiums** 96:10

**stage** 174:12

**stamp** 155:13

**stamped** 188:8 235:3

**stamps** 151:18

**stand** 105:3 131:4 143:2 150:10 151:7 166:18 204:16 218:15

**standard** 126:16 137:4 221:13 247:1

**standing** 14:25 73:24 74:4 169:14 191:7 200:24

**standoffish** 107:16

**stands** 108:9 173:23 204:21

**star** 265:10

**Starbucks** 30:18

**stars** 48:16, 17

**start** 15:9 47:11 48:3 81:6 84:6 93:24 130:8 225:1

**started** 69:23 70:7, 8, 19 71:3, 7 80:19, 20 200:20 249:13 268:23 269:4

**starters** 178:23 265:5

**State** 1:10 6:7 66:23 135:12 140:23 223:6 281:3, 24

**stated** 107:11 111:14 144:2 251:15

**statement** 79:6 106:4 120:9 123:19 136:24 148:13 159:9 161:12 172:23

**statements** 110:11 170:1

**STATES** 1:2 111:14 118:7 148:9

**stating** 160:11

**status** 255:21

**statute** 166:3 173:18

**stay** 54:20 60:17 64:14 75:14 258:24

**stayed** 238:12

**steak** 220:13

**stellar** 117:8

**stenotype** 281:8

**step** 49:1

**STEPHEN** 2:14

**steps** 130:25 131:1 135:24 136:11 181:25

**Steve** 6:10

**stick** 232:17 240:1

**sticky** 251:15

**stigma** 255:2

**stipulate** 76:5

**stone** 226:11 237:10

**stones** 225:8, 15 226:16, 17 227:4 233:20 240:9, 10 248:14, 15, 25 249:13

**stood** 75:7

**stop** 145:2 229:9 233:3 243:7 249:20 250:1, 13, 16

**stopped** 94:16 209:13, 19 241:16

**stops** 195:17

**store** 36:6, 11, 20, 21 37:5 39:2 40:14, 25 42:1

**stores** 14:16

**stories** 175:11

**story** 56:1 59:21 69:10 213:16

**straight** 79:25 195:22 250:23

**strange** 213:1 215:19

**street** 60:19 61:9 76:24 77:24 79:13, 20 185:6 186:21 198:5

**streets** 75:2 216:12

**strewed** 67:14

**strictly** 99:13

**strike** 119:14 168:13

**strip** 14:16

**stripes** 196:8

**strong** 47:12

**strongly** 45:16

**structure** 74:13

**stuff** 33:20, 25 40:8 51:24 75:14 79:3 80:20 92:21 131:10, 12 132:9 140:24 144:3 166:7 169:18 179:19 191:6 200:13 202:23 219:10 220:1 226:6 230:20, 21, 22 244:21 264:18, 21 269:6

**stupid** 127:3

**style** 91:3

**subcommittee** 31:21, 24 32:1, 4, 9

**subcommittees** 34:22

**Subject** 3:5 4:8, 13 31:2 76:13 113:12 180:21 238:19 251:23

**subjected** 130:12 131:12 189:16

**submissions** 119:19 127:12

**submit** 138:6, 8, 12 145:5

**submitted** 119:24 120:1 121:1, 2 122:1, 25 123:12, 23 191:5 218:22 278:15

**subsequent** 160:25

**substantive** 81:11

**succeed** 124:18, 23

**sudden** 130:25

**suffering** 65:1 255:1

**suggest** 144:4 275:9

**suggested** 30:3, 5, 9 31:13, 16 33:8 171:16

**suggestion** 32:8

**suit** 60:4

**sundown** 48:15

**SUP** 79:6 81:3, 4 82:25 189:13 191:5

**super** 93:22 212:11

**supercedes** 103:25

**super-charged** 196:7

**superfluous** 142:12

**superior** 90:15

**supplement** 63:25 137:23 269:2

**supplemental** 117:15

**supply** 273:18

**support** 117:23 118:13, 19 127:21, 22

**supporter** 66:4

**supportive** 180:19

**suppose** 195:8

**supposed** 214:25 226:9 228:7, 13 230:24 245:25 246:2

**supposedly** 191:9

**supposition** 177:18

**sure** 13:12 18:14 22:15, 17 32:7, 23 35:9, 23 40:10 45:13, 17 47:12 70:22 73:21 75:8 83:2 89:17 93:23 94:1 97:25 103:22 112:6, 8 124:25 127:11 136:18 138:21 143:25 157:13 158:24 159:4 167:21, 23 168:11 171:6 174:4 176:22 179:17 187:10 190:4, 21 195:9 253:14 256:7 258:12 263:22

**surmising** 177:12

**surprise** 270:23

**surprised** 67:3 181:9

273:21, 24

**surveil** 141:3

**surveillance** 140:23 199:14 215:10 216:4

**surveilled** 209:13 215:17 217:13

**surveillers** 217:2

**surveilling** 215:1, 7 216:17, 18

**suspect** 138:2

**suspicions** 129:25

**suspicious** 212:3, 5

**sustenance** 253:21

**swords** 93:1

**sworn** 281:5

**syllogisms** 166:12

**synagogue** 45:25 46:10, 12, 14, 22 49:3 50:1 51:2 54:13 57:11 58:12 74:11 88:19 92:16, 19, 20 93:6, 9 96:1 97:10, 21 98:6, 19, 22 99:3, 5, 6, 14 100:1, 2, 9, 16 102:10 105:21 106:5, 13 107:21 160:17 161:9 164:10, 11, 14, 16 166:1 170:21 198:13, 15 211:25 213:4, 9 276:25 277:3 278:10 279:5, 17

**synagogues** 46:11 50:22 51:23 54:9 56:7 58:14 65:17 101:2 161:10

**synonymous** 26:22

**synopsis** 147:15 175:19

**system** 61:20 89:18 253:25

**< T >**

**table** 7:13 76:13 77:18, 22 106:17 115:19, 20 128:20 131:22 178:9 234:9 250:18

**tabled** 182:24 270:17 273:3

**tables** 114:11 115:4

**tack-on** 36:7

**tag** 249:25 250:13

**take** 7:6, 8 21:20 28:12, 25 33:3 39:9 42:4 67:22 88:24 103:1 110:8 118:1, 20 126:19 135:24 136:11 137:1, 5 141:15, 17, 24 147:11 152:4, 21 156:21 164:25 165:12 177:15 186:3 201:4, 5, 13 205:13, 21 220:9 222:5 231:22 242:18 254:22 256:4 269:24 272:13

**taken** 1:10 51:19 60:23 114:15 280:18 281:12

**takes** 29:3

---

Tackla Court Reporting, LLC                    PH: 216.241.3918                    Page: 25

**talk** 7:4 14:8 24:5
45:19 69:1 75:18 77:17
113:21 170:6, 8 184:7
205:25 207:5, 6 215:10
216:19 217:21 219:19
225:6 237:2, 13 243:25
244:2 252:21 254:24
264:20 265:16 277:14
**talk@dannygrand** 40:6
**talked** 106:25 126:9
168:16 187:11 209:5
218:9 252:8
**talking** 7:9 25:11, 12
30:1 39:14 52:7 58:8
66:10, 13, 15 69:13 70:13
72:7, 9 79:3 83:6 91:3,
15 93:16 106:6 107:6
112:2 115:10, 13 117:9
120:15 121:22 132:15, 16
155:24 164:15 166:4
191:14 209:1 211:1, 4
214:8, 20, 23 220:23
226:12, 13, 16 229:14
231:10 233:16 238:11
264:15 265:12 279:21
**talks** 229:22 237:6
257:24
**tamp** 226:23 238:24
**tandem** 130:15
**tangible** 68:24
**tangle-tongued** 119:15
**tar** 79:2 129:24 176:8
232:15
**tarred** 192:9
**tarring** 244:5
**tax** 33:21
**taxes** 222:11
**tech** 16:6, 19
**technical** 22:3
**technically** 255:21
**technology** 16:1
**tefilah** 85:5, 6, 8, 13, 16,
17 86:6
**telephone** 184:12
**tell** 14:5 16:17 20:14
28:5 29:1, 15, 16 32:17,
21 33:10 35:3, 8 52:22
69:19 70:2 83:23 85:7
88:13 89:16 92:22 103:4
112:7 129:25 131:5
134:6 138:3 145:7 150:5
152:23 153:19 166:21
168:25 169:16, 17 173:10
175:22 176:5 178:22
186:16 192:17 193:1, 2
194:19 195:6 208:4
210:13 218:18 219:3, 6
220:24 223:24, 25 224:19
225:18 233:6, 24 238:13
241:8 243:4, 6 244:12

245:8 248:5 252:1
253:18 255:2 256:22
265:2 272:21 276:23
**telling** 134:17 135:16
138:10 160:16 170:20
176:2 193:17 201:2
205:12 225:7 269:7
**tells** 214:12
**temple** 45:22, 23 98:22
100:17
**ten** 48:18
**tenant** 28:21
**tend** 58:25
**tenor** 186:13
**tense** 85:13 147:13
**tent** 53:7, 9
**term** 21:2 24:9 86:2
118:17
**terminology** 41:11
**terms** 11:19 69:21
111:17 120:11
**terrible** 80:19 174:21
191:3 265:22
**terribly** 259:4
**territory** 196:21
**test** 66:22
**testified** 6:3, 18
**testify** 281:5
**testimony** 142:22 273:10
281:7, 10
**Thank** 4:8 11:3 36:24
42:21 45:2 50:4 77:5
81:4 96:6 124:5 137:10
151:7 189:8 228:16
249:11 257:19, 21
**thanked** 37:12
**Thanks** 43:9 189:4, 7, 10
225:3 241:19
**Thanksgiving** 77:13
**theater** 106:19
**theme** 191:12
**therapist** 262:18
**thin** 212:14
**thing** 24:9 29:2 31:11
33:13 37:15, 16 38:2
42:23 54:14 57:8 70:16
73:20 74:16, 18 90:24
99:4, 16, 18 101:6 105:5,
8 132:17 133:24 134:1, 2,
3 142:11 169:3 195:18
199:2, 5 204:20 229:6, 21
234:10 237:1, 9 241:13
247:16, 17 249:17 253:12
265:22
**things** 6:22 17:7 20:21
21:1 23:23 24:10 31:15
33:23 34:14, 23 49:15
60:14 61:25 66:2 69:16
78:24 95:8 105:3 106:14
121:17 125:21 132:4

133:4, 10 138:3 147:17
152:5 164:18 166:15
170:25 174:20 200:10
202:22 204:16 221:12
227:2 232:20 258:21
265:1 268:24 271:19
272:8
**think** 8:25 13:24 14:17
17:2, 25 18:15 19:2
25:21 26:6, 21 27:7, 18
32:2, 16, 21, 24 33:19
34:12, 15, 18 35:4 36:20
37:1, 2 40:10, 21 41:5, 11
44:21, 22 45:5, 15 46:23
51:15, 16 54:3, 12 55:25
56:10 57:14 64:24, 25
65:23 66:20, 23 67:1
71:1, 11 75:20 76:13, 20
77:1 78:21 85:2, 19
89:14, 15, 20, 25 92:2, 15
94:6 99:10 100:13, 15
101:14 102:14 103:24
106:14, 15 108:5, 24
110:9 118:12, 25 121:7,
11 129:13, 15, 18 130:11
137:12 140:2, 3 141:6
145:19 146:11, 18, 19
147:5, 25 152:14 160:9,
10 163:18, 22 165:22
168:3, 5, 9, 10 169:12
174:21 178:8 181:19, 21
182:17 186:18, 25 187:11
189:16, 17, 19 191:5, 9, 11,
23 192:20 194:5 198:19
199:17 200:17 202:15
204:15 205:15 207:14
208:21, 25 214:19 215:18
221:19 223:6 233:2, 8
242:22 245:15 253:23
254:13 256:5, 9 260:23
262:3, 25 265:22 267:4,
19
**thinking** 30:12 64:7
79:22 111:11 119:21
**thinks** 243:3
**third** 55:1, 2 79:15
122:7, 12 123:22, 24
204:20
**Thomas** 113:14 117:10,
13 133:6, 9, 22 267:21
270:7, 8 274:12 278:3
**thought** 31:23 33:13
37:14 40:17 57:8 58:8
59:14 62:5 78:23 80:16
83:5 87:1, 2 88:4 106:1
119:1 120:19 141:3
156:10 171:4 174:24
175:18 180:18 202:9
204:16 215:1 270:20

279:4
**thoughts** 10:1
**thousands** 228:20
**threatened** 141:16 169:11
**three** 46:7 48:4, 16, 21
50:14 52:12 54:10, 15, 22
58:5, 6 63:6 79:18, 19, 22
88:3 94:20 130:22 174:7,
11 175:7 192:1 197:20
199:18, 20, 21, 24 204:15
213:19 228:6 237:23
240:7 242:24 255:14, 17
256:13, 14 258:25 262:7
265:6
**three-block** 150:6
**threw** 220:12
**throw** 74:22, 23 275:7
**Thursday** 1:10 155:1
**ticket** 187:24, 25 188:2
198:9, 18, 21 199:11
239:20, 23 250:25
**tickets** 25:17 199:10
237:24 238:9, 10
**tidbits** 219:22
**time** 7:5, 12 10:13 12:13
16:14, 23 18:6, 13 21:6
30:21 31:21 34:5 35:25
36:12, 22 41:6 43:11
46:12 51:20 52:9 55:22
57:5 59:17 61:5 63:5
64:10, 11 65:8, 13, 18, 23
66:6, 16, 19 67:12 69:13,
24 71:2, 12, 15 72:16, 25
73:17, 23 77:7, 15, 16, 19
78:11 79:4, 10 80:11
81:1 82:24 86:19 89:2
90:12 92:8 94:14 100:7
102:10, 14 111:11 116:11
119:12, 17, 24 120:9, 13,
15, 22 121:11 122:11, 12,
20 123:6, 10, 15, 21, 22, 24
124:12 125:11 131:19
132:8 134:15 137:17, 21,
24 138:16, 17 139:16, 21,
22, 24 140:4, 10, 11, 12, 25
143:6 146:14 147:20
148:14, 16, 18, 21 149:17
156:11 158:1 159:13
160:22 161:2 164:7, 8
168:12 169:7 171:8
177:10 185:5 187:8
189:5, 17 194:8 195:16
196:13 199:25 204:21
208:15, 18 209:11 215:18
220:13 221:15, 18 225:5
228:12 229:2, 4 230:16
235:11 236:16 238:22
240:7 245:17 246:22
247:15 248:19 249:8, 23
250:25 261:12, 14 262:4,

Case: 1:22-cv-01594-BMB  Doc #: 80  Filed: 01/26/24  98 of 101.  PageID #: 1324

Deposition of Daniel Grand

Daniel Grand, vs. City of University Heights, Ohio, et al.

*12, 25* 265:5 268:*19, 22* 269:23 270:*19, 24* 271:*1* 272:*13* 281:*13*
**timeline** 161:7 210:*1*
**times** 46:7, *8* 48:*21* 52:*12* 54:*15, 16* 55:6 72:16, *18* 87:11 92:6 114:*12, 13* 121:*15, 22* 127:*11* 147:16 190:*10* 199:22 209:*14* 210:*1* 221:16 279:15
**tiny** 199:7 254:*20*
**today** 8:*17* 21:16 38:5 108:9 109:2 112:*8* 139:22 140:*11* 143:*4, 15* 157:*17* 210:17 246:7 250:16 252:4 266:*10*
**toe** 238:22
**toilet** 23:25 24:2
**told** 33:*17* 37:4, *9* 43:*16* 60:*1* 66:3 67:24 77:8 98:*21* 101:8 106:23 120:*17* 123:6 127:*12* 135:*13* 138:6 149:22, *23* 169:*3* 170:23 176:3, *4, 6* 177:23 180:2 196:*17* 205:22 210:*11, 12, 15, 20, 22* 211:*12* 214:*1* 216:2 226:2 229:*10, 11* 231:*21, 25* 237:*17* 241:*17* 244:*25* 245:22 250:2, *4, 12, 13* 258:*3* 259:*15* 260:*11, 13, 20, 22, 23* 261:*21, 25* 264:*8* 267:*19* 268:2, *7* 273:7 276:7, *9*
**Tom** 74:*23*
**tone** 186:*13*
**tons** 200:*12, 13*
**top** 108:*4* 274:5, *21, 22*
**topic** 59:*6*
**Torah** 253:*18*
**tort** 202:*14, 15*
**torture** 143:*5*
**toss** 66:*21*
**total** 210:*1*
**totally** 52:*1* 74:9 130:*1* 173:*17* 247:*1, 2*
**touch** 255:*5*
**tour** 255:*13*
**Touro** 10:*12, 19* 16:2, *4, 6, 14, 18*
**town** 29:*19* 36:*13, 14* 58:*15* 60:*17* 78:25 81:7 84:*10* 86:*17, 23* 88:*16* 89:*3* 192:*18* 197:22
**towns** 88:*3*
**toy** 93:*1*
**track** 213:*8* 224:*24*
**transaction** 13:*11* 14:*14*

**transactions** 12:*14, 21, 23* 13:*1, 3, 8, 14*
**transcribed** 281:*9*
**Transcript** 1:*10* 104:*24* 133:*20*
**transcription** 281:*10*
**transcripts** 200:*10*
**transferred** 262:*24*
**transmission** 186:*14*
**transmissions** 82:*3*
**transpired** 263:*22*
**trash** 221:*22*
**travel** 53:*13*
**traveling** 57:*10*
**travels** 88:*15*
**traverse** 227:*12*
**treasury** 187:*7*
**treated** 128:*15, 17* 168:*23* 196:*15, 16* 259:*4*
**treating** 128:*19*
**treatment** 108:6 264:*14*
**tree** 186:2
**tremendous** 185:*8, 9*
**trespassing** 80:*20*
**Triangle** 238:*19, 20, 21* 239:*3, 9, 14* 241:*4* 246:5 247:22 248:*6, 11* 259:7
**triangular** 250:*19*
**tribunal** 23:*18* 26:*13* 126:*16*
**trick** 117:*3*
**tried** 127:*18* 170:*12, 14* 223:25 256:*3*
**tries** 275:*7*
**trigger** 146:*3*
**trimmed** 226:*20*
**trinkets** 219:*23*
**trip** 61:*14*
**triple** 62:*3* 231:9 232:*10*
**trips** 54:22 55:*5*
**trouble** 215:*8*
**truck** 195:*15* 196:7 259:*8*
**true** 59:*20* 65:*15* 75:16 92:23 111:2 112:9 124:*11* 128:5 170:2, *5* 177:25 182:*10* 191:*11* 195:9 244:16 281:*10*
**Trump** 65:*11, 12* 66:*3* 71:5
**truth** 44:20 67:*13* 78:*13* 88:*13* 112:7 178:*11* 218:*18* 244:*12* 253:*18* 266:6 281:6
**truthfully** 40:*9*
**try** 7:*4* 57:8 73:*12* 91:*12* 100:*19* 159:9 160:7 188:*23* 222:*21* 229:6 241:*25* 261:*19*

**trying** 20:*14* 28:5, *6* 32:20 44:8, *25* 45:2, *4* 47:20 49:*18* 70:*18* 74:*10, 12* 82:7 84:*1* 92:22, *24* 98:*11* 100:4, *8, 21, 23, 25* 106:*15* 125:*19* 133:2, *15* 134:*19* 139:*1* 140:22 153:*19* 159:4, *23* 161:9 164:8 166:14 169:*18* 217:9 229:*15* 234:*11* 235:7 238:7 241:*13* 242:*16* 244:*10* 257:*13* 278:9, *17*
**Tuesday** 221:*14*
**tumult** 215:5
**tune** 69:*10*
**turn** 61:*18* 84:20 109:20 146:25 151:16 156:20 274:*1, 9* 275:*3*
**turned** 182:*19* 215:2, 6 216:*16*
**turning** 196:3, *9*
**twice** 209:*13* 210:23
**twilight** 48:*18*
**two** 7:9 11:*18* 24:*10* 32:*14* 54:5, *10* 57:24 58:*4* 62:22 63:6 65:*14* 76:23 79:*18, 19* 81:*24* 86:20 94:20 115:25 121:*15, 22* 122:*3* 136:2 137:25 148:20 149:*1, 3* 159:24 163:5, *14* 164:*18* 166:*15* 174:6 177:5, *16* 180:22 181:*16, 25* 182:6, *13* 184:*15* 192:*1* 195:*12, 19* 196:2, *4, 6, 10* 197:5, *20* 209:*14, 19* 210:*1* 211:*18* 217:23 218:*24* 219:23 220:9 230:*14* 235:*15* 236:4, *21, 23* 237:22 242:*15* 243:*10* 244:*19, 25* 247:9 255:*14* 258:25 263:5
**two-block** 58:7 150:5
**two-minute** 72:*21*
**type** 15:*11* 18:*13* 26:*18* 37:*19* 49:*10* 53:*3* 65:22 71:5 107:7 133:24 134:*1, 2, 3* 177:*21* 205:*11* 236:24 263:*15* 264:20 268:*11*
**type/GOP** 71:*5*
**types** 11:*10* 12:*21*
**typical** 174:*10*
**typically** 48:*19* 160:*14*
**tzitzit** 68:*18*

**< U >**
**U-1** 191:*8* 192:*13* 193:*5*

**UHCO** 202:6, *13* 229:22 237:*5*
**ulterior** 166:*14*
**ultimately** 120:*25* 199:*24* 255:20 261:*14*
**umbrella** 53:6, *8*
**Um-hmm** 31:*18*
**unable** 256:*20* 259:*13*
**uncomfortable** 169:*5* 265:*11*
**undergarment** 68:*18*
**understand** 6:*23* 10:6 13:6 16:5 19:*17* 24:*17, 21* 26:*17* 28:*3, 5* 40:*18* 46:4, *24* 47:20 49:20 52:*3, 6* 55:*16* 56:*14, 23* 83:2 84:*1* 86:*15* 92:*1* 96:*19* 98:*17* 100:8, *23* 111:*15* 113:*16* 115:*17, 18* 116:*15* 120:24 121:20 129:*12* 145:8 162:*1* 191:*19* 195:*3* 199:*1, 14* 211:5 217:*7, 9, 12* 221:*10* 235:*17* 255:2 257:*13* 258:*18* 265:23 271:*14, 16* 272:9 274:*13* 275:*1* 278:8
**understanding** 29:*10* 82:*23* 95:3, *5* 115:*21* 152:*19* 157:6 268:25 275:6, *15* 276:*10, 13*
**understood** 7:*16* 38:*12* 44:8 96:*17* 98:*18* 133:*1* 156:*13* 207:*1* 230:*4*
**unfair** 106:*21* 108:5 120:*19* 124:*15, 17, 21* 128:7 129:*3* 130:*1* 132:*19* 133:*14* 134:*21* 142:25 164:*21* 175:*1* 198:*23* 273:22
**unfairly** 168:*24* 259:*4*
**Unfortunately** 62:22 91:5 279:*15*
**UNITED** 1:*2*
**units** 14:*14* 211:*19*
**UNIVERSITY** 1:8 3:*5* 6:*11* 8:*15, 24* 9:*10, 16, 21* 10:2, *7, 8* 23:9 29:7 33:*14, 16* 34:*16* 45:20 49:*4* 50:*1* 51:20 52:9 54:*8* 60:9 67:*17* 87:*19* 142:9 143:*1* 144:5 182:9 189:*19* 202:*12* 204:*10, 19* 213:*12, 24* 214:24 219:20 222:*12* 224:*8* 227:*14* 263:*13* 266:9, *13* 270:9
**unknowingly** 91:*8* 240:*6*
**unmarked** 212:*4, 6* 216:*13*

Case: 1:22-cv-01594-BMB  Doc #: 80  Filed: 01/26/24  99 of 101.  PageID #: 1325

Deposition of Daniel Grand

Daniel Grand, vs. City of University Heights, Ohio, et al.

unnoticed 66:*24*
unpack 187:*9*
unpleasant 35:*13*
unprofessional 126:*19, 20*
unraveling 84:*7*
unreasonable 251:*23*
untrue 170:*22*
unwillingly 91:*8*
updates 153:*22* 209:*2*
uprooting 32:*23*
upset 78:*12* 119:*3* 134:*5*
  222:*16, 17* 243:*20*
upside 182:*19*
Urban 134:*1* 184:*21*
urgency 104:*5*
use 3:*5* 24:*13* 51:*11*
  60:*13* 78:*8* 99:*13* 101:*6*
  105:*6, 13, 14* 107:*4, 7, 9*
  112:*15, 23* 113:*2, 13, 20,*
  *23* 114:*17* 116:*4* 117:*11*
  120:*17* 122:*15* 125:*5*
  129:*22* 135:*8, 14, 17, 25*
  136:*3, 12* 137:*6, 17*
  138:*16* 139:*13* 159:*22*
  173:*14* 180:*3, 4* 190:*10*
  192:*14* 193:*6* 194:*11*
  239:*7* 275:*10*
usual 213:*8* 229:*11*
  244:*25* 278:*22*
usually 48:*9, 15*
utilization 99:*22*
utilize 114:*3* 231:*15*
utilized 221:*1*

< V >
V8 196:*7*
vague 69:*18*
vaguely 205:*15*
valuation 256:*5*
vapor 244:*22*
variance 70:*9* 227:*10, 15,*
  *16* 231:*12* 235:*16* 241:*21*
  242:*21*
variety 17:*6*
various 111:*3* 190:*11*
vehemently 130:*24*
vehicle 208:*15*
vehicles 169:*20* 196:*2*
  198:*7* 237:*22*
veiled 69:*5*
verbal 183:*4, 15, 17, 19*
  184:*25* 185:*19* 188:*5*
  205:*7*
verbalized 68:*25*
verbatim 104:*25* 110:*12,*
  *17* 111:*6, 18* 175:*16*
verbiage 133:*8*
verge 112:*6*
verify 48:*17* 195:*8*

version 136:*20*
versus 202:*23*
vestry 190:*3*
vet 195:*14*
veteran 198:*10*
vibe 71:*4* 190:*24*
video 117:*20* 199:*14*
  200:*4* 276:*17, 20* 279:*14,*
  *19*
videos 197:*24* 200:*10*
view 91:*16* 200:*8*
viewpoint 67:*2*
vigor 59:*13*
vile 74:*2* 174:*15*
vim 59:*13*
violated 251:*23*
violating 53:*8* 105:*16*
Violation 21:*8, 10, 12, 13,*
  *25* 22:*5, 22, 24* 24:*9, 23*
  25:*4* 27:*13, 22, 23* 28:*6, 9,*
  *24* 29:*3* 80:*25* 105:*13*
  198:*2* 237:*3, 8, 15* 239:*25*
  245:*5* 246:*7*
Violations 23:*17* 24:*4, 6,*
  *8, 24* 25:*6, 22* 26:*23*
  80:*24* 81:*11* 194:*17*
  237:*7, 12* 238:*11* 240:*24*
  258:*4, 6*
Virginia 239:*21*
Virtually 124:*8* 278:*25*
  279:*1*
visible 74:*5*
vision 117:*8*
visit 61:*2* 77:*8* 258:*24*
visited 197:*22*
visually 190:*13*
Vivienne 179:*7* 185:*9*
  249:*14*
voicemail 104:*2, 3*
volition 67:*20*
voyeurism 204:*21*
Vroom 196:*12*
vs 1:*7*

< W >
Wagner 79:*25* 80:*2*
  81:*19*
Wagner's 81:*23*
wait 137:*7* 141:*7* 221:*23*
  241:*4* 243:*17*
waited 234:*21*
waiting 220:*3*
waive 280:*4*
waived 280:*24*
waiving 280:*20*
wake 50:*3*
walk 54:*5, 21* 57:*16, 19*
  58:*4, 5, 6, 13, 25* 65:*9*
  72:*19* 81:*21* 150:*19*
  167:*5, 10* 169:*7* 175:*19*

230:*6, 12* 231:*2* 232:*3, 7*
  234:*15* 236:*8, 23* 248:*11*
  250:*21, 22*
walkarounds 235:*22*
walked 36:*10* 56:*7* 62:*8*
  72:*18*
walking 59:*9* 187:*16*
  217:*12* 236:*9* 241:*10, 11*
  248:*14* 250:*22*
walks 70:*11*
walkway 230:*5, 7* 231:*1*
  232:*3* 236:*3, 7, 11, 13, 14,*
  *15, 24* 248:*15*
walkways 225:*25* 229:*23*
  230:*1* 232:*1* 233:*11*
  236:*11, 19* 238:*18* 239:*1,*
  *2*
want 18:*17* 22:*3, 18, 20*
  24:*1, 7, 16, 18, 21* 28:*25*
  36:*14* 37:*25* 39:*9* 42:*13,*
  *19* 43:*19* 45:*13* 46:*24*
  47:*1, 11* 49:*5, 13, 14, 16*
  55:*24* 56:*11* 57:*25* 58:*3,*
  *4, 6, 10, 24* 59:*5, 7* 60:*14*
  61:*4* 62:*1, 23* 63:*1, 3*
  67:*13* 73:*21* 74:*18, 19*
  75:*1, 18* 79:*23* 82:*8, 13,*
  *14* 83:*1* 84:*2, 6* 90:*1*
  91:*12, 23, 24* 101:*24, 25*
  104:*14* 105:*1, 6* 112:*8*
  117:*6* 118:*16* 121:*16*
  124:*13* 125:*4* 127:*19*
  128:*20* 131:*5* 136:*19*
  137:*22* 138:*2, 4, 10, 13*
  142:*19* 144:*10, 11, 12*
  146:*9* 148:*7* 149:*25*
  150:*1* 160:*12* 161:*8, 10,*
  *15* 163:*22* 164:*9* 166:*17*
  169:*2, 9* 170:*8, 17* 171:*9*
  178:*3* 187:*9* 191:*9* 192:*5,*
  *16* 193:*1, 18* 203:*2, 5*
  205:*25* 206:*21* 209:*9*
  213:*7* 216:*15* 218:*18*
  219:*14, 15* 220:*12* 222:*17*
  223:*23* 224:*3, 8, 10* 226:*6*
  228:*23* 230:*10* 231:*11, 15,*
  *17, 20* 232:*1, 5, 11, 17*
  233:*9* 234:*2, 15* 237:*5*
  240:*24* 241:*24* 243:*14*
  244:*21* 245:*2, 24* 246:*4*
  247:*2, 24* 248:*14, 19*
  252:*21* 254:*24* 257:*4, 16,*
  *18, 19* 258:*14, 18* 260:*7,*
  *11* 264:*17* 265:*15, 16*
  278:*19* 280:*3*
wanted 8:*13* 9:*13* 35:*23*
  42:*5* 53:*14* 56:*23* 57:*5*
  59:*21* 64:*4, 5* 70:*1* 78:*22*
  100:*19* 102:*4* 107:*17, 18*
  117:*15, 19* 125:*2, 8, 9, 10*

127:*8* 129:*1, 24* 130:*13*
  133:*24, 25* 134:*1, 2*
  135:*13* 137:*15* 150:*17*
  157:*20, 24* 159:*21* 175:*25*
  178:*2* 187:*24* 191:*23, 25*
  222:*21* 235:*16* 240:*1*
  247:*13, 23* 248:*1* 258:*2,*
  *11, 14* 261:*13, 15* 263:*21*
wanting 55:*16* 56:*15*
  75:*4* 220:*19*
wants 42:*21* 74:*14, 15*
  115:*2* 161:*13* 193:*13*
  207:*10* 255:*5*
warm 75:*14*
wash 50:*5*
washing 50:*6*
Washington 79:*11, 13*
  98:*1*
waste 248:*19*
wasteland 174:*10*
wasting 228:*12*
watch 265:*17*
watched 279:*14*
watching 197:*24*
water 233:*17*
watered 24:*2*
wave 72:*20*
wavelength 7:*2*
way 10:*1* 26:*15* 31:*5*
  33:*4* 34:*1* 36:*1* 42:*3*
  47:*12* 49:*1, 22* 53:*4* 59:*1*
  61:*25* 68:*9* 71:*4* 75:*9*
  81:*1* 84:*7* 99:*18* 101:*25*
  105:*10* 109:*25* 115:*15*
  119:*7* 124:*18, 24, 25*
  125:*8* 128:*2, 10, 12, 19*
  129:*2, 8* 130:*1* 147:*18*
  148:*23* 150:*12* 151:*17*
  153:*6* 163:*22* 169:*11, 23*
  176:*22* 178:*10* 186:*23*
  190:*24* 196:*16* 204:*2, 3*
  211:*25* 213:*4* 220:*25*
  232:*20* 241:*6* 242:*19, 20*
  245:*11, 19, 22* 246:*15*
  247:*13* 248:*12, 13* 251:*19*
  265:*1* 274:*22*
ways 53:*20* 62:*18* 147:*14*
wear 65:*12* 68:*19* 169:*8*
wearing 65:*11* 67:*2*
weather 52:*23* 54:*1*
week 10:*25* 37:*5* 51:*23*
  52:*13* 77:*14* 87:*11* 88:*17*
  131:*7* 196:*15* 221:*23*
  222:*2, 3* 263:*5*
weekday 52:*4, 8* 54:*6*
  63:*25*
weekdays 54:*7*
weekly 55:*8* 60:*23* 148:*7,*
  *12* 156:*23* 157:*20*

Case: 1:22-cv-01594-BMB  Doc #: 80  Filed: 01/26/24  100 of 101.  PageID #: 1326

Deposition of Daniel Grand                    Daniel Grand, vs. City of University Heights, Ohio, et al.

**weeks** 86:20 88:7 137:25
218:11 225:4 229:3
244:13 249:13 262:7
**weigh** 271:11
**weight** 59:9
**weird** 73:15
**Weiss** 30:3, 4, 8, 18 31:13
32:14 267:22
**welcomed** 32:23
**welcoming** 36:15
**welfare** 141:19 169:6
**Well** 14:8 15:9 18:19, 25
27:9 35:13 38:24 42:19
46:16 48:15 51:25 56:18
57:13 62:15 64:22 69:11
82:4 84:3 85:24 87:9
92:15 105:21 106:9
115:3, 18 119:14 120:14
122:19 123:5 128:6
152:23 168:4, 22 171:14
178:23 182:18 185:9
198:1 201:11 204:3
219:4 223:9, 25 229:18
230:11 232:19 233:8, 12,
15 237:5 238:22 244:7
245:19 247:5 255:18
261:15 263:2 271:10
272:21 275:10
**went** 26:9, 11 32:8 37:6
63:23 67:25 68:21 74:1
75:10 78:6 80:25 82:20
92:9 94:18 119:24 156:7
175:13 177:6 183:2
184:8 187:5 192:1
196:19 205:22 208:14
221:7 228:21, 22 230:9,
20 233:8 236:6 239:19
246:20 261:22
**we're** 8:16 22:7, 15
25:11, 12 27:18 29:25
36:23 38:4 45:13 58:8
61:4, 5 62:5 63:10 66:10
74:25 83:6 91:14 93:22
115:13 121:22 128:19
130:5 153:5 160:16
164:10 166:6 169:15
174:17 175:21 191:14
194:5, 11 213:19, 24
217:23 226:16 228:18
229:9 230:11 233:12
235:1 249:2 276:3
280:19
**we've** 108:1 119:16
128:12, 17 149:17 152:22
168:22 186:5 194:8
252:8 277:20, 21
**whatnot** 65:10
**whatsoever** 125:3 133:12
173:16

**whereabouts** 89:22
**WHEREOF** 281:18
**White** 241:17 244:5, 6
**whittle** 149:5
**wide** 195:23, 24 199:7, 8
242:3, 6
**width** 242:7
**wife** 9:19, 24 60:1 61:7
62:6 63:11, 14 64:6
67:24 72:17 80:3 150:20
186:24 187:1, 3 210:14
211:12 221:16 222:22
223:9, 20 224:22 228:9
241:11 248:1 253:4
254:4, 21 257:24 262:18
263:12 264:4 277:23
**wife's** 186:25 197:21
241:10
**willfully** 108:4
**willing** 34:5, 6 158:1
256:3 278:20
**willy-nilly** 231:16
**wind** 63:8 275:7
**winding** 195:21 224:2
**window** 61:19 210:21
212:17
**winds** 195:18
**wine** 36:2, 3, 17 37:7, 19
42:6 43:2, 7
**wish** 114:3 135:19 252:7
**wished** 55:22
**withdraw** 135:13
**withdrawing** 3:5 135:7,
17
**withdrawn** 138:25
**withdrew** 138:17 139:21
**WITNESS** 38:11 47:10
56:20 75:7 136:22 143:2
145:15 146:2, 6 153:16,
23 183:12 189:8 194:1, 4
203:23 204:5 211:6, 7, 9
259:24 280:5, 8, 12 281:4,
8, 11, 18
**witnesses** 268:13
**wives** 139:18
**woman** 78:19 181:20
**Women** 78:14
**wondering** 213:9
**wood** 226:22
**word** 24:14 26:9 41:20
45:23 92:17 94:22 95:3,
5 97:22 98:20, 22, 24
99:1, 6, 7, 9, 10, 13, 19
100:3, 9, 22 101:3 139:10
147:4, 8 153:22 164:16
201:3 213:23 227:21
268:2 277:5
**wording** 22:21 114:9, 10
**words** 22:12 24:18
34:19 44:12 66:21 75:6

98:3, 6 129:12 150:10
156:16 165:7, 8 166:16
174:15 274:25
**work** 16:3 22:13 24:7
25:25 27:3 28:23 38:23
48:6, 22 60:10 64:8
67:11 70:16 115:6
153:25 219:25 225:21
229:2, 10 249:20 250:1,
14, 16 253:19 259:21
261:16 265:15
**workday** 48:23
**worked** 16:18 130:14
**worker** 36:19
**work-from-home** 260:3, 8,
12, 21 261:1, 13, 20
262:15 263:24
**working** 28:15 33:24
36:21 61:4, 5 170:11
223:22 226:4 254:22
258:9
**works** 247:8 250:8
260:18
**world** 78:22 140:7, 8
180:15 197:8 199:8
206:20 258:18
**worlds** 52:2
**worried** 233:17
**worries** 47:18 189:1
**worry** 223:20
**worship** 46:6 47:21 49:3,
25 135:19 164:24 165:2
166:3 189:14 192:13
193:5
**wound** 65:1 219:24
244:13
**Wow** 36:22 43:22 63:11
74:17, 21
**wracking** 265:8
**wrapped** 142:21
**write** 44:20 147:23
150:9 159:20 167:25
168:2 209:8 257:10
**writes** 150:11 180:13
272:5
**writing** 120:23 147:14,
15 160:11, 18 164:12
205:7 267:25 269:21
**writings** 167:23
**written** 103:13 109:5
112:2, 3 145:16 257:2, 10
258:12 266:15
**wrong** 35:7 58:9 98:10
118:6 153:8 187:23
206:9 223:14 234:13
245:15, 16 261:11 268:2
280:18
**wrote** 44:18 94:11 97:6,
25 99:9 101:5, 10 115:4
121:13 133:22 135:21

156:6 157:4, 8, 9 158:2
161:25 164:5 165:5
257:9, 12 270:9 272:23

**< Y >**
**yard** 67:11, 15, 23 68:1, 4
70:10, 11 91:1, 13 92:25
98:15 197:4 225:16
232:2 233:11 234:2
236:14
**yarmulke** 67:3 265:20
**Yeah** 11:21, 23 13:9, 16
17:16 18:4 24:13 26:13
29:25 38:6 41:5, 16 44:1
45:1 57:20 64:20 69:6,
14 71:24 73:14 77:10
87:20, 22 88:23 90:6, 10,
23 93:21 95:1, 7 96:22
97:20 99:1 102:10 104:8
106:25 107:21 112:21
113:16, 25 114:7, 10, 12
115:25 116:1, 16, 21
117:9, 13, 20 118:4, 5, 18
120:1, 3 126:5, 7 129:21
131:13 133:18, 22 139:20
140:19 142:1, 11 144:14,
24 145:9 146:24 148:19
153:3 158:1, 4, 12, 13, 15
159:1, 22 165:8 172:1, 10,
18 178:21 179:3, 12
181:18 184:23 188:5
191:15, 17, 21 201:19
206:14 207:15, 18 208:6
209:18 211:23 212:2, 5, 7,
8 213:11 215:1, 18
217:20 218:23 220:21, 22
225:3 243:16 246:13, 15
257:19 264:16, 23 265:4
266:23 269:21 270:12
271:7, 17, 18, 24 272:3
273:7, 17, 24 276:19
277:1 278:25 279:6, 10
**year** 10:21 12:15, 18
13:7 16:8 17:2 21:20
46:8 153:2, 18 209:7
219:23 241:12 255:20
256:12
**years** 32:24 59:15, 16
65:14 83:6 100:6 115:25
128:14, 18 181:9 197:5
219:23 220:9 226:4
235:25 242:15 245:1
246:1 253:12 259:19
**Yep** 212:6 217:22
**yes/no** 167:13
**yesterday** 83:8
**Yiddish** 92:18 97:22
98:20 99:1, 7, 8, 10
100:10, 12
**Yonatan** 61:1

**York**  2:*7*  9:*7*  15:*16*
22:*1, 6, 8, 25*  23:*13*  24:*23*
25:*10, 14*  26:*11*  27:22
28:*10*  31:*5*  61:*1*  192:*17*
195:*16*  237:*19*  262:*23*
**young**  17:*9*  51:6  90:*14*

**< Z >**
**Zichron**  51:*5*
**zone**  241:*4*
**zoning**  97:*9, 20*  101:2
135:*20*  169:22  189:*15, 18*
191:*8*  192:*13, 17*  193:5
196:*23*  240:*18*
**Zoom**  2:*4*  75:23