## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| GRAND, | ) | |
| | ) | |
| v. | ) | Case No. 1:22-cv-1594 |
| | ) | |
| UNIVERSITY HEIGHTS, et al. | ) | JUDGE BRIDGET M. BRENNAN |
| _____ | ) | |

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Now comes Plaintiff, Daniel Grand, by and through counsel, and pursuant to Federal Rule

of Civil Procedure 56(c), move this Honorable Court for an order granting partial summary

judgment as to Counts I, II, III, V, VI, VIII, IX, X, XI, XII, and XIV against the City of University

Heights (the "City") and Counts I, II, III, V, VI, and XII against Michael Brennan. This motion is

supported by the attached Brief in Support and exhibits all of which are attached hereto and fully

incorporated herein.


Dated: January 26, 2024

                                        Respectfully submitted,

                                        /s/ Eden P. Quainton
                                        Eden P. Quainton, Esq.
                                        QUAINTON LAW PLLC
                                        2 Park Ave., 20th Fl.
                                        New York, NY 10016
                                        (212) 419-0575
                                        eden.quainton@quaintonlaw.net

                                        /s/ Jonathan S. Gross
                                        Jonathan S. Gross, Esq.
                                        BAR ID:  MD 1912170138
                                        2833 Smith Ave, Suite 331
                                        Baltimore, MD 21209
                                        (443) 813-0141
                                        jonathansgross@gmail.com

                                        *Counsel for Plaintiff Daniel Grand*

# **TABLE OF CONTENTS**

I.  TABLE OF AUTHORITIES ........................................................................................ ii

II.  BRIEF STATEMENT OF ISSUES ............................................................................ 1

III.  PROCEDERAL HISTORY ........................................................................................ 1

IV.  UNDISPUTED MATERIAL FACTS ........................................................................ 2

V.  LEGAL STANDARD................................................................................................ 12

VI.  THE CITY'S POLICIES AND BRENAN'S ACTIONS VIOLATED GRAND'S FIRST AMENDMENT RIGHT TO FREE EXERCISE OF RELIGION AND FREEDOM OF ASSEMBLY, COSTITUTE AN UNLAWFUL PRIOR RESTRAINT, AND VIOLATE THE OHIO CONSTITUTION (COUNTS I, II, III, AND XII). ..................................... 12

VII.  THE CITY'S POLICIES AND BRENNAN'S ACTIONS VIOLATED GRAND'S PROCEDURAL DUE PROCESS RIGHTS (COUNT V).................................... 20

VIII. THE CITY'S POLICIES AND BRENNAN'S CONDUCT VIOLATED GRAND'S EQUAL PROTECTION RIGHTS (COUNT VI). ................................................ 26

IX.  THE CITY'S POLICIES VIOLATED RLUIPA (COUNTS VIII, IX, X, AND XI) ............ 28

X.  The City violated Ohio Code 149.43(C)(1)(b), by failing to promptly prepare and make available for inspection public records that Grand requested (Count XIV). ......................... 29

XI.  CONCLUSION................................................................................................... 30

XII.  CERTIFICATION OF PAGE LIMITATION ...................................................... 31

XIII. INDEX                                    OF                                    EXHIBITS
      32

i

# I.    TABLE OF AUTHORITIES

## Cases

*American Cyanamid Company v. F.T.C*, 363 F.2d 757 (6th Cir. 1966) ........................................ 26

*Anshe Chesed Congregation v. Bruggemeier,* 115 N.E. 2d 65 (Ohio App. 1953) ....................... 19

*Believers v. Wayne Cnty.*, 765 F.3d 578 (6th Cir. 2014) .............................................. 15

*Carey v. Piphus*, 435 U.S. 247 (1978) .................................................................. 21

*Chabad Lubavitch of Litchfield Cty., Inc. v. Litchfield Historic Dist. Commission*, 768 F.3d 183
    (2d Cir. 2014) .................................................................................. 29

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993) ................. 14, 15

*City of Cuyahoga Falls, Ohio v. Buckeye Cmty. Hope Found.*, 538 U.S. 188 (2003) ................. 26

*City of Huber Heights,* No. 2000 CV 03932 (slip op.), at 12-13) ................................. 23

*Cleveland Bd. of Educ. v. Loudermill* 470 U.S. 532 (1985) ...................................... 21

*Coley v. Bagley*, 706 F.3d 741 (6th Cir. 2013) ................................................. 23

*Connick v. Thompson*, 563 U.S. 51 (2011) ...................................................... 12

*De Jonge v. Oregon*, 299 U.S. 353 (1937) ...................................................... 13

*Deja Vu of Cincinnati, L.L.C. v. Union Township Board of Trustees*, 411 F.3d 777 (6th Cir. 2005)
    ............................................................................................. 23

*Elrod v. Burns,* 427 U.S. 347 (1976) .......................................................... 17

*Employment Div. v. Smith,* 494 U.S. 872 (1990) ................................................ 13

*Fritz v. Charter Twp. of Comstock,* 592 F.3d 718 (6th Cir.2010) ............................... 12

*Frontera v. City of Columbus Division of Police*, 395 F. App'x 191 (6th Cir. 2010) ............. 18

*Get Back Up, Inc. v. City of Detroit*, 725 F.App'x 389 (6th Cir. 2018) ........................ 26

*Hamby v. Neel*, 368 F.3d 549 (6th Cir. 2004) .................................................. 21

*Hernandez v. New York*, 500 U.S. 352 (1991) ........................................................................... 27

*Humphrey v. Lane*, 728 N.E.2d 1039 (2000) ...................................................................... 18, 19

*John Doe v. Univ. of Cincinnati*, 872 F.3d 393 (6th Cir. 2017) ................................... 22

*Johnson v. Memphis Light Gas & Water Div.*, 777 F.3d 838 (6th Cir. 2015) .............................. 12

*Johnson v. Morales*, 946 F.3d 911 (6th Cir. 2020) ...................................................... 21

*LCS v. Genoa Charter Twp.*, 858 F.3d 996 (6th Cir. 2017) ........................................ 28

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) ............................................. 12, 18

*Murphy v. Intern. Union of Operating Engineers*, 774 F.2d 114 (6th Cir. 1985) ...................... 23

*MX Group, Inc. v. City of Covington*, 293 F.3d 326 (6th Cir. 2002) ........................... 27

*Myers v. Affiliated Property Craftsmen, etc.,* 667 F.2d 817 (9th Cir. 1982) ............................... 23

*Nasierowski Bros. v. City of Sterling Heights*, 949 F.2d 890 (6th Cir. 1991) ............................. 23

*Newsom v. Norris*, 888 F.2d 371 (6th Cir. 1989) ........................................................... 17

*Paris Adult Theatre I v. Slaton*, 413 U.S. 49 (1973) .................................................. 15

*Pembaur v. City of Cincinnati,* 475 U.S. 469 (1986) ...................................................... 12

*Phillips v. DeWine*, 841 F.3d 405 (6th Cir. 2016) ........................................................ 17

*Prater v. City of Burnside,* 289 F.3d 417 (6th Cir.2002) ............................................... 13

*Reed v. Goertz*, 143 S. Ct. 955 (2023) ...................................................................... 19

*Robinson v. 12 Lofts Realty, Inc.,* 610 F.2d 1032 (1979) .......................................... 27

*Sause v. Bauer*, 138 S. Ct. 2561 (2018) ................................................................... 13

*Spurlock v. Fox*, 716 F.3d 383 (6th Cir. 2013) ........................................................ 26

*Taghzout v. Gonzales*, 219 F. App'x 464 (6th Cir. 2007) ........................................ 21

*Thomas v. Bright*, 937 F.3d 721 (6th Cir. 2019) ....................................................... 15

*Tingle v. Arbors at Hilliard*, 692 F.3d 523 (6th Cir. 2012) ....................................... 12

iii

*Transco Sec., Inc. of Ohio v. Freeman*, 639 F.2d 318 (6th Cir. 1981) ......................................... 21

*United States v. Bianchi Co.*, 373 U.S. 709 (1963) ....................................................... 24

*United States v. Guest*, 383 U.S. 745 (1966) ............................................................. 19

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) ........................ 26, 28

*Vitek v. Jones*, 445 U.S. 480 (1980).......................................................................... 22

*Wesley v. Collins*, 791 F.2d 1255 (6th Cir. 1986) ...................................................... 27

*Wilkinson v. United States*, 365 U.S. 399 (1961)........................................................ 13

*Young Israel Org. of Cleveland v. Dworkin,* 133 N.E. 2d 174 (Ohio App. 1956)...................... 19

*Zilich v. Longo*, 34 F.3d 359 (6th Cir. 1994) ............................................................ 12

*Zinermon v. Burch* , 494 U.S. 113 (1990) ................................................................. 21

## Statutes

42 U.S.C. § 1983.............................................................................................. 12

42 U.S.C. § 2000cc ................................................................................... 27, 28, 29

## Rules

Fed.R.Civ.P. 56............................................................................................... 11

## Regulations

University Heights Codified Ordinance, Chapter 1250................................................. 28

University Heights Codified Ordinance, Chapter 1274............................................. 28, 29

## Constitutional Provisions

Ohio Const. Art. I, § 7...................................................................................... 18

## II.    BRIEF STATEMENT OF ISSUES

Plaintiff Daniel Grand moves for partial summary judgment as to Counts I, II, III, V, VI, VIII, IX, X, XI, and XII against the City of University Heights (the "City") and Counts I, II, III, V, VI, and XII against Michael Brennan. The City and Brennan prohibited Grand from holding a prayer group in his home without first obtaining a Special Use Permit ("SUP") from the City's Planning Commission ("PC") and then issued an oral injunction barring Grand from conducting any activities in his home consistent with those of a house of worship, an overbroad edict that violated Grand's First Amendment rights to free exercise and free assembly and Grand's Ohio Constitutional right to freedom of worship and imposed an impermissible prior restraint on the same (Counts I, II, III, and XII). The City and Brennan subjected Grand to an arbitrary, capricious, and discriminatory process that did not provide him with adequate notice or with a meaningful opportunity to be heard, in violation of his Fourteenth amendment rights of due process and equal protection (Counts V and VI). University Heights Codified Ordinance ("UHCO") Chapter 1274, that governs Special Use Permits for "Houses of Worship," violates the Religious Land Use and Institutionalized Persons Act ("RLUIPA") (42 U.S.C. § 2000cc) substantial burden, equal terms, nondiscrimination, and unreasonable limitations clauses (Counts VIII, IX , X, and XI). Finally, the City violated Ohio Public record Law, Ohio Code Section 149.43(C)(1)(b), by failing to promptly prepare and make available for inspection public records that Grand requested (Count XIV).

## III.    PROCEDERAL HISTORY

Plaintiff's Complaint against City of University Heights and Michael Brennan was filed on September 8, 2022. Dkt. 1. Defendants' Answer was filed on November 29. Dkt. 9. Plaintiff's First Amended Complaint was filed on May 9, 2023, adding Luke McConville and Paul Siemborski.

Dkt. 25.[1] Defendants' Answer was filed on July 28. Dkt. 43. Plaintiff' Second Amended Complaint

was filed on January 2, 2024. Dkt. 67. Defendants' Answer was filed on January 16, 2024.

## IV.    UNDISPUTED MATERIAL FACTS

Daniel Grand lives with his wife and young children at 2343 Miramar Blvd. in University

Heights, Ohio. Ex. 1. As part of Grand's sincerely held religious beliefs as an Orthodox Jew, Grand

is required to "daven" (pray) three times daily with a "minyan" (group of ten men), and he does

not drive on "Shabbos" (the Jewish day of rest) from Friday sunset to Saturday when stars come

out. Ex. 1. To daven with a minyan on Shabbos, Grand must walk to a "shul."[2] On Tuesday,

January 19, 2021, Grand sent an email inviting some neighbors to "join us this Shabbos for the

inauguration of the Shomayah Tefilah Beis Hakeneset located at 2434 Miramar Blvd. (The Daniel

J. Grand Residence)." Ex. 2. He included three davening times: one on Friday evening, one on

Saturday morning, and one on Saturday evening. *Id.* According to Grand's email:

> The prayer session is being put together for two reasons, one has always been to
> expand the community, so we can spread out and open up more houses on the other
> side of Belvoir, and the other is to have a place where people come to really
> seriously daven to Hashem - we want to have a place that doesn't have talking
> during davening, a powerful place to have your prays [sic] heard and answered
> Bezrat Hashem.

*Id.* The email was only sent to a few neighbors. Ex. 1. On Thursday, January 21, 2021, at 12:14

PM, a resident named Ben Feldman forwarded the invitation to University Heights Mayor Michael

Brennan using Facebook Messenger. Ex. 3, Ex. 4, 54:2-7. The message stated: "If there is anything

you could do to put a stop to this it would be greatly appreciated." Ex. 3. Brennan forwarded the

message to the Law Director Luke McConville that day at 1:43 PM. Ex. 4, 58:8-9, Ex 5. Brennan

---

[1] Other defendants were also added but subsequently voluntarily dismissed. Dkt. 12/19/2023.

[2] A "shul" is a Yiddish term that means a place where davening occurs. Depending on the context, a shul can refer to a large formal synagogue, a small residential home where davening groups are held, or a room within a larger building where davening groups are held. Ex. 1.

"act[ed] quickly" because "residents [were] asking us to take action." Ex. 4, 72:4-16. At 2:34 PM, McConville asked Brennen for Grand's email address, and Brennan sent it at 3:00 PM. Ex. 5. At 5:22 PM, McConville emailed a cease-and-desist letter to Grand. Ex. 4, 72:25; Ex. 6.  The letter from McConville, written in his capacity as the City Law Director and authorized by Brennan (Ex. 4, 78:1-3), forbid Grand from using his home "as a place of assembly and/or in operation of a shul or synagogue," and that "to the extent that the Premises are currently being used for said purposes or are intended to be used for such purposes in the immediate future, the City hereby demands that you immediately cease and desist any and all such operations." Ex. 6. The letter threatened the issuance of "citations" and "additional remedies." *Id.* The letter referred Grand to University Heights Codified Ordinance ("UHCO") Chapter 1274 entitled "Houses of Assembly and Social Service Uses" (Ex. 32) and directed Grand to "make application to the City's Planning Commission for a Special Use Permit." *Id.*

That same day, Brennan called Grand. Ex. 4, 81:20-21. Grand told Brennan "that he was just trying to get some people together at his house to pray" (Ex. 4, 82:20-22), but Brennan decided that Grand's email to friends was enough evidence to determine that Grand intended to open a formal synagogue that required a SUP and it was "crucial" to send out a cease-and-desist letter before Shabbos. Ex. 4, 79:21-80:6. Brennan did not give Grand the option to host a small prayer group without a SUP while the City determined whether he was opening a synagogue. Ex. 4, 85:10-23, 89:10-15.

That night, at 11:17 PM, Grand sent an email, cc'd to Brennan, informing his friends that the prayer group scheduled for that Shabbos was canceled because the City directed him to apply for a SUP. Ex. 2. Early the very next morning, Friday, January 22, 2021, at 1:05 AM, Grand sent an email to the Clerk for City Council, Kelly Thomas. Ex. 7.

3

Good Morning Ms. Thomas,

This is Daniel Grand – apparently, and unbeknownst to me, I will need to file for a special use permit with the city planning commission to have friends come over to pray at my house. I am totally willing to comply (as usual) – I need to fill out an application today and submit it back to you today so I can be inside the 14 day window of the next upcoming meeting – God willing I will be able to make it in – I have my checks ready, one for $100 and one for $300 – I have the paperwork I need to submit the drawings and a picture, and all I need is the application which I will fill out like greased lightning and get it right back to you.

*Id.* On January 22, 2021, at 10:46 AM, Grand applied for a SUP via email to Ms. Thomas. Ex. 8. The SUP application stated that he was "advised" to apply and that his intention was to "utilize my current recreation room for periodic religious gatherings." *Id.* He shared the following details about the space: (1) the room was "soundproofed via sound attenuation insulation;" (2) "The total room size is a tinge over 700 square feet;" (3) "11 tables set up and 21 chairs set up – there is plenty of walking space between the tables and chairs as well;" (4) the room is on the ground floor "on slab" and "there is no basement below it;" (5) the room has three means of egress, and the windows provide means of egress as well; and (6) the group will be held on Shabbos, so participants cannot drive in cars. Grand concluded, "If there is any other information you need prior to my request for a special use permit please let me know if I have not satisfied any of the requirements, and again after our discussion I understand that I would miss the upcoming meeting and could be on the 'docket' for the next one." *Id.* Nobody from the City ever reached out to Grand to inform him of any deficiencies in his application. Ex. 1

A City PC meeting was scheduled for March 4, 2021, with a single agenda item, "Recommendation to City Council Regarding a Special Use Permit Application to Mr. Daniel Grand to use 2343 Miramar Blvd., as a Planned Operation of Shul/Place of Religion Assembly," and a notice was sent out. Ex. 9, Ex 10, 33:11-18. Grand's application never mentioned a "shul/place of religious assembly," and Grand did not formulate the language for the notice. Ex.

4

8; Ex. 10, 34:4-25. Hardcopies of the notice were sent by U.S. mail to "the entire block of Miramar and possibly the houses that are in the rear of Miramar." Ex. 10, 36:11-14.

Sometime around February 15, 2021, a petition was posted on the website change.org that included" digital signatures of those opposed to "2343 Miramar Blvd Proposed Shul." Ex. 11. The petition was submitted to the PC in advance of the March 4, 2021 meeting. Ex. 12, 141:22-142:11. By that time, the petition had garnered 195 signatures (*id.*), including people from other cities and other states. Ex. 11. Grand submitted a document with 240 signatures in support of his application. Ex. 15. Brennan sent an email to McConville on February 22, 2021, with the subject "graph of signers of petition opposing special use permit at 2343 Miramar." Ex. 13, 14. Attached to the email was a "partial map" of the City titled "households near 2343 Miramar that signed petition" that Brennan had personally shaded in: Grand's home was shaded in blue, and the homes of those opposed to Grand's application were shaded in pink. Ex. 4, 140:2-141:2, 141:16-20; Ex. 14. The map was distributed to the PC prior to the meeting (Ex. 15, at 1), but was not entered into the record at the meeting (Ex. 12, 10:9-17).

The PC also received letters from residents in favor and opposed to the application that were included in the record of the meeting. Ex. 12, 10:9-17. One resident wrote:

> I am not Jewish and I do not want our neighborhood labeled as Jewish. This is not prejudice, this is common sense. Gesu school draws an awful lot of people to University Hts. and that has kept the area vital. I have signed the petition but I would like to know what else I can do to prevent this from happening.

Ex. 16. Several other letters in opposition received by the PC mentioned affiliation with Gesu. *See, e.g.* Ex. 17; Ex. 18; Ex. 19, at 4-5. Gesu is a large Catholic church that operates a parochial school with hundreds of students and is located on Miramar Blvd., one block away from Grand's home. Ex. 1; Ex. 14.

On March 3, 2021, Grand submitted to the PC a "Letter of Clarity" that he personally delivered to 36 of his neighbors on his block, and he requested that it be "part of the meeting tomorrow." Ex. 19, at 2; Ex. 20. The Letter stated that Grand sought "to have an informal prayer group for services in my home on the Jewish Sabbath and High Holidays" when driving was prohibited by Jewish law, and that he only filed his application because the City told him it was a requirement. *Id.* The Letter of Clarity was not included as part of the record. Ex. 12, 10:9-17.

Prior to the March 4, 2021 meeting, the members of the PC deliberated via email. Ex. 15. Prior to the meeting, one PC member asked Brennan whether "there are other violations on the Miramar property, and whether they have breached any agreements/understandings with the City to date." *Id.* Brennan replied "we have not conducted a review" of potential violations, but suggested, "[i]f you find that you would be willing to grant the application, and the only question is whether he is otherwise in compliance, the matter could be tabled to ascertain that." *Id.* These deliberations were not included in the record of the meeting. Ex. 12, 10:9-17. Before the meeting, Police Chief Dustin Rogers checked the police records for any Parking Complaints/Violations and Noise Complaints at Grand's address and found none. Ex. 21. The facts of this search and its results were also not introduced into the record. Ex. 12, 10:9-17.

The March 4, 2021 Meeting was held via zoom and can be viewed on the City's official YouTube channel at https://www.youtube.com/watch?v=D5kP12aBUUY. All PC members were present. Ex. 12, 1-2. Brennan chaired the meeting and is part of the PC. *Id.* The other members of the PC are April Urban, Paul Siemborski, Michael Fine, and John Rach. *Id.* Kelly Thomas, Luke McConville, and Dustin Rogers were present in their official capacities of City Council Clerk, Law Director, and Police Chief, respectively. *Id.* No other City officials attended the meeting. *Id.* Before Grand was permitted to present his application, Brennan invited McConville to speak, and

McConville stated that "the hearing will be conducted as a quasi-judicial hearing under Chapter 2506 of the Ohio Revised Code." Ex. 12, 5:7-11. This was the first time a Planning Commission meeting had ever been held in this manner. Ex. 12, 143:5-18, Ex. 19, at 4.

Grand, through counsel, opened his presentation by stating on the record, "this hearing is about whether a residence of University Heights may host prayer services in a designated, modest space in the resident's house and in a manner that is respectful of and unintrusive upon the resident's neighbors," specifically, "Mr. Grand wants to use the space in his house to host men's only prayer services for a prayer group once a week and on certain high holidays." Ex. 12, 17:8-22:20. When Grand finished presenting his application, he asked to present certain documents for the record, and Brennan said he would have a chance to be recalled after other testimony was heard, Ex. 12, 47:13-48:1, but later when Grand tried to introduce his documents, Brennan stated, "I've rested your application, your case." Ex. 12, 72:5-18.

Several of those who spoke in opposition mentioned their affiliation with Gesu. *See, e.g.,* Ex. 12, 74:11-14, 92:4, 111:2-5, 131:2-6. The opposition included "anti-semitic" and "problematic community rhetoric," including repeated concerns about "tax exemptions" and "profit making." Ex. 19, at 2-3. One resident said she and her husband had "some suspicions [about Grand] early on" because, two years earlier, when Grand first moved to the neighborhood, he invited her and her husband for the Sabbath, "[s]o that to me is already very suspect. From that day on, I thought, okay, something is going to happen here." Ex. 12, 95:16-96:1-3. Several members expressed the same sentiment that if Grand wished to walk to a synagogue he should have purchased a house in a different neighborhood. *See, e.g.,* Ex. 12, 96:12-16, 122:10-15, 128:7-13. One resident suggested that Grand host his prayer group by renting space in a "large office building next to Target" so that "it wouldn't bother the neighbors." Ex. 12, 134:1-14.

After the neighbors' testimony but before any deliberation, Planning Commission Member Michael Fine made a motion:

> I would then make a motion to table that the applicant come back with a more thorough presentation as to site plan with the review from the fire department, inspection of the building, what needs to be done, whether it's a realistic option from … and if he's going to ask for a special use permit. Then it should be what the applicant has articulated, what the applicant wants to do.

Ex. 12, 148:21. The Motion was seconded by April Urban. Ex. 12, 151:10-11. John Rach voted for the Motion and requested for the next meeting "more drawings of the building and the site plans so we have a clearer understanding of how the space is to be used." Ex. 12, 151:23-152:1. Fine's Motion passed 3-2, with Brennan and Siemborski voting against it. Ex. 12, 152:12-25. Before Brennan could adjourn the meeting, one resident said, "you people should have done your homework. Embarrassing," and another said "Gross, gross. I hope you don't get reelected. I hope you don't get reelected. I hope you don't. Disgusting." Ex. 12:153:2-7.

After the Meeting, the PC deliberated off the record via email as they had done prior to the meeting. *See, e.g.,* Ex. 19; Ex. 22, Ex 23, Ex. 24. A notice for a second PC meeting went out on March 11, 2023. Ex. 25, at 2-3. On March 12, 2023, Brennan posted a message to the public stating: "To be clear, the administration does not endorse or support the application." Ex. 26. He also stated that the reason for holding the meeting as a quasi-judicial hearing was to make it more difficult for Grand to get "a second bite at the apple" by appealing to a court. *Id.* Brennan sought to ensure that a court would be confined to the transcript of the hearing and the documents presented to the PC, and that Grand would be forbidden from bringing up matters that he failed to raise at the hearing. *Id.*

On March 16, 2021, Grand emailed the PC:

> As you know, the hearing has been accelerated, I have still not been provided clear requests from the city planning commission – I have yet to be put in touch with the proper personnel including the city engineer, the fire department chief, the police

chief, I thought Councilman Rach as an architect wanted to see the space, I really don't know what the city is expecting, and I have requested it in writing, meaning what they want me to do prior to the next meeting… This was the entire basis for the decision to table, was it not? To date, I have not been given the contact information, or a clear list of requested items, and the added acceleration makes me feel as though I should request a continuance, so that is what I am doing, if I do not have the requested information by the end of the day tomorrow, I will request a continuance.

Ex. 27, at 2-3. Grand's lawyer also reached out to the PC on March 17. *Id.,* at 2. PC Member Rach responded that he needed floor plans and a site plan from an architect "indicating space to be used for assembly, entrance/exit, parking as applicable, setback requirements, property lines, etc." *Id.*

On March 17, Brennan responded:

At the meeting of March 4, 2021, the Planning Commission tabled the matter without discussion or deliberation, even though you had closed your case as applicant. Since the meeting, individual members have expressed their desire to discuss what has been presented. This discussion is not to be done as a group outside of the confines of a public meeting.

We have called the public meeting in order to allow the Planning Commission to take the application from the table for discussion among the board members and city administration officials. Any additional testimony or additional evidence/materials for or against the application is closed for purposes this meeting. As such, there is no expectation that you prepare or submit additional materials before or at the March 23 special meeting.

I suggest applicant be present to answer questions of commission members pertaining to applicant's previous testimony. *Notwithstanding that, neither are you expected to submit additional materials before next Tuesday's meeting, nor will they be considered on Tuesday if you do.* The Planning Commission may discuss whether additional materials are needed to make the decision on the merits. If such materials are deemed necessary, you will be given sufficient time to provide them.

Ex. 27, at 1 (emphasis added). Grand's counsel asked Brennan whether Grand had been advised that Brennan had decided to turn the first meeting into a quasi-judicial format, to which Brennan responded by stating that "Special Use Permit proceedings are quasi-judicial" and suggested that it was Grand's counsel's responsibility to know that and to advise Grand in advance. *Id.*

On March 22, 2021, Chief of Police Rogers sent Brennan a memorandum regarding the upcoming March 23, 2021 meeting stating that he was not aware of Grand or any member of the PC reaching out to the police department regarding the application. Ex. 28. Chief Rogers listed as "public safety factors to be considered . . . the impact on vehicular/pedestrian traffic, vehicular parking, maintaining the good order and quiet of the community, and the potential for subsequent opportunistic crimes." *Id.* He reiterated that "since 2017 we have had zero noise/disturbance complaints at 2434 Miramar, and zero parking complaints in the immediate area of 2343 Miramar." *Id.*

The March 23, 2021 Planning Commission meeting was held via zoom, lasted only 6 minutes and 5 seconds, and is available for viewing on the City's official YouTube Channel at https://www.youtube.com/watch?v=5Pl0YbrbZek&t=278s. *See also* Ex. 4, 243:4-248:15. Brennan was the only person to speak at the meeting. *Id.* Brennan stated that PC had "demonstrated their desire to discuss this matter, in essence to deliberate, in the form of e-mails" after the March 4, 2021 meeting until "[o]ur law director reminded all commission members of our obligations under the Sunshine Law to deliberate by way of a publicly noticed meeting." *Id.* Brennan did not disclose the substance of the email deliberations, the concerns about "antisemitic rhetoric" (Ex. 19, at 2-3), the discussions with Grand and his attorney (ex. 27), or the Police Chief's report (Ex. 28). Brennan read into the record an email sent by Grand to the Planning Commission that day prior to the Meeting which stated:

> Mayor Brennan and Planning Commission, please be advised that I'm withdrawing my application for a special-use permit. I do not wish to operate a house of worship as is defined under the zoning ordinance, in the privacy of my home.

Brennan then went on to state on the record:

> I therefore note for the record that the application is withdrawn. There is no special-use permit for 2343 Miramar Boulevard. And I will remind the applicant that the cease-and-desist order of the City, dated January 21, 2021 remains in effect. Let

there be no confusion, *congregating at 2343 Miramar Boulevard or any other address located in a residence zoned U-1 without a special-use permit is a violation of city law.*

I'm hopeful that the wording of the withdrawal is *not intended to suggest that congregating weekly at a residence to conduct activities consistent with those in a house of assembly does not require a special-use permit.* As recently as two months ago, the city brought suit against the organizers of another residential shul, one on Churchill Boulevard, and ultimately obtained a permanent injunction in court.

To the community members who are here, *let there be no question, there is no permission granted here to operate ... a house of assembly or conduct activities consistent with one at 2343 Miramar Boulevard. If you observe such activities,* and I hope you do not, but if you do, *you may report them to the city,* and the city will enforce its laws, which exist for the benefit of the entire community. And we will seek all appropriate remedies in court. With that I move to adjourn.

Ex. 4, 243:4-248:15 (emphasis added).

On March 23, 2021, prior to the meeting, the City's entire uniform police division was instructed to monitor Grand's home for "violations to 452.03 Prohibited Standing or Parking Places." Ex. 29. On March 25, 2021, Police Chief Rogers wrote to Brennan, McConville, and the head of the City Building Department that "it would be my recommendation for the Building Department to take the lead on this matter going forward … However, the PD will assist in any way we can to resolve the matter, to include patrol officers responding after hours to photograph/video possible evidence of a complaint/infraction." Ex. 30. On March 28, 2021, the City prosecutor wrote in an email that Brennan had directed a housing inspector to conduct an inspection of Grand's property "and issue a written 10-day notice for all violations he sees" as the first step to "laying a foundation for a successful prosecution if it becomes necessary." Ex. 31. The prosecutor noted that she currently did not have probable cause for a warrant but believed that the inspector could create a list of external violations that "may be enough to get me started on a process of getting a court to order more." *Id.* She concluded by stating that "between the mayor's

office, the housing department, and [the prosecutors] office, we are all pressing forward as urgently as we can. *Id.*

## V.    LEGAL STANDARD

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). Ultimately, the question is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Johnson v. Memphis Light Gas & Water Div.*, 777 F.3d 838, 843 (6th Cir. 2015). "[A] mere 'scintilla' of evidence in support of the non-moving party's position is insufficient to defeat summary judgment; rather, the non-moving party must present evidence upon which a reasonable jury could find in her favor." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 529 (6th Cir. 2012).

## VI.   THE CITY'S POLICIES AND BRENAN'S ACTIONS VIOLATED GRAND'S FIRST AMENDMENT RIGHT TO FREE EXERCISE OF RELIGION AND FREEDOM OF ASSEMBLY, COSTITUTE AN UNLAWFUL PRIOR RESTRAINT, AND VIOLATE THE OHIO CONSTITUTION (COUNTS I, II, III, AND XII).

Section 1983 creates a federal cause of action against state or local officials who deprives someone of a federal constitutional right while acting under color of state law. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691-92 (1978). To prevail in a § 1983 suit against a municipality, a plaintiff must show that the alleged federal right violation occurred because of a municipal policy or custom. *Monell,* 436 U.S. at 694. The "touchstone," then, is an "official policy" that causes the alleged constitutional violation. *Monell*, 436 U.S. at 691. Official municipal policy includes lawmakers' legislative and policy-making decisions, as well as "practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). A plaintiff can prove the existence of a municipality's illegal policy or custom by looking to policy statements, ordinances, decisions officially adopted and promulgated by a governing body's

officers, or decisions made and implemented by authorized decision makers that have not received formal approval. *Monell*, 436 U.S., at 694; *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480-81 (1986). An individual official is liable if the plaintiff shows that the official, acting under the color of law, violated a constitutional right that was clearly established at the time. *Fritz v. Charter Twp. of Comstock,* 592 F.3d 718, 722 (6th Cir.2010); *Zilich v. Longo*, 34 F.3d 359, 365 (6th Cir. 1994).

The First Amendment protects the right to engage in conduct motivated by religious belief. *Prater v. City of Burnside,* 289 F.3d 417, 427 (6th Cir.2002) (citing *Employment Div. v. Smith,* 494 U.S. 872, 877 (1990)). To establish a claim under the Free Exercise Clause, a plaintiff must show that the defendants' behavior infringes upon the plaintiff's sincerely held religious belief. *Id.* The First Amendment also protects the right to assemble peaceably. *Wilkinson v. United States*, 365 U.S. 399, 427 (1961); *De Jonge* v. *Oregon*, 299 U.S. 353 (1937).

There is no genuine issue of material fact that Grand's stated intention to peaceably assemble with a group of friends to pray in his private home on the Jewish Sabbath (Ex. 2; Ex. 7; Ex. 8) is (1) pursuant to his sincerely held religious belief (Ex. 1); (2) is protected by the First Amendment's guarantees of the rights to exercise religion and peaceably assemble, *Sause v. Bauer*, 138 S. Ct. 2561, 2562 (2018) ("The Free Exercise Clause plainly protects the right to pray in one's own home."); *De Jonge* , 299 U.S. 353; and (3) was clearly established in January of 2021.

The January 21, 2021 cease-and-desist order stated unambiguously that Grand was prohibited from using his home "as a place of religious assembly *and/or* in operation of a shul or synagogue." Ex. 6 (emphasis added). The order thus targeted any religious "assembly" in a private home as well as the formal operation of a synagogue. Brennan authorized the cease-and-desist order (Ex. 4, 81:6-13) after receiving a single facebook message from a resident that included a message that stated that Grand allegedly invited the people on the "Groveland Chat" to join him

13

"this Shabbos" for "Davening" on Friday at 5:20 p.m., Shabbos at 9:45 p.m., and again on Shabbos at 5:00 p.m. Ex. 3. Brennan found Feldman's complaint consistent with a phenomenon of "pop up synagogues." Ex. 4, 69:2-7. Grand told Brennan he was "just trying to get some people together at his house to pray" (Ex. 4, 83:20-22), but Brennan decided that Grand was actually opening a synagogue in his house and that Brennan needed to respond immediately to prevent a meeting at Grand's house before the upcoming Shabbos. Ex. 83:21-84:4, 85:12-15. Brennan pursued a policy of ordering Grand to cease-and-desist his prayer group based on the suspicion that Grand might be opening a synagogue in his house, and "if it's not a synagogue, then that was something that could be determined later." Ex. 4, 85:16-23. This is the exact opposite of the least restrictive means. Brennan acted peremptory to ban Grand's prayer group before it even started, and without providing Grand any means to pray with fellow Jews in the privacy of his home, to eliminate "any confusion about the fact that the city cannot simply – does not simply abide having houses of worship opened without going through the process that involves having asking the [PC] for a special use permit." Ex. 4, 85:16-23.

Grand immediately canceled the scheduled prayer group and applied for a SUP. Ex. 2; Ex. 7; Ex. 8. He was not able to have a hearing until March 4, 2021, over six weeks later. Ex. 9. At minimum, he was prevented from having his prayer group for six weeks. When the government intentionally places a burden upon religiously motivated practice, it must justify that burden by "showing that it is the least restrictive means of achieving some compelling state interest." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 578 (1993). In this case there was no compelling stated interest and least restrictive means were not used.

There is no issue of material fact as to why Brennan sent the order prohibiting Grand from hosting his prayer group in his home: it was to vigorously enforce the City's policy against

"residential shuls," "pop up synagogues," or "makeshift synagogues," which have occurred periodically around the city. Ex. 3, Ex. 4, 156:13-21, 159:20-25. According to the message from Ben Feldman on which Brennan relied (Ex. 4., 91:7-9), "there are already a number of these pop up synagogues in the neighborhood, one on my own block on Groveland." Ex. 3. The City has no compelling interest in banning assembly in "residential shuls." If it did, the compelling interest would equally apply to other residential religious assembly activities such as Bible study, houses of mourning, and large Christmas or Shabbos gatherings. There was no legitimate concern for safety as the police reported that there had never been even a single complaint about Grand in all the years he lived in his home. Ex. 21; Ex. 28. Traffic and parking were also not legitimate concerns as the invitation only invited people to come and pray on Shabbos when Grand and his friends do not drive. Ex. 2; Ex. 8; Ex. 20. Further, neither the Supreme Court nor the Sixth Circuit have found even "highway safety" to be a compelling governmental interest in the First Amendment context, and certainly not parking and traffic on a residential street. *Thomas v. Bright*, 937 F.3d 721, 733 (6th Cir. 2019). Brennan revealed the true government interest when he created the map of opposition (Ex. 13; Ex. 14), namely, that there is a vocal constituency opposed to "residential shuls." But the First Amendment does not allow for a "heckler's veto." *Cf. Believers v. Wayne Cnty.*, 765 F.3d 578, 593 (6th Cir. 2014); *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 112 (1973) (Brennan, J. dissenting) ("Even a legitimate, sharply focused state concern for the morality of the community cannot, in other words, justify an assault on the protections of the First Amendment.").

But even if the governmental interests were compelling – which they are not - the City policy regarding "residential shuls" and religious "assembly" is not narrowly tailored to accomplish those interests. *Lukumi Babalu Aye*, 508 U.S. at 546. According to Brennan, he was following the City's policy that was triggered when he received the Ben Feldman message. If a

resident desires to "open[ ] something that requires a special [use] permit under [UHCO Chapter 1274] … there is a process for doing that," namely, the resident must first seek permission from the PC to determine whether the applicant is opening a synagogue or else just wants to "have a small group of people pray in his home." Ex. 4, 91:10-16, 161:23-162:14. If it turns out to be the latter, "the City is prepared to say fine. That's not the City's business." *Id.* Brennan knew that Grand had "not yet actually started" hosting a prayer group, "apart from the announcement" (Ex. 4, 74:5-75:10), but under the City's ordinances and policies, the determination of whether Grand's home prayer group constituted a synagogue was:

> something that could be determined later. But in the meantime, [Brennan] didn't want there to be any confusion about the fact that the city cannot simply – does not simply abide by having houses of worship opened without going through the process that involves having asking the board for a Special Use Permit.

Ex. 4, 85:16-23. Brennan was very clear, "if he's attempting to open a synagogue or a shul in his home, *as per this invitation,* that he is not to do that without a special use permit." Ex. 4, 162:23-163:3 (emphasis added).

According to Brennan, the invitation that he received in the Ben Feldman message (Ex. 3), is subject to the same rules as Brennan getting "a notification that somebody is opening a new business in the City and they don't have an occupancy permit." Ex. 4, 159:4-16. The City policy is "to go over there before their grand opening and say, hey, full stop, what you doing? You haven't been before the city … We don't wait for them to just go ahead and open up and then come and shut them down in the middle of the process." *Id.* The City policy does not require any "lengthy analysis." Ex. 4, 162:3-4. Brennan did not inquire into the extent to which Grand had distributed the invitation or the number of people who were likely to attend, and he saw no reason why such investigation would be necessary before preemptively ordering Grand to shut down his prayer group. Ex. 4, 161:8-14, 162:15-19. Brennan did not provide guidelines as to when private prayer

16

in a private home might be permissible, such as proposing a limitation on the number of people who could gather, or indicating what communications relating to the private prayer group might create an issue of municipal concern. Ex. 4, 89:10-15. The City simply shut down Grand's prayer group, regardless of the number of people who would attend, without gathering any evidence beyond the hearsay comment of a single resident. There is no question that the City's order to cease-and-desist from religious assembly in his home until he obtains approval from the City is an unconstitutional prior restraint that resulted in injury to Grand. *Phillips v. DeWine*, 841 F.3d 405, 424 (6th Cir. 2016); *Newsom v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989) (quoting *Elrod v. Burns,* 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

The Supreme Court has found a prior restraint where public officials had forbidden the exercise of protected conduct in public places, under the authority of laws that gave public officials the power to deny the use in advance of the actual expression. *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 552-53 (1975) (collecting cases). Here, the City policy forbids protected conduct in Grand's private home without a SUP, giving Brennan unbridled discretion to determine that Grand's intentions were to open a formal synagogue in his house, and therefore prevent him from inviting friends to his home prior to first obtaining a SUP at a quasi-judicial hearing. A policy that gives Brennan such unbridled discretion is patently unconstitutional. *Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 752-53, 757 (1988). Based on nothing more than an unverified complaint from a single resident, Grand was prohibited from hosting the prayer group in his home for six weeks until the first hearing, and was required to pay $400 for application fees and hire an attorney for the hearing. Ex. 7, Ex. 12, 15:1-3.

17

But the City's violation of Grand's rights did not stop with its initial cease-and-desist letter. After Grand withdrew his application for a SUP, Brennan announced an official City policy of frightening overbreadth, making clear that Grand was barred from conducting any activities "consistent with those in a house of assembly" and that neighbors should feel free "to report" Grand if they observed activities "consistent with those of a house of assembly." Ex. 4, 243:4-248:15. Pursuant to the City policy outlined above, Grand's application to "utilize [his] current recreation room for periodic prayer gatherings" constitutes the "sorts of things [that] seem consistent with a house of worship." Ex. 4, 120:3-122:18, Ex. 8. Such a policy unquestionably and incontrovertibly chilled Grand's exercise of his First Amendment rights and validated the kind of community ostracism and hatred characteristic of the some of the lowest moments in history, when antisemitism was formally endorsed by the state. There is no question that Brennan's prepared statement, as the Mayor and chair of the City's Planning Commission, made in front of and with acquiescence of the PC, at a widely attended official public meeting, was a City policy under *Monell.* A "municipal policy" can include a policy statement,  an ordinance or regulation, a decision officially adopted and promulgated or the existence of an "actionable custom" that "policymaking officials knew about and acquiesced in the practice at issue." *Frontera v. City of Columbus Division of Police*, 395 F. App'x 191, 196 (6th Cir. 2010). Brennan also expressly stated on March 23, 2021, that activities "consistent with" the ones that Grand intended were forbidden and did not clarify what those activities were. Ex. 4, 243:4-248:15.[3] This vagueness constitutes an unlawful restriction on Grand's First Amendment rights that is still in effect to this day.

---

[3] This is an issue of religious freedom generally. Though the City has until now only targeted Orthodox Jewish residential religious assemblies, the City may begin to enforce this ban against residential religious assemblies of other religions.

The Ohio Constitution provides even broader protection of the free exercise of religion than the Federal Constitution. *Humphrey v. Lane*, 728 N.E.2d 1039, 1043-45 (2000). While the federal Constitution states that Congress shall make no law "prohibiting the free exercise [of religion]," the Ohio Constitution adds the phrase, "nor shall any interference with the rights of conscience be permitted," which, according to the Ohio Supreme Court, makes even those "tangential effects potentially unconstitutional." *Id.* (quoting Ohio Const. Art. I, § 7) ("That protection applies to direct and indirect encroachments upon religious freedom."). Further, there is no requirement either that (a) the regulation at issue not be neutral and generally applicable; or (b) that the burden must be "substantial" in nature. *Id.* Preventing Grand from hosting a prayer group in his home on Shabbos "has a coercive effect against [him] in the practice of [his] religion." *Id.,* at 1045. As discussed above, that action is not the least restrictive means of achieving a compelling government interest. Moreover, Ohio courts have a strong history of sensitivity to Orthodox Jews in particular whose faith requires them to have places to pray within walking distance. *See, e.g., Young Israel Org. of Cleveland v. Dworkin,* 133 N.E. 2d 174, 176 (Ohio App. 1956) ("Because they adhere to this faith their places of worship must be within walking distance of their homes."); *State ex rel. Anshe Chesed Congregation v. Bruggemeier,* 115 N.E. 2d 65, 70-71 (Ohio App. 1953) ("The place of the church is to be found in that part of the community where the people live.").

On the uncontroverted evidence, there is no genuine issue of material fact as to whether the City's policies and Brennan's conduct violated Grand's First Amendment rights of free exercise and assembly and imposed a prior restraint on his ability to do so. Summary judgment must be imposed on the City and Brennan under Counts I, II, III, and XII of Plaintiff's Second Amendment Complaint.

## VII.    THE CITY'S POLICIES AND BRENNAN'S ACTIONS VIOLATED GRAND'S PROCEDURAL DUE PROCESS RIGHTS (COUNT V).

"A procedural due process claim consists of two elements: (i) deprivation by state action of a protected interest in life, liberty, or property, and (ii) inadequate state process." *Reed v. Goertz*, 143 S. Ct. 955, 961 (2023). It cannot be disputed that Grand's freedom to pray and assemble in his home is a protected liberty interest. *United States v. Guest*, 383 U.S. 745, 770 (1966) ("The liberty of all human beings which cannot be taken away without due process of law includes liberty of speech, press, assembly, religion, and also liberty of movement.") (citation omitted) (cleaned up). It also cannot be disputed that Grand was deprived of those liberty interests, first by the cease-and-desist order, and then by Brennan's proclamation at the PC meeting held on March 23, 2021, when Brennan declared that "congregating weekly at a residence to conduct activities consistent with those in a house of assembly" at Grand's home is a "violation of City law." Ex. 4, 243:4-248:15.

Grand's basic freedoms to pray and assemble in his home were taken away by the City without due process. First and most obviously, Grand was denied due process by the cease-and-desist order that immediately and without a hearing or any meaningful opportunity to be heard deprived Grand of his right to host a prayer group in his home until he obtained a SUP from the PC. *See supra.* Brennan called Grand after he had already decided to issue the order, but only to inform Grand of his decision, not to have "a conversation about what he may or may not be claiming to be doing." Ex. 4, 93:14-24. Grand tried to tell Brennan "that he was just trying to get some people together at his house to pray," but Brennan determined that Grand was "withholding" that he had "invited the community to come over to the opening of the synagogue, to come meet the rabbi, and be a part of an ongoing concern with regular weekly services." Ex. 4, 82:20-25. Brennan withheld from Grand that he had received the Ben Feldman message containing Grand's email and did not give Grand an opportunity to explain its contents. Ex. 4, 83:1-4.

Grand was thus deprived of his right to exercise his religion and assemble in his home without the benefit of a hearing for six weeks, from January 21, 2021, until at least the first opportunity for a Planning Commission meeting, which was March 4, 2021 (Ex. 7). The meeting was tabled until a second meeting scheduled for March 23, 2021, extending the ban created by the cease-and-desist letter for another three weeks. Brennan then made it clear that Grand could not submit additional materials or present any argument in support of his position at the second meeting, even though the March 4, 2021 meeting had been tabled expressly to permit Grand to supplement his application. As a result, even if the City allowed Grand to host a private prayer group in his home after the March 23, 2021 meeting, he was denied a the right to do so for nine weeks without a hearing. This fact alone constitutes a violation of Grand's right to procedural due process rights, and summary judgment against the City and Brennan is appropriate. *Johnson v. Morales*, 946 F.3d 911, 921 (6th Cir. 2020) ("It is the general rule that due process 'requires some kind of a hearing *before* the State deprives a person of liberty or property.'") (quoting *Zinermon v. Burch* , 494 U.S. 113, 127,  (1990) (collecting cases)); *Taghzout v. Gonzales*, 219 F. App'x 464, 472 (6th Cir. 2007) ("When a person has no hearing or opportunity to be heard whatsoever, the process is inadequate."); *Cleveland Bd. of Educ. v. Loudermill* 470 U.S. 532, 542 (1985); *Carey v. Piphus*, 435 U.S. 247, 266 (1978) (holding that "the right to procedural due process is 'absolute' in the sense that it does not depend upon the merits of a claimant's substantive assertions").

Grand's due process rights were further violated by the unfair process to which he was subjected by the PC. The minimum requirements of due process are notice and an opportunity for a hearing appropriate to the nature of the case. *Transco Sec., Inc. of Ohio v. Freeman*, 639 F.2d 318, 321 (6th Cir. 1981). The purpose of notice is to apprise the affected individual of, and permit adequate preparation for, an impending hearing. *Id.,* at 323. When a hearing or decision may be

determinative of a parties' rights, due process requires that notice be "reasonably calculated, under all circumstances," to apprise interested parties of the action to be taken, to provide them with an "effective opportunity to be heard," and to afford them an "opportunity to present their objections." *Hamby v. Neel*, 368 F.3d 549, 560 (6th Cir. 2004) (citations omitted).

The general notice which Grand received for the March 4, 2021 meeting (Ex. 9) "did not permit adequate preparation for participation in a meaningful way" for the hearing on March 4, 2021. *Transco*, 639 F.2d at 321. The notice only provided the time and date of the meeting, a zoom link, and one sentence description of the subject of the hearing. Ex. 9 Grand was not informed that the proceeding would be conducted as a "quasi-judicial" hearing with sworn testimony, direct and cross-examination of witnesses, opening and closing statements, and municipal direction as to when an applicant had rested its case, and was no longer permitted to add to, comment on, or clarify a prior statement. The quasi-judicial format was "different than one [the PC] ever used before." Ex. 12, 143:5-18; Ex. 19, 4 ("Never have we allowed such a format...That we turned this into a court proceeding...").[4]  No reasonable person could possibly have known – in the absence of any notice or any prior practice – that the PC proceeding was to be "quasi-judicial" or could possibly have meaningfully prepared for such a proceeding. A departure from normal rules amounts to a due process violation "when the departure results in a procedure which itself impinges on due process rights." *John Doe v. Univ. of Cincinnati*, 872 F.3d 393, 407 (6th Cir. 2017) (citations omitted). Here, the quasi-judicial hearing directly impinged on Grand's ability to be

---

[4] Only one month earlier, on February 4, 2021, the PC met on a different application for a nonreligious use, https://www.youtube.com/watch?v=eUtw7M0x-TE&t=356s (last visited Jan. 26, 2024). The proceedings were not "quasi-judicial." The applicant and witnesses were not sworn in under oath. *Id.*, at 2:49, 4:15. There was no cross examination and the City did not intervene to silence the applicant by telling him his case had been "rested" by the chair. On the contrary, the PC had previously considered the applicant's presentation several weeks earlier and had given him an opportunity to modify his application and return. *Id.*, at 3:10.

heard, as his counsel was not prepared to cross-examine witnesses and Brennan forced Grand to rest his case against his will, even as he tried to introduce evidence into the record. Ex.12, 47:13-48:1, 72:5-18. Grand would plainly have prepared and presented differently had he known he would be subjected to this form of proceeding. Ex. 27, at 1-2.

Aside from inadequate notice, "the essence of procedural due process is a fair hearing," *Vitek v. Jones*, 445 U.S. 480, 500 (1980), and the March 4, 2021 hearing was not fair. First, Brennan, the chair of the committee, admitted that he and his administration were biased. Ex. 25 ("To be clear, the administration does not endorse or support the application."). Already before the March 4, 2021 meeting, at the time Brennan sent the cease-and-desist letter, Brennan had determined that anything Grand would say regarding his application would be a lie. Ex. 4, 163:14-21 ("I don't find what he says to be truthful in general. So I was less concerned about asking Mr. Grand questions, giving him opportunities to lie to me."), 164:5-4 ("I don't find Mr. Grand to be an honest person."), 164:24-165:1 ("[H]e doesn't respect the law, clearly. He doesn't respect the authority of the board of zoning appeals[.]"); 168:2-3 ("Mr. Grand seems willing to game the system."). Brennan even created and distributed a map highlighting the houses of residents who signed a petition opposing Grand's application (Ex. 13: Ex. 14; Ex. 15, at 1), while failing to highlight the houses of residents who signed a similar petition in support that Grand had submitted. Ex. 15, at 2. "[I]t is a hallmark of procedural due process that a biased decisionmaker is constitutionally unacceptable[.]" *Nasierowski Bros. v. City of Sterling Heights*, 949 F.2d 890, 897 n.8 (6th Cir. 1991); *Deja Vu of Cincinnati, L.L.C. v. Union Township Board of Trustees*, 411 F.3d 777, 784 (6th Cir. 2005) (quoting *City of Huber Heights,* No. 2000 CV 03932 (slip op.), at 12-13) ("[I]t is axiomatic that a hearing conducted before a biased individual . . . would not fulfill a requisite requirement of fundamental fairness that must pre-dominate in all quasi-judicial

23

proceedings."); *Coley v. Bagley*, 706 F.3d 741, 750 (6th Cir. 2013) ("A biased decision-maker is constitutionally unacceptable."). *Cf. Murphy v. Intern. Union of Operating Engineers*, 774 F.2d 114, 124 (6th Cir. 1985) (quoting *Myers v. Affiliated Property Craftsmen, etc.,* 667 F.2d 817, 820 (9th Cir. 1982) ("When a member of a trial committee has admitted to prejudging the guilt of the accused before the hearing, the courts have not hesitated to rule there was no full and fair hearing as required by the L.M.R.D. A.").

Further, the quasi-judicial hearing on March 4, 2021, was not fair because critical evidence was withheld from Grand and never entered into the record by the City. "When the agency making the decision relies on evidence that the claimant has no chance to refute, the hearing becomes infected with a procedure that lacks that fundamental fairness the citizen expects from his Government." *United States v. Bianchi Co.*, 373 U.S. 709, 720 (1963). Significantly, the Ben Feldman facebook message was withheld from Grand (Ex. 4, 83:1-4) and was never entered into the record. Grand was not provided with the letters from residents, including ones that contained what members of the PC considered to be "antisemitic rhetoric." Ex. 1; Ex. 16; Ex. 17; Ex. 18; Ex. 19, at 2-3, 4-5. Favorable evidence, including Grand's Letter of Clarity (Ex. 20), was also never entered into the record.

In closed-session email deliberations prior to the March 4, 2021 meeting, the Planning Commission discussed in advance of the meeting the possibility of tabling the application to conduct a determination as to whether there were other unknown and unspecified violations. Ex. 15, at 1-2 ("We have not yet conducted or completed that review. But if you find you would be willing to grant the application, and the only question is whether he is otherwise in compliance, the matter could be tabled to ascertain that."). Not only were these deliberations not included in the record on March 4, 2021, but worse yet, the City was prepared to let Grand present his

24

application without providing notice that the City was unprepared to render a decision until it "conducted or completed a review" for unspecified violations. The police completed a review just hours before the meeting and found zero violations. Ex. 21. This critical piece of evidence was also withheld from Grand and was not entered into the record. Brennan also withheld the map he prepared that was distributed to the PC prior to the meeting. Ex. 13; Ex. 14; Ex. 15, at 1.

Grand's due process rights were further violated by the City's failure to notify Grand in advance of the meeting that his application was deficient, despite his repeated requests for assistance. Ex. 7; Ex. 8. According to Kelly Thomas, the most senior City administrator, the City's normal procedure had always been for the City's Building Commissioner to reach out to an applicant to assess whether the proposed application is deficient in any material way. Ex. 10, 7:21-25, 17:18-19-2. Normally, the City "will work with an applicant to help them develop their application to make the best case for their proposal," but Grand was deprived of that assistance from the City because "the application was made only after the City sent a cease-and-desist letter to applicant in response to his widely circulated invitation announcing the opening of a shul." Ex. 25. In other words, based on the contents of the Ben Feldman facebook message, the City took an adversarial approach to Grand's application and withheld its "input and support." *Id.* The fact that Grand was not given notice that his application was deficient was especially prejudicial as Grand was forced to rest his case before he had a chance to submit all of his evidence at the March 4, 2021 hearing, and he was prevented from modifying or revising his application prior to the March 23, 2021 meeting. Ex. 27.

The City's violation of Grand's due process rights continued after the hearing. The official Transcript of the hearing unambiguously records that the PC voted to table the discussion of Grand's application to permit Grand to present additional evidence to the PC. Ex. 12, 148:21-

149:4. Yet shortly after the hearing, Brennan unequivocally stated that Grand would not be allowed to present additional evidence at the subsequent meeting. Ex. 27, at 1-2. Brennan's arbitrary refusal to implement an official decision unquestionably constitutes a violation of Grand's Fourteenth Amendment due process rights. Additionally, the PC had substantive closed-session deliberations via email after the meeting (Ex. 19; Ex. 22; Ex. 23: Ex. 24), but these deliberations were never entered into the record, and Grand did not have knowledge of them or an opportunity to respond to the PC's concerns. The deliberations after the meeting included discussions of "antisemitic rhetoric" demonstrating that the PC was aware that at least some of the opposition was motivated by antisemitism. Ex. 19. At 2-3. These concerns were never made public.

"[A]n administrative hearing of such importance and vast potential consequences must be attended, not only with every element of fairness but with the very appearance of complete fairness. Only thus can the tribunal conducting a quasi-adjudicatory proceeding meet the basic requirement of due process." *American Cyanamid Company v. F.T.C*, 363 F.2d 757, 767 (6th Cir. 1966). Theres is no issue of material fact that the City's and Brennan's failure to afford Grand a fair opportunity to be heard before depriving him of his constitutional rights constituted a denial of procedural due process. Accordingly, summary judgment against these Defendants must be entered under Count V of Grand's Second Amended Complaint.

## VIII.   THE CITY'S POLICIES AND BRENNAN'S CONDUCT VIOLATED GRAND'S EQUAL PROTECTION RIGHTS (COUNT VI).

An individual's right to equal protection is violated if he receives differential treatment as the result of intentional discrimination directed at a suspect class such as religion. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp*., 429 U.S. 252, 265 (1977) (articulating several non-exhaustive evidentiary factors, including the background and events leading to the decision, departures from normal procedures, and statements by members of the decisionmaking body); *Spurlock v. Fox*, 716

26

F.3d 383, 397 (6th Cir. 2013). Discriminatory motivation can be imputed to governmental decisionmakers if they were responsive to community animus against a protected group. *City of Cuyahoga Falls, Ohio v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 196 (2003); *Get Back Up, Inc. v. City of Detroit*, 725 F.App'x 389, 392 (6th Cir. 2018) (holding that public discriminatory comments made at a zoning board meeting are enough to show a *prima facie* case of discrimination.); *MX Group, Inc. v. City of Covington*, 293 F.3d 326, 341-342 (6th Cir. 2002). Courts often look to circumstantial evidence of discrimination because "overtly bigoted behavior has become more unfashionable," and "clever men may easily conceal their motivations." *Robinson v. 12 Lofts Realty, Inc.,* 610 F.2d 1032, 1043 (1979). "[D]iscriminatory purpose which characterizes violations of the Equal Protection Clause can sometimes be established by objective evidence that is consistent with a decisionmaker's honest belief that his motive was entirely benign." *Hernandez v. New York*, 500 U.S. 352, 377 (1991) (Steven, J. dissenting). "A plaintiff need not prove that a discriminatory purpose was the sole reason for the action, only that discrimination was a motivating factor." *Wesley v. Collins*, 791 F.2d 1255, 1262 (6th Cir. 1986).

In addition to the glaring departures from normal procedures mentioned above, it is undeniable that the record contains strong evidence that the City's decision to shut down Grand's prayer gorup was at least partially motivated by the fact that Grand is Jewish. *E.g.,* Ex. 2; Ex. 3; Ex. 4, 69:2-7; Ex. 11; Ex. 12, 78:8-14; 92:1-11 ("I've had many friends that are Jewish that are still my close friends that are amazing people, I think as a population."); Ex. 16 ("I do not want our neighborhood labeled as Jewish."); Ex 19, at 2-4; Ex. 25, at 3-4. There is no genuine issue of material fact as to whether the City and Brennan discriminated against Grand as a religious minority in violation of his Fourteenth Amendment right to equal protection, and accordingly, summary judgment should be granted as to those Defendants under Count VI.

## IX.  THE CITY'S POLICIES VIOLATED RLUIPA (COUNTS VIII, IX, X, AND XI)

42 U.S.C. § 2000cc(a)(1) prohibits government from imposing a substantial burden on religious exercise without a compelling governmental interest and in the least restrictive means. "[I]f a plaintiff produces *prima facie* evidence to support a claim alleging a violation of the Free Exercise Clause or a violation of section 2000cc…the government shall bear the burden of persuasion on any element of the claim, except that the plaintiff shall bear the burden of persuasion on whether the law…or government practice that is challenged by the claim substantially burdens the plaintiff's exercise of religion." Section 2000cc-2(b). A substantial burden is one that prevents a plaintiff from engaging in desired religious behaviors, or places significant pressure on a plaintiff to modify his behavior. *LCS v. Genoa Charter Twp.*, 858 F.3d 996, 1004 (6th Cir. 2017). There is no genuine issue of material fact that the City's policies substantially burdened Grand's exercise of religion by placing significant pressure on Grand to modify his behavior.

42 U.S.C. § 2000cc(b)(1) provides that "No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." UHCO 1274 violates this on its face. UHCO § 1250.02(b) allows buildings operated by a board of education, municipality, or library board as of right in a residential zone (Ex. 33), but UHCO § 1274(b)(1) requires "houses of worship or religious education, including churches, temples, synagogues, religious organizations, parish houses and parochial schools" to obtain a SUP (Ex. 32). A secular board of education may operate without a SUP, but if the building is sold to a religious organization that wants to teach religion, the owners must apply for a SUP. The City approved a permit Grand to build a music room, but when he decided to move out his drums and use the same room for a prayer gorup, he was required to apply for a SUP. Ex. 4, 171:24-172:2.

42 U.S.C. § 2000cc(b)(2) provides that "No government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination." Federal courts have applied the Equal Protection analysis developed in *Arlington Heights*, 429 U.S. 252, to claims brought under RLUIPA's Nondiscrimination provision. *See, e.g., Chabad Lubavitch of Litchfield Cty., Inc. v. Litchfield Historic Dist. Commission*, 768 F.3d 183, 198 (2d Cir. 2014). For all of the reasons stated in the Equal Protection claim section above, the City violated this provision.

42 U.S.C. § 2000cc(b)(3)(B) provides "no government shall impose or implement a land use regulation that … unreasonably limits religious assemblies, institutions, or structures within a jurisdiction." The prohibitions of UHCO § 1274(f) unreasonably limit religious assemblies within the City. Section 1274(f)(1) prohibits religious assemblies in buildings that were not "originally designed and approved for such use," 1274(f)(2) prohibit the conversion a residence into a place of religious assembly, 1274(f)(3) requires frontage on one of only six streets in the City, and 1274(f)(4) prohibits the inclusion of "sleeping or residential use on any part of the site" of a place of religious assembly. Pursuant to Section 1274(f)(5), "No variance … may be granted without the approval of the PC and the approval of Council, each following public hearings at which the applicant demonstrates a clear benefit to the community and that denial will result in an unnecessary hardship to the applicant." Grand desired to change a music room into a prayer room and was required to obtain not only a SUP, but also multiple variances, which necessitated not one, but two public hearings, each with a very high standard to meet. These requirements, on their face, unreasonably limit places of religious assembly in the City, and accordingly, Section 1274(f) violates RLUIPA as a matter of law.

**X.  The City violated Ohio Code 149.43(C)(1)(b), by failing to promptly prepare and make available for inspection public records that Grand requested (Count XIV).**

29

On July 28, 2021, Grand sent a document to Kelly Thomas requesting documents about him that were in the City's possession. Ex. 34. On August 11, 2021, Grand emailed two counsel persons about that request and inquired why it had not been acknowledged. Ex. 35. Also on that day, Grand sent an email to Ms. Thomas doing the same. Ex. 36. On August 13, 2021, Thomas responded that she would send an email to all associated parties related to fulfilling the request. Ex. 37. On September 30, 2021, Grand followed up again. Ex. 38. On Grand followed up again on June 22, 2022 (Ex. 39) and again on September 2, 2022 (Ex. 40). The City did not respond in any way to the July 29, 2021 request to the City until after the lawsuit was filed on September 8, 2022.

## XI.  CONCLUSION

For the foregoing reasons, summary judgment should be granted in favor of the Plaintiff as to Counts I, II, III, V, VI, VIII, IX, X, XI, XII, and XIV against the Defendant City of University Heights (the "City") and as to Counts I, II, III, V, VI, and XII against the Defendant Michael Brennan.

Dated: January 26, 2024

Respectfully submitted,

/s/ Eden P. Quainton
Eden P. Quainton, Esq.
QUAINTON LAW PLLC
2 Park Ave., 20th Fl.
New York, NY 10016
(212) 419-0575
eden.quainton@quaintonlaw.net

/s/ Jonathan S. Gross
Jonathan S. Gross, Esq.
BAR ID:  MD 1912170138
2833 Smith Ave, Suite 331
Baltimore, MD 21209
(443) 813-0141
jonathansgross@gmail.com

Counsel for Plaintiff Daniel Grand

30

## XII.  CERTIFICATION OF PAGE LIMITATION

I here by certify, pursuant to LCvR 7.1(f), that this case was assigned to the Complex Track (*see* ECF No. 19) and that the foregoing memorandum adheres to the 30 page page limitation set forth in LCvR 7.1(f) for complex cases.

/s/ Jonathan Gross

## XIII.    INDEX OF EXHIBITS

**EXHIBIT 1**: Declaration of Daniel Grand

**EXHIBIT 2:** UNIVHTS001027 Grand email invitation, January 19, 2021

**EXHIBIT 3:** UNIVHTS001093 Ben Feldman facebook message, January 21, 2021

**EXHIBIT 4:** Deposition of Michael Brennan, October 31, 2023

**EXHIBIT 5:** UNIVHTS001331 Brennan email to McConville, January 21, 2021

**EXHIBIT 6:** McConville email to Grand with cease-and-desist letter, January 21, 2021

**EXHIBIT 7:** Grand email to Thomas, January 22, 2021

**EXHIBIT 8:** Grand SUP application, January 22, 2021

**EXHIBIT 9:** Notice of March 4 Planning Commission Meeting

**EXHIBIT 10:** Deposition of Kelly Thomas, December 6, 2021

**EXHIBIT 11:** Change.org Petition

**EXHIBIT 12:** Transcript of March 4, 2021 Planning Commission Meeting

**EXHIBIT 13:** Brennan email with map, February 22, 2021

**EXHIBIT 14:** color copy of map

**EXHIBIT 15:** UNIVHTS001180 premeeting deliberations email, March 4, 2021

**EXHIBIT 16:** Letter in opposition #1, February 16, 2021

**EXHIBIT 17:** UNIVHTS000032 Letter in opposition #2, February 22, 2021

**EXHIBIT 18:** UNIVHTS000035 Letter in opposition #3, March 3, 2021

**EXHIBIT 19:** UNIVHTS001377 Post meeting deliberations email, March 9, 2021

**EXHIBIT 20:** UNIVHTS000604 Grand Letter of Clarity, March 2, 2021

**EXHIBIT 21:** Police CAD system report, March 4, 2021

**EXHIBIT 22:** Siemborski email to McConville post meeting deliberation #1, March 4, 2021

**EXHIBIT 23:** Siemborski email to McConville post meeting deliberation #2, March 10, 2021

**EXHIBIT 24:** Siemborski email to McConville post meeting deliberation #3, March 10, 2021

**EXHIBIT 25:** Brennan public statement with email re: antisemitism, March 12, 2021

**EXHIBIT 26:** UNIVHTS001470 Brennan public statement with opposition, March 12, 2021

**EXHIBIT 27:** Rosenfeld email to Grand, March 17, 2021

**EXHIBIT 28:** Police memorandum, March 22, 2021

**EXHIBIT 29:** Email to Police Uniform Division, March 23, 2021

**EXHIBIT 30:** UNIVHTS000838 Email from Police to Brennan, March 25, 2021

**EXHIBIT 31:** UNIVHTS000849 Scalise email, March 28, 2021

**EXHIBIT 32:** UHCO Chapter 1274

**EXHIBIT 33:** UHCO Chapter 1250

**EXHIBIT 34**: Email

**EXHIBIT 35**: Email

**EXHIBIT 36**: Email