Page 1

- - -

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - -

Daniel Grand,                    )
                                 )
              Plaintiff,          )
                                 )
         vs.                      )  Case No.
                                 )  1:22-cv-01594
City of University Heights,       )
Ohio, et al.,                     )
                                 )
              Defendants.         )

- - -

Tuesday, October 31, 2023

- - -

Videoconference deposition of MICHAEL DYLAN
BRENNAN, taken remotely, via Zoom, pursuant to
notice, commencing at 9:39 p.m., on the above
date, before Deborah C. Furey, Registered
Professional Reporter and Notary Public in and
for the State of Ohio.

- - -

MAGNA LEGAL SERVICES

866-624-6221



Page 2

```
 1
 2   APPEARANCES:
 3          Quaintan Law
            BY: EDEN QUAINTAN, Esq.
 4          BY: JONATHAN GROSS, Esq.
            Two Park Avenue
 5          20th Floor
            New York, New York 10016
 6          212-813-8389
            jonathangross@gmail.com
 7          Representing the Plaintiff;
 8          MAZANEC, RASKIN & RYDER CO,  LPA
            BY:  JAMES CLIMER, Esq.
 9          34305 Solon Road
            Suite 100
10          Solon, Ohio  44139
            440-248-7906
11          jclimer@mrrlaw.com
            Representing the Defendants.
12
13   ALSO PRESENT:
14          Daniel Grand
15          Miguel Banuelos, Videographer
16                       -   -   -
17
18
19
20
21
22
23
24
25
```



Page 3

```
 1

 2                          -  -  -

 3                       I N D E X

 4                          -  -  -

 5   TESTIMONY OF: Michael Dylan Brennan        PAGE:

 6      By Mr. Quaintan                              8

 7                          -  -  -

 8                     E X H I B I T S

 9   PB              Description               Marked:

10   Exhibit 1

11   E-mail chain, 1-21-21, Bates

12   stamped UNIVHTS001027. . . . . . . . . . . . .56

13   Exhibit 2

14   Messenger, Facebook, 1-21-21,

15   Ben Feldman, Bates stamped

16   UNIVHTS001093. . . . . . . . . . . . . . . . .61

17   Exhibit 3

18   E-mail/letter, 1-21-21, Bates

19   stamped UNIVHTS001027. . . . . . . . . . . . .75

20   Exhibit 4

21   Ohio Revised Code 2506.03 Hearing. . . . . . 101

22   Exhibit 5

23   DEFENDANT CITY OF UNIVERSITY

24   HEIGHTS' ANSWERS TO PLAINTIFF'S

25   FIRST SET OF INTERROGATORIES. . . . . . . . .106
```



1

2   ----------------EXHIBITS CONTINUED----------------

3   PB                                              PAGE

4   Exhibit 6

5   Chapter 1274, Houses of Assembly

6   And Social Services Uses,

7   no Bates stamps. . . . . . . . . . . . . . . . 114

8   Exhibit 7

9   E-mail, 1-22-21, no Bates stamp. . . . . . . . 119

10  Exhibit 8

11  Letter, 2-16-21, Maureen Lanza,

12  no Bates stamps. . . . . . . . . . . . . . . . 135

13  Exhibit 9

14  Color-coded partial address map,

15  University Heights, Ohio,

16  no Bates stamps. . . . . . . . . . . . . . . . 140

17  Exhibit 10

18  2/16/21 Godaven, Shomayah Tefillah,

19  Minyan Schedule, no Bates stamps. . . . . . . .143

20  Exhibit 11

21  10/29/23, Godaven, Yankee

22  Stadium, Today's Sponsor,

23  no Bates stamps. . . . . . . . . . . . . . . . 148

24  Exhibit 12

25  E-mail chain, 1-21-21, Bates



1   stamped UNIVHTS001331 through 001332. . . . . .154

2   ----------------EXHIBITS CONTINUED----------------

3   PB                                            PAGE

4   Exhibit 13

5   Letter, 3-2-21, Bates stamped

6   UNIVHTS000604 through 000605. . . . . . . . . .176

7   Exhibit 14

8   E-mail chain, 7-29-21, no

9   Bates stamps. . . . . . . . . . . . . . . . . .179

10  Exhibit 15

11  E-mail chain, 7-29-21, no

12  Bates stamps. . . . . . . . . . . . . . . . . .183

13  Exhibit 16

14  E-mail chain, 3-4-21, no

15  Bates stamps. . . . . . . . . . . . . . . . . .186

16  Exhibit 17

17  Transcript of the minutes of

18  the City Planning Commission

19  Meeting, 4-4-21, University

20  Heights, no Bates stamps. . . . . . . . . . . .201

21  Exhibit 18

22  E-mail chain, 3-17-21, no

23  Bates stamps. . . . . . . . . . . . . . . . . .220

24  Exhibit 19

25  E-mail chain, 3-12-21, Bates



Page 6

1   stamped UNIVHTS0001470 through 0001472. . . . .223

2   ----------------EXHIBITS CONTINUED----------------

3   PB                                              PAGE

4   Exhibit 20

5   E-mail, 3-19-21, no

6   Bates stamps. . . . . . . . . . . . . . . . . .233

7   Exhibit 21

8   E-mail chain, 3-9-21, no

9   Bates stamps. . . . . . . . . . . . . . . . . .238

10  Exhibit 22

11  January 7, 2021 meeting no 2506,

12  no Bates stamps. . . . . . . . . . . . . . . . 243

13  Exhibit 23

14  Community News article, updated

15  9-16-21, no Bates stamps. . . . . . . . . . .263

16                       -   -   -

17                 DEPOSITION SUPPORT INDEX

18                       -   -   -

19  Direction to Witness not to answer:

20       (None)

21  Request for Production of Documents:

22       (None)

23  Stipulations:

24  Page   Line

25       (None)



Page 7

```
 1                      -  -  -
 2            THE VIDEOGRAPHER:  We are now on the
 3       record.  This begins Video Number 1 in the
 4       deposition of Mayor Michael Brennan, in the
 5       matter of Daniel Grand versus City of            09:38
 6       University Heights, Ohio, et al.  In the
 7       United States District Court for the
 8       Northern District of Ohio, Eastern Division.
 9            Today is October 31st, 2023 and the time
10       is 9:39 a.m.                                      09:39
11            This deposition the being taken
12       virtually at the request of Quainton Law.
13            The videographer is Miguel Banuelos with
14       Magna Legal Services, and the court reporter
15       is Debi Furey of Magna Legal Services.           09:39
16            Will counsel and all parties present
17       state their appearances and whom they
18       represent?
19            MR. CLIMER:  My name is James Climer, I
20       represent the defendants.                         09:39
21            MR. QUAINTON:  Eden Quainton for
22       plaintiff Daniel Grand.
23            MR. GROSS:  Jonathan Gross for plaintiff
24       Daniel Grand.
25            THE VIDEOGRAPHER:  Will the court            09:39
```



Page 54

1    opening a shul in his house?                                10:49

2         A.    A resident of the community, Ben

3    Feldman, forwarded me the invitation.  And he said

4    this was going around to numerous people in the

5    community, the orthodox community, and that, you          10:49

6    know, he was -- he thought the city should do

7    something about it, so.

8         Q.    Do you recall when you received that

9    communication from Mr. Feldman?

10        A.    I believe it was January of 2021.  The          10:49

11   exact date I don't recall.

12            If I had the document in front of me, it

13   probably has the date on it.  It would have been

14   shortly before we issued a cease-and-desist letter

15   to Mr. Grand, and that would also have a date on          10:50

16   it.

17        Q.    We're going to look at those documents

18   in a second.

19            Before we look at the documents, you

20   said when you looked at whatever Mr. Feldman had          10:50

21   said -- sent you, it mentioned opening a shul, is

22   that right?

23        A.    Well, the document says what it says,

24   and that's -- I believe that's what it said, but,

25   you know, the communication has been produced in          10:50



Page 55

```
 1    discovery.                                            10:50

 2         Q.    I want to ask you a question, though,

 3    what -- do you know what -- what is a shul to you?

 4         A.    Well, a -- it's any number of things.

 5    You know, it can be a small gathering place, yes,      10:50

 6    you know.  But it can also be, you know, in the

 7    case of like Aleksander Shul, they've called it a

 8    shul, but they've also called it the great shtetl.

 9    And, you know, it's much larger than a shul or a

10    shtetl.                                                10:50

11         You know, in the case of Aleksander

12    Shul, I was in the basement of that building at

13    one time with at least hundred 120 or 130 other

14    people.

15         And, you know, so -- so in my             10:51

16    experience, a shul has come to mean, you know,

17    that which is a small gathering for a small group

18    of folks or it can be a very large group.  And a

19    shul is interchangeable with a school and/or a

20    synagogue, depending on context.                      10:51

21         Q.    So if a shul can be a small gathering,

22    what was it that made you think that Mr. Grand's

23    use of the word shul was anything other than a

24    small gathering?

25         A.    Well, because he built out his home on a    10:51
```



Page 56

```
 1    triple lot in our community.                        10:51

 2           We knew that he had built what had been

 3    represented to us as a music room, which was

 4    fairly large.  I had never been inside of it, but

 5    I had seen it from the street.                      10:52

 6           It seemed as if there would be capacity

 7    in his house for a large group of people.  And

 8    there was this seemingly very open invitation to

 9    amass a large group of people for prayers.  I

10    didn't see anything here that suggested a small    10:52

11    operation.

12       Q.   All right.  Let me pull up what I'm

13    going to mark as -- I think we'll call these just

14    P and then B, so just PB1.  Just give me a second

15    to get these documents up.                          10:52

16               (Exhibit 1 PB, E-mail chain,

17               1-21-21, Bates stamped

18               UNIVHTS001027, was marked for the

19               purposes of identification.)

20       Q.   Okay.  Let me share my screen here.         10:53

21    This is going to be PB1, and this is 21.01.19 in

22    the documents that Jonathan circulated.  And I

23    just want you to take a minute and look at these

24    documents?

25       A.   It's too small for me to read.  Is there    10:53
```



Page 57

```
 1    a way to blow that up?                                    10:54
 2         Q.    There is.  Hold on a second.  Is that
 3    better?
 4         A.    That is better.
 5         Q.    If you could just take a minute to look        10:54
 6    at that letter and let me when you've had a chance
 7    to look at it.
 8         A.    Okay.
 9         Q.    Do you recognize this document?
10         A.    I do.                                          10:54
11         Q.    And what is it?
12         A.    Well, it's some e-mails.  One is the --
13    the bottom part is the e-mail I believe that was
14    also the invitation that had been forwarded to me
15    by one of the residents who had expressed concern      10:55
16    about this shul opening up.
17              And then there was this message here
18    from Mr. Grand.  I believe he forwarded this to
19    me.  I'm cc'd on it.  I believe this was after the
20    cease-and-desist letter, yeah.  This appears to be     10:55
21    that.
22         Q.    Okay.  So the -- the bottom half of this
23    document is a document that has the top of it on
24    1-19, 2021, 11:37 p.m., Daniel Grand wrote.  So
25    that would be almost at midnight on January 19th.      10:56
```



Page 58

```
 1              And this document was -- do you         10:56

 2    recognize this document, the bottom half?  And

 3    that you said was forwarded to you by Mr. Feldman?

 4        A.    Well, Mr. Feldman -- what Mr. Feldman

 5    forwarded to me was through Facebook Messenger.    10:56

 6              I don't know if that date that is listed

 7    there at the top was the e-mail that had gone

 8    through, but it is probably about the time that it

 9    was sent to us for probably the next day.  Because

10    when I got this, I sent it to our law department   10:56

11    right away.

12              We had also been -- you know, this

13    hasn't come up yet, but we had also been at the

14    same time responding to resident concerns on

15    Churchill Boulevard about a shul that was opening  10:57

16    in a house over there, where some folks had

17    purchased a house of Churchill Boulevard for the

18    purpose of opening up a shul.  And nearly every

19    resident on the street signed a petition asking

20    the city to do something about it.                 10:57

21              So, you know, in the context here of

22    everything else that was going on among people

23    opening up shuls or synagogues in residences, I

24    had Aleksander Shul, which, you know, had started

25    in 2019, as far as them coming before the planning  10:57
```



Page 59

```
1    commission.  We had given them 90 days, they        10:57
2    hadn't come back after their February meeting in
3    2020.  So we had that outstanding matter.
4            Then we had the shul on Churchill that
5    was opening, and we ended up in court over that.     10:58
6            And then we had Danny Grand, apparently
7    opening up a shul of his own in his house over on
8    Miramar Boulevard.
9            So there was a lot going on at that
10   time, but --                                         10:58
11      Q.   As you said about one of my questions,
12   there's a lot to unpack in what you just said.
13           But let me try to just zero in on this
14   e-mail for a second.
15      A.   Sure.                                        10:58
16      Q.   Did you receive a copy of this, the
17   e-mail, the bottom half here that's on the screen
18   or did you just receive the Feldman Facebook post,
19   which we'll get to in a second?
20           I just want to know if you received this     10:58
21   actual e-mail, which appears to be the invitation
22   that Mr. Grand sent to some of his friends.
23           Did you receive that document itself?
24      A.   Well, I have received it right here.  I
25   mean, I have received it here and I received it      10:59
```



Page 60

```
 1    from Mr. Feldman.  I don't think Mr. Grand          10:59
 2    forwarded it to me originally.
 3         Q.    Okay.  So it was part of this e-mail
 4    chain that is on the screen.  But is it fair,
 5    before you received the e-mail from Mr. Grand        10:59
 6    dated January 21st, 11:17 p.m. on top, had you
 7    received a copy of the bottom portion of this
 8    document?  Let's just call this the invitation,
 9    for lack of a better word.  Had you received a
10    copy of this invitation from any other source        10:59
11    before receiving Mr. Grand's e-mail, dated January
12    21st?
13         A.    Yes, I did.
14         Q.    How did you receive that?
15         A.    From Ben Feldman.                          11:00
16         Q.    So Ben Feldman made a Facebook post and
17    he also sent you the invitation itself?
18         A.    He sent me it.  It wasn't a Facebook
19    post, it was on Facebook message.
20         Q.    Okay.                                      11:00
21         A.    And he -- I think he copy/pasted the
22    contents of the e-mail into Messenger.
23         Q.    Okay.  Let's go out of this -- we may
24    come back to this -- for a second.
25              MR. QUAINTON:  Can we just go off the       11:00
```



```
                                                           Page 61
1        record for one second?                           11:00

2              THE VIDEOGRAPHER:  Going off the record

3        at 11:00 a.m.

4                   (Recess taken from 11:00 a.m. to

5        11:18 a.m.)                                       11:00

6              THE VIDEOGRAPHER:  Back on the record.

7        11:18 a.m.  Go ahead.

8   BY MR. QUAINTON:

9        Q.    Okay.  I'm going to pull up a document

10   that I would like the reporter to mark as PB2.        11:19

11   And this is identified as 21.01.21 a in the folder

12   of documents.  And let me try to make sure that

13   this is the right size, so you can see the whole

14   document.

15                   (Exhibit 2 PB, Messenger, Facebook,   09:44

16                   1-21-21, Ben Feldman, Bates stamped

17                   UNIVHTS001093, was marked for the

18                   purposes of identification.)

19        Q.    Take a chance to look at this document

20   and let me know if you can read it.                   11:20

21              And then, when you've looked through

22   it -- actually, there's -- well, just look through

23   that and then I may have to resize it.  Let me

24   know when you're done.

25              MR. CLIMER:  Enlarge it.  Scroll it.       11:20
```



Page 62

```
 1              THE WITNESS:  Yeah, I mean, could we do      11:20
 2       that?  That would be a lot easier.
 3       Q.    Yeah, let's do that.  That's fine.
 4       A.    Okay.
 5       Q.    So, is that size good?                        11:20
 6       A.    That's much better.  Thank you.
 7       Q.    Okay.  Let me know when you get to the
 8       part where it says, "Star-K."
 9       A.    Star-K, I think I'm ready.
10       Q.    Do you recognize what you've just had a       11:22
11       chance to look through?
12       A.    Yes.
13       Q.    And what is that?
14       A.    It is the message I received from Ben
15       Feldman regarding the opening of the synagogue     11:23
16       Shomayah Tefillah at 2343 Miramar Boulevard --
17              (Zoom interference.)
18       A.    -- it is the -- it is the invitation
19       forwarded to me from Ben Feldman, announcing the
20       opening of the Shomayah Tefillah -- Tefillah       11:23
21       synagogue or shul at 2343 Miramar Boulevard, the
22       Daniel J. Grand residence.
23       Q.    You say this is a message that informs
24       people of the opening of a synagogue.
25              Where do you see that this -- that           11:23
```



Page  63

```
 1    anything in here from Mr. Grand indicates that          11:23

 2    there will be a synagogue opening?

 3          A.    Well, it says, "shul."

 4          Q.    But that's not my question.

 5          Did it say anything about a synagogue in          11:24

 6    anything from Mr. Grand?

 7          A.    I don't see the word synagogue, if

 8    that's what you're asking.  I see the word shul.

 9          Q.    Does it say anything about a synagogue

10    specifically?                                           11:24

11          A.    I don't see synagogue in the part that's

12    on the screen here.  I see what's described as the

13    activities of a synagogue.

14          Q.    So let's start -- so there are two parts

15    to this.                                                11:24

16          A.    And there's references there to

17    synagogues.

18          Q.    Yeah.  Let's just -- hold on, let me ask

19    the question.

20          There are two parts to this document.            11:24

21    There's a first part, which begins, "Mayor

22    Brennan, Hello!"

23          And it's a little bit unclear, but I

24    think the context makes it clear, there's one long

25    block paragraph that ends, "I can send those too        11:24
```



Page 64

1    if you need."                                                11:24

2              Do you see that long block paragraph?

3         A.    I see that.

4         Q.    And that appears to be the actual

5    message from Ben Feldman, correct?                           11:25

6         A.    Yes, that appears to be Ben Feldman's

7    message.

8         Q.    And then, "You are cordially invited to

9    join us this Shabbos for the inauguration of the

10   Shomaya Tefillah Beis Hakeneset."                            11:25

11             That appears to be a message not from

12   Ben Feldman, but the beginning of a message from

13   Mr. Grand, is that correct?

14        A.    I would agree with that.

15        Q.    So just looking at the message from --          11:25

16   not the message from Mr. Feldman -- this message

17   from Mr. Grand begins, "You are cordially

18   invited."

19             That section does not mention a

20   synagogue, correct?                                          11:25

21        A.    Right.  It's in the other section.

22        Q.    Now, I think you testified earlier that

23   you know the word shul can mean -- I think your

24   testimony was, it can mean a small gathering or, I

25   think you said a great shtetl, those are the                 11:26



Page 65

```
 1    two -- the two poles of what you understand by        11:26

 2    shul.

 3            Ignoring what Mr. Feldman wrote, just

 4    looking at what Mr. Grand wrote, do you see any

 5    invitation to daily prayers?                          11:26

 6        A.    Daily prayers, no.

 7        Q.    Do you see three prayer dates that are

 8    mentioned, or three prayer times that are

 9    mentioned?

10        A.    I do see where those are mentioned here.    11:27

11        Q.    Those are called davening times.

12            You understand deveining means praying,

13    correct?

14        A.    That's what I understand, yes.

15        Q.    So there would be one davening time on      11:27

16    Friday evening, one davening time on shabbos in

17    the morning -- you understand shabbos is the same

18    thing as shabbat or the sabbath -- you understand

19    that, right?

20        A.    I do.  Thank you.                           11:27

21        Q.    And then there's a prayer time on

22    shabbat evening at 5 p.m.

23            Do you see that?

24        A.    I see that.

25        Q.    So there are three prayer times in all,     11:28
```



Page 66

```
 1    that are listed here.                                    11:28
 2            When you see those three prayer times --
 3    are you familiar with the prayer practices of
 4    orthodox Jews generally?
 5        A.    To some extent.  I'm not orthodox          11:28
 6    myself.
 7        Q.    But you understand that orthodox Jews
 8    generally do pray multiple times during the day,
 9    every single day of the week.  You're familiar
10    with that, correct.                                     11:28
11        A.    I am familiar that there are daily
12    prayers, yes.
13        Q.    And there's no invitation here to daily
14    prayers, correct?
15        A.    There is no invitation here to daily     11:28
16    prayers.
17        Q.    If you go down to the bottom of this
18    e-mail, the next-to-the-last line, it says, "we're
19    pushing hard to make sure we have a minyan right
20    from the start."                                        11:28
21            Are you familiar with the word "minyan"?
22        A.    I am.
23        Q.    And so what is a minyan?
24        A.    A minyan is a quorum of ten Jewish men.
25        Q.    So if he's pushing hard to get ten       11:29
```



Page  67

```
 1    people, does that sound to you like a great          11:29

 2    shtetl, in your word?

 3         A.    Well, a great shtetl is a reference to

 4    Aleksander Shul, that's the nickname they've given

 5    themselves.  I don't know if that was applicable     11:29

 6    here.  That's Aleksander Shul's name.

 7         Q.    Sorry.  Does this sound to you -- when

 8    you see, "we're pushing hard to make sure we have

 9    a minyan," which is we're trying hard to have ten

10    people, does that sound to you like this is of the   11:29

11    scope or scale of the Aleksander Shul?

12         A.    That one line?

13         Q.    Yes.

14         A.    I don't know.

15         Q.    Well, if he's pushing hard to make sure    11:30

16    he has ten people, it sounds like he's not sure if

17    he's even going to get ten people to come to his

18    house, correct?

19         A.    I don't know that I would agree.  You

20    know, a certain amount of enthusiasm to have a       11:30

21    good turnout.

22              I've organized events, I will describe

23    something as, you know, pushing hard to have good

24    attendance.

25              I mean, it also says here, "Please         11:30
```



Page 68

```
 1    spread the word to whomever you feel might be           11:30

 2    interested in coming."

 3             That sounds pretty broad to me.

 4        Q.   Okay.  But the goal here is to have --

 5    to push hard to get a minyan of ten people.             11:30

 6             The goal -- that's -- do you understand

 7    what the e-mail -- what the message here is

 8    saying, we're pushing to make sure we have a

 9    minyan?

10             So let's move on.  Let's go now to the         11:31

11    characterization of this message by Mr. Feldman.

12             And does Mr. Feldman mention opening a

13    synagogue in his message to you?

14        A.   Yes, it says that here.

15        Q.   And, in fact, he mentions the word             11:31

16    synagogue probably -- mentions the word synagogue

17    four times:  "Opening a synagogue" on Line 5;

18    "makeshift synagogues," on Line 7; "official

19    synagogues" on the next line; he talks about "pop

20    up synagogues in the neighborhood."                     11:32

21             And my question is:  Did you consider --

22    when you received this message from Mr. Feldman,

23    it has two pieces, it has Mr. Feldman's commentary

24    and an invitation from Danny Grand -- did you

25    focus on Mr. Feldman's commentary or on                 11:32
```



Page 69

```
 1    Mr. Grand's message itself?                              11:32

 2         A.    I read all of it, but certainly I think

 3    I gave Mr. Feldman some credence here on his

 4    observations.  And these are consistent with other

 5    complaints people have made about residential          11:33

 6    shuls, he calls them "non zoned makeshift

 7    synagogues, pop up synagogues."

 8               Those aren't terms I usually use, but

 9    these are terms I do hear.

10               And, you know, we've had a number of         11:33

11    these in University Heights, and in the context of

12    what is going on with the one on Churchill and

13    what had gone on with Aleksander Shul, it appeared

14    that, you know, Mr. Feldman here, who is part of

15    the Jewish community, describes it this way, that      11:33

16    seems at least plausible to me and worthy of

17    attention and investigation.

18         Q.    So Mr. Feldman's characterizations

19    seemed plausible and worthy of investigation.

20               So then did you investigate               11:34

21    Mr. Feldman's claims?

22         A.    Well, you know, what we did was we

23    sought to contact Mr. Grand.

24         Q.    Okay.  So let's just look at the timing

25    here, if we could.                                     11:34
```



Page 70

```
 1              This message, the upper left-hand          11:34
 2    corner, it says "1-21-2021."
 3        A.    I see that.
 4        Q.    And then the message itself says "12:14
 5    p.m."                                                11:34
 6        A.    I see that.
 7        Q.    Okay.  So we're going to do an
 8    investigation.
 9              And I think you said earlier that your
10    investigation of Aleksander Shul, it's              11:34
11    situation -- that lasted about a year, is that
12    right?
13        A.    No, we took a year to try to get a
14    meeting.
15        Q.    Okay.  It took a year to try to get a     11:35
16    meeting, fair enough.
17              And this is 12:14 p.m.  And I think you
18    said that these complaints were plausible -- I'm
19    sorry.  We have to start over again.
20        A.    Okay.                                      11:35
21              MR. GROSS:  If you're having technical
22        difficulties, I can share a screen.
23              MR. QUAINTON:  That's fine.  It's
24        something by mistake and we're good.  Let me
25        just put that back on the screen.              11:36
```



Page 71

```
1   BY MR. QUAINTON:                                          11:36

2       Q.    Okay.  All right.  So 12:14 p.m. on

3   1-21, 2021, and you said the allegations that

4   Mr. Feldman made were plausible and warranted an

5   investigation.                                           11:36

6             So I just want you to walk me through

7   the steps you took to conduct an investigation.

8       A.    I said they warranted investigation, you

9   know, so -- but --

10      Q.    I thought you said with Aleksander Shul,   11:36

11  there was an investigation.

12            I'm just talking specifically with

13  Mr. Grand, where you said this allegation by

14  Mr. Feldman was plausible.

15            MR. QUAINTON:  Actually, Reporter, can    11:36

16      you go back to that section of the transcript

17      where the mayor says it's plausible, just so I

18      don't put words in his mouth?

19                 (Record read.)

20  BY MR. QUAINTON:                                      11:39

21      Q.    So, in our discussions you've -- you

22  struck me as very thorough, Mr. Mayor.  I'm not

23  saying that to butter you up, it's just the way

24  you struck me.

25            My question is:  When you said that        11:39
```



Page 72

```
 1    Mr. Feldman's claims were plausible and worth         11:39
 2    attention and investigation, what steps did you
 3    take to investigate Mr. Feldman's claims?
 4         A.    Well, you know, the step that was taken
 5    here was -- you know, we've got these davening       11:39
 6    times that are coming up on shabbos, and I'm not
 7    immediately recalling what day of the week the
 8    21st is.  But it seemed to me, especially in light
 9    of what we had just dealt with on Churchill
10    Boulevard, with a shul that was, you know, opening   11:40
11    up there, and, you know, residents asking us there
12    to take action, that this was something that
13    we're -- if we wanted to contact Mr. Grand about
14    this before these davening times, that we needed
15    to, you know, act quickly to reach out to           11:40
16    Mr. Grand.
17              And reaching out to Mr. Grand, you know,
18    whether we want to call that investigation or just
19    taking action or being responsive to a resident,
20    you know, this is something where attempting to     11:40
21    contact Mr. Grand regarding our concern here
22    wasn't working.
23         Q.    Did you attempt to reach out to
24    Mr. Grand?
25         A.    Oh, we did, we sent him a letter and I    11:41
```



Page 73

1   also tried to call him.                                              11:41

2       Q.    Sorry, but let's just do things in time.

3           So I think we'll get to the letter in a

4   sec.  I don't think the letter was about

5   investigation.                                                        11:41

6           So it's 12:14 on the 21st, and you've

7   got this allegation by Mr. Feldman that there's a

8   pop-up synagogue or makeshift synagogue or bad

9   synagogue or some kind of synagogue to cause a

10  problem, and then you've got an invitation from      11:41

11  Mr. Grand inviting people to pray on shabbos eve.

12          So I guess my question was:  Did you

13  attempt to contact Mr. Grand right after you

14  received this communication from Mr. Feldman?

15      A.    Minute to minute, I don't recall exactly     11:42

16  when I contacted Mr. Grand or in what precise

17  order.  I know I went to a voicemail.  But it

18  seemed to me that we needed to clear up some

19  miss -- you know, whatever the misunderstanding is

20  that you can't just open a house of worship in       11:42

21  University Heights without first going through and

22  seeking and obtaining a special-use permit.

23      Q.    I understand that.

24      A.    He's describing having services and the

25  kinds of -- different kinds of services, you know,    11:42



Page 74

```
 1    This week it will be Ashkenaz, you know, next week    11:42

 2    it may be something else.  So this seems like

 3    something that's organized and ongoing, and not,

 4    you know, informal.

 5        Q.    Okay.  You used the words "seems like."    11:43

 6    I guess what I'm trying to understand is what you

 7    did to determine what this was really like.

 8            I mean, you read this and it says he's

 9    trying to get a minyan of ten people.  And he

10    mentions praying on three times, once on Friday    11:43

11    evening, two times the following day.

12            And I think you said that you left a

13    voicemail for Mr. Grand, is that right?

14        A.    I did leave a voicemail for Mr. Grand.

15        Q.    Okay.  And then did you speak to your    11:43

16    law director about this?

17        A.    Yes, yes, I did.

18        Q.    I'm not going to ask you about the

19    contents of that discussion.

20            Did you attempt to speak to the rabbi    11:44

21    who's mentioned here, Rabbi Rosskam?

22        A.    I did not know Rabbi Rosskam to know how

23    to contact him.  I don't even have a first name

24    here.

25        Q.    That wasn't my question.    11:44
```



Page 75

```
 1              Did you attempt to find out what Rabbi        11:44

 2    Rosskam's first name was?

 3         A.    No.

 4         Q.    But you spent a year trying to find --

 5    to get in touch with Rabbi Denciger, right?           11:44

 6         A.    Well, in that instance the Aleksander

 7    Shul was a longstanding ongoing concern, and this

 8    is something that appears to be opening and has

 9    not yet actually started, apart from the

10    announcement.                                          11:45

11         Q.    So you want to shut it down before

12    there's any prayer at all, is that fair?

13         A.    No, no, that's not fair.  I mean, I

14    don't like that characterization.

15              What I would say -- well, go ahead and       11:45

16    ask me another question.

17         Q.    Okay.  You don't like the phrase shut it

18    down, so let's look at another document then.

19         A.    Okay.

20         Q.    Okay.  So I'm going to mark the next        11:46

21    document as, I think, PB3.  And this is in the

22    folder that was previously submitted marked as

23    21.1.21 c.

24              (Exhibit 3 PB, E-mail/letter,

25              1-21-21, Bates stamped                       11:46
```



Page 76

```
 1                     univhts001027, was marked for the          11:46

 2                     purposes of identification.)

 3        Q.     I guess this is the same thing, we'll

 4    try to scroll through this.

 5                     Take a look at this, Mr. Mayor, and tell    11:46

 6    me when you've got to the end of this paragraph.

 7                     You've read that page?

 8        A.     Yes.

 9        Q.     Are you familiar with the document

10    that's marked as PB3?                                        11:47

11        A.     I am.

12        Q.     And what is it?

13        A.     It is a cease-and-desist letter sent on

14    behalf of the city to the Grands, and to the

15    synagogue or shul, by our city law department,              11:47

16    Mr. McConville, in particular.

17        Q.     Have you reviewed this letter before it

18    was sent out?

19        A.     I don't know if I did or not.

20        Q.     So it's possible you did not review this         11:48

21    letter before it went out?

22        A.     It's possible.  I don't remember.

23        Q.     How would that be possible?

24        A.     How would it be possible for the law

25    director to send a letter?                                   11:48
```



Page  77

```
 1        Q.    Well, the law director is sending a         11:48

 2    cease-and-desist letter.

 3              So did you ask the law director to

 4    prepare the cease-and-desist letter?

 5        A.    The law director and I had a                11:49

 6    conversation about this matter.

 7              THE WITNESS:  Should I talk about that

 8        conversation?

 9              MR. CLIMER:  No.

10              (Court reporter clarification.)           11:49

11              MR. CLIMER:  I have advised the witness

12        not no answer concerning the contents of his

13        conversation with Mr. McConville, to the

14        extent that conversation was for the purposes

15        of obtaining legal advice.                       11:49

16        Q.    Well, as mayor of the City of University

17    Heights, if you make a decision to send a -- that

18    a cease-and-desist letter should be sent to

19    Mr. Grand?

20        A.    I believe that it was an appropriate        11:50

21    thing to do.

22        Q.    That wasn't my question.

23              Did you, as the mayor, make a decision

24    that a cease-and-desist letter should be sent to

25    Mr. Grand?                                           11:50
```



Page 78

```
 1        A.    After consultation with our law            11:50

 2   director, I believed that this was the appropriate

 3   step and I believe I authorized it, yes.

 4        Q.    This letter says -- I'm looking at the

 5   second paragraph, "To the intent (sic) you intend     11:50

 6   to use the Premises" -- "as a place of religious

 7   assembly" -- "the City demands that you

 8   immediately cease and desist any such operations."

 9            Do you see that?

10        A.    I see that.                                 11:51

11        Q.    Did you agree with that?

12        A.    Well, I agree that that would be a

13   correct statement, that the city would want

14   Mr. Grand, to the extent that he was planning on

15   operating a house of worship, that that needs to      11:51

16   cease and that he desist from doing that.

17        Q.    This says a -- I'm just looking at the

18   words here.  This says, "a place of religious

19   assembly."

20            The city demands you immediately cease        11:51

21   using the premises, 2343 as "a place of religious

22   assembly."

23        A.    Well, I didn't write the letter and I

24   think it speaks for itself.  You know, the

25   operation of a shul or synagogue is prohibited         11:52
```



Page 79

```
 1    without a special-use permit.                       11:52
 2        Q.    Well, when we were talking before,
 3    looking at Mr. Grand's invitation, where he's
 4    inviting people prospectively to pray at his house
 5    on shabbos, and I said you were trying to shut       11:52
 6    that down before it happened, and you said no, no,
 7    I wouldn't agree with that.
 8        A.    I didn't agree with your
 9    characterization.
10        Q.    Okay.  Well, let me ask you that.          11:52
11        A.    Yeah, okay.
12        Q.    Having read this letter, when you had
13    Mr. Grand's invitation that he have a minyan at
14    his house for prayer on shabbos, you were trying
15    to shut that down, right?                            11:53
16             MR. CLIMER:  Objection.  I object.
17             Go ahead.
18             THE WITNESS:  Yeah, I think you're
19        misstating my testimony and you're
20        mischaracterizing what I said.                   11:53
21             You know, I believed that Mr. Grand was
22        opening a synagogue.  He had a name for it.
23        He has registered that name as a synagogue.
24             And, you know, Mr. Feldman believed it
25        was a synagogue.  I tended to believe           11:53
```



Page 80

```
 1        Mr. Feldman was more knowledgeable about it      11:53
 2        than I was.
 3             And given that the opening of the
 4        synagogue appeared to be this shabbos, getting
 5        a letter out now, before shabbos, seemed        11:53
 6        crucial.
 7        Q.    You said that Mr. Grand had registered
 8   the name as a synagogue, what are you referring
 9   to?
10        A.    I believe Mr. Grand has registered       11:54
11   that -- the name Shomayah Tefillah Beis Hakeneset,
12   I think with the State of New York, as a going
13   concern.
14        Q.    And your understanding is he has
15   registered that name as a synagogue?               11:54
16        A.    I don't have the legal filing in front
17   of me, but he has registered the name.  And I
18   think the filing reflects it being used as a
19   synagogue and/or school or place of religious, you
20   know, teaching and observation.  But I'm going on   11:54
21   memory here.  Whatever the document says, it says.
22        Q.    Before --
23        A.    I've never heard of registering a name
24   for an informal gathering, so I'll leave it that.
25        Q.    Do you recall what time of day this     11:54
```



Page 81

```
 1    letter went out?                                      11:54

 2         A.    No.  I mean, it had to be in the

 3    afternoon, though, or the evening, because we

 4    didn't even get Mr. Feldman's message until, you

 5    know, the afternoon of that day.                      11:55

 6         Q.    Right.  So you received a message from

 7    Mr. Feldman in the afternoon of that day, and then

 8    sometime in the evening -- but just to be clear,

 9    you did authorize Mr. -- you did authorize the

10    author of this letter, who is a Mr. McConville,      11:55

11    you did authorize him to send this letter,

12    correct?

13         A.    Yes.  He was not acting on his own, no.

14    I do approve of this letter being sent.

15         Q.    Okay.                                      11:55

16         A.    I do not recall whether I read it before

17    it was sent.

18         Q.    Did you speak to Mr. Grand before this

19    letter was sent?

20         A.    I did speak with Mr. Grand, I believe on   11:56

21    this day.  I don't know if he would have received

22    the letter or if it was sent prior to my speaking.

23         Q.    When you spoke to Mr. Grand, what's your

24    recollection of that conversation?

25         A.    My recollection is that Mr. Grand tried    11:56
```



Page 82

```
 1    to minimize what he was doing, and tried to                11:56

 2    characterize it as something different than what I

 3    saw in the invitation.

 4              And I made clear to him that we have

 5    requirements in the City of University Heights,            11:56

 6    that one seek and obtain a special-use permit

 7    before operating a house of worship, yeah, in our

 8    city.

 9         Q.   Well, you said he was trying to minimize

10    what he was doing.  It sounds like your mind was           11:57

11    already made up; is that fair?

12         A.   No, I wouldn't quite put it like that,

13    but I would say that I didn't find Mr. Grand

14    credible.

15         Q.   Okay.  So why is it that you didn't find         11:57

16    him -- so let's go back, without sort of the

17    characterizations he was trying to minimize.

18              Just can you tell me specifically what

19    you recall him saying was his intention?

20         A.   Well, he was describing that he was just         11:57

21    trying to get some people together at his house to

22    pray, but he was withholding that he had invited

23    the community to come over to the opening of the

24    synagogue, to come meet the rabbi and be a part of

25    an ongoing concern with regular weekly services.          11:58
```



Page  83

```
 1              I had the benefit of the invitation from    11:58

 2    him.  I didn't tell Mr. Grand I had that.  And

 3    when I heard him minimize what he was doing, I

 4    believed he was being dishonest with me.

 5       Q.    So you interpreted his letter or his        11:58

 6    invitation as an invitation to the community?

 7       A.    Yes.

 8       Q.    Why did you think that?

 9       A.    Because the invitation tells people to

10    share this with everybody who might be interested.   11:58

11       Q.    Did you know who this e-mail was sent

12    to, the invitation was sent to?

13       A.    At that time, I did not know everybody

14    who had received the invitation.

15       Q.    Did you seek to find out who had            11:59

16    received the invitation?

17       A.    When?  At that moment?  I was just

18    trying to --

19       Q.    After you received --

20              (Cross-talking.)                            11:59

21       A.    -- any misunderstanding over whether or

22    not you can open a synagogue without a permit in a

23    day or two prior to when the opening is.

24              I don't remember exactly which day of

25    the week was the 21st, but it seemed to me that we   11:59
```



Page 84

```
 1     should be responsive and acting timely with          11:59
 2     respect to an upcoming shabbos, an invitation to
 3     attend shabbos services, you know, later that same
 4     week.
 5          Q.    Okay.  I'm just trying to get to what      12:00
 6     you actually knew.
 7                Did you know who had received
 8     Mr. Grand's invitation?
 9          A.    I do not know the extent of who had it.
10     I think Mr. Feldman had it.  He mentioned it was      12:00
11     discussed on his Groveland group.  Groveland is a
12     street in the City of University Heights.
13          Q.    Did you ask Mr. Feldman whether
14     Mr. Feldman had forwarded this invitation to other
15     people or whether Mr. Grand had forwarded -- had      12:00
16     sent the invitation to people on Groveland?
17          A.    I don't think I asked any of that.
18          Q.    Did you call Mr. Feldman after you
19     received the message from Mr. Feldman?
20          A.    I don't recall.                            12:01
21          Q.    Did you send him an e-mail asking what
22     he meant by pop-up synagogue or makeshift
23     synagogue?
24          A.    I don't think so.
25          Q.    You just took him at his word?            12:01
```



Page 85

```
 1        A.    That may be.  I don't know if we spoke      12:01
 2   on the phone.  We might have.  He might have
 3   called me.
 4        Q.    Did you ask Mr. Grand whether he was
 5   planning on opening a synagogue?                       12:01
 6        A.    At that point I was telling Mr. Grand
 7   that he cannot open a synagogue.
 8        Q.    Why did you think he was opening a
 9   synagogue?
10        A.    Because Mr. Feldman believed that he was    12:02
11   opening a synagogue.
12              And it appeared to me, from what was
13   described in the message, the invitation that was
14   forwarded to me, that this was consistent with the
15   formal opening of a synagogue with a name.             12:02
16              And if it's not a synagogue, then that
17   was something that could be determined later.  But
18   in the meantime, I didn't want there to be any
19   confusion about the fact that the city cannot
20   simply -- does not simply abide having houses of       12:02
21   worship opened without going through the process
22   that involves having asking the board for a
23   special-use permit.
24        Q.    Okay.  Let me just step back for a
25   second, because I -- Brennan, is that a Catholic       12:02
```



Page 86

```
 1    name?                                                    12:02

 2         A.    It's an Irish name.

 3         Q.    So are you Catholic?

 4         A.    I was raised Catholic.

 5         Q.    The reason, my father was Catholic and        12:03

 6    he died recently.

 7         A.    I'm sorry to hear that.

 8         Q.    He was sick for quite some time.  We had

 9    a priest come over to his house to administer the

10    Eucharist.                                               12:03

11            If my mother sent an e-mail and said,

12    please come to our house on Sunday to share the

13    Eucharist with Tony -- that's my dad's name --

14    would you have sent her -- if she had lived in

15    your community, would you have sent her a letter         12:03

16    saying you must immediately cease and desist from

17    any such attempts?

18         A.    No, I don't think I would have.

19         Q.    And why not?

20         A.    Because I don't think there's anything        12:03

21    there to indicate a regular practice of opening a

22    house of worship in your mother's and father's

23    home.

24         Q.    So what was it that made this seem like

25    a regular house of worship, in Mr. -- not in             12:04
```



Page 87

```
 1    Mr. Feldman's characterization -- just get        12:04
 2    Mr. Feldman's characterization, which is just pure
 3    hearsay, out of your mind, and look at Mr. Grand's
 4    invitation.
 5            What in that invitation makes you think    12:04
 6    that this was a regular house of worship that
 7    required a special-use permit?
 8        A.    He referred to weekly services.
 9        Q.    Okay.  Let's go back to my mother is
10    saying we'd like you to come and share the         12:04
11    Eucharist with Tony on Sundays, no one knew how
12    long he was going to live.  In fact, he lived
13    about a year in that condition.
14            With a regular weekly administering of
15    the Eucharist in my parents' home, with a priest   12:04
16    and other people coming by on a regular basis, as
17    a mayor, would you have shut that down?
18        A.    I don't know that that's -- that's a
19    very interesting hypothetical.  I mean, you were
20    describing his last rights, I thought.  And, you   12:05
21    know, I'm not aware of last rights being given on
22    a weekly basis, so.
23        Q.    Sorry.  Just to be clear, my
24    hypothetical -- and I'll move on from this -- but
25    it was not last rights, it was just a regular      12:05
```



Page 88

```
 1    administration of the Eucharist by a priest, with     12:05
 2    a small group of people in the living room.
 3    That's what it was.
 4            My question was:  Had an e-mail gone out
 5    saying we would like you to come on Sundays to        12:05
 6    share the Eucharist with Tony in our living room,
 7    whether you would have sent a cease-and-desist
 8    letter to prevent that, had that happened in
 9    University Heights?
10    A.    Based upon the limitations you had             12:06
11    described, I don't think so.
12    Q.    So let's -- okay.  We'll come back to
13    this.  I would like to move on to another topic.
14            In the cease-and-desist letter the
15    author, I guess it's Mr. McConville, says that a     12:06
16    special-use permit under 1274 will be required.
17            Do you see that?  Did you see that
18    before I took it down?
19    A.    I did see that.
20    Q.    Okay.                                           12:06
21    A.    It has disappeared.
22    Q.    So I don't need to put that back up.
23            What I would like to do, though, is --
24    I'm just going to -- I would like to shift gears a
25    little bit here and talk about the planning          12:07
```



Page 89

1    commission meeting that would occur a couple          12:07

2    months later.

3              And I just want to go back to the

4    cease-and-desist letter just for a second.  I'm

5    going to pull this up.  Yeah, I'm just pulling up     12:07

6    again PB3, and I'm looking at the last page here.

7              And it says, "You may make application

8    to the City's Planning Commission for a Special

9    Use Permit."

10             Before we get to that, did you consider      12:08

11   telling Mr. Grand, either in conversations with

12   him or before this letter went out, that if he

13   kept the prayer on shabbos to a small group of

14   people, he would not need a special-use permit?

15        A.   No, I don't -- no, I did not.               12:09

16        Q.   And do you believe that if he had

17   kept -- if he were to keep shabbos prayer at

18   his -- in a room in his home to ten or so people,

19   that he would not need a special-use permit?

20        A.   Yeah, I would agree with that.  I would     12:09

21   agree that a small prayer gathering, even a small

22   regular prayer gathering is not the same as a shul

23   or a synagogue, and not the city's business at

24   that point.

25        Q.   Okay.  So a small prayer -- and I think     12:09



Page 90

```
 1    you said that you understand a shul can be a small      12:09

 2    prayer gathering, correct?

 3         A.    Apparently, it can.

 4         Q.    That was your earlier testimony, yeah.

 5               So a shul that would be a small prayer        12:10

 6    gathering would not require a special-use permit,

 7    and yet you didn't -- you jumped immediately to

 8    telling Mr. Grand that he wouldn't -- he had to

 9    cease any use of the premises -- and I'm just

10    quoting here -- as a place of religious assembly,       12:10

11    even though using his home as a shul for a small

12    gathering of people to pray, would not require a

13    special-use permit.

14               I guess I just don't understand the

15    procedure here.                                         12:10

16         A.    I don't understand your question.

17         Q.    My question is:  Why did you send a

18    cease-and-desist letter to Mr. Grand, when you

19    just said he wouldn't need any approval if he

20    wanted to have a shul in his home for a small           12:11

21    gathering?

22         A.    No, that wasn't my testimony.  We sent a

23    cease-and-desist letter because we believed he was

24    opening a synagogue in his home.  And it appeared

25    that this was going to be a large gathering.  The       12:11
```



Page 91

```
 1    aspirations in the invitation itself suggested,        12:11
 2    you know, let everybody know who might want to be
 3    here, we're having regular weekly services.  There
 4    is a name for the organization or the concern,
 5    called Shomayah Tefillah Beis Hakeneset, led me to     12:11
 6    believe we were talking about the opening of a
 7    formal house of worship in Mr. Grand's home, based
 8    upon Mr. Feldman's comments and Mr. Grand's
 9    invitation itself.
10            And if it turned out it wasn't that,           12:12
11    then the cease-and-desist letter was -- would not
12    be -- and eventually, when it became clear that
13    all Mr. Grand, you know, wanted to do was have a
14    small group of people pray in his home, you know,
15    the city is prepared to say fine.  That's not the     12:12
16    city's business.
17            But at this point it did not appear that
18    that's what we were talking about.  It appeared to
19    me, and I think to the law director, too, because
20    he signed the letter and prepared this, that it       12:12
21    appeared to be a more formal, larger, you know,
22    shul or synagogue that was opening a house of
23    worship.  And under the code 1274 a special-use
24    permit is required.
25         Q.    Just to recap, you didn't ask              12:13
```



Page 92

```
 1    Mr. Feldman to clarify his allegations, correct?      12:13

 2        A.    No.  I think I said I didn't recall

 3    whether I spoke with him or not.

 4        Q.    And you didn't ask Rabbi Rosskam to

 5    clarify his role in this?                              12:13

 6        A.    I had to idea how to get ahold of the

 7    rabbi.

 8        Q.    Then you said you thought Mr. Grand was

 9    not credible, is that correct?

10        A.    I believe that's what I said, yes.          12:13

11        Q.    Just if you can help me understand, why

12    did you think he was not credible?

13            MR. CLIMER:  Objection.  Asked and

14        answered.

15            But go ahead.                                 12:13

16            THE WITNESS:  Mr. Grand's credibility is

17        informed to me by how he had conducted himself

18        in his meeting with me back at city hall,

19        when, you know, followed by that inappropriate

20        gift he sent over.                                12:14

21            It was informed by the bazaar request to

22        be my intern.

23            It is the -- the way he behaved at the

24        planning commission meeting with Aleksander

25        Shul, and the overall way that he conducted      12:14
```



Page 93

```
 1          himself with regard to the expansion of his        12:14

 2          home, especially in proceedings before the

 3          board of zoning appeals, where he took a very

 4          antagonistic approach to our BZA and its

 5          board, and was dishonest in representing         12:14

 6          how -- what he was doing in the expansion.

 7               He was -- he had misrepresented with

 8          regard to the use in pouring of concrete at

 9          the home, and the -- and the overall dealings

10          that we had had with the city had -- he had      12:15

11          built a reputation for himself as not being

12          honest or credible with regard to matters that

13          he was bringing before the city.

14               And thus, when I called Mr. Grand, I was

15          less interested in having a conversation about   12:15

16          what he may or may not be claiming to be

17          doing, because he generally claimed various

18          things before the board of zoning appeals

19          which proved not to be true, than I was trying

20          to convey to him simply, at this point, I        12:15

21          don't care how you're characterizing this, if

22          you are attempting to open a synagogue here in

23          your home, that requires a special-use permit.

24          Don't try to call it something else.

25          Q.    Like a shul?                               12:15
```



Page  94

```
 1      A.    Well, you know, and a shul, apparently,    12:15
 2  can mean different things to difference people.
 3          In the experience I've had in University
 4  Heights, Aleksander Shul has 100 -- lots of
 5  different people who were attending those          12:16
 6  gatherings for some period of time.
 7          There was the shul that was opening up
 8  on Churchill Boulevard, where all of the other
 9  residents on the street, many of whom were
10  orthodox Jewish themselves, all signed a petition  12:16
11  asking the city to stop that.
12          And, you know, we intervened in that
13  matter and advised -- and took legal action about
14  not opening a shul or synagogue in that home on
15  Churchill Boulevard without receiving a            12:16
16  special-use permit.
17          And ultimately they abandoned
18  proceeding.  They ended up selling the house
19  instead of going through a process to try to
20  endeavor to open a religious institution at that   12:17
21  time.
22      Q.    Are you familiar with the phrase "a
23  shabbos shul"?
24      A.    I have come to learn of that phrase,
25  yes.                                               12:17
```



Page  95

```
 1        Q.    What does a shabbos shul mean, as you've          12:17
 2   come to learn what that term means?
 3        A.    I have come to learn it is a -- it is a
 4   place where prayers and observations are had only
 5   on shabbos, so basically sundown Friday and            12:17
 6   sundown Saturday.
 7        Q.    And does a shabbos shul of that type,
 8   does that meet your definition of a full-blown
 9   synagogue?
10        A.    I don't know.  I mean, probably not,          12:17
11   because if you're not there every day, then it's
12   not a full-blown synagogue, but is it still a
13   synagogue?  I don't know the answer to that.
14             I also don't know if it still doesn't
15   qualify as a house of worship, depending on the      12:18
16   amount of attendance at the shabbos shul.  Are we
17   talking 10 or 12 of 18 people, or are we talking
18   100 or 200 people?
19             I would tend to say, if it's on the
20   larger end, we're talking about a house or           12:18
21   worship, even if it's only used just a couple days
22   of the week.
23             If it's a smaller, informal group, then
24   that's not going to be anything that is of the
25   city's concern.                                       12:18
```



Page 120

```
 1                    Bates stamp, was marked for the        02:09
 2                    purposes of identification.)
 3       Q.    And this was 21.01.22 Grand SUP app in
 4    the folder we provided.
 5                    Mayor, could you just look through this    02:10
 6    document?
 7       A.    Blow it up, please.
 8       Q.    Sure, yep.  Actually I want to give -- I
 9    can give you control.
10            MR. QUAINTON:  How do I give you control    02:10
11       of the screen again?
12            MR. GROSS:  Request remote control.
13            (Cross-talking.)
14       Q.    Just look at this document and let me
15    know when you're done.
16            MR. CLIMER:  Which one is that 21.01.22?
17            MR. QUAINTON:  Yes, 21.01.22.
18            MR. CLIMER:  Thank you.
19       A.    Okay.
20       Q.    Okay.  You recognize this document?      02:13
21       A.    I do.
22       Q.    And what is that?
23       A.    It is Mr. Grand's filing request for a
24    special-use permit.
25       Q.    Okay.  And it's a three-page document.   02:13
```



Page 121

```
 1     The first page is an e-mail and the second page is     02:13

 2     a drawing of a floor plan, and actually a room,

 3     within in a -- on a floor.  And then the third

 4     page is a photograph of a room with some tables

 5     and chairs in it, is that correct?                     02:13

 6          A.    That's what I see here.

 7          Q.    All right.  Now, this was sent to you on

 8     January 22nd at 10:46 a.m., is that correct?

 9          A.    That's what it says here.

10          Q.    Okay.  What is Mr. Grand asking for?         02:14

11          A.    I think he's asking for a special-use

12     permit, as reflected in the document.

13          Q.    And for what purpose?

14          A.    Well, he writes "for a place of

15     religious assembly."                                   02:14

16          Q.    And specifically --

17          A.    In his home at 2343 Miramar Boulevard.

18          Q.    And specifically what about his home?

19          A.    I can read you the whole thing if you

20     would like or, you know, he is asking -- he states     02:14

21     what he says are his intentions.  He includes a

22     diagram.  He includes a photograph.

23          Q.    Is it his stated intention to use his

24     house as a house of worship?

25          A.    He does not use the term "house of          02:14
```



Page 122

```
1     worship," but these sorts of things seem              02:14

2     consistent with a house worship.

3              (Court reporter clarification.)

4        Q.    So he's asking for permission -- if you

5     look at the third paragraph -- permission to use      02:15

6     his "current recreation room for periodic

7     religious gatherings," is that correct?

8        A.    Well, it says, "computer room/music

9     room."

10       Q.    Computer room/music room, correct.           02:15

11             So the previous paragraph says he wants

12    to use the current recreation room.

13       A.    Oh, I see that.

14       Q.    And then he says "this room," so I think

15    that's the same room he's identifying as the          02:15

16    computer/music room; would you agree with that?

17       A.    Yes, that's what it appears to state,

18    yes.

19       Q.    And he says the room "is a tinge over

20    700 square feet."                                      02:15

21             Do you see that?

22       A.    I see that in the application, yes.

23       Q.    Do you know how large Mr. Grand's house

24    is?

25       A.    Offhand, no.                                  02:16
```



Page 140

```
 1              (Court reporter clarification.)              02:41

 2      Q.    This is PB9.  It says on the top of it

 3   21.03.04.

 4            And I'll ask you to look at that, this

 5   document, and when you've done that -- let me know    02:41

 6   when you're done.

 7                  (Exhibit 9 PB, Color-coded partial

 8                   address map, University Heights,

 9                   Ohio, no Bates stamps, was marked

10                   for the purposes of                    02:41

11                   identification.)

12      A.    I'm ready.

13      Q.    Do you recognize this document?

14      A.    I do.

15      Q.    And what is it?                               02:41

16      A.    This is a -- this is a map, partial map

17   of our city, an address map.  And the spot in blue

18   is 2343 Miramar Boulevard, that's Mr. Grand's

19   residence.

20            And then, the spots that have been --         02:42

21   the lots that have been shaded in pink are the

22   addresses of people who signed a petition opposing

23   the application of Mr. Grand to have his

24   special-use permit for a house of worship.

25      Q.    Who prepared this map?                        02:42
```



Page 141

```
 1        A.    I did.  Well, that is, I shaded it in.        02:42

 2    I didn't draw the map itself.

 3            MR. CLIMER:  Hey, Eden, can you give me

 4        the number of that document again.

 5            MR. QUAINTON:  Yes.  21.03.04.                   02:42

 6            MR. CLIMER:  I have 03, 04, 1, 2.

 7            MR. QUAINTON:  Let me see.  Let's just

 8        go off the record for one second.

 9            THE VIDEOGRAPHER:  Going off the record.

10        2:43 p.m.                                            02:43

11                (Recess taken from 2:43 p.m. to

12        2:44 p.m.)

13            THE VIDEOGRAPHER:  Back on the record

14        2:44 p.m.  Go ahead.

15    BY MR. QUAINTON:                                         02:44

16        Q.    Okay.  So I guess -- referring back to

17    PB9, you -- you took the list of people opposed to

18    the application and then you personally shaded in

19    the addresses, right?

20        A.    I did, yes.                                    02:44

21        Q.    And did you share this map with anyone

22    prior to the actual hearing?

23        A.    I believe I shared it with the other

24    members of the planning commission, but I don't

25    know if I shared it prior to the hearing or when    02:44
```



Page 155

```
 1        the first.                                          03:06

 2   BY MR. QUAINTON:

 3        Q.    Okay.  So I guess I just want you to --

 4   this -- I'll just scroll down this one quickly.

 5             So have you had a chance to review what      03:07

 6   is marked as PB12?

 7        A.    Yes, I saw that as you scrolled down.

 8        Q.    Do you recognize it?

 9        A.    It seems familiar.

10        Q.    And what was it or what is it?              03:07

11        A.    It's an e-mail between myself and our

12   legal counsel, Luke McConville.

13        Q.    I don't want to get into any of the

14   contents of attorney/client privilege, but the

15   "RE" line is "miramar synagogue."                      03:07

16             This is at 3 p.m. on the 21st.  So this

17   is after you've seen Mr. Grand's -- the e-mail

18   that he had sent to some friends, that then got

19   distributed by other people.

20             You refer to "miramar synagogue."  Do        03:08

21   you think you were jumping the gun a little bit in

22   calling this the Miramar synagogue?

23        A.    We didn't know exactly what it was.  It

24   was characterized by Mr. Feldman as a pop-up

25   synagogue, a residential synagogue.                    03:08
```



Page 156

1              You know, folks in the community who are        03:08

2       closer to this are calling it a synagogue, so I --

3          Q.    You say folks in the community are

4       calling it a synagogue.  Who else in the community

5       is calling it a synagogue, other than Mr. Feldman?    03:08

6          A.    No, it sounded like the other people

7       that Mr. Feldman was communicating with.  He

8       referred to his Groveland discussion group.

9          Q.    So it seems like you are putting

10      repeatedly a lot of weight on Mr. Feldman's           03:09

11      characterization of what Mr. Grand wanted to do;

12      is that fair?

13         A.    I needed to call it something to

14      differentiate it from other e-mail and other

15      residential shuls and synagogues in the community,    03:09

16      so I used the word Miramar as opposed to just

17      synagogue, because we have Aleksander Shul, we've

18      got Heichal Hakodesh, which tried to build on

19      Churchill.  We've got Zichron Asher Zelig also on

20      University Parkway.  We've got a number of these      03:09

21      things.

22              I used language that I believed was

23      sufficiently descriptive to allow

24      Mr. McConville to know what -- you know what, this

25      is me replying, so perhaps Mr. McConville called      03:09



Page 157

```
1    it "miramar synagogue."  I don't know that I used       03:10

2    that in the subject line, now that you mention it.

3               No, no, it looks like I did use it

4    there.

5               So, yeah, it appeared that it may be a       03:10

6    synagogue.  It had a name.  I probably wrote

7    "miramar synagogue" because I didn't necessarily

8    have the full name right in front of me.

9         Q.    You know, again, I'm not saying this to

10   butter you up or anything, but you do respect          03:10

11   religious liberty, is that fair?

12        A.    I believe I do.

13        Q.    Just, it seems like there's a very quick

14   rush to judgment, you've used the words "these

15   things."  I mean, based on Mr. Feldman's               03:10

16   characterization of, you know, of an e-mail that

17   was intended for a small group of people.

18               Looking back on that, do you have any

19   regret that you jumped to such a quick conclusion,

20   that whatever Mr. Grand was trying to do, you          03:11

21   really knew what it was?

22        A.    No, I don't know what it was.  I mean,

23   at 3:00 in the afternoon, I've known about this

24   for less than two hours.

25        Q.    And yet you authorize a cease-and-desist    03:11
```



Page 158

| | |
|---|---|
| 1 | letter to shut it down. | 03:11 |

    2      A.    Well, yes, because, as I explained,

    3   shabbos was coming up and it seemed to me that

    4   responding proactively right away to what he had

    5   heard -- you know, if it turned out that this          03:11

    6   wasn't -- that this was all some elaborate prank,

    7   that Mr. Grand wasn't actually doing anything at

    8   his house, that would have been the end of it.

    9            I had no reason to think that the e-mail

   10   that Mr. Feldman had sent to me was, you know, a      03:12

   11   hoax.  And as it turned out, it was not.

   12      Q.    Mayor, don't you think that cuts the

   13   other way?  That precisely because shabbos is

   14   coming up, I mean, that's a very important day of

   15   prayer for Mr. Grand and other people who want to     03:12

   16   pray on shabbos, and shouldn't you have, before

   17   telling him, Mr. Grand, he can't pray in his home

   18   with other people, don't you think you should have

   19   hit the pause button on the whole thing?

   20            MR. CLIMER:  I'm going to object to the       03:12

   21        form of that question.

   22            You can answer.  Go ahead.

   23            THE WITNESS:  Well, I don't know what

   24        Mr. Grand created the week before that or the

   25        week before that or the week before that.  But   03:12



Page 159

1       it appeared that this was the first time that          03:12

2       he was advertising what appeared to be a

3       synagogue that he was opening in his home.

4              And before a grand opening of a new

5       establishment in the city -- and, you know,           03:13

6       whether we're talking a synagogue or a fried

7       chicken restaurant, if I get notification that

8       somebody is opening a new business in the city

9       and they don't have an occupancy permit, we're

10      going to go over there before their grand             03:13

11      opening and say, hey, full stop, what are you

12      doing?  You haven't been before the city.

13      This is really no different than that. You

14      know, we don't wait for them to just go ahead

15      and open up and then come and shut them down         03:13

16      in the middle of the process.

17             You know, here we have reason to think

18      that there is a synagogue or shul or house of

19      worship or something that is opening up.

20             It's been characterized to us by a            03:13

21      resident, who I had no reason to think was

22      mischaracterizing his thoughts, as a

23      residential shul or as he put it a pop-up

24      synagogue or makeshift synagogue.  And we've

25      had others like this around the city.  It            03:14



Page 160

```
 1        seemed like the others in these respects.          03:14

 2              And in the limited amount of time that

 3        we had here, sending Mr. Grand a letter to let

 4        him know that if this is what he's doing, he's

 5        to cease and desist.                                03:14

 6        Q.    You use the words "grand opening."

 7   Where did you get the idea that there was

 8   essentially a grand opening that was planned?

 9        A.    I think I was referring to like the

10   chicken restaurant.                                      03:14

11        Q.    Well, you were acknowledgizing (sic) it

12   to what Mr. Grand was doing, it was not a --

13        A.    I mean, I'm not using -- yeah, I used

14   grand in the conventional sense, not in the way

15   that Mr. Grand has adopted that.                         03:14

16        Q.    Oh, no, no, no, I don't -- I don't --

17   yeah, no, I meant -- I didn't mean the power of

18   the word.  Sorry.  I'm getting tired.

19              You know, "grand opening," you meant

20   that in the conventional sense, there was some big      03:15

21   hullabaloo, big opening?

22        A.    Yeah, right, right.

23        Q.    You thought that because -- what exactly

24   made you think that there was this big grand

25   opening of this pop-up synagogue, other than            03:15
```



Page 161

```
 1    Mr. Feldman's e-mail?                                    03:15

 2        A.    Well, I thought the e-mail was quite

 3    sufficient reason to think that he was announcing

 4    to everyone who received it, and everyone who

 5    would pass it on thereafter, because he puts        03:15

 6    explicitly in the invitation to share this with

 7    anybody who you think may be interested.

 8        Q.    Just to make sure I get an answer to

 9    this:  Did you check at any time to whom Mr. Grand

10    had originally intended his e-mail to be            03:15

11    distributed to?

12        A.    No.

13        Q.    Why not?

14        A.    Why would I?

15        Q.    Well, if you're concerned about some      03:15

16    grand opening and somebody has sent an e-mail to a

17    few people, and said to those few people bring

18    your friends, isn't that very different from

19    somebody who sends an e-mail to thousands of

20    people and says bring all of your friends?  I       03:16

21    mean, just as a prudent man, isn't that an

22    important fact that you would want to know?

23        A.    Well, perhaps -- regardless if I haven't

24    heard otherwise, but in the two hours here between

25    receiving that invitation, which says share this    03:16
```



Page 162

```
 1    with anybody who you think may be interested and        03:16
 2    our sending a cease-and-desist letter, I don't
 3    know that we needed to have the kind of lengthy
 4    analysis that you are talking about before we let
 5    Mr. Grand know, hey, you may have a problem here.        03:16
 6    And if you're opening a house of worship, if
 7    you're opening a synagogue here, if you're opening
 8    something that requires a special permit under
 9    1274, well, you haven't obtained one, so there is
10    a process for doing that, and the letter in            03:17
11    closing refers to Chapter 1274 and provides
12    Mr. Grand that direction.  And if that is the
13    direction he wants to go, then he can do that, and
14    he proceeded to do that.
15         Q.    So, did you ask Mr. Grand -- when you        03:17
16    spoke to him on the telephone, did you say -- did
17    you ask him who he had originally sent his e-mail
18    to?
19         A.    I did not.
20         Q.    You didn't think -- you just didn't         03:17
21    think it was important to know how broadly he
22    intended his invitation to be communicated?
23         A.    I thought it was important to let
24    Mr. Grand know that, if he's attempting to open a
25    synagogue or a shul in his home, as per this           03:17
```



Page 163

```
 1     invitation, that he is not to do that without a          03:17

 2     special-use permit.  You know, secondary nature as

 3     far as how far his advertising campaign went.

 4          Q.   Even though you know that a shul can be

 5     just a small gathering?                                  03:18

 6          A.   This didn't seem like a small gathering.

 7          Q.   Okay.  I think we went over that.  I

 8     think you said -- you, having spoke to Mr. Grand,

 9     and he told you what he actually intended to use

10     the room in his house for, you didn't find him          03:18

11     credible, is that right?

12          A.   Well, I don't know that he told me what

13     he actually intended to use the house for.

14               I don't find Mr. Grand credible

15     generally.  I have heard him make numerous              03:19

16     misstatements in public forums where he has been

17     sworn or made to affirm under oath as to veracity

18     of what he's saying.  I don't find what he says to

19     be truthful in general.

20               So I was less concerned about asking          03:19

21     Mr. Grand questions, giving him opportunities to

22     lie to me, than to convey to him that -- that, if

23     he's opening a shul or synagogue, that he cannot

24     do that without a special-use permit.

25          Q.   That's pretty strong language, Mayor,         03:19
```



Page 164

```
 1    that you felt you would be giving him              03:19

 2    opportunities to lie by asking him questions about

 3    his intent?  Is that -- do you really mean that?

 4         A.    I don't find Mr. Grand to be an honest

 5    person.                                            03:19

 6         Q.    So let's talk about that, because you've

 7    mentioned numerous misstatements.

 8               Can you give me some examples of these

 9    misstatements that he's made when he was been

10    sworn under oath?                                  03:19

11         A.    Well, I can't say that I've attended

12    every BZA hearing that he has attended.

13               I know that his history before the board

14    of zoning appeals is troubling, when it comes to

15    his representations with regard to variances and   03:20

16    various permissions that he has sought with

17    connection to projects he's had at his house,

18    especially as it pertains to pouring of concrete,

19    especially as it pertains to the driveway,

20    especially as it pertains to being told that he    03:20

21    can't turn his driveway into essentially a parking

22    lot, and then throwing gravel down and parking his

23    truck on it.

24               But he doesn't respect the law, clearly.

25    He doesn't respect the authority of the board of   03:20
```



Page 165

```
 1      zoning appeals, which I guess is his right.          03:20
 2             But, you know, when it comes down to
 3      whether somebody is, you know, honest and plays by
 4      the rules and, you know, holds themselves out
 5      there as somebody who is credible and whose word    03:20
 6      you can count on, none of these things come to
 7      mind when we're talking about Danny Grand.
 8      Q.    It sounds like there's an awful lot of
 9      animus there.  Is that --
10      A.    I wouldn't call it animus.  I would just      03:21
11      call it the collective experience of working -- of
12      the encounters I've had with Mr. Grand, starting
13      with his visit to me at city hall and going on
14      forward.
15      Q.    Okay.  Well, let's -- I really want to         03:21
16      get to the bottom of this, because you use some
17      serious allegations that you've made here, which I
18      haven't heard before.
19             You said Mr. Grand doesn't respect the
20      law.                                                 03:21
21             So, you know, just slow down and give me
22      some specific examples of Mr. Grand's failure to
23      respect to law.
24      A.    You know, I think when he's been told by
25      the board of zoning appeals, you know, not to pour   03:21
```



Page 166

```
 1      concrete in a particular area, and instead he            03:21
 2      throws gravel down and parks on it anyway, that's
 3      a prime example.
 4           Q.    So he poured concrete and then threw
 5      gravel on it?                                             03:22
 6           A.    He did not pour concrete.
 7           Q.    Okay.  He did not pour -- okay -- he did
 8      not pour concrete, but he put gravel down.
 9                 I have to tell you just -- it's a pretty
10      big leap from to that to say you are dealing with        03:22
11      a man who doesn't respect the law, who lies, who's
12      dishonest, that seems fairly trivial.
13                 Why is that such a big thing that sticks
14      in your crawl?
15           A.    You asked me for an example.                  03:22
16           Q.    Okay.  Fair enough.
17                 What other examples can you --
18           A.    Well, you know, I would just refer to
19      his entire record before the board of zoning
20      appeals.  You know, I don't have it memorized, I'm      03:22
21      not going to give you blow by blow, but there's
22      minutes to all of those meetings, and I think
23      anybody could review those.
24                 And for that matter, if you're deposing
25      every member of the planning commission, I suppose       03:22
```



Page 167

```
 1    you could also depose every member of the board of      03:22
 2    zoning appeals, as well, who has had to hear from
 3    Mr. Grand in his numerous applications and
 4    misleading statements he has made.
 5            And, you know, when it came to -- you            03:23
 6    know, one of the things that he did, apparently,
 7    was he had come before the board of zoning appeals
 8    to ask permission for concrete in excess of the
 9    amount that is permitted for his property.
10            He was denied at that point, or it was           03:23
11    tabled, one or the other.
12            He then went to the building department
13    and got a permit for that, about that.  As a
14    matter of right, he could pour and then poured it.
15            But then went back to the board of               03:23
16    zoning appeals with an amended application, saying
17    he only wanted to pour this much concrete.
18    Omitting the fact that he had obtained a permit to
19    pour the other concrete.  And then told the board
20    of zoning appeals he was no longer seeking to pour       03:23
21    this other concrete.  But what he omitted was that
22    he had actually poured it and it had already been
23    poured and he was no longer counting that among
24    the concrete he wanted to pour because he had
25    already poured it.  It's a material omission.            03:24
```



Page 168

```
 1              So, you know, this is the kind of thing      03:24

 2    I'm talking about.  You know, Mr. Grand seems

 3    willing to game the system.

 4              You know, he was having a problem with

 5    construction rubble at the house on Miramar.  And      03:24

 6    he was noticed that he needed to get rid of it.

 7              And, you know, what he did to get rid of

 8    it was he took it over to another house that he

 9    owned, another property in South Euclid.

10              And then I hear from their housing           03:24

11    director that they're having to cite him for

12    construction debris that's over at that house.

13    And, you know, it seemed as if that debris

14    appeared at the same time, coincidentally, that

15    debris disappeared from the house on Miramar.          03:24

16              So, you know, comparing notes with the

17    housing director of the City of South Euclid,

18    it's like, oh, well, that's very interesting.  So

19    instead of disposing of it properly, he took it

20    from one property of his and dumped it at another      03:25

21    property.

22              I mean, this is the kind of stuff that,

23    you know, reputable people don't do that kind of

24    thing.  This is dishonest.  It is.

25         Q.   Slow down, because I really -- there's a     03:25
```



Page 169

```
1     lot in what you just said, but I want -- so the        03:25

2     specific -- because I think the allegation was or

3     the accusation was that he made numerous

4     misstatements under oath and, you know, you're

5     here today under oath.                                  03:25

6         A.    I am.

7         Q.    I'm not really interested in what other

8     people said, what -- I'm actually not interested

9     in what -- I am interested in what you said.

10             So I'm asking you, under oath, what are       03:25

11    these numerous misstatements that you know of.

12    Okay.  You mentioned the whole concrete story.  To

13    be honest with you, that is above my pay grade.

14             But can you please give me some specific

15    examples, that you are aware of, material             03:25

16    misstatements to the board of zoning appeals?

17        A.    Well, I think just went over the one

18    regarding the pouring of concrete.

19        Q.    Okay.  Aside from the pouring of

20    concrete.                                              03:26

21        A.    Well, I think that would be the big one

22    right there.

23        Q.    Is there anything else to support your

24    allegation?  Because you said he made numerous

25    misstatements.  Numerous is more than just one or     03:26
```



Page 170

```
 1    two, numerous is many misstatements.                    03:26

 2            Do you want to withdraw that?

 3            But if your testimony is he made

 4    numerous misstatements to the board of planning

 5    commission, and that's why you thought he wasn't      03:26

 6    credible when he said he wanted to pray in a

 7    certain way --

 8        A.   He didn't say he wanted to pray in a

 9    certain way.  I don't know where you're getting

10    that from.  You are making assertions that I don't    03:26

11    think have been established here.

12        Q.   Okay.  Well, I'm trying to get

13    descriptions -- I'll withdraw that.

14            Let's go back to the numerous

15    misstatements Mr. Grand has made under oath, that      03:26

16    you were aware of.  I'll list them down and then

17    that will help me with our deposition of other

18    people.

19            So I understand he made a big

20    misstatement about pouring concrete.  I got it.        03:27

21            What else?

22        A.   You know, another one may be that he had

23    built this room on his house to be a music room.

24            And then he has made this statement

25    where he apparently has a revelation that this is      03:27
```



Page 171

```
 1    actually now going to be the site of his shul or        03:27
 2    synagogue or house of worship.
 3             And, you know, I don't know that -- you
 4    know, what I'm reading elsewhere, that he had
 5    designed this room to be used for that purpose,          03:27
 6    and then, you know, he has gone to our building
 7    department or our architectural review board and
 8    described it as being a music room, to be meant
 9    for his private personal use for his drum kit,
10    which has been -- and the room has been               03:27
11    soundproofed and so on.  You know, none of that --
12    it doesn't seem as of that can all be true.
13        Q.    And you didn't hear the testimony at the
14    hearing that some neighbors, in fact, had heard
15    him playing his drums, and that, you know, they        03:28
16    heard him several times, and that, you know, the
17    soundproofing may not have been as perfect as he
18    hoped it would be.  You didn't hear that
19    testimony?
20        A.    I may have, but I don't recall it just        03:28
21    now, but that's not what I was getting at.
22             I was getting at the fact that he had
23    represented to the city that this was to be his
24    music room, and then he was turning it into
25    something else.  And then there has been              03:28
```



Page 172

```
 1    representations to us that it was always intended        03:28

 2    to be a place of worship.

 3        Q.    Hold on one second.  So A couple of

 4    things you said there.

 5            So you said he had originally had             03:28

 6    designs, this was Mr. Grand, to make his -- this

 7    recreation room a prayer room?  And you have seen

 8    these designs, the original designs that he

 9    then -- I guess you're saying he hid from the BZA?

10        A.    I'm not saying designs in the form of        03:28

11    blueprints.  I'm talking about representations

12    that he and his lawyers have since made and

13    throughout this litigation, that that room was

14    always intended to be his prayer room.  That's not

15    what he told the city.                                 03:29

16        Q.    And specifically, what are you referring

17    to when you say he has made the representation he

18    always intended that to be a prayer room?

19        A.    I believe that was in one of your

20    letters, sir.                                          03:29

21        Q.    No, I think that's a misstatement.

22            I think there seems to be a lot of --

23    again, confusion here, so regarding misstatements.

24    So you think that -- I was just trying to get a

25    list of misstatements.                                 03:29
```

