**EXHIBIT A**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| DANIEL GRAND,<br>Plaintiff,<br>vs.<br>CITY OF UNIVERSITY HEIGHTS, OHIO, ET AL.,<br>Defendants. | ) Case No. 1:22-cv-01594 |

\- - - - -

Transcript of the deposition of DANIEL GRAND, the Plaintiff herein, called by the Defendants as if upon examination pursuant to the Federal Rules of Civil Procedure, taken before Rebecca L. Fumich, Registered Professional Reporter, Notary Public in and for the State of Ohio, held at Mazanec, Raskin & Ryder, 100 Franklin's Row, 34305 Solon Road, Solon, Ohio 44139, Thursday, November 2, 2023, commencing at 10:10 a.m.

\- - - - -

A I own property on Silsby.
**Q Is that where you lived?**
A Yes.
**Q Okay. How long did you live on Silsby?**
A From 2017 until I moved to Miramar.
**Q Okay. Where did you live prior to Silsby?**
A In Queens, New York.
**Q And you're a native of Queens?**
A Yes.
**Q And what motivated your move to University Heights?**
A Interested in a change.
**Q You wanted a change of scenery?**
A Yes.
**Q Okay. Any particular reason you picked University Heights?**
A Recommendation of a friend.
**Q Okay. Who was that?**
A Someone that my wife met on Facebook.
**Q Okay. And what was it that you found appealing about University Heights?**
A I didn't know it. I didn't find anything appealing about it.
**Q Okay. Did your wife find it appealing?**
A I don't know.

**Q So you had no thoughts one way or the other about whether University Heights would be a good place to live?**

A Agreed.

**Q Okay. How far have you gone in school?**

**As I understand it, you're a graduate of Excelsior University.**

A I'm a graduate of Excelsior University, yes.

**Q Okay. And you have a Bachelor's degree from there?**

A I do.

**Q You attended Touro Law School for a period of time?**

A That is correct.

**Q All right. When was that?**

A I believe it was in 2014.

**Q That's when you were enrolled there?**

A Yes.

**Q How long did you spend at Touro?**

A I was a 1L.

**Q Okay. Did you complete your first year?**

A No.

**Q Okay. Why not?**

A My father died abruptly and I got married all within about a week of finals and it was hard to

continue.
**Q Okay. My condolences about your dad.**
A Thank you.
**Q Are you presently employed?**
A Yes.
**Q Okay. What do you do?**
A Be more specific.
**Q What's your occupation?**
A Entrepreneur.
**Q What types of endeavors do you pursue as an entrepreneur?**
A A multitude.
**Q Can you describe some of them for us?**
A Music.
**Q Anything else?**
A Real estate.
**Q Anything else?**
A Mainly in those two realms.
**Q In terms of the music industry, what do you do there? Are you a performer?**
A Yeah.
**Q Do you also produce or are you a producer?**
A My own music, yeah.
**Q And what kind of music do you perform?**
A What do you mean? Genre?

**Q Yes.**
A Rock and roll.
**Q Okay. Are you a member of a group?**
A Not at the moment.
**Q Okay. You mentioned real estate. What do you do in the real estate industry?**
A I buy and sell.
**Q Okay. Where's that? I mean, in any particular area?**
A No. Wherever the deals are.
**Q Okay. Is it predominantly in the Cleveland area?**
A At this time, yes.
**Q Okay. How many transactions, say, in the past year have you engaged in in the real estate industry approximately?**
A A couple.
**Q Okay. How about the year before that?**
A The same.
**Q Okay. Are these residential, commercial? What types of transactions are you involved in?**
A Could you clarify what you mean by "transactions"? I'm not following.
**Q You indicated that you buy and sell real estate. That implies to me that there are**

**transactions for the purchase and sale of that real estate, and that's what I mean by "transactions."**
A I haven't really bought very much or sold very much recently.
**Q I understand that. But you indicated in the past year or so you've had a couple of real estate transactions, correct?**
A Yeah. But they were not what you say buy or sell. They were like refinances, which is a transaction of a different kind with a bank, so I wasn't sure what you meant.
**Q Okay. And are you engaging in these transactions with the bank on properties that you own --**
A Yeah.
**Q -- or for other people?**
A Properties I own.
**Q All right. And are these residential or commercial properties?**
MR. GROSS: I'm just going to object to relevance.
But you can answer.
MR. CLIMER: I think it has a great deal of relevance to

this case.
BY MR. CLIMER:
**Q Are these residential or commercial properties?**
A Could you tell me what you mean by "commercial"? Because it might have more than one definition in this line of business.
**Q Well, let's talk about residential, anything that people live in whether it be houses or apartments. Everything else would be defined as commercial.**
A That wouldn't be an accurate definition. Commercial is defined as any multi-family over four units. That's a commercial transaction. Even though it's purely residential, that's still commercial. Not just stores and strip malls.
But what I think you're saying is, yes, residential.
**Q Fair enough. And are those single family, multi-family?**
A Mostly single family. One multi-family.
**Q All right. Have you ever been employed by other people?**
MR. GROSS: I'm just going to do one standing objection and

we'll discuss it later -- but you can answer -- to the relevance of this line of questioning.
A I'm sorry. I didn't hear the question. Can you repeat it?
**Q Have you ever been employed by another person or entity?**
A In Ohio?
**Q Well, let's start with Ohio.**
A No.
**Q And you've engaged in the same type of entrepreneurial activities more or less since you came to Ohio?**
A Yes.
**Q How about your previous residence in New York, have you ever been employed by another person or entity?**
MR. GROSS: I'm going to object.
But you can answer.
A Yes.
**Q When were you last employed by another person or entity?**
A 2008.
**Q Okay. And what did you do?**

A I was the information technology director for the Touro College of Pharmacy.
**Q How long did you work there?**
A The Touro College of Pharmacy or Touro College? I didn't understand.
**Q As the info tech for the Touro College of Pharmacy.**
A Maybe a year and a half.
**Q Why did you leave?**
A The death of the founder.
**Q Okay. The founder of the school?**
A Correct.
**Q Were you employed by any persons or entities prior to your time at the Touro College of Pharmacy?**
A Yes.
**Q Okay. Can you tell us about that?**
A I had worked for Touro main campus.
**Q Was that also in the information tech sector?**
A It was, but a different position.
**Q Okay. What did you do in that position?**
A The latter position?
**Q The position prior to your time with the College of Pharmacy.**
A I was in the help desk.

**Q How long did you do that?**
A I think another about year and a half or so.
**Q Okay. That would get us back to 2006 or so?**
A Correct.
**Q What did you do prior to that?**
A I did a variety of different jobs, restaurants and things.
**Q Okay.**
A I was a young 20-something-year-old.
**Q Good enough.**

MR. CLIMER: Can you mark this as Defendant's Exhibit --

MR. GROSS: Which one is this? The ones that were sent to me?

MR. CLIMER: Yeah. Let's go Defendant's N.

\- - - - -

(Defendant's Exhibit N was marked for identification.)

\- - - - -

BY MR. CLIMER:
**Q Mr. Grand, I'm going to hand you what's been marked Defendant's Exhibit N, and the pages are actually kind of backwards on that. I think page**

**2 should probably be page 1, if I'm not mistaken.**
**Do you recognize that document?**
A It's a picture of something that I recognize, yeah.
**Q And is that a business card you handed out at one time?**
A It's not really a business card, no.
**Q A card of introduction, so to speak?**
A Yes.
**Q I'm going to represent that you gave this to Mayor Brennan at a meeting you had with him back, I believe, in 2018. Does that sound like the right time frame that you used this type of card?**
A I'm not sure. If you're asking if I gave -- you said something in my name, I don't think you should do that.
Did you want to ask me if I gave this to Mayor Brennan, please?
**Q Well, did you?**
A Did I?
**Q Yes.**
A Yes.
**Q Okay.**
A I don't know what you're saying. I'm sorry.
**Q Well, I asked you, first of all, if you used**

**this card around 2018 or 2019.**
A I think, yes.
**Q Okay. And do you recall having given it to Mayor Brennan?**
A I did give it to him.
**Q Okay. And does this card accurately describe the scope of your entrepreneurial activities that you've engaged in?**
A No.
**Q All right. What's inaccurate about it?**
A Nothing is inaccurate about it. It's just not a correct assessment.
**Q How is it --**
A It's a description of my entrepreneurial pursuits. It's not limited to. No, there's nothing inaccurate about this card.
**Q I'm sorry. I don't understand your answer.**
A There's nothing inaccurate about this card, but it's not limited to my entrepreneurial pursuits.
**Q Okay. So explain what you mean.**
A What's your question?
**Q All right. You indicated that it does not accurately list your entrepreneurial pursuits, correct?**

A No.
**Q All right. And what -- why does it not accurately list them?**
A I never said accurate. It does -- this is accurate, but it's not correct to say to me that this is an embodiment of my entrepreneurial pursuits. I disagree with your question. I don't agree with that.
**Q Okay. Why not?**
A Why not what?
**Q Why do you not agree with my question?**
A Because it doesn't seem to really capture what is on the card here.
**Q All right. Tell me what you're trying to convey with the card.**
A Aspects of my character and personality and a little bit about me.
**Q Okay.**
A Not my entrepreneurial pursuits.
**Q Fair enough.**
A These are certain things I do.
**Q Okay. You've listed one of your characteristics as being a business expense reductionist. What do you mean by that?**
A Businesses have expenses and sometimes they

can overspend on certain things -- and reductionist is a chokhmah term -- that you can help people to reduce their business expenses.
**Q Are you engaged in doing that presently?**
A No, I'm not.
**Q When was the last time you acted as a business expense reductionist?**
A For over a decade as an owner of Violation Removal, Inc.
**Q What is Violation Removal, Inc.?**
A Pardon?
**Q What is Violation Removal, Inc.?**
A It was my property violation removal company.
**Q Okay. Are you still actively engaged with that company?**
A As of today, no.
**Q When were you last active with it?**
A I don't know the exact date, but I phased myself out around -- it's been almost -- it's been around a year or so, give or take.
**Q Okay. And that company was active in the Cleveland area?**
A No.
**Q Okay. Where did you pursue that business, the Violation Removal, Inc. business?**

\- - - - -

BY MR. CLIMER:

**Q All right. I'm going to hand you what's been marked Defendant's Exhibit G. Are you familiar with that?**

A Yes. This is a letter that I wrote.

**Q Okay. And I'm going to refer you to the first paragraph, second sentence, where you indicate "The city informed me that the zoning ordinances allowed for a synagogue or shul."**

A I apologize. The second paragraph or the first?

**Q I'm sorry. First paragraph.**

A No.

**Q I may have said second.**

A You said second sentence. I don't see anything -- oh, the very end of the second sentence. I'm sorry. I see where you're looking at.

**Q Yeah. "The zoning ordinances allowed for a synagogue or shul," and in brackets you put "same word in Yiddish." Okay.**

**Can I ask you what you're intending to say with that?**

A Sure. This is a letter that I wrote to the

people who live on Miramar between Washington and Silsby because they have no idea what any of these words mean. So the audience of this letter, with that in mind, was to a bunch of people who don't know the difference between any of these words, a shul and synagogue. They have no concept. They wouldn't have known that your conference room could be a shul either. So I have to kind of politely do my part to explain to them, no, no, no, no, you're getting this wrong. I'm not trying to build some massive commercial facility here.

And I was making a joke, a Roman Coliseum, when it's really nothing more that a ball game in the back yard with the kids. I was making a joke by that. This is simply a letter to people that didn't understand what that meant.

**Q Understood. I get that. And you're saying in that sentence "allowed for a synagogue or shul** (same word in Yiddish)."

A The city told me that they would allow for a synagogue or temple, which is the same word in English, and I said shul because they were using the word "shul." So I had just responded to their misunderstanding by saying it's a similar

word, yeah, it's same the same word in Yiddish. It just means it's another place you can pray. A synagogue is a place you can pray, but it doesn't mean that it's the same thing as far as it's a synagogue and it's a place where you can pray.

**Q Are you saying that the word for synagogue and shul is the same in Yiddish, the same word in Yiddish?**

A What I wrote here was that shul is a word that's a Yiddish word. Really, I think it means school, but it's, so to speak, used colloquially interchangeably. But it doesn't mean that it's limited to strictly the use of the word full-blown commercial synagogue establishment that has to have a permit to be where it was and shul, and that's exactly the same thing because you said so in this letter. No, it's not the same thing in that way.

What I said is the same word, sort of like parenthetical -- that's why it's in parenthesis -- to give people a little bit of an idea of the similarity between utilization and colloquial Hebrew and Jewish expressions in the community that they're not familiar with, that if we say shul, it just means a place you go to

pray. You might look at that as a synagogue or something, but it's not like a synagogue necessarily because you hear that word.

That's what I was trying to do, but whether I failed or not is fine. I didn't know I was going to be speaking to you years later, but that was my intention at the time of this letter.

**Q And that's what I'm trying to understand. Is, in fact, the word for synagogue and shul the same in Yiddish?**

A I don't know. Can I ask somebody who speaks Yiddish better than I do? I'm being honest with you. I think shul means school.

**Q Okay.**

A I think so, but it has a reference to a place you pray. A synagogue is like a reference to a place you pray. Temple. There's multiple Jewish places to pray. A minyan room, conference rooms, those are all shuls. I just wanted to try to make a connection there, but I don't know if I can be held to the degree you're trying to hold me to this word.

**Q I'm trying to understand --**

A Me too.

**Q -- what you're trying to express there.**

A I was saying that the city informed me that zoning ordinances allow for synagogues, which is an English word, or what somebody might refer to as a shul, which is what these people were doing. That's why I wrote "or shul." There's such a thing with a special use permit.

"Upon being notified, I immediately abided" -- because I was told to go file one by the mayor. I abided. I've never had anyone come over to my house to pray. That's what I wrote there. It speaks for itself. I don't know the answer.

**Q All right. So --**

A I think it means school.

**Q -- let's move on.**

**The city eventually became aware of the plans for a shul or prayer group in your house, correct?**

A I don't know what you mean by "plans." Do you mean architectural plans? There are none. What do you mean by "plans"?

**Q Your intention --**

A To host a group?

**Q However you want to put it.**

A I want to put it the right way. I had no

**Q Okay. Nevertheless, you did apply for a special use permit, correct?**
A I did.

- - - - -
(Defendant's Exhibit E was marked for identification.)
- - - - -

BY MR. CLIMER:
**Q You've been handed what's been marked as Defendant's Exhibit E. I'm going to ask you to familiarize yourself with that.**
A The subject is "2343 Miramar request for special use permit." It seems like it was simply from me to Ms. Thomas and Mayor Brennan. That's what this document is.
**Q Yeah. I understand. Go ahead and let me know when you've had a chance to look at and then we'll discuss it.**
A "I have been advised to apply for a special use permit." My recreation room. Okay. Okay. We can talk about this document.
**Q All right. At the outset you indicate you've been advised to apply for a special use permit for a place of religious assembly, correct?**
A I was advised, yeah --

**Q All right.**
A -- by the mayor.
**Q And you do indicate that you wish to utilize my current recreation room for periodic religious gatherings; is that correct? That would be the second paragraph, I believe.**
A Yeah. My recreation room for periodic religious gatherings. That's correct.
**Q And that's your wording?**
A That was my wording, yeah.
**Q And you have 11 tables set up and 21 chairs.**
A Yeah. This room's like four times or five times the size of this room. You got about 15 chairs in here. So it's not that much space taken up, actually.
**Q Gotcha. In that you give other details concerning the use, and I believe that document also contains a picture of the room as you anticipated setting it up.**
A Yes.
**Q And a drawing of the room as you intended to set it up, correct?**
A No. This is an excerpt of the floor plan from my architectural plans when I filed, and then I drew in much later a hand sketch just to

give them a description because the application wants you to give a little drawing. So I didn't know how to draw that well a sketch of my house so I just hand wrote in the tables.

**Q This is part of your --**

A That's not my work there, just to clarify.

**Q Fair enough.**

A The architectural part of it was done as part of my on-the-record plans when I built my home.

**Q And you're talking about --**

A My recreation room, which it says here it's remodeling the garage room in the middle of that paper. This drawing -- we're talking about the architectural rendering that you're pointing out was done by my architect way before any of this was ever even a figment of my imagination.

**Q I understand.**

A Well, I need to understand. The drawing of table, table, table, table, table, table, table, table, table, table, that's me. That's what I did, yes.

**Q So am I correct in my understanding your architect essentially drew the layout of the room and you drew the details of how you intended to set it up?**

A Two and a half years apart, yeah. That's

what it says. Yeah. My remodeled garage. This was my garage before. It became a rec room. That's what we did.

**Q Leading up to the special use permit hearing on March 4th of 2021, did you have any interactions with city officials at all concerning the anticipated hearing?**

A When you say "interactions," can you be more clear what you mean?

**Q Communications.**

A From the time I filed this application, this email says Friday, January 22nd, 2021, until March 4th, the actual moments of the hearing, did I have any sort of communications with any city officials? Did I understand that right?

**Q Yeah. And I phrased that badly, and for that I apologize because I know you had at least one exchange.**

A Email maybe. Does that sound right?

**Q Yes.**

A Maybe. Yeah.

- - - - -

(Defendant's Exhibit H was marked for identification.)

- - - - -

- - - - -

BY MR. CLIMER:

**Q You've been handed what's been marked Defendant's Exhibit J, and if you have your magnifying glass, that appears to me to be an email from you to the mayor and the planning commission withdrawing your application for a special use permit, correct?**

A This is an email from Mr. Michael Brennan acknowledged -- meaning he's acknowledging that he's still going to host a planning commission meeting as intended, and he'll state on that record that I told him that I wanted to withdraw the application for a special use permit. And below that is an email from me around eight minutes earlier at 5:50 p.m. telling him that I was withdrawing my application for a special use permit.

"I do not wish to operate a house of worship as it's defined in the zoning ordinance in the privacy of my home." I wrote that.

**Q Did you attend the meeting that evening?**

A No, sir.

**Q Did you take any further steps to pursue a special use permit?**

A I'd like to ask, actually, for one-minute break, if I could, two minutes. I kind of have to use the hole -- use the bathroom.
**Q That's fine. But --**
A May I --
**Q If you can just answer the question.**
MR. GROSS: You have to answer the question. There's a question pending.
A What is the question again?
**Q Did you take any further steps to pursue a special use permit?**
A At that moment -- that moment of that email, no, I hadn't.
**Q No. I mean after that.**
A It's a little murky, the question. It's not your fault. The answer I should say. It's a little murky. Not exactly sure.
**Q I don't want to hold up your bathroom break, but can you give us the capsulated version?**
MR. QUAINTON: I'm going to object to ask the witness to answer that when he's clearly made a statement he needs a bathroom break. Why don't you just let him

take the bathroom break before he --

MR. KELLEY: It's a pretty standard procedure to answer a question before we take the break.

A Jewish laws says if you have to use the bathroom it's forbidden to wait a millisecond. It's a detestable nature.

**Q Go ahead and go.**

A That's what it says in the Bible. Thank you.

(Recess had.)

A I think the answer to your question is like this: At that moment I didn't feel like the permit process I was going through and enduring was fair at all. I wanted to reserve myself the right to maybe, maybe not, potentially attempt at a later time to file for a special use permit if that's what was necessary. Because I clearly couldn't get it through to this group of people running the planning commission and the city administrative personnel at that time that you want me to provide you with documentation to supplement this meeting that we had, you're giving me less than the normal amount of time, which is one month, you're giving me two weeks

right in the middle of a Jewish holiday -- that's not suspect, right? -- and you want me to produce these things by myself, but you don't even tell me what you really want? I had to ask you for the minutes. Then you gave it to me. Then you told me you won't be able to submit anything else -- Mayor Brennan says in an email you won't be able to submit anything.

So what the hell's going on here? On one hand you're telling me you want all these other documents, then you've got Mayor Brennan saying you're not going to be able to submit anything else that you want.

So, to be honest with you, I couldn't say that I was ruling it out forever, but at that time I ruled out having the special use permit and withdrew at that time. So anything after that, I'm -- you never know. I don't know. I don't have a good answer for you.

**Q So the answer is you haven't to date?**

A Not sure. I don't really have a good answer for you.

**Q Okay.**

A If the process was more fair, maybe I would have never withdrawn. Maybe that's what I'm

MR. CLIMER: No worries. You have a good one if we don't see you.

MR. QUAINTON: Thanks. And I'll check back if I have time.

MR. CLIMER: All right. Thanks.

THE WITNESS: Thank you, Eden.

MR. QUAINTON: Thanks.

BY MR. CLIMER:

**Q Do you know of any non-Jewish religious organizations that have applied for an SUP to conduct a house of worship within the residential zoning district?**

A I think Gesu would be subjected to that. However, I think they are establishing a time period that would have preceded the zoning rules of University Heights in the '50s, I think, and before that.

**Q Okay.**

A So they would be needing to do that. I believe the Gesu nuns, they have a commissary -- not a commissary. That's not correct. Not a monastery.

**Q A convent?**
A That's what I meant. I'm sorry. A convent. And for a priest it would be vestry?
**Q I'm not sure.**
A The convent, they do have a house --
**Q I grew up Presbyterian so ...**
A Okay. All right.
They do have a house on Miramar up the block past the church that they have gone over many times for special use permits and special accommodations for garages and various permits for the expansion of their driveway. I've seen those visually. I read them in my history being involved in this matter. And they're on the record as far as the city's matters, city's business, but it didn't revolve around my property, per se, so it never came out like in the document dumps or whatever. So they have an ongoing renewed permit that they have to do.
So, at minimum, I can say the Gesu church people, they carte blanche just get oh, sure, here you go, you need another extension for 700 more families, okay, we'll give you 10. That's the way you get that vibe.
I don't mind. I'm kind of open to

everybody's races, religions, and creed. I love everybody equally. They all hate me equally. So it's just terrible, but it's not my fault.

**Q So are you aware of the specific nature of the SUP requests submitted by Gesu, I think you said, for garages and stuff like that?**

A Not Gesu. The church is standing because -- it is in U-1 zoning, as a matter of fact, but I think it's supposedly -- you might want to call it grandfathered in. I don't know that to be accurate or true, but I think that's what the overall theme of the city's mentality is.

**Q You mean the previous --**

A But we're talking about the convent.

**Q Yeah. The convent or the --**

A That's a separate -- it's home.

**Q Right. Yeah.**

A That home --

**Q I understand.**

A -- had a regular home --

**Q Yeah.**

A -- that has a regular garage in the back, and I think it was the nuns who wanted to have an extension or expansion to their driveway, which was approved. And they wanted to have their

garages -- maybe it went from a two to three garage -- expanded, and that was it, requiring them to get a permit or whatever, and it was approved, and they had no problems getting it. They could get whatever they want. That's the problem.

It's not like they had to go -- they had to go too. They had to get a permit too. It's the fact that they weren't tarred and feathered and executed in broad daylight. That's the point I'm making.

**Q Are you aware of any non-Jewish organizations conducting a house of worship in the U-1 zoning district who have not had to get a special use permit?**

A I don't want to argue with you, but I want to tell you as a zoning guy from New York days, there are distinctions in this town that are pretty -- not fleshed out, and it's not going to look good in the future probably, but think about this --

**Q My question is --**

A -- there's something called community facility --

**Q No. My question is --**

A You're not letting me tell you what I want to tell you.
**Q -- are you aware of any non-Jewish religious organizations who have been permitted to conduct a house of worship in the U-1 zoning district without a special use permit?**
A I don't know if they're required to or not.
**Q Okay. You don't know if they are --**
A If they were required to or not.
**Q Okay.**
A They might have made me go for one when I didn't necessarily need one, but they might let the Catholic group who wants to have a prayer group in their house not even have to apply, so the question doesn't even add up. I don't know that they made them go get one. The mayor made me go get one. That's what I'm telling you. I didn't want to make --
**Q So the answer is you don't know, correct?**
A The answer is I don't know if the city imposed that restriction on them like they did on me.
**Q All right.**
A I can say this: I do know --
**Q You've answered the question.**

CERTIFICATE

I, Rebecca L. Fumich, Notary Public within and for the State of Ohio, do hereby certify that the within named witness, DANIEL GRAND, was first duly sworn to testify to the truth and nothing but the truth in the cause aforesaid; that the testimony was by me reduced to stenotype in the presence of said witness; afterwards transcribed, and that the foregoing is a true and correct transcription of the testimony so given by the above referenced witness. I further certify that this deposition was taken at the time and place in the foregoing caption specified. I do further certify that I am not a relative, counsel or attorney for either party, or otherwised interested in the event of this action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed by seal of office at Cleveland, Ohio this 22nd day of November, 2023.

Rebecca R. Fumich
________________________________

Rebecca L. Fumich, Notary Public,
within and for the State of Ohio.
My Commission expires: 6-5-2025.