UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DANIEL GRAND, | ) | CASE NO.:  1:22-cv-1594 |
| | ) | |
| Plaintiff, | ) | JUDGE BRIDGET MEEHAN BRENNAN |
| | ) | |
| v. | ) | |
| | ) | **AMENDED MEMORANDUM OPINION** |
| CITY OF UNIVERSITY HEIGHTS, | ) | **AND ORDER** |
| OHIO, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

Before the Court are the parties' cross-motions for summary judgment.  Plaintiff Daniel Grand moved for partial summary judgment on Counts One through Three, Five, Six, Eight through Twelve, and Fourteen, and only as asserted against University Heights and Mayor Michael Brennan.  (Doc. 81.)  Defendants opposed that motion (Doc. 88), and Grand replied (Doc. 91).  For the reasons explained below, Grand's partial motion for summary judgment is DENIED in its entirety.

All Defendants moved for summary judgment on all counts.  (Doc. 79.)  Grand partially opposed Defendant's motion (Doc. 89), and Defendants replied (Doc. 90).  Defendants' motion for summary judgment is GRANTED in part.  Counts One through Three and Five through Twelve are DISMISSED for lack of subject matter jurisdiction.  Defendants' summary judgment motion is GRANTED as to Counts Four, Thirteen, and Fifteen through Twenty, with those counts now summarily DISMISSED pursuant to Rule 56 of the Federal Rules of Civil Procedure.  The Court DECLINES supplemental jurisdiction on Count Fourteen.

I.      **Background**

     **A.      Factual Background**

This case arises from a land-use and zoning dispute between Plaintiff Daniel Grand ("Grand") and certain University Heights officials.  The facts of this case are largely undisputed. Grand is an Orthodox Jew.  (Doc. 79 at 1011; Doc. 79-1 at 1063; Doc. 81 at 1334.) [1]  As such, Grand is required to pray (or "daven") three times daily with a group of ten men ("minyan"). (*Id.*)  Typically, Grand does so at a synagogue or a shul.  (Doc. 79 at 1011; Doc. 79-1 at 1063–64.)  A shul is a place where davening occurs, which may or may not be a synagogue.  (Doc. 81 at 1334; Doc. 81-1 at 1367.)  Grand and practicing members of his faith do not drive on the Sabbath (or "Shabbos"), a Jewish day of rest that runs from Friday evening to Saturday evening. (*Id.*)  To pray with a minyan on the Sabbath, then, Grand and his fellow adherents must walk. (*Id.*)

     Grand moved to University Heights, Ohio ("University Heights" or the "City") in 2017. (Doc. 79 at 1010; Doc. 79-1 at 1041.)  Previously, he lived in New York City and worked in real estate, including owning a property violation company where he was involved with local administrative departments.  (Doc. 79-1 at 1041, 1053–55.)  When Grand moved to University Heights, he initially lived on Silsby Road, but relocated to Miramar Boulevard in 2019.  (Doc. 79 at 1011; Doc. 79-1 at 1040.)  From his Miramar residence, Grand frequently attended prayers at various nearby synagogues.  (Doc. 81-16 at 1530–31.)  On the Sabbath, Grand and his family walked to the synagogue.  (Doc. 81 at 1334.)  To avoid having to walk to and from a synagogue on the Sabbath multiple times a day, Grand decided to host prayers at his home on Miramar—

---

[1] For ease and consistency, record citations are to the electronically stamped CM/ECF document and PageID# rather than any internal pagination.

one prayer on Friday evening, one on Saturday morning, and one on Saturday evening.  (*Id.*)

Grand planned to host these meetings in a recreation room in his home.  (Doc. 81-8 at 1459.)

Grand constructed the recreation room when he moved to Miramar as an addition to his home for

use as a computer room or a place to play music.  (*Id.*)

On January 19, 2021, Grand sent an email inviting approximately twelve neighbors—and

any others those invitees wanted to bring—to join him for a minyan prayer session at his home.

(Doc. 88-2.)  The invitation read, in pertinent part:

> You are cordially invited to join us this Shabbos for the inauguration of the
> Shomayah Tefillah Beis Hakeneset located at 2343 Miramar Blvd. (The Daniel J.
> Grand Residence)
>
> We would also like to take this opportunity to introduce to you our Rabbi – Rabbi
> Rosskam - a smicha recipient from Rabbi Rueven Feinstein, and Rabbi Heinemann
> from Star-K
>
> The Davening Times will be:
>
> Friday Erev Shabbos Mincha 5:20 p.m.  [Friday evening]
> Shabbos Shacharis followed by Kiddush 9:45 a.m.  [Saturday morning]
> Mincha Followed by Seudah Shlishit 5:00 p.m.  [Saturday evening]
>
> You will see the shul entrance - keep a look out for the Orange Windows -
>
> And Please spread the word to whomever you feel might be interested in coming –
>
> The shul is being put together for two reasons, one has always been to expand the
> community, so we can spread out and open up more houses on the other side of
> belvoir, and the other is to have a place where people come to really, seriously
> daven to Hashem - we want to have a place that doesn't have talking during the
> davening, a powerful place to have your prays heard and answered Bezrat Hashem.

(*Id.*)

On January 21, 2021, a local resident forwarded Grand's January 19th email invitation to

University Heights Mayor Michael Brennan ("Brennan").  (Doc. 81 at 1334; Doc. 81-3.)  That

same day, Brennan forwarded the message to University Heights Law Director Luke McConville

("McConville").  (Doc. 81-5.)  Around two hours later, McConville emailed Grand a cease-and-desist letter.  (Doc. 81-6.)  The email subject line referred to "Use of Premises as a Shul," and the body of the cover email referred to "proposed use of said premises for religious assembly."  (*Id.* at 1452.)  The letter stated:

> I am writing to you in my capacity as Law Director for the City of University Heights (the "City").  The City has been made aware that you intend to use the premises at 2343 Miramar Boulevard (the "Premises") as a place of religious assembly and in operation of a shul.  Pursuant to the zoning map and codified ordinances of the City, the premises are zoned U-1 for residential use.  The use or operation of the Premises as a religious place of assembly and/or in operation as a shul or synagogue is not permitted under the City's ordinances.
>
> The City hereby notifies you that the use of the Premises as a place of religious assembly and/or in operation of a shul or synagogue is prohibited.  To the extent that the Premises are currently being used for said purposes or are intended to be used for such purposes in the immediate or near future, the City hereby demands that you immediately cease and desist any and all such operations. Violation of the City's ordinances in this manner may result in building code citations against you and in the pursuit of additional remedies.
>
> The City is particularly disturbed to learn of the proposed use of the Premises as a place of religious assembly given that you recently appeared before the City's Board of Zoning Appeals in connection with your application for variances.  The City is exploring whether variances granted for the Premises may be voidable based upon a subsequent illegal use of the Premises, or due to material omissions during the hearing process relating to your intent to utilize the Premises as a place of religious assembly.
>
> Allow me to refer you to City Codified Ordinance Chapter 1274 entitled "Houses of Assembly and Social Service Uses."  Under Chapter 1274, you may make application to the City's Planning Commission for a Special Use Permit.

(*Id.* at 1454–55.)  After McConville issued the letter, Brennan and Grand spoke about Grand's proposed activities.  (Doc. 81 at 1335.)  Grand explained that he wanted to host a small informal prayer group.  (*Id.*)  However, Brennan felt that Grand was being dishonest about his characterization of the small informal prayer group.  (Doc. 88-3 at 2476.)  This was based, in part, on (1) the content of the invite, which Grand allegedly contradicted in the phone call with

Brennan, and (2) the City's prior experiences with "pop-up" synagogues and shuls.[2]  (*Id.* at 2479–80.)  To Brennan, Grand should be required to go through the necessary permitting process, which he told Grand during the call: "I made clear to him that we have requirements in the City of University Heights, that one seek and obtain a special-use permit before operating a house of worship . . . in our city."  (*Id.* at 2476.)

Grand's residence is zoned U-1.  (Doc. 79 at 1013.)  According to the University Heights Code of Ordinances ("UHCO"), only permitted uses in U-1 zones are one-family dwellings, buildings owned by a board of education, buildings owned by the municipality, and buildings owned by a library board.  UHCO § 1250.02.  Churches are not permitted as a matter of right in U-1 districts.  UHCO § 1256.01.

Pursuant to § 1250.02(g), a person may apply for a Special Use Permit ("SUP").  UHCO § 1250.02(g).  If granted, a SUP allows certain buildings or uses in U-1, U-2, and U-4 districts where those buildings or uses would otherwise be prohibited.  UHCO § 1250.02.  The SUP process is found in UHCO § 1274.  Among those buildings or uses that may qualify for a SUP are: "(1) Houses of worship . . . including . . . synagogues[.]"  UHCO § 1274.01(b)(1).  UHCO does not define houses of worship.  Other buildings and uses qualify as well, such as physical or behavioral health care facilities, educational institutions, nurseries, day care centers, senior housing, and office space, among others.  UHCO § 1274.01(b)(2)–(7).  SUPs are issued by the University Heights Planning Commission ("Planning Commission") if the applicant shows by "clear and convincing evidence" the special use "will not impair surrounding property values or uses, vehicular parking and pedestrian or traffic conditions, lighting glare at night, noise

---

[2] Prior to the dispute here, University Heights shut down a separate residential shul after the City determined approximately 120 to 130 individuals were meeting in the basement.  (Doc. 90 at 2569.)

pollution to others or other applicable criteria in the Planning and Zoning Code, and will not be otherwise contrary to the public health, safety and welfare."  UHCO § 1274.01(a), (d).

Upon receiving an application, the Planning Commission may hold a public hearing, to occur within 90 days.  UHCO § 1274.01(d)(1).  Approval by the Planning Commission is subject to approval by City Council, and any denial of a SUP by the Planning Commission can be appealed to the City Council.  UHCO § 1274.01(d)(2).  At the time of the dispute here, the members of the Planning Commission were Brennan, Paul Siemborski ("Siemborski"), Michael Fine, John Rach, and April Urban.  (Doc. 81 at 1338.)

After receiving the letter from McConville, and after his conversation with Brennan, Grand cancelled the prayer group scheduled for that weekend.  (Doc. 81 at 1335; Doc. 81-2 at 1372.)  In the early hours of the next day, at approximately 1:00 a.m., Grand emailed the Clerk for City Council so he could apply for a SUP, stating "unbeknownst to me, I will need to file for a special use permit with the city planning commission to have friends come over to pray at my house."  (Doc. 81 at 1335–36; Doc. 81-7 at 1457.)  He applied for a SUP that same day, stating it was his intention to "utilize my current recreation room for periodic religious gatherings."  (Doc. 81 at 1336; Doc. 81-8 at 1459.)  Grand provided information relating to the room, including that it is about 700 square feet, he has 11 tables and 21 chairs set up, the room is on slab with no basement below it, there are three means of egress, and there would be no traffic since prayers will only be held on the Sabbath when no driving is permitted.  (Doc. 81-8 at 1459.)  The Planning Commission scheduled a meeting for March 4, 2021, to address Grand's application. (Doc. 81-9 at 1463.)

On March 3, 2021, Grand submitted a "Letter of Clarity" to the Planning Commission, which stated he only seeks to "have an informal prayer group for services in my home on the

Jewish Sabbath and High Holidays" and is not seeking to establish a formal house of worship, whether called a "shul" or "synagogue."  (Doc. 81-16 at 1530–31.)  The letter explained Grand was only seeking the SUP because University Heights officials told him to do so.  (*Id.*)

The March 4 hearing lasted approximately three hours.  (Doc. 79 at 1012; Doc. 81-11.)  Before the hearing, McConville stated it would be conducted as a quasi-judicial hearing (Doc. 81-11 at 1476), allegedly the first time a Planning Commission hearing was held in this manner (Doc. 81 at 1339).  Grand presented his application to the Planning Commission, through counsel, stating "this hearing is about whether a residence of University Heights may host prayer services in a designated, modest space in the resident's house and in a manner that is respectful of an unintrusive upon the resident's neighbors."  (Doc. 81-11 at 1478–80.)  Grand explained he wanted "to use the space in his house to host men's only prayer services for a prayer group once a week and on certain high holidays."  (*Id.* at 1479.)  After hearing from citizens, a Planning Commissioner made a motion:

> I would then make a motion to table that the applicant come back with a more thorough presentation as to site plan with the review from the fire department, inspection of the building, what needs to be done, whether it's a realistic option from . . . and if he's going to ask for a special use permit. Then it should be what the applicant has articulated, what the applicant wants to do.

(*Id.* at 1511–12.)  Another Commissioner voted for the motion and requested for the next meeting "more drawings of the building and the site plans so we have a clearer understanding of how the space is to be used."  (*Id.* at 1512.)  The motion to table passed three to two.  (*Id.*)  Essentially, the meeting adjourned so Grand could present a more thorough application, if he was going to present one at all, which included specific site plans.

Immediately following the meeting, members of the Planning Commission exchanged emails on Grand's position.  (Doc. 81-15 at 1523–28.)  Commissioner Siemborski expressed his

opposition to Grand's SUP application. (*Id.* at 1527.) Commissioner Fine, in addition to articulating his thoughts on the hearing generally, stated:

> As an aside, I do not know why anyone would need a special use permit to invited 10 friends to pray with them Friday night and Saturday morning in their living room. I also do not see how this would be different then my having friends over regularly for parties. There is no restriction on how much I can entertain. However, if I reconfigure my house for 10 or more people to come over regularly, give my group a name, and hire a prayer leader, that may be qualitatively different. It also raises suspicions that I am not really intending to limit my parties/meetings to Fri night and Sat day. However, there is a spectrum here, and I think that needs to be clarified.

> Mr. Grand's problem is that he testified that all he wanted to accomplish was the former, but his actions speak to something further along the spectrum toward a real house of prayer.

(*Id.* at 1526.) Commissioner Urban replied to Commissioner Fine, stating:

> I do think the application should be dismissed. I think the reason for dismissal should be that the use presented (the applicant proposed gathing [sic] 10-15 friends at his house once a week, as well as three times a year on the high holidays, for prayer) does not require a special use permit. We don't require other social gatherings occurring in a private home to have a special use permit. If the applicant's intentions are truly within the bounds they describe, why would he need a special use permit?

> I believe we were to take the applicant at his word as he was under oath, and he maintained a smaller group size. If the application is dismissed, and it is stated that reasonably sized gatherings can occur in private homes what is the mechanism for enforcement if gatherings get out-of-hand in size or frequency? My guess is the cease and desist order and other nuisance property mechanisms. Given he is an owner-occupant, I think these could be reasonably effective if the situation worsened. But how can we tell when activity is truly a nuisance to neighbors from when neighbors are being unneighborly because of their differences?

(*Id.* at 1525.) Commissioner Fine replied, "[a]s I wrote previously, a tension exists regarding at what point does a social gathering become a house of worship." (*Id.* at 1524.)

On March 12, 2021, the Planning Commission scheduled a second meeting for March 23, 2021. (Doc. 81-18.) When scheduling that meeting, Brennan explained in an email to a resident the first meeting was held as a quasi-judicial hearing so that if a decision of the Planning

Commission was appealed, the record would be limited to what was presented to the Commission and nothing more.  (*Id.* at 1539.)  In this way, it would prevent Grand, or anyone else, from presenting new evidence to a reviewing body.  (*Id.*)  Brennan also stated: "To be clear, the administration does not endorse or support the application.  Instead, this application was made only after the City sent a cease and desist letter to applicant in response to his widely circulated invitation announcing the opening of a shul." (*Id.*)

On March 16, Grand emailed the Planning Commission, requesting to be put in touch with City officials so he could supplement the SUP application with a site plan.  (Doc. 81 at 1341; Doc. 81-17 at 1534–35.)  Brennan responded to Grand, stating that he closed his application after Grand presented his application in the first meeting and explained no additional presentation would be necessary.  (Doc. 81-17 at 1533.)  Brennan explained that "[s]ince the meeting, individual members [of the Planning Commission] have expressed their desire to discuss what has been presented.  This discussion is not to be done as a group outside of the confines of a public meeting." (*Id.*)  Brennan was referring to the post-meeting email exchange between the Planning Commissioners.  (Doc. 81-15.)  Those emails were not made part of the record in the underlying proceeding.

On March 23, 2021, hours before the second meeting, Grand withdrew his SUP application.  His email read:

Mayor Brennan and Planning Commission,

Please be advised that I'm withdrawing my application for a special use permit.  I do not wish to operate a house of worship as is defined under the zoning ordinance, in the privacy of my home.

(Doc. 88-4 at 2482.)  The Planning Commission held the March 23 meeting as scheduled. During that meeting, Brennan stated the second meeting was called because members of the

Planning Commission had "demonstrated a desire to discuss this matter, in essence to deliberate, in the form of e-mails" after the first meeting. (Doc. 81 at 1342.) Brennan then read Grand's withdrawal into the record. (*Id.*) Brennan then stated:

> I therefore note for the record that the application is withdrawn. There is no special use permit for 2343 Miramar Boulevard. And I will remind the applicant that the cease-and-desist order of the City, dated January 21, 2021 remains in effect. Let there be no confusion, congregating at 2343 Miramar Boulevard or any other address located in a residence zoned U-1 without a special permit is a violation of city law.

> I'm hopeful that the wording of the withdrawal is not intended to suggest that congregating weekly at a residence to conduct activities consistent with those in a house of assembly does not require a special-use permit. As recently as two months ago, the city brought suit against the organizers of another residential shul, one on Churchill Boulevard, and ultimately obtained a permanent injunction in court.

> To the community members who are here, let there be no question, there is no permission granted here to operate . . . a house of assembly or conduct activities consistent with one at 2343 Miramar Boulevard. If you observe such activities, and I hope you do not, but if you do, you may report them to the city, and the city will enforce its laws, which exist for the benefit of the entire community. And we will seek all appropriate remedies in court. With that I move to adjourn.

(Doc. 81 at 1342–43.)

Between the submission of the SUP until immediately after it was withdrawn, certain events occurred. In February 2021, after Grand submitted his SUP application, Grand noticed a neighbor had set up multiple cameras pointing directly at and into his home. (Doc 89-1 at 2541.) Grand filed two police reports. (*Id.*) The City declined to act. (*Id.*) Grand hung a landscaping mesh sheet to block the cameras, but the City instructed him to remove it. (*Id.*)

On March 23, 2021, UHPD Lieutenant Mark McArtor sent an email to patrol units advising they make frequent "drive-bys" of Grand's residence to ensure compliance with certain city laws. (Doc. 82-1 at 1772.) Also in March 2021, Grand's neighbors reported to the City and Brennan that Grand laid gravel for additional parking at his residence. (Doc. 82-1 at 1775.)

Grand was previously denied a permit to pour concrete and so the neighbors wanted the City to intervene.  (*Id.*)  After UHPD officers told the neighbors the UHPD would not intervene, the neighbors contacted Brennan.  (*Id.*)  Brennan reached out to the UHPD, who reported back that "it would be my recommendation for the Building Department to take the lead on this matter going forward. . . . However, the PD will assist in any way we can to resolve the matter, to include patrol officers responding after hours to photograph/video possible evidence of a complaint/infraction."  (*Id.*)

On March 28, 2021, after further complaints from a neighbor about building code violations at Grand's residence, the City Prosecutor raised conducting a full inspection of Grand's home.  (*Id.* at 1779.)  The City Prosecutor explained such an inspection would require either the property owner's permission or a search warrant.  (*Id.*)  Afterwards, a city inspector went to Grand's home to conduct an inspection.  Grand's wife consented to the City's inspection of the house.  (Doc. 79 at 1019; Doc. 79-9 at 1224; Doc. 90 at 2575.)  The record does not reflect whether citations were issued.

### B.    Procedural History

Grand initiated this action on September 8, 2022, approximately a year and a half after the events giving rise to the dispute.  (Doc. 1.)  Since then, Grand amended his complaint twice (Docs. 25, 67) and dismissed several named defendants (Docs. 49, 50, 59, 60, 61).  The remaining defendants are University Heights, Michael Brennan, Luke McConville, and Paul Siemborski.[3]  (Doc. 67.)  Grand sued Brennan in his official capacity as Mayor of University Heights and in his individual capacity.  (*Id.* at 573.)  Grand's claims against McConville and

---

[3] The Court will use "Defendants" to mean all Defendants collectively.  The Court will use "Individual Defendants" to refer to Brennan, McConville, and Siemborski collectively. Otherwise, the Court will refer to each Defendant separately by name.

Siemborski are brought in their individual capacities. (*Id.*) The operative complaint, the second amended complaint, asserts twenty claims. (*Id.* at 633–39.) Some claims are asserted against all Defendants, while others are asserted against a subset. (*Id.*)

The twenty claims are: First Amendment, Free Exercise Clause (Count One); First Amendment, Freedom of Assembly (Count Two); First Amendment, Prior Restraint (Count Three); Fourth Amendment, Unreasonable Search (Count Four); Fourteenth Amendment, Procedural Due Process (Count Five); Fourteenth Amendment, Equal Protection (Count Six); Fourteenth Amendment, Equal Protection (Class of One) (Count Seven); Religious Land Use and Institutionalized Persons Act ("RLUIPA"), Substantial Burdens (Count Eight); RLUIPA, Equal Terms (Count Nine); RLUIPA, Non-Discrimination (Count Ten); RLUIPA, Unreasonable Limitation (Count Eleven); Ohio Constitution, Freedom of Religious Exercise (Count Twelve); Common Law Right to Worship (Count Thirteen); Ohio Public Records Law (Count Fourteen); Invasion of Privacy (Count Fifteen); Freedom of Access to Clinic Entrances Act ("FACE Act") (Count Sixteen); Intentional Infliction of Emotional Distress (Count Seventeen); Civil Conspiracy (Count Eighteen); Abuse of Process (Count Nineteen); and Malicious Prosecution (Count Twenty). (*Id.*) Grand asserts his federal claims pursuant to 42 U.S.C. § 1983.

Counts One through Thirteen are asserted against all Defendants. (*Id.* at 633–37.) Count Fourteen is brought against University Heights only. (*Id.* at 637.) Counts Fifteen and Seventeen are brought against Brennan only. (*Id.* at 637–38.) Count Sixteen is asserted against University Heights and Brennan. (*Id.* at 638.) Counts Eighteen and Nineteen are asserted against the Individual Defendants. (*Id.* at 638–39.) Count Twenty is asserted against Brennan and McConville. (*Id.* at 639.)

Grand's second amended complaint seeks the following extensive relief: a permanent

injunction permitting him to pray in his home with others without obtaining a SUP; a declaration that the City's conduct was unlawful; an order enjoining the City from treating Grand differently than other residents; an order enjoining the City from revoking permits previously provided to him; a declaration that the City discriminated against Grand for his religious beliefs; an order that the City's discriminatory actions are void; a declaration that Grand is entitled to a certificate of occupancy for his home; a writ of mandamus compelling the City to issue a certificate of occupancy; a writ of mandamus compelling the City to comply with the Ohio Public Records Act and an award of statutory fees, court costs, and attorneys' fees relating to the Ohio Public Records Act; damages relating to FACE Act violations; a declaration that the City's land-use ordinances are unconstitutional because they violate the First Amendment, RLUIPA, and the Ohio Constitution; a permanent injunction barring the City from enforcing the ordinances; and an award of compensatory damages.  (*Id.* at 639–40.)

The parties filed cross-motions for summary judgment.  Defendants' motion for summary judgment seeks judgment on all claims and as to all Defendants.  (Doc. 79.)  Grand moved for partial summary judgment, seeking judgment only on certain claims and against only certain Defendants.  (Doc. 81.)  Specifically, Grand moved for partial summary judgment on Counts One through Three, Counts Five and Six, Counts Eight through Twelve, and Count Fourteen against University Heights.  (*Id.* at 1328.)  Grand moved for partial summary judgment on Counts One through Three, Counts Five and Six, and Count Twelve against Brennan.  (*Id.*)  Grand did not move for summary judgment on any claims he asserts against McConville or Siemborski.  (*Id.*)

Grand only partially opposed Defendants' motion for summary judgment.  (Doc. 89.)  Specifically, Grand stated no opposition to summary judgment on Count Seventeen and Counts

Nineteen and Twenty.  (*Id.*)  He further did not provide any opposition as it relates to Siemborksi or McConville, except for Count Eighteen.  (*Id.*)  Defendants' opposed Grand's partial motion for summary judgment in full.  (Doc. 88.)  The motions are fully briefed.  (Doc. 90, 91.)

In Grand's summary judgment papers, he affirmatively disclaims seeking to operate a house of worship at his home.  (Doc. 81 at 1345.)  Instead, he wants only to host a small informal prayer group.  (*Id.*)  Defendants, in their summary judgment papers, have stipulated that Grand, and anyone else in the City, can hold small, informal religious (or non-religious) gatherings on a regular basis and such activity is not subject to any of the City's ordinances or permitting requirements.  (Doc. 88 at 2419–20.)  Thus, to the extent Grand's activities are consistent with this type of gatherings, the City will not take any action.

## II.  <u>Analysis</u>

### A.  **Summary Judgment Standard**

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."  Fed. R. Civ. P. 56(a).  "Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and affidavits show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  The moving party bears the burden of showing that no genuine issues of material fact exist."  *Williams v. Maurer*, 9 F.4th 416, 430 (6th Cir. 2021) (quotation and citations omitted).

A "material" fact is one that "might affect the outcome of the suit under the governing law[.]"  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "And a genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the

non-moving party." *Abu-Joudeh v. Schneider*, 954 F.3d 842, 849–50 (6th Cir. 2020) (quotation and citations omitted).

"Once the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact." *Queen v. City of Bowling Green*, 956 F.3d 893, 898 (6th Cir. 2020) (quotation and citations omitted).  On summary judgment, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion.  *Kalamazoo Acquisitions, L.L.C. v. Westfield Ins. Co.*, 395 F.3d 338, 342 (6th Cir. 2005).  A party asserting or disputing a fact must cite evidence in the record or show that the record establishes either the absence or the presence of a genuine dispute.  *See* Fed. R. Civ. P. 56(c) & (e).  Rule 56 further provides that "[t]he court need consider only" the materials cited in the parties' briefs.  Fed. R. Civ. P. 56(c)(2); *see also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.").

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation and citation omitted).  The Court's role is not to make credibility determinations or weigh conflicting evidence.  *Payne v. Novartis Pharms. Corp.*, 767 F.3d 526, 530 (6th Cir. 2014) (citation omitted).  "The ultimate question is whether the evidence presents a sufficient factual disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law." *Id*. (citation omitted).

"[A] plaintiff is deemed to have abandoned a claim when [he] fails to address it in response to a motion for summary judgment." *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368,

372 (6th Cir. 2013) (collecting cases).  However, the party moving for summary judgment "always bears the burden of demonstrating the absence of a genuine issue as to material facts" and this burden applies "regardless if an adverse party fails to respond."  *Carver v. Bunch*, 946 F.2d 451, 454–55 (6th Cir. 1991) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). A district court "cannot grant summary judgment in favor of a movant simply because the adverse party has not responded."  *Id.*  Instead, "[t]he court is required, at a minimum, to examine the movant's motion for summary judgment to ensure that he has discharged that burden."  *Id.*; *see also Delphi Auto. Sys., LLC v. United Plastics, Inc.*, 418 F. App'x 374, 381 (6th Cir. 2011) (holding a movant was not entitled to summary judgment simply because the other party failed to respond).

### B.  Ripeness

Before considering the merits, the Court must first resolve whether Grand's claims are ripe for federal judicial review.[4]

"The ripeness doctrine encompasses 'Article III limitations on judicial power' and 'prudential reasons' that lead federal courts to 'refuse to exercise jurisdiction' in certain cases." *Miles Christi Religious Ord. v. Twp. of Northville*, 629 F.3d 533, 537 (6th Cir. 2010) (quoting *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003)).  Federal court jurisdiction is limited to justiciable cases and controversies, thereby eliminating from their judicial review

---

[4] Defendants raise ripeness in their opposition to Grand's motion for partial summary judgment, but only as to procedural due process (Count Five).  Because the doctrine applies to all claims arising from a land-use dispute, and because it goes to whether the Court has subject matter jurisdiction, the Court considers ripeness *sua sponte* for all land-use related claims at issue here. *See Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006) (a court has an "independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party.").

abstract, unresolved, or premature matters.  *Id.*; *see also Warshak v. United States*, 532 F.3d 521, 525 (6th Cir. 2008); *Nat'l Park*, 538 U.S. at 807–08.

In assessing ripeness, courts must resolve two questions: "(1) is the dispute 'fit' for a court decision in the sense that it arises in 'a concrete factual context' and involves 'a dispute that is likely to come to pass'? and (2) what are the risks to the claimant if the federal courts stay their hand?"  *Miles Christi*, 629 F.3d at 537 (quoting *Warshak*, 532 F.3d at 525).

In the land-use context, the concepts of "a concrete factual context" and "a dispute that will likely come to pass" hinge on whether there has been a final determination by the appropriate local or administrative body.  *Id.* (citing *Williamson Cnty. Reg'l Plan. Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186 (1985)).  Meaning, has the disputed issue been presented to local authorities and, if so, has the local or administrative body "adopted a 'definitive position' as to 'how the regulations at issue apply to the particular land in question.'"  *Catholic Healthcare Int'l, Inc. v. Genoa Charter Twp.*, 82 F.4th 442, 448 (6th Cir. 2023) (quoting *Pakdel v. City & Cnty. of San Fran.*, 594 U.S. 474, 478–79 (2021)); *see also Bannum, Inc. v. City of Louisville*, 958 F.2d 1354, 1363–64 (6th Cir. 1992) ("By finality we mean that the actions of the city were such that further administrative action by [the plaintiff] would not be productive.").  Final decisions in this context do not require exhaustion.  *Miles Christi*, 629 F.3d at 541; *Catholic Healthcare*, 82 F.4th at 448.  That is, plaintiffs do not need to prove that their land-use request was reviewed by every applicable authority at the local level.  Nor does a plaintiff need to exhaust appeals.  Instead, finality is a "'relatively modest' showing that the 'government is committed to a position' as to the strictures its zoning ordinance imposes on a plaintiff's proposed land use."  *Catholic Healthcare*, 82 F.4th at 448 (quoting *Pakdel*, 594 U.S. at 479); *see also McCausland v. Charter Twp. of Canton*, No. 23-1479, 2024 WL 3045525, at *6 n.6 (6th Cir.

June 18, 2024) (explaining recent Supreme Court precedent does not require exhaustion but does still require finality).

The finality requirement has been applied to "constitutional and statutory challenges to local land-use requirements," including those at issue here. *See, e.g.*, *Grace Cmty. Church v. Lenox Twp.*, 544 F.3d 609, 615 (6th Cir. 2008) (RLUIPA claims); *Insomnia, Inc. v. City of Memphis*, 278 F. App'x 609, 616 (6th Cir. 2008) (First Amendment claim arising under the Free Speech Clause); *Bannum*, 958 F.2d at 1363–64 (Equal Protection Clause under Fourteenth Amendment); *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 350 (2d Cir. 2005) (First Amendment claim arising under the Free Exercise Clause). Procedural due process claims are also subject to the finality requirement unless the "denial of procedural due process itself creates an injury." *Bigelow v. Mich. Dept't of Nat. Res.*, 970 F.2d 154, 160 (6th Cir. 1992).[5]

Absent a showing the City expressed a final or definitive position, this Court does not have subject matter jurisdiction. *See, e.g.*, *Insomnia*, 278 F. App'x at 610 (affirming dismissal of constitutional claims on ripeness grounds where interim order instructed applicant to reapply under different code provisions); *Grace Cmty. Church*, 544 F.3d at 611 (affirming dismissal of RLUIPA and Equal Protection claims as unripe where planning commission's revocation of SUP to operate a church in a residential area was not appealed to the local body's reviewing authority); *Miles Christi*, 629 F.3d at 53 (affirming dismissal of RLUIPA and constitutional claims on ripeness grounds where city officials initially determined plaintiff's at-home religious activities required a permit and cited plaintiff for failing to obtain a SUP, but where the zoning

---

[5] Grand's denial of due process claim is subject to the same ripeness inquiry because it is indisputably ancillary to these constitutional and statutory challenges. *See Bigelow*, 970 F.2d at 160. And, even if it was not, Grand was afforded due process. Grand submitted a SUP application and presented it to the Planning Commission, but later withdrew it because, as he stated at the time of withdrawal, the local ordinance did not apply to small religious assemblies.

board had not yet stated whether the local ordinance applied to plaintiff's stated use); *but see Catholic Healthcare*, 82 F.4th at 448 (finding First Amendment and RLUIPA claims ripe where township insisted on and then denied (twice) plaintiff's application for SUP to put up religious displays and appeal to zoning board of appeals was unsuccessful).

Following the Sixth Circuit, district courts have required finality as a condition precedent for ripeness. *See, e.g.*, *Yetto v. City of Jackson*, No. 17-cv-1205, 2019 WL 2715545, at *9–10 (W.D. Tenn. June 28, 2019) (dismissing case as unripe where plaintiff withdrew application for special use permit before final determination was made regarding whether ordinances applied to religious gatherings in home even though city issued a cease-and-desist order); *Oliver v. Etna Twp.*, No. 22-cv-2029, 2024 WL 1804993, at *5–6 (S.D. Ohio Apr. 24, 2024) (dismissing as unripe claims relating to rezoning application that was withdrawn before the city's decision on the application); *Daisy Invest. Corp. v. City of Seven Hills*, No. 22-cv-1276, 2024 WL 3759648, at *6 (N.D. Ohio Aug. 12, 2024) (finding claim ripe where the city denied variance and sent a letter to applicant that the "mayor, administration, and city council" reviewed regarding proposed special use permit).

So, what types of statements or decisions can be considered final for ripeness purposes?

In *Miles Christi*, plaintiff began using his residential home for religious activity, including religious gatherings of increasing size.  629 F.3d at 535.  After an investigation and discussion with the plaintiff, the city official with authority to interpret and apply local ordinances told plaintiff they needed to request a variance from the board of zoning appeals or submit a site plan to the city planning commission.  *Id.* at 536.  After no action from plaintiff, the city issued a citation, and a lawsuit followed.  *Id.* at 537.  The Sixth Circuit rejected the argument that the city official's insistence that plaintiff file for a variance or file a site plan was "the kind

of decision necessary to overcome . . . ripeness concerns." *Id.* at 538.  Further, the city's ordinances provided that the zoning board of appeals was responsible for interpretation of the ordinances and that any matter before the planning commission could be tabled until the board could weigh in.  *Id.*  Thus, the remaining open questions were: "(1) Has Miles Christi put its house to a 'more intensive use' within the meaning of § 170–33.2 of the Northville Code? (2) Is the Miles Christi house a 'church' within the meaning of § 170–26.2 of the Code? and (3) Does Miles Christi have an obligation to submit a site plan in the first instance in view of the meaning of these ordinances and its request for a variance?"  *Id.*  Since none of these were answered, finality was not demonstrated.

Also instructive is the district court's holding in *Yetto*.  In *Yetto*, plaintiffs hosted at their residence approximately twenty to thirty gatherings each year with members of their faith led by a priest.  2019 WL 2715545 at *3–4.  After an initial investigation, the city planner sent a zoning violation letter to plaintiffs, indicating a church might be operating at the residence and places of worship required a special exception since the residence was in a residential only zone.  *Id.*  The letter stated an application must be made to the Board of Zoning for approval and any further use of the property will result in a fine or an injunction.  *Id.*  In discussions with the city, plaintiffs referred to the residence as a church, but later, plaintiffs explained they were only holding informal prayer gatherings.  *Id.* The city still then required plaintiffs to apply for a SUP.  City representatives testified if plaintiffs demonstrated they were not using their property as a church, and instead, were only using it for small gatherings akin to bible studies, the ordinance would not apply, and a special permit would be unnecessary.  *Id.*  Without a definitive answer at that time, the city assumed the ordinances applied to plaintiffs' activities, and so, plaintiffs filed for a permit.  *Id.* at *4–5.

Prior to a decision on the permit, plaintiffs withdrew their application and sued in federal court alleging, as relevant here, violations of RLUIPA.  *Id.*  During litigation, both parties agreed that if plaintiffs were using the property akin to a bible study or other small gathering the ordinance would not apply in the first place.  *Id.*  The court found the cease-and-desist letter was not sufficient to meet the finality requirement.  *Id.* at *8.  Instead, the court found the letter put plaintiffs on notice about the purported violation and potential penalties, but that no enforcement action was taken at that time.  *Id.*  The court rejected plaintiffs' argument the letter "enjoined" them from future activities because plaintiffs could engage in the process to either get a permit or receive a determination that a permit was not necessary.  *Id.*  Since plaintiffs withdrew their application before that could be done, the claims were not ripe.

On the other hand, the Sixth Circuit in *Catholic Healthcare* found the plaintiff's claims to be sufficiently ripe, but the plaintiff there identified prior denials of SUP applications, citations issued to him for failing to have a SUP, and the zoning board's denial of his appeal.  82 F.4th at 448.

Moving to the facts of this case, the City neither reached nor stated a "definitive position" such that the finality requirement has been met.  Grand received a cease-and-desist letter stating he needed to submit a SUP application for a "religious place of assembly."  Grand promptly contacted city officials to obtain information on how to submit his application (within hours of receiving the City's letter and speaking with Brennan), applied the day after receiving the letter, and the Planning Commission held a hearing on March 4, 2021.  Brennan, one voting member of the Planning Commission, expressed his views during and after that meeting.  But the Planning Commission tabled Grand's petition so members could receive more information and determine the ordinance's applicability.

Grand insisted the ordinance did not apply.  After the meeting, certain members of the

Planning Commission appeared to agree, with one member stating "I do not know why anyone

would need a special use permit to invite 10 friends to pray with them Friday night and Saturday

morning in their living room.  I also do not see how this would be different then my having

friends over regularly for parties."  (Doc. 81-15 at 1526.)  No vote was taken and no

pronouncement from the Planning Commission was ever stated.  Thus, like in *Insomnia*, *Grace*

*Cmty. Church*, *Miles Christi*, and *Yetto*, the Planning Commission had not yet reached a final

decision on the ordinance's applicability to Grand's small, religious gatherings.  Grand also

asserts Brennan's comments after Grand withdrew his application are evidence of First

Amendment violations, but (1) there was no longer an application pending with the city, and (2)

even as Mayor, Brennan was only one member to the Planning Commission, and he is not a

member of the Board of Zoning Appeals—the entity who interprets the UHCO.  *Cf. Miles*

*Christi*, 629 F.3d at 538 (finding no finality where entity charged with interpretation of

ordinances had not yet rendered a decision on the application of the zoning code to dispute).

The Sixth Circuit has long recognized land-use disputes like the one presented here may

"be satisfactorily resolved at the local level," thereby obviating the need for any litigation, let

alone federal judicial review.  *Miles Christi*, 629 F.3d at 537.  This is why finality is a critical

component of the court's ripeness assessment.[6]  Grand withdrew his application after the hearing.

---

[6] This Court recognizes that finality is required for as-applied challenges. *Tini Bikinis-Saginaw, LLC v. Saginaw Charter Twp.*, 836 F.Supp.2d 504, 517–18 (E.D. Mich. 2011) (distinguishing ripeness doctrine between as-applied and facial challenges).  Some of Grand's statements suggest a possible facial challenge, but such a challenge is neither stated nor developed in argument. Moreover, the parties' agreement that the ordinance does not apply eliminates a facial challenge altogether.  *See Yetto*, 2019 WL 2715545, at *7 (dismissing facial challenges to ordinances where parties agreed that plaintiffs' conduct did not qualify as operating a place of worship, and therefore, did not come within the bounds of the city's ordinances).

In so doing, he advised City officials withdrawal was appropriate because the ordinance did not apply, and no SUP was required for his small, religious gatherings. Notably, this is where the factual record ends. There is no evidence that Grand was denied the ability to engage in small religious gatherings in his home after withdrawing the SUP application. There is no evidence the City insisted he obtain a SUP for these small religious gatherings or that it interfered with Grand's religious gatherings after he withdrew the application. While Brennan stated the cease-and-desist order was still in effect, Grand's withdrawal of his application indicated he believed his conduct was not subject to the prohibitions in the letter.

Simply put, the factual record before the Court is that the ordinance did not apply, Grand withdrew his application, and the City did nothing further. And while not "factual," the City's stated position in briefings before this Court is that the ordinance does not apply to Grand and that it agrees that small, religious gatherings do not require a SUP. Thus, to the extent a "definitive" statement was made, it appears such a statement was made in Grand's favor.[7]

For the reasons stated above, the Court dismisses Counts One through Three and Five through Twelve for lack of subject matter jurisdiction.[8]

### C.    Fourth Amendment (Count Four, all Defendants)

Grand's Fourth Amendment claim alleges Defendants conducted an unreasonable search of his house by "engaging in unwarranted, indiscriminate, and intrusive video surveillance and surveillance by other means." (Doc. 67 at 634.) Defendants moved for summary judgment.

---

[7] This raises a mootness issue for some of claims and requested relief. Mootness was not raised by the parties, and that the Court need not address it after having determined Grand's claims are not ripe for federal judicial review.

[8] As it relates to Grand's RLUIPA claims, the Court notes Grand affirmatively disavowed any intention to hold religious gatherings of the sort subject to the UHCO.

(Doc. 79 at 1018.)  Grand opposed that motion but did not move for summary judgment himself. (Doc. 89 at 2527.)

Grand's Fourth Amendment claim involves three fact patterns.  One, neighbors directed video cameras at his home.  (*Id.* at 2527.)  Two, police officers drove by the house.  (*Id.*)  Three, University Heights' conducted an "illegal" inspection of his home.  (*Id.*)  In their papers, Defendants argue the neighbors' conduct lacked government action and was not a search, the monitoring of Grand's home was not a search, and the inspection of Grand's home was consensual.  (Doc. 79 at 1019–20; Doc. 90 at 2574–75.)

The Fourth Amendment to the United States Constitution provides "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]"  U.S. Const. amend. IV.  "The basic purpose of this Amendment . . . is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials."  *Camara v. Mun. Ct. of City & Cnty. of S.F.*, 387 U.S. 523, 528 (1967).  "To determine whether a Fourth Amendment violation has occurred, we ask two primary questions: first, whether the alleged government conduct constitutes a search within the meaning of the Fourth Amendment; and second, whether the search was reasonable."  *Taylor v. City of Saginaw*, 922 F.3d 328, 332 (6th Cir. 2019).

*Neighbors' Surveillance.*  "[T]he Fourth Amendment proscribes only governmental action and does not apply to a search or seizure, even an unreasonable one, conducted by a private individual not acting as an agent of the government or with the participation or knowledge of any governmental official."  *United States v. Lambert*, 771 F.2d 83, 89 (6th Cir. 1985) (citing *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)).  "[T]o trigger Fourth Amendment protection under an agency theory, the police must have instigated, encouraged, or participated in the search,' and

'the individual must have engaged in the search with the intent of assisting the police in their investigative efforts.'"  *United States v. Robinson*, 390 F.3d 853, 872 (6th Cir. 2004) (quoting *Lambert*, 771 F.2d at 89).

Grand argues the cameras pointed at his residence were set up by his neighbor in February 2021 shortly after he submitted his application for a SUP.  (Doc. 89 at 2528.)  However, Grand does not provide the Court with any facts that indicate any Defendant requested or ordered the neighbor to set up such surveillance.  Grand cites to a March 2021 meeting where Brennan stated that Grand's neighbor had cameras focused on his property and reported such material to Brennan "at all hours of the night."  (*Id.*)  But in his deposition, *Grand* explained that Brennan was frustrated by the neighbor sending such "evidence" to him "at all hours of the night."  (Doc. 79-1 at 1105.)  That is, Brennan was not asking for the neighbors' surveillance footage, but instead, was angered by the neighbors sending that footage and reporting other sorts of evidence throughout the evening.  Grand therefore concedes Brennan did not instigate, encourage, or participate in the monitoring of his home.  Further, if the neighbors set up cameras in February 2021, and Grand relies on Brennan's statements in a March 2021 meeting, Brennan's statements could not have been the source of the neighbor's conduct.

*Monitoring of Home.*  A "search" within the meaning of the Fourth Amendment occurs when "a government official invades an area in which a person has a constitutionally protected reasonable expectation of privacy."  *United States v. May-Shaw*, 955 F.3d 563, 567 (6th Cir. 2020) (quotation and citation omitted).  A person must "exhibit 'an actual (subjective) expectation of privacy'" and that "expectation is one 'that society is prepared to recognize as reasonable.'"  *Id.* (quoting *Katz v. United States*, 389 U.S. 347, 361 (1967)).  Under well-settled law, the Fourth Amendment does not "preclude an officer's observations from a public vantage

point where he has a right to be and which renders the activities clearly visible." *California v. Ciraolo*, 476 U.S 207, 213 (1986).  A person has no reasonable expectation of privacy where the "same views enjoyed by passersby on public roads" were used by police.  *United States v. Houston*, 813 F.3d 282, 287–88 (6th Cir. 2016).

Grand presents no evidence police officers conducted a "search" within the meaning of the Fourth Amendment.  Instead, in his opposition, Grand cites an email from the University Heights Police Department instructing officers to "please make frequent drive-bys at [Grand's residence] for violations to 452.03 PROHIBITED STANDING OR PARKING PLACES of parking on landscaped surfaces."  (Doc. 82-1 at 1772.)  But merely driving by Grand's residence is not a "search."  In fact, the Sixth Circuit has rejected Fourth Amendment claims involving far more intrusive conduct.  *See, e.g.*, *Houston*, 813 F.3d at 289 (with respect to a front porch, holding that the government "could have staffed an agent disguised as a construction worker to sit atop the pole or perhaps dressed an agent in camouflage to observe the farm from the ground level for ten weeks"); *May-Shaw*, 955 F.3d at (long-term surveillance of carport next to home through video did not violate Fourth Amendment because area recorded was "was readily accessible from a public vantage point").  In short, Grand has presented no evidence driving by his home constituted a search.

*Home Inspection*.  Home inspections conducted by municipal governments are a "search" within the meaning of the Fourth Amendment.  *Camara*, 387 U.S. at 534 (holding that housing code inspections are subject to Fourth Amendment).  Typically, the municipality either needs a warrant or probable cause to conduct the inspection.  Consent is an exception to the warrant or probable cause requirement.  *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) ("one of the specifically established exceptions to the requirements of both a warrant and probable cause

is a search that is conducted pursuant to consent"); *United States v. Jenkins*, 92 F.3d 430, 436 (6th Cir. 1996) (same).

Defendants assert the inspection was consensual.  (Doc. 79 at 1019; Doc. 90 at 2575.) Grand's wife gave consent for the inspection.  (Doc. 79 at 1019; Doc. 90 at 2575.)  She testified to this fact.  (Doc. 79-9 at 1224.)  There is no dispute about her consent and no evidence from which the Court could infer that her permission was not freely given.  Consensual searches do not violate the Fourth Amendment.

None of Grand's Fourth Amendment theories survive Defendants' motion for summary judgment.  Count Four is dismissed with prejudice.

### D.    Common Law Right to Worship (Count Thirteen, all Defendants)

Grand alleges all Defendants violated his common law right to worship.  (Doc. 67 at 637.)  Grand did not move for summary judgment on this claim.  All Defendants did.  (Doc. 79 at 1030.)  Grand did not oppose Defendants' motion.  In their motion, Defendants argue Ohio has not recognized a common law right to worship as pleaded in Grand's second amended complaint. (*Id.*)  Grand has not supplied this Court with any authority to suggest Ohio recognizes such a cause of action, and this Court has found none.  Accordingly, Defendants' motion for summary judgment on this claim is granted.  Count Thirteen is dismissed with prejudice.

### E.    Ohio Public Records Law (Count Fourteen, University Heights only)

Grand moved for summary judgment on his claim that University Heights violated R.C. § 149.43(C)(1)(b), the Ohio Public Records Act.  (Doc. 81 at 1361–62.)  University Heights also moved for summary judgment on this claim.  (Doc. 79 at 1030.)  Both parties opposed the other's motion.  (Doc. 88, 89.)

R.C. § 149.43 allows an individual to request documents from public entities.  R.C. § 149.43(B)(1).  If the government entity does not "promptly" provide those documents, the aggrieved person may bring an action to seek those documents, and additionally seek statutory damages, costs, and reasonable attorneys' fees.  R.C. § 149.43(C)(1).

Grand argues University Heights violated the Act when the City failed to timely respond to his records request relating to documents in the City's possession about him.  (Doc. 81 at 1362.)  Grand sent a document request to the City on July 28, 2021 which was not responded to until after this lawsuit was filed on September 8, 2022.  (*Id.*)  For its part, University Heights argues only that this Court is the improper venue and jurisdiction to bring a claim under R.C. § 149.43.  (Doc. 79 at 1030.)  Section 149.43(C)(1)(b) allows an aggrieved person to commence a mandamus action which may be initiated in the court of common pleas, the Ohio Supreme Court if it has original jurisdiction, or the court of appeals if it has original jurisdiction.  Because the statute specifically requires a party to file in one of those three courts, the City argues this Court is the improper venue and jurisdiction.  (Doc. 79 at 1030–31.)

The City's argument is misplaced.  State statutes cannot divest a federal court of jurisdiction.  *See Superior Beverages Co., Inc. v. Schieffelin & Co.*, 448 F.3d 910, 917 (6th Cir. 2006) (citing *Ry. Co. v. Whitton*, 80 U.S. 270, 286 (1871)).  Instead, "[i]n determining its own jurisdiction, a District Court of the United States must look to the sources of its power and not to acts of states which have no power to enlarge or to contract the federal jurisdiction."  *Id.* (quoting *Grand Bahama Petrol. Co., Ltd. v. Asiatic Petrol. Corp.*, 550 F.2d 1320, 1325 (2d Cir. 1977)).  This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) because the facts giving rise to this claim involve the "same case or controversy" as the federal claims also asserted in this case.  Thus, R.C. § 149.43(C)(1)(b) does not deprive this Court of jurisdiction.  *See First*

*Response Metering, LLC v. City of Wilmington*, No. 20-cv-329, 2021 WL 1172070, at *3 (S.D.

Ohio Mar. 29, 2021) (rejecting argument that statute in the Ohio Revised Code deprived federal

court jurisdiction where statute required filing in court of common pleas).

However, supplemental jurisdiction pursuant to § 1367 is discretionary, not mandatory.

*See Charvat v. NMP, LLC*, 656 F.3d 440, 446 (6th Cir. 2011) ("Although the district court may

exercise supplemental jurisdiction over these state-law claims pursuant to 28 U.S.C. § 1367,

supplemental jurisdiction is discretionary, not mandatory."). Accordingly, while the Court may

exercise jurisdiction to reach the merits of this claim, it need not do so. In this case, the Court

exercises its discretion to deny supplemental jurisdiction so that a state court can evaluate the

claim and the reasonableness of any damages sought. Therefore, the claim is dismissed.

### F.    Invasion of Privacy (Count Fifteen, Brennan only)

Brennan moved for summary judgment on Grand's invasion of privacy claim. (Doc. 79

at 1031.) Grand did not move for summary judgment on this claim but did oppose Brennan's

motion. (Doc. 89 at 2536.)

In Ohio, invasion of privacy involves four distinct torts: "(1) intrusion upon the plaintiff's

seclusion or solitude, or into his private affairs; (2) public disclosure of embarrassing private

facts about the plaintiff; (3) publicity which places the plaintiff in a false light in the public eye;

and (4) appropriation, for the defendant's advantage, of the plaintiff's name or likeness." *Devore*

*v. Rolls-Royce Energy Sys., Inc.*, 373 F.Supp.2d 750, 769 (S.D. Ohio 2005) (quoting *Hamrick v.*

*Wellman Prods. Grp.*, No. 03CA0146–M, 2004 WL 2243168, at *7 (Ohio Ct. App. Sept. 29,

2004)). Grand asserts an intrusion upon seclusion invasion of privacy claim. (Doc. 67 at 637.)

Under this type of claim, a person "who intentionally intrudes, physically or otherwise, upon the

solitude or seclusion of another or his private affairs or concerns, is subject to liability to the

other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." *Retuerto v. Berea Moving Storage & Logistics*, 38 N.E.3d 392, 406 (Ohio Ct. App. 2015) (quoting *Hamrick*, 2004 WL 2243168, at *8). The intrusion must be "done in a manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities." *Strutner v. Dispatch Printing Co.*, 442 N.E.2d 129, 132 (Ohio Ct. App. 1982).

Grand's claim is premised on various alleged activities surrounding his home, including surveillance by neighbors and police. (Doc. 67 at 596–97, 599, 605–11.) Grand's second amended complaint alleges Brennan ordered the surveillance or was at least aware of it. (*Id.*) Brennan argues any monitoring does not constitute invasion of privacy because it involved public observation not rising to the level of invasion of privacy. (Doc. 79 at 1031–32.) Grand's opposition does not address this argument, and instead, only asserts Brennan was at least aware that neighbors were surveilling his property. (Doc. 89 at 2536.)

Ohio courts consistently reject invasion of privacy claims where a party observes another's movements in a public place. *See Moran v. Lewis*, 114 N.E.3d 1254, 1259 (Ohio App. Ct. 2018) ("liability for intrusion into another's seclusion or private affairs does not exist where the defendant observes or records a person in a public place"). While surveillance of another's home may amount to a nuisance, observations of another's home from public places does not— in itself—amount to invasion of privacy. *See Blevins v. Sorrell*, 589 N.E.2d 438, 441 (Ohio Ct. App. 1990) (defendant's conduct, while found to be a nuisance, did not constitute invasion of privacy where surveillance cameras were set up by defendant neighbor to observe conduct that might amount to city ordinance violations); *Branan v. Mac Tools*, No. 03AP-1096, 2004 WL 2361568, at *10 (Ohio Ct. App. Oct. 21, 2004) ("Photographing of appellant's house or vehicles parked in front of the house would not constitute an invasion of privacy under these conditions.

Since appellant has not alleged any photography of the interior of his house, these actions alone would not sustain the tort of wrongful invasion of privacy."). Thus, to the extent this claim involves alleged surveillance of areas in which anyone passing by could see, the claim must be dismissed.

Moreover, Grand has not put forth any evidence in his opposition that creates a dispute of material fact as to whether *Brennan* intruded upon his private activities in a place that was not public. Brennan's mere awareness of such activities by Grand's neighbors is insufficient to establish Brennan's liability. This claim is dismissed with prejudice.

### G.    FACE Act (Count Sixteen, University Heights and Brennan)

Count Sixteen alleges a violation of the FACE Act against University Heights and Brennan. (Doc. 67 at 638.) University Heights and Brennan moved for summary judgment on this claim. (Doc. 79 at 1026.) Grand did not move for summary judgment on this claim but did oppose University Heights' and Brennan's motion. (Doc. 89 at 2534.)

The FACE Act, codified at 18 U.S.C. § 248, protects individuals from being intimidated or prohibited from entering a place of worship. Specifically, the Act imposes civil liability on those who "by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempt to injure intimidate or interfere with any person lawfully exercising or seeking to exercise the First Amendment right of religious freedom at a place of religious worship." 18 U.S.C. § 248(a)(2).

University Heights and Brennan first argue the FACE Act claim fails because Grand has not presented evidence either University Heights or Brennan used force, a threat of force, or physically obstructed Grand from seeking to exercise his First Amendment right at a place of worship. (Doc. 79 at 1026.) Grand argues the police presence around his home and Brennan's

statements about resident reporting is "sufficient to support the reasonable inference that Grand and his friends would be intimidated by the threat of arrest if they congregated at his home to pray."  (Doc. 89 at 2534.)

Grand presented no evidence University Heights or Brennan used force or a threat of force within the meaning of the FACE Act.  A "threat of force" under the FACE Act means "a statement which, in the entire context and under all the circumstances, a reasonable person would foresee would be interpreted by those to whom the statement is communicated as a serious expression of intent to inflict bodily harm upon that person."  *Planned Parenthood of Columbia/Willametter, Inc. v. Am. Coal. of Life Activists*, 290 F.3d 1058, 1077 (9th Cir. 2002); *United States v. Hart*, 212 F.3d 1067, 1071 (8th Cir. 2000) (same).  There is no indication that Grand, or his friends, would be subject to arrest for any violations of any order by University Heights or Brennan.  Grand makes no effort to explain why a police presence or resident reporting would result in an arrest.  In fact, in the cease-and-desist letter, University Heights communicated to Grand that violations of the City's ordinance "may result in building code citations against you and . . . the pursuit of additional remedies."  (Doc. 79-3 at 1205.)  Grand presents no evidence he or others were ever at risk of arrest.

University Heights and Brennan also argue the FACE Act claim fails because Grand's house is not a "place of worship" under the meaning of the Act.  (Doc. 90 at 2583.)  Grand, without citing any authority, argues the Act "does not distinguish between a formal place of worship like a synagogue, or a private prayer group held in a residential home."  (Doc. 89 at 2534.)  In a recent case, the Second Circuit concluded the FACE Act only applies to "a place recognized or dedicated as one primarily used for religious worship."  *Jingrong v. Chinese Anti-Cult World All. Inc.*, 16 F.4th 47, 58–59 (2d Cir. 2021).  In *Jingrong*, the Second Circuit found

the phrase "place of worship" in the FACE Act ambiguous.  *Id.* at 58.  For instance, a "place of worship" could mean a specific building used only for religious purposes, or it could feasibly mean places "such as a public-school classroom where a religious student group meets at lunchtime or a café where believers gather to study and discuss religious texts."  *Id.*  However, in analyzing the legislative history, the Second Circuit concluded "Congress did not intend all locations where incidental worship activities occur to qualify as 'places of religious worship.'"  *Id.* at 59.  The court explained:

> "Places of religious worship" may be fixed or moveable, enduring or temporary, bounded within a structure or structureless.  But the basic feature of "a place of religious worship," as recognized by Congress, is that religious adherents collectively recognize or religious leadership designates the place as one primarily for religious worship.

*Id.*  Under that reading of the statute, plaintiffs could not maintain a cause of action where the alleged "place of worship" were tables set up on a sidewalk.  *Id.* at 60.

The holding in *Jingrong* is persuasive here.  Grand unequivocally disavowed using his home as a "place of worship."  For his FACE Act claim to survive, Grand would have to present facts that his home was "primarily used for religious worship," which he cannot do.

For these reasons, the FACE Act claim is dismissed with prejudice.

### H.    Intentional Infliction of Emotional Distress (Count Seventeen, Brennan only)

Brennan moved for summary judgment on Grand's claim of intentional infliction of emotional distress (Count Seventeen).  (Doc. 79 at 1032.)  Grand did not oppose summary judgment on this claim.

Under Ohio law, to "establish a *prima facie* claim for intentional infliction of emotional distress . . . a plaintiff must prove (1) that the defendant intended to cause the plaintiff serious emotional distress, (2) that the defendant's conduct was extreme and outrageous, and (3) that the

defendant's conduct was the proximate cause of the plaintiff's serious emotional distress."  *Burgess v. Fischer*, 735 F.3d 462, 480 (6th Cir. 2013) (quoting *Phung v. Waste Mgmt., Inc.*, 644 N.E.2d 286, 289 (Ohio 1994)).  "Liability can only be found where conduct is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Id.* (citations omitted).

Brennan argues his conduct was not "extreme and outrageous," and Grand did not suffer "severe emotional distress."  (Doc. 79 at 1032–33.)  Having not opposed summary judgment, Grand failed to present evidence of "extreme and outrageous conduct" or that he suffered "severe emotional distress," and the record reflects none.  Thus, there is no evidence of "extreme" or "outrageous" conduct, or that Grand suffered severe emotional distress.  *See Colston v. Cleveland Pub. Libr.*, 522 F. App'x 332, 340 (6th Cir. 2013) (affirming summary judgment on Ohio intentional infliction of emotional distress claim where plaintiff failed to produce evidence of extreme and outrageous conduct or serious emotional distress).  Count Seventeen is dismissed with prejudice.

## I.     Civil Conspiracy (Count Eighteen, Individual Defendants)

Count Eighteen asserts a claim for civil conspiracy under § 1983 against the Individual Defendants.  (Doc. 67 at 638.)  All three moved for summary judgment.  (Doc. 79 at 1027.)  Grand did not move for summary judgment on this claim but did oppose summary judgment. (Doc. 89 at 2535.)

To succeed on a civil conspiracy claim, a plaintiff must show "'that (1) a single plan existed, (2) the conspirators shared a conspiratorial objective to deprive the plaintiffs of their constitutional rights, and (3) an overt act was committed' in furtherance of the conspiracy that

caused the injury." *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014) (quoting *Revis v. Meldrum*, 489 F.3d 273, 290 (6th Cir. 2007)).

The Individual Defendants argue, as members of the same organization, they cannot be liable for conspiracy under the intra-corporate doctrine.  (Doc. 79 at 1028.)  Grand argues the Individual Defendants engaged in a conspiracy to require Grand to apply for a SUP when they knew no permit was necessary to host small informal prayer groups in his home.  (Doc. 89 at 2535.)  He relies on emails between the Individual Defendants and a map which identified city residents who opposed Grand's use of his home as a shul.  (*Id.*)  Grand does not address the intra-corporate doctrine.  (*Id.*)

"The intra-corporate conspiracy doctrine provides that employees of a corporation or governmental entity cannot conspire among themselves because they are treated as one entity." *Nuovo v. The Ohio State Univ.*, 726 F.Supp.2d 829, 845 (S.D. Ohio 2010) (citing *Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.*, 926 F.2d 505, 509 (6th Cir. 1991)).  In *Hull*, the Sixth Circuit held:

> In the present case, plaintiff is alleging a conspiracy between a school district superintendent, the executive director of the district, and a school administrator, all of whom are employees or agents of the Board.  Since all of the defendants are members of the same collective entity, there are not two separate "people" to form a conspiracy.

*Hull*, 926 F.2d at 510.  The same is true here.  The Individual Defendants are all members of the University Heights government and were acting as such.  Grand does not dispute this fact and he offers no argument in response.  The Court finds the intra-corporate doctrine applies and dismisses this claim with prejudice.

**J.      Abuse of Process (Count Nineteen, Individual Defendants) and Malicious Prosecution (Count Twenty, Brennan and McConville only)**

The Individual Defendants moved for summary judgment on Grand's abuse of process claim.  (Doc. 79 at 1033.)  Brennan and McConville also moved for summary judgment on Grand's malicious prosecution claim.  (*Id.*)  Grand has not opposed summary judgment on either count.

In Ohio, abuse of process requires a plaintiff to show: "(1) that a legal proceeding has been set in motion in proper form and with probable cause; (2) that the proceeding has been perverted to attempt to accomplish an ulterior purpose for which it was not designed; and (3) that direct damage has resulted from the wrongful use of process."  *Voyticky v. Vill. of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005) (quoting *Yaklevich v. Kemp, Schaeffer, & Rowe Co.*, 626 N.E.2d 115, 116 (Ohio 1994)).

To state a claim for malicious prosecution, a plaintiff must show: "(1) malice in instituting or continuing the prosecution, (2) lack of probable cause, and (3) termination of the prosecution in favor of the accused."  *Id.* at 675–76 (quoting *Trussell v. Gen. Motors Corp.*, 559 N.E.2d 732, 736 (Ohio 1990)).

The Individual Defendants argue no criminal or other legal proceedings were initiated against Grand, and therefore, these claims fail as a matter of law.  (Doc. 79 at 1033–34.)  Grand does not argue there was any legal proceeding, and there is no record evidence of any legal proceeding initiated against Grand.  Because both torts under Ohio law require such a proceeding, his claims fail as a matter of law and are dismissed with prejudice.

III.     **Conclusion**

For the reasons stated above, Grand's partial motion for summary judgment is DENIED in its entirety.  Defendants' motion for summary judgment is GRANTED in part.  Counts One through Three and Five through Twelve are DISMISSED for lack of subject matter jurisdiction.  Defendants' summary judgment motion is GRANTED as to Counts Four, Thirteen, and Fifteen through Twenty, with those counts now summarily DISMISSED pursuant to Rule 56 of the Federal Rules of Civil Procedure.  The Court DECLINES supplemental jurisdiction on Count Fourteen.

**IT IS SO ORDERED.**

Date:  October 1, 2024

BRIDGET MEEHAN BRENNAN
UNITED STATES DISTRICT JUDGE